# 09 CV 4346

JAMES A. CLARKSON
ACTING REGIONAL DIRECTOR
Attorney for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Suite 400
New York, NY 10281-1022
(212) 336-1023 (Brown)

RECEIVED
MAY - 5 2009
U.S.D.C. S.D. N.Y.
CASHIERS

UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------x

SECURITIES AND EXCHANGE      :
COMMISSION,                   :

                          :
               Plaintiff,    :

                          :
      v.                   :    NO. _____ ( )

                          :
RESERVE MANAGEMENT COMPANY, INC.,  :    ECF CASE
RESRV PARTNERS, INC., BRUCE BENT SR. :
and BRUCE BENT II,             :    COMPLAINT

                          :
              Defendants,   :
    and                     :

                          :
THE RESERVE PRIMARY FUND,      :

                          :
             Relief Defendant. :

------------------------------------------------------------x

Plaintiff Securities and Exchange Commission (the "Commission") brings this action against Defendants Reserve Management Company, Inc. ("RMCI"), Resrv Partners, Inc. ("Resrv Partners"), Bruce Bent Sr., and Bruce Bent II (collectively, "Defendants") and Relief Defendant The Reserve Primary Fund ("Primary Fund" or the "Fund"). The Commission alleges the following:

## SUMMARY OF ALLEGATIONS

1.       Over a two day period in September 2008, after the news of Lehman Brothers' bankruptcy filing roiled the US financial markets, Defendants engaged in a systematic campaign to deceive the investing public into believing that the Primary Fund – their flagship money market fund – was safe and secure despite its substantial Lehman holdings. That campaign involved both the knowing dissemination of false information to the Primary Fund's Board of Trustees, investors, and rating agencies and, in the case of certain Defendants, the knowing concealment of the true effect of the Lehman holdings on the Fund.

2.       The Primary Fund is a money market fund that historically provided shareholders with a $1.00 per share NAV. Like most investors in money market funds, investors in the Primary Fund viewed it as a safe and stable option for preservation of capital. For many investors seeking preservation of capital and virtually immediate access to their funds, money market funds are an attractive regulated alternative to bank deposits.

3.       On September 15, 2008 – the day Lehman Brothers filed for bankruptcy protection – the Fund held $785 million in Lehman debt securities. RMCI, the Primary Fund's adviser, was immediately besieged by shareholders seeking to redeem their shares based on fears that a decline in the value in the Fund's Lehman holdings could compromise the Fund's $1.00 NAV.

4.       In order to persuade investors to refrain from redeeming shares, and to induce new purchases of shares, Defendants systematically violated the antifraud provisions of the federal securities laws by, *inter alia*, misrepresenting material facts

2

concerning the Primary Fund's status, most notably by falsely assuring shareholders, the Fund's Board of Trustees and the rating agencies that RMCI had agreed to provide the Fund with sufficient capital to maintain its NAV at $1.00. In the case of RMCI, Bent Sr. and Bent II, rather than comply with their fiduciary obligations as investment advisers, they placed their own financial and reputational interests ahead of the Fund and its shareholders.

5.    Defendants' campaign of misinformation came to an end at 4:00 p.m. EST on September 16, 2008, when RMCI disclosed that the Primary Fund had broken the buck, *i.e.*, its shares had declined in value below $0.995, the lowest point at which they could permissibly be rounded to $1.00.

6.    Defendants' misconduct on September 15 and 16 arose from a simple reality: unless RMCI could persuade shareholders that the $1.00 NAV of the Fund was absolutely safe despite the Fund's Lehman exposure, shareholders would continue to redeem shares in massive and unsustainable amounts. Defendants also knew that Moody's and Standard & Poor's – both of which had assigned the Primary Fund their highest ratings – would likely initiate crippling ratings downgrades absent evidence of a plan to protect the $1.00 NAV, a scenario which would accelerate the pace of redemptions and increase the likelihood that the Fund would break the buck.

7.    In order to falsely assure shareholders, the Board, and the rating agencies that the Fund's $1.00 NAV would remain intact, and that the Fund remained a safe and liquid investment, Defendants published, or authorized the dissemination of, numerous materially false statements, including that:

> a.    RMCI "intended to protect" the $1.00 NAV of the Primary Fund to "whatever degree is required;"

3

b. RMCI and the Bents had sufficient capital available to maintain the Fund's NAV at $1.00 in the event it fell below that level;

c. RMCI was in the process of executing a credit support agreement whereby it would provide capital to the Primary Fund to allow it to maintain a per share NAV of $1.00;

d. RMCI had submitted a request for "no-action" relief to the Commission to implement a credit support agreement to protect the $1.00 NAV of the Fund, and expected such relief to be granted within hours; and

e. The Primary Fund was liquid and was timely honoring shareholder redemptions.

8. All of these statements of material fact were false. RMCI and the Bents did not intend to provide the levels of credit support necessary to maintain the NAV of the Primary Fund at $1.00 per share and, in fact, knew on September 15 that they would not do so even as they told shareholders, the Board and the rating agencies otherwise. Moreover, contrary to Defendant Resrv Partners' September 15, 2008 press release claiming that RMCI *already* had credit support agreements in place that would "ensure the integrity of a $1.00 NAV" for the Primary Fund and was submitting "appropriate documentation to the SEC," RMCI never implemented *any* such agreements or submitted *any* documents to the Commission.

9. On September 15, RMCI and the Bents also knew that the skyrocketing levels of redemptions by Fund shareholders had outstripped the Fund's ability to generate liquidity to pay those requests, a disastrous state of affairs for a money market fund. By approximately 10:10 a.m. on September 15, the Fund's custodian bank, State Street Bank, had suspended the Fund's overdraft privileges because of massive redemption outflows. Therefore, by approximately 10:10 a.m. on September 15, although the Fund was no longer in a position to pay investors, redeeming shareholders had no knowledge

4

of this critically important fact and continued to believe that they would timely be paid at the NAV of $1.00 per share.

10.     Public knowledge of the fact that the Primary Fund was illiquid would have irreparably damaged the Fund's and RMCI's reputation, prompted a downgrade in the Fund's ratings, and frustrated Defendants' ongoing efforts to falsely persuade investors that the $1.00 NAV was safe. As a result, RMCI and the Bents omitted or misrepresented material facts concerning redemption activity and the Fund's liquidity to the Fund's Board, shareholders, and Moody's.

11.     The misinformation imparted by RMCI and the Bents on September 15, 2008 was intended to, and did in fact, prevent the Primary Fund's Board of Trustees from acting in an informed manner in setting the Fund's NAV. As a result, the process the Board used to strike the NAV of the Fund up until 4:00 p.m. on September 16, when RMCI disclosed the Fund had broken the buck, was hopelessly flawed, to the advantage of some investors who were the beneficiaries of redemption confirmations at an artificially derived $1.00 NAV and the disadvantage of others who were not.

12.     Since September 15, 2008, approximately twenty nine lawsuits have been filed by investors in the Primary Fund against Defendants and the Fund, among others. The vast majority of these actions have been consolidated for pre-trial purposes under a Transfer Order issued by the United States Judicial Panel on Multidistrict Litigation in In re: The Reserve Fund Securities and Derivative Litigation, MDL No. 2011 (Feb. 10, 2009). The resolution of those suits may lead to conflicting judicial determinations and inconsistent treatment of shareholders, as well as an inexorable and piecemeal drain on the Fund's assets.

13.    In response to this flood of litigation, the Primary Fund has adopted a plan of distribution that withholds at least $3.5 billion from shareholders indefinitely until all pending and future lawsuits are resolved, at which point the remaining assets will presumably be distributed in accordance with whatever judgments are entered in the various lawsuits. To address this scenario, which will result in potential prejudice and unacceptable delay to shareholders, the Commission seeks to compel the distribution of all remaining Fund assets on a *pro rata* basis.

