UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————————x
                          :

SECURITIES EXCHANGE COMMISSION,    :
                          :

         Plaintiff,         :

     *v.*                    :
                          :

RESERVE MANAGEMENT COMPANY, INC.,  :
RESRV PARTNERS, INC., BRUCE BENT SR.,  :    No. 09-CV-4346 (PGG) (AJP)
and BRUCE BENT II,             :
                          :    ECF Case

        Defendants,     :

    and                  :    ORAL ARGUMENT REQUESTED
                          :

THE RESERVE PRIMARY FUND,     :
                          :

         Relief Defendant.  :
                          :

—————————————————————x

## RESERVE MANAGEMENT COMPANY, INC., RESRV PARTNERS, INC., BRUCE BENT SR. AND BRUCE BENT II'S MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION TO DISMISS THE COMPLAINT

Robert B. McCaw
Lori A. Martin
Christopher J. Meade
Anne K. Small
WILMER CUTLER PICKERING
  HALE AND DORR LLP
399 Park Avenue
New York, NY 10022
Telephone: 212-230-8800
Facsimile: 212-230-8888

*Counsel for Defendants Reserve
Management Company, Inc., Resrv
Partners, Inc., Bruce Bent Sr. and
Bruce Bent II*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................ iii

PRELIMINARY STATEMENT ................................................................................... 1

STATEMENT OF FACTS ........................................................................................... 4

    Alleged Misstatements Of The Price Of Lehman Paper At The 9:30 a.m. Board
        Meeting ...................................................................................................... 4

    Alleged Non-Disclosure On The 15th Of State Street's 10:10 a.m. Stop On
        Redemptions .............................................................................................. 6

    Alleged Misstatements And Omissions On The 15th Of The Level Of
        Redemption Requests ................................................................................. 6

    Alleged Misstatements About Support For The Fund NAV On The 15th ......................... 7

    The Decision To Liquidate The Fund On The Afternoon Of The 16th ............................. 9

ARGUMENT ............................................................................................................. 10

I.    THE SEC FAILS TO ALLEGE ADEQUATELY SCIENTER UNDER
     RULE 9(b) ............................................................................................... 10

     A.    The Allegations In The Complaint Of Defendants' Efforts To Involve and
          Consult Regulators, Lawyers, Auditors, And The Board Are Flatly
          Inconsistent With An Intent To Defraud ................................................. 10

     B.    The Complaint Fails To Establish Motive And Opportunity ................................ 11

     C.    The Complaint Fails To Establish Conscious Misbehavior Or
          Recklessness ........................................................................................ 14

II.   THE COMPLAINT FAILS TO ALLEGE ACTIONABLE MISSTATEMENTS
     OR OMISSIONS ...................................................................................... 15

     A.    The Allegations Regarding Valuation Of The Fund's Lehman Holdings
          Are Non-Actionable Statements Of Opinion ........................................... 16

     B.    The Allegations About Support For The Fund's NAV Do Not Provide The
          Basis For A Claim Based On Misstatements ........................................... 17

          1.    The allegations of Defendants' statements of intent do not state a claim .. 17

          2.    The remaining allegations concerning the support for the NAV of the
              Fund do not suffice to state a claim based on false statements .................. 19

C.    The SEC Acknowledges That The Allegedly Omitted Facts Were Disclosed On The Morning Of September 16 ........................................................21

III.    THE COMPLAINT FAILS TO ALLEGE ADEQUATELY MATERIALITY ................22

A.    The Alleged Misstatements Regarding The Pricing Of The Lehman Paper Are Immaterial In Light Of The Simultaneous Statements Regarding The Market For Lehman Paper .......................................................................................23

B.    The Alleged Misstatements Regarding the Bents' Intent To Enter Into A Credit Support Agreement For The Fund Are Demonstrably Non-Material Given The Events Of The Day................................................................................24

CONCLUSION................................................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*ATSI Communications, Inc. v. Shaar Fund, Ltd.*,
  493 F.3d 87 (2d Cir. 2007)......................................................................................16

*Acito v. IMCERA Group*,
  47 F.3d 47 (2d Cir. 1995) .......................................................................................22

*Armstead v. Stop & Shop Companies, Inc.*,
  No. 3:01 CV 1489, 2003 WL 1343245 (D. Conn. Mar. 17, 2003)...........................5

*Armstrong v. McAlpin*,
  699 F.2d 79 (2d Cir. 1983).....................................................................................10

*Ashcroft v. Iqbal*,
  129 S. Ct. 1937 (2009)......................................................................................13, 23

*Cortec Industries, Inc. v. Sum Holding L.P.*,
  949 F.2d 42 (2d Cir. 1991)........................................................................................5

*Edison Fund v. Cogent Investment Strategies Fund, Ltd.*,
  551 F. Supp. 2d 210 (S.D.N.Y. 2008)....................................................................21

*Fraternity Fund Ltd. v. Beacon Hill Asset Management LLC*,
  479 F. Supp. 2d 349 (S.D.N.Y. 2007)....................................................................16

*Glickman v. Alexander & Alexander Services, Inc.*,
  No. 93 Civ. 7594, 1996 WL 88570 (S.D.N.Y. Feb. 29, 1996) ...............................14

*Gurary v. Winehouse*,
  190 F.3d 37 (2d Cir. 1999)......................................................................................18

*Hart v. Internet Wire, Inc.*,
  163 F. Supp. 2d 316 (S.D.N.Y. 2001), *aff'd*, 50 F. App'x 464 (2d Cir. 2002).......14

*Howard v. SEC*,
  376 F.3d 1136 (D.C. Cir. 2004) ..............................................................................11

*In re Allied Capital Corp. Securities Litigation*,
  No. 02 Civ. 3812, 2003 WL 1964184 (S.D.N.Y. Apr. 25, 2003)...........................16

*In re Bayer AG Securities Litigation*,
  No. 03 Civ. 1546, 2004 WL 2190357 (S.D.N.Y. Sept. 30, 2004)..........................15

*In re Duane Reade Inc. Securities Litigation*,
No. 02 Civ. 6478, 2003 WL 22801416 (S.D.N.Y. Nov. 25, 2003),
*aff'd*, 107 F. App'x 250 (2d Cir. 2004) ...................................................................18

*In re Glenayre Technologies Inc. Securities Litigation*,
982 F. Supp. 294 (S.D.N.Y. 1997), *aff'd*, 201 F.3d 431 (2d Cir. 1999) ................................20

*In re Merrill Lynch & Co.*,
273 F. Supp. 2d 351 (S.D.N.Y. 2003), *aff'd*, 396 F.3d 161 (2d Cir. 2005) .............................5

*In re Northern Telecom Securities Litigation*,
116 F. Supp. 2d 446 (S.D.N.Y. 2000)...................................................................12

*In re Nokia Oyj (Nokia Corp.) Securities Litigation*,
423 F. Supp. 2d 364 (S.D.N.Y. 2006)...................................................................17

*In re PXRE Group, Ltd., Securities Litigation*,
600 F. Supp. 2d 510 (S.D.N.Y. 2009)..............................................................12, 14

*In re Sierra Wireless, Inc. Securities Litigation*,
482 F. Supp. 2d 365 (S.D.N.Y. 2007)....................................................................5

*In re Zyprexa Products Liability Litigation*,
549 F. Supp. 2d 496 (E.D.N.Y. 2008) ....................................................................5

*Kalnit v. Eichler*,
264 F.3d 131 (2d Cir. 2001)....................................................................11, 12, 14

*Kinsey v. Cendant Corp.*,
No. 04 Civ. 582, 2004 WL 2591946 (S.D.N.Y. Nov. 16, 2004) ..........................................15

*National Westminster Bank v. Ross*,
130 B.R. 656 (S.D.N.Y. 1991), *aff'd*, 962 F.2d 1 (2d Cir. 1992) .....................................18, 19

*Neder v. United States*,
527 U.S. 1 (1999)...................................................................................23

*Novak v. Kasaks*,
216 F.3d 300 (2d Cir. 2000)...........................................................................10

*Panther Partners, Inc. v. Ikanos Communications, Inc.*,
538 F. Supp. 2d 662 (S.D.N.Y. 2008)...................................................................15

