UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
SECURITIES AND EXCHANGE           :
COMMISSION,                       :
                                  :
                    Plaintiff,    :
                                  :
        v.                        :          No. 09 Civ. 4346 (PGG)
                                  :
RESERVE MANAGEMENT COMPANY, INC., :          ECF CASE
RESRV PARTNERS, INC., BRUCE BENT SR. :
and BRUCE BENT II,                :
                                  :
                    Defendants,   :
        and                       :
                                  :
THE RESERVE PRIMARY FUND,         :
                                  :
                    Relief Defendant. :
-------------------------------------------------------------------x


# PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE COMPLAINT

Nancy A. Brown
Michael D. Birnbaum
Michael J. Osnato Jr.
SECURITIES AND EXCHANGE
COMMISSION
3 World Financial Center
New York, NY 10281
(212) 336-1023

Attorneys for Plaintiff

July 13, 2009

# TABLE OF CONTENTS

**Page**

Table of Authorities .................................................................................................. iii

PRELIMINARY STATEMENT ................................................................................. 1

Summary of the Complaint ......................................................................................... 2

    A.  Summary of False Statements of Material Fact and
        Material Omissions ........................................................................................... 2

    B.  The Elements of Plaintiff's Claims Against the Defendants ............................... 8

ARGUMENT ............................................................................................................ 10

I.    THE COMPLAINT SATISFIES THE STANDARDS FOR
      PLEADING FRAUD .......................................................................................... 10

    A.  Standard of Review for Motions Pursuant to Fed. R. Civ. P. 12(b)(6) ............. 10

    B.  The Commission's Complaint Satisfies Rule 9(b) ............................................. 10

        1.  The Complaint Alleges Facts to Support a Strong Inference that
             RMCI, Resrv Partners, Bent II and Bent Sr. Each Acted with Conscious
             Misbehavior ................................................................................................ 12

             (a)  The Complaint Alleges, and Defendants Now Confirm, that RMCI,
                  Resrv Partners and Bent II Each Made False Statements
                  Knowingly or Recklessly ..................................................................... 12

             (b)  RMCI, Resrv Partners and Bent II's False Public Statements Were
                  Contradicted by Facts They Had Access to, or Failed
                  to Ascertain Despite Their Critical Importance to the Fund's
                  Survival and Defendants' Duty to Monitor Them ............................... 17

             (c)  RMCI, Bent Sr. and Bent II's False Statements to the Board
                  Were Similarly Contradicted by Facts They Knew, Had Access to,
                  or Failed to Ascertain Despite Their Critical Importance to the Fund's
                  Survival and Defendants' Duty to Monitor Them ............................... 19

             (d)  Defendants' Reliance on Professionals' Advice May Give Them an
                  Argument at Trial, But It Is Not a Matter for Determination
                  on a Motion to Dismiss ....................................................................... 21

2. The Complaint Alleges that RMCI, Resrv Partners, Bent II and Bent Sr. Had Both Motive and Opportunity to Make False Statements and Misleading Omissions ........................................................................22

II. THE COMPLAINT ALLEGES SUFFICIENT FACTS SUPPORTING MATERIALITY OF MISSTATEMENTS AND OMISSIONS.............................................24

III. THE COMPLAINT SUFFICIENTLY ALLEGES NON-FRAUD CLAIMS AGAINST DEFENDANTS....................................................................................................27

CONCLUSION...............................................................................................................................28

# TABLE OF AUTHORITIES

**Page**

**Cases**

Aaron v. SEC, 446 U.S. 680 (1980) ......................................................................8, 27

Acito v. IMCERA Group, Inc., 47 F.3d 47 (2d Cir. 1995)............................................26

Ashcroft v. Iqbal, __ U.S. __, 129 S. Ct. 1937 (2009)...................................................10

ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87 (2d Cir. 2007) .........................9

Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007) ........................................................10

Cosmas v. Hassett, 886 F.2d 8 (2d Cir. 1989) ..............................................................17

Ganino v. Citizens Utils. Co., 228 F.3d 154 (2d Cir. 2000) ..........................................24

Goldstein v. SEC, 451 F.3d 873 (D.C. Cir. 2006) ...................................................... 8-9

Hall v. The Children's Place Retail Stores, Inc., 580 F. Supp. 2d 212 (S.D.N.Y. 2008) ..............24

Heller v. Goldin Restructuring Fund, L.P., 590 F. Supp. 2d 603 (S.D.N.Y. 2008)........................23

Howard v. SEC, 376 F.3d 1136 (D.C. Cir. 2004).........................................................21

In re Alstom SA Sec. Litig., 406 F. Supp. 2d 433 (S.D.N.Y. 2005)...............................17

In re Glenayre Techs. Inc. Sec. Litig., 982 F. Supp. 294 (S.D.N.Y. 1997),
aff'd, 201 F.3d 431 (2d Cir. 1999)................................................................................26

In re Novagold Res., Inc. Sec. Litig., No. 08 Civ 7041 (DLC), 2009 WL 1575220
(S.D.N.Y. June 5, 2009).............................................................................................10

In re Phillips Petroleum Sec. Litig., 881 F.2d 1236 (3rd Cir. 1989)...............................14

In re Refco, Inc. Sec. Litig, 503 F. Supp. 2d 611 (S.D.N.Y. 2007)......................... 17-18

In re Revlon, Inc. Sec. Litig., No. 99 Civ. 10192 (SHS), 2001 WL 293820
(S.D.N.Y. March 27, 2001)..........................................................................................12

In re Salomon Analyst AT&T Litig., 350 F. Supp. 2d 455 (S.D.N.Y. 2004)................16

In re Scholastic Corp. Sec. Litig., 252 F.3d 63 (2d Cir. 2001) ........................................................12

Kalnit v. Eichler, 264 F.3d 131 (2d Cir. 2001) ........................................................................22, 23

Leberman v. John Blair & Co., 880 F.2d 1555 (2d Cir. 1989) ........................................................22

Luce v. Edelstein, 802 F.2d 49 (2d Cir. 1986) ........................................................................13, 28

Makor Issues & Rights, Ltd. v. Tellabs Inc., 513 F.3d 702 (7th Cir. 2008) ....................................18

Nathel v. Siegal, 592 F. Supp. 2d 452 (S.D.N.Y. 2008) ..................................................................17

Novak v. Kasaks, 216 F.3d 300 (2d Cir. 2000) ................................................................ 11-12, 17

Ouaknine v. MacFarlane, 897 F.2d 75 (2d Cir. 1990) ....................................................................11

Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,
446 F. Supp. 2d 163 (S.D.N.Y. 2006) ..............................................................................................16

Pension Comm. of Univ. of Montreal. Pension Plan v. Banc of Am. Sec., LLC,
592 F. Supp. 2d 608 (S.D.N.Y. 2009) ............................................................................... 9, 27-28

Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38 (2d Cir. 1978) ................................................14

Roth v. Jennings, 489 F.3d 499 (2d Cir. 2007) ..............................................................................10

Rothman v. Gregor, 220 F.3d 81 (2d Cir. 2000) ............................................................................12

Ruotol v. City of New York, 514 F.3d 184 (2d Cir. 2008) ..............................................................10

SEC v. Banner Fund Int'l, 211 F.3d 602 (D.C. Cir. 2000) ..............................................................8

SEC v. Batterman, No. 00 Civ. 4835 (LAP), 2002 WL 31190171
(S.D.N.Y. Sept. 30, 2002) ................................................................................................................8

SEC v. Capital Gains Research Bureau, 375 U.S. 180 (1963) ........................................................8

SEC v. DiBella, No. 3:04cv1342 (EBB), 2007 WL 2904211 (D. Conn. Oct. 3, 2007) ................27

SEC v. Kenton Capital, Ltd., 69 F. Supp. 2d 1 (D.D.C. 1998) ........................................................8

SEC v. Monarch Funding Corp., 192 F.3d 295 (2d Cir. 1999) ........................................................8

SEC v. Rabinovich & Assocs., LP, No. 07 Civ. 10547 (GEL),
2008 WL 4937360 (S.D.N.Y. Nov. 18, 2008)..........................................................9, 27

SEC v. Stanard, No. 06 Civ. 7736 (GEL), 2009 WL 196023 (S.D.N.Y. Jan. 27, 2009)................9

SEC v. Steadman, 967 F.2d 636 (D.C. Cir. 1992).......................................................27

SEC v. Tambone, 550 F.3d 106 (1st Cir. 2008) ...............................................8, 11, 27

SEC v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir. 1968) (en banc).....................................26

SEC v. U.S. Envtl., Inc., 155 F.3d 107 (2d Cir. 1998) .................................................11

Semple v. Eyeblaster, Inc., No. 08 Civ. 9004 (HB), 2009 WL 1457163
(S.D.N.Y. May 26, 2009)...............................................................................10

Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87 (2d Cir. 2001).................12

UCAR Int'l, Inc. v. Union Carbide Corp., No. 00CV1338 (GBD),
2004 WL 137073 (S.D.N.Y. Jan. 26, 2004), aff'd, 119 F. App'x 300 (2d Cir. 2004) .................12

United States v. Carpenter, 791 F.2d 1024 (2d Cir. 1986), aff'd, 484 U.S. 19 (1987).................23

Vladimir v. Bioenvision Inc., 606 F. Supp. 2d 473 (S.D.N.Y. 2009)...........................................10

Wight v. Bankamerica Corp., 219 F.3d 79 (2d Cir. 2000) ..........................................................28

## Statutes and Rules

Securities Act of 1933

Section 17(a), 15 U.S.C. § 77q(a).........................................................................3, 6, 8, 9, 27

Securities Exchange Act of 1934

Section 10(b), 15 U.S.C. § 78j(b) .....................................................................3, 6, 8, 9, 27, 28

Rule 10b-5, 17 C.F.R. § 240.10b-5..................................................................3, 6, 8, 9, 27

Section 20(a), 15 U.S.C. § 78t(a)..........................................................................................9

Section 20(e), 15 U.S.C. § 78t(e)................................................................................ 3, 27-28

Investment Advisers Act of 1940

    Section 206(1), 15 U.S.C. § 80b-6(1) ............................................................................3, 8, 9, 19

    Section 206(2), 15 U.S.C. § 80b-6(2) ....................................................................3, 8, 9, 19, 27

    Section 206(4), 15 U.S.C. § 80b-6(4) ....................................................................3, 8, 9, 19, 27

        Rule 206(4)-8, 17 C.F.R. § 275.206(4)-8 ...........................................................3, 9, 19, 27

Investment Company Act of 1940

    Section 25(c), 15 U.S.C. § 80a-25(c)............................................................................................2

Fed. R. Civ. P. 9(b) ................................................................................... 1, 10-11, 17, 28

Fed. R. Civ. P. 12(b)(6)............................................................................................1, 10, 24

Plaintiff Securities and Exchange Commission respectfully submits this Memorandum of Law in Opposition to the Motion to Dismiss the Complaint filed by Defendants Reserve Management Company, Inc. ("RMCI"), Resrv Partners, Inc. ("Resrv Partners"), Bruce Bent, Sr. ("Bent Sr."), and Bruce Bent II ("Bent II") (collectively, "Defendants"), pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

The Commission's Complaint details the lies the Defendants told the Primary Fund's Board of Trustees and the investing public to keep the Fund afloat in the aftermath of the Lehman bankruptcy.

In a brief more appropriately submitted in support of a motion for summary judgment than on a motion to dismiss, Defendants primarily argue that their conduct should be excused because of the very grave events that they faced in the aftermath of Lehman's bankruptcy. Whatever appeal this argument might have at trial, it has no merit in the context of this, a motion to dismiss, in which the allegations of the Complaint must be accepted as true and all reasonable inferences drawn in Plaintiff's favor.

Those allegations and inferences are that in the two days immediately following the Lehman bankruptcy, Defendants engaged in a frantic effort to save their business and reputation, including by knowingly and recklessly lying to the Primary Fund's Board and its investors, most notably about Defendants' purported intent to provide credit support to protect the Primary Fund's $1 net asset value ("NAV") and about the Primary Fund's liquidity.

Defendants devote much of their motion to Fed. R. Civ. P. 9(b), claiming that the Complaint fails to plead Defendants' scienter with the necessary particularity. However, this Complaint alleges fraud with overwhelming detail, well beyond what Rule 9(b) requires. It

alleges with particularity each statement alleged to be false, the speaker, where and when it was made, why the statement was false and scienter. For the most part, Defendants simply dispute the facts alleged and try to disregard them. But there is no substance to the claim that the Complaint is not sufficiently particularized.

In sum, there is no merit to Defendants' motion. The Complaint states its claims with the requisite particularity. The motion should be denied.[1]

## Summary of the Complaint

### A.    Summary of False Statements of Material Fact and Material Omissions

The Complaint chronicles Defendants' campaign to deceive the investing public that the Reserve's flagship money market fund was a safe and secure investment that would survive Lehman Brothers' bankruptcy filing despite the Fund's substantial Lehman holdings. (¶ 1.)[2]

The Primary Fund historically provided shareholders with a $1 per share NAV. Investors bought shares in the Fund because they viewed it as a safe and stable option for preservation of capital that gave them virtually immediate access to their funds. (¶ 2.) Indeed, the Primary Fund struck an hourly NAV, even though not required to, to enable investors to cash out throughout the day. (¶ 33.)

After the Lehman filing was announced, and Fund investors realized that its holdings of $785 million in Lehman securities put the $1 NAV at risk, redemption requests began to pour into the Fund. (¶ 3.) Defendants were not surprised; on Sunday night, when Lehman's filing

---

[1]    Defendants' final argument, made only in their Preliminary Statement, has already been addressed by the parties. The resolution of Defendants' culpability is entirely separate and independent from Plaintiff's 25(c) claim against the Relief Defendant, the Primary Fund. See Letter of Lori A. Martin to the Court, dated May 11, 2009 (conceding Defendants' understanding that the Commission's 25(c) claim can be resolved by the Court without a determination of the Commission's claims against Defendants).

[2]    References to "¶ __" are to Plaintiff's Complaint, filed May 5, 2009.

appeared inevitable, RMCI's Director of Marketing and Bent II, RMCI's President and Co-CEO of the Primary Fund,[3] discussed how RMCI[4] would calm investor panic once the filing was made and announced. (¶ 47.) Bent II told RMCI employees to start working on a public relations piece to try to head off a "run on the fund," and he called a special meeting of the Fund's Board for 8 a.m. the next day. (¶¶ 48, 50.) By the morning, even before the markets opened, Bent II and Bent Sr. (RMCI's Chairman and Chairman and Trustee of the Primary Fund)[5] were so concerned about the potential disastrous effect of the Lehman announcement that they called the New York Fed to warn that Lehman's filing would negatively impact the Fund. (¶ 53.)

In short, the Bents knew that they had to maintain investor confidence that each share would return a dollar and that each share was almost immediately redeemable. If investors learned that the Fund was no longer able to report a $1 NAV and provide liquidity, the Bents' reputations as "the world's most experienced money fund manager" (¶ 26) would be destroyed. Thus their mission became to preserve that investor confidence at all costs.

---

[3]    Bent II is charged with primary violations of Securities Exchange Act of 1934 ("Exchange Act") Section 10(b) and Rule 10b-5, Securities Act of 1933 ("Securities Act") Section 17(a), primary violations of Investment Advisers Act of 1940 ("Advisers Act") Sections 206(1), (2), and (4) and Rule 206(4)-8. Bent II is also charged with aiding and abetting other Defendants' violations of Section 10(b) and Section 17(a), and the Advisers Act claims, as well as control person liability under Exchange Act 20(e). (¶¶ 127-148.)

[4]    RMCI, the Primary Fund's investment adviser (¶ 19), is charged with primary violations of Exchange Act Section 10(b) and Rule 10b-5, Securities Act Section 17(a) and primary violations of Advisers Act Sections 206(1), (2), (4) and Rule 206(4)-8 thereunder. (¶¶ 127-130, 134-142.)

[5]    Bent Sr. is charged with primary violations of the Advisers Act Sections 206(1), (2) and (4) and Rule 206(4)-8. Bent Sr. is also charged with aiding and abetting other Defendants' primary violations of Exchange Act Section 10(b) and Rule 10b-5, Securities Act Section 17(a) and RMCI's Advisers Act violations, as well as control person liability under Exchange Act Section 20(e). (¶¶ 127-133, 137-148.)

To do so, the Bents also had to convince the Board to retain a $1 NAV. With the Lehman filing, those Lehman securities in the Fund's portfolio could no longer be valued at amortized cost, and the Board was required to assign them a "fair value," relying on the Fund's adviser, RMCI, for information necessary to do so. (¶ 33.) What value the Board assigned to the Lehman holdings therefore had a direct impact on the Fund's NAV. With the Lehman holdings at 1.2% of the Fund's assets when valued at par, the Fund's ability to maintain a $1 NAV was dependent on (i) whether and the extent to which the Board lowered the Lehman holdings' value; and (ii) the total assets of the Fund at the time of valuation. (¶ 55.)

So it was that when the Board convened to determine Lehman's value at 9:30, neither Bent told the Board that his concerns about the Lehman impact were so grave that they had reached out to the Fed, or that the information they had suggested that Lehman debt would not trade any higher than $.30 or $.40 cents (¶ 57); instead, Bent Sr. recommended that the Board value the holdings at par. (¶ 58.) The Board determined to value the holdings at 80 % of par, but directed RMCI management to reconvene the Board if anything occurred to call that valuation into question. (¶ 59.)

Notwithstanding the Board's directive and their own duties as Fund adviser, Bent Sr. and Bent II never informed the Board on September 15 of the enormous redemptions that were being submitted by Fund investors (¶ 75), or that the enormity of those redemptions caused the Fund's custodian bank, State Street, to stop funding them by 10:10 a.m. on September 15, essentially wiping out the Fund's liquidity. (¶¶ 61, 62, 117.) Nor did they inform the Board that two other Reserve funds had already broken the buck because of their Lehman holdings, and that receivables had been recorded on their books to keep their NAV's at $1. (¶ 75.)

4

Nonetheless, by 1 p.m., when the Board reconvened at Bent II's request, the Bents realized that they would have to take bold action to stop what had become the very run on the Fund that Bent II had predicted the night before. (¶¶ 70, 71.) At that meeting, Bent II announced that RMCI intended to implement a credit support agreement to protect the Primary Fund's $1 NAV, and would immediately seek relief from the Commission to implement it. (¶ 71.) Concerned that the level of support that RMCI was committing was potentially substantial, the Independent Trustees' counsel asked about RMCI's resources to make good on Bent II's pledge. (¶ 72.) Bent Sr. assured the Board that RMCI had sufficient capital. (Id.) Nothing he said qualified his or his son's representations.

Having reassured the Board, Bent II turned to getting the false pledge of support out to the investing public. Immediately, he sent an email (the "1:19 Email") to RMCI's Directors of Sales and Marketing, among others, reiterating RMCI's commitment to protect the Fund's NAV, but this time, he added that that commitment was "to whatever degree is required." (¶ 77.) Further cementing the certainty of RMCI's decisive action to protect the Fund, Bent II added that RMCI had spoken with the SEC and "are waiting [for] their final approval which we expect to have in a few hours." (Id.) Bent II ensured that the news was communicated to existing and potential investors by instructing that it be communicated "to clients on an as needed basis," and he invited the preparation of a similar communication for the Reserve's web site. (Id.) Even after the market had closed, and redemptions had reached $20 billion (¶ 107), Bent II authorized RMCI to affirm RMCI's commitment to support the NAV "to whatever degree is required" to the *Wall Street Journal.* (¶ 109.)

The RMCI marketing department understood the importance of getting the news of credit support out as quickly as possible. They prepared a press release announcing RMCI's

commitment, and while both Bents reviewed and commented on it, neither objected to its statement reiterating RMCI's unqualified intention to "support the value of Lehman credit held in the Fund." (¶ 89.) Later that afternoon, a RMCI marketing employee circulated a revised version of the press release, the Reserve *Insights* piece, to the marketing and sales teams, and all Directors and Managers, including the Bents. (Id.) The Reserve *Insights* repeated the earlier statements made by Bent II in his 1:19 Email, including the unqualified statement of support and the fact that RMCI was "submitting appropriate documentation to the SEC." (¶ 92.) RMCI and Resrv Partners[6] distributed the Reserve *Insights* piece widely throughout the latter part of the day on the 15th (¶ 93) and posted it to the Reserve's web site that evening. (¶ 112.)

Bent II knew that he also had to mollify the ratings agencies. Throughout the morning of the 15th, Moody's and Standard & Poor's had placed several calls to the Bents and other RMCI personnel in an effort to find out how the Bents planned to respond to the Lehman bankruptcy, and, more particularly, whether RMCI would implement credit support agreements to support the Fund. (¶¶ 63-66.) With that in mind, almost immediately after he sent the 1:19 Email, Bent II called Moody's and Standard & Poor's to pass along the same news of RMCI's decision to provide the Fund with unqualified support. (¶ 81.) RMCI's marketing department made sure to send a copy of the Reserve *Insights* to both firms later that afternoon. (¶ 95.)

Bent II also realized the importance of assuaging the rating agencies' and investors' concerns about the Fund's liquidity. Although both Bents now disclaim that they were aware that State Street had pulled redemption funding, Bent II undertook a frantic effort to find other sources of liquidity, including a buyer for the Fund, throughout the afternoon of the 15th. (¶¶

---

[6]     Resrv Partners, the distributor of funds managed by RMCI, including the Primary Fund (¶ 20), is charged with primary violations of Exchange Act Section 10(b) and Rule 10b-5 and Securities Act Section 17(a). (¶¶ 127-130, 134-136.)

104, 105.) Notwithstanding those efforts, Bent II assured Moody's that RMCI had paid all outstanding redemptions through liquidity in the Fund. (¶ 104.) Other RMCI and Resrv Partners personnel told investors that the Fund had no liquidity problems and that any delay in transmitting money was caused by operational or technical delays at State Street. (¶ 102.)

Between 5 p.m. on September 15 and 9 a.m. the next day, total redemption requests grew from $20 billion (¶ 107) to $24.6 billion (¶ 116.) While the Bents' announcement of support had slowed the tide, it had failed to stem it. And with no buyer or other source of liquidity in hand, the rating agencies pressing for details of the support agreements (¶ 97), and the public waiting for an announcement that the Commission had approved RMCI's application for approval of its credit support agreement, the Bents realized that the jig was up. Time had run out, and the Fund was closing in on the point where it would turn to RMCI for the support the Bents had pledged to save the $1 NAV. Out of options, Bent II told the Board at its first meeting on September 16 at 10 a.m. that RMCI would not support the Fund's $1 NAV after all. (¶ 115.)

The Board reacted with shock as the true situation was finally revealed to them. (¶ 117.) The minutes of the Board's Executive Session detail the facts that no one disclosed to the Board between its prior meeting at 1 p.m. the day before and this one: no one told the Board anything about redemption levels, the lack of liquidity, the unsuccessful efforts of Bent II to find a buyer for the Fund or third-party source of liquidity or that no submission of any credit support agreement had been made to the Commission. (¶ 117.) When the Trustees learned all of these facts – as well as the Bents' decision not to support the Fund – they immediately convened in Executive Session to assess these developments and met nearly continuously on September 16. (¶¶ 117, 118.) At 4 p.m., the Fund announced that the Board had determined to value Lehman at zero, and declared that the Fund had broken the buck. (¶ 121.)

**B. The Elements of Plaintiff's Claims Against the Defendants**

To state a violation of Section 10(b) or Rule 10b-5 against RMCI, Resrv Partners and

Bent II, the Commission must allege that each "(1) made a material misrepresentation or a

material omission as to which he had a duty to speak, or used a fraudulent device; (2) with

scienter; (3) in connection with the purchase or sale of securities." SEC v. Monarch Funding

Corp., 192 F.3d 295, 308 (2d Cir. 1999). Securities Act Section 17(a)(1) "is in substance almost

identical to Section 10(b) . . . and to Rule 10b-5," SEC v. Banner Fund Int'l, 211 F.3d 602, 609-

10 (D.C. Cir. 2000), and consequently the sections "establish very similar requirements for proof

of securities fraud." SEC v. Kenton Capital, Ltd., 69 F. Supp. 2d 1, 12 (D.D.C. 1998). The

principal difference between the two sections is that the Exchange Act is concerned with the

"purchase" and sale of securities, while the Securities Act is concerned with the "offer" or sale.

Additionally, scienter is a necessary element of any claim brought under Section 17(a)(1), but a

showing of negligence will suffice to establish a violation of Sections 17(a)(2) and 17(a)(3).

Aaron v. SEC, 446 U.S. 680, 701-02 (1980).

The Commission's claims under the Advisers Act against RMCI, Bent Sr. and Bent II

share certain elements with the Exchange Act and Securities Act claims. "Section 206 [of the

Advisers Act] imposes a fiduciary duty on investment advisers to act at all times in the best

interest of the fund and its investors, and includes an obligation to provide 'full and fair

disclosure of all material facts' to investors and independent trustees of the fund." SEC v.

Tambone, 550 F.3d 106, 146 (1st Cir. 2008) (quoting SEC v. Capital Gains Research Bureau,

Inc., 375 U.S. 180, 191 (1963)); see also SEC v. Batterman, No. 00 Civ. 4835 (LAP), 2002 WL

31190171, at *8 (S.D.N.Y. Sept. 30, 2002). The "client" to whom an adviser's fiduciary duties

are owed is ordinarily the fund, not the fund's investors. Goldstein v. SEC, 451 F.3d 873, 881-

82 (D.C. Cir. 2006). The Advisers Act's "anti-fraud provision [under Section 206(4)] also applies, however, to persons other than clients." Id. at 881 n.6 (distinguishing Section 206(4) of the Advisers Act from Sections 206(1) and (2)); see also SEC v. Rabinovich & Assocs., LP, No. 07 Civ. 10547 (GEL), 2008 WL 4937360, at *4 (S.D.N.Y. Nov. 18, 2008) (applying Rule 206(4)-8 to material misstatements to investors). As is explained more fully below, only Section 206(1) requires allegations of scienter.

Where the Complaint alleges that Bent Sr. and Bent II aided and abetted primary violations of Section 10(b) of the Exchange Act and Rule 10b-5, Securities Act Section 17 and Sections 206(1), (2) and (4) of the Advisers Act and Rule 206(4)-8, it must allege (1) an underlying violation of each provision of the securities laws; (2) knowledge of that violation, and (3) substantial assistance in the achievement of the primary violation. SEC v. Stanard, No. 06 Civ. 7736 (GEL), 2009 WL 196023, at *31 (S.D.N.Y. Jan. 27, 2009). Plaintiff also asserts claims against Bent Sr. and Bent II under Section 20(a) of the Exchange Act as control persons. To state that claim, the Complaint must allege "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 592 F. Supp. 2d 608, 622-23 (S.D.N.Y. 2009) (citing ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 108 (2d Cir. 2007)).

## ARGUMENT

### I.
### THE COMPLAINT SATISFIES THE STANDARDS FOR PLEADING FRAUD

**A.**     **Standard of Review for Motions Pursuant to Fed. R. Civ. P. 12(b)(6)**

On a motion to dismiss under Rule 12(b)(6), a court must "accept the facts alleged in the

complaint as true, even if doubtful, and draw all reasonable inferences in favor of the nonmoving

party." Semple v. Eyeblaster, Inc., No. 08 Civ. 9004 (HB), 2009 WL 1457163, at *3 (S.D.N.Y.

May 26, 2009) (citing Ruotol v. City of New York, 514 F.3d 184, 188 (2d Cir. 2008)). To

survive a motion to dismiss, the complaint must contain sufficient factual matter to "'state a

claim to relief that is plausible on its face.'" In re Novagold Res., Inc. Sec. Litig., No. 08 Civ.

7041 (DLC), 2009 WL 1575220, at *8 (S.D.N.Y. June 5, 2009) (quoting Ashcroft v. Iqbal, __

U.S. __, 129 S. Ct. 1937, 1949 (2009)). In determining whether the factual allegations are

enough to "raise a right to relief above the speculative level," Bell Atl. Corp. v. Twombly, 550

U.S. 544, 555 (2007), the Court's "sole focus is on the sufficiency of the pleadings and not on

the weight of the evidence that might be presented at trial." Vladimir v. Bioenvision Inc., 606 F.

Supp. 2d 473, 483 (S.D.N.Y. 2009)(citations omitted).[7]

**B.**     **The Commission's Complaint Satisfies Rule 9(b)**

Like any litigant asserting a fraud claim, the Commission is also bound by the pleading

requirements imposed by Federal Rule of Civil Procedure 9(b). Therefore, the Complaint must

"state with particularity the circumstances constituting fraud or mistake . . . [but] [m]alice,

---

[7]     This principle precludes the Court's consideration of much of the material outside the
Complaint that the Defendants offer on this motion to dismiss. While documents not appended
to or incorporated in the complaint may be considered under certain circumstances on a motion
to dismiss, they are appropriate to consider only for "'what' they contain, 'not to prove the truth'
of their contents." Roth v. Jennings, 489 F.3d 499, 511 (2d Cir. 2007) (quotations omitted).

intent, knowledge, and other conditions of a person's mind may be alleged generally." Id. The Complaint, with its detailed allegations of each Defendant's false statements – including, for many, the precise minute that he or it made the statement, the reasons those statements were false, its allegations demonstrating the falsity of those statements, and each Defendant's intent or recklessness in making the statements – fully satisfies Rule 9(b)'s requirements. Quaknine v. MacFarlane, 897 F.2d 75, 79 (2d Cir. 1990) (Rule 9(b) is satisfied where plaintiff (1) specifies the statements it contends were fraudulent; (2) identifies the speaker; (3) states where and when the statements were made; and (4) explains why they were fraudulent).

Defendants assume that the Commission must meet the heightened pleading standard imposed on private securities litigants, first by the Second Circuit, and now by Congress in the Private Securities Litigation Reform Act of 1995; they argue that the Commission's Complaint must include factual allegations supporting a "strong inference" of Defendants' scienter. (Defendant's Br. at 10.) Whether the Second Circuit would agree that Commission enforcement claims should be subjected to that private litigants' standard is not as clear as Defendants make it out to be,[8] but it is not necessary for the Court to decide that issue here because this Complaint satisfies even that standard.

The "strong inference" standard requires allegations of either (a) "facts to show that defendants had both motive and opportunity to commit fraud," or (b) "facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." Novak, 216 F.3d at 307

---

[8]     See Tambone, 550 F.3d at 119 (First Circuit decision refusing to apply the "strong inference" standard to Commission complaints because the strike suit abuses sought to be curbed by it are not presented in Commission actions). See also SEC v. U.S. Envtl., Inc., 155 F.3d 107, 111 (2d Cir. 1998) (concluding that Commission complaint satisfied 9(b) because generalized allegations of intentional or reckless wrongdoing were sufficient and that the particularized motive of the defendant was "irrelevant"); Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000) (calling the "strong inference" standard a "requirement for a private action under Rule 10b-5").

(quotations omitted). The Complaint alleges sufficient facts to show both motive and opportunity and conscious misbehavior.

### 1. The Complaint Alleges Facts to Support a Strong Inference that RMCI, Resrv Partners, Bent II and Bent Sr. Each Acted with Conscious Misbehavior

The Commission alleges that RMCI, Resrv Partners, Bent II and Bent Sr. each made false statements and it alleges facts demonstrating that each knew, or had access to information that would have made them aware, that such statements were false.[9] To allege conscious misbehavior or recklessness, a complaint must point to facts that defendants "knew facts or had access to information suggesting that their public statements were not accurate . . . or failed to check information they had a duty to monitor. . . ." Novak, 216 F.3d at 311; accord In re Scholastic Corp. Sec. Litig., 252 F.3d 63, 75-77 (2d Cir. 2001).

### (a) The Complaint Alleges, and Defendants Now Confirm, that RMCI, Resrv Partners and Bent II Each Made False Statements Knowingly or Recklessly

RMCI, Resrv Partners[10] and Bent II's scienter with respect to the 1:19 Email's false pledge of unqualified credit support (¶¶ 78, 79, 80, 128) is now established, not just as a matter of pleading, but as fact. In their Brief, Defendants concede that when Bent II sent his 1:19 Email

---

[9]     Where conscious misbehavior is alleged, the Court's analysis of the falsity of the statements and scienter is conducted simultaneously. In re Revlon, Inc. Sec. Litig., No. 99 Civ. 10192 (SHS), 2001 WL 293820, at * 7 (S.D.N.Y. March 27, 2001) (citing Rothman v. Gregor, 220 F.3d 81, 89-90 (2d Cir. 2000)).

[10]     For RMCI and Resrv Partners, allegations of scienter necessarily relate to those entities' corporate officers, including the Bents, as a "corporation can only act through its employees and agents." Suez Equity Investors, L.P. v. Toronto-Dominion Bank, 250 F.3d 87, 101 (2d Cir. 2001). Indeed, "[i]t is well settled law that the guilty intent of officers of a corporation may be imputed to the corporation itself in order to prove guilt of the corporation." UCAR Int'l, Inc. v. Union Carbide Corp., No. 00CV1338 (GBD), 2004 WL 137073, at *13 (S.D.N.Y. Jan. 26, 2004), aff'd, 119 F. App'x 300 (2d Cir. 2004).

announcing RMCI's intention to "protect the NAV on the Primary fund to whatever degree is required" – an announcement that he authorized RMCI and Resrv Partners personnel to disseminate publicly – all of the Defendants knew it was untrue. Defendants now profess that their intention was not, as Bent II stated, to protect the Fund to whatever degree was required, but only "to support the NAV, based on an 80% valuation of Lehman, so long as redemptions stayed within a certain range." (Br. at 20 n. 11.)[11]

If this concession were not enough, the Complaint alleges that Bent II had already determined that a credit support agreement was "not an option" on the evening of September 14, 2008 (¶ 47), at a time when the effects of Lehman's bankruptcy on the Fund were not yet known. If the Bents had deemed that option unavailable on Sunday, it strains credulity to believe that they changed their minds on Monday and were suddenly willing to provide unqualified support when such a commitment would mean unlimited personal exposure.

Bent II was at least reckless in pledging *un*qualified support, both at the Board meeting and in his 1:19 Email, when it was secretly qualified by undisclosed redemption and valuation limitations, especially since he had expressed his own fears the night before that RMCI might

---

[11]    Defendants maintain that their "capacity" (Br. at 20) to support the Fund was limited by those considerations, but if their capacity was so limited, they cannot argue that their intent was broader than their ability because statements of intent made knowing that "they could not be carried out" are actionable. Luce v. Edelstein, 802 F.2d 49, 56 (2d Cir. 1986).  Nor can Defendants credibly claim that they simply changed their minds once facts became known to them that triggered their unspoken conditions. Defendants claim that all of the facts of the catastrophic effect of the Lehman bankruptcy on the Fund were widely known at the very time that Bent II was pledging unqualified support and Bent Sr. was assuring the Board that RMCI had the necessary resources to do so. (Br. at 25.)  If that is true, then Defendants' claim that they only decided to abandon credit support when those very same facts came to their attention hours later (Br. at 9) must be false.  Either everyone – including the Bents – knew that they could not possibly support the Fund at the time the Defendants claimed they could and would, or the statement was material, and Defendants were simply reckless in making the pledge without qualification or checking the facts before they did so.

face a full and uncontrollable run on the Fund when the markets opened. (¶ 48.) So great was the Bents' concern that, before the markets even opened on September 15, Bent Sr. and Bent II notified the New York Federal Reserve Bank of their fear that Lehman's filing would have a negative impact on the Fund. (¶ 53.) In fact, according to Defendants, by the time the Board met at 1 p.m., and before they announced RMCI's unqualified intention to support the Fund, Defendants knew that their predictions of a run on the Fund had been realized. (Br. at 7 ("Defendants [told the Board] that there appeared to be a 'run on the Primary Fund' . . .").)[12] If so, their failure to disclose that their pledge of support was actually conditioned on containment of the run makes Bent II's pledge of unqualified support at least "highly unreasonable" and "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that [he] must have been aware of it." Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 47 (2d Cir. 1978) (quotations omitted); see also In re Phillips Petroleum Sec. Litig., 881 F.2d 1236, 1246-47 (3rd Cir. 1989) (reversing summary judgment for defendants where a jury could find that unequivocal statements of intent presented obvious danger of misleading audience that nothing would alter the speaker's intent). It was even more reckless when Bent II authorized RMCI at 5:46 p.m. to tell the *Wall Street Journal* that RMCI intended to protect the NAV "to whatever degree is required." (¶ 109.) If he still did

---

[12]     On this point, Defendants raise an issue of disputed fact -- the Complaint alleges that Defendants did not inform the Board of the true level of redemptions at the 1 p.m. meeting. Given the official minutes of the Board's September 16 Executive Session, at which the Board recounts that they were *not* told the true level of redemptions (¶ 117), this issue cannot be resolved at the pleading stage.

not know by 5:46 that the level of redemptions had increased beyond the undisclosed "range," he was reckless in not inquiring.[13]

Defendants' concession that their statements of support were qualified by unspoken caveats also establishes Bent Sr.'s liability on the aiding and abetting claims asserted in the Complaint. Bent Sr.'s intentionally misleading statement of fact to the Board that RMCI had the resources necessary to support the $1 NAV (¶ 72), when he now admits that that statement was qualified by limits he did not reveal to any attendee (¶ 54), was the catalyst for many of the false public statements made later by the other Defendants, and substantially assisted the primary violations alleged in the Complaint. (E.g., ¶¶ 92-95 (quoting the Reserve *Insights*, "our support agreements ensure the integrity of a $1.00 NAV").)

Other examples from the Complaint of RMCI, Resrv Partners and Bent II's knowingly false public statements:

### False Statements Regarding Submission of Credit Support Agreements to Commission and Forthcoming Approval

- RMCI was awaiting "final approval" from the Commission of its credit support agreements. (¶ 77 (from Bent II 1:19 Email).)

- RMCI was "submitting appropriate documentation to the SEC today, September 15, 2008." (¶ 92 (from Reserve *Insights* (3:57 p.m.) piece publicly distributed by Resrv Partners and circulated to Bent II for approval.))

### Knowledge of Facts or Access to Information Rendering Statements False:

Bent II knew that RMCI was not awaiting final approval because no request for approval had been submitted, and could not be submitted until the agreements were finalized and signed.

---

[13]   In their Brief, Defendants decline to specify what that range was. If the Bents only intended to support the NAV so long as redemptions did not force the Fund to break the buck, they were at least reckless in not clarifying that for the Board and the public, because no one would understand them to be offering support only so long as it was not needed.

(¶¶ 80; 99.) Because neither Bent II nor Bent Sr. ever asked to review a credit support agreement, none could be executed or submitted for approval. (¶ 98.)

The Bents disclaim responsibility for the second Reserve *Insights* piece by asserting that its more "definitive" statements about RMCI's support for the fund cannot be attributed to Bent Sr. or Bent II because neither of them wrote the disclosure. (Br. at 20-21.)[14] Their efforts to distance themselves fail. Nothing in the second *Insights* piece is materially different from Bent II's definitive "to whatever degree is required" pledge, and "[we] are waiting [for the SEC's] final approval" assurance contained in his 1:19 Email, or Bent Sr.'s unqualified assurance to the Board that RMCI had the ability to support the Fund.

Likewise, Defendants cannot disclaim statements made by RMCI and Resrv Partners personnel "on behalf of and at the behest of" the Bents. See Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 446 F. Supp. 2d 163, 179 (S.D.N.Y. 2006); In re Salomon Analyst AT&T Litig., 350 F. Supp. 2d 455, 474 (S.D.N.Y. 2004). It would pervert the securities laws to hold that an officer who "effectively directly ordered a subordinate to issue false and misleading statements on behalf of the firm," can escape primary liability. In re Salomon, 350 F. Supp. 2d at 474. Given that these statements – which Defendants acknowledge conveyed false information concerning credit support (Br. at 21) – were made pursuant to Bent II's instruction that the substance of his 1:19 email should be "communicate[d] . . . to clients" (¶ 77), and continued to be broadcast after an "approved" version of *Insights* referencing purportedly existing "support agreements" had been circulated to the entire marketing and sales teams (¶ 91), Bent II and RMCI are responsible for them as communications issued on their behalf and at their behest.

---

[14]    Defendants do not appear to contest RMCI's or Resrv Partners' responsibility for the false statements set forth in the Reserve *Insights* publication.

16

<u>False Statements Regarding the Effect of Lehman Holdings</u>

- Bent II and Bent Sr. reviewed, commented on and approved the first *Insights* piece that represented that they believed that "the [Lehman] holdings will mature at par value."(¶¶ 89, 90.)

- Bent II did not object to the second *Insights* piece that represented that the Lehman holdings would not have "a material impact" on the Fund or a "negative impact[]" on the NAV because the holdings would mature at par. (¶¶ 91, 92.)

<u>Knowledge of Facts or Access to Information Rendering Statements False:</u>

The Complaint sets out the facts known to Bent II that show that these statements were false when made: (i) Bent II and Bent Sr. knew that the Board had already voted to value Lehman at .80 of par, not par (¶¶ 89, 92); and (ii) given the level of redemptions, the impact of the Fund's valuation of its Lehman holdings was in fact material to the Fund's NAV. (¶¶ 6, 55, 59, 72.)

**(b)      RMCI, Resrv Partners and Bent II's False Public Statements Were Contradicted by Facts They Had Access to, or Failed to Ascertain Despite Their Critical Importance to the Fund's Survival and Defendants' Duty to Monitor Them**

As <u>Novak</u> makes clear, scienter can adequately be pled even in circumstances (unlike those here) where the complaint alleges that officer defendants only had access to the facts they publicly contradict, or a duty to monitor facts they failed to check. If the complaint alleges that the statements are contradicted by information relating to matters for which defendants were responsible, or which were vitally important to the company, it survives 9(b) scrutiny. <u>In re Alstom SA Sec. Litig.</u>, 406 F. Supp. 2d 433, 459-60 (S.D.N.Y. 2005)) (citing <u>Cosmas v. Hassett</u>, 886 F.2d 8, 13 (2d Cir. 1989)); <u>Nathel v. Siegal</u>, 592 F. Supp. 2d 452, 465 (S.D.N.Y. 2008) (holding that scienter was pled against creator of partnerships and their promoter because complaint alleged that each had access to information reflecting true facts regarding important aspect of investment); <u>In re Refco, Inc. Sec. Litig</u>, 503 F. Supp. 2d 611, 649, 650-52 (S.D.N.Y.

2007) (denying motion to dismiss of officers whose responsibilities were alleged to give them access to dealings of subsidiary involved in fraud, supporting inference that true facts were "reasonably available"). For example, in Makor Issues & Rights, Ltd. v. Tellabs Inc., 513 F.3d 702 (7th Cir. 2008) (on remand following the Supreme Court's Tellabs decision), Judge Posner found sufficient allegations that defendant corporate officers either knew or were reckless in not knowing that sales of their "flagship" product were not as depicted in their public statements because the product was "to Tellabs as Windows XP and Vista are to Microsoft." Id. at 709.

The Complaint demonstrates the Bents' complete control over every aspect of the Fund – their "Windows XP" product -- as well as their unfettered access to any information they asked for, thus making their claim that they failed to learn about the catastrophic levels of redemptions and lack of liquidity incredible. (¶ 28 ("Bent Sr. and Bent II exercised control and decision-making authority over all aspects of RMCI's investment advisory business, including with respect to the management of the Primary Fund."); ¶¶ 37, 38 (alleging the catastrophic effect to a money market fund if it were to break the buck.) And if they failed to check the level of redemptions or the Fund's liquidity before, they certainly had a duty to do just that after the Board directed them at their 9:30 a.m. September 15 meeting to keep it apprised of any meaningful developments. (¶ 59 (alleging that Board directed RMCI management to "reconvene the Board if anything occurred 'to call into question the $0.80' [Lehman] valuation").)

The Complaint alleges that RMCI and Bent II made several false statements about the Fund's liquidity. It also alleges facts sufficient to show that both Defendants had access to or a duty to monitor facts relating to the Fund's ability to fund its redemption requests:

False Statements Regarding Liquidity

- RMCI claimed to have had the liquidity to satisfy redemptions and that any difficulty in funding them was attributable to technical glitches. (¶ 102.)

- RMCI told Moody's at 2:30 that the Fund had been able to generate sufficient liquidity to satisfy outstanding redemption requests. (¶ 103.)

- Bent II represented to Moody's during the afternoon of September 15 that RMCI had been able to fund all redemptions through liquidations of Fund assets. (¶ 104.)

<u>Knowledge of Facts or Access to Information Rendering Statements False:</u>

RMCI and the Bents well understood the effect redemptions would have on the ability of the Fund to maintain its $1 NAV. On the day before the markets opened on September 15, Bent II warned others that redemption levels might be dangerously high, and acknowledged his understanding of the disastrous effect of a run on the Fund. (¶ 48.) As Co-CEO of the Fund and President of RMCI (¶ 22), he cannot seriously argue that no one at RMCI told him what the Complaint alleges RMCI knew as of 1:50 – that State Street had stopped funding redemptions such that RMCI was "screwed" (in the words of one RMCI employee) (¶ 101), or that he did not have instantaneous access to this critical information if he had asked for it. Indeed, if he did not know of the true state of affairs, his frantic efforts throughout the afternoon of September 15 to find third-party sources of liquidity to satisfy the backlog of redemption requests (¶ 104) would have been unnecessary. That he made those efforts at all makes his assurances to Moody's of the Fund's continued liquidity in the late afternoon of September 15 blatant misrepresentations. (<u>Id.</u>)

**(c)    RMCI, Bent Sr. and Bent II's False Statements to the Board Were Similarly Contradicted by Facts They Knew, Had Access to, or Failed to Ascertain Despite Their Critical Importance to the Fund's Survival and Defendants' Duty to Monitor Them**

The Complaint is replete with allegations of the knowingly or recklessly false statements and material omissions that RMCI, Bent II and Bent Sr. made to the Fund's Independent Trustees in violation of the Advisers Act:

19

- RMCI, Bent II and Bent Sr. did not disclose the level of redemptions to the Board at any time between the end of the 8:00 a.m. Board meeting and the 1 p.m. meeting. (¶¶ 60, 75.)

- RMCI, Bent II and Bent Sr. grossly understated the level of redemptions the Fund had then experienced at the 1 p.m. Board meeting. (¶¶ 75, 117.)

- RMCI, Bent II and Bent Sr. did not disclose to the Board at any time prior to Tuesday, September 16, that State Street had stopped funding redemptions at 10:10 on Monday morning. (¶¶ 62, 116.)

- RMCI, Bent II and Bent Sr. did not disclose to the Board at any time that the Bents had contacted the Federal Reserve Bank of New York before the start of business on Monday, September 15 to express their concerns that Lehman's bankruptcy would have a negative impact on the Primary Fund. (¶ 53.)

- RMCI and Bent II did not disclose to the Board on September 15 that by mid-day, Bent II had retained investment bankers to search for a buyer or partner for the Fund. (¶ 105.)

Knowledge of Facts or Access to Information Rendering Statements False or Omissions Misleading:

Bent II had acknowledged the significance of redemptions and the potential for a run on the Fund on Sunday, September 14. (¶ 48.) In light of Bent Sr.'s and Bent II's roles at RMCI and the Fund, their concomitant responsibilities in those roles, the Bents could have and should have found out what those redemptions were and they could have and should have found out that State Street had cut off funding them.

RMCI knew by 1:50 pm that State Street had suspended overdraft privileges, resulting in the Fund's inability to fund redemptions. (¶ 101.)

Given the critical nature of the level of redemptions and the lack of liquidity to the

Fund's survival – as explained by one RMCI senior manager, an inability to fund investors'

redemptions was the "the kiss of death" for the Primary Fund (¶ 101) – RMCI's and the Bents'

access to that information can be presumed. If RMCI and the Bents did not know of State

Street's funding suspension or the Fund's lack of liquidity, they were highly reckless in not

discovering that information, and failing to apprise the Board.

<u>False Statements and Misleading Omissions Regarding RMCI's Willingness and Ability to Enter Into Credit Support Agreements to Protect the NAV</u>

- RMCI, Bent II and Bent Sr. told the Board at its 1 p.m. meeting that RMCI intended to provide credit support to the Fund to maintain its $1 NAV. Bent Sr. assured the Board that RMCI had sufficient capital to do so. Bent II advised the Board that RMCI would seek immediate relief from the Commission to implement credit support. (¶¶ 71, 72.)

- RMCI, Bent II and Bent Sr. did not advise the Board until September 16 that they had decided not to enter into a credit support agreement and that they had made no submission to the Commission. (¶ 115.)

<u>Knowledge of Facts or Access to Information Rendering Statements False or Omissions Misleading:</u>

Defendants now admit that their expressions of intent were false because none of the qualifications to their pledge to maintain the Fund's NAV was disclosed. (Br. at 20, n.11.)

Neither Bent Sr. nor Bent II ever asked to review the draft credit support agreements throughout the day on September 15, making a submission of a final agreement to the Commission for approval impossible. (¶ 98.)

In light of these allegations, the Complaint adequately alleges conscious misbehavior, satisfying the "strong inference" standard with respect to each fraud claim against the Defendants.

**(d) Defendants' Reliance on Professionals' Advice May Give Them an Argument at Trial, But It Is Not a Matter for Determination on a Motion to Dismiss**

Whether Defendants "sought input and approval from all relevant sources" (Br. at 11) over the two day period alleged in the Complaint is at best an issue for trial, but it does not aid them on this motion to dismiss. While "evidence of good faith [is] a relevant consideration in evaluating a defendant's scienter," <u>Howard v. SEC</u>, 376 F.3d 1136, 1147 (D.C. Cir. 2004), it is inherently a factual question not resolvable on a motion to dismiss. That is, the merit of Defendants' claim turns on the factual question of whether Defendants made good faith and full disclosure to their advisers, an issue at the heart of the dispute in this case. Issues of intent, state

21

of mind and good faith are triable issues "notoriously inappropriate" for resolution by motion, and provide no grounds for dismissal here. See Leberman v. John Blair & Co., 880 F.2d 1555, 1560-61 (2d Cir. 1989) (reversing district court's grant of summary judgment for defendant who had relied upon an advice of counsel defense, noting that his failure to provide his attorney with certain material information "may have constituted 'studious avoidance[,' and raised] a genuine issue of material fact concerning whether [defendant] acted in good faith in relying on advice when he knew or should have known that it was rendered without consulting all of the pertinent documents.").

## 2. The Complaint Alleges that RMCI, Resrv Partners, Bent II and Bent Sr. Had Both Motive and Opportunity to Make False Statements and Misleading Omissions

The Complaint adequately alleges Defendants' motive and opportunity to commit fraud. Defendants to not appear to dispute that they had ample opportunities to deceive the investing public and the Board on September 15 and 16, and the communications with investors and the Board identified in the Complaint make clear that Defendants availed themselves of those opportunities repeatedly.

As for motive, the Complaint sets forth facts alleging that each of the Defendants possessed the kind of "concrete and personal benefit" required under Second Circuit precedent. (Br. at 11-12, citing Kalnit v. Eichler, 264 F.3d 131, 139 (2d Cir. 2001).) Here, the Complaint does not merely allege that Defendants sought to save the Primary Fund or impact its share price. Rather, the Complaint alleges that the Bents' financial and business livelihood and reputation depended on preventing investors from learning about the Fund's plight, such that Defendants "placed their own financial and reputational interests ahead of the Fund and its shareholders." (¶¶ 4, 10, 38.) Indeed, any question that Defendants were motivated by their own self-interest to

the detriment of investors should be put to rest by Bent II's decision to tell potential buyers of the Fund from the Reserve that they "would *not* be required to protect the $1.00 NAV." (¶ 106.)

Unlike the generalized allegations of motive that the Second Circuit has characterized as "common to all corporate executives," Kalnit, 264 F.3d at 139, Defendants possessed a concrete and personal stake in the success or failure of the Reserve funds – indeed, all profits from the Reserve companies are controlled by the Bent family. (¶ 19.) In other words, much like defendants in Heller v. Goldin Restructuring Fund, L.P., 590 F. Supp. 2d 603, 621 (S.D.N.Y. 2008), the Bents "possessed the unique incentive, as managers of a struggling, privately-owned investment fund in which they possessed a personal financial stake." Id. at 621 (holding plaintiff adequately alleged motive in denying a motion to dismiss).

Finally, Defendants' assertion that the Complaint fails to allege "that Defendants benefited from the alleged fraud" (Br. at 12) is false. While the curtain was ultimately drawn on the Primary Fund on September 16 when the Board and investors could no longer be deceived into believing that the Primary Fund's NAV was not in imminent jeopardy, Defendants successfully bought time on September 15 and 16 to try and draw the Reserve back from the abyss. (¶¶ 4, 6-7, 74, 86, 110.) Indeed, this is how many frauds operate, as companies falsify reports to investors in the belief, or hope, that all can be fixed once everything "returns to normal." The fact that Defendants were ultimately unsuccessful does not lessen their motivation for trying.[15]

---

[15]     Success is not an element of a fraud claim brought in an enforcement action. United States v. Carpenter, 791 F.2d 1024, 1032 n.8 (2d Cir. 1986) (ruling that defendants' failure to profit consistently from insider trading scheme did not make the scheme any less actionable), aff'd, 484 U.S. 19 (1987).

## II.
## THE COMPLAINT ALLEGES SUFFICIENT FACTS SUPPORTING
## MATERIALITY OF MISSTATEMENTS AND OMISSIONS

Materiality is a fact-specific inquiry, and particularly inappropriate for determination on a motion to dismiss where, as here, defendants argue that the facts allegedly misstated or omitted were already known to the market. Ganino v. Citizens Utils. Co., 228 F.3d 154, 162, 167 (2d Cir. 2000); accord Hall v. The Children's Place Retail Stores, Inc., 580 F. Supp. 2d 212, 226 (S.D.N.Y. 2008). In the context of a Fed. R. Civ. P. 12(b)(6) motion, "a complaint may not properly be dismissed . . . on the ground that the alleged misstatements or omissions are not material unless they are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance.'" Ganino, 228 F.3d at 162 (quotations omitted) (alteration in original).

Here, there should be no dispute that Defendants' misrepresentations and omissions are not "so obviously unimportant to a reasonable investor." To the contrary, as the Complaint alleges, by 2:00 p.m. and thereafter on September 15, Defendants' message of purported support for the Primary Fund had the desired impact on unredeemed investors and had in fact slowed the rate of redemptions. (¶¶ 85, 86, 110.) This positive reaction, of course, was the whole point of Defendants' campaign to spread the word of RMCI's "intent" to protect the Fund's $1 NAV. Facts concerning the Primary Fund's inability to satisfy redemption requests on September 15 would certainly have been important to reasonable investors as well, as quick access to funds is what makes money market funds attractive to investors. (¶ 2.)[16]

---

[16] Defendants question how investors could have believed that "individuals of limited means *intended* to enter into a credit support agreement" sufficient to support the Primary Fund (Br. at 24 (emphasis in original)), but the misstatements identified in the Complaint almost uniformly refer to support from RMCI, not the Bents personally, and investors could reasonably have assumed that the adviser of a multibillion dollar family of funds either had sufficient means

Nor can RMCI's and the Bents' statements to the Board be dismissed as definitively immaterial. The misstatements and omissions to the Board, summarized above, are plainly material. The Trustees unquestionably would have wanted to consider accurate information about credit support, redemption activity and the Primary Fund's liquidity in discharging their duties as Trustees. Indeed, the Trustees asked for just that kind of information at the close of the 9:30 a.m. meeting on September 15. (¶ 59.)

Defendants argue repeatedly that certain misstatements and omissions could not have been material because "the Board took no action" upon receiving more accurate information. (Br. at 21, 24, 25.) This assertion not only asks the Court to accept Defendants' factual (albeit false) assertion that the Trustees stood idly by after certain facts were eventually disclosed to them on September 16, but the contention also ignores the fact that within only a few hours of learning of facts that Defendants withheld from them on September 15 and on September 16, the Board made the extremely significant decision to mark down the Lehman holdings to zero and announce to the world that the Primary Fund had broken the buck. (¶ 121.) Had the Board received accurate information from Defendants at or around the September 15, 1 p.m. meeting, the Court may reasonably infer that the Trustees would have taken these or other steps sooner.

Finally, Defendants contend that their misrepresentations and omissions are not actionable because the material facts were eventually disclosed on September 16. (Br. at 21-22.) The amount of time that elapsed from when Defendants first misrepresented and omitted material facts on September 15 to the time those facts were ultimately disclosed, Defendants contend, is not long enough to support the Commission's fraud claims. Defendants' argument is

on its own, or, as the Bents tried to do on September 15, had secured sufficient means from a third party to support the Fund consistent with Defendants' public statements. Indeed, the Complaint alleges that investors did in fact alter their investment decisions upon hearing the falsehoods about credit support that Defendants now label as patently immaterial. (¶¶ 86, 110.)

unavailing. First, delay in disclosing facts may not be actionable where immediate disclosure is not important or serves some other corporate purpose. SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 850 n. 12 (2d Cir. 1968) (en banc) (Br. at 21)(holding that "a valuable corporate purpose was served by delaying the publication" of the discovery); In re Glenayre Techs. Inc. Sec. Litig., 982 F. Supp. 294, 297 (S.D.N.Y. 1997), aff'd, 201 F.3d 431 (2d Cir. 1999) (Br. at 20) (while corporation was analyzing impact of widely-publicized federal regulation and preparing its response, no duty to disclose the regulation or the response.)[17] But that was not the case here. The Fund undertook to strike an hourly NAV and benefitted by offering the high degree of liquidity provided by hourly NAV strikes. (¶ 32.) In doing so, however, the Fund had an obligation to ensure that disclosures were accurate at the time they were made, not 24 hours later. Furthermore, investors were clearly monitoring news about the Primary Fund on September 15 and 16 and that news clearly impacted investors' decisions about whether or when to redeem shares. (¶ 110.) The belated disclosure of highly relevant information to the Board and the investing public that RMCI and the Bents orchestrated thus had an immediate and devastating effect.

Second, Defendants ignore that the Complaint alleges not just omissions, but their affirmative misrepresentations of fact. The securities laws offer no safe harbor to those who affirmatively mislead, but later make corrective announcements.

---

[17] Defendants' reliance on Acito v. IMCERA Group, Inc., 47 F.3d 47 (2d Cir. 1995) (Br. at 22) is misplaced. In that case, the Court did not hold that the allegations of delay were not "actionable"; the Court affirmed the dismissal of plaintiff's complaint because it failed adequately to allege the defendants' scienter in delaying the disclosure. Id. at 53-54.

### III.
### THE COMPLAINT SUFFICIENTLY ALLEGES NON-FRAUD
### CLAIMS AGAINST DEFENDANTS

Defendants make no attempt to address the Commission's claims that do not require that fraudulent intent be pled. Specifically, with respect to the Commission's claims of Securities Act Sections 17(a)(2) and (a)(3), the Commission need only allege negligence. Aaron, 446 U.S. at 701-02. So too with respect to the claims that RMCI, Bent Sr. and Bent II violated, and Bent Sr. and Bent II aided and abetted RMCI's violations, of Section 206(2) of the Advisers Act. Tambone, 550 F.3d at 146; see also SEC v. DiBella, No. 3:04cv1342 (EBB), 2007 WL 2904211, at *11 (D. Conn. Oct. 3, 2007) ("Proving a violation of Section 206(2) simply requires proof of negligence.") (quotation omitted). And, while the Second Circuit has not ruled on whether scienter is an element of Rule 206(4)-8, the caselaw militates against requiring scienter for such claims. See SEC v. Steadman, 967 F.2d 636, 646-47 (D.C. Cir. 1992) ("[s]cienter is not required under Section 206(4)," and noting the similarities between Section 206(4) of the Advisers Act and those subsections of Section 17(a) of the Securities Act for which the Supreme Court has held do not require a showing of scienter); see also Rabinovich & Assocs., LP, 2008 WL 4937360, at *4 (not identifying scienter among elements of a Rule 206(4)-8 violation).

Defendants' arguments also ignore entirely the Commission's "control person" claims, alleged against Bent Sr. and Bent II for RMCI's violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder. (¶¶ 131-33.) "The Second Circuit has not defined what is meant by the requirement that a controlling entity be a 'culpable participant,'" with some district courts holding that "scienter need not be pleaded on a Section 20(a) claim for control person liability," and others requiring "some level of culpable participation at least approximating the recklessness

in the section 10(b) context." <u>Pension Comm.</u>, 592 F. Supp. 2d at 635 n.192 (analyzing cases from the Southern District of New York).  Because this Complaint adequately alleges Defendants' scienter, it satisfies either standard.

## CONCLUSION

Defendants' Motion to Dismiss should be denied in its entirety.  If the Court grants any part of Defendants' Motion, the Commission respectfully requests leave to amend. <u>Luce</u>, 802 F.2d at 56 (citations omitted); <u>accord</u> <u>Wight v. Bankamerica Corp.</u>, 219 F.3d 79, 91 (2d Cir. 2000) (reversing lower court's denial of leave to amend in dismissing claim under Rule 9(b)).

Dated: New York, New York
　　　July 13, 2009

Respectfully submitted,

By: _____

Nancy A. Brown
Michael D. Birnbaum
Michael J. Osnato Jr.

SECURITIES AND EXCHANGE
COMMISSION
3 World Financial Center
New York, NY  10281
(212) 336-1023

Attorneys for Plaintiff