UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------------x

SECURITIES AND EXCHANGE
COMMISSION,

                            Plaintiff,

        v.

RESERVE MANAGEMENT COMPANY, INC.,
RESRV PARTNERS, INC., BRUCE BENT SR.
and BRUCE BENT II,

                       Defendants,
     and

THE RESERVE PRIMARY FUND,

                    Relief Defendant.

             :

No. 09 Civ. 4346 (PGG)

ECF CASE

---------------------------------------------------------------------x

## PLAINTIFF'S LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT

SECURITIES AND EXCHANGE
COMMISSION
    Nancy A. Brown
    Valerie A. Szczepanik
    Michael D. Birnbaum
    Michael P. Holland
3 World Financial Center
New York, NY  10281
(212) 336-1023 (Brown)

May 13, 2011

Pursuant to Local Rule 56.1, Plaintiff Securities and Exchange Commission (the

"Commission") submits this statement of undisputed facts in support of its motion for partial

summary judgment against Defendants Reserve Management Company, Inc. ("RMCI") and

Resrv Partners, Inc. ("Resrv Partners," collectively with RMCI, the "Entity Defendants"), Bruce

Bent Sr. ("Bent Sr.") and Bruce Bent II ("Bent II"), pursuant to Rule 56(a) of the Federal Rules

of Civil Procedure.

**Relevant Parties**

1.      As of September 2008, Bent Sr. was President of RMCI, a privately held

corporation registered with the Commission since 1984 (Ex. 85, Primary Fund Prospectus at 1),[1]

and Chairman of Resrv Partners, a broker-dealer registered with the Commission. (Ex. 103 at

12.) Bent II was Senior Vice President of RMCI (Ex. 85, Primary Fund Prospectus at 1) and

Secretary and Director of Resrv Partners. (Ex. 103 at 12.) Along with Arthur Bent (Bent Sr.'s

other son), Bent Sr. and Bent II owned all shares of Resrv Partners and, directly or through

certain Trusts, all shares of RMCI. (Ex. 88, "Chart of Stock Certificate Ownership As of

September 14, 2008"; Ex. 7, Bent Sr. Deposition ("Dep.") at 140:4-141:8.) Bent Sr., Bent II and

Arthur Bent are also the only members of the "Office of the Chairman." (Ex. 103 at 2.) As Bent

Sr. testified: "[I]t's a family business." (Ex. 5, Bent Sr. Investigative ("Inv.") Testimony

("Test.") Day[2] 1 at 28:11-20.)

2.      Bent Sr. has spent his entire life in the financial industry. (Ex. 5, Bent Sr. Inv.

Test. Day 1 at 10:4-11:10.) Bent II has worked for The Reserve since graduating from college.

(Ex. 1, Bent II Inv. Test. Day 1 at 9:4-14.)

---

[1]      References to "Ex. __" refer to the exhibits attached to Appendix submitted herewith
pursuant to the Court's Individual Practices.

[2]      References to "Day __" refer to the transcript from the relevant session of the witnesses'
investigative or deposition testimony.

**Defendants' Misrepresentations Concerning Their "Intent" to Protect the Primary Fund's NAV**

Background

3.      Prior to September 15, 2008, Defendants had committed, and utilized, Reserve assets to support the net asset value ("NAV") of The Reserve Enhanced Cash Fund. (Ex. 1, Bent II Inv. Test. Day 1 at 96:5-97:25; Ex. 5, Bent Sr. Inv. Test. Day 1 at 66:22-67:8.) In fact, RMCI's accounting group generated and circulated a "daily report that would track the Enhanced Cash Strategies portfolio" and allow recipients, including the Bents, to monitor the receivable recorded on that day owing to the fund in order to keep the NAV at $1. (Ex. 3, Bent II Inv. Test. Day 3 at 33:11-34:2; Ex. 15, Lentinello Inv. Test. at 19:6-21:9.)

4.      On June 17, 2008, Moody's Investors Services, Inc. ("Moody's") analyst Henry Shilling emailed Bent Sr. to convey that Moody's wished to discuss certain topics, including "[c]ontingency planning around credit and liquidity events; [and] timely response to unexpected events." (Ex. 43.) Shilling subsequently discussed with Bent Sr. matters relating to Defendants' ability and willingness to support the Reserve funds if support became necessary. In that conversation, Bent Sr. recalled that they discussed the "resources of Reserve management and the Bent family" and, when Shilling asked if the Bents were "committed to support the fund[,]" he told Shilling: "[W]e don't have a choice." (Ex. 6, Bent Sr. Inv. Test. Day 2 at 10:8-14; 11:1-11.)

5.      On September 14, Eric Lansky, Reserve Senior Vice President and Managing Director of Marketing, reminded Bent II that other companies had leveraged the existence of certain credit support to allay investors' concerns, explaining by email that certain other fund companies had "calm[ed] investors by stating that they had line of credits [sic] available." (Ex. 45.) Bent II responded that that approach was "not an option for [the Reserve]." (Id.)

3

6.      On September 15, Bent II knew that other funds with Lehman or other exposure, both on September 15 and in prior financial crises, had allayed investors' concerns by announcing various kinds of credit support agreements. Bent II emailed Eric Lansky a statement published early on September 15 announcing that Wachovia Corporation had entered into support agreements "to support the value of Lehman credit held in [certain Evergreen] Funds." (Ex. 46 at RF-SEC-00105204-6.)  In response, Lansky explained that Wachovia's announcement referred to a line of credit (something, as noted above, Bent II had told Lansky the night before was "not an option" for Defendants) and that Reserve likewise "need[ed] to deliver a message of confidence of nav stability" even if they could not point to specific steps as described by Wachovia. (Id. at RF-SEC-00105204.)

7.      Bent II also was reminded at 12:57 p.m. on September 15, by his Chief Investment Officer, Patrick Ledford, that "last year when the SIV market imploded," money funds had relied on capital support arrangements. (Ex. 47.)  Ledford also communicated his understanding that such support had amounted to the difference between par value and the impaired securities' market price. (Id.)

8.      On September 15, Primary Fund investors contacted the Reserve seeking information about, among other matters, any credit support the Primary Fund might have in place to protect its $1.00 per-share NAV. As explained by John Drahzal, Reserve's Global Head of Sales, on September 15, "we were getting questions about [credit support], are you going to protect the NAV." (Ex. 14 at 166:2-11; see also Ex. 83, Declaration of Tracy Reeg, executed April 27, 2011, and Exhibits thereto ("Reeg Decl.") ¶ 7.)

9.      Certain investors placed their short term excess cash in the Primary Fund because it offered safety of principal, intraday liquidity to fund day-to-day expenses, and greater yields

4

than typical bank accounts. (Ex. 82, Declaration of John Boyd, executed April 22, 2011 ("Boyd Decl.") ¶ 2; Ex. 83, Reeg Decl. ¶¶ 2, 3; Ex. 84, Declaration of Brian Gamble, executed May 12, 2011 ("Gamble Decl.") ¶ 4.) Those were the attributes of a Fund investment that the Primary Fund's prospectus touted. (Ex. 85, Primary Fund Prospectus at 2 ("The investment objective of the Primary Fund . . . is to seek as high a level of current income as is consistent with the preservation of capital and liquidity."); Ex. 7, Bent Sr. Dep. at 97:11-17 ("money fund provide[r's mantra] should be safety of principal, liquidity and a reasonable rate of return . . .").)

10.     Some of the Primary Fund investors who did not receive timely redemptions on September 15 and 16 were forced to incur substantial expenses borrowing money to meet their cash needs. (See, e.g., Ex. 110, Fidelity National Financial, Inc. Sept. 30, 2008 Form 10-Q at 33-34.)

11.     Analysts from Moody's and Standard & Poor's ("S&P") also sought information about the Primary Fund on September 15. (Ex. 79, Declaration of Henry Shilling from Moody's, executed May 5, 2011 ("Moody's Decl.") ¶¶ 13-16; Ex. 80, Declaration of Peter Rizzo from Standard & Poor's Ratings Services, executed May 4, 2011 ("S&P Decl.") ¶¶ 9-12.) At 12:57 p.m., Bent II received an email from Ledford, stating: "I just got off the phone with the folks at S&P. . . . Similar to Henry Shilling at Moody's they are looking for some type of capital support facility to be put in place." (Ex. 47.) Bent II responded one minute later: "[I'm] calling them now." (Id.)

12.     Moody's Shilling had spoken earlier on September 15 with the Bents and discussed, among other matters, his need for information about the Reserve's contingency plans in case the Primary Fund's Lehman exposure threatened the Fund's NAV. (Exs. 21(b) at 5:4-5;

5

7:11-25, and 21(a)[3]; Ex. 79, Moody's Decl. ¶ 13.)  Shilling related that call to Ledford:  "The

contingency plan that I suggested – the Bents think about would be in the form of a capital

support agreement . . . [I]t's probably going to be a minimum requirement for us to keep these

[triple A] ratings."  (Exs. 21(b) at 7:14-25, and 21(a).)  Shilling further explained that the amount

of any capital support would not need to be the entire value of the Fund's Lehman holdings, but

would be "a big dollar amount . . . a huge dollar amount."  (Exs. 21(b) at 11:12-12:6, and 21(a).)

That amount would be "at the minimum half of par."  (Exs. 21(b) at 11:25, and 21(a).)  When

Shilling asked Ledford whether the Bents "have the capacity" to provide such support, Ledford

expressed his belief that providing such support would be "just a matter of writing a check."

(Ex. 21(b) at 12:6-12; Ex. 21(a).)

      13.     Investors also asked Defendants whether they could afford to provide adequate

support for the Primary Fund, and they were assured that such support would be forthcoming.

(See, e.g., Exs. 30(b) at 3:18-4:5, and 30(a); 31(b) at 3:13-5:5, and 31(a).)

      14.     Defendants understood during the morning of September 15 that even with zero

net redemptions, the Primary Fund would break the buck if its Lehman holdings were valued at

approximately 62.5 percent of par value. (Ex. 97, Reserve chart reflecting "break a buck"

thresholds for Reserve Funds with Lehman holdings at RF-SEC-00062056; see also Ex. 8,

Lentinello Dep. Day 1 at 54:2-58:14 (explaining chart and identifying a mark-down of 37 cents

as "the break even point"); Exs. 41(b) at 4:8-10, and 41(a) (Ledford confirms for Bent Sr. and

Bent II at 9:33 a.m. that the Primary Fund would break the buck if it took "a hit of $300 million,"

which constituted approximately 38 percent of the Lehman holdings' par value).)

---

[3]     References to "Ex. __ (a)" are to recordings of taped telephone calls of Reserve
employees; references to "Ex. __ (b)" are to the transcripts prepared of those recordings.

15.     Defendants further understood that "as redemptions increased . . . the Lehman holdings would take up a higher percentage of the portfolio." (Ex. 4, Bent II Dep. at 187:19-23.)

16.     By 1:00 p.m. on September 15, 2008, according to the minutes of the Primary Fund's Board Meeting, Defendants realized there was a "run" on the Primary Fund. (Ex. 18 at RF-WFG 000180 ("Mr. Bent II told the Trustees that [there] appeared to be a run on the Primary Fund. . . .").)

Bent II's 1:19 Email of Intent to Support the Fund

17.     At 1:19 p.m., Bent II provided his sales team with a message about the Reserve's contingency plans that they could share with inquiring investors:

> We (Reserve Management Company Inc.) intend to protect the NAV on the Primary fund *to whatever degree is required*. We have spoken with the SEC and are waiting fro (sic) their final approval which we expect to have in a few hours. You may communicate this to clients on an as needed basis.
>
> Eric [Lansky] if you want something on the website I need to see language for approval first, thanks.

(Ex. 48 (emphasis added).)

18.     As instructed, John Drahzal, the Reserve's Global Head of Sales, shared Bent II's 1:19 email ("1:19 Email") with his sales team, reading it aloud to them "word for word." (Ex. 14 at 163:24-164:6.) In turn, the Reserve salespeople communicated to clients that RMCI intended to protect the Primary Fund's $1.00 NAV to whatever degree was required and that the Reserve was awaiting final approval of their plan from the SEC. (See, e.g., Exs. 28(b) at 2:15-3:20, and 28(a) ("we're going to support the fund unequivocally"); Exs. 29(b) at 4:13-14; 5:11-13, and 29(a) ("at the end of the day, the Reserve company will support the [Primary Fund's] NAV[] if they need to"); Exs. 30(b) at 3:4-6, and 30(a) ("you can tell and share with . . . the people who

invested with you that we are supporting the [Primary Fund] 100 percent"); Exs. 31(b) at 4:18-19, and 31(a) ("[supporting the Fund] removes the whole Lehman issue from the equation").)

19.     When Bent II instructed the Reserve's sales team to disseminate his message of support for the Primary Fund, he did not have any "understanding as to what degree of support could be required to . . . protect the NAV on the Primary Fund." (Ex. 2, Bent II Inv. Test. Day 2 at 84:9-12.)

20.     In fact, Defendants did not have sufficient resources to protect the Primary Fund to whatever degree might have been required to maintain the $1 NAV. When asked whether Defendants could have covered the Primary Fund's Lehman exposure up to "half of par," Bent Sr. testified that there was "no possible way that I could. . . ." (Ex. 6, Bent Sr. Inv. Test. Day 2 at 43:6-17.) He further testified that RMCI could not have committed even $100 million on September 15. (Ex. 7, Bent Sr. Dep. at 130:23-131:5.) Asked about his son's 1:19 Email, Bent Sr. testified that he "certainly wouldn't have approved that" because "'whatever degree is required' is open ended." (Ex. 6, Bent Sr. Inv. Test. Day 2 at 100:11-19.)

21.     Bent II likewise did not believe Defendants could, on their own, protect the Primary Fund's NAV to whatever degree was required. He believed RMCI had only approximately $50 million in "cash on hand" on September 15 (or less than seven percent of the Primary Fund's Lehman exposure), and, as of 1:19 p.m., he had not decided to commit even that money to any credit support agreement. (Ex. 1, Bent II Inv. Test. Day 1 at 159:20-160:3.) RMCI's financial statements from only weeks prior to September 15, 2008 confirm that RMCI did not have sufficient resources to provide the kind of unlimited, unqualified support Defendants pledged for the Primary Fund. (Ex. 100 at RF-SEC-00088772-73.)

8

22.     When Defendants spoke of supporting the Primary Fund's NAV, they had in their

minds various third parties or governmental entities that might have been willing to provide

liquidity in some form to the Primary Fund. Bent II testified that when he said "to whatever

degree is required" in his 1:19 Email, he was including funds he hoped would be contributed by

these third parties, explaining that on September 15 and 16, Defendants were doing everything

from "[l]ooking for a buyer for the company to trying to get some sort of support from the

Fed/Treasury. You name it, in my mind I was working on it." (Ex. 2, Bent II Inv. Test. Day 2 at

76:20-77:8; see also Ex. 86, Bents' January 23, 2009 Joint Wells Submission at 50-51 (arguing

that intent to support Primary Fund "to whatever degree is required" included willingness to sell

or otherwise cede control of RMCI to raise funds necessary to protect the Primary Fund's $1.00

NAV).)

23.     As Bent Sr. has explained, Defendants' commitment was made up of third party

funds:

Q.     And did you ever talk to Mr. Bent II about what you could afford
       to commit?

A.     Well, I think that what we could afford to commit is represented by
       the fact that we went out and started to look for somebody to buy
       the company, and that effectively says, you know, we're whole
       hog, we're into the whole thing.

Q.     So was it your view that the $100 million, just to use the figure you
       just threw out, would actually come from someone buying RMCI?

A.     Buying it, you know, borrowing it – effectively, buying it, yes.

(Ex. 7, Bent Sr. Dep. at 130:3-14; see also Ex. 2, Bent II Inv. Test. Day 2 at 79:14-18 ("[The

1:19 Email] is not focused on the financial resources of the management company being

committed to protect the NAV.")

9

24.     Bent II acknowledged that he lacked the ability to compel any of the third parties from whom he sought liquidity to assist, purchase or partner with the Reserve (Ex. 2, Bent II Inv. Test. Day 2 at 77:19-22), and he lacked the authority as of 1:19 p.m. to commit the Reserve to the kinds of arrangements he contemplated might be necessary to obtain that liquidity from third-parties. (Id. at 78:3-9.)

25.     As for Defendants' hopes that the government might rescue their business, Bent Sr. testified that on September 15 he had no reason to believe the Federal Reserve was going to intervene other than his personal belief that the situation "justified" government intervention. (Ex. 5, Bent Sr. Inv. Test. Day 1 at 130:22-131:22.)

26.     Eventually, the Bents testified, they decided to commit $10 million of their own money to support the Primary Fund. Bent Sr. testified that he had the $10 million figure "in the back of [his] mind" on September 15 (Ex. 5, Bent Sr. Inv. Test. Day 1 at 186:1-5; see also Ex. 6, Bent Sr. Day 2 at 34:6-11 and 37:4-8, explaining that "the $10 million that ultimately come up wasn't discussed, it just kind of happened" and was a "number I had in my head"), including when he addressed the Board at 1:00 p.m. (Ex. 6, Bent Sr. Inv. Test. Day 2 at 56:18-25 (when asked when the $10 million figure first came into his head, Bent Sr. explained that "this was while we were talking on the phone about the credit support agreement at the Board meeting."))

27.     The $10 million figure, which later on September 15 appeared in a draft credit support agreement for the Primary Fund (Ex. 3, Bent II Inv. Test. Day 3 at 185:5-8), was not a product of any calculations concerning what might be needed to adequately support the Primary Fund's $1.00 NAV. (Ex. 6, Bent Sr. Inv. Test. Day 2 at 56:1-5 ("Q: Did you make any calculations to arrive at $10 million? A: No. Q: On what did you base the $10 million figure? A: It came out of my head."); Ex. 3, Bent II Inv. Test. Day 3 at 191:10-192:17.) Rather,

Defendants' statements of support were focused on instilling investor confidence. (Ex. 3, Bent II Inv. Test. Day 3 at 192:18-25.)

      28.    Bent II believes he had a conversation with Bent Sr. in the afternoon on the 15th in which they agreed to "the $10 million figure." (Ex. 1, Bent II Inv. Test. Day 1 at 157:25-158:12). Bent Sr. does not recall discussing the $10 million figure with anyone (Ex. 5, Bent Sr. Inv. Test. Day 1 at 186:7-8 ("I'm not even sure that I discussed it among my sons.") Either way, both Bent II and Bent Sr. agree that they did not discuss at any time prior to 1:19 p.m. (or the 1 p.m. Board meeting) the amount of support Defendants could afford, or would be willing, to expend to protect the Primary Fund's NAV. (Ex. 1. Bent II Inv. Test. Day 1 at 157:25-158:12; Ex. 6, Bent Sr. Inv. Test. Day 2 at 37:12-13.)

      29.    The $10 million limitation on support for the Primary Fund was never shared with the Primary Fund's Board or the public. Bent II testified:

Q.     You never told the $10 million figure to the trustees, correct?

A.     I don't believe so.

Q.     You never told that figure to KPMG, correct?

A.     I don't believe so.

Q.     You never told that figure to the rating agency, correct?

A.     I don't believe so.

Q.     You never told that figure to the SEC, correct?

A.     Are you talking about the 15th still?

Q.     Correct.

A.     I don't believe so.

(Ex. 2, Bent II Inv. Test. Day 2 at 69:21-70:7; see also Ex. 6, Bent Sr. Inv. Test. Day 2 at 37:12-

13: "Q: Did you communicate that $10 million to anybody?  A:  Not that I recall.")

### The Wall Street Journal

30.     Bent II approved a message substantially identical to his 1:19 Email for the

Reserve's marketing team to share with the *Wall Street Journal.*  At 5:38 p.m. on September 15,

Lansky sought Bent II's approval for that statement, which read:  "If needed The Reserve intends

to protect the NAV on the *funds to whatever degree is required* . . . . "  (Ex. 60 at RF-SEC-

00107007 (emphasis added).)

31.     Minutes later, at 5:46 p.m., Bent II instructed Lansky to edit an unrelated portion

of the text and otherwise "go with it."  (Ex. 60.)

32.     With this email, Bent II authorized the Reserve's statement to the *Wall Street

Journal*, notwithstanding the executive review procedures that Defendants testified governed all

public communications at the Reserve.  (Ex. 3, Bent II Inv. Test. Day 3 at 147:13-15; see also id.

at 144:22-145:1.)

33.     Bent II has since admitted that, at 5:46 p.m., it was not true that "The Reserve

intended to protect the NAV on all of the funds in its fund family that held Lehman" because

Defendants "hadn't drawn a conclusion on anything other than the Primary Fund."  (Ex. 3, Bent

II Inv. Test. Day 3 at 150:5-12.)  According to Bent II, he had contacted Fund Accounting

Manager David Lentinello shortly before the 1:00 p.m. Board meeting and told him to be

prepared to take certain steps in case Defendants decided to support any of The Reserve funds

with Lehman exposure, but no decision to support the other funds was made.  (Id. at 33:2-35:5.)

Bent II testified that he nevertheless approved the statement for the *Wall Street Journal* because

12

he "was tired. There was a lot of pressure around this with the [media's] deadline" for their stories." (Id. at 150:13-16.)

34.    Throughout the day on September 15 and 16, some Reserve investors monitored the markets and the financial press for news about their investments. (Ex. 83, Reeg Decl. ¶ 9; Ex. 84, Gamble Decl. ¶ 8.)

Reserve *Insights* and the Bents' Approval of It

35.    On September 15, Defendants published Reserve *Insights*, a marketing document intended to convey information about the state of the Primary Fund in the wake of Lehman's bankruptcy filing. (Ex. 10, Lansky Inv. Test. at 74:18-75:2.)

36.    Defendants sent *Insights* to scores of investors on September 15. (See, e.g., Exs. 50-55; Ex. 83, Reeg Decl. ¶ 8.)

37.    In response to requests for more information about Defendants' plans to protect the Primary Fund's NAV (see supra at ¶¶ 11, 12), Defendants also sent *Insights* to analysts at both S&P and Moody's, respectively, on September 15. (Exs. 74 and 75.)

38.    *Insights* stated that "[t]he Reserve is committed to a $1.00 NAV for its Primary Fund" and explained that "Reserve Management Company, Inc., (RMCI) intends to enter into support agreements with the Primary Fund to support the value of Lehman credit held in the Fund." (Ex. 74.)

39.    *Insights* made no mention of any conditions attaching to Defendants' intent to enter into any credit support agreements. (Id.)

40.    *Insights* continued:

> Due to the small exposure as well as par value at maturity, the NAV is not negatively impacted. Furthermore, our support agreements ensure the integrity of a $1.00 NAV.

> \*      \*      \*
>
> We are confident that there will be no shareholder impact as the
> portfolios are structured to insure principal protection and provide
> daily liquidity.

(Id.)

41.     At some point on September 15 before the *Insights* piece was published, both

Bent Sr. and Bent II had the opportunity to comment on – and made revisions to – a draft of that

publication. (Ex. 106.) Bent II hand wrote proposed edits on a version marked "BII and Mr.

Bent comments." (Ex. 2, Bent II Inv. Test. Day 2 at 144:19-145:8.) Bent Sr. confirmed that the

handwritten comments reflected certain edits he proposed after Bent II read the *Insights* draft to

him over the telephone. (Ex. 5, Bent Sr. Inv. Test. Day 1 at 161:23-162:2.)

42.     The draft the Bents reviewed and commented on included the assurance that the

Lehman paper would mature at par. (Ex. 106.) Yet both Bents had participated in the Fund's

9:30 a.m. Board Meeting, at which the Trustees, including Bent Sr., voted to mark the "fair

value" of the Fund's Lehman holdings to 80% of par. (Exs. 42(b) at 8:12-21, and Ex. 42(a).)

Moments before that meeting began, Bent Sr. had heard Ledford state that his sources on Wall

Street were suggesting "60 to 80 cents on the dollar will be recovered" through Lehman's

bankruptcy process, and Bent Sr. acknowledged to the Board that he would not pay par value for

the Fund's Lehman holdings. (Exs. 41(b) at 3:16-19; 19:3-4, and Ex. 41(a).)

43.     Frank Bonanno, RMCI's Director of Marketing, recalled receiving the

handwritten comments from Bent II and understood the handwriting to be Bent Sr.'s and Bent

II's revisions to the draft marketing piece that ultimately became Reserve *Insights.* (Ex. 13,

Bonanno Dep. at 187:8-188:9.)

14

44.     The only substantive difference between the draft and final versions was the sentence beginning "[f]urthermore, our support agreements ensure the integrity of a $1.00 NAV." (Compare Exs. 74 and 106.)

45.     Both the draft and final versions also described the Reserve's "exposure to Lehman debt in the Primary Fund [as] less than 1.2%." (Exs. 74 and 106.) The quoted percentage did not factor in the net redemptions the Fund experienced before *Insights* was published, which pushed the percentage of Lehman held by the Fund significantly higher. As Bent II testified, "as redemptions increased, that [sic] the Lehman holdings would take up a higher percentage of the portfolio." (Ex. 4, Bent II Dep. at 187:20-23.) And Defendants understood this relationship, as according to Bent II, they communicated the changing proportion of Lehman assets in the Primary Fund's portfolio to the Primary Fund's Board on September 15. (Id. at 187:5-23)

46.     At 3:41 p.m. on September 15, Bonanno circulated an email with the subject line "Statement from the Reserve on Lehman/Merrill ..." to the Reserve's "Sales" and "Marketing" email distribution lists. (Ex. 49.) Bonanno's email contained only four lines of text, announcing, in relevant part: "Attached is the ***approved*** version of The Reserve's communication regarding this weekend's events with Lehman/Merrill and the position The Reserve is taking." (Id. (emphasis added).) He attached the *Insights* piece that was later shared with investors by email and was posted on the Reserve's website. (Id.)

47.     Bonanno instructed the email's recipients to use the *Insights* piece as "leverage on your calls and when fielding any redemption requests." (Id.) The Reserve sales team did use the piece in communications with investors, sending it by email to numerous investors and

15

communicating the same message on calls with investors. (See e.g., Exs. 50-55 (emails); 35(b) at 3:14-23; 5:11-24, and 35(a).)

48.     Bent II testified that he was a member of the "sales" email distribution list. (Ex. 2, Bent II Inv. Test. Day 2 at 149:17-24.) And the record indicates that Bent II was at his desk at 3:41 p.m. – his office phone records reflect a six minute call with someone at State Street Bank initiated at 3:40 p.m. (Ex. 98, at RF-SEC-00187437) before Bent II apparently stepped away to call his wife from his cell phone at 3:51 p.m. (Id. at RF-SEC-00468787 (reflecting call to (646) 215-4927); Ex. 4, Bent II Dep. at 277:5-17 (identifying same as Bent II home number).) But while Bent II responded to scores of emails on September 15, there is no evidence that he responded to Bonanno's 3:41 p.m. email and there is no evidence that he ever asked how any document could have been approved without his sign-off.

49.     Nor is there any evidence that Bent II questioned "approved" versions of other documents Bonanno sent around that day. At 11:05 a.m., Bonanno sent Bent II, along with the entire Reserve sales and marketing teams, an email attaching "the approved version" of a Reserve "Lehman Communication to Clients," that was prepared prior to the Bents' announcement of their intent to support the Fund. (Ex. 56.) There is no evidence that Bent II responded to Bonanno, although the record reflects that Bent II was logged into his email account at the time. At 11:06 (one minute after receiving Bonanno's email), Bent II exchanged emails with his wife (Ex. 107 at 2), whom he testified had no role whatsoever in the management or operations of any Reserve entity (Ex. 4, Bent II Dep. at 264:5-7). Then, after receiving another email from Mrs. Bent several minutes later (Ex. 107 at 2), Bent II called his wife and began a 21 minute conversation. (Ex. 98 at RF-SEC-00468787 (reflecting call to (646) 215-

4927).)  There is also no evidence that Bent II questioned anyone about how any document could be approved without his (or his father's) formal sign-off.

50.    Bent Sr., who was vacationing in Italy on September 15, testified that he did not ordinarily access email personally, but had an assistant who monitored his account. (Ex. 5, Bent Sr. Inv. Test. Day 1 at 109:12-15.) Bent Sr. further testified that he had telephone access while in Italy (Ex. 7, Bent Sr. Dep. at 13:13-14), and his hotel placed no limit on the number of faxes he could receive there, and he did, in fact, receive faxes at his hotel. (Id. at 91:11-19.)

51.    Bonanno was responsible on September 15 for shepherding *Insights* through the Reserve's review process. (Ex. 10, Lansky Inv. Test. at 79:22-80:7.)

52.    At 3:25 p.m. on September 15, Bonanno emailed his immediate boss, Lansky, that "all parties have reviewed and signed off" on an attached version of *Insights*. (Ex. 57; see also Ex. 13, Bonanno Dep. at 193:10-21.)

53.    Bonanno testified that he would not have distributed the *Insights* piece as "approved" unless he understood that everyone at the highest level of the Reserve's review process had approved the document (or was otherwise properly excused from doing so). (Ex. 13, Bonanno Dep. at 113:23-114:5; see also id. at 196:4-21 (stating that the "final" *Insights* document was sufficiently "reviewed and signed off" to distribute to the public).)

54.    Bonanno further testified that he would not have assumed that any reviewer's silence indicated approval. (Ex. 13, Bonanno Dep. at 74:18-25.)

55.    At approximately 5:16 p.m. on September 15, Bonanno reaffirmed his understanding that *Insights* had been approved for distribution, informing Reserve CIO Ledford that Bent Sr. in particular had approved the *Insights* piece. (Exs. 22(b) at 2:3-13, and 22(a).)

17

56.     Ledford directed Bonanno to share *Insights* with Moody's and S&P (Exs. 22(b) at 2:14-18, and 22(a)), and then informed Bent Sr. by telephone that news of the Reserve's "capital support agreement" had been sent to the agencies.  (Exs. 23(b) at 4:12-18, and 23(a).)

57.     Ledford joked to Bent Sr. on a call beginning at 5:18 p.m. on September 15 that the ratings agencies would be "fat and happy tonight" after receiving the news from Defendants concerning credit support.  (Exs. 23(b) at 4:16-18, and 23(a).)  In response, Bent Sr. did not ask Ledford what had been sent to the ratings agencies, or how anything could have been sent absent his formal authorization.  (Id.)

58.     Eric Lansky likewise recalls learning on September 15 that the Reserve *Insights* document was approved.  (Ex. 10, Lansky Inv. Test. at 87:22-88:4.)

59.     When Lansky received Bent II's 1:19 Email, he understood that the message of RMCI's "intent to support the dollar" NAV was officially approved to be incorporated into subsequent communications with the public, including written communications.  (Ex. 10, Lansky Inv. Test. at 174:5-17.)  More generally, Lansky (who had worked with the Bents since 1999), understood that when Bent II conveyed that a message could be shared with the public, that meant the message could be included in subsequent communications with investors.  (Id. at 172:17-22.)

60.     Bent II again approved *Insights* when Lansky asked him for permission to add it to RMCI's website.  (Ex. 58.)

61.     Bent II had instructed Lansky earlier on September 15 not to post any materials to the website without first obtaining his approval.  (Ex. 48 at 00178840; id. at 00178834-35; Ex. 10, Lansky Inv. Test. at 181:2-12.)

18

62.    At 9:01 p.m. on September 15, Lansky asked Bent II for such approval, urging him to use "a statement that we have prepared [to] at least address some concerns re being on top of issue and nav intent." (Ex. 58.)

63.    Bent II testified that when he received Lansky's request, he "wasn't clear about what [Lansky] was talking about." (Ex. 2, Bent II Inv. Test. Day 2 at 142:11-13; see also id. at 151:15-17; id. at 157:1-3 (testifying that the first time he read the final *Insights* piece was after it was posted to RMCI's website).)

64.    Without being clear on what Lansky was talking about, Bent II approved the posting, responding to Lansky's email at 9:36 p.m. with the instruction: "Ok, go ahead." (Ex. 58.) *Insights* was subsequently posted to the Reserve website. (Ex. 2, Bent II Inv. Test. Day 2 at 94:24-95:4.) It remained there until sometime after 10:30 a.m. on September 16. (Ex. 108, Plaze Dep. at 181:15-182:16; 184:12-19; Ex. 109, DiMartino Inv. Test. at 125:12-127:17; see also Ex. 4, Bent II Dep. at 121:9-13 (testifying that his instruction to remove *Insights* from company website may have been as late as 11:00 a.m. on September 16).)

Defendants Continued to Communicate Their Message of Intent to Support Even After the Bents Decided Conclusively Not to Support the Primary Fund

65.    According to Defendants, they decided against supporting the Primary Fund late at night on September 15. (Ex. 5, Bent Sr. Inv. Test. Day 1 at 203:7-23; Ex. 2, Bent II Inv. Test. Day 2 at 177:1-5.)

66.    But nobody told the Primary Fund's sales force to stop communicating the message of RMCI's unqualified intent to support the Fund's $1.00 NAV. John Drahzal, the Reserve's Director of Sales, did not learn that "The Reserve would not be protecting the $1 NAV" until "right after" the Fund announced publicly that it was breaking the buck. (Ex. 14, Drahzal Dep. at 244:9-21.)

19

67.     Bent Sr. did "nothing" to make sure that investors were made aware of Defendants' decision to abandon any plan to support the Primary Fund. (Ex. 5, Bent Sr. Inv. Test. Day 1 at 213:15-19.) Bent Sr. explained that he assumed Bent II or counsel would have handled clarifying the message for investors (id. at 214:4-8), but there is no evidence that anyone shared Defendants' decision not to support the Primary Fund with those Reserve employees who were communicating with investors.

68.     The sales force continued to share the *Insights* publication with investors throughout the day on September 16, both in written form and on numerous telephone calls. (See, e.g., Exs. 36(b) at 2:18-23, and 36(a); 39(b) at 3:1-6, and 39(a); and 40(b) at 3:3-4:12, and 40(a); see also Ex. 84, Gamble Decl. ¶ 12.)

69.     On September 16, certain Reserve investors purchased additional shares in the Primary Fund after receiving specific assurances by email and in telephone communications with RMCI, or through *Insights*, that the Fund's $1.00 NAV would be supported by RMCI. (Ex. 83, Reeg Decl. ¶¶ 9, 10; Ex. 81; Ex. 84, Gamble Decl. ¶ 9; see also Ex. 81, Declaration of Brian Moore, executed April 14, 2011 ¶¶ 5, 6 (describing purchases made after Reserve represented that delays in funding redemption requests related to processing issues).)

**Additional Misrepresentations to Ratings Agencies**

70.     RMCI assured Moody's that the Primary Fund had sufficient liquidity to satisfy redemption requests at a time when RMCI knew that was not the case. At approximately 2:29 p.m. on September 15, Patrick Ledford told Moody's that redemptions had stopped and the Reserve had "sold product in the street" to satisfy outstanding redemption requests. (Exs. 24(b) at 2:4-13, and 24(a).)

71.     When Shilling responded that he thought there was "very little . . . movement in terms of paper," Ledford assured him that "we were able to get it done." (Exs. 24(b) at 2:11-21, and 24(a).)

72.     Slightly more than an hour before, however, Ledford had told Patrick Farrell that he had been able to sell very few assets. At 1:27 p.m. Farrell called Ledford to relay a question from State Street regarding how much money RMCI "thought [it would] be able to raise today." (Exs. 26(b) at 2:5-8, and 26(a).) When Ledford answered "not much," and noted the magnitude of RMCI's existing overdraft with State Street, Farrell informed Ledford that State Street was "not gonna be able to send out the wires . . . they're not gonna be able to front us that much money." (Id. at 2:9-14; 2:16-19)

73.     Minutes later, at 1:49 p.m., Ledford explained to Farrell that the Reserve was "in the hole for about eight [billion dollars]," referring to the $8 billion overdraft credit that Reserve's custodian bank, State Street had provided to the Primary Fund in order to fund the redemptions that were wired. (Exs. 25(b) at 2:18, and 25(a).)

74.     On that same 1:49 call, Ledford and Farrell reviewed in detail the amount of liquidity that might be available from maturing assets and assets RMCI was able to sell, and that analysis left Farrell to conclude that customers would not "get their money tonight," a result Ledford acknowledged was "the kiss of death." (Exs. 25(b) at 7:4-6, and 25(a).) Ledford also noted (after Reserve head of sales John Drahzal and head of operations David Gareis joined the call) that even a credit support agreement might be too little too late, since Reserve was "looking at a $15 billion overdraft tonight" with State Street. (Exs. 25(b) at 8:21-9:4, and 25(a).) Ledford knew that, in his own words, letting clients know that they would not get redemption requests funded "would exacerbate the whole situation." (Exs. 25(b) at 10:11-18, and 25(a).)

75.     And, despite what Ledford had told Shilling, redemptions had not stopped at the time Ledford spoke with him. (Ex. 4, Bent II Dep. at 158:5-8; see also Ex. 67 at RMCI-SEC-DL-00000245A.)

76.     Communicating with the ratings agencies was one of Ledford's responsibilities as RMCI's Chief Investment Officer. Bent II knew that "Ledford had spoken with S&P and/or Moody's at some point, maybe more than once, during the 15th." (Ex. 4, Bent II Dep. at 143:10-12.) Bent Sr., too, understood that Ledford played a role on RMCI's behalf in communicating with the ratings agencies, in part because Bent Sr. considered them "a waste of time." (Ex. 7, Bent Sr. Dep. at 86:6-13.)

77.     Many investors had a different view of the ratings agencies, with some governed by investment policies that made the agencies' highest ratings a factor in their review of any fund for possible investment. (See, e.g., Ex. 82, Boyd Decl. ¶ 3; Ex. 83, Reeg Decl. ¶ 3; Ex. 84, Gamble Decl. ¶ 5.) Bent Sr., himself, understood that for some investors, ratings were important, and the Reserve sought to be rated in order to "solicit" certain investors. (Ex. 7, Bent Sr. Dep. at 76:14-19.)

78.     Investors who chose to buy and sell Primary Fund shares on September 15 and 16 monitored what the ratings agencies had to say about the Primary Fund. (See, e.g., Ex. 82, Boyd Decl. ¶ 5; Ex. 83, Reeg Decl. ¶ 9.)

79.     The published ratings criteria for both S&P and Moody's made clear that the willingness of a fund sponsor to support a fund was information they would use in formulating their credit ratings, and when making a determination to place a fund on a credit watch, the agencies' public announcement of possible ratings downgrades. (Ex. 79, Moody's Decl. ¶¶ 9-11; Ex. 80, S&P Decl. ¶¶ 5-6.)

80.    After conversations throughout the 15th with the Bents and Ledford, and after

receiving the Reserve *Insights*, neither S&P nor Moody's took any negative action with respect

to the Primary Fund, such as putting the Primary Fund on its credit watch list, and neither issued

any public statement regarding its credit views of the Fund. (See Ex. 79, Moody's Decl. ¶ 20;

Ex. 80, S&P Decl. ¶¶ 16, 17.)

**Misrepresentations and Omissions to the Board**

Intent to Support the Fund

81.    In seeking Board approval to approach the Commission about a possible credit

support agreement, Bent II explained to the Trustees at the 1:00 p.m. meeting on September 15

that "RMCI would commit to provide capital to the Primary Fund to protect its NAV from

falling below $1.00 per share." (Ex. 18, September 15 Minutes at RF-WFG 000180.)

82.    Defendants never communicated to the Board any conditions on RMCI's ability

or willingness to contribute capital to support the Primary Fund's $1.00 NAV. Bent II testified,

both in his personal capacity and as RMCI's representative:

> Q:    Did anybody, at the 1:00 meeting, communicate to the Board any conditions on
>        RMCI's ability or willingness to contribute capital to support the Primary Fund's
>        $1.00 NAV?
>
> A.    Not that I'm aware of.
>
> Q.    All right. And the same answer for you in your individual and your 30(b)(6)
>        capacity?
>
> A.    Yes, sir.

(Ex. 4, Bent II Dep. at 242:8-15; see also Ex. 11, Montgoris Inv. Test. at 55:18-19 (testifying that

nobody expressed any conditions to the Board that attached to any intent to support the Primary

Fund).)

83.     When the Primary Fund's Board specifically "questioned management respecting whether RMCI had sufficient capital to provide credit support to the Primary Fund," Bent Sr. "represented that sufficient capital could be made available for this purpose." (Ex. 18, September 15 Minutes at RF-WFG 000180.)

84.     Bent Sr. meant for his statement to be understood as "unconditional." (Ex. 6, Bent Sr. Inv. Test. Day 2 at 90:22-91:2.)

85.     Bent Sr. did not share with the Primary Fund's Board at the time (or at any time on September 15) that "in the back of [his] mind [he was] talking about $10 million" in potential credit support. (Ex. 5, Bent Sr. Inv. Test. Day 1 at 186:1-5.)

86.     This was not the first time Bent Sr. had made such an unqualified statement of intent to support a cause. In running for Nassau County Executive in 2001, Bent Sr. promised to spend whatever it took to win the election. (Ex. 101.) Later, Bent Sr. scaled back his commitment to $10 million, and finally to only $1 million. (Ex. 102.)

87.     Defendants also did not disclose to the Board that a line of credit was not an option for the Reserve. (Ex. 46 at RF-SEC-00039763-65 (explaining that a line of credit such as those utilized for funds responding to previous financial crises was "not an option for us."); Ex. 18, September 15 Minutes.)

88.     Ultimately, the Bents opted not to provide any support for the Primary Fund because, as Bent Sr. explained, "Bruce said it was hopeless"; "there was no sense in going forward with the credit support . . . [b]ecause of the rate of redemptions – redemptions and the rate of redemptions." (Ex. 6, Bent Sr. Inv. Test. Day 2 at 84:12-19; see also Ex. 7, Bent Sr. Dep. at 25:3-13 (confirming that decision not to support the Primary Fund was made because of "rate of redemptions, and also liquidity in the marketplace"); Ex. 19, September 16 Minutes at 1

24

("Bent II told the Trustees that by Monday night, it had become apparent ... that the effect of those redemption requests, when coupled with the inability of the Primary Fund's investment manager to sell Fund assets at reasonable prices in a virtually illiquid market, made it unlikely that RMCI could provide the level of credit support necessary to support a Fund NAV of $1.00 per share").) But while the large majority of those redemption requests were submitted before the 1 p.m. Board meeting, Bent Sr. testified that the $16.5 billion redemption total as of 1 p.m. on September 15 did not lead him to conclude that a credit support agreement would be "futile." (Ex. 6, Bent Sr. Inv. Test. Day 2 at 86:1-9.)

89.     Bent II acknowledges that he knew, at least by the 1:00 p.m. Board meeting, that "if redemptions continued at the pace they were at, that Primary would break the buck" even with Lehman valued at .80.  (Ex. 4, Bent II Dep. at 205:4-8.)

90.     According to Drahzal, Defendants' unqualified announcements about credit support for the Primary Fund succeeded in slowing the rate of redemptions on September 15.  In Drahzal's words, as set forth in an email to Bent II at 8:34 p.m. on September 15, after Defendants "established a posture that [RMCI] would 'protect' the nav of the primary fund[,] [t]he client base reacted positively to this news and the redemption activity slowed greatly. . . ." (Ex. 61.)

91.     Getting investors to stop redeeming (and, later in the day, to buy back into the Primary Fund) was Bent II's stated goal on September 15.  (See, e.g., Ex. 59 at RF-SEC-00178834-35 (email from Bent II urging Lansky to "[j]ust try and get the institutional folks back in"); Ex. 14, Drahzal Dep. at 191:17-193:6 (describing Bent II's instruction to approach investors redeeming Primary Fund shares on September 15 to ask them to cancel their redemptions).)

92.     Arthur Bent was also focused on influencing investors' decisions, as he made clear in his contribution to the email chain that followed Bent II's 1:19 Email. "[W]e should say as little as possible to get the positive effect," he suggested. (Ex. 59 at RF-SEC- 00178839.[4])

Level of Redemptions, the Lack of Liquidity and the Bents' Efforts to Sell RMCI

93.     Defendants also never informed the Primary Fund Board at any time on September 15 that redemptions had reached a level so high that the Reserve was unable to fund redemption requests and State Street had told RMCI personnel, including CFO Patrick Farrell and Director of Operations, David Gareis, that it was unwilling to extend additional overdraft privileges to the Reserve to cover those net redemptions. (See Ex. 71, September 15, 9:55 a.m. email from State Street's John Stratton to Farrell explaining overdraft was limited to less than $2 billion); Ex. 72 at SSC003907 (State Street email indicating they "told [RMCI] that we can not fund any [overdrafts] overnight today"); see also Ex. 99 (call log of Reserve calls with State Street, reflecting call from Robert Dame of State Street to Gareis one minute prior to time stamp of Exhibit 72.); Ex. 18, September 15 Minutes.)

94.     Gareis kept Bent II apprised of redemption information throughout the day on September 15. (Ex. 4, Bent II Dep. at 161:5-163:17; Ex. 12, Gareis Dep. Day 2 at 83:22-84:9.)

95.     "[K]eep[ing] track of net redemptions" on September 15 was one of Bent II's responsibilities. (Ex. 7, Bent Sr. Dep. at 43:4-15.) As the sole member of RMCI's "Office of the Chair" who was in the office on September 15, Bent II's responsibilities extended, in Bent Sr.'s words, to "[e]verything." (Id.)

---

[4]     Like many emails produced by Defendants as received by Lansky, the time stamp on the Exhibit is one hour earlier than Eastern Time. On September 15 and 16, Lansky was working from his home in Alabama, in the Central Time zone. (Ex. 10, Lansky Inv. Test. at 204:17-22.)

96.     Virtually all redemption requests received after 10:10 a.m. on September 15 remained unfunded throughout the rest of the day. (See Exs. 65-69 (shaded entries in reports reflect unfunded redemptions); Ex. 4, Bent II Dep. 55:1-56:12 (as of 7 p.m., State Street advised that they had had "frozen redemptions . . . [and] were not going to send out any more redemptions.") By approximately noon on September 15, State Street completed funding of redemption requests received prior to 10:10 a.m. (See Ex. 65 at RMCILIT 0000659, 661, 664.) Between noon and 4:00 p.m., however, State Street did not fund any Primary Fund redemption requests, as reflected by the hourly email notifications to several senior employees of the Reserve, alerting them to the static nature of unfunded redemptions throughout the afternoon of September 15. (See, e.g., Exs. 65-69.) This information was not shared with the Board. (Ex. 18, September 15 Minutes.)

97.     State Street had put the Reserve, including Gareis, Farrell, and Lentinello, on notice as early as Friday, September 12, that, due to already existing overdraft amounts and $1 billion in redemptions scheduled to be funded on September 15, it "may have difficulties getting the wires released Monday morning." (Ex. 70 at SSC003997). This information was not shared with the Board. (Ex. 18, September 15 Minutes.)

98.     State Street again told the Reserve early on September 15 to expect delays in funding redemption requests (Ex. 27(b) at 2:10-19). At 9:55 a.m. that day, John Stratton of State Street told CFO Farrell that RMCI was being limited to an overdraft that day of less than $2 billion. (Ex. 71.) This information was not shared with the Board. (Ex. 18, September 15 Minutes.)

99.     As redemption activity increased, and after State Street mistakenly allowed the Reserve to incur $8 billion in overdraft debt to fund redemption requests from the Fund, State

Street decided to cut off further credit and to hold all wires while the Reserve tried to sell securities to create its own liquidity. (Ex. 72 at SSC003907.) At approximately 1:00 p.m., State Street "told [RMCI] that we can not fund any [overdrafts] overnight today." (Id.; see also Ex. 99 (call log of Reserve calls with State Street, reflecting call from Robert Dame of State Street to Gareis one minute prior to time stamp of Exhibit 72.).) This information was not shared with the Board. (Ex. 18, September 15 Minutes.)

100.    Defendants acknowledge that RMCI learned by 3:00 p.m. that State Street had stopped funding redemptions. (Ex. 86, Bents' Jan. 23, 2009 Wells Submission at 41; see also Ex. 12, Gareis Dep. at 7:5-10 ("On September 15th, RMCI learned that State Street stopped funding redemptions at approximately 2:30.") In fact, Defendants acknowledge that Bruce II learned that State Street was no longer funding redemption requests shortly after receiving an email from John Drahzal at 2:48 p.m. on September 15. (Ex. 86, Bents' Jan. 23, 2009 Wells Submission at 41; see also Ex. 113, September 15, 2:48 p.m. email from Drahzal to Bent II stating: "Here with Dave Gareis – need to discuss daylight overdraft situation.") Nevertheless, Defendants did not reconvene the Primary Fund's Board on September 15 after learning of that critical fact. (Ex. 18, September 15 Minutes.)

101.    While Bent II disputes precisely when he personally became aware of State Street's refusal to extend any additional overdraft protection to RMCI to fund redemptions in the Primary Fund, he testified that by 7:00 p.m. on September 15, State Street's decision was clear to him. (Ex. 4, Bent II Dep. at 55:1-56:12.) He also knew the Primary Fund's assets were not sufficiently liquid to cover redemption requests received on September 15. (Id. at 53:10-54:5.)

102.    Defendants also failed to keep the Board apprised of the magnitude of redemption requests on September 15. There is no material dispute as to the actual number of redemptions

in the Primary Fund as of the start of the 1:00 p.m. Board Meeting – approximately 16.5 billion

shares. The Board minutes are silent as to whether that figure was communicated to the Board

on September 15, but the record is otherwise unequivocal.

- None of the contemporaneous notes of the September 15 Board meetings reflect a redemption figure approaching 16.5 billion shares. (Exs. 89-92, September 15 notes of General Counsel and Recording Secretary Catherine Crowley, Chief Compliance Officer Christina Massaro, Bent II and RMCI attorney Scarlett Du, respectively.)

- The original draft of the Primary Fund Board minutes does not include any number approaching 16.5 billion as a number shared with the Trustees at any Board meeting on September 15; the earliest draft of the minutes that identified any number included a bracketed $8 billion figure. (Ex. 73 at RF-SEC-00210248)

- The Independent Trustees, in their first meeting on September 16, expressed "shock" to learn that redemptions had significantly exceeded 5 billion shares. (Ex. 20, September 16 "Executive Session" Minutes at TRES_SEC 0000107-8; see also Ex. 11, Montgoris Inv. Test. at 63:11-64:20 (recalling no redemption figure reported on September 15 greater than 8 billion shares).)

- The initial drafter of the minutes, RMCI General Counsel and Recording Secretary Catherine Crowley, testified that she did not recall any figure having been actually communicated to the Trustees at the 1 p.m. Board Meeting, and that her eventual inclusion of a 16.5 billion figure was based on a Reserve employee (likely CFO Patrick Farrell), retrieving the number of "actual redemptions" as of 1pm, not any figure communicated to the Board. (Ex. 9, Crowley Inv. Test. Day 2 at 150:9-151:25.)

- Bent Sr. testified that he could not recall any mention of the 16.5 billion figure at the 1:00 p.m. Board meeting. (Ex. 7, Bent Sr. Dep. at 62:21-25.)

103.    Investors continued to redeem billions of Primary Fund shares on September 15

during and after the 1:00 Board meeting (see Exs. 66-69), but the Trustees were not provided

with any updates after that Board meeting about the rate or magnitude of additional redemptions.

(Ex. 18, September 15 Minutes.)

104.    Defendants also never informed the Board that the ratings agency analysts had

called the Reserve repeatedly to inquire about whether the Reserve had in place any credit

support agreement, or that the Reserve had communicated with the analysts and sent them

statements about existing support agreements and an unqualified intent to support the Primary Fund's NAV. (Exs. 18 and 19, September 15 and 16 Minutes, respectively.)

105.    And while Defendants deemed their liquidity needs on September 15 sufficiently urgent to call the Federal Reserve early in the morning to seek assistance (Ex. 2, Bent II Inv. Test. Day 2 at 121:19-122:24) – a call Bent II claims was never returned on September 15 (id. at 124:15-125:15) – they never informed the Board on September 15 of this fact. (See generally Ex. 18, September 15 Minutes.)

106.    Likewise, Defendants never informed the Board that, before the 1:00 p.m. Board meeting even began, the Fund owed State Street approximately $8 billion for the overdraft State Street had extended the Fund to cover the first redemptions in excess of what the Fund's liquid assets would cover. (See supra at ¶ 98 (describing overdraft position); Ex. 18, September 15 Minutes (reflecting failure to inform Board of overdraft position).)

107.    Because the Board was not told of the $8 billion debt to State Street, the Trustees were also not advised that the Primary Fund was in violation of its stated investment policies when it incurred that debt. The Primary Fund's September 28, 2007 Statement of Additional Information (in effect on September 15, 2008) cited the Fund's Investment Policies as prohibiting the Fund from borrowing any "amount exceeding 5% of its total assets," "including through reverse REPO transactions, for extraordinary or emergency purposes." (Ex. 104 at 5-6; see also id. at 1 (the Primary Fund may not "borrow money except as a temporary or emergency measure and not in an amount to exceed 5% of the market value of its total assets."); Exhibit 83 ¶ 5.)

108.    Furthermore, though one way to improve the Fund's liquidity on September 15 was to sell assets for less than par value, Defendants decided before 1 p.m. that they would

"refrain from selling securities at below par," but they did not communicate that decision to the Board.  (Ex. 4, Bent II Dep. at 192:6-9; Ex. 18, September 15 Minutes.)

    109.    Although Bent II testified that he had decided to explore a potential partnership with, or sale of RMCI to, a third party "[e]arly on the 15th" (Ex. 4, Bent II Dep. at 91:19-22), Defendants did not share that information with the Board on September 15 either.  (Ex. 18, September 15 Minutes.)

    110.    The Trustees were shocked to learn on September 16 about the many material facts that had not been disclosed to them on September 15.  Independent Trustee William Montgoris explained:

> I was shocked and surprised when we were told that the
> redemptions had gotten to a very large number, almost $25 billion
> and also surprised and shocked to hear that the management had
> conversations with various people about buying the fund, buying
> the management company, about hiring an investment banker to
> see if there was anybody that would be interested in buying it
> because it seemed that 1:30 or 2:00 whenever it was that we had
> the last call on the 15th that things were seemingly under control
> and then when they started the meeting at 10:00 we were given all
> this information that was a radically different picture from what we
> had been left with the prior day at 1:30, 2:00, whatever time it was,
> and it was shocking to me that there had been such a substantive
> and large run on the bank in such a short period of time.

(Ex. 11, Montgoris Inv. Test. at 61:19-62:8; see also id. at 69:18-20 (testifying that the Trustees would have wanted to know about State Street's suspension of redemption funding); Ex. 20, September 16 Executive Session Minutes ("Initially, the Independent Trustees indicated how shocked they were by the information related to the by Reserve Management during the [September 16] morning's earlier call.").)

    111.    The Board instructed RMCI to keep the Trustees apprised (through their counsel) "of any significant developments."  (Ex. 18, September 15 Minutes at RF-WFG 000179.)  The

Board was also informed on September 15 that they would be re-convened if any developments material to the Primary Fund's value transpired. (Exs. 42(b), 9:33 a.m. Board call at 2:19-23 and 3:24-4:23, and 42(a); Ex. 11, Montgoris Inv. Test. at 66:11-19.)

Another Reserve Fund Broke the Buck as of 10:00 a.m. on September 15

112.    Defendants also never advised the Board that another Reserve fund with Lehman exposure, the Yield Plus Fund (a fund that shared the same Board with the Primary Fund), had broken the buck as soon as the Board voted to mark down the value of all Lehman holdings to 80 percent of par. (Ex. 18, September 15 Minutes.)

113.    News of the Yield Plus Fund's NAV dip below a dollar was also never disclosed to the public on September 15 because Defendants instructed State Street to credit the fund with a sufficient receivable (to be charged to RMCI) that would bring its NAV back up to $1. (Ex. 15, Lentinello Inv. Test. at 42:19-48:16 (testifying that Bent II instructed him to have State Street book a receivable to maintain a $1.00 NAV for the Yield Plus Fund, and he conveyed that request to State Street).) That receivable kept the Yield Plus Fund's NAV at $1 until after the Primary Fund broke the buck. (Ex. 3, Bent II Inv. Test. Day 3 at 97:23-98:5 ("had [Lentinello] not booked those receivables, the N.A.V.s would have dropped below a dollar.") Bent II subsequently directed State Street to reverse the receivable, claiming his original instruction had been misunderstood. (Id. at 95:21-97:6.)

Trades in Comparable Lehman Securities

114.    The Trustees expected to be informed of "[w]hether or not paper was trading, how much paper was trading [and] at what prices paper was trading (Ex. 11, Montgoris Inv. Test. at 94:22-95:2), and they communicated that expectation to Defendants. (Exs. 42(b) at 2:19-23, and

32

42(a) (asking Bents to reconvene Board "if there are any material events during the day that management thinks impact on the – the values that you've arrived at this morning").)

115.    Bent Sr., despite having "no electronic access to market information, documents or e-mails" (Ex. 86 at 22 n.75), "agreed – from Italy – to supervise the collection of Lehman market information to 'see what happens in the marketplace.'" (Id. at 35 (quoting Bent Sr.'s recorded statements to Primary Fund Board on September 15).)

116.    Actual trades of Lehman securities comparable in seniority and maturity date to those held by the Primary Fund reflect that investors were unwilling to purchase such securities for par as early as September 12, 2008 and, by the morning of September 15, such securities were trading for approximately 30-35 percent of par. (Ex. 105, Declaration of James A. Powell, executed July 27, 2009, ¶¶ 3-8.)

117.    RMCI told the Trustees at the 9:30 Board meeting that there were "no trades out there. There's no transactions ... that's why we're saying we should value it at par." (Exs. 41(b) at 11:1-4, and 41(a).) Defendants never informed the Board on September 15 of any trading in Lehman securities. (Ex. 18, September 15 Minutes; Ex. 19, September 16 Minutes.)

**Defendants Failed to Inform the Public or the Board When the Primary**
**Fund Broke the Buck**

118.    Defendants admit that "contrary to previous statements to the public and to investors, the [Primary] Fund's net asset value per share was $0.99 from 11:00 a.m. Eastern time to 4:00 p.m. Eastern time on September 16, 2008 and *not* $1.00." (Ex. 93, Reserve Press Release: "Important Notice Regarding Reserve Primary Fund's Net Asset Value" (Emphasis in original).)

119.    Defendants allowed investors to purchase shares in the hours after 11:00 a.m. on September 16 when the Fund's per-share NAV was actually below $1.00; those purchasers were

charged $1.00 per share. (Ex. 95 and 96, charts reflecting, *inter alia*, purchases of Primary Fund shares.)

120.    Purchases were accepted throughout the day on September 15, 16 and several days after that as well. (Id.)

121.    Investors were also permitted to transfer their Primary Fund shares to other Reserve funds, such as the Reserve's U.S. Government Fund, on September 15 and 16. (Id.)

122.    Early in the morning on September 15, Bent II instructed Drahzal to tell investors who requested redemptions from the Primary Fund that, instead of redeeming, they could move their money to one of the Reserve's funds that did not have exposure to Lehman Brothers. (Ex. 14, Drahzal Dep. at 79:5-80:4; Ex. 78 at RF-SEC-00058183-86 (Bent II inquiring whether redeemers were keeping their money "in house").) Drahzal, following this instruction, told Reserve's sales team to communicate this option to Primary Fund investors. (Ex. 14, Drahzal Dep. at 79:5-80:4.)

123.    Defendants acknowledged that they were responsible for the error in computing the Primary Fund's NAV, calling the mistake "administrative error." As Defendants explain their error:

> On Tuesday, September 16, 2008, the Reserve's Fund Accounting Group was closely monitoring NAV per share as redemption orders were received throughout the day. Unfortunately, the Fund Accounting Group was computing the hourly NAVs using a spreadsheet showing the fair value of Fund assets that did not take the previous day's write-down of the three Lehman securities held by the Fund into account.

(Ex. 93, Reserve Press Release: "Important Notice Regarding Reserve Primary Fund's Net Asset Value.")

124.    At 10:39 a.m. on September 16, David Lentinello sent a spreadsheet to each of the Bents, Farrell, Crowley, Ledford and others indicating that the Primary Fund's per-share NAV

was almost exactly $1 (99.97 cents). (Ex. 77.) But Lentinello had "failed to account for the 20 percent write down of Lehman" (Ex. 17, Farrell Inv. Test. at 150:1-150:16), so no matter how many redemptions shareholders requested, Lentinello's "Snapshot Report" would reflect a per-share NAV of approximately $1.00. (Id. at 155:9-156:24.)

125.    Based on actual net redemption requests and the Board's valuation of Lehman holdings at 80 percent of par, the Primary Fund was already dangerously close to breaking the buck on September 15, closing the day with a per-share value of $0.995734. (Ex. 104; see also Ex. 16, Lentinello Dep. Day 2 at 12:1-14:24.)

126.    According to Defendants' proffered "damages" expert, Defendants "earned" more than $8 million in profit. (Ex. 94, July 15, 2010 Report at 21.)  This appears to exclude the Bents' personal salary and/or bonuses claimed for that time period. (Id.)

127.    The Bents have faulted numerous entities for the demise of the Primary Fund, including State Street Bank (Ex. 7, Bent Sr. Dep. at 106:4-19), the Federal Reserve (id. at 115:24-116:7; 119:1-25), the Treasury Department (id. at 116:4-5; 120:3-9; 123:6-20); the Commission (id. at 116:12-117:7); and Willkie (Ex. 111; Ex. 4, Bent II Dep. at 279:21-280:10); and blame everyone from Reserve employees (other than themselves) to the company's printer for their misrepresentations. (See, e.g., Ex. 2, Bent II Inv. Test. Day 2 at 149:25-150:18 (claiming Bonanno erroneously identified *Insights* as "approved" in email to sales and marketing teams); id. at 151:7-152:20 (claiming Lansky caused the unapproved *Insights* press release to be posted on the Reserve's website); Ex. 3, Bent II Inv. Test. Day 3 at 95:14-96:8 (claiming Lentinello had made a "mistake" in causing State Street to book a receivable for certain Reserve funds); Ex. 1, Bent II Inv. Test. Day 1 at 66:24-68:5 (expressing his and Arthur Bent's belief that

35

Ledford "needs to go"); and Ex. 112 at 4 (blaming a "printer's mistake" for misstatements in the

published version of *Insights*).)


Dated: New York, NY
     May 13, 2011            Respectfully submitted,

           SECURITIES AND EXCHANGE COMMISSION

           By: _____
              Nancy A. Brown
              Valerie A. Szczepanik
              Michael D. Birnbaum
              Michael P. Holland

           3 World Financial Center
           New York, New York 10281
           (212) 336-1023 (Brown)

           Attorneys for Plaintiff