UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------x
SECURITIES AND EXCHANGE                          :
COMMISSION,                                      :
                                                 :
                          Plaintiff,             :
                                                 :
          v.                                     :          No. 09 Civ. 4346 (PGG)
                                                 :
RESERVE MANAGEMENT COMPANY, INC.,                :          ECF CASE
RESRV PARTNERS, INC., BRUCE BENT SR.             :
and BRUCE BENT II,                               :
                                                 :
                          Defendants,            :
          and                                    :
                                                 :
THE RESERVE PRIMARY FUND,                        :
                                                 :
                          Relief Defendant.      :
------------------------------------------------------------------x


## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT AGAINST BRUCE BENT SR., BRUCE BENT II, RESERVE MANAGEMENT COMPANY, INC. AND RESRV PARTNERS, INC.

SECURITIES AND EXCHANGE COMMISSION
Nancy A. Brown
Valerie A. Szczepanik
Michael D. Birnbaum
Michael P. Holland
3 World Financial Center
New York, New York  10281
(212) 336-1023 (Brown)

May 13, 2011

## TABLE OF CONTENTS

**Page**

**PRELIMINARY STATEMENT** ...................................................................................1

**STATEMENT OF FACTS**...........................................................................................2

**A. Defendants** ...............................................................................................................2

**B. Defendants' False and Misleading Statements of Intent to Protect
  the Primary Fund's NAV** ....................................................................................3

    1.  Defendants' Appreciation for the Significance of Credit Support to
  Investors...........................................................................................................3

    2.  Bent II's 1:19 Email of Unqualified, Unlimited and Unconditional Intent
  to Support ........................................................................................................4

    3.  Defendants' Broadly Disseminated Statements on September 15
  Consistent with the 1:19 Email................................................................6

        a.   The *Insights* Publication ....................................................................6

        b.  Defend ants' Approval of the False and Misleading Statements
  in *Insights*............................................................................................6

        c.   Bent II's Approval of the Web Site Publication of *Insights* ...............8

        d.  Bent II's Approval of the *Wall Street Journal* Statement...................9

    4.  Defendants' Failure to Publicly Announce Their Decision Not to Support
  the Fund ..........................................................................................................9

**C. Defendants' Additional Misrepresentations to Ratings Agencies** ........................10

**D. Defendants' Misrepresentations and Omissions to the Board**...............................11

    1.  The Bents' Unqualified, Unlimited and Unconditional Statement of Intent
  to Support the Primary Fund...........................................................................11

    2.  Defendants' Failure to Apprise the Board of Material Facts .................................12

**ARGUMENT**...............................................................................................................14

Page

I.   **DEFENDANTS VIOLATED SECTION 17(a) OF THE
     SECURITIES ACT AND SECTION 10(b) OF THE EXCHANGE
     ACT AND RULE 10b-5 THEREUNDER** ................................................................15

A.   **Elements of Plaintiff's Securities Act and Exchange Act Claims** ........................15

B.   **Defendants Made Numerous False Statements to the Public and
     the Primary Fund Board and Omitted Facts that Made
     Other Statements Misleading**....................................................................................15

     1.  Defendants' Misstatements and Omissions Concerning Their "Intent" to
         Support the Primary Fund Were False When Made ...............................................15

         a.   There Was No Reasonable Basis for Defendants' Belief that They
              Could Support the Fund................................................................................16

         b.   Defendants Concede That They Failed to Disclose the Host of
              Contingencies that Made Their Intent to Support Conditional.........................18

     2.  Reserve *Insights* Contained Additional Material Misrepresentations
         Concerning the Impact of Lehman's Bankruptcy Filing and the
         Fund's Liquidity........................................................................................................19

     3.  Defendant RMCI Falsely Informed Moody's that the Run on the
         Primary Fund Had Ended and the Fund Was Able to Satisfy
         Redemption Requests.................................................................................................21

C.   **Defendants' Misstatements and Omissions Were Material**....................................21

D.   **Defendants' Material Misstatements and Omissions Were Made in
     Connection with the Purchase and Sale of Securities**.............................................24

E.   **Defendants Acted with Scienter in Misleading the Investing Public
     and the Independent Trustees Regarding the Primary Fund's
     Predicament**...............................................................................................................24

F.   **RMCI and Resrv Partners Are Responsible for the Fraudulent Acts
     of Their Employees Committed Within the Scope of Their Employment**............28

     1.  RMCI and Resrv Partners Are Responsible for the Bents' False
         and Misleading Statements to the Board and the Investing Public.........................28

ii

**Page**

2. RMCI Is Responsible for Ledford's Knowingly False and Material
Statements to Moody's ........................................................................................29

**II. DEFENDANTS VIOLATED SECTIONS 206(1), (2) AND (4) OF
THE ADVISERS ACT AND RULE 206(4)-8 THEREUNDER** ...........................29

**A. Elements of Plaintiff's Advisers Act Claims**............................................................29

**B. RMCI, Bent Sr., and Bent II Violated Sections 206(1), (2), and (4) and
Rule 206(4)-8 of the Investment Advisers Act** ........................................................30

1. RMCI, Bent Sr., and Bent II Violated Sections 206(1) and (2) ...........................31

2. RMCI, Bent Sr., and Bent II Violated Section 206(4) and Rule 206(4)-8 ...........33

**III. BENT II AND BENT SR. ARE LIABLE AS "CONTROL PERSONS"
UNDER SECTION 20(A) OF THE EXCHANGE ACT** .......................................33

**IV. THE COURT SHOULD PERMANENTLY ENJOIN DEFENDANTS
FROM FUTURE SECURITIES LAW VIOLATIONS AND ORDER
DISGORGEMENT AND MONETARY PENALTIES**..........................................34

**A. The Court Should Issue a Permanent Injunction** ...................................................35

**B. The Court Should Order Defendants to Disgorge Their Ill-Gotten
Gains and Award Prejudgment Interest**..................................................................36

**C. The Court Should Order Defendants to Pay Civil Monetary Penalties** ...............38

**CONCLUSION** .........................................................................................................40

# TABLE OF AUTHORITIES

**Page**

## Cases

Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)................................................ 14-15

ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87 (2d Cir. 2007) ..........................33

Basic, Inc. v. Levinson, 485 U.S. 224 (1988)....................................................................21

Caiola v. Citibank, N.A., 295 F.3d 312 (2d Cir. 2002)................................................18, 20

Dietrick v. Bauer, 126 F. Supp. 2d 759 (S.D.N.Y. 2001)..................................................34

Goldstein v. SEC, 451 F.3d 873 (D.C. Cir. 2006) .......................................................30, 33

Hughes v. SEC, 174 F.2d 969 (D.C. Cir. 1949) .................................................................18

In re IBM Corporate Sec. Litig., 163 F.3d 102 (2d Cir. 1998)..........................................17

In re Parmalat Sec. Litig., 474 F. Supp. 2d 547 (S.D.N.Y. 2007) .....................................28

In re Parmalat Sec. Litig., 594 F. Supp. 2d 444 (S.D.N.Y. 2009) .....................................34

In re Parmalat Sec. Litig., 684 F. Supp. 2d 453 (S.D.N.Y. 2010) .....................................28

In re Phillips Petroleum Sec. Litig., 881 F.2d 1236 (3d Cir. 1989).............................. 25-26

In re Salomon Analyst AT&T Litig., 350 F. Supp. 2d 455 (S.D.N.Y. 2004)....................25

In re Time Warner Sec. Litig., 9 F.3d 259 (2d Cir. 1993) ...........................................18, 22

Luce v. Edelstein, 802 F.2d 49 (2d Cir. 1986)...................................................................16

Marbury Mgmt., Inc. v. Kohn, 629 F.2d 705 (2d Cir. 1980)............................................28

Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC,
467 F.3d 73 (2d Cir. 2006)................................................................................................38

**Page**

Ragin v. E. Ramapo Cent. Sch. Dist., No. 05 Civ. 6496 (PGG),
2010 WL 1326779 (S.D.N.Y. Mar. 31, 2010) ............................................................14, 15

Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38 (2d Cir. 1978).............................. 24-25

SEC v. Batterman, No. 00 Civ. 4835 (LAP), 2002 WL 31190171
(S.D.N.Y. Sept. 30, 2002)....................................................................................... 29, 30-31

SEC v. Berger, 244 F. Supp. 2d 180 (S.D.N.Y. 2001), aff'd, 322 F.3d 187
(2d Cir. 1998)..................................................................................................................36

SEC v. Blavin, 760 F.2d 706 (6th Cir. 1985) ...................................................................15

SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180 (1963) ............................29, 30

SEC v. Cavanagh, 155 F.3d 129 (2d Cir. 1998) ...............................................................35

SEC v. Commonwealth Chem. Sec., Inc., 574 F.2d 90 (2d Cir. 1978) .......................35, 36

SEC v. Credit Bancorp. Ltd., No. 99 Civ. 11395 (RWS),
2011 WL 666158 (S.D.N.Y. Feb. 14, 2011)............................................................... 36-37

SEC v. First Jersey Sec., Inc., 101 F.3d 1450 (2d Cir. 1996) ................................24, 33, 37

SEC v. Forest Resources Mgmt. Corp., No. 09 Civ. 0903 (JSR),
2010 WL 2077202 (S.D.N.Y. May 18, 2010) ...................................................................38

SEC v. Gabelli, No. 08 CV 3868 (DAB), 2010 WL 1253603
(S.D.N.Y. Mar. 17, 2010) ...............................................................................................30, 31

SEC v. Infinity Group Co., 212 F.3d 180 (3d Cir. 2000) ..................................................17

SEC v. Inorganic Recycling Corp., No. 99 Civ. 10159 (GEL),
2002 WL 1968341 (S.D.N.Y. Aug. 23, 2002)..................................................................38

SEC v. Invest Better 2001, 01-Civ.-11427 (BSJ),
2005 WL 2385452 (S.D.N.Y. May 4, 2005) .....................................................................39

SEC v. Jakubowski, 150 F.3d 675 (7th Cir. 1998) ...........................................................27

SEC v. Kenton Capital, Ltd., 69 F. Supp. 2d 1 (D.D.C. 1998)................................... 39-40

**Page**

SEC v. Leffers, 289 F. App'x 449 (2d Cir. 2008) ............................................................40

SEC v. Mayhew, 121 F.3d 44 (2d Cir. 1997) ....................................................................22

SEC v. Mgmt. Dynamics, Inc., 515 F.2d 801 (2d Cir. 1975) ...........................................35

SEC v. Monarch Funding Corp., 192 F.3d 295 (2d Cir. 1999) .........................................15

SEC v. McNulty, 137 F.3d 732 (2d Cir. 1998)..................................................................24

SEC v. N. Am. Research & Dev. Corp., 424 F.2d 63 (2d Cir. 1970)................................15

SEC v. Pirate Investor LLC, 580 F.3d 233 (4th Cir. 2009) ..............................................15

SEC v. Rabinovich & Assocs., LP, No. 07 Civ. 10547 (GEL),
2008 WL 4937360 (S.D.N.Y. Nov. 18, 2008)............................................................30, 33

SEC v. Rosenfeld, No. 97 Civ. 1467, 2001 WL 118612
(S.D.N.Y. Jan. 9, 2001)......................................................................................................37

SEC v. Shehyn, No. 04 CV 2003 (LAP), 2010 WL 3290977
(S.D.N.Y. Aug. 9, 2010) ............................................................................................... 37-38

SEC v. Steadman, 967 F.2d 636 (D.C. Cir. 1992)......................................................30, 33

SEC v. Svoboda, 409 F. Supp. 2d 331 (S.D.N.Y. 2006) ...................................................36

SEC v. Tambone, 550 F.3d 106 (1st Cir. 2008),
rev'd en banc on other grounds, 597 F.3d 436 (1st Cir. 2010).............................. 29, 30-31

SEC v. Texas Gulf Sulphur, 401 F.2d 833 (2d Cir. 1968)...........................................22, 24

SEC v. TLC Invs. & Trade Co., 179 F. Supp. 2d 1149 (C.D. Ca. 2001)...........................27

SEC v. Universal Express, Inc., 646 F. Supp. 2d 552 (S.D.N.Y. 2009)............................37

SEC v. Universal Major Indus. Corp., 546 F.2d 1044 (2d Cir. 1976)...............................35

SEC v. Youmans, 729 F.2d 413 (6th Cir. 1984)................................................................36

TSC Indus. Inc. v. Northway, Inc., 426 U.S. 438 (1976) ............................................ 21-22

**Page**

United States v. Autuori, 212 F.3d 105 (2d Cir. 2000)................................................ 16-17

United States v. Jenkins, 633 F.3d 788 (9th Cir. 2011) ...............................................22, 23

United States v. Koppers Co., 652 F.2d 290 (2d Cir. 1981).............................................28

United States v. Naftalin, 441 U.S. 768 (1979) ..................................................15

United States v. Philip Morris USA, Inc., 566 F.3d 1095 (D.C. Cir. 2009)......................23

Va. Bankshares v. Sandberg, 501 U.S. 1083 (1991)...........................................................16

**Statutes and Regulations**

Securities Act of 1933

      Section 20(d), 15 U.S.C. § 77t(d) ...........................................................38

Securities Exchange Act of 1934

      Rule 12(b)(2), 17 C.F.R. § 240.12b-2.................................................33

      Section 21(d)(3), 15 U.S.C. § 78u(d)(3) ..............................................39

Investment Advisers Act of 1940

      Section 206(1), 15 U.S.C. § 80b-6(1) ....................................... 29-30, 32

      Section 206(2), 15 U.S.C. § 80b-6(2) ....................................... 29-30, 32

      Section 209(e), 15 U.S.C. § 80b-9(e)...................................................38

Debt Collections Improvement Act of 1996

      17 C.F.R. § 201.1003............................................................................39

**Rules**

Fed. R. Civ. P. 56(c) ...........................................................................................14

Plaintiff Securities and Exchange Commission ("Commission") respectfully submits this Memorandum of Law in Support of its Motion for Partial Summary Judgment Against Reserve Management Company, Inc. ("RMCI") and Resrv Partners, Inc. ("Resrv Partners," collectively with RMCI, the "Entity Defendants"), Bruce Bent Sr. ("Bent Sr.") and Bruce Bent II ("Bent II"), pursuant to Rule 56(a) of the Federal Rules of Civil Procedure.

## PRELIMINARY STATEMENT

On September 15, 2008, the Reserve Primary Fund ("Primary Fund" or "Fund"), the Reserve's flagship money market fund, began the day with over $62 billion in assets. A little more than 1% of those assets were held in commercial paper of Lehman Brothers, the financial conglomerate that had filed for bankruptcy in the pre-dawn hours of September 15.

The relatively small extent of the Fund's Lehman holdings had a huge impact on investor confidence. Investors understood that the Primary Fund's Lehman exposure put its $1 per-share net asset value ("NAV") in danger, and the Fund could reach the point that it "broke the buck," where its NAV fell below 99.5 cents, the lowest value that may be rounded to a dollar. Investors understood that the Lehman holdings would affect the NAV in two ways: (1) the Fund had to mark its Lehman commercial paper down to its market value, and could no longer carry it at par, inflicting negative pressure on the NAV; and (2) the threat to the Fund's NAV would grow with redemptions, as there would be fewer shares over which to spread the Lehman exposure. Thus, many investors rushed to cash out of the Primary Fund soon after the markets opened.

Defendants understood these facts. And, so, when they realized that they faced a flood of redemptions that would turn a big problem into a full-fledged disaster, Defendants decided to say whatever they had to say to calm investors and stop the redemptions. Defendants told the Fund's Board, the ratings agencies and investors that RMCI intended to support the Fund's NAV. And

it worked, to some degree. After Defendants gave those assurances, redemptions slowed considerably.

But Defendants' statements were false. As they admit, Defendants only intended to support the $1 NAV – in fact, only were *able* to adequately support the Fund's NAV – if they could find third-party financing, or they could get the federal government to bail the Fund out. And, as Defendants also admit, they assumed that the rate of redemptions would slow and that the credit markets would open back up, allowing them to sell their liquid assets; in other words, they only intended to support the Fund if their message of support bought them enough time to stay afloat until market conditions improved and no support would be necessary.

But a qualified pledge of support would not have had the desired effect on the Board and investing public, so Defendants never told investors or the Board about the contingencies to and assumptions underlying their statement of intent. As Defendants understood, few investors would risk their Primary Fund investment on Defendants' hopes of government intervention, third-party rescue or better market conditions.

To be sure, Lehman's bankruptcy brought unprecedented turmoil to the market. But the federal securities laws do not relax the proscriptions against intentionally false statements in times of turmoil. Indeed, it is in those times that investors arguably need and deserve even greater transparency from those offering or selling them securities.

## STATEMENT OF FACTS[1]

### A.    Defendants

As of September 2008, Bent Sr. was President of RMCI, a privately held corporation registered with the Commission since 1984, and Chairman of Resrv Partners, a broker-dealer

---

[1] The Commission does not include here all of the wrongful conduct it will seek to prove at trial. Instead, included here are the misstatements and omissions as to which there is no dispute.

registered with the Commission. (See ¶ 1.)[2]  Bent II was Senior Vice President of RMCI and

Secretary and Director of Resrv Partners. (Id.)  Along with Arthur Bent (Bent Sr.'s other son),

Bent Sr. and Bent II owned all shares of Resrv Partners and, directly or through certain Trusts,

all shares of RMCI. (Id.)

**B.    Defendants' False and Misleading Statements of Intent to Protect the
        Primary Fund's NAV**

1. Defendants' Appreciation for the Significance of Credit Support to Investors

Back-stopping a fund's NAV through a credit support agreement was a concept the Bents

understood well by September 15.  Indeed, before Lehman's bankruptcy, Defendants had

executed a credit support agreement to commit RMCI funds to support the $1.00 NAV of their

"Enhanced Cash Fund." (¶ 3.)  And in the weeks immediately preceding September 15, the

Bents had discussed the possibility of a credit support agreement for other Reserve Funds at a

meeting Moody's analyst Henry Shilling had arranged to discuss their ability and willingness to

protect a fund's NAV in the event of unusual "credit and liquidity events." (¶ 4.)

Defendants also well understood the calming effect a credit support agreement would

have on investor confidence.  On September 14, Reserve Director of Marketing Eric Lansky

reminded Bent II that other companies had leveraged the existence of credit support

arrangements to allay investors concerns in times of market stress, noting that they had been able

to "calm investors by stating that they had line of credits [sic] available." (¶ 5.)

So on September 15, when other funds began announcing that they were obtaining credit

support agreements from their sponsors to support their money funds in the wake of Lehman's

filing, Defendants appreciated the importance of those arrangements. (¶¶ 3, 6, 7.)  Just how

---

[2]  References to "¶ __ " refer to the relevant paragraph of Plaintiff's Rule 56.1 Statement of
Undisputed Facts in Support of Its Motion for Partial Summary Judgment, dated May 13, 2011.

important they were was underscored by the flood of investor calls to the Reserve seeking information about RMCI's intentions to support the Primary Fund. (¶ 8.)

The ratings agencies that followed the Primary Fund were concerned too. Henry Shilling of Moody's called Bent Sr. and Bent II on the morning of the 15th and told them he needed information about the Reserve's contingency plans in case the Primary Fund's Lehman exposure threatened the Fund's NAV. (¶¶ 11, 12.) Standard and Poor's ("S&P") contacted Defendants seeking similar information. (¶ 11.)[3] As Shilling told Patrick Ledford, RMCI's Chief Investment Officer, a credit support agreement was "probably going to be a minimum requirement for us to keep these [triple A] ratings." (¶ 12.)

2. Bent II's 1:19 Email of Unqualified, Unlimited and Unconditional Intent to Support

By 1:00 p.m. on September 15, 2008, Defendants realized there was a "run" on the Primary Fund that, coupled with the Board's mark down of its Lehman holdings to 80% of par, threatened the Primary Fund's $1.00 per-share NAV. (¶¶ 16, 89.) Soon after convening the 1:00 p.m. Board meeting to obtain approval of a credit support agreement – but before determining whether, and to what extent, the Reserve would (or could) provide such support – Defendants began telling the public that that they intended to support the Primary Fund's NAV to whatever extent was necessary. Specifically, at 1:19 p.m., Bent II provided his sales team with a message about the Reserve's contingency plans that they could share with inquiring investors:

> We (Reserve Management Company Inc.) intend to protect the NAV on the Primary fund *to whatever degree is required*. We have spoken with the SEC and are waiting fro [sic] their final approval which we expect to have in a few hours. You may communicate this to clients on an as needed basis.

---

[3] At 12:57 p.m., Patrick Ledford passed on a request for information from S&P to Bent II: "I just got off the phone with the folks at S&P . . . . Similar to Henry Shilling at Moody's they are looking for some type of capital support. Bent II responded one minute later that he was "calling them now." (¶ 11.)

Eric [Lansky] if you want something on the website I need to see language
for approval first, thanks.

(¶ 17 (emphasis added).)

As instructed, John Drahzal, the Reserve's Global Head of Sales, shared Bent II's 1:19
email ("1:19 Email") with his sales team, reading it aloud to them "word for word." (¶ 18.)  In
turn, the Reserve salespeople did what Bent II's 1:19 Email told them to:  They told clients that
RMCI intended to protect the Primary Fund's $1.00 NAV to whatever degree was required and
that the Reserve was awaiting final approval of their plan from the SEC.  (Id.)

Bent II admits that when he instructed the sales team to disseminate his unqualified
message of support for the Primary Fund, he did not have any "understanding as to what degree
of support could be required to . . . protect the NAV on the Primary Fund," let alone whether
RMCI had sufficient resources to achieve that goal.  (¶ 19.)  In fact, Defendants did not have
sufficient resources to protect the Primary Fund to whatever degree might have been required to
maintain the $1 NAV.  (¶¶ 20, 21.)[4]

While the 1:19 Email expressed unqualified and unconditional support, Bent II now
maintains that RMCI's support was contingent on a host of factors outside his and RMCI's
control that he disclosed to no one. Bent II admits that RMCI's intent to support the Fund to
whatever degree was required depended on the success of his efforts to find support *other than
from RMCI* for that purpose, including "[l]ooking for a buyer for the company [or] trying to get
some sort of support from the Fed/Treasury.  You name it, in my mind I was working on it." (¶
22.)  Of course, the willingness of any white knight to bail out the Fund was not guaranteed (¶¶

---

[4] Eventually, the Bents claim, they decided to "commit" $10 million to support the Primary
Fund (¶¶ 26-28), but that figure was never shared with the Fund's Board or the investing public.
(¶ 29.)  Both Bent II and Bent Sr. have testified that they did not discuss at any time prior to 1:19
p.m. the amount of support Defendants could afford, or would be willing, to expend to protect
the Primary Fund's NAV.  (¶ 28.)

24, 25), and Bent II did not even have the authority at 1:19 p.m. to commit the Reserve to the kinds of arrangements he contemplated might be required to obtain those bail outs. (¶ 24.)

### 3. Defendants' Broadly Disseminated Statements on September 15 Consistent with the 1:19 Email

#### a.     The *Insights* Publication

On September 15, the Entity Defendants published Reserve *Insights*, a marketing document intended to allay investor concerns about the state of the Primary Fund in the wake of Lehman's bankruptcy filing. They emailed *Insights* to scores of investors on September 15 and 16 (¶ 36), posted *Insights* on the company's website (¶ 64), and emailed *Insights* to representatives at both S&P and Moody's following those analysts' requests for details about Defendants' purported intent to support the Primary Fund. (¶ 37.)

The substance of the *Insights* piece echoed Bent II's 1:19 Email announcement of RMCI's "intent" to protect the Primary Fund's $1.00 NAV. Specifically, *Insights* boasted that "[t]he Reserve is committed to a $1.00 NAV for its Primary Fund" and explained that "Reserve Management Company, Inc. (RMCI) intends to enter into support agreements with the Primary Fund to support the value of Lehman credit held in the Fund." (¶ 38.) *Insights* continued:

> Due to the small exposure as well as par value at maturity, the NAV is not negatively impacted. Furthermore, our support agreements ensure the integrity of a $1.00 NAV.
>
> \*     \*     \*
>
> We are confident that there will be no shareholder impact as the portfolios are structured to insure principal protection and provide daily liquidity.

(¶ 40.) Like the 1:19 Email, *Insights* made no mention of any conditions attaching to Defendants' intent to support the Fund's $1 NAV. (¶ 39.)

#### b.     Defendants' Approval of the False and Misleading Statements in *Insights*

Defendants have long maintained that the *Insights* piece was never properly approved by Reserve management, but the following facts are undisputed. At some point on September 15

before the *Insights* piece was published, both Bent Sr. and Bent II reviewed and commented on a draft of that publication that contains all but one of the false statements. (¶ 41.) The only additional phrase, not appearing in the draft the Bents reviewed, was this one: "Furthermore, our support agreements ensure the integrity of a $1.00 NAV." (¶ 44.)[5]

Both Bents subsequently learned that Reserve's marketing staff understood the *Insights* piece to be approved. Neither did anything to correct them or even inquire how something could be approved without having been formally authorized by the Reserve's approval process.

At 3:41 p.m. on September 15, Frank Bonanno, Reserve's Director of Marketing, circulated an email with the subject line "Statement from the Reserve on Lehman/Merrill . . ." to the Reserve's "Sales" and "Marketing" email distribution lists. (¶ 46.) Bonanno wrote: "Attached is the ***approved*** version of The Reserve's communication regarding this weekend's events with Lehman/Merrill and the position The Reserve is taking." (Id. (emphasis added).) Bent II was a member of the "sales" email distribution list (¶ 48), and he was at his desk at 3:41 p.m. – his office phone records reflect a six minute call with someone at State Street Bank initiated at 3:40 before Bent II apparently placed a call to his wife from his cell phone at 3:51. (Id.) But while Bent II responded to scores of emails on September 15, he never responded to Bonanno's 3:41 email to question how any document could have been approved without his sign-off. (Id.)

Reserve SVP of Marketing Eric Lansky likewise recalls learning on September 15 that the Reserve *Insights* document was properly approved. (¶ 58.) There may be an issue of fact as

---

[5]  Both the draft and final version also misrepresented the Reserve's "exposure to Lehman debt in the Primary Fund is less than 1.2%," a statement that was true based on the Primary Fund's holdings *before* factoring in the massive net redemptions the Fund experienced before *Insights* was published, but significantly understated the Fund's growing Lehman exposure after redemptions were given effect. (¶ 45.)

to whether Lansky inserted the "[f]urthermore . . ." statement into *Insights* after that document was approved, but that additional line is not materially different from the 1:19 Email's pledge of support that Bent II informed his sales team that they could share with investors. Lansky testified unambiguously that when he received Bent II's 1:19 Email, he understood that this message of RMCI's "intent to support the dollar" NAV was approved to be incorporated into subsequent communications with the public, including written communications. (¶ 59.)[6]

For his part, Bent Sr. learned that some approved communication had been shared with the ratings agencies, but he asked no one what they were communicating. (¶¶ 56, 57.)[7] Ledford directed Bonanno to share *Insights* with Moody's and S&P and then informed Bent Sr. by telephone that the Reserve's "capital support agreement" had been sent to the agencies. (¶ 57.) Bent Sr. did not ask Ledford what exactly had been sent to the ratings agencies (he knew it could not be a credit support agreement that did not exist), or how anything could have been sent absent his formal authorization. (Id.)

    c.    Bent II's Approval of the Web Site Publication of *Insights*

If *Insights* had not been properly approved before, Bent II approved it again when he told Lansky to post it on Reserve's website at 9:36 p.m. on the 15th. (¶¶ 60, 64.) Bent II had instructed Lansky earlier on September 15 not to post any materials to the website without running them by him. (¶ 61.) At 9:01 p.m. on September 15, Lansky did just that, asking Bent II to allow him to post "a statement that we have prepared [to] at least address some concerns re

---

[6] Lansky also debunked the myth that statements such as those in the 1:19 Email should not be treated as "approved" unless attached to an official Reserve signoff sheet. Lansky understood that when Bent II wrote that a message could be shared with the public, that meant the message could be included in subsequent communications with investors. (¶ 59.)

[7] Bent Sr., who was vacationing in Italy on September 15, testified that he did not ordinarily use email, but that the hotel he booked placed no limit on the number of faxes he could receive. (¶ 50.)

being on top of issue and nav intent." (¶ 62.) Bent II testified that when he received Lansky's

request, he "wasn't clear about what [Lansky] was talking about." (¶ 63.) Nevertheless, Bent II

responded to Lansky's email at 9:36 p.m. by telling him: "Ok, go ahead." (¶ 64.)

      d.    Bent II's Approval of the *Wall Street Journal* Statement

      Bent II also followed no formal review process in authorizing his staff to disseminate

RMCI's statement of unqualified and unconditional support to the *Wall Street Journal*. At 5:38

p.m. on September 15, hours after Bent II transmitted his 1:19 Email and hours before he

approved the posting of *Insights* to the Reserve's website, Lansky sought Bent II's approval for a

statement to share with the *Wall Street Journal*. "If needed," that statement read, "The Reserve

intends to protect the NAV on the *funds to whatever degree is required.* . . ." (¶ 30 (emphasis

added).) Minutes later, Bent II instructed Lansky to "go with it." (¶ 31.) With this email, Bent

II has explained, he personally authorized the Reserve's statement to the *Wall Street Journal*,

notwithstanding whatever purportedly mandatory executive review procedures applied to public

communications at the Reserve. (¶ 32.)[8]

      4.   Defendants' Failure to Publicly Announce Their Decision Not to Support the Fund

      According to Defendants, they decided against supporting the Primary Fund late at night

on September 15. (¶ 65.) But nobody ever told the Primary Fund's sales force to stop spreading

the news of RMCI's unqualified intent to support the Fund's NAV. John Drahzal, the Reserve's

Global Head of Sales, testified that he did not learn that "The Reserve would not be protecting

the $1 NAV" until "right after" the Fund announced publicly that it was breaking the buck. (¶

66.) Bent Sr. testified that he did "nothing" to make sure that investors were made aware of

Defendants' decision to abandon any purported plan to support the Primary Fund." (¶ 67.) Bent

---

[8] Bent II later admitted that, as of 5:46 p.m., it was not true that "The Reserve intended to
protect the NAV on all of the funds in its fund family that held Lehman" because Defendants
"hadn't drawn a conclusion on anything other than the Primary Fund." (¶ 33.)

Sr. explained that he assumed Bent II or counsel would have handled getting out that message to investors, but there is no evidence that anyone shared Defendants' decision with Reserve employees tasked with communicating with investors. (Id.) To the contrary, the record reflects a sales force that continued to share the *Insights* message with investors throughout the day on September 16, both in written form and on numerous telephone calls. (¶ 68.)

## C.    Defendants' Additional Misrepresentations to Ratings Agencies

In addition to misleading ratings agencies about the existence of credit support for the Primary Fund, RMCI also falsely assured Moody's that the Primary Fund had sufficient liquidity to satisfy redemption requests at a time when RMCI knew that was not the case. Specifically, at approximately 2:29 p.m. on September 15, Patrick Ledford told Moody's that redemption orders had stopped and the Reserve had "sold product in the street" to satisfy outstanding redemption requests. (¶ 70.) When Shilling challenged that he thought there was "very little . . . movement in terms of paper," Ledford assured him that "we were able to get it done." (¶ 71.)

But as Bent II testified, redemption requests had not stopped at the time Ledford spoke with Shilling. (¶ 75.) And Ledford knew that the Reserve was not able to sell sufficient paper to satisfy redemption requests on September 15. Less than an hour before, at 1:49 p.m., Ledford had explained to Reserve's CFO, Patrick Farrell, that the Reserve was "in the hole for about 8 [billion dollars]," and that they had been able to sell only "about a billion" (¶ 73), leading them both to realize that redemptions would not go out that night. (¶ 74.) Ledford further explained (after Drahzal and head of operations David Gareis joined the call), that even a credit support agreement might be too little too late, since Reserve was "looking at a $15 billion overdraft tonight" with State Street. (Id.) Ledford understood that letting clients know that they would not get redemption requests funded "would exacerbate the whole situation." (Id.) He called it "the kiss of death." (Id.)

Communicating with the ratings agencies was one of Ledford's responsibilities as RMCI's Chief Investment Officer. Bent II knew that "Ledford had spoken with S&P and/or Moody's at some point, maybe more than once, during the 15th." (¶ 76.) Bent Sr., too, testified that he understood that Ledford played a role on RMCI's behalf in communicating with the ratings agencies, in part because Bent Sr. considered them "a waste of time." (¶ 76.)

But while Bent Sr. may have considered the ratings agencies a waste of time, investors did not. (¶ 77.) Indeed, even Bent Sr. acknowledged that ratings are important for some investors, and the Reserve sought to be rated in order to "solicit" certain investors. (Id.) On September 15, both Moody's and S&P made clear to Defendants that they wanted information about, among other matters, credit support for the Primary Fund. (¶¶ 11, 12.) Both agencies' published criteria cited the willingness of a fund to sponsor or support a fund as information they would use in formulating their credit ratings. (¶ 79.) It is undisputed that once the agencies received the assurances of support that the Defendants provided to them, neither put the Primary Fund on credit watch or downgraded its ratings. (¶ 80.) It is also undisputed that investors monitored what the ratings agencies had to say about the Primary Fund, so the lack of any ratings action on September 15 and 16 impacted those investors' decisions. (¶ 78.)

### D.   Defendants' Misrepresentations and Omissions to the Board

1.   The Bents' Unqualified, Unlimited and Unconditional Statement of Intent to Support the Primary Fund

Defendants' misrepresentations about their "intent" to support the Primary Fund's NAV were not limited to public communications. Rather, in seeking Board approval to approach the Commission about a possible credit support agreement, the Bents made to the Board the same statements of unqualified, unlimited and unconditional support that Bent II later conveyed in his 1:19 Email. Bent II told the Trustees at the 1:00 p.m. meeting on September 15 that "RMCI would commit to provide capital to the Primary Fund to protect its NAV from falling below

11

$1.00 per share." (¶ 81.) At the same meeting, Bent Sr. followed up with a promise to make "sufficient capital . . . available" to support the Fund. (¶ 83.)[9]

Although the Defendants never said so (¶ 82), their intent to support the $1 NAV was both limited and contingent. While Bent Sr. was pledging "sufficient capital" – a pledge he meant to be understood as "unconditional" (¶ 84) – he testified that he had in mind only $10 million (¶ 85), a number that later appeared in a draft credit support agreement the Bents were considering. (¶ 27.) Also undisclosed was the reliance both Bents were placing on an eventual bailout from the Fed or Treasury, or the sale of RMCI or the Fund to a third-party, or the easing of the markets and reduction of the pace of redemptions – each a contingency that would have made support from RMCI unnecessary. (¶ 82.)

   2.   Defendants' Failure to Apprise the Board of Material Facts

   Defendants kept the Board unapprised of many facts critical to their understanding of the dire circumstances the Fund faced. At no time on September 15 did anyone let the Board know that redemptions had reached a level so high that the Reserve was unable to fund redemption requests (¶ 93), or that the Fund's custodial bank, State Street, was unwilling to extend additional overdraft privileges to cover those net redemptions. (Id.) At approximately noon on September 15, State Street stopped funding redemption requests for the Primary Fund; by that time, only redemptions requested prior to 10:10 a.m. had been funded. (¶ 96.)

   State Street's decision could not have surprised anyone at the Reserve given State Street's warnings of limits on the Reserve's overdraft communicated as early as the previous Friday. In an email from September 12, State Street notified the Reserve that then-existing

---

[9]  This was not the first time Bent Sr. had made such an unqualified statement of support to a cause. In running for Nassau County Executive in 2001, Bent Sr. promised to spend whatever it took to win the election. (¶ 86.) Later, when winning seemed less likely, Bent Sr. scaled back his commitment to $10 million, and finally to only $1 million. (Id.)

overdraft amounts and the $1 billion in redemptions scheduled to be funded on September 15

might cause "difficulties getting the wires released Monday morning." (¶ 97.) State Street again

told the Reserve early on September 15 to expect delays in funding redemption requests. (¶ 98.)

More explicitly, State Street told the Reserve's CFO at 9:55 a.m. that that day's overdraft would

be limited to less than $2 billion. (Id.) As redemption activity increased, State Street decided to

hold all wires while Reserve tried to sell securities to create additional liquidity and, by

approximately 1:00 p.m., State Street "told them that we cannot fund any [overdrafts] overnight

today." (¶ 99.)

     Other facts that the Defendants never shared with the Board, but of equal importance to

an understanding of the magnitude of the situation were:

     <u>Trades in Lehman Commercial Paper</u>. While Defendants promised to keep the Board
apprised of the market for Lehman securities so that the Board could fix an appropriate value for
the Fund's holdings, no one told the Board that trades were in fact occurring in comparable
Lehman commercial paper. None of those securities traded at more than 35% of par. (¶¶ 114-
117.)

     <u>The Primary Fund's $8 Billion Debt to State Street</u>. Defendants never told the Board that
the Primary Fund had incurred more than $8 billion in debt to State Street by 1 p.m.[10] By that
point, it was not just that the Fund could not satisfy the redemptions in its queue by selling
assets; it was also that they were now deeply in debt with no ability to sell assets. Thus, even
assuming that Defendants told the Board that the Fund had received $16.5 billion in redemption
requests – and the Independent Trustees hotly contest that claim[11] – all agree that Defendants
said nothing about their inability to fund the redemptions lined up or that they had an $8 billion
dollar debt they would have to pay off first. (¶¶ 93, 99, 100, 106.)

---

[10] This was a fact of significance not just to the Board, but to investors as well, as it constituted a
violation of the Reserve's Investment Objectives and Policies contained in its Statement of
Additional Information. (¶ 107.) There, the Reserve declared that it would never borrow more
than 5% of its assets. (Id.) At $8 billion, the Primary Fund was way beyond that limit.

[11] Defendants have made this dispute a centerpiece issue to their defense. But it is unnecessary
to resolve it on this Motion for Partial Summary Judgment. Ample other evidence – all
undisputed – supports the Commission's claims that Defendants made knowing
misrepresentations of material fact to the investing public, the Board and the ratings agencies.

Ratings Agency Concerns and Communications. Nor did Defendants ever inform the Board that the ratings agency analysts had called repeatedly to inquire about a credit support agreement (¶ 104), or that RMCI sought to quiet them and investors by sending them statements about the planned support agreement and an unqualified intent to support the Primary Fund's NAV. (Id.)

Instruction Not to Sell Assets at Less than Par. Though one way to obtain liquidity to meet redemptions was to sell assets for less than par value, Defendants decided before 1 p.m. that they would "refrain from selling securities at below par," and instructed Ledford to make no such sales -- yet another fact they never communicated to the Board. (¶ 108.)

Attempts to Sell RMCI or the Fund and Overtures to the Fed. Bent II claims to have decided to explore a potential partnership or sale of RMCI or the Fund "[e]arly on the 15th" (¶ 109), but if so, Defendants did not share that plan with the Board. (Id.) Nor did either Bent tell the Board that, prior to the first meeting that morning, they had placed a call to the New York Fed to let them know the trouble the Fund faced. (¶ 105.)

Finally, Defendants never shared with the Board the fact that the per-share NAV of two other Reserve funds with Lehman exposure, the Yield Plus Fund and International Liquidity, had fallen below $1.00 as soon as the Board voted to mark down the value of all Lehman Holdings to 80 percent of par. (¶ 112.) News of the Yield Plus and International Liquidity Funds' NAV troubles was also never shared with the public on September 15, as Defendants instructed State Street to credit both with a receivable (to be charged to RMCI). (¶ 113.) Bent II subsequently directed State Street to reverse the receivable, claiming his original instruction had been misunderstood (id.), but the temporary fix artificially propped up the Yield Plus and International Liquidity Fund's NAV until after the Primary Fund broke the buck. (Id.)

## ARGUMENT

"Summary judgment is warranted where the moving party shows that 'there is no genuine issue as to any material fact' and that it 'is entitled to a judgment as a matter of law.'" Ragin v. E. Ramapo Cent. Sch. Dist., No. 05 Civ. 6496 (PGG), 2010 WL 1326779, at *6 (S.D.N.Y. Mar. 31, 2010) (citing Fed. R. Civ. P. 56(c)). An issue of material fact is "genuine" only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

14

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  And while a non-movant should

benefit from "all factual inferences that could rationally be drawn" in its favor, "[m]ere

conclusory statements, conjecture or speculation" will not defeat a summary judgment motion.

Ragin, 2010 WL 1326779, at *6 (citations omitted).

## I.     DEFENDANTS VIOLATED SECTION 17(a) OF THE SECURITIES ACT AND SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 THEREUNDER

### A.     Elements of Plaintiff's Securities Act and Exchange Act Claims

Under Section 17(a)(1) of the Securities Act of 1933 ("Securities Act") and Section 10(b)

of the Securities Exchange Act of 1934 ("Exchange Act"), the Commission must establish that,

in the offer or sale of a security, or in connection with the purchase or sale of a security, the

defendant made a false statement or omission of material fact with scienter.  SEC v. Monarch

Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999) (Section 10(b) of the Exchange Act and Rule

10b-5); United States v. Naftalin, 441 U.S. 768, 772, 778 (1979) (Section 17(a) of the Securities

Act).  Unlike private litigants, the Commission need not prove the additional elements of reliance

or causation.  SEC v. Pirate Investor LLC, 580 F.3d 233, 239 n. 10 (4th Cir. 2009); SEC v.

Blavin, 760 F.2d 706, 711 (6th Cir. 1985); SEC v. N. Am. Research & Dev. Corp., 424 F.2d 63,

84 (2d Cir. 1970).

### B.     Defendants Made Numerous False Statements to the Public and the Primary Fund Board and Omitted Facts that Made Other Statements Misleading

1.  Defendants' Misstatements and Omissions Concerning Their "Intent" to Support the Primary Fund Were False When Made

Defendants assured the Board, the ratings agencies and the investing public that they

intended to support the Primary Fund's $1 NAV no matter what, when that intent was

conditioned and qualified by a host of caveats and limitations they did not disclose.[12]  Those

---

[12]  Bent II's statement of intent to "whatever degree is required" and Bent Sr.'s assurance to the Board that "sufficient capital could be made available" to support the Fund are functionally identical, since both are unqualified and unconditional and neither was accompanied by the

statements were false because Defendants' own admissions demonstrate that they were made without a reasonable basis for believing that they <u>could</u> support the Fund. They were misleading because they were (as Defendants admit) based on assumptions and conditioned on facts that they disclosed to no one, including that their willingness to support was capped at $10 million; they were relying on a government or third-party bailout; and/or they expected redemptions to slow and market conditions to improve – in short, their statements of support were based on the undisclosed condition that their support would never be necessary at all. Whether the Court focuses on the falsity of Defendants' statements on their face, or the material omissions that rendered the published statements at issue so misleading, the result should be the same, as Defendants knowingly misled the Fund's Board and investing public about the most pressing Reserve-related issue of the day, namely the safety of the Primary Fund's $1.00 NAV.

a.   There Was No Reasonable Basis for Defendants' Belief that They Could Support the Fund

The Bents' statements of unqualified intent to support the Primary Fund were both objectively and subjectively false. Statements of belief or intent are proven false by evidence that they are contradicted by facts known or available to the speaker, giving him no basis for the belief or opinion. <u>Va. Bankshares v. Sandberg</u>, 501 U.S. 1083, 1093 (1991).

In <u>Sandberg</u>, the Court ruled that evidence that a board had no basis for its opinion on the fairness of a merger proposal would be sufficient to show that the opinion was both objectively false (the proposal was not fair); and subjectively false (the Board did not really believe it to be fair). <u>Id.</u> at 1092-93; <u>accord</u> <u>Luce v. Edelstein</u>, 802 F.2d 49, 56 (2d Cir. 1986) (defendant's promise to perform not actionable unless he made it with knowledge that he could not perform); <u>see also</u> <u>United States v. Autuori</u>, 212 F.3d 105, 118-19 (2d Cir. 2000) (statements that

---

limitations and contingencies both Bents have testified were in their minds at the time they made them. (¶¶ 17, 82, 84.)

projections were "good" and "credible" were materially misleading where evidence suggested

speaker's actual knowledge of company's inability to meet projections and financial woes); SEC

v. Infinity Group Co., 212 F.3d 180, 192-93 (3d Cir. 2000) (defendants' good faith belief in their

offered guarantees insufficient to defeat fraud claim where no basis existed for the guarantees

and defendants had made no inquiry into the basis).[13]

The facts available to the Bents gave them no reasonable basis for their belief that they

could support the Fund. First, Bent II testified that when he told the Board that RMCI intended

to support the Fund and later told investors that RMCI intended to support the Fund to whatever

degree was required, he had no understanding of what level of resources would be necessary to

satisfy that commitment. (¶ 19.) If, then, he truly believed that RMCI had sufficient resources,

he was as reckless as the defendant in Infinity Group, 212 F.3d at 193, because he had made no

inquiry to determine whether there was any basis for his assertion.

And the Bents knew RMCI could not provide support for the Fund sufficient to protect its

$1.00 NAV. Bent II recalled that RMCI had approximately $50 million in available assets in

September 2008 (¶ 21), which was hundreds of millions of dollars short of the $785 million of

Lehman exposure the Fund faced. Bent Sr. explained that there was "no possible way I could"

cover even half of the par value of the Fund's Lehman holdings. (¶ 20.) Only if Defendants

could sell RMCI could they have come up with anywhere close to the resources necessary to

support the Primary Fund. (¶¶ 22, 23.) As Bent II himself candidly admitted, their statements of

intent to support the Fund were made to give investors confidence in the Fund; they were not

---

[13]  Compare In re IBM Corporate Sec. Litig., 163 F.3d 102, 109 (2d Cir. 1998) (affirming
summary judgment for defendant where no evidence that speakers were aware of any facts
undermining the accuracy of their stated opinion or that opinions were made without a "basis in
fact").

based on any ascertainable facts, nor were they the product of any reasonable inquiry by

Defendants. (¶ 27.)

> b.    Defendants Concede That They Failed to Disclose the Host of Contingencies
> that Made Their Intent to Support Conditional

The Bents have now conceded that their statements of intended support omitted the many

caveats they had placed on that intention. Therefore, Defendants' statements were intentionally

false when made and are fraudulent as a matter of law.

A defendant has no duty to disclose every piece of information that an investor might

want to know. In re Time Warner Sec. Litig., 9 F.3d 259, 268 (2d Cir. 1993). But where a

defendant chooses to speak, his statements must be both accurate and complete. Caiola v.

Citibank, N.A., 295 F.3d 312, 331 (2d Cir. 2002). Even literally true statements can turn into

actionable half-truths where they are unaccompanied by information that renders them

misleading in context. Time Warner, 9 F.3d at 268 (holding defendants' public announcement of

business plan required disclosure of alternative plans also under consideration); Hughes v. SEC,

174 F.2d 969, 976 (D.C. Cir. 1949) (in making unlawful "'any omission to state a material fact

necessary in order to make the statements made . . . not misleading, Congress forbid not only the

telling of purposeful falsity but also the telling of half-truths and the failure to tell the 'whole

truth.'")

Here, Defendants' unqualified statements of intent to support the Primary Fund were just

the kinds of half-truths that Congress sought to prohibit. As both Bents now admit, among the

undisclosed qualifications and conditions to their intent were:

- Their support was limited to a dollar amount far below that which may have been
  required to protect the Primary Fund's $1.00 NAV. (¶¶ 20, 21, 27.)

- Their support was conditioned on obtaining a government or third party bail out. (¶¶
  22, 23.)

- Their support was conditioned on market conditions easing so that they could sell Fund assets at par. (¶ 88.)

- Their support was conditioned on the message working; if investors continued to redeem and the Fund broke the buck, then they would not support it. (Id.)

But Defendants told the Board and investors nothing about those caveats, leaving them to believe that, no matter what, adequate resources would be provided by them and RMCI intended to support the Primary Fund to whatever degree was required.

2. Reserve *Insights* Contained Additional Material Misrepresentations Concerning the Impact of Lehman's Bankruptcy Filing and the Fund's Liquidity

Defendants made other demonstrably false statements to investors and the ratings agencies in the Reserve *Insights* piece. In addition to reiterating the false statements of Defendants' unqualified intent to support the Primary Fund's $1 NAV, the *Insights* press release also misstated the effect the Lehman exposure had on the Fund: "Due to the small exposure as well as par value at maturity, the [Primary Fund's] NAV is not negatively impacted," and "[w]e are confident that there will be no shareholder impact as the portfolios are structured to insure principal protection and provide daily liquidity." (¶ 40.) These statements were undeniably false when Defendants approved *Insights* and shared it with investors, rating agencies, and the public.

Defendants knew by 9:30 a.m. on September 15 that the Fund was unlikely to receive "par value at maturity" for its Lehman holdings. Patrick Ledford informed Bent Sr. and Bent II just prior to the 9:30 a.m. Board meeting that his sources on Wall Street were suggesting that "60 to 80 cents on the dollar will be recovered" through Lehman's bankruptcy process (¶ 42), and the Board voted at that 9:30 meeting to mark the Lehman holdings down to 80 percent of par after Bent Sr. acknowledged that he would not pay par value for such securities. (Id.) And by the time *Insights* was approved and distributed, the Fund was well on its way to breaking the buck, so the NAV already had been "negatively impacted." (¶¶ 89, 125.) The combination of the 20%

19

reduction in the value of the Fund's Lehman holdings and the unprecedented level of redemption requests caused the Fund's NAV to move progressively and perilously closer to $.995 during the afternoon of September 15. (Id.)

Furthermore, when Defendants informed investors that "there will be no shareholder impact as the portfolios are structured . . . to provide daily liquidity," they had already learned that State Street had stopped funding redemption requests (¶¶ 99, 100), that approximately $8 billion (¶¶ 73, 99) in requests would not be funded on September 15 (a number that grew as the day went on), and that the Fund had not been able to sell sufficient securities in the market to address these crucial problems. (¶¶ 72, 74.)

Defendants knew all of these facts when the Entity Defendants began distributing *Insights* after Bonanno circulated the "approved" version at 3:41 p.m. on September 15 (¶ 46), and Bent II himself acknowledged that he was personally aware of these facts when he approved Lansky's request to publish *Insights* on the Reserve's website. (¶ 101.) Indeed, Bent II testified that he knew as of 7:00 p.m. on September 15 that State Street was not going to fund the more than $11 billion in outstanding redemption requests (id.); yet, almost three hours later, he approved the posting of *Insights* on TheR.com.

These additional affirmative misstatements in *Insights* constitute further evidence of actionable fraud by Defendants. Once they chose to email, call and otherwise contact investors to communicate a message about their response to Lehman's possible impact on the Primary Fund, Defendants were obligated to make all disclosures as were necessary to make the statements accurate and complete. See Caiola, 295 F.3d at 331.

3. Defendant RMCI Falsely Informed Moody's that the Run on the Primary Fund
   Had Ended and the Fund Was Able to Satisfy Redemption Requests

At approximately 2:29 p.m., September 15, RMCI's CIO, Patrick Ledford (whose job it

was to interact with analysts), informed Moody's analyst Henry Shilling that the Primary Fund

had been able to sell sufficient assets to satisfy outstanding redemption requests. (¶¶ 70, 71.)

Ledford further informed Shilling that redemptions in the Primary Fund had stopped. (¶ 70.)

Defendants cannot dispute – and, indeed, have acknowledged – the falsity of Ledford's

statements. (¶ 75.) Ledford knew that what he was telling Moody's was false. When Ledford

discussed redemption activity and the Primary Fund's ability to satisfy outstanding requests with

Shilling, he was fresh off a call with the Reserve's CFO, Patrick Farrell, during which Ledford

explained that the Reserve was "in the hole for about 8 [billion dollars]," a figure that did not

even include the billions in unfunded redemption requests about which Defendants were aware at

that time. (¶ 73.) On that 1:49 call, Ledford and Farrell reviewed in detail the amount of money

that might be available from maturing assets and assets RMCI was able to sell, and that analysis

left Farrell to conclude that customers would not "get their money tonight," a result Ledford

acknowledged was "the kiss of death." (¶ 74.)

C.    **Defendants' Misstatements and Omissions Were Material**

Unquestionably, no information was more significant to Primary Fund investors in the

wake of Lehman's bankruptcy filing than whether the Fund's NAV would remain at $1 per share

and whether Defendants' statements of intent to support the NAV were truthful and

unconditional. A fact is material if there is a "substantial likelihood that the disclosure of [it]

would have been viewed by the reasonable investor as having significantly altered the 'total mix'

of information made available." Basic Inc. v. Levinson, 485 U.S. 224, 231-32 (1988) (quoting

TSC Indus. Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)). While ordinarily, a determination

of materiality involves the application of a legal standard to a particular set of facts, TSC Indus.,

Inc., 426 U.S. at 450, where there is no disputed issue of material fact, materiality can be resolved on summary judgment. Time Warner, 9 F.3d at 268.

There can be no dispute of fact about the materiality of Defendants' statements and omissions here. Information about a company's financial condition is material. United States v. Jenkins, 633 F.3d 788, 802 (9th Cir. 2011); accord SEC v. Mayhew, 121 F.3d 44, 52 (2d Cir. 1997) ("Material facts include those 'which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities'") (quoting SEC v. Texas Gulf Sulphur, 401 F.2d 833, 849 (2d Cir. 1968)).

Each of the facts Defendants omitted "affect[ed] the probable future" of the Primary Fund's $1 NAV. Mayhew, 121 F.3d at 52. For example, if Defendants had informed the investing public that they were only willing to commit up to $10 million to support the Fund's NAV (when the par value of the Fund's Lehman holdings was $785 million), a reasonable investor would have questioned just how secure the Primary Fund's $1 NAV really was.[14] Had investors been told that Defendants were counting on the Fed or Treasury to step in and bail them out, or that Defendants intended to make good on their pledge only if the run slowed and market conditions eased, there is more than a "substantial likelihood that a reasonable [investor] would consider it important in deciding how to [invest]." Mayhew, 121 F.3d at 51 (quotations omitted).

The significance of Defendants' misstatements and omissions to investors is confirmed by the evidence of what actual Primary Fund investors considered material to their investment decision on those critical days. Investors contacted RMCI on September 15 with the express

---

[14] Of course, that was just the kind of question Defendants were fielding on September 15. Shilling of Moody's asked Ledford if the Bents could cover "at the minimum half of par . . . it's a big dollar amount." (Ledford replied that he thought it would "just be a matter of writing a check" for the Bents.") (¶ 12.) And investors asked the same questions. (¶ 13.)

purpose of inquiring about the impact of Lehman's bankruptcy on the Primary Fund's $1.00 NAV. (¶ 8.)  When they did, Fund shareholders were assured by RMCI sales representatives that the $1.00 NAV was secure and that the Bents had pledged to support the NAV, and many were directed to or sent a copy of *Insights*. (¶ 36.)  Assured by those representations, and without knowing of the conditions that Defendants had put on their support, investors decided to keep their shares in the Primary Fund through September 16, made no effort to transfer their investments to a different Reserve fund, and, in a great many instances, purchased millions of additional Primary Fund shares. (¶¶ 69, 119, 120.)

The materiality of the Defendants' false statements to the ratings agencies is similarly indisputable.[15]  Both S&P's and Moody's published ratings criteria cite a sponsor's willingness to support its fund's NAV as a factor that both consider in assigning ratings or putting issuers on credit watch for possible downgrade. (¶ 79.)

Further, Defendants' communications on September 14 and 15 demonstrate their own appreciation of the materiality of the statements they made to the Board, investors and the ratings agencies.  Where defendants' conduct attests to their own belief that investors would view the disclosures as material, materiality is established.  Jenkins, 633 F.3d at 802-03 (defendants' contributions to investor message board to falsely promote company belie contention that message board comments are immaterial); cf. United States v Philip Morris USA, Inc., 566 F.3d 1095, 1122-23 (D.C. Cir. 2009) (tobacco company's continuous denials of the link between cancer and smoking indicates that such information was material).  Defendants understood that their statement of support was critical to investors' decisions about redemptions and purchases

---

[15]  Whether investors contacted the Reserve directly, or not, most were aware of the ratings agencies' actions, and many investment decisions were guided by the Primary Fund's highest quality ratings. (¶¶ 77, 78.)

(¶¶ 8, 47, 92), and Defendants kept close watch on the effect these statements were having on investors. (¶ 90.)[16] Bonanno's email sharing the approved *Insights* publication specifically instructed the sales team to "leverage on your calls and when fielding any redemption requests." (¶ 47.) And that leveraging worked. As John Drahzal wrote in his end-of-day summary email to Bent II, at 8:34 p.m. on September 15: "The client base reacted positively to th[e] news [that RMCI would protect the Fund's NAV] and the redemption activity slowed greatly . . . ." (¶ 90.)

**D.     Defendants' Material Misstatements and Omissions Were Made in Connection with the Purchase and Sale of Securities**

The "in connection with the purchase or sale of securities" requirement of Rule 10b-5 is satisfied "whenever assertions are made . . . in a manner reasonably calculated to influence the investing public." Texas Gulf Sulphur Co., 401 F.2d at 862. Here, Defendants' internal communications show that influencing the investing public was the driving force behind the misstatements in *Insights*, Bent II's 1:19 Email and other communications with ratings agencies, investors and the media. (¶¶ 91, 92.) Indeed, their contemporaneous emails and actions can reasonably support no other conclusion. (Id.)

**E.     Defendants Acted with Scienter in Misleading the Investing Public and the Independent Trustees Regarding the Primary Fund's Predicament**

Scienter may be established by demonstrating an intent to deceive, manipulate, or defraud, or knowing misconduct, SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996), or a through a showing of reckless disregard for the truth. SEC v. McNulty, 137 F.3d 732, 741 (2d Cir. 1998). Reckless conduct is "'conduct which is "highly unreasonable" and which represents "an extreme departure from the standards of ordinary care."'" Id. (quoting Rolf

---

[16] As explained by Arthur Bent, RMCI's co-SVP, the purpose of Defendants' public pledge of support was to impact investors' decisions. When Lansky asked about "the means" for Defendants' "plan to protect [the Primary Fund's] NAV," Arthur Bent advised: "We should say as little as possible to get the positive effect." (¶ 92.)

v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 47 (2d Cir. 1978)). Under either standard,
evidence of Defendants' scienter is overwhelming.

First, where the statements in question are statements of opinion, belief or intent, the
elements of falsity and scienter are properly collapsed because, if the statement of intent is false,
it is necessarily made with knowledge of the falsity. In re Salomon Analyst AT&T Litig., 350 F.
Supp. 2d 455, 466 (S.D.N.Y. 2004) (statement of intention cannot be "false at all unless the
speaker is knowingly misstating his truly held [intention].") Thus, because the Bents failed to
reveal – in the 1:19 Email, statements to the Board, and statements to the public – the many
conditions to their willingness to support the Primary Fund, their unqualified statement of intent
to support was knowingly false.

Second, even if the Bents had meant their statements to be taken literally – that there
were no conditions to their intent to support the Primary Fund – they would have acted recklessly
in making them without appreciating that the situation might require them to change their minds.
Where a statement of intent is made in a fast-moving securities market, the speaker is reckless in
making it unconditional because circumstances might change that could cause him to change his
mind. In re Phillips Petroleum Sec. Litig., 881 F.2d 1236, 1246-47 (3d Cir. 1989). In Phillips, a
corporate raider repeatedly pledged that he would never sell his stake back to the target for less
than what was offered to other shareholders. Id. at 1239-41. When he ultimately did just that,
shareholders sued him for fraud, claiming that his unqualified statements of intent were false
when made. Id. at 1241. Like Defendants here, the raider contended that he had simply changed
his mind, and thus, his earlier statement of intent had not been false. Id. at 1244. The court
rejected that argument, holding that a reasonable jury might well conclude that his statements of
intent – even if honestly held when made -- had been reckless: "[S]uch unequivocal statements

presented an obvious danger of misleading the public – because they can fairly be read as a statement by the [raider] that, no matter what happened, [the raider] would not change its intentions." Id. at 1246.

Defendants made, and repeated, similarly unequivocal statements of intent that presented an equally obvious danger of misleading the public that, no matter what happened, the Defendants would not change their minds. Made when the markets were in unprecedented turmoil, and with the goal of calming increasingly worried investors, those statements were, at the least, reckless.

With respect to *Insights*, the Bents were equally reckless. Both approved all but one of the statements that were false and appear there. (¶¶ 43, 44, 46, 52, 55-57.) And Bent II authorized its posting on the Reserve's website. (¶¶ 60, 64.) By 9:36 p.m. on September 15th, when Bent II gave Lansky permission to post a statement on RMCI's website, he already knew all the facts that he says led him to conclude that the situation was hopeless and that they would provide no support for the Fund after all. He knew that State Street was not going to fund any pending redemptions until the Reserve paid down its overdraft, that no investors' redemptions would be paid until that overdraft had been paid down, and that redemptions (although slowed) had continued throughout the afternoon of September 15. (¶¶ 101, 103.) Both Bents cite those same facts, unchanged in the interim, as the reasons for their later conclusion that executing on their pledge to support the Primary Fund's NAV would be futile, as the "the whole thing was academic" and the situation was "hopeless." (¶ 88.) Nevertheless, with knowledge of the same facts, Bent II approved the posting on RMCI's website of *Insights* and, by doing so, reaffirmed the statements assuring the public that "our credit agreements ensure the integrity of the Fund's

NAV," the "[Primary Fund's] NAV is not negatively impacted," and "there will be no shareholder impact as the portfolios are structured to . . . provide daily liquidity." (¶ 40.)

It does not lessen Bent II's culpability to argue as he does that he had no idea what Lansky was proposing to post. When a defendant does not read the statements he is approving, he acts recklessly. SEC v. Jakubowski, 150 F.3d 675, 681 (7th Cir. 1998) (rejecting defendant's claim that his failure to read the documents that contradicted his public statements was merely negligent, not reckless); SEC v. TLC Invs. & Trade Co., 179 F. Supp. 2d 1149, 1154 (C.D. Cal. 2001) (same). If Bent II truly had no idea what he was approving, then he was reckless in approving it.[17]

Bent Sr.'s excuses fare no better. While he persists in pointing to the physical distance that separated him from the Reserve on the 15th and 16th, the record reflects that he was closely involved in crafting the Reserve's message to the public and to the Board, and that he personally reviewed and edited the *Insights* publication at issue and spoke directly to the Board on several occasions. (¶¶ 41, 42, 55, 83.) He had phone and fax access at all times, and used both throughout the day on the 15th to keep abreast of developments. (¶ 50.)[18]

Not only did Bent Sr. approve most of Reserve *Insights*, he approved its dissemination to the ratings agencies. When Ledford informed him that he had conveyed the message of support

---

[17] Bent II's excuse for misleading the *Wall Street Journal* is equally unavailing to refute his scienter. According to Bent II, when he approved telling the *Wall Street Journal* that RMCI intended to protect the NAV of Reserve funds, including the Primary Fund, to whatever degree is required, he "was tired [and] [t]here was a lot of pressure around this with the [media's] deadline" for their stories. (¶ 33.) Far from excusing his actions, most generously, Bent II's explanation demonstrates his recklessness, reflecting "an extreme departure from the standards or ordinary care."

[18] At the time, Bent Sr. considered himself much more fully engaged than he is now willing to admit. He assumed responsibility for supervising the collection of Lehman trading data and reporting it to the Trustees even though he was physically removed from the trading desk. (¶115.)

and that the ratings agencies should now be "fat and happy," Bent Sr. did nothing to satisfy

himself that the message that had been conveyed had been an appropriately factual one. (¶ 57.)

**F.    RMCI and Resrv Partners Are Responsible for the Fraudulent Acts of Their Employees Committed Within the Scope of Their Employment**

The Entity Defendants are liable for the acts committed by their employees. "Acts

performed and knowledge acquired by a corporate agent within the scope of his or her

employment are imputed to the corporation. The misconduct of an agent therefore is imputed to

the corporation if committed within the scope of the agent's employment." In re Parmalat Sec.

Litig., 684 F. Supp. 2d 453, 471-72 (S.D.N.Y. 2010); see also United States v. Koppers Co., 652

F.2d 290, 298 (2d Cir. 1981) (approving jury instruction charging that a corporation could be

held criminally liable for the acts of its employees). The Second Circuit has "explicitly held that

*respondeat superior* applies in federal securities cases." Parmalat, 474 F. Supp. 2d 547, 550 n.12

(S.D.N.Y. 2007) (citing Marbury Mgmt., Inc. v. Kohn, 629 F.2d 705, 712-16 (2d Cir. 1980)).

1.    RMCI and Resrv Partners Are Responsible for the Bents' False and Misleading Statements to the Board and the Investing Public

It is axiomatic that the Bents' actions are imputed to RMCI and Resrv Partners. As

President of RMCI, Chairman of Resrv Partners, and founder of both entities (¶ 1), all of Bent

Sr.'s acts for RMCI and Resrv Partners were committed in the scope of his employment. And,

based on Bent Sr.'s testimony, Bent II could not have acted outside the scope of his employment

on September 15 because the scope of his job responsibilities on that day was "[e]verything." (¶

95.) Bent II was S.V.P., Secretary and Assistant Treasurer of RMCI and Secretary and Assistant

Treasurer of Resrv Partners (¶ 1), and nothing he did was outside the scope of his authority to

manage both entities' affairs.

2.  RMCI Is Responsible for Ledford's Knowingly False and Material
    Statements to Moody's

Ledford's intentional misrepresentations to Moody's about the Primary Fund's purported

success in selling sufficient securities to satisfy redemption requests is also imputed to RMCI.

As noted above, Ledford misrepresented the Reserve's predicament to Moody's moments after

he bemoaned the Reserve's plight to fellow Reserve employees. See supra at p.10.

There can be no legitimate dispute about whether Ledford was acting within the scope of

his authority when he communicated with analysts from ratings agencies on September 15.

Communicating with ratings agencies was one of Ledford's responsibilities as CIO (¶ 76), and

the Bents were aware that Ledford performed that role. (Id.)

More generally, the RMCI employees' knowledge about State Street's refusal to extend

additional overdraft protection (¶ 93), and the Fund's inability to sell sufficient assets to address

that problem (¶¶ 72, 73), is imputed to RMCI, so RMCI's failure to inform the Board and public

of these critical facts at any time on September 15 is also actionable.

## II. DEFENDANTS VIOLATED SECTIONS 206(1), (2) AND (4) OF THE ADVISERS ACT AND RULE 206(4)-8 THEREUNDER

### A.    Elements of Plaintiff's Advisers Act Claims

"Section 206 [of the Investment Advisers Act of 1940] imposes a fiduciary duty on

investment advisers to act at all times in the best interest of the fund and its investors, and

includes an obligation to provide 'full and fair disclosure of all material facts. . . .'" SEC v.

Tambone, 550 F.3d 106, 146 (1st Cir. 2008), rev'd en banc on other grounds, 597 F.3d 436 (1st

Cir. 2010) (quoting SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 191 (1963)); see

also SEC v. Batterman, No. 00 Civ. 4835 (LAP), 2002 WL 31190171, at *8 (S.D.N.Y. Sept. 30,

2002) ("An investment adviser has . . . an affirmative obligation 'to employ reasonable care to

avoid misleading' his clients.") (quotation omitted).  Sections 206(1) and 206(2) of the Advisers

Act prohibit an investment adviser from employing any device, scheme, or artifice to defraud

clients or engage in any transaction, practice, or course of business that defrauds clients. 15

U.S.C. §§ 80b-6(1) & (2).

While the "client" to whom an adviser's fiduciary duties are owed under Sections 206(1)

and (2) is the fund, not the fund's investors, Goldstein v. SEC, 451 F.3d 873, 881-82 (D.C. Cir.

2006), Section 206(4) and Rule 206(4)-8 apply to investors. Id. at 881 n.6 (distinguishing

Section 206(4) of the Advisers Act from Sections 206(1) and (2)); see also SEC v. Rabinovich &

Assocs., LP, No. 07 Civ. 10547 (GEL), 2008 WL 4937360, at *4 (S.D.N.Y. Nov. 18, 2008)

(applying Rule 206(4)-8 to material misstatements to investors). Violations of the antifraud

provisions of Section 206 do not require a showing of actual injury to any client. Capital Gains

Research Bureau, Inc., 375 U.S. at 195.

The elements of a primary violation of Section 206(1) and (2) "have been interpreted as

substantively indistinguishable from Section 17(a) of the Securities Act, except that Section

206(1) requires proof of fraudulent intent, while Section 206(2) simply requires proof of

negligence by the primary wrongdoer." SEC v. Gabelli, No. 08 CV 3868 (DAB), 2010 WL

1253603, at *9 (S.D.N.Y. Mar. 17, 2010) (quotations omitted). Likewise, Section 206(4) does

not require proof of fraudulent intent. SEC v. Steadman, 967 F.2d 636, 646-47 (D.C. Cir. 1992)

(scienter not required under Section 206(4)); Rabinovich, 2008 WL 4937360, at *4.

**B.    RMCI, Bent Sr., and Bent II Violated Sections 206(1), (2), and (4) and Rule 206(4)-8 of the Investment Advisers Act**

On September 15, RMCI, Bent Sr., and Bent II violated their Section 206 fiduciary duty

to the Primary Fund's Independent Trustees, who collectively represented RMCI's client, the

Fund, by failing to provide "'full and fair disclosure of all material facts'" concerning the Fund's

predicament in the wake of Lehman's bankruptcy filing. Tambone, 550 F.3d at 146; see also

Batterman, 2002 WL 31190171, at *8.

1. RMCI, Bent Sr., and Bent II Violated Sections 206(1) and (2)

RMCI's and the Bents' false and misleading statements and material omissions to the

Independent Trustees on September 15 prevented them from gaining a full and fair picture of

RMCI's response to Lehman's bankruptcy filing and the Fund's increasingly dire situation as

that day progressed. (¶ 110.) These misrepresentations and omissions amount to violations of

Sections 206(1) and (2) of the Advisers Act. Gabelli, 2010 WL 1253603, at *9.

Similar to Bent II's unequivocal message in his 1:19 Email, RMCI, Bent Sr., and Bent II

misled the Independent Trustees by pledging to protect the Fund's $1.00 NAV without

communicating the conditions and limitations they had "in their mind" concerning their ability

and willingness to provide sufficient credit support. (¶ 82.) Further, RMCI, Bent Sr., and Bent

II withheld critical information from the Trustees on September 15, including:

- State Street's warning on September 12 that it "may have difficulties [funding redemptions] Monday morning" (¶ 97 ); its suspension of funding for redemptions requested after approximately 10:10 a.m. (¶ 96); and its communicated overdraft limit for the Reserve on September 15 (¶¶ 93, 98);

- The Fund had incurred an $8 billion debt to State Street (¶ 99);

- Lehman commercial paper was trading at levels far below the .80 fair value that the Board had assigned to the Fund's Lehman paper. (¶¶ 116, 117.)

- The ratings agencies had expressed concerns about maintaining the Fund's ratings (¶ 104);

- Management had instructed that no sales of assets be made at less than par (¶ 108);

- Bent II had made overtures to investment bankers about selling RMCI and to the Fed for help (¶ 109); and

- International Liquidity's and Yield Plus Funds' NAVs fell below $1.00 during the 9:30 a.m. Board meeting after the Lehman holdings were reduced to 80 percent of par (¶¶ 112, 113).

31

There is no dispute that RMCI was aware of all of this information (and could easily have been aware of the Lehman trades if it had inquired) as of the beginning of the 1:00 p.m. Board meeting. Bent Sr. and Bent II only dispute that they were personally aware at 1:00 p.m. of State Street's overdraft limit that had been communicated to Farrell, the CFO, hours earlier (¶ 93), and that State Street had stopped funding redemptions (¶¶ 93, 100).[19]

There also should be no dispute that each of these facts was material information that the Independent Trustees needed (and wanted) to know on September 15 to enable them to act on the Fund's behalf. As one of them, William Montgoris, described it, the Trustees were "shocked" when they learned on the 16th all the information that the Bents had kept secret from the Trustees on September 15:

> I was shocked and surprised when we were told [on September 16] that the redemptions had gotten to a very large number . . . that the management had conversations with various people about buying the . . . management company . . . because it seemed that [as of] 1:30 or 2:00 . . . on the 15th that things were seemingly under control.

(¶ 110.)

RMCI's , Bent Sr.'s, and Bent II's false statements and material omissions to the Independent Trustees constituted a "device, scheme, or artifice to defraud" their "client" and was also a part of a "course of business which operate[d] as a fraud" on September 15.  15 U.S.C. § 80b-6(1) & 80b-6(2).  For the same reasons noted in Section I.E., supra, Bent Sr. and Bent II acted with scienter in misleading the Independent Trustees.

---

[19]  Defendants do not dispute that Bent II learned on the afternoon of September 15 that State Street refused to extend additional overdraft protection, or that they failed to convey this critical information to the Board on September 15 despite instructions to keep the Board apprised of "any significant developments."  (¶ 100.)

2.  RMCI, Bent Sr., and Bent II Violated Section 206(4) and Rule 206(4)-8

Sections 206(4) and Rule 206(4)-8 do not require scienter. Steadman, 967 F.2d at 646-47

(scienter not required under Section 206(4)); Rabinovich, 2008 WL 4937360, at *4 (not

identifying scienter among elements of a Rule 206(4)-8 violation). Though RMCI's, Bent Sr.'s,

and Bent II's fraudulent acts were certainly committed knowingly and intentionally, under the

lower standard applicable to these sections of the Act, their violations of Section 206(4) and Rule

206(4)-8 are patently obvious. Additionally, the substance of their Section 206(4) and Rule

206(4)-8 violations is not limited to statements and omissions to the Independent Trustees; it also

includes statements made to then current and prospective Primary Fund investors. Goldstein,

451 F.3d at 881 n.6.; see also Rabinovich, 2008 WL 4937360, at *4. For all the reasons that the

Bents' statements to investors violated the antifraud provisions of the Securities Act and the

Exchange Act, they violate these provisions of the Advisers Act as well.

### III.    BENT II AND BENT SR. ARE LIABLE AS "CONTROL PERSONS" UNDER SECTION 20(a) OF THE EXCHANGE ACT

The Bents are liable as control persons. Control person liability turns on three factors:

"(1) a primary violation by the controlled person, (2) control of the primary violator by the

defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the

controlled person's fraud." ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 108 (2d Cir.

2007).

"Control over a primary violator may be established by showing that the defendant

possessed 'the power to direct or cause the direction of the management and policies of a person,

whether through the ownership of voting securities, by contract, or otherwise.'" First Jersey, 101

F.3d at 1472-73 (quoting and adopting 17 C.F.R. § 240.12b-2 standard for Section 20(a) claim).

That the Bents exerted complete control over the operations of RMCI and Resrv Partners is not

in dispute. As of September 2008, Bent Sr., Bent II and Arthur Bent owned all shares of Resrv

33

Partners and, directly or through trusts, all shares of RMCI. (¶ 1.) Furthermore, RMCI's "Office of the Chairman" comprises only Bent Sr., Bent II and Arthur Bent. (Id.) As Bent Sr. testified: "it's a family business." (Id.)

The record also unequivocally demonstrates the Bents' culpable participation in the primary violations described above. Where the control person "'knew or should have known that [the] primary violator . . . was engaged in fraudulent conduct, but . . . did not take steps to prevent" it, culpability is established. In re Parmalat Sec. Litig., 594 F. Supp. 2d 444, 458 (S.D.N.Y. 2009) (quoting Dietrick v. Bauer, 126 F. Supp. 2d 759, 765 (S.D.N.Y. 2001)). Here, most of the wrongdoing by the Entity Defendants was in fact committed by Bent Sr. and Bent II, leaving no doubt that they knew of it and failed to take steps to prevent it. Both Bent II and Bent Sr. acknowledged that they reviewed and commented on a draft of Defendants' misleading *Insights* piece. (¶ 41.) Both Bents knew that Ledford was communicating with the ratings agencies (¶ 76), and Bent Sr. knew what he was telling them. (¶ 57.) In short, because the Bents controlled the Entity Defendants responsible for the primary violations described above, knew what the Entity Defendants were doing, and to the extent they were not acting themselves, did nothing to stop the Entity Defendants, they are liable as control persons under Section 20(a) of the Exchange Act.

## IV.    THE COURT SHOULD PERMANENTLY ENJOIN DEFENDANTS FROM FUTURE SECURITIES LAW VIOLATIONS AND ORDER DISGORGEMENT AND MONETARY PENALTIES

The Commission seeks permanent injunctions against future violations of the federal securities laws against all Defendants, disgorgement of ill-gotten gains plus prejudgment interest, and an award of civil monetary penalties.

A.    **The Court Should Issue a Permanent Injunction**

The Commission may seek, and this Court may grant, an injunction permanently

enjoining Defendants from future violations of federal securities laws under Section 20(b) of the

Securities Act, 15 U.S.C. § 77t(b), Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), and

Section 209(d) of the Advisers Act, 15 U.S.C. § 80b-9(d).  Under those provisions, an injunction

is appropriate when (1) a defendant has violated the securities laws, and (2) the defendants are

reasonably likely to violate the securities laws again in the future.  SEC v. Commonwealth

Chem. Sec., Inc., 574 F.2d 90, 99-100 (2d Cir. 1978).

In determining whether a reasonable likelihood exists that a defendant will commit future

violations, courts recognize that "the commission of past illegal conduct is highly suggestive of

the likelihood of future violations."  SEC v. Mgmt. Dynamics, Inc., 515 F.2d 801, 807 (2d Cir.

1975).  A court may also consider the degree of scienter involved; the isolated or recurrent nature

of the infraction; whether the defendant has accepted responsibility for his misconduct; and

whether, because of his position or occupation, the defendant might be in a position to violate the

securities laws again.  SEC v. Cavanagh, 155 F.3d 129, 135 (2d Cir. 1998).

Defendants' violations of the federal securities laws, including their high degree of

scienter, are set forth in detail above.  Courts in this Circuit have granted injunctions for

violations far less egregious than the fraud committed by Defendants here.  E.g., SEC v.

Universal Major Indus. Corp., 546 F.2d 1044, 1047-48 (2d Cir. 1976) (awarding injunctive relief

for aiding and abetting Section 5 violations).  And while it may be true that Defendants do not

stand accused of committing additional fraudulent acts since they were sued by the Commission

and investors, appellate courts have repeatedly cautioned that "cessation of illegal activity does

not *ipso facto* justify the denial of an injunction."  Id. at 1048; Mgmt. Dynamics, Inc., 515 F.2d

at 807.

Nor is it relevant that Defendants have, for now at least, exited the industry. As the court concluded in SEC v. Youmans, 729 F.2d 413, 415-16 (6th Cir. 1984), where nothing precludes a defendant from re-entering the industry, his current occupation outside it should not bear on whether he will have an opportunity to commit further securities laws violations.[20]

Finally, the Court should consider the Defendants' insistence that factors beyond their control and individuals other than they caused investor harm. Almost since the Fund broke the buck, the Bents have laid the blame at the doorstep of every other entity and individual, but not their own: the Fed's failure to bail out Lehman; the Treasury's failure to include the Primary Fund in its temporary guarantee program; State Street's failure to lend the Fund even more credit than the $8 billion it extended; the SEC's failure to alert investors to Lehman's true financial condition; and the federal government's failure to bail out the Fund when it was at the brink. (¶ 127.) The Bents even scapegoat the very employees and advisers they claim they reasonably relied on: Ledford, Lansky, Bonanno, Lentinello and Willkie. (Id.) Defendants' unwillingness to take responsibility for their own actions is a factor the Court should consider when it determines the likelihood that they may violate the law again.

## B. The Court Should Order Defendants to Disgorge Their Ill-Gotten Gains and Award Prejudgment Interest

The Commission seeks disgorgement of Defendants' profits from their fraud. Disgorgement is an appropriate means of "forcing a defendant to give up the amount by which he was unjustly enriched," Commonwealth Chem., 574 F.2d at 102, and should include "all gains flowing from illegal activities." SEC v. Credit Bancorp. Ltd., No. 99 Civ. 11395 (RWS),

---

[20] Indeed, courts have concluded that a defendant's experience in the industry increases the likelihood of further violations. SEC v. Svoboda, 409 F. Supp. 2d 331, 343 (S.D.N.Y. 2006); SEC v. Berger, 244 F. Supp. 2d 180, 193 (S.D.N.Y. 2001), aff'd, 322 F.3d 187 (2d Cir. 2003). Here, Bent Sr. has spent his entire life in the industry (¶ 2); Bent II has spent his entire career working for RMCI. (Id.)

2011 WL 666158, at \*2 (S.D.N.Y. Feb. 14, 2011).  Disgorgement serves a deterrent purpose, and the district court has broad discretion in calculating the amount of ill-gotten gains to be returned. First Jersey, 101 F.3d at 1474-75.

Where an assessment of ill-gotten gains "cannot be made with precision, the 'risk of uncertainty . . . should fall on the wrongdoer whose illegal conduct created that uncertainty.'" SEC v. Universal Express, Inc., 646 F. Supp. 2d  552, 563 (S.D.N.Y. 2009) (quotations omitted); see also SEC v. Rosenfeld, No. 97 Civ. 1467 (WHP), 2001 WL 118612, at \*2 (S.D.N.Y. Jan. 9, 2001) (once the Commission has approximated ill-gotten gains, 'the burden shifts to the defendant to demonstrat[e] that he received less than the full amount . . . sought to be disgorged") (quotation omitted).  Here, the Commission can only approximate Defendants' ill-gotten gains, owing in large part to Defendants' various and conflicting submissions concerning the profits they claim they earned  "managing" the billions of dollars investors tried to redeem in September 2008 through the liquidation of the Fund.  Defendants should therefore be required to account for any monies they have received to date and, for other claims they have made, distinguish between any expense components and any profits.[21]

As co-participants in the fraudulent scheme, Defendants should be held jointly and severally liable for the full amount of disgorgement plus prejudgment interest thereon.  First Jersey, 101 F.3d at 1475-76 (holding a firm's owner and chief executive officer jointly and severally liable for disgorgement where he collaborated in the conduct and profited from it).

An order granting prejudgment interest is also within the broad discretion of the Court. First Jersey, 101 F.3d at 1476.  Prejudgment interest "serves the important purpose of the

---

[21]   According to Defendants' proffered "damages" expert, Defendants "earned" more than $8 million in profit.  (¶ 126.)  This appears to exclude the Bents' personal salary and/or bonuses claimed for that time period.  (Id.)  As the Court is aware, the Commission has objected to the Bents' inflated salaries as true expenses; if they are to be counted, it should be as profits.

deterrence, which is central to securities law." SEC v. Shehyn, No. 04 CV 2003 (LAP), 2010 WL 3290977, at *7 (S.D.N.Y. Aug. 9, 2010). It prevents a defendant from obtaining what "amounts to an interest free loan procured as a result of illegal activity." Id. (quotation omitted). To ensure that Defendants are not benefitted by their wrongdoing, the Court should award prejudgment interest on any profits Defendants have already received.

**C.     The Court Should Order Defendants to Pay Civil Monetary Penalties**

Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), Section 21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), and Section 209(e) of the Advisers Act, 15 U.S.C. § 80b-9(e), all provide for the imposition of civil penalties, and they should be awarded here against all Defendants.

Civil penalties were enacted by Congress to further "the dual goals of punishment of the individual violator and deterrence of future violations." Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC, 467 F.3d 73, 81 (2d Cir. 2006) (quotations omitted). "Disgorgement alone is an insufficient remedy, since there is little deterrent in a rule that allows a violator to keep the profits if she is not detected, and requires only a return of ill-gotten gains if she is caught." SEC v. Inorganic Recycling Corp., No. 99 Civ. 10159 (GEL), 2002 WL 1968341, at *4 (S.D.N.Y. Aug. 23, 2002).

To determine what civil penalties should be imposed, courts look to a number of factors, including "(1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition." SEC v. Forest Resources Mgmt. Corp., No. 09 Civ. 0903 (JSR), 2010 WL 2077202, at *2 (S.D.N.Y. May 18, 2010) (quotations omitted).

Defendants whose securities law violations (1) involve fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement, and (2) directly or indirectly result in substantial losses or create a significant risk of substantial losses to other persons are subject to "third tier" penalties not to exceed the greater of $130,000 ($650,000 for corporations) per violation[22] or the gross amount of defendant's pecuniary gain. E.g., 15 U.S.C. § 78u(d)(3)(B)(iii).[23] Defendants' misconduct put billions of dollars of investors' money at risk. Purchasers on September 15th and 16th put their money at risk the moment they bought Primary Fund shares. And existing shareholders' funds were placed at risk when Defendants, by their actions, induced them to stay in the Primary Fund (instead of redeeming or transferring their shares to another Reserve Fund) on September 15 and 16. Without access to their cash, some investors were forced to incur substantial expenses borrowing money to meet their needs for cash. (See, e.g., ¶ 10.)

The Court has discretion in the manner in which it calculates the appropriate penalty at any of the levels provided by the statutes. One way is to multiply the number of Defendants' securities law violations by the per violation amount, $130,000 for the Bents and $650,000 for the Entity Defendants, under the maximum third tier guidelines. See generally SEC v. Invest Better 2001, 01 Civ. 11427 (BSJ), 2005 WL 2385452, at *4 (S.D.N.Y. May 4, 2005) (discussing calculation of civil penalties in securities fraud action). In doing so, the Court may set the number of violations as equal to the number of investors who were affected by the wrongdoing,

---

[22] The statute sets the penalties at lower amounts. However, pursuant to the Debt Collections Improvement Act of 1996, these amounts have been adjusted for inflation. 17 C.F.R. § 201.1003.

[23] "First tier" violations are violations without any additional qualifications; "second tier" violations are those involving "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." 15 U.S.C. § 77u(d)(3)(B)(i-ii). Each of those tiers imposes lower dollar amounts per violation.

with each investor constituting a separate violation.  SEC v. Kenton Capital, Ltd., 69 F. Supp. 2d

1, 17 n.15 (D.D.C. 1998) (multiplying third tier penalty amount by number of investors

victimized by conduct).  Alternatively, the Court might choose to set the penalty based on the

gross amount of Defendants' ill-gotten gains, basing it on the amount of profits to which

Defendants claim they are entitled.  SEC v. Leffers, 289 F. App'x 449, 452 (2d Cir. 2008)

(affirming penalty in amount of pecuniary gain and calling it an "appropriate sum even in the

lowest tier of the penalty structure.")

As set forth above, Defendants' egregious and repeated securities law violations warrant

nothing less than the maximum penalty the law allows for each Defendant.

## CONCLUSION

For all the foregoing reasons, the Commission's Motion for Partial Summary Judgment

should be granted in all respects.

Dated: New York, New York
      May 13, 2011

                                  Respectfully submitted,

                                  By:
                                      Nancy A. Brown
                                      Valerie A. Szczepanik
                                      Michael D. Birnbaum
                                      Michael P. Holland

                                  SECURITIES AND EXCHANGE
                                  COMMISSION
                                  3 World Financial Center
                                  New York, NY  10281
                                  (212) 336-1023 (Brown)

                                  Attorneys for Plaintiff