## SECURITIES LAW VIOLATIONS

14.    At all times relevant hereto, Bent Sr. and Bent II were controlling persons of RMCI for the purposes of Section 20(a) of the Exchange Act [15 U.S.C. §78t(a)]. By virtue of the foregoing conduct, RMCI, Bent II and Resrv Partners, directly or indirectly, singly or in concert, violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R § 240.10b-5]; and Bent Sr. and Bent II are also liable in the alternative, pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], for aiding and abetting the violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5] committed by the other Defendants. By virtue of the conduct described above, RMCI, Bent II and Resrv Partners, directly or indirectly, singly or in concert, also violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)]. In addition, Defendants RMCI, Bent II and Bent Sr. are also liable, by virtue of the conduct described herein, for direct violations of Sections 206(1), 206(2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)], and 206(4) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-6(4)], and Rule 206-4(8) [17 C.F.R. § 275.206(4)-8]

6

thereunder, and Bent Sr. and Bent II are also liable, in the alternative, for aiding and abetting violations by RMCI of 206(1), 206(2) [15 U.S.C. §§ 80b-6(1) and 80b-6(2)], 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)],·and Rule 206-4(8) [17 C.F.R. § 275.206(4)-8] thereunder.

15. Unless each of the Defendants is permanently restrained and enjoined, they will again engage in the acts, practices, transactions and courses of business set forth in this Complaint and in acts, practices, transactions and courses of business of similar type and object.

## JURISDICTION AND VENUE

16. The Commission brings this action pursuant to Section 20 of the Securities Act, 15 U.S.C. § 77t(b), Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), Section 209 of the Advisers Act, 15 U.S.C. § 80b-9(d), and Section 25(c) of the Investment Company Act of 1940 (the "Investment Company Act"), 15 U.S.C. § 80a-25. This Court has jurisdiction over this action pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), Sections 21(d), 21(e) and 27 of the Exchange Act, 15 U.S.C. §§ 78u(d), 77u(e) and 78aa, Section 214 of the Advisers Act, 15 U.S.C. § 80b-14, and Section 25(c) of the Investment Company Act, 15 U.S.C. § 80a-25.

17. Venue lies in this District pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and Section 214 of the Advisers Act, 15 U.S.C. § 80b-14. Certain of the transactions, acts, practices and courses of business constituting the violations alleged herein occurred within the Southern District of New York.

18. Defendants, directly or indirectly, singly or in concert, have made use of

the means or instrumentalities of transportation or communication in, or the
instrumentalities of, interstate commerce, or of the mails, in connection with the
transactions, acts, practices, and courses of business alleged in this complaint.

## DEFENDANTS AND RELIEF DEFENDANT

19.     **Defendant RMCI**, which carries out its business under the name "The
Reserve," is a privately held corporation owned and controlled by Bruce Bent Sr. and his
family, including Defendant Bruce Bent II, with its headquarters and principal place of
business in New York, New York. RMCI has been registered with the Commission as an
investment adviser since 1984. In 2008, RMCI provided investment advisory services to
five registered, open-end, investment companies set up as trusts, offering a total of 22
open-end investment portfolios (collectively, the "Reserve Funds"). RMCI had
approximately $120 billion in assets under management as of September 12, 2008.

20.     **Defendant Resrv Partners** is a broker-dealer registered with the
Commission and a member of FINRA. Resrv Partners is the distributor for the funds
managed by RMCI. The Bents collectively own and control Resrv Partners. Resrv
Partners has its headquarters and principal place of business in New York, New York.

21.     **Defendant Bruce Bent Sr.**, age 71, is Chairman of RMCI, and Chairman,
President, Treasurer and Trustee of the Primary Fund. Bent Sr. has been employed by
The Reserve family of companies since 1971. Bent Sr. resides in Manhasset, New York.

22.     **Defendant Bruce Bent II**, age 42, is Vice Chairman and President of
RMCI. Bent II is Co-Chief Executive Officer, Senior Vice President and Assistant
Treasurer of the Primary Fund. Bent II has been employed by RMCI since 1991. Bent II
resides in Manhasset, New York.

8

23.     **Relief Defendant The Reserve Primary Fund** is a series of the Reserve

Fund, a Massachusetts business trust registered with the Commission under the

Investment Company Act as an open-end investment company.

**OTHER RELEVANT ENTITIES**

24.     **The Reserve Yield Plus Fund**, a diversified mutual fund, was managed

and marketed by RMCI and Resrv Partners as a fund that sought to provide investors

with a stable $1.00 NAV. The Yield Plus Fund held $30 million in Lehman debt in its

portfolio on September 15, 2008. The Yield Plus Fund is governed by the same Board of

Trustees as the Primary Fund.

25.     **The Reserve International Liquidity Fund Ltd.**, which also sought to

maintain a stable NAV of $1.00 per share, is an off-shore fund registered in the British

Virgin Islands. The International Liquidity Fund held $125 million in Lehman debt on

September 15, 2008.

**DEFENDANTS' FRAUDULENT CONDUCT**

**Overview Of Relevant Reserve Entities**

26.     Defendant Bruce Bent Sr. is the public face of the Reserve, and a longtime

advocate of the safety and stability of money market funds. Bent Sr. and his family own

and control Defendants RMCI and Resrv Partners. According to RMCI, as of September

2008:

> The Reserve is the world's most experienced money fund manager and the
> largest asset management company dedicated solely to cash and liquidity
> management. With over $125 billion in assets, representing the trust of
> hundreds of institutions and millions of individuals, The Reserve is
> recognized as the fastest growing money fund complex in 2005, 2006 and
> 2007 according to *iMoneyNet.*

27.     Defendant Bruce Bent II is Bent Sr.'s son and, in his capacity as co-Vice

9

Chairman of RMCI, had substantial responsibility for overseeing RMCI's business operations, including on September 15 and 16, 2008.

28. Bent Sr. and Bent II exercised control and decision-making authority over all aspects of RMCI's investment advisory business, including with respect to the management of the Primary Fund. In the case of Bent Sr., he reviewed and approved the list of issuers from which the Primary Fund could purchase securities, and chaired RMCI's Credit Committee. Both Bent Sr. and Bent II, as a matter of RMCI policy, were required to approve all public communications, including shareholder communications, prior to dissemination.

29. In the case of Bent II, he supervised the Marketing and Sales divisions of RMCI, and supervised RMCI's chief investment officer. Moreover, as alleged herein, Bent Sr. and Bent II, acting in their capacities as investment advisers, played a central role on September 15 and 16 with respect to RMCI's dealings with the Board, shareholders and the rating agencies concerning the Fund's Lehman holdings. As set forth below, upon learning of Lehman's bankruptcy filing, the Board relied upon Bent Sr. and Bent II to provide them with timely and accurate information concerning the valuation of the Fund's Lehman debt.

30. At the time of the transactions and events alleged in this Complaint, and as a result of the control and influence alleged further herein, Bent Sr. and Bent II each were investment advisers for purposes of the violations of the Investment Advisers Act alleged herein, and controlling persons of RMCI for the purposes of Section 20(a) of the Exchange Act, 15 U.S.C. §78t(a).

## The Primary Fund's Redemption Procedures

31.     RMCI's flagship fund, the once approximately $62 billion Primary Fund, functioned as a money market fund under Rule 2a-7 of the Investment Company Act. Money market funds are subject to stringent regulations designed to ensure their safety and liquidity.  To qualify as a money market fund under Rule 2a-7, the Primary Fund was required to maintain a conservative investment portfolio that was: (i) sufficiently safe – as measured by, among other criteria, the ratings of the underlying securities held by the Fund, and (ii) sufficiently liquid – as measured by, among other things, the weighted maturity dates of all assets held by the Fund.

32.     Rule 22c-1(b)(1) under the Investment Company Act requires money market funds to compute their net asset values "no less frequently than once daily, Monday through Friday, at the specific time or times during the day that the board of directors of the investment company sets."  Unlike most other money market funds, which compute a per share NAV on a once daily basis, the Primary Fund, pursuant to its prospectus, computed its NAV on an approximately hourly basis.  In the ordinary course, shareholders would, after submitting their redemption requests to RMCI, receive payment at some point in the next hour in the form of a wire transfer initiated by State Street Bank, the custodian bank for the Reserve Fund at that hour's NAV.

33.     Until September 15, 2008, the Primary Fund's hourly NAV calculation was mechanical in nature, as the Fund's holdings were all carried at amortized cost (as permitted under Rule 2a-7), meaning the Fund's hourly per share NAV remained constant at $1.00.  If, however, the Board determined that a given security should no longer be valued at amortized cost, and should be assigned a "fair value" – as it did with

11

the Lehman holdings following Lehman's bankruptcy – the Board would rely upon RMCI to provide it with timely and accurate information to ensure that the assigned fair value remained accurate in light of available market data.

## The Primary Fund's Increasingly Risky Investment Profile

34.    From its inception in 1971, the Primary Fund historically invested in very conservative assets such as government securities and bank certificates of deposit. The Fund also carried the highest possible ratings from Moody's and Standard & Poor's denoting safety and liquidity, a fact which RMCI highlighted in its promotional materials.

35.    In 2007 and 2008, however, the Fund began to purchase riskier commercial paper issued by financial institutions, including Lehman, Merrill Lynch, and Washington Mutual. The higher yields paid by these securities generated attractive returns for Fund shareholders, and helped the Fund attract billions of new dollars in investments, which in turn bolstered the management and advisory fees earned by RMCI.

36.    The Primary Fund's shifting investment strategy, and substantial increase in assets under management, had significant implications given RMCI's status as a private family-owned company. Unlike many other large mutual fund complexes, RMCI, and the funds it advises, are not owned, or otherwise affiliated with, a large public company or commercial bank with the resources to provide financial support in the event a portfolio security were to become impaired. To the contrary, in the event a Primary Fund holding declined in value to the point where it threatened the Fund's $1.00 NAV, the Fund's ability to maintain a stable $1.00 NAV depended exclusively on the Bent family's ability and willingness to provide or secure capital – either personal resources, those of RMCI, or from some third party – to support the NAV.

12

37.     While an investment adviser such as RMCI is under no legal obligation to provide financial support to maintain the $1.00 NAV of a distressed money market fund, breaking the buck is a catastrophic development for a money market fund and its shareholders. Although agreements to protect a fund's $1.00 NAV can be implemented in a variety of ways, they generally require a fund adviser or other third party to commit financial resources to protect a fund's $1.00 per share NAV, *e.g.*, by providing the fund with capital to maintain the $1.00 NAV, by providing capital to offset the decline in value in the impaired security, or by purchasing the impaired security out of the portfolio.

38.     The Bents were fully aware prior to September 15, 2008 of the devastating reputational and business damage that would arise if a fund managed by RMCI broke the buck. To avoid this very result, in 2007, RMCI and the Bents had agreed to provide millions of dollars in credit support to maintain the $1.00 per share NAV of The Reserve Enhanced Cash Strategies Portfolio, LLC, a smaller non-money market fund that sought to maintain a $1.00 NAV.

**RMCI Ignores Issues Raised By Moody's**

39.     Beginning in the summer of 2007, as economic conditions worsened, some money market funds began to experience declines in the value of securities held in their portfolios. Many of the funds implemented credit support agreements that allowed the funds to maintain a $1.00 per share NAV to avoid breaking the buck.

40.     In July 2008, as part of its ratings review process, Moody's sought information from rated money market funds, including the Primary Fund, about whether they had engaged in contingency planning for responding to adverse credit events. As part of this inquiry, Moody's asked fund advisers, including RMCI, whether they had in

13

place, or were prepared to enter into, a credit support agreement to protect the $1.00 NAV of their money market funds in the event of a credit event.

41.     In a meeting with the Bents on July 18, 2008 at RMCI's offices specifically called to discuss, in part, RMCI's contingency planning, Moody's asked the Bents whether they had considered the impact on the Primary Fund of an unforeseen credit event and whether RMCI and/or the Bents were willing and financially capable of supporting the $1.00 NAV of the Fund in such a situation. The Bents provided Moody's with general assurances that they were committed to the Fund and that they could, if necessary, execute a personal note to support the Fund.

42.     RMCI did not develop or even discuss internally the type of contingency plan discussed with Moody's or investigate the credit support agreements that had been utilized by other money market funds even though the agreements were often publicly available.

**RMCI Ignores Lehman's Potential Impact On The Reserve Funds**

43.     Throughout the summer and first half of September 2008, RMCI maintained that Lehman's financial condition – which the financial press and rating agencies had described as increasingly troubled – did not pose a risk to the three Reserve funds with Lehman exposure. For example, in a meeting of the Primary Fund's Board of Trustees on September 10, 2008, RMCI's chief investment officer ("CIO") and Bent Sr. assured the Board that the Reserve Fund's Lehman exposure did not a constitute a threat to any of the funds.

44.     Likewise, on September 12, 2008, a Moody's employee sent an email to the CIO seeking "Reserve's view of the [Lehman] credit? I know you have some

14

exposure into 2009." In the subsequent exchange of emails, the CIO indicated that RMCI was "ok holding what we own," and that he believed Lehman would, if necessary, be assisted by the federal government. In the same email exchange, Moody's told the CIO that it wanted to discuss the increasingly risky nature of the Fund's portfolio, which was "pushing up against the boundaries for Aaa rating."

45.    Even as RMCI downplayed concerns about Lehman, Primary Fund shareholders were communicating a different message. By August 2008, certain shareholders were beginning to question RMCI sales personnel about whether it was appropriate for the conservative Primary Fund to continue to hold substantial positions in Lehman debt. Over time, these concerns became more pointed, and during the week of September 8, 2008, RMCI's sales personnel reported to senior RMCI management – including Bent II – that investors were increasingly likely to redeem their shares as a result of the Primary Fund's exposure to Lehman.

46.    It was not until the evening of September 14, 2008 (when Lehman's bankruptcy filing appeared inevitable and just hours before the actual filing) that RMCI began to belatedly consider the impact of a Lehman bankruptcy on its flagship fund.

47.    Anticipating that shareholders would seek assurances that RMCI would, if necessary, provide financial support to maintain the Fund's $1.00 per share NAV, at 5:35 p.m. on Sunday, September 14, RMCI's Director of Marketing told Bent II via email that earlier in 2008, "other fund companies which had significant [structured investment vehicle] exposure calmed investors by stating they had line of credits [sic] available – not sure how or even if this would apply to any [L]ehman exposure ... ." Bent II responded by stating that "this is not an option for us," indicating that as of September 14, RMCI

15

and the Bents were not able or inclined to provide credit support to protect the $1.00 NAV of the Primary Fund.

48.     At 10:24 p.m. on September 14, Bent II instructed several senior RMCI employees via email to begin working on a public relations "piece that assumes Lehman liquidates." Bent II's message was clear:  RMCI needed to address shareholders' fears about the Primary Fund's ability to withstand a Lehman bankruptcy "so we don't have a run on the fund tomorrow which co[u]ld be a major problem in itself." Bent II further noted that, as of the night of Sunday, September 14, over "700 million to 1.5 billion [dollars] may be redeeming [Monday]."

49.     Although RMCI's chief operating officer (and co-Vice Chairman) was copied on these and other emails involving the emerging Lehman threat to the Primary Fund, he chose not to appear in the office on September 15.  At the same time Lehman filed for bankruptcy, Bent Sr. was en route to a destination out of the country and was thereafter reachable only by telephone over the critical days of September 15 and 16.

50.     During the late evening of September 14, Bent II arranged for a meeting of the Primary Fund's Board of Trustees to be held at 8:00 a.m. the next morning.

51.     Shortly after midnight, in the early morning of September 15, 2008, Lehman Brothers Holdings, Inc. announced that it was filing for bankruptcy protection pursuant to Chapter 11 of the United States Bankruptcy Code.

52.     During the early morning on September 15, Bent Sr. and Bent II discussed whether they could arrange for the Commission and Federal Reserve to participate in the Board meeting scheduled for later that morning because of their concerns that the Fund would be profoundly impacted by the Lehman bankruptcy.

53.     At approximately 7:50 a.m. on September 15, 2008, the Bents contacted the Banking Division of the Federal Reserve Bank of New York to express their concerns that Lehman's bankruptcy would have a negative systemic impact on the money market fund industry, and in particular the Primary Fund given its size and reputation. When the Board met just ten minutes later on September 15, the Bents did not reveal their decision to seek the intervention of the Federal Reserve or the concerns that had prompted such an extraordinary step so early in the day on September 15.

## The Board Meetings on September 15, 2008

54.     The Board met three times on September 15 – first at 8:00 a.m., then at 9:30 a.m., and finally at approximately 1:00 p.m. Participants, many of whom joined the meeting by telephone, included Bent Sr., who was out of the country, Bent II, certain Independent Trustees and their outside regulatory counsel, inside and outside counsel to RMCI and, at various times, certain managing directors of RMCI and a representative from KPMG LLP, the Primary Fund's outside auditor.

55.     As of the morning of September 15, 2008, the Primary Fund held various Lehman Brothers debt securities that it valued – under an amortized cost method, as permitted by Rule 2a-7 – at $785 million, the assets' par value. The Primary Fund held approximately $62.4 billion in total assets, such that the Lehman debt, valued at par, constituted approximately 1.2% of the Fund's assets. The likelihood that the Fund's Lehman debt would threaten the Fund's $1.00 NAV therefore depended on (i) whether and how far below par value the Fund, through its Board of Trustees, valued the Lehman holdings at any particular time, and (ii) the total assets of Fund at that time.

56.     At the 8:00 a.m. Board meeting, the Board determined that it would no

17

longer value the Lehman debt at amortized cost but that it required additional information to determine a fair value for the debt. The meeting adjourned at 8:40 a.m. to provide RMCI with an opportunity to gather market information about the pricing of Lehman debt.

57.     When the Board reconvened at 9:30 a.m. to determine a fair value for the Lehman debt, Bent Sr., Bent II and RMCI's CIO reported to the Board that there was "no valid market" for Lehman paper, with bids "being thrown out there anywhere from 45 to 80 [cents on the dollar]." In reality, however, market data available to RMCI on the morning of September 15, which was shared with the Bents but not the Board, actually suggested that Lehman debt would not trade any higher than between $0.30 and $0.40 cents on September 15.

58.     At the 9:30 a.m. meeting, the Bents, not the CIO, made the decision about what recommendation to make to the Board about the valuation of the Lehman debt. Bent Sr. recommended that the Board value the Lehman holdings at par, despite the fact that Lehman was a bankrupt entity whose estate would not likely make any payments on its debt until after months, if not years, of court proceedings. After Bent Sr. conceded that he would not authorize RMCI to purchase the Lehman debt at par value, the Trustees resolved that 80% of par was an appropriate valuation as of approximately 10:00 a.m. on September 15.

59.     Before the meeting adjourned, the Board issued the explicit instruction to RMCI management to reconvene the Board if anything occurred "to call into question the $0.80" valuation, an instruction that was particularly critical given that the decision to value the Lehman debt at $0.80 had *already* reduced the Fund's per share NAV to

18

approximately 0.9975 –halfway to breaking the buck – without even factoring in net redemptions, which were at that time already approximately $10 billion.

60.     Despite the clear cause for heightened vigilance by the Board as of mid morning on September 15, RMCI did not disclose to the Board the actual level of redemptions during the 9:30 meeting, or the troubling fact that the rate at which they were being received was unprecedented in the history of the Fund.

61.     At approximately 10:10 a.m., shortly after the Board valued the Lehman debt at $0.80 of par, State Street, the Reserve Funds' custodian bank, stopped funding redemption requests placed by shareholders. As was customary, up until that point, State Street had wired funds to redeeming shareholders by applying the redemption amounts against an overdraft line of credit provided to RMCI. On September 15, however, the extremely rapid rate of redemptions – over $10 billion by mid-morning – caused State Street to suspend RMCI's overdraft privileges. At the same time, by virtue of extreme illiquidity in the market, RMCI was unable to generate sufficient liquidity through sales of portfolio holdings to make up the redemption shortfall.

62.     As a result, while shareholders could and did continue to place redemption requests with RMCI – which they believed would entitle them to redemption at $1.00 per share based on a purportedly accurate hourly NAV strike – the Primary Fund lacked liquidity from State Street or any other source to fund those redemptions. This highly material development should have been reported to the Board as soon as it came to the attention of senior RMCI management. At no point on September 15, however, did RMCI and Bent II disclose this material fact to the Board; instead, they actively fostered the impression that the situation was under control.

**Defendants' False Representations Of Credit Support for the Fund's $1.00 NAV**

63. Beginning in the early morning on September 15, Moody's and Standard & Poor's began to urgently seek information from the Bents about RMCI's plans for responding to Lehman's bankruptcy, including whether RMCI would, if necessary, take steps to protect the $1.00 per share NAV of the Primary Fund. This information was critical to the rating agencies' assessments of whether to take adverse ratings action against the Fund.

64. As early as 8:23 a.m. on September 15, Moody's began attempting to reach Bent Sr. to discuss RMCI's plans for responding to the Lehman crisis, including its willingness to support the Primary Fund's $1.00 NAV. At approximately 9:15 a.m., the Bents spoke at length with Moody's to address Moody's desire to learn whether RMCI intended to protect the $1.00 NAV of the Fund.

65. Moody's relayed its concerns and questions about RMCI's intentions to support the Primary Fund during another telephone call with RMCI's CIO at approximately 10:30 a.m.

66. RMCI was also in frequent contact with Standard & Poor's on September 15. At 12:57 p.m., RMCI's CIO emailed Bent II to report on the CIO's just concluded conversation with contacts at Standard & Poor's. "Similar to . . . Moody's," the CIO wrote, "they are looking for some type of capital support facility to be put in place."

67. At the same time the rating agencies began to press the Bents for evidence of their commitment to support the Primary Fund's $1.00 NAV, RMCI and Bent II became aware that Evergreen, another money market fund with sizeable holdings of Lehman debt, had, at the very outset of the day on September 15, publicly disclosed that

20

it would protect its $1.00 NAV against any declines in the value of the Lehman debt. At 8:34 a.m., Bent II forwarded to RMCI's Director of Marketing a link to Evergreen's press release about its credit support agreement.

68.     At 8:38 a.m., the Director of Marketing responded, pointing out to Bent II that "the part it offers which we don't is the line of credit item from Wachovia. For us we need to deliver a message of confidence of nav stability without any specific steps as outlined below." The email also noted that the Director of Marketing was sharing the Evergreen press release with RMCI's Sales Director, as it was likely that, in light of Evergreen's disclosure, Primary Fund shareholders would seek information about whether RMCI also intended to provide support for the Fund's $1.00 NAV.

69.     Beginning in the morning on September 15, and throughout the day, multiple shareholders did in fact actively seek information from RMCI about whether it would, if necessary, support the $1.00 per share NAV of the Primary Fund.

70. .    The persistent questions posed by the rating agencies and shareholders about RMCI's willingness to protect the Fund's $1.00 NAV, and the actions taken by Evergreen, exerted immense pressure on RMCI and the Bents to publicly reassure shareholders that RMCI would in fact protect the $1.00 NAV of the Primary Fund.

71.     Around noon on September 15, Bent II requested another meeting of the Board. When the Board convened at 1:00 p.m., Bent II informed the Trustees that RMCI intended to implement a credit support agreement to protect the $1.00 NAV of the Primary Fund. He further stated that RMCI would seek immediate relief from the Commission to implement the credit support agreement, a threshold step that was required under the Investment Company Act.

21

72.     Given the $785 million in Lehman debt held by the Fund, the level of financial support potentially required to maintain a $1.00 NAV was substantial, particularly if redemptions continued to rise or the Board voted to further reduce the value of the Lehman holdings. Upon hearing Bent II state RMCI's intention to provide credit support to the Fund, outside counsel for the Independent Trustees asked whether RMCI had adequate financial resources. According to the minutes of the meeting, Bent Sr. reassured the Independent Trustees that RMCI had sufficient capital, leading the Trustees to ratify the plan to implement a credit support agreement for the Fund.

73.     As alleged more fully below, even as Bent II was informing the Board that RMCI intended to provide unqualified support to the Primary Fund, and Bent Sr. was representing that RMCI had sufficient financial resources for such an undertaking, RMCI and the Bents had not yet arrived at any decision concerning whether and to what extent RMCI would support the Primary Fund, and in fact never intended to support the Fund in a manner that would have had a remotely meaningful impact on the Fund's NAV.

74.     To the contrary, their decision to announce unqualified financial support for the Primary Fund was driven by a desire to falsely reassure shareholders that the Fund remained safe, thus slowing the rate of redemptions, and a desire to placate Moody's and Standard & Poor's, thus avoiding a calamitous ratings downgrade.

75.     In addition to falsely informing the Board that RMCI would maintain the Primary Fund's NAV at $1.00 at the 1:00 p.m. Board meeting, RMCI and/or the Bents provided the Board with materially false information, or failed to provide them with material information, concerning other topics. Those material misstatements and omissions included:

22

a. RMCI failed to disclose the vitally important fact that shareholder redemptions were no longer being paid as a result of State Street's suspension of overdraft privileges such that the Fund was effectively illiquid, an omission that Bent II compounded by failing to subsequently inform the Board of this development at any point after the 1:00 p.m. Board meeting when he became personally involved in efforts to find additional sources of liquidity;

b. RMCI vastly understated the actual level of redemptions as of 1:00 p.m. and the rising threat to the Primary Fund's $1.00 per share NAV as the percentage of Lehman debt began to make up a greater percentage of the Fund's shrinking asset pool;

c. RMCI and Bent II failed to disclose the fact that the Yield Plus and International Liquidity Funds – both of which also held Lehman debt – had *already* broken the buck during the morning of September 15; and

d. RMCI and Bent II failed to disclose that Bent II had already directed RMCI personnel to record receivables on the books of the Yield Plus and International Liquidity Funds to maintain their respective NAVs at $1.00, which would avoid disclosure of the fact that their NAVs had declined below $1.00.

76.     The Independent Trustees' ability to discharge their duties to the Fund on September 15 was fatally compromised by these misstatements and omissions. Because the Trustees were not provided with timely and accurate information concerning redemptions and the Fund's lack of liquidity, and were affirmatively misled into believing RMCI would, if necessary, support the Fund's NAV, they had no reason to believe that their decision to value the Lehman debt at $0.80 should be re-evaluated, and did not do so until well after the fact on September 16. Accordingly, the NAVs struck for most of the day on September 15 were not the product of a good-faith informed assessment of the facts.

## Bent II Authorizes False Statements Concerning Nonexistent Credit Support

77.     Shortly after informing the Board at 1:00 p.m. that RMCI would support the $1.00 per share NAV of the Primary Fund, Bent II and RMCI began a concurrent

effort to mislead shareholders. At 1:19 p.m., Bent II sent an email (the "1:19 Email") to RMCI's Directors of Sales and Marketing, copying the General Counsel, Bent Sr. and chief operating officer, that reads as follows:

> We (Reserve Management Company Inc.) intend to protect the NAV on the Primary fund to whatever degree is required. We have spoken with the SEC and are waiting [for] their final approval which we expect to have in a few hours. You may communicate this to clients on an as needed basis.
> . . .
> [  ] if you want something on the website I need to see language for approval first, thanks.

78.     The 1:19 Email was materially misleading in multiple respects. RMCI and the Bents did not intend to protect the NAV of the Primary Fund to "whatever degree was required," a commitment that would have obligated RMCI and the Bents to provide hundreds of millions of dollars in credit support if the Lehman debt was valued at zero.

79.     To the contrary, at the time Bent II sent the 1:19 Email promising unqualified support for the Primary Fund, RMCI and the Bents had not yet arrived at any decision concerning whether and to what extent RMCI and the Bents would support the Fund, and in fact never intended to provide unqualified support to the Fund. Bent II's statement of unconditional support was false and misleading.

80.     The 1:19 Email was also materially false and misleading because RMCI could not reasonably state that it was awaiting "final approval" from the SEC, because RMCI had not even submitted a written request for no-action relief to the Commission staff for its consideration by 1:19 p.m. on September 15, and in fact never did so.

81.     Less than ten minutes after sending the 1:19 Email, Bent II placed separate telephone calls to Moody's and Standard & Poor's to further disseminate the false

message that RMCI was implementing credit support agreements to protect the $1.00 NAV of the Primary Fund. In the case of Moody's, Bent II represented that RMCI was entering into credit support agreements to protect the $1.00 NAV of the Primary Fund, the Yield Plus Fund, and the International Liquidity Fund, all of which held Lehman debt. When pressed by Moody's for additional details of the structure of the credit support agreements, Bent II declined, and promised Moody's that additional detail would be provided later in the day.

82.    Bent II purposefully sent the 1:19 Email to, among others, RMCI's Directors of Marketing and Sales to authorize them to falsely reassure the public that RMCI would provide unqualified financial support to the Primary Fund. Bent II's goal was to convince investors to stop redeeming shares in the Primary Fund by inducing them to rely on the false representation that RMCI would maintain the $1.00 NAV.

83.    Consistent with Bent II's authorization in his 1:19 Email that RMCI could communicate its unqualified support for the Primary Fund to "clients," RMCI's Director of Sales immediately read the Email to the sales force and instructed them to tell shareholders that RMCI would unequivocally protect the $1.00 NAV of the Primary Fund.

84.    As Bent II intended, the sales team – including sales personnel associated with Defendant Resrv Partners – thereafter communicated, both in writing and telephonically, with multiple Primary Fund shareholders to falsely assure them that RMCI and the Bents were protecting the $1.00 per share NAV of the Primary Fund. In some of these communications, members of the sales team informed investors that the Bents "definitively" "would step in and support our money-market funds," and take

25

"whatever steps that are needed to support the NAV of the funds." As one salesperson explained, in representatively unequivocal language, "we have a backstop and are going to ensure that the fund does not break a buck."

85.     In other cases, sales personnel even contacted prospective investors to falsely assure them that RMCI was committed to protecting the $1.00 NAV to encourage them to purchase new shares in the Fund, which the Primary Fund continued to accept and process on September 15 and 16.

86.     By 2:00 p.m. on September 15, RMCI's Director of Sales reported internally to, among others, RMCI's CIO and the chief financial officer, that the message of unqualified credit support for the NAV of the Primary Fund was having the desired impact on unredeemed investors and was slowing the rate of redemptions. On September 16, RMCI sales personnel, in the context of describing an investor that had decided to refrain from redeeming shares in the Fund on September 15 based on false assurances from RMCI that it would protect the $1.00 NAV, noted that the investor had "stayed in the Primary Fund" when RMCI "shared with them the Reserve *Insights* about [RMCI] supporting the NAV of $1.00."

87.     The Director of Sales emphasized to Bent II at approximately 7:30 p.m. on September 15 via email that the false message of credit support had been instrumental in slowing the rate of redemptions: "the client base reacted positively to this news and the redemption activity slowed greatly."

**RMCI And Resrv Partners Disseminate A Materially False Shareholder Communication**

88.     Upon receipt of Bent II's 1:19 Email, RMCI marketing personnel began to finalize a press release describing RMCI's purported intent to protect the $1.00 per share

26

NAV of the Primary Fund.

89.     During the afternoon of September 15, Bent II and Bent Sr. reviewed and commented on the draft press release, which falsely stated that RMCI "intends to enter into support agreements with the Primary Fund to support the value of Lehman credit held in the Fund." The draft also falsely stated that RMCI "believe[d] that the [Lehman] holdings will mature at par value" even though the Board had already acted to value the Lehman debt at 80% of par, and the fact that Lehman paper would no longer "mature at par" because of the bankruptcy.

90.     The Bents did not object to any of the false statements in the press release and, upon receiving their comments, RMCI marketing personnel proceeded to finalize the draft for public distribution.

91.     At 3:41 p.m. on September 15, a RMCI marketing employee circulated via email "the approved version of The Reserve's communication regarding this weekend's events with Lehman/Merrill and the position The Reserve is taking." The email and attachment were addressed to RMCI's entire marketing and sales teams, which included Bent II. A few minutes later, at 3:57 p.m., the Director of Marketing sent the same communication to, among others, all "Directors and Managers," a list that includes each of the Bents. At no point did the Bents object to the contents of the shareholder communication.

92.     The "communication," titled "The Reserve *Insights*," and publicly distributed by Defendant Resrv Partners, repeated and amplified the false statements in Bent II's 1:19 Email, and included the following specific false statements:

> a.  RMCI's "inten[tion] to enter into support agreements with the Primary Fund to support the value of Lehman credit held in the Fund," which

RMCI and the Bents never intended to do, and never did;

b. That RMCI was "submitting appropriate documentation to the SEC today, September 15, 2008," although no documentation had been, or was ever, submitted to the Commission;

c. That "our support agreements ensure the integrity of a $1.00 NAV," a plainly false statement given that no such agreement ever existed; and

d. That the Lehman holdings would not have a "material impact" on the Primary Fund or a "negative impact[]" on the NAV because the holdings would "mature at par value." In fact, the Board had already acted to value the Lehman debt at less than par and, by virtue of Lehman's bankruptcy filing, any payout on the debt would take months or years and would in all likelihood be at substantially less than par.

93.    During the afternoon and evening of September 15, members of RMCI's

and Resrv Partners' sales team distributed the materially false and misleading "The

Reserve *Insights*" via email to numerous shareholders located in multiple states.

94.    One representative email, sent to investors at 7:01 p.m. on September 15,

attached a copy of "The Reserve *Insights*" and stated as follows:

Due to the unprecedented stress in the market (characterized by Alan Greenspan as a 'once in century event') and based on our client conversations and feedback during the day, I want to pass along the attached document to you (if you have not received already). We currently have a 1.2% exposure to Lehman in Primary Fund – as you will note:

The Reserve is committed to a $1.00 NAV for its Primary Fund. Reserve Management Company, Inc. (RMCI) intends to enter into support agreements with the Primary Fund to support the value of Lehman credit held in the Fund. RMCI is the investment adviser to the Fund and has provided investment advice to investment companies within The Reserve family of funds since November 15, 1971. We have discussed with the SEC that our intent is to mitigate any decline in the value of the Lehman debt so that it will not result in a decrease to the NAV of the Fund. We are submitting appropriate documentation to the SEC today, September 15, 2008.

95.    On September 15, RMCI personnel also emailed copies of "The Reserve

*Insights*" to personnel at Standard & Poor's and Moody's to falsely assure them that RMCI was committed to protecting the $1.00 NAV of the Primary Fund, such that Moody's and Standard & Poor's would refrain from a ratings downgrade.

96.     At approximately 5:00 p.m. on September 15, RMCI's CIO informed Bent Sr. via telephone that he believed the rating agencies would be "fat and happy" after having received the affirmative message of credit support for the Fund set forth in "The Reserve *Insights*."

97.     Although both Moody's and Standard & Poor's informed RMCI that they wanted additional information about the credit support agreements – including copies of the actual agreements – RMCI's decision to provide them with the affirmative manifestations of support in "The *Reserve Insights*" was instrumental in delaying any adverse ratings action on September 15 or September 16 before the Fund disclosed it had broken the buck.

98.     Although RMCI's counsel had prepared and virtually finalized all of the draft documentation necessary to implement a credit support agreement for the Primary Fund by 4:00 p.m. on September 15, the Bents never asked to review or execute the drafts.

99.     Moreover, even though RMCI and the Bents had told the Fund's Board at 1:00 p.m. that entering into a credit support agreement was an urgent priority, and that RMCI would immediately seek relief from the Commission staff as part of the process, RMCI never submitted any draft documentation to the staff for review. To the contrary, RMCI's and the Bents' only objective with respect to a credit support agreement was to reap the benefits of telling the public that such an agreement existed.

29

**RMCI Misleads Shareholders and Moody's Concerning The Status of Redemptions**

100.    In addition to falsely representing the existence of unqualified credit support for the Primary Fund, RMCI provided investors with materially false information concerning the Primary Fund's ability to satisfy redemption requests.

101.    On September 14, 2008, RMCI had anticipated that redemption levels on September 15 would likely exceed State Street's customary level of overdraft privileges. By approximately 1:50 p.m. on September 15, senior RMCI personnel, including the chief financial officer and CIO, had acknowledged that State Street's suspension of overdraft privileges (which occurred at approximately 10:10 a.m.) was the "the kiss of death" for the Primary Fund, and that the Fund was "screwed" unless "something magical happens." The Board of Trustees was not, however, informed of these developments, or management's exceedingly grim assessment of the situation.

102.    Despite knowing that the Fund's inability to generate liquidity on September 15 to pay billions of dollars of unfunded redemptions was the result of State Street' suspension of overdraft privileges, and RMCI's inability to locate alternative sources of liquidity, RMCI and Resrv Partners sales personnel falsely assured investors via telephone communications and email that the Primary Fund was not experiencing any liquidity problems and that any delay in transmitting money was caused by operational or technical delays at State Street.

103.    RMCI also falsely informed Moody's at approximately 2:30 p.m. on September 15 that redemptions appeared to have "stopped" and that the Reserve had been able to generate sufficient liquidity by "selling product on the street" to fund all outstanding redemption requests. RMCI personnel were aware, however, that

30

redemptions had not stopped, that billions of dollars of shareholder redemptions remained unfunded, and that RMCI had been able to sell only a very small amount of assets to generate marginal amounts of liquidity.

104. Later in the afternoon, Bent II reiterated to Moody's that RMCI had paid all outstanding redemptions through liquidity in the Fund, thus reassuring Moody's that the Primary Fund remained viable and liquid. Bent II's representation was, however, false, as evidenced by RMCI's and Bent II's unsuccessful efforts in the hours before Bent II spoke with Moody's to obtain liquidity from third parties to satisfy billions of dollars of unpaid redemptions.

105. Unbeknownst to the public, the Board and the rating agencies – which had been falsely assured that the situation at the Primary Fund was under control – Bent II had *already* concluded as early as midday on September 15 that RMCI should pursue an immediate sale of the RMCI and the Reserve Funds to a third party, and had retained two investment banks to search for a buyer or partner.

106. Bent II also failed to disclose that he had instructed the investment banks on the morning of September 16 to inform potential buyers that they would *not* be required to protect the $1.00 NAV of the Primary Fund, which directly contradicted Defendants' public assurances that they would protect the $1.00 NAV.

**RMCI Continues To Deceive Investors During the Evening of September 15**

107. By approximately 5:00 p.m. on September 15, redemption requests had climbed to over $20 billion, nearly half of which were unfunded. RMCI had also failed in its efforts to persuade State Street, or any other third parties, to provide it with additional liquidity to meet the large and growing backlog of investor redemptions.

108.     Despite knowledge of these facts, as part of a last-ditch effort to salvage the Primary Fund's viability as a money market fund, Bent II continued to authorize false statements by RMCI during the evening of September 15 to reassure investors that RMCI would -- without reservation -- support the $1.00 NAV of the Primary Fund.

109.     At 5:46 p.m. on September 15, Bent II authorized RMCI marketing personnel to communicate to the *Wall Street Journal* that "[i]f needed, The Reserve intends to protect the NAV on the funds to whatever degree is required, however this protection has not been needed." In addition to authorizing the false statement that RMCI intended to provide an unlimited degree of support to the Primary Fund, the statement falsely suggested that no "protection" had been needed for any Reserve Fund holding Lehman debt when in fact both the Yield Plus Fund and International Liquidity Fund had *already* broken the buck earlier in the day and had thereafter been propped up by the recording of receivables.

110.     At 7:34 p.m., Bent II received an email from RMCI's Director of Sales, which indicated that RMCI's and the Bents' plan to slow redemption activity by convincing investors that the Primary Fund's NAV was safe had been successful. The Director of Sales wrote: "[a]t approximately midday, the Reserve (via RMC) established a posture that it would 'protect' the NAV of the primary fund. The client base reacted positively to this news and the redemption activity slowed greatly."

111.     Bent II did not question the accuracy of the message the sales team had communicated to the public, which had been authorized by his 1:19 Email. Nor did he instruct the sales team to alter the message going forward in light of the alarming redemption levels and State Street's unwillingness to provide additional liquidity.

Instead, at 9:47 p.m., he responded: "that's a nice summary, thank you very much."

112.    At approximately 9:36 p.m. on September 15, RMCI posted the materially false "The Reserve *Insights*" publication to its website to further disseminate word of the false plans to support the $1.00 NAV of the Primary Fund.

113.    RMCI's misrepresentations continued on September 16 when RMCI's Director of Marketing emailed a copy of "The Reserve *Insights*" to a contact at Crane Data, a web site covering developments in the money market industry. Shortly thereafter, Crane Data published a news article on the impact of Lehman's bankruptcy on money market funds. The article noted that "Reserve Primary" was "expected to protect their funds from any threat to the $1.00 a share NAV should it become necessary."

**RMCI Failed To Timely Disclose That The Primary Fund Had Broken The Buck**

114.    After adjourning shortly after 1:00 p.m. on September 15 with the belief that the Fund was not in distress and would, if necessary, be supported by RMCI, the Board of Trustees did not meet again until approximately 10:00 a.m. on September 16. Unbeknownst to the Board, by this point on September 16, the Fund was about to strike its third hourly NAV of the day on the basis of wholly inaccurate and incomplete information.

115.    At the outset of the 10:00 a.m. meeting, Bent II revealed to the Board that RMCI had not, contrary to its representations on September 15, entered into a credit support agreement to protect the $1.00 NAV of the Primary Fund.

116.    Bent II also disclosed that the level of redemption requests as of 9:00 a.m. on September 16 was approximately $24.6 billion, but that the Primary Fund had only been able to generate liquidity to pay approximately the first $10.7 billion of those

33

requests. Bent II also revealed for the first time that State Street had refused to extend

additional overdraft privileges to the RMCI and the Reserve Fund, even though RMCI

had been aware of that fact since early the day before.

117.    The Trustees were staggered by these enormously material developments.

They ended the Board meeting and convened an Executive Session to assess the

ramifications of what Bent II had disclosed. According to the minutes of that session:

> Initially, the Independent Trustees indicated how shocked they
> were by the information relayed to them by Reserve
> Management during the morning's earlier call. The Trustees
> noted that at 1:30 p.m. meeting yesterday Management had
> indicated that redemptions were approximately $5 billion and
> that Management intended to enter into a capital support
> agreement to support the $1.00 NAV. Moreover, in response
> to a direct question from counsel to the Independent Trustees
> regarding whether Management had sufficient capital to
> support a $1.00 NAV, Management assured the Trustees they
> did. The Trustees further indicated that no indication had been
> given prior to this morning's call that redemptions had
> mushroomed to $20 billion and that there was essentially a run
> on the funds.

118.    Finally armed with information about the actual state of affairs, the Board

met nearly continuously on September 16. The Bents, meanwhile, were focused on

locating a third party to provide liquidity or to acquire the RMCI and the Reserve Funds.

119.    Based on the valuation of the Lehman debt at $0.80 and the redemption

figures available to RMCI, the Primary Fund's NAV declined below .995 at some point

prior to 11:00 a.m. on September 16. Remarkably, however, RMCI failed to detect this

critical development despite its intense focus on tracking the Fund's declining NAV over

the course of September 16. As a result, the Board was not informed of the actual state of

affairs during the morning of September 16.

120.    As RMCI conceded months later in a press release issued on November

34

26, 2008, "contrary to previous statements to the public and to investors, the [Primary] Fund's net asset value per share was $0.99 from 11:00 a.m. Eastern time to 4:00 p.m. Eastern time on September 16, 2008 and *not* $1.00." According to RMCI, the failure to accurately determine when the Primary Fund broke the buck was caused by "administrative error."

121. On September 16 at approximately 4:00 p.m. – wholly unaware that the Fund had actually broken the buck several hours earlier – RMCI issued a press release announcing that the "value of the debt securities issued by Lehman Brothers Holdings, Inc. ... and held by the Primary Fund has been valued at zero effective 4:00PM New York time today. As a result, the NAV of the Primary Fund, effective as of 4:00PM, is $0.97 per share."

122. Around the same time that RMCI announced that its flagship fund had broken the buck – thus giving the Bents little incentive to protect the reputation and viability of other Reserve funds – Bent II instructed RMCI's Director of Fund Accounting to reverse the receivables that had been secretly recorded the day before to maintain the $1.00 NAV of the Yield Plus Fund and International Liquidity Fund. At the time they were reversed, the receivables totaled approximately $17 million that was owed by RMCI, and ultimately, the Bents.

**The Trustee's Decision to Liquidate the Primary Fund And Withhold $3.5 Billion**

123. On September 29, 2008, RMCI disclosed that the Primary Fund's Board of Trustees had voted to liquidate the Fund and distribute its assets to shareholders. The press release stated that an initial distribution of $20 billion would be made on a *pro rata* basis, and the Fund and the Board were developing a plan for distributing the remainder

35

of the Fund's assets.

124.    On December 3, 2008, RMCI disclosed the terms of a "Plan of Liquidation and Distribution of Assets" for the Fund. The Plan provided for further interim distributions of Fund assets to shareholders on a *pro rata* basis up to the point of a "special reserve," which would be calculated at a later date and "would include amounts that would be required to satisfy disputed claims."

125.    On December 24, 2008, RMCI disclosed that the Fund's Board was still in the process of evaluating the appropriate size of the special reserve.

126.    On February 26, 2009, RMCI announced that the Board had determined to withhold from distribution a $3.5 billion "Special Reserve" that will, among other things, be used to satisfy any damages claims brought by shareholders seeking to have their shares redeemed at the highest possible NAV per share. The February 26 press release further stated that *pro rata* distributions would continue up until the amount of the Special Reserve.

## FIRST CLAIM FOR RELIEF

### Violations of and Aiding and Abetting Violations of
### Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder
### (Defendants RMCI, Resrv Partners, Bent II and Bent Sr.)

127.    Paragraphs 1 through 126 are realleged and incorporated by reference as if fully set forth herein.

128.    RMCI, Resrv Partners, and Bent II, directly or indirectly, singly or in concert, by use of the means or instrumentalities of interstate commerce, or by the use of the mails, or of the facilities of a national securities exchange, in connection with the purchase or sale of securities, knowingly or recklessly, have: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make statements made, in the light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices and courses of business which operated or would have operated as a fraud or deceit upon purchasers of securities and upon other persons.

129.    By reason of the foregoing, RMCI, Resrv Partners, and Bent II, singly or in concert, directly or indirectly, have violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

130.    By reason of the foregoing and pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)], Defendants Bent Sr. and Bent II, singly or in concert, directly or indirectly, also aided and abetted, and are therefore also liable for each of the other Defendants' primary violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. §240.10b-5], because they each knowingly

provided substantial assistance to such other Defendants' violations of Section 10(b) of the Exchange Act [15 U.S.C. §78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]. Unless enjoined, Bent Sr. and Bent II will again aid and abet violations of Section 10(b)of the Exchange Act [15U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## SECOND CLAIM FOR RELIEF

### Violations of Section 20(a) of the Exchange Act
### (Defendants Bent Sr. and Bent II)

131.    Paragraphs 1 through 126 are realleged and incorporated by reference as if fully set forth herein.

132.    At all relevant times, Bent Sr. and Bent II have been, directly or indirectly, control persons of Defendant RMCI for purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a).]

133.    Defendants Bent Sr. and Bent II, as control persons of Defendant RMCI, are jointly and severally liable with and to the same extent as Defendant RMCI for its violations of Section 10(b) of the Exchange Act [15U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## THIRD CLAIM FOR RELIEF

### Violations of Section 17(a) of the Securities Act
### (Defendants RMCI, Resrv Partners and Bent II)

134.    Paragraphs 1 through 126 are realleged and incorporated by reference as if fully set forth herein.

135. RMCI, Resrv Partners and Bent II, directly or indirectly, singly or in concert with others, in the offer and sale of securities, by use of the means and instruments of transportation and communication in interstate commerce and by use of the mails, knowingly or recklessly, have: (a) employed devices, schemes or artifices to defraud; (b) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in transactions, practices or courses of business which operate or would operate as a fraud or deceit upon the purchaser.

136. By reason of the foregoing, RMCI, Resrv Partners and Bent II have violated Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## FOURTH CLAIM FOR RELIEF

### Sections 206(1) and (2) of the Advisers Act
### (Defendants RMCI, Bent Sr. and Bent II)

137. Paragraphs 1 through 126 are realleged and incorporated by reference as if fully set forth herein.

138. Defendants RMCI, Bent Sr. and Bent II, while acting as investment advisers, by the use of the means and instrumentalities of interstate commerce and of the mails, directly and indirectly, have employed and are employing devices, schemes and artifices to defraud clients and prospective clients; and have engaged and are engaging in transactions, practices and courses of business which operate as a fraud or deceit upon clients and prospective clients.

139. By reason of the foregoing, Defendants RMCI, Bent Sr. and Bent II have violated Sections 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1) and 80b-6(2)].

## FIFTH CLAIM FOR RELIEF

### Section 206(4) and Rule 206(4)-8 Thereunder of the Advisers Act
### (Defendants RMCI, Bent Sr., and Bent II)

140. Paragraphs 1 through 126 are realleged and incorporated by reference as if fully set forth herein.

141. Defendants RMCI, Bent Sr., and Bent II, while acting as investment advisers to a pooled investment vehicle, have made untrue statements of material fact or omitted to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, to an investor or prospective investor in the pooled investment vehicle or otherwise engaged in acts, practices, or courses of business that are fraudulent, deceptive or manipulative with respect to an investor or prospective investor in the pooled investment vehicle.

142. By reason of the foregoing, Defendants RMCI, Bent Sr., and Bent II have violated Section 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

## SIXTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of
### Section 206(1) and (2) of the Advisers Act
### (Defendants Bent Sr. and Bent II)

143. Paragraphs 1 through 126 are realleged and incorporated by reference as if fully set forth herein.

144. Defendants Bent Sr. and Bent II have knowingly provided substantial assistance to RMCI who, while acting as an investment adviser, by the use of the means and instrumentalities of interstate commerce and of the mails, has directly or indirectly, employed devices, schemes, and artifices to defraud clients and prospective clients, or

40

engaged in transactions, practices, and courses of business which operate as a fraud or deceit upon its clients and prospective clients.

145.    By reason of the foregoing, Defendants Bent Sr. and Bent II have aided and abetted RMCI's violations of Sections 206(1) and (2) of the Advisers Act [15 U.S.C. § 80b-6(1) and (2)].

**SEVENTH CLAIM FOR RELIEF**

**Aiding and Abetting Violations of Sections 206(4)
and Rule 206(4)-8 Thereunder of the Advisers Act
(Defendants Bent Sr. and Bent II)**

146.    Paragraphs 1 through 126 are realleged and incorporated by reference as if fully set forth herein.

147.    Defendants Bent Sr. and Bent II have knowingly provided substantial assistance to RMCI who, while acting as an investment adviser to a pooled investment vehicle, by the use of the means and instrumentalities of interstate commerce and of the mails, has made untrue statements of material fact or omitted to state a material fact necessary to make the statements made, in light of the circumstances under which they were made, not misleading, to an investor or prospective investor in the pooled investment vehicle and engaged in acts, practices, or courses of business that are fraudulent, deceptive or manipulative with respect to an investor or prospective investor in the pooled investment vehicle.

148.    By reason of the foregoing, Defendants Bent Sr. and Bent II have aided and abetted RMCI's violations of Sections 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)] and Rule 206(4)-8 thereunder [17 C.F.R. § 275.206(4)-8].

## EIGHTH CLAIM FOR RELIEF

### Injunctive and Related Relief Under Section 25(c) of the
### Investment Company Act and Section 21(d)(5) of the Exchange Act
### (Relief Defendant The Reserve Primary Fund)

149.    Paragraphs 1 through 126 are realleged and incorporated by reference as if fully set forth herein.

150.    Because the Primary Fund's stated Plan of Distribution cannot ensure a *pro rata* distribution to investors of the Primary Fund's assets, it is neither fair nor equitable under Section 25(c) of the Investment Company Act, 15 U.S.C. § 80a-25, and should be enjoined.

### PRAYER FOR RELIEF

**WHEREFORE**, the Commission respectfully requests that this Court enter a Final Judgment:

### I.

Permanently enjoining and restraining each of the Defendants, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### II.

Permanently enjoining and restraining Defendants RMCI, Resrv Partners and Bruce Bent II, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from violating, directly or indirectly, Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)].

## III.

Permanently enjoining and restraining Defendants RMCI, Bruce Bent Sr., and Bruce Bent II, their agents, servants, employees and attorneys and all persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, and each of them, from directly or indirectly committing, or aiding and abetting, violations of Sections 206(1) and (2) [15 U.S.C. § 80b-6(1) and (2)] and 206(4) of the Advisers Act [15 U.S.C. § 80b-6(4)], and Rule 206-4(8) [17 C.F.R. § 275.206(4)-8] thereunder.

## IV.

Ordering each of the Defendants to disgorge the ill-gotten gains they received from the violations alleged herein, and to pay prejudgment interest thereon.

## V.

Ordering each of the Defendants to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)], Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

## VI.

Retain jurisdiction over this action, in accordance with the principles of equity and the Federal Rules of Civil Procedure, in order to implement and carry out the terms of all orders, plans and decrees that may be entered, or to entertain any suitable application or motion for additional relief, including the entry of relief pursuant to Section 25(c) of the Investment Company Act and Section 21(d)(5) of the Exchange Act: (a) enjoining the plan of distribution of Relief Defendant, and (b) compelling the Primary Fund to distribute all Primary Fund assets *pro rata* for all redeemed shares for which

shareholders have not been fully paid or to entertain any suitable application or motion

for additional relief, within the jurisdiction of this Court.

## VII.

Granting such other and further relief as the Court deems just and proper.

Dated: May 5, 2009
       New York, New York

Respectfully Submitted,

*James A. Clarkson*

James A. Clarkson
ATTORNEY FOR PLAINTIFF
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
3 World Financial Center, Room 400
New York, New York 10281
(212) 336-1100

***Of Counsel:***

Andrew M. Calamari
Alison Conn (admitted only in Pennsylvania)
Michael Birnbaum
Nancy A. Brown
Michael J. Osnato, Jr.