*Podany v. Robertson Stephens, Inc.*,
318 F. Supp. 2d 146 (S.D.N.Y. 2004)..............................................................16, 17

*Press v. Chemical Investment Services Corp.*,
166 F.3d 529 (2d Cir. 1999) ..................................................................22

*Rombach v. Chang*,
355 F.3d 164 (2d Cir. 2004) ..................................................................20

*SEC v. Boling*,
No. 06-1329, 2007 WL 2059744 (D.D.C. July 13, 2007) .......................13

*SEC v. Dunn*,
587 F. Supp. 2d 486 (S.D.N.Y. 2008) .....................................................13

*SEC v. Espuelas*,
579 F. Supp. 2d 461 (S.D.N.Y. 2008) .....................................................10

*SEC v. Northshore Asset Management*,
No. 05 Civ. 2192, 2008 WL 1968299 (S.D.N.Y. May 5, 2008) ..............13

*SEC v. Pentagon Capital Management PLC*,
No. 08 Civ. 3324, 2009 WL 320608 (S.D.N.Y. Feb. 10, 2009) .............13

*SEC v. Snyder*,
292 F. App'x 391 (5th Cir. 2008) ...........................................................11

*SEC v. Texas Gulf Sulphur Co.*,
401 F.2d 833 (2d Cir. 1968) ..................................................................22

*Shields v. Citytrust Bancorp, Inc.*,
25 F.3d 1124 (2d Cir. 1994) .......................................................10, 13, 14

*TSC Industries, Inc. v. Northway, Inc.*,
426 U.S. 438 (1977) ...........................................................................22, 23

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308, 127 S. Ct. 2499 (2007) ....................................................13

## FEDERAL STATUTES AND RULES

15 U.S.C. § 77q(a) ......................................................................................10, 23

15 U.S.C. § 78j(b) .......................................................................................10, 23

15 U.S.C. § 78t(a) .......................................................................................10, 23

15 U.S.C. § 80b-6(1) ..................................................................................10, 23

- v -

15 U.S.C. § 80b-6(2)..................................................................................................23

15 U.S.C. § 80b-6(4)..................................................................................................23

17 C.F.R. § 240.10b-5................................................................................................10

17 C.F.R. § 240.10b-5(a) ...........................................................................................23

17 C.F.R. § 240.10b-5(b) ...........................................................................................23

17 C.F.R. § 240.10b-5(c) ...........................................................................................23

17 C.F.R. § 275.206(4)-8(a)(1) ..................................................................................23

17 C.F.R. § 275.206(4)-8(a)(2) ..................................................................................23

Fed. R. Civ. P. 8 ..........................................................................................12, 13, 23

Fed. R. Civ. P. 9(b) ............................................................................................ *passim*

## OTHER AUTHORITIES

1 Weinstein's Federal Evidence (2d ed. 2003) .............................................................5

H.R. Conf. Rep. No. 369, 104th Cong., 1st Sess., at 41 (1995), *as reprinted in* 1995
    U.S.C.C.A.N. 730, 740 ..........................................................................................13

Tom Lauricella, Liz Rappaport & Annelena Lobb, *Mounting Fears Shake World Markets*
    *As Banking Giants Rush to Raise Capital*, Wall St. J., Sept. 18, 2008...................24

Press Release, Lehman Brothers Holdings Inc. Announces It Intends to File Chapter 11
    Bankruptcy Petition; No Other Lehman Brothers' U.S. Subsidiaries or Affiliates,
    Including Its Broker-Dealer and Investment Management Subsidiaries, Are Included
    in the Filing, Sept. 15, 2008, *available at* http://www.lehman.com/press/pdf_2008/
    091508_lbhi_chapter11_announce.pdf. ..................................................................17

SEC Office of Inspector General, SEC's Oversight of Bear Stearns and Related Entities:
    The Consolidated Supervised Entity Program, Report No. 446-A (Sept. 25, 2008),
    *available at* http://www.sec-oig.gov/Reports/AuditsInspections/2008/446-a.pdf....................2

# PRELIMINARY STATEMENT

The SEC alleges that Bruce R. Bent Sr. ("Bent Sr.") and Bruce R. Bent II ("Bent II"), Reserve Management Company, Inc. ("RMCI"), the investment adviser they controlled, and Resrv Partners, Inc., the principal underwriter of The Reserve Primary Fund ("Primary Fund" or "Fund"), defrauded Fund investors beginning after the bankruptcy of Lehman Brothers Holdings Inc. on the morning of September 15, and ending the next morning with what the SEC acknowledges was full disclosure to the Fund Board of the information allegedly withheld or misstated. The Complaint alleges that Defendants perpetrated this fraud even though (1) they were unexpectedly caught up in a worldwide market crisis of unprecedented severity, where information flow was incomplete and in flux; (2) their management team was dispersed across New York, Chicago, and Rome, Italy; (3) they involved, and took guidance from, their in-house and outside counsel, the auditors for the Fund, and the SEC Division of Investment Management in their actions on September 15-16; and (4) they neither sought nor achieved any personal gain. We are unaware of any precedent for such charges in the 75-year history of the federal securities laws.

SEC rules for money market funds permitted the Primary Fund to invest in highly-rated debt, and the Fund's prospectus advised investors that it would do so. When the Fund invested approximately $785 million—or roughly 1.2% of its assets—in Lehman debt, it was highly rated by both S&P and Moody's. This investment was disclosed to the Fund's Board, and in the Fund's SEC filings (and daily reports of its holdings were available to any investor who asked). Lehman was one of a few financial institutions subject to SEC consolidated financial supervision, under which the SEC had even greater access to Lehman's books and records and its financial and operational condition and, therefore, was responsible for "monitor[ing] for, and act[ing] quickly in response to, financial or operational weaknesses" in Lehman "that might

place . . . the broader financial system at risk."[1]  Although Lehman's senior management publicly pronounced its financial health on September 10, 2008, it unexpectedly filed for bankruptcy protection five days later, freezing the credit markets.  The SEC's failed supervision of Lehman contributed to the surprise and panic that gripped the markets on September 15.

On the date Lehman sought bankruptcy protection, Bent Sr. was out of the country, without access to e-mail, computers, or electronic market data, and RMCI's Chief Financial Officer was at a conference in Chicago.  Bent II was the only principal executive available in RMCI's New York office to deal with the unexpected crisis.  Because Primary Fund investors had been informed of the Fund's Lehman investments, knew that RMCI was a family-owned business with limited resources, and could understand the effect on the value of Lehman debt in a bankruptcy, investors started a run on the Fund.  With the credit markets frozen in response to the Lehman bankruptcy (on top of the unprecedented failure of Bear Stearns, the collapse of Merrill Lynch, and the precarious position of AIG), the Fund was unable to liquidate its high-quality assets to meet redemptions.  By 10:10 a.m., redemption requests exceeded available cash and credit, leading State Street Bank, the Fund's custodian, to cease filling redemption requests.

Bent II scheduled a meeting of the Fund's Board of Trustees, auditors, internal and external counsel, and counsel for the independent Trustees beginning at 8:00 a.m. on September 15.  The Board met three times throughout the day (at 8:00 a.m., 9:30 a.m., and 1:00 p.m.).  Bent II, with internal and external counsel, communicated with the SEC Division of Investment Management, and internal and external counsel had additional communications with the SEC. Bent II sought assistance from the Federal Reserve Bank of New York and the U.S. Department

---

[1]      SEC Office of Inspector General, SEC's Oversight of Bear Stearns and Related Entities: The Consolidated Supervised Entity Program, Report No. 446-A (Sept. 25, 2008), at viii (citation omitted), *available at* http://www.sec-oig.gov/Reports/AuditsInspections/2008/446-a.pdf.

of Treasury. During that day, he made or received 96 phone calls and sent or received 237 e-mails.

Although during this worldwide panic Defendants, like all other market actors, had imperfect information as the events of the day unfolded, the SEC—with the benefit of 20-20 hindsight—now brings fraud charges based on four themes:

- Although Defendants explicitly informed the Primary Fund's Board on the morning of September 15 that there were no trades in Lehman paper, the SEC contends that Defendants misled the Board about the value of Lehman paper at that time.

- Although the SEC does not allege when Defendants knew that State Street had stopped redemptions, they allegedly fraudulently failed so to inform the Board on September 15.

- Although Defendants informed the Board at the 1:00 p.m. Board meeting that there appeared to be "a run on the Primary Fund" and that there had been $16.5 billion in redemption requests thus far (of the Fund's roughly $64 billion in assets), Defendants allegedly somehow concealed the high level of redemption requests.

- Although Defendants, with the assistance of counsel, sought permission to put in place a credit support agreement committing their own funds to support the Primary Fund, and received SEC guidance that it was permissible to publicly disclose such an intent, Defendants allegedly committed fraud because the Bents subsequently determined they could not support the Fund and promptly informed the SEC and the Board of the change.

As shown below, the SEC's Complaint does not adequately allege that Defendants knowingly concealed material information or misstated material facts as required by Fed. R. Civ. P. 9(b). The Complaint also does not adequately allege that Defendants intended to deceive the Board or the Fund's investors. Importantly, the Complaint acknowledges two critical facts that

vitiate its theory of deceit: (1) Defendants sought guidance from a host of professional advisers (as well as the Federal Reserve) throughout September 15; and (2) whatever the misstatements or omissions of September 15, Defendants made full disclosure to the Board by 10:00 a.m. on September 16 (and indeed to the SEC itself). We respectfully submit that to find securities fraud in such a context would set an unprecedented and unworkable standard for executives confronted with a crisis.

The SEC's Complaint appears to be driven by the relief it seeks (*i.e.*, that all shareholders should receive a *pro rata* distribution). The SEC apparently believes that it is unfair that some investors in the Primary Fund redeemed at $1.00 per share, while others received less, and believes that, as a matter of policy and fairness, all investors should receive the same amount. In order to advocate for this result, however, the SEC is forced to allege that Defendants must have lied to the Fund Board and investors about the value of the Fund, such that an extraordinary remedy should be applied—the unprecedented act of invalidating the NAV struck for the Fund on September 15.[2] However laudable the SEC's intentions as a matter of policy or fairness, the premise of the action is flawed because Defendants did not fraudulently make material misstatements or omissions to the Fund Board or investors, or to anyone else.

## STATEMENT OF FACTS

**Alleged Misstatements Of The Price Of Lehman Paper At The 9:30 a.m. Board Meeting**

Bent II called a Board meeting for early morning on September 15. The Board met at 8:00 a.m., shortly after the Lehman bankruptcy announcement, but adjourned to allow for the gathering of additional information regarding the value of the Lehman securities held by the Fund. Compl. ¶ 56. At a 9:30 a.m. meeting, the Board discussed the preliminary pricing

---

[2] *See* Plaintiff Securities and Exchange Commission's Memorandum of Law in Support of Its Proposed Order to Show Cause and Application for Injunctive and Other Relief and Approval of the Commission's Proposed Plan of Distribution ("Order to Show Cause") 3.

information that RMCI's Chief Investment Officer ("CIO") had gleaned from market

discussions. Compl. ¶ 57. According to the minutes, the CIO stated:

> that while no trades in Lehman debt had occurred since the 8:00 AM meeting,
> there was indicative pricing in the market for the Lehman paper that was in a
> range of between $0.45 to $0.80 per dollar. [The CIO] stated that there were no
> bids for the securities and that these indicators were, in fact, third party analysts'
> conjectures as to what unsecured Lehman debt like that held by the Fund was
> likely to be received out of the bankruptcy process.

Osnato Decl. Ex. 3, Minutes of the Joint Meeting of the Boards of Trustees of The Reserve Fund,

dated Sept. 15, 2008 ("9/15 Mins.") at RF-SEC-00178717;[3] *id*. Ex. 26, Partial Audio Recording

of 9:30 a.m. Board Call ("9:30 a.m. Call") ("[T]here is no actual trading being done."). Outside

counsel for the Independent Trustees informed the Board that "it's the ultimate responsibility of

the Board to determine fair value." *Id*. Ex. 26, 9:30 a.m. Call. One Trustee described the

Board's valuation attempt as "like throwing a dart on the wall and seeing where it comes, so

there's no right answer or wrong answer[.]" *Id.* Bent Sr. initially opined that the Lehman debt

should be valued at par (Compl. ¶ 58), based in part on the fact that Lehman owned valuable

businesses and its assets exceeded its liabilities (Osnato Decl. Ex. 3, 9/15 Mins. at RF-SEC-

00178716). But the Board valued the Lehman paper at 80% (Compl. ¶ 58), and persuaded Bent

Sr. that this was the right decision (Osnato Decl. Ex. 3, 9/15 Mins. at RF-SEC-00178717).

---

[3] "Osnato Decl. Ex. __" refers to exhibits submitted to this Court with the Order to Show Cause, under the Declaration of Michael J. Osnato, Jr., dated May 4, 2009. Because this Court may take judicial notice of documents filed in related proceedings, it may properly consider these exhibits on a motion to dismiss. *See Armstead v. Stop & Shop Cos., Inc.*, No. 3:01 CV 1489, 2003 WL 1343245, at *2 (D. Conn. Mar. 17, 2003); 1 Weinstein's Federal Evidence § 201.12[3] (2d ed. 2003); *see also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47-48 (2d Cir. 1991). The Court may also consider documents either incorporated by reference in or integral to the Complaint, or documents or information of which the SEC had knowledge or possession and on which the SEC relied in framing the Complaint. *See In re Merrill Lynch & Co.*, 273 F. Supp. 2d 351, 356-57 (S.D.N.Y. 2003) (collecting cases), *aff'd*, 396 F.3d 161 (2d Cir. 2005); *In re Sierra Wireless, Inc. Sec. Litig.*, 482 F. Supp. 2d 365, 380 n.4 (S.D.N.Y. 2007). This memorandum also cites a news article and a press release, of which this Court may also take judicial notice. *In re Zyprexa Prods. Liab. Litig.*, 549 F. Supp. 2d 496, 501 (E.D.N.Y. 2008).

The Complaint alleges that this discussion of valuation was misleading in two ways. First, although Defendants disclosed that there was "'no valid market for Lehman paper'" (Compl. ¶ 57), the Complaint alleges that Defendants misstated its value because "market data available to RMCI . . . suggested that Lehman debt would not trade any higher than between $0.30 and $0.40" (*id.*). Second, it alleges that Bent Sr.'s initial proposal to value Lehman debt at par value was misleading (Compl. ¶ 58), notwithstanding that the Board rejected his opinion and Bent Sr. assented to the $0.80 valuation.

**Alleged Non-Disclosure On The 15th Of State Street's 10:10 a.m. Stop On Redemptions**

In light of the Lehman bankruptcy, and the unprecedented freezing of the credit markets, redemption levels on the morning of September 15 were high, reflecting a flight to quality, and "[a]t approximately 10:10 am . . . State Street, the Reserve Funds' custodian bank, stopped funding redemption requests placed by shareholders." Compl. ¶ 61. Even after that time, in accordance with Section 28 of the Investment Company Act, redemption requests continued to be received and processed, but State Street could not make payments on the redemptions (Compl. ¶ 62).

The SEC alleges that the non-disclosure of State Street developments by Defendants on September 15 was a fraudulent omission. Compl. ¶¶ 62, 75(a). The Complaint fails, however, to specify when or how Defendants became aware of this information, an essential requirement for a knowing omission. The Complaint further recognizes that this information was disclosed at the first Board meeting on the morning of September 16. Compl. ¶ 116.

**Alleged Misstatements And Omissions On The 15th Of The Level Of Redemption Requests**

At the 8:00 a.m. Board meeting, the Trustees were advised of $5.2 billion in Fund redemption requests. Osnato Decl. Ex. 29, Partial Audio Recording of 8:00 a.m. Board Call. At the 1:00 p.m. meeting, Bent II advised the Board "that redemption requests from shareholders in

the Primary Fund had continued unabated throughout the morning" in what "appeared to be a run on the Primary Fund" to $16.5 billion.  *Id.* Ex. 3, 9/15 Mins. at RF-SEC-00178719.

Without any specifics, the SEC alleges that Defendants fraudulently concealed the level of redemptions at the 9:30 a.m. Board meeting (Compl. ¶ 60), and that at the 1:00 p.m. meeting, RMCI "vastly understated the actual level of redemptions . . . and the rising threat to the Primary Fund's $1.00 per share NAV" (Compl. ¶ 75(b)), without identifying the actual redemption level at that time, or the material facts that Defendants "understated."  To the contrary, Defendants stated that there appeared to be a "run on the Primary Fund" and that redemption levels had reached $16.5 billion (of the roughly $64 billion of assets).  Osnato Decl. Ex. 3, 9/15 Mins. at RF-SEC-00178719.  Rather than relying on these Board minutes—official Fund documents voted on and unanimously approved by the Board—the SEC relies instead on unofficial notes of a meeting of a subset of Board members (*see* Compl. ¶ 117), which are contradicted by the official minutes of the meeting at issue.  The Complaint also acknowledges that the level of redemption requests was disclosed at the 10:00 a.m. meeting on September 16.  Compl. ¶ 116.

**Alleged Misstatements About Support For The Fund NAV On The 15th**

On the afternoon and evening of September 15, Defendants pursued a number of mechanisms to protect Fund investors, including a credit support agreement to protect the Fund's NAV.  At the 1:00 p.m. Board meeting, as required by the Investment Company Act of 1940, Defendants asked the Board for permission to approach the SEC about entering into a credit support agreement to protect the Fund's NAV.  Compl. ¶¶ 71-72.  The Board permitted RMCI to do so, though it reserved approval of any finalized credit support agreement.  Osnato Decl. Ex. 3, 9/15 Mins. at RF-SEC-00178719.   Thereafter, Bent II joined outside counsel and RMCI's General Counsel for part of their teleconference with both the Director and Associate Director for the SEC Division of Investment Management regarding RMCI's potential credit support for

the Fund. The Associate Director authorized RMCI to communicate to investors its intent to support the Primary Fund. Inside and outside counsel had additional contacts with the SEC throughout the day. *See id.* Ex. 15, Minutes of the Meeting of the Boards of Trustees of The Reserve Fund, *et al.*, dated Sept. 16, 2008 ("9/16 Mins.") at 1.

Following the phone call with the SEC, Bent II circulated an e-mail to a handful of RMCI employees, copying RMCI's General Counsel, stating that RMCI "intend[s] to protect the NAV on the Primary Fund[.]" Compl. ¶ 77. In light of the conversation with the SEC, the e-mail stated that RMCI was awaiting final approval on the credit support agreement (*see* Compl. ¶¶ 77, 80), which was contemporaneously being drafted by outside counsel for the Fund and RMCI. Ten minutes later, the General Counsel responded to the same internal group, confirming that the Fund did not yet have the agreements in place, which was why the e-mail stated that RMCI "intend[s]" to secure them.[4] Among the recipients of these internal e-mails were the heads of the Sales and Marketing Departments (Compl. ¶ 82), who were advised that they could communicate these messages to investors on an as-needed basis. The Director of Sales read this e-mail to his staff, who communicated with investors in response to investors' questions. Compl. ¶¶ 83-84. Bent II also described RMCI's plan to implement a credit support agreement to a Moody's representative, but, when pressed for details, declined to provide them because the agreements had only begun to be drafted and were not yet approved by the SEC. *See* Compl. ¶ 81.

Defendants also communicated their intent to enter into a credit support agreement through a *Reserve Insights* release. After a first draft was approved by RMCI's General Counsel,

---

[4]    This e-mail chain ("1:29 p.m. E-mail"), was produced to the SEC during its investigation *In the Matter of The Reserve Fund* (File No. NY-7999), and excerpts of the complete chain are relied on in the Complaint (*e.g.*, ¶¶ 77-80). Accordingly, the Court may consider this e-mail in resolving this Motion to Dismiss. *See supra* n.3. The e-mail is submitted to this Court with this Memorandum under the Declaration of Lori A. Martin, dated June 11, 2009 ("Martin Decl.") at Ex. A.

Bent II commented on this first version of the *Reserve Insights* piece, which stated RMCI's "intent[ion]" to enter into "support agreements with the Primary Fund" (Compl. ¶¶ 89-90). Contrary to set procedures for such releases, requiring approvals from the Bents and counsel, a second, unapproved, version was circulated to investors via the Marketing Department in the afternoon on September 15 (*see* Compl. ¶¶ 91, 93-95). The second version added language, neither reviewed nor authorized by counsel or the Bents, stating that "our support agreements ensure the integrity of a $1.00 NAV" (Compl. ¶ 92(c)).

When the trading day drew to a close on September 15, redemptions had climbed to $20 billion. Compl. ¶ 107. It became apparent to the Bents that they would be unable to save the Fund in light of the massive redemptions, the lack of market liquidity, the consequent amount of support needed (*see* Compl. ¶¶ 72, 78), and the amount they could provide. The next morning, the Bents disclosed to the SEC (Osnato Decl. Ex. 15, 9/16 Mins. at 1-2) and to the Board at the first meeting (Compl. ¶ 115) that they had not entered into an agreement to support the Fund.

The SEC alleges that these statements on September 15, which were explicitly framed as an "inten[t]" to enter into a credit support agreement (Compl. ¶¶ 77, 92(a)), were false and misleading. The SEC posits that because no credit support agreement was finalized, *a fortiori*, Defendants never intended to enter into any such agreements (*see* Compl. ¶¶ 8, 115, 117).

**The Decision To Liquidate The Fund On The Afternoon Of The 16th**

Defendants made full disclosure of all material facts to the SEC at 8:00 a.m. (Osnato Decl. Ex. 15, 9/16 Mins. at 1-2), and to the Board at 10:00 a.m. on the morning of September 16 (*see* Compl. ¶¶ 115-16). Nonetheless, the Board did not immediately alter its valuation of Lehman paper, or the Fund's NAV. Instead, it left the Lehman valuation unchanged, while it encouraged management to continue to explore additional mechanisms for supporting the Fund, including a potential sale of the adviser. It was only at 3:45 p.m., by which time all avenues of

potential assistance had been closed off and redemption requests had climbed to $40 billion, that

the Board reduced the Lehman valuation to zero.  Osnato Decl. Ex. 15, 9/16 Mins. at 7; *see also*

Compl. ¶ 121.  RMCI then issued a press release disclosing that, effective at 4:00 p.m., the NAV

of the Fund was $0.97 per share.  Compl. ¶ 121.

## ARGUMENT

## I.    THE SEC FAILS TO ALLEGE ADEQUATELY SCIENTER UNDER RULE 9(b)

Under Fed. R. Civ. P. 9(b), claims sounding in fraud must be supported by factual

allegations giving rise "to a strong inference of fraudulent intent." *Novak v. Kasaks*, 216 F.3d

300, 307 (2d Cir. 2000); *SEC v. Espuelas*, 579 F. Supp. 2d 461, 469 (S.D.N.Y. 2008).  The

Complaint fails to do so, alleging facts neither (a) showing "both motive and opportunity to

commit fraud," nor (b) constituting "strong circumstantial evidence of conscious misbehavior or

recklessness." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994).[5]

### A.    The Allegations In The Complaint Of Defendants' Efforts To Involve and Consult Regulators, Lawyers, Auditors, And The Board Are Flatly Inconsistent With An Intent To Defraud

Read as a whole, the Complaint cannot support a strong inference of scienter because its

allegations of fraud are flatly inconsistent with its description of Defendants as seeking

involvement and guidance of lawyers, auditors, Board members, and the same regulators who

now bring this suit.  The Complaint describes how Defendants convened a Board meeting

immediately following the announcement of Lehman's bankruptcy and met with the Board twice

---

[5]    The First, Second, and Third Claims require the SEC to plead a primary violation with
scienter.  *See* 15 U.S.C. § 78j(b) & 17 C.F.R. § 240.10b-5; 15 U.S.C. § 78t(a); 15 U.S.C.
§ 77q(a).  The Fourth Claim requires the SEC to plead scienter to the extent that it is premised on
a violation of Section 206(1) of the Investment Advisers Act, *see* 15 U.S.C. § 80b-6(1).  It is an
open question whether the Fifth Claim, which is premised on a violation of Section 206(4) and
Rule 206(4)-8, requires a plaintiff to plead scienter.  The Sixth and Seventh Claims, for aiding
and abetting, require the SEC to plead scienter irrespective of whether the underlying violations
require scienter.  *See, e.g.*, *Armstrong v. McAlpin*, 699 F.2d 79, 91 (2d Cir. 1983).

more that day.  Compl. ¶ 54.  These meetings included "certain Independent Trustees and their outside regulatory counsel, inside and outside counsel to RMCI and, at various times, certain managing directors of RMCI and a representative from KPMG LLP, the Primary Fund's outside auditor."  *Id.*; *see also* Compl. ¶ 53 (telephone call to the Fed).  And, although the SEC neglects to mention it, throughout the day, Defendants repeatedly called the SEC itself.  *See* Osnato Decl. Ex. 15, 9/16 Mins. at 1-2.  RMCI's inside and outside counsel spoke with the SEC at least three times on September 15, to disclose the exposure to Lehman and the Board's valuation of Lehman, and, later, to discuss a potential credit support agreement for the Fund.[6]

The fact that Defendants sought input and approval from all relevant sources, including the SEC itself, rather than acting secretly or on their own instincts or opinions, severely undercuts the generic assertions of fraudulent intent, even assuming *arguendo* that information was omitted or, based on subsequent events, later turned out to be inaccurate.  *See, e.g.*, *SEC v. Snyder*, 292 F. App'x 391, 406 (5th Cir. 2008) (reliance on counsel is "a means of demonstrating good faith and represents possible evidence of an absence of any intent to defraud" (internal quotation marks omitted)); *Howard v. SEC*, 376 F.3d 1136, 1147-48 (D.C. Cir. 2004) (similar).

**B.      The Complaint Fails To Establish Motive And Opportunity**

To allege scienter through motive and opportunity, "plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud."  *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001).  The SEC alleges Defendants were "driven by a desire" to "slow[]

---

[6]     Even with regard to the sources of the more central allegations of misstatements, the 1:19 p.m. e-mail and the first version of the *Reserve Insights* press release, Defendants sought involvement and approval by others.  Bent II copied the 1:19 e-mail to RMCI's General Counsel for her approval and commentary on the substance of the communication.  *See* Martin Decl. Ex. A, 1:29 p.m. E-mail.  The content of the first version of the *Reserve Insights* piece was run past both internal counsel as well as outside counsel to the Fund.  As noted above, *supra* pp. 8-9, the alleged statements of the sales force and the second, unauthorized, version of the *Reserve Insights* piece were not subject to such additional guidance, nor were they approved by, or even known to, the Bents.

the rate of redemptions" and to avoid "a calamitous ratings downgrade" and damage to "the Fund's and RMCI's reputation." Compl. ¶¶ 10, 74. An intent to preserve a business—which reflects natural, pro-investor desires that could apply to "most corporate directors and officers"— is inadequate as a matter of law. *Kalnit*, 264 F.3d at 139; *see also id.* at 140 ("generalized" motives such as "a desire to maintain or increase executive compensation" or to "avoid[] . . . personal liability" are insufficient). The SEC's emphasis on the Fund's "disastrous state of affairs" (Compl. ¶ 9), does not change this analysis; otherwise, "virtually any company . . . , especially in a woeful economic climate, would face specious securities fraud allegations." *In re PXRE Group, Ltd., Sec. Litig.*, 600 F. Supp. 2d 510, 533 (S.D.N.Y. 2009). Critically, the SEC nowhere alleges that Defendants benefited from the alleged fraud, which is "inconsistent with an intent to defraud." *In re N. Telecom Sec. Litig.*, 116 F. Supp. 2d 446, 462 (S.D.N.Y. 2000). The SEC does not allege, for example, that Defendants tried to keep the Fund up and running long enough to sell their significant holdings in the Fund—they are not alleged to have sold any shares in the Fund before the buck was broken, or otherwise to have financially benefited in any way from inside information. Thus, Defendants, like all Fund investors, incurred losses when they were unable to save the Fund. While the SEC repeatedly alleges that Defendants sought to "salvage the Primary Fund's viability" (Compl. ¶ 108), this laudable intent is to be expected because it aligns the interests of the fund manager with those of its shareholders.

Second, the Complaint's scienter allegations fail under Fed. R. Civ. P. 8 and 9(b) for the additional reason that they are completely implausible. If the fall of the Fund was inevitable, as the SEC suggests, Defendants would know that their failure to execute a support agreement and escrow funds on behalf of the Fund, in the face of rising redemption levels, would result in the Fund breaking the buck as early as September 16. But the SEC offers no possible reason why

Defendants would want to stall redemptions—and the inevitable collapse of the Fund—for a single day. *See Shields*, 25 F.3d at 1130 ("It is hard to see what benefits accrue from a short respite from an inevitable day of reckoning."). The only credible explanation for Defendants' conduct is that they did not believe on September 15 that the Fund was destined to collapse and instead believed in the quality of the Fund's assets. Their confidence that they could preserve the Fund is a manifestly non-fraudulent intent. Even under Rule 8, a plaintiff is required to plead sufficient "factual content" to move the claim "across the line from conceivable to plausible." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1952 (2009) (internal quotation marks omitted). The implausible scienter allegations in the Complaint fail under Rule 8, and thus fall short of Rule 9(b)'s "strong inference" requirement, *Shields*, 25 F.3d at 1130.

In addition to failing under these two standards, the Complaint also fails under the pleading standard for scienter set out in *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 127 S. Ct. 2499, 2510 (2007) (emphasis added), which provides that "[a] complaint will survive . . . only if a reasonable person would deem the inference of scienter cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged." While *Tellabs* interpreted the "strong inference" language under the PSLRA, it also informs the Second Circuit's "strong inference" requirement under Rule 9(b), from which Congress drew in shaping the PSLRA amendment.[7] Here, non-fraudulent intent is substantially more plausible than the

---

[7]     *See* H.R. Conf. Rep. No. 369, 104th Cong., 1st Sess., at 41 (1995), *as reprinted in* 1995 U.S.C.C.A.N. 730, 740. The Second Circuit has not addressed whether the *Tellabs* standard applies under Rule 9(b). *Compare SEC v. Northshore Asset Mgmt.*, No. 05 Civ. 2192, 2008 WL 1968299, at *7 (S.D.N.Y. May 5, 2008) (applying "strong inference" standard articulated in *Tellabs*), *and SEC v. Boling*, No. 06-1329, 2007 WL 2059744, at *4 n.1 (D.D.C. July 13, 2007) (same), *with SEC v. Pentagon Capital Mgmt. PLC*, No. 08 Civ. 3324, 2009 WL 320608, at *18-*19 (S.D.N.Y. Feb. 10, 2009) (rejecting application of *Tellabs*), *and SEC v. Dunn*, 587 F. Supp. 2d 486, 500-02 (S.D.N.Y. 2008) (same).

assertion that Defendants wanted to prop up the Fund for a single day with no apparent personal gain and no way out at the end.

###### C. The Complaint Fails To Establish Conscious Misbehavior Or Recklessness

Where a complaint fails to allege motive, "the strength of the circumstantial allegations of conscious misbehavior or recklessness must be correspondingly greater." *In re PXRE Group*, 600 F. Supp. 2d at 535 (citing, *inter alia*, *Kalnit*, 264 F. 3d at 142). The Complaint's repeated assertions that Defendants disseminated "misinformation" (Compl. ¶ 5), and failed to disclose other information (*e.g.*, Compl. ¶ 10), are insufficient. Scienter cannot be established through the "elliptical argument," that "because the underlying conduct is said to be fraudulent, any statement or act thereafter singled out is . . . motivation for . . . fraud." *Glickman v. Alexander & Alexander Servs., Inc.*, No. 93 Civ. 7594, 1996 WL 88570, at *8 (S.D.N.Y. Feb. 29, 1996). Rather, a plaintiff must allege with particularity that defendants had *knowledge* at the time they made a misstatement or omitted a fact that gives rises to a strong inference that the alleged misstatements or omissions were made with an intent to defraud. It is not enough to allege that "defendants were wrong," *Shields*, 25 F.3d at 1129, or that a defendant "merely ought to have known," *Hart v. Internet Wire, Inc.*, 163 F. Supp. 2d 316, 321 (S.D.N.Y. 2001) (internal quotation marks omitted), *aff'd*, 50 F. App'x 464 (2d Cir. 2002).

As detailed in Part II, *infra*, the SEC wholly fails to allege that Defendants had the requisite knowledge at the time they spoke or failed to speak, including for the key allegations concerning redemption levels and funding by State Street. First, while alleging (Compl. ¶ 60) that at the 9:30 a.m. Board meeting RMCI did not disclose redemption levels, the SEC fails to allege that Defendants had knowledge of the redemption levels allegedly not disclosed. Second, alleging merely that "RMCI had been aware of th[e] fact since early [on the 15th]" (Compl. ¶ 116), and without alleging who learned the information and when, the SEC seeks to hold

Defendants liable for fraudulently failing to disclose to the Board on September 15 State Street's refusal to fund redemptions (Compl. ¶¶ 62, 75(a)). But its "allegations with regard to what [Defendants] knew, and when they knew it, lack specificity and detail" as required by Rule 9(b). *Panther Partners, Inc. v. Ikanos Commc'ns, Inc.*, 538 F. Supp. 2d 662, 670 (S.D.N.Y. 2008). Additionally, no inference of scienter can be drawn as to the Bents because the SEC does not allege that they themselves had knowledge (and the SEC's investigation confirmed that they were unaware prior to the 1:00 p.m. Board meeting that State Street had stopped paying redemptions). *See In re Bayer AG Sec. Litig.*, No. 03 Civ. 1546, 2004 WL 2190357, at *16 (S.D.N.Y. Sept. 30, 2004) (dismissing claims where "[p]laintiffs fail to allege that either [defendant] knew of the conclusion by other [of the corporate defendant's] executives"). Nor can an inference of scienter be drawn as to RMCI; the SEC does not identify any individual who both failed to disclose information and had knowledge. *See Kinsey v. Cendant Corp.*, No. 04 Civ. 582, 2004 WL 2591946, at *13 (S.D.N.Y. Nov. 16, 2004) ("It is not enough to establish fraud on the part of a corporation that one corporate officer makes a false statement that another officer knows to be false." (internal quotation marks omitted)).

## II.   THE COMPLAINT FAILS TO ALLEGE ACTIONABLE MISSTATEMENTS OR OMISSIONS

The alleged misstatements fall into two categories:  (1) allegations relating to the valuation of the Fund's Lehman holdings on the morning of September 15 (Compl. ¶¶ 57-58), which are non-actionable statements of opinion; and (2) allegations concerning the intent to support the NAV of the Fund (*e.g.*, Compl. ¶¶ 71-72, 75, 77), which are non-actionable forward-looking statements. As for the alleged omissions—relating to redemption levels (Compl. ¶ 60) and liquidity from State Street (Compl. ¶¶ 61-62, 75(a))—the SEC not only fails to allege that Defendants had actual knowledge of the information allegedly omitted, but also acknowledges

that all material facts allegedly omitted were disclosed to the Board early the following morning (*see* Compl. ¶¶ 115-116; *see also* Osnato Decl. Ex. 15, 9/16 Mins. at 1-2).

A.     **The Allegations Regarding Valuation Of The Fund's Lehman Holdings Are Non-Actionable Statements Of Opinion**

The SEC's allegations concerning Defendants' view of Lehman's valuation on the morning of September 15 are non-actionable statements of opinion because the SEC has not offered any basis from which to infer that the valuation estimates were not what Defendants believed at the time.  "[V]aluing securities for which no current market exists involves the exercise of judgment, and is inherently imprecise." *In re Allied Capital Corp. Sec. Litig.*, No. 02 Civ. 3812, 2003 WL 1964184, at *1 (S.D.N.Y. Apr. 25, 2003).  Such valuation is "considerably more a statement of opinion than a report of an objectively determinable fact." *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt. LLC*, 479 F. Supp. 2d 349, 362 (S.D.N.Y. 2007).  To state a claim for fraud based on a statement of opinion, the SEC must allege facts demonstrating "with particularity that defendants did not sincerely believe the opinion they purported to hold." *Podany v. Robertson Stephens, Inc.*, 318 F. Supp. 2d 146, 154 (S.D.N.Y. 2004).

The Complaint, however, fails to allege any facts to support the inference that Defendants did not believe the estimates provided beyond insufficient "conclusory or unsupported" assertions.  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2007). Defendants and the Board (supported by inside and outside counsel and independent auditors) were facing a nearly impossible situation on September 15 and 16:  seeking to value Lehman paper after Lehman declared bankruptcy in the largest bankruptcy in the history of U.S. capital markets, at which time trading was paralyzed and rumors were rampant as to the value of Lehman debt.  The allegation that Bent Sr. made an actionable misstatement by proposing par value for Lehman at the 9:30 a.m. Board meeting (Compl. ¶ 58), when Lehman itself—subject to

consolidated financial supervision by the SEC—was reporting that its assets exceeded its liabilities,[8] fails.  It is not enough to allege that "it would have been possible to reach a different opinion . . . based on information available to defendant at the time, or even that the defendant's opinion was unreasonable."  *Podany*, 318 F. Supp. 2d at 154.  That the Board rejected Bent Sr.'s opinion and instead valued the paper at 80% (Compl. ¶ 58)—with Bent Sr.'s assent—only reinforces that the par value proposal was merely a statement of opinion.

Likewise, Defendants' statement "'that no valid market'" existed and that bids "'were being thrown out there anywhere from 45 to 80,'" when other data allegedly "suggested" that Lehman debt would trade between 30 to 40 (Compl. ¶ 57), provides no basis for a fraud claim. The partial recording of the Board meeting repeatedly makes clear the lack of meaningful market information on the morning of the 15th, the cautionary language accompanying the information, and the highly speculative nature of any valuation.  *See* Osnato Decl. Ex. 26, 9:30 a.m. Call. Given the obvious market turmoil and the caveats provided, the allegations of purported "falsity" of Defendants' valuation opinions are insufficient.  *See In re Nokia Oyj (Nokia Corp.) Sec. Litig.*, 423 F. Supp. 2d 364, 398 (S.D.N.Y. 2006) (dismissing securities fraud claim and criticizing plaintiffs for "disturbingly leaving [cautionary language] out of their selective quotations").

     **B.**     **The Allegations About Support For The Fund's NAV Do Not Provide The Basis For A Claim Based On Misstatements**

     1.     *The allegations of Defendants' statements of intent do not state a claim*

The central allegations regarding Defendants' intention to enter into a credit support agreement—which are explicitly framed as what Defendants "intended" to do (*e.g.*, Compl.

---

[8]     Press Release, Lehman Brothers Holdings Inc. Announces It Intends to File Chapter 11 Bankruptcy Petition; No Other Lehman Brothers' U.S. Subsidiaries or Affiliates, Including Its Broker-Dealer and Investment Management Subsidiaries, Are Included in the Filing, Sept. 15, 2008, *available at* http://www.lehman.com/press/pdf_2008/091508_lbhi_chapter11_ announce.pdf.

¶¶ 71-73, 77-78, 92)—fail because the SEC does not allege any facts even suggesting that Defendants lacked that intent at the time of the statements. Generally, an actionable "representation must be one of existing fact, and not merely an expression of opinion, expectation, or declaration of intention." *In re Duane Reade Inc. Sec. Litig.*, No. 02 Civ. 6478, 2003 WL 22801416, at *4 (S.D.N.Y. Nov. 25, 2003) (internal quotation marks omitted), *aff'd*, 107 F. App'x 250 (2d Cir. 2004). Under Rule 9(b), plaintiffs must allege facts establishing that, at the time of the statement, "the defendant secretly intended not to perform or knew that he could not perform." *Gurary v. Winehouse*, 190 F. 3d 37, 44 (2d Cir. 1999) (internal quotation marks omitted).

The Complaint fails to allege facts demonstrating that Defendants never intended to perform, resting only on conclusory assertions that no such intention existed because the agreements were never finalized (*see* Compl. ¶¶ 8, 73, 79, 92(a), 115, 117). Such conclusory assertions that Defendants "never intended to perform" are insufficient under Rule 9(b). *National Westminster Bank v. Ross*, 130 B.R. 656, 664-65 (S.D.N.Y. 1991), *aff'd*, 962 F.2d 1 (2d Cir. 1992). The central allegation offered to support the SEC's proposed inference that these statements of intent were false when made is an e-mail sent on September 14 regarding whether RMCI then had bank lines of credit (Compl. ¶ 47)—before Lehman even declared bankruptcy. Yet, as the allegation makes clear, that document relates to a different subject: that is, whether the Reserve *already* had "lines of credit available." *See id.* In any event, that e-mail does not speak to Defendants' intent on the afternoon of September 15, as the world looked significantly different following the cataclysmic event of the Lehman bankruptcy and the resulting freezing of the credit markets. Defendants' conduct, moreover, is consistent with their statement of intent. As the SEC itself concedes (Compl. ¶ 98), Defendants took active steps toward a credit support

agreement, such as drafting by counsel of the necessary documents. And as the SEC knows (though fails to state), Defendants and counsel had a number of phone conversations with, and exchanged a number of e-mails with, the SEC, relating to a credit agreement on September 15,[9] during which the SEC authorized Defendants to state their intent publicly. That RMCI ultimately did not implement such an agreement is insufficient to demonstrate that the statements were false when made. *See, e.g.*, *National Westminster Bank*, 130 B.R. at 665.

2. *The remaining allegations concerning the support for the NAV of the Fund do not suffice to state a claim based on false statements*

The SEC's attempts to contort certain forward-looking statements by Defendants into false statements of fact fall short under the Complaint itself. The allegation of falsity based on the 1:19 p.m. internal e-mail's statement that RMCI had "spoken with the SEC and [was] waiting [for] their final approval which we expect to have in a few hours" (Compl. ¶ 77) fails. The SEC does not dispute that RMCI had already contacted the SEC. Rather, it alleges that RMCI could not state that it was awaiting "'final approval'" from the Commission because it had not yet "submitted a written request" for no action relief. Compl. ¶ 80. It is not clear why this statement would be fraudulent as the SEC suggests. In any event, not ten minutes later, the General Counsel of RMCI clarified for the entire group (all of whom were RMCI employees): "We haven't entered into the agreements yet; that's why Bruce's email said we intend to. We will submit a form of the agreement to the SEC this afternoon for its review and approval which we expect to obtain." Martin Decl. Ex. A, 1:29 p.m. E-mail.[10]

---

[9]    The SEC does not allege that any of the Defendants' statements to the SEC—during the numerous conversations—were false or misleading.

[10]    The SEC's efforts to allege false statements to the credit rating agencies fail. The SEC takes issue with the statement that "RMCI was implementing credit support agreements," around the time of the 1:19 e-mail (Compl. ¶ 81), but the Complaint describes (¶ 98) the preparations then underway at RMCI to implement such an agreement. Moreover, the preliminary nature of

The Complaint also alleges that Defendants falsely represented their capacity to support the Fund's NAV. *E.g.*, Compl. ¶¶ 72, 77. Again, however, the Complaint fails to offer any factual allegations to support the conclusion that the statements were false when made.[11] Instead, the Complaint merely alleges that, as it turned out, the Bents did not provide the necessary support that was *ultimately* needed, after investors had withdrawn half of the Fund's assets, the credit markets had precluded a sale of Fund assets, and the Fund's custodian would not continue to extend credit to the Fund, thus exacerbating a run on the Fund. *See* Compl. ¶¶ 72, 78, 115-117. Any suggestion that Defendants should have foreseen a need for support that would exceed their resources (*see* Compl. ¶¶ 72, 78) is insufficient as Defendants were not required to anticipate such a doomsday scenario. *See, e.g.*, *Rombach v. Chang*, 355 F.3d 164, 174 (2d Cir. 2004). Furthermore, when subsequent developments transpired to render support impossible, the Bents informed the SEC (Osnato Decl. Ex. 15, 9/16 Mins. at 1-2) and Fund Board (Compl. ¶ 115) early in the morning on September 16 that they had not entered into a support agreement. *See In re Glenayre Techs. Inc. Sec. Litig.*, 982 F. Supp. 294, 297 (S.D.N.Y. 1997) (dismissing complaint because it failed to allege facts establishing defendants "had any obligation to disclose [information] sooner than they did"), *aff'd*, 201 F.3d 431 (2d Cir. 1999).

Finally, the Complaint includes allegations of misstatements by the sales force to investors and in the second version of the *Reserve Insights* piece regarding support for the Fund. Specifically, the Complaint alleges that the sales team informed institutional investors that the Bents "'definitively'" would step in, and also said that "'we have a backstop'" (Compl. ¶ 84), and that the second version of *Reserve Insights* stated that "'our support agreements ensure the

---

the plan to secure the agreements was apparent to Moody's because, as the Complaint alleges (¶ 81), Bent II did not provide Moody's with details when asked for them.

[11] At the time the statement was made, Defendants had the capacity to support the NAV, based on an 80% valuation of Lehman, so long as redemptions stayed within a certain range.

integrity'" of the Fund (Compl. ¶ 92(c)). Unlike the statements by the Bents to the Board, to the credit ratings agencies, in the 1:19 e-mail, and in the approved first version of the *Reserve Insights* piece, the alleged statements by the sales force were more definitive and could be understood to suggest that some sort of support was already in place. These statements cannot be used to establish liability as to the Bents, however, as the Complaint offers no link between these statements and those by the Bents. *See, e.g.*, *Edison Fund v. Cogent Inv. Strategies Fund, Ltd.*, 551 F. Supp. 2d 210, 228 (S.D.N.Y. 2008) ("plaintiffs cannot automatically impute scienter on the basis of conclusory statements of associations, and must state with particularity facts giving rise to a strong inference that each defendant acted with scienter" (internal quotation marks omitted)).[12]

C. **The SEC Acknowledges That The Allegedly Omitted Facts Were Disclosed On The Morning Of September 16**

The Complaint alleges two central omissions: that Defendants fraudulently failed to disclose to the Board on September 15 (1) the level of redemption activity in the Fund at the 9:30 a.m. Board meeting (Compl. ¶ 60); and (2) that State Street had stopped funding redemptions (Compl. ¶¶ 61-62, 75(a), 116). As noted, however, the Complaint fails to allege that Defendants knew this information at the time they allegedly failed to disclose it. *See* Part I.C, *supra*. And, with respect to the level of redemptions, Defendants disclosed to the Board at the 1:00 p.m. Board meeting on September 15 that redemptions had reached a staggering $16.5 billion, which they saw as a "run on the Primary Fund." Osnato Decl. Ex. 3, 9/15 Mins. at RF-SEC-00178719.[13]

---

[12] Even if such statements could be attributed to the Bents, they are immaterial for the reasons articulated below given the context in which they were made. *See* Part III.A, *infra*.

[13] The conclusory allegation that "RMCI vastly understated the actual level of redemptions as of 1:00 p.m." (Compl. ¶ 75(b)) is both devoid of any factual detail—including the level of redemptions at the time and what RMCI allegedly said (and who allegedly said it) that

In any event, the Complaint acknowledges that the information allegedly omitted on September 15 was disclosed at the first Board meeting on the 16th, at 10:00 a.m. *See* Compl. ¶¶ 115-16. Material facts need not be disclosed immediately; rather, "timing of disclosure is a matter for the business judgment of the corporate officers entrusted with the management of the corporation within the affirmative disclosure requirements promulgated by the exchanges and by the SEC." *SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 850 n.12 (2d Cir. 1968) (en banc). An obligation of immediate disclosure is particularly inappropriate here, given that the flow of information and events was moving quickly with multiple key topics to raise with the Board at any given time. Allegations "that statements in one report should have been made in earlier reports do not make out a claim of securities fraud." *Acito v. IMCERA Group*, 47 F. 3d 47, 53 (2d Cir. 1995) (*one month* disclosure delay not actionable).[14]

## III.     THE COMPLAINT FAILS TO ALLEGE ADEQUATELY MATERIALITY

Because the securities laws are designed to "ensure disclosures" sufficient to "enable . . . an informed choice," the question is whether the information at issue would have "assumed actual significance in the [individual's] deliberations." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448, 449 (1977). The standard is objective, not subjective, *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999), and turns on the "particular set of facts" and

---

"understated" that level—and is in any event insufficient given that Defendants disclosed an apparent "run on the Primary Fund."

[14]     The Complaint alleges a few additional alleged omissions, such as that RMCI and Bent II failed to disclose that the "Yield Plus" and "International Liquidity" funds had "already broken the buck" and that Bent II had "directed RMCI personnel to record receivables on the books" of these funds in a manner to "avoid disclosure" of this fact. Compl. ¶¶ 75(c)-(d). The Complaint does not allege that this information—regarding two other funds, neither of which is alleged to mirror or affect the Fund—was material, much less that there was a duty to disclose. The same shortcomings apply to the allegations that Defendants failed to disclose that they had placed unreturned calls to the Fed on the morning of September 15 (Compl. ¶ 53).

circumstances of each case, *TSC Indus.*, 426 U.S. at 450.[15]  Here, the allegations regarding the

valuation of Lehman paper at the 9:30 a.m. Board meeting and proposed support for the Fund's

NAV are necessarily immaterial in the context of the rapidly changing events on September 15.[16]

> **A.     The Alleged Misstatements Regarding The Pricing Of The Lehman Paper Are Immaterial In Light Of The Simultaneous Statements Regarding The Market For Lehman Paper**

The Complaint alleges that the valuation information provided to the Board—suggesting

a $0.45-$0.80 valuation—was misleading because other "market data" supposedly suggested a

$0.30-$0.40 valuation.  Compl. ¶ 57.  The Complaint, however, does not offer any explanation

for how this information could be material given that, at the same meeting, the Bents and others

stated that there "was 'no valid market' for Lehman paper" (*id.*); the indicators were merely

"third party analysts' conjectures" (Osnato Decl. Ex. 3, 9/15 Mins. at RF-SEC-00178717);

counsel for the Board advised the Board against considering exploitative bids in its valuation

analysis (*id.* Ex. 3, 9/15 Mins. at RF-SEC-00178717; *see also id.* Ex. 26, 9:30 a.m. Call); counsel

for the Board repeatedly made clear to the Board that it was the Board, and not RMCI, that was

responsible for valuing the securities (*id.* Ex. 3, 9/15 Mins. at RF-SEC-00178717; *see also id.*

Ex. 26, 9:30 a.m. Call); and it was readily apparent, even to market observers, that valuation for

---

[15]     All seven claims are predicated on alleged misstatements or omissions (Compl. ¶¶ 127-48) and all require the SEC to plead materiality.  Most expressly require that misstatements or omissions be material.  *See* 15 U.S.C. § 78j(b) & 17 C.F.R. § 240.10b-5(b) (First Claim); 15 U.S.C. § 78t(a), 15 U.S.C. § 78j(b) & 17 C.F.R. § 240.10b-5(b) (Second Claim); 15 U.S.C. § 77q(a)(2) (Third Claim); 15 U.S.C. § 80b-6(4) & 17 C.F.R. § 275.206(4)-8(a)(1) (Fifth Claim and Seventh Claim).  The remaining claims require the SEC to plead a scheme to defraud or acts that operated as a fraud or deceit, *see* 15 U.S.C. § 78j(b) & 17 C.F.R. § 240.10b-5(a),(c) (First Claim); 15 U.S.C. § 78t(a), 15 U.S.C. § 78j(b) & 17 C.F.R. § 240.10b-5(a),(c) (Second Claim); 15 U.S.C. § 77q(a)(1),(3) (Third Claim); 15 U.S.C. § 80b-6(1)-(2) (Fourth Claim and Sixth Claim); 15 U.S.C. § 80b-6(4) & 17 C.F.R. § 275.206(4)-8(a)(2) (Fifth Claim and Seventh Claim), and are themselves dependent on misstatements or omissions, which must be material: "the well-settled meaning of 'fraud' require[s] a misrepresentation or concealment of *material* fact," *Neder v. United States*, 527 U.S. 1, 22 (1999) (emphasis in original).

[16]     The Complaint's conclusory assertions of materiality (*e.g.*, Compl. ¶¶ 62, 78, 128, 135) are insufficient to survive a motion to dismiss, even under Rule 8.  *See Iqbal*, 129 S. Ct. at 1954.

a company newly entering into bankruptcy was a matter of guesswork at that time (*see* Tom Lauricella, Liz Rappaport & Annelena Lobb, *Mounting Fears Shake World Markets As Banking Giants Rush to Raise Capital*, Wall St. J., Sept. 18, 2008, at A1).  Indeed, a Board member recognized as much at the meeting, likening the effort to value the Lehman paper hours after a bankruptcy filing to "throwing a dart on the wall and seeing where it comes, so there's no right answer or wrong answer[.]"  Osnato Decl. Ex. 26, 9:30 a.m. Call.  The allegation (Compl. ¶ 58) that Bent Sr. materially misled the Board (as well as the counsel and independent auditors present who had information other than that available to Defendants about the valuation of Lehman) by suggesting that the paper be valued at par value fails for similar reasons.  Moreover, the Board *rejected* Bruce Sr.'s valuation proposal and, instead, valued the paper at 80% (*id.*), a valuation to which Bent Sr. assented, thereby making it clear that the Board did not view his recommendation as material.

The immateriality of these valuation estimates is further confirmed by the Board's actions on September 16.  As the SEC acknowledges (*see* Compl. ¶¶ 115-16), Defendants provided full disclosure of the allegedly misstated and omitted information to the Board on the morning of the 16th, but the Board nevertheless did not alter its valuation of Lehman paper at that time.  It waited for further information, including the results of RMCI's pursuit of additional sources of liquidity, and reevaluated the Lehman valuation only at the end of the day.  *See* Compl. ¶ 121.

**B.      The Alleged Misstatements Regarding the Bents' Intent To Enter Into A Credit Support Agreement For The Fund Are Demonstrably Non-Material Given The Events Of The Day**

The Complaint's allegations that Defendants' statements of intent to enter into a credit support agreement to protect the NAV of the Fund were material misstatements ignore the forward-looking nature of the statements in the context of the unprecedented market conditions.  Although the market opened with substantial uncertainty, there could be little doubt that the

bankruptcy would negatively affect the Fund given—as was widely known (*see* Compl. ¶ 45)—that the Fund had $785 million invested in Lehman debt, and the adviser was owned by individuals of limited means (as opposed to a huge financial institution (Compl. ¶ 36)). As the high level of redemption requests and the halting of redemptions at 10:10 a.m. demonstrate (Compl. ¶¶ 60-61), the consequences for the Fund of the Lehman announcement were not lost on the public. The Complaint, however, asks the Court to put aside common sense and assume that a reasonable person would attribute significance to a generic statement that individuals of limited means *intended* to enter into a credit support agreement to protect the Fund, when the scope of such assistance was not yet clear. Indeed, the rating agencies that were told of the Bents' intent plainly found such information nonmaterial. As the Complaint notes, the agencies pressed the Bents, insisting on seeing "the actual agreements" to understand what that potential support would mean for Fund investors. Compl. ¶ 97; *see also* Compl. ¶¶ 67, 81.

And even after disclosure of their decision not to pursue a credit support agreement at the 10:00 a.m. Board meeting on September 16, as noted, the Board took no action with respect to liquidating or adjusting the NAV of the Fund at that time. It sought further information and acted only at the end of that day (*see* Compl. ¶¶ 115-16, 118, 121), thus undermining the suggestion that the prior statements of intent were material.

## CONCLUSION

For the foregoing reasons, the motion to dismiss should be granted.

June 11, 2009

Respectfully submitted,

s/ Lori A. Martin_____
Robert B. McCaw
Lori A. Martin
Christopher J. Meade
Anne K. Small
WILMER CUTLER PICKERING
   HALE AND DORR LLP
399 Park Avenue
New York, NY 10022
Telephone: 212-230-8800
Facsimile: 212-230-8888
lori.martin@wilmerhale.com

*Counsel for Defendants Reserve
Management Company, Inc., Resrv
Partners, Inc., Bruce Bent Sr. and
Bruce Bent II*