## UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re THE RESERVE FUND SECURITIES AND DERIVATIVE LITIGATION | : : : : 09 MD 2011 (PGG) |
| | : |
| SECURITIES AND EXCHANGE COMMISSION, | : : |
| Plaintiff, | : : : No. 09 Civ. 4346 (PGG) |
| v. | : : ECF Case |
| RESERVE MANAGEMENT COMPANY, INC., RESRV PARTNERS, INC., BRUCE BENT SR., and BRUCE BENT II, | : : : : |
| Defendants, | : : |
| and | : : |
| THE RESERVE PRIMARY FUND, | : : |
| Relief Defendant. | : : |

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION
## TO THE SEC'S MOTION FOR SUMMARY JUDGMENT

DUANE MORRIS LLP
1540 Broadway
New York, NY  10036
(212) 692-1000
Attorneys for Defendants
Reserve Management Company, Inc. Resrv Partners,
Inc., Bruce R. Bent, Sr. and Bruce R. Bent II

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT……………………………………………………….. ...........1

THE SEC'S VERSION OF THE FACTS IS NOT UNDISPUTED ................................................3

ARGUMENT…………………………………………………………………………………10

I.      THE SEC CANNOT SUSTAIN ITS SUMMARY JUDGMENT BURDEN .......10

II.     THE SEC HAS NOT COME CLOSE TO SHOWING THAT IT IS
        ENTITLED TO JUDGMENT AS A MATTER OF LAW ON ITS CLAIMS
        UNDER SECTIONS 10(b) and 17(a) ...................................................................11

        A.      The SEC Cannot Establish the "In Connection With" Element of Its
                Claims…………………………………………………………… ................11

                1.      Representations to the Board Are Not Actionable Under
                        §§10(b) and 17(a)……………………………………...................11

                2.      Statements Intended to Induce Investors Not to Redeem In
                        Connection With" the Purchase or Sale of a
                        Security……………………………………………………. ........12

                3.      The SEC's Evidence of Purchases Is Improper and Does Not
                        Satisfy the "In Connection With" Requirement……….............13

        B.      The SEC Cannot Establish A Material Misstatement…………….............14

        C.      The SEC Cannot Establish the Falsity Element of Its
                Claims…………………………………………………………….. ..............16

        D.      The SEC Cannot Establish the Scienter Element of Its
                Claims…………………………………………………………….. ..............18

                1.      The SEC Cannot Establish Recklessness As a Matter of
                        Law……………………………………………………… ........18

                2.      Defendants' Expert Reports Further Reinforce Lack of
                        Scienter ...........................................................................21

                3.      A Valid Advice of Counsel Defense Exists Here……………. ....22

                4.      Ledford's Statements to Moody's Were Unauthorized and
                        Cannot Be Imputed to RMCI……………………...........................23

III.    THE SEC CANNOT ESTABLISH ALL OF THE ELEMENTS OF
        CONTROL PERSON LIABILITY UNDER §20(a)……………………….. ...........24

IV.     THE SEC CANNOT ESTABLISH A RIGHT TO RELIEF ON ITS
        ADVISERS ACT CLAIMS…………………………………………..................25

        A.      No Violation of §§206(1) and (2) Can Be Shown……………………...25

        B.      The SEC Has Not Established an Entitlement to Judgment on Its
                §206(4) Claim………………………………………………... .............31

V.      THE SEC HAS NOT SHOWN AN ENTITLEMENT TO ANY OF THE
        RELIEF REQUESTED…………………………………………….................31

        A.      The SEC Has No Evidence That an Injunction Is Necessary to Prevent
                a Recurrence…………………………………………….................31

        B.      The SEC Admits That It Has No Evidence of Any Ill-Gotten Gains… ....33

        C.      The SEC's Request for Penalties Is Unsupported By the Law and
                Based on Arguments It Should Be Estopped From Making………..........35

CONCLUSION……………………………………………………………………35

TABLE OF AUTHORITIES

Cases                                                                 Page

Abrash v. Fox,
   805 F. Supp. 206 (S.D.N.Y. 1992) ...................................................................13

Allen v. Coughlin,
   64 F.3d 77 (2d Cir. 1995)................................................................................11

In re Alstom SA Secs. Litig.,
   406 F. Supp. 2d 433 (S.D.N.Y. 2005)..............................................................25

Anderson v. Liberty Lobby, Inc.,
   477 U.S. 242 (1986)........................................................................................11

ATSI Communs., Inc. v. Shaar Fund, Ltd.,
   493 F.3d 87 (2d Cir. 2007)..............................................................................25

In re Bank of Am. Corp. Secs.,
   2010 U.S. Dist. LEXIS 89199 (S.D.N.Y. Aug. 27, 2010) ......................................16

In re Elan Corp. Sec. Litig.,
   543 F. Supp. 2d 187 (S.D.N.Y. 2008)..............................................................27

Ernest Lawrence Group v. Mktg. the Ams., Inc.,
   2005 U.S. Dist. LEXIS 25307 (S.D.N.Y. Oct. 26, 2005) ........................................10

Ernst & Ernst v. Hochfelder,
   425 U.S. 185 (1976)........................................................................................12

Feit v. Leasco Data Processing Equip. Corp.,
   332 F. Supp. 544 (S.D.N.Y. 1971) ..................................................................15

Freschi v. Grand Coal Venture,
   551 F. Supp. 1220 (S.D.N.Y. 1982).................................................................14

Golar v. Daniels & Bell, Inc.,
   533 F. Supp. 1021 (S.D.N.Y. 1982).................................................................12

Intellivision v. Microsoft Corp.,
   2011 U.S. Dist. LEXIS 29950 (S.D.N.Y. Mar. 23, 2011) ........................................35

Kalnit v. Eichler,
   85 F. Supp. 2d 232 (S.D.N.Y. 1999),
   aff'd, 264 F.3d 131 (2d Cir. 2001)....................................................................24

Leberman v. John Blair & Co.,
    880 F.2d 1555 (2d Cir. 1989).......................................................................22

Luce v. Edelstein,
    802 F.2d 49 (2d Cir. 1986)...........................................................................17

Nationwide Life Ins. Co. v. Bankers Leasing Ass'n,
    182 F.3d 157 (2d Cir. 1999).........................................................................10

Novak v. Kasaks,
    216 F.3d 300 (2d Cir. 2000).........................................................................20

In re Parmalat Sec. Litig.,
    659 F. Supp. 2d 504 (S.D.N.Y. 2009).........................................................10

In re Parmalat Sec. Litig.,
    684 F. Supp. 2d 453 (S.D.N.Y. 2010).........................................................23

In re Phillips Petroleum Sec. Litig.,
    881 F.2d 1236 (3d Cir. 1989)................................................................. 18-20

Plumbers & Steamfitters Local 773 Pension Fund v. Canadian Imperial Bank of
    Commerce,
    694 F. Supp. 2d 287 (S.D.N.Y. 2010).........................................................20

Press v. Chem. Inv. Servs. Corp.,
    166 F.3d 529 (2d Cir. 1999)....................................................................17, 31

In re Salomon Analyst AT&T Litig.,
    350 F. Supp. 2d 455 (S.D.N.Y. 2004).........................................................16

SEC v. Batterman,
    2002 WL 31190171 (S.D.N.Y. Sept. 30, 2002)..........................................28

SEC v. Bausch & Lomb, Inc.,
    565 F.2d 8 (2d Cir. 1977).............................................................................31

SEC v. Biovail Corp.,
    2010 U.S. Dist. LEXIS 27604 (S.D.N.Y. Mar. 18, 2010) .........................22

SEC v. Biovail Corp.,
    2010 U.S. Dist. LEXIS 59700 .................................................................15, 18

SEC v. Caserta,
    75 F. Supp. 2d 79 (E.D.N.Y. 1999) ........................................................17, 22

SEC v. Commonwealth Chem. Sec., Inc.,
    574 F.2d 90 (2d Cir. 1978).........................................................................................32

SEC v. First Jersey Sec., Inc.,
    101 F.3d 1450 (2d Cir. 1996).............................................................................17, 22

SEC v. Infinity Group Co.,
    212 F.3d 180 (3d Cir. 2000)....................................................................................17

SEC v. Invest Better 2001,
    2005 WL 2385452 (S.D.N.Y. May 4, 2005) ...........................................................35

SEC v. Jadidian,
    2011 U.S. Dist. LEXIS 36485 (S.D.N.Y. Mar. 31, 2011) ......................................32

SEC v. Jakubowski,
    150 F.3d 675 (7th Cir. 1998) ............................................................................ 19-20

SEC v. Johnson,
    2005 U.S. Dist. LEXIS 4732 (S.D.N.Y. Mar. 24, 2005) ........................................24

SEC v. Johnson,
    2006 U.S. Dist LEXIS 50307 ..................................................................................33

SEC v. Jones,
    476 F. Supp. 2d 374 (S.D.N.Y. 2007).............................................................. 32-33

SEC v. Kelly,
    2011 U.S. Dist. LEXIS 3290 (S.D.N.Y. Jan. 7, 2011)............................................34

SEC v. Kenton Capital,
    69 F. Supp. 2d 1 (D.D.C. 1998) ..............................................................................35

SEC v. Leffers,
    289 Fed. Appx. 449 (2d Cir. 2008)..........................................................................22

SEC v. McNulty,
    137 F.3d 732 (2d Cir. 1998).....................................................................................20

SEC v. Meltzer,
    440 F. Supp. 2d 179 (E.D.N.Y. 2006) ...............................................................10, 15

SEC v. Mgmt. Dynamics, Inc.,
    515 F.2d 801 (2d Cir. 1975).....................................................................................32

SEC v. Monarch Funding,
    192 F.3d 295 (2d Cir. 1999).....................................................................................11

SEC v. Northshore Asset Mgmt.,
   2008 U.S. Dist. LEXIS 36160 (S.D.N.Y. May 5, 2008)........................................................12

SEC v. PIMCO Advisors Fund Mgmt. LLC,
   341 F. Supp. 2d 454 (S.D.N.Y. 2004).................................................................................25

SEC v. Reserve Mgmt. Co.,
   732 F. Supp. 2d 310 (S.D.N.Y. 2010).................................................................................8

SEC v. Rorech,
   720 F. Supp. 2d 367 (S.D.N.Y. 2010).................................................................................11

SEC v. Sheyn,
   2010 WL 3290977 (S.D.N.Y. Aug. 9, 2010)......................................................................35

SEC v. Snyder,
   292 Fed. Appx. 391 (5th Cir. 2008)...................................................................................21

SEC v. Svoboda,
   409 F. Supp. 2d 331 (S.D.N.Y. 2006)............................................................................32-33

SEC v. Tambone,
   550 F.3d 106 (1st Cir. 2008),
   rev'd on other grounds, 597 F.3d 436 (1st Cir. 2010) ..........................................................28

SEC v. Texas Gulf Sulphur Co.,
   401 F.2d 833 (2d Cir. 1968)..............................................................................................13

Slayton v. Am. Express Co.,
   604 F.3d 758 (2d Cir. 2010)..............................................................................................27

South Cherry St., LLC v. Hennessee Group LLC,
   573 F.3d 98 (2d Cir. 2009)................................................................................................18

TCS Capital Mgmt., LLC v. Apax Partners, L.P.,
   2008 U.S. Dist. LEXIS 19854 (S.D.N.Y. Mar. 7, 2008) ......................................................12

Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.,
   531 F.3d 190 (2d Cir. 2008)..............................................................................................23

Troyer v. Karcagi,
   476 F. Supp. 1142 (S.D.N.Y. 1979)...................................................................................13

United States v. Autuori,
   212 F.3d 105 (2d Cir. 2000)..............................................................................................17

Va. Bankshares v. Sandberg,
    501 U.S. 1083 (1991)................................................................................................ 16-17

Vt. Teddy Bear Co., Inc. v. 1-800 BEARGRAM Co.,
    373 F.3d 241 (2d Cir. 2004)........................................................................................10

In re Wachovia Equity Secs. Litig.,
    753 F. Supp. 2d 326 (S.D.N.Y. 2011)...................................................................18, 20

Wechsler v. Steinberg,
    733 F.2d 1054 (2d Cir. 1984)......................................................................................17

Wright v. Ernst & Young LLP,
    152 F.3d 169 (2d Cir. 1998)........................................................................................12

Other Authorities

Fed. R. Civ. P. 56(d) ............................................................................................................14

PRELIMINARY STATEMENT

Knowing that Defendants would be moving for summary judgment, the SEC apparently felt compelled to do so as well. The resulting motion should be denied because it is based upon facts that are not undisputed, evidence that is not admissible, and legal theories that were not set forth in the Complaint, that the SEC expressly represented it would not pursue, and that in many cases are just plain wrong. While the SEC may someday be able to use parts of its motion in a post-trial brief – should any of its claims make it to trial – nothing it says here is appropriate on summary judgment, and the motion should be denied in all respects.

The pretext the SEC gives for seeking summary judgment is that Defendants somehow "admitted" they only intended to support the Fund's NAV if they found third-party financing or the government provided a bail-out. This assertion is repeated again and again in the SEC's brief, but no evidence is ever produced showing that Defendants made such an admission. The absence of record support was no oversight. In actuality, Defendants never admitted any such thing. Despite the SEC's heavy-handed efforts to put words in their mouths, Defendants have repeatedly denied that their intent to support the Fund's NAV was conditional.

To cite just one example, when the SEC asked Bent Sr. under oath in November 2008 whether he intended his statement that "'sufficient capital could be made available to support the [P]rimary [F]und'... to be unconditional," his response was: "It was unconditional." (Ex. 2-B, 90:22-91:2.) If it would have been effective to save the Fund's N.A.V., RMCI was prepared to commit the "[t]otal resources that we had available." (Ex. 2-B, 33:18-23.)

As Bent Sr. went on to explain, it was only hours later, when it became clear that the scale of the financial crisis was far worse than anything he or anyone else imagined, that he and Bent II came to the realization that RMCI would not be able to put a viable support agreement in place. They then notified the Fund's counsel, the SEC, and the Board of the change. (Exs. 3-E,

78:7-79:3; 3-CC; 2-J.)  Even though circumstances changed as the crisis unfolded, Bent Sr.'s statement of intent to the Board was true at the time it was made.

What the SEC is now calling "conditions" were in fact extraordinary efforts on the part of Defendants to save Fund investors from incurring a loss.  As financial markets around the world descended into chaos, the Bents' efforts to generate additional liquidity ranged from trying, in effect, to exchange their equity in RMCI for credit support, to asking the government to create liquidity for the Fund's assets (including government paper for which the market had dried up), so that redemptions could be paid.  The SEC's claim that the Bents' subsequent efforts rendered their initial statements of intent "conditional" is wrong – and so is its claim that scienter can be decided *in its favor* on summary judgment.

The law is clear that a defendant cannot be held liable for securities fraud merely for making statements of intent that could not be fulfilled because things unexpectedly went wrong.  That is particularly so where, as here, the statements were made in reliance on the advice of qualified counsel, prompt disclosure was given when circumstances changed, and the change was the onset of a worldwide financial crisis.  (See Point II(C)-(D) below.)

Nor is the SEC able to show that it is entitled to the relief it seeks.  For example, in asking for disgorgement, the SEC offers absolutely no proof that Defendants received any ill-gotten gains causally connected to their supposedly wrongful conduct – a fatal evidentiary shortcoming that the SEC attempts to blame on "Defendants' various and conflicting submissions."  (SEC Mem. 37.)  But Defendants made no conflicting submissions, and the SEC produces none.  Defendants neither sought nor received a penny in profits from any of the alleged misconduct.  Their position is backed up by submissions from RMCI's Chief Financial Officer, expert analysis, and a report from KPMG.  (Ex. 5-A.)  For its part, the SEC has never even bothered to conduct discovery on the issue.  Since all the evidence shows that Defendants

received no ill-gotten gains, the SEC cannot possibly sustain its burden on summary judgment of demonstrating any profit causally connected to the alleged violations.

The SEC's request for injunctive relief is just as deficient.  Although the SEC is asking for relief which could have severe collateral consequences for Defendants, it has not even made a token effort to meet its burden of producing evidence showing a reasonable likelihood that the alleged wrongdoing will recur.  Since the supposed misconduct was limited to an extraordinary period of market turmoil lasting less than 24 hours – and the SEC does not allege that it was preceded or succeeded by any other misconduct – no basis for an injunction can be shown here. The SEC's claims for injunctive and other relief should therefore be dismissed.

As the foregoing deficiencies underscore, the SEC does not merit summary judgment; rather, summary judgment should be granted in Defendants' favor.

<u>THE SEC'S VERSION OF THE FACTS IS NOT UNDISPUTED</u>

A summary of the facts relevant to this case appears in the memorandum Defendants submitted in support of their own summary judgment motion, a copy of which is included as Exhibit A to Defendants' Opposition Appendix.[1]  Defendants' Rule 56.1 Statement provides a point-by-point rebuttal of the SEC's factual recitation.  Listed below are only some of the more egregious examples of how the SEC has changed or distorted the facts:

*1.*   *<u>The SEC's Assertion</u>:  "Back-stopping a fund's NAV through a credit support agreement was a concept the Bents understood well by September 15."*  (SEC Mem. 3.)

<u>The Facts</u>:  In an effort to prop up its scienter theory, the SEC suggests that the Bents understood how support agreements worked prior to September 15, 2008.  They did not.  While RMCI had in the past provided support to the Enhanced Cash Fund – an unregistered private

---

[1]     To avoid duplicative submissions, Defendants incorporate by reference the materials filed in support of their summary judgment motion, and limit this submission to additional evidence. As referred to herein, Defendants' Opposition Appendix is "(Opp. Ex.)", the Appendix filed with their summary judgment motion is "(Ex.)", and the SEC's  Appendix is "(SEC Ex.)".

vehicle with under 20 investors, which was not subject to the '40 Act – the Bents' experience

with Enhanced Cash gave them no reason to believe that, to support the Primary Fund, the SEC

would require RMCI to quantify in advance the amount of support it was going to provide.  Nor

did RMCI's attorneys advise it that it would have to do so, until several hours after the subject

of credit support was discussed at the 1:00 P.M. Board meeting.  (Ex. 3 ¶7.)

   2. _The SEC's Assertion:  Bent Sr. "promised" and "pledged" to make sufficient capital available to support the Fund._  (SEC Mem. 12.)

  The Facts:  When the subject of a support agreement came up at the 1:00 Board meeting

on September 15, Bent Sr. was asked whether RMCI had sufficient capital to provide credit

support and the minutes indicate his response was that it "could be made available."  (Ex. 2-I, p.

4.)  The SEC tries to turn this nebulous exchange into a commitment by RMCI to provide $785

million of support.  (SEC Mem. 17, 22.)  But it is undisputed that no amounts were discussed at

the 1:00 Board meeting.  At the time, the Fund did not need any support and, if support were

needed, Bent Sr. believed RMCI had the ability to provide it.  (Ex. 2 ¶¶20-21.)  While things

may look different in hindsight, Bent Sr. had no reason to assume then that the Lehman paper

was worthless, nor did he know that the Lehman bankruptcy had created a once-in-a-lifetime

crisis, and not just a temporary, self-correcting market aberration.  (Ex 2 ¶29.)

   3. _The SEC's Assertion:  The Bents' commitment to support the Fund was limited to $10 million._  (SEC Mem. 5 n. 4.)

  The Facts:  The amount of credit support RMCI would provide was not limited to

$10 million.  Rather, as the Willkie attorney who prepared the draft support agreement

explained, the $10 million represented RMCI's initial contribution – and Bent Sr. explained that

it could be increased up to the "[t]otal resources" Defendants had available.  (Ex. 2 ¶34.)

   4. _The SEC's Assertion:  The $10 million figure used in the draft support documents was never shared with the Board._  (SEC Mem. 5 n. 4.)

  The Facts:  The same Willkie attorneys who represented RMCI also represented the

Fund.  (Ex. 2-K, 13:18-14:4; 15:2-7.)  As Fund counsel, the Willkie attorneys attended all of the September 15 Board meetings and reported directly to the Trustees.  They therefore knew what the Board was told about supporting the Fund's NAV.  And they knew this when they inserted the $10 million figure in the draft support documents.  (Exs. 3-R; 3-T.)  Had the Willkie attorneys thought the amount of support called for in the draft documents was at odds with the discussion at the 1:00 Board meeting, they would have been expected to say so.  Not only did they say nothing, DiMartino testified that she saw no inconsistency between what the Board was told and what she thereafter inserted in her draft because she understood that the $10 million was just an initial contribution which could be increased.  (Ex. 2-K, 67:17-25.)

5.   *The SEC's Assertion:  The Bents have conceded that their statements of support were conditional*.  (SEC Mem. 5, 18.)

The Facts:  The Bents have each denied viewing RMCI's intent to support the Fund as conditional.  (SEC Ex. 2, 77:19-78:2; Ex. 2-B, 90:22-91:2.)  What the SEC calls "conditions" were not, in any event, conditions, but sources of capital which the Bents reasonably expected RMCI to be able to tap into to satisfy redemption requests.  (Ex. 3 ¶16.)

6.   *The SEC's Assertion:  "[R]edemptions slowed considerably" after Defendants said RMCI intended to support the Fund.*  (SEC Mem. 3.)

The Facts:  The empirical evidence shows that any statements of intent that actually reached investors did not dampen their desire to redeem on September 15.  Rather, redemption requests continued unabated for the balance of the day.   (Opp. Ex. C ¶¶6-10.)

7.   *The SEC's Assertion:  "Communicating with the rating agencies was one of Ledford's responsibilities."*  (SEC Mem. 11; see also p. 21.)

The Facts:  After the Bents declined to provide Moody's and Standard & Poor's with any firm commitments on the afternoon of September 15, and set up a time to talk later, the rating agencies tried to pump Ledford, the CIO, for information.  (SEC Ex. 24; Ex. 2-O.)  That is not because it was Ledford's job to communicate with the rating agencies.  On the contrary, as the

following telephone conversation between Bent II and Ledford makes clear, Ledford was

directed by Bent II at 10:22 A.M. on September 15 not to speak to the rating agencies, and was

told that the Bents would communicate with Moody's themselves (Opp. Ex. K):

| | |
|---|---|
| LEDFORD: | Hey Bruce.  You and your father spoke to Henry Shilling this morning? |
| BENT II: | Yeah. |
| LEDFORD: | Yeah.  Did – Any more thought on that because I had – He had – |
| BENT II: | No.  We're going to talk to him at 5:00.  You don't need, you don't need to do anything. |
| LEDFORD: | Oh, okay. |
| BENT II: | We've got it covered. |
| LEDFORD: | Alright.  Okay.  Thanks, Bruce. |

  The call in which Ledford allegedly made misrepresentations to Moody's occurred at

2:29 P.M.[2] – four hours after Ledford was told not to do anything because the Bents had "it

covered."  Defendants had no reason to believe Ledford would continue speaking to the rating

agencies.  They also did not expect Moody's to keep calling Ledford for unofficial information

after they spoke to Moody's directly and arranged to do so again later in the day.  Ledford

himself did not purport to be Defendants' spokesman, admitting in a conversation with Moody's

that he was "not necessarily in the loop." (Opp. Ex. L, 9:1.)  While the Moody's representative

has submitted a declaration describing his call with Ledford, he conspicuously avoids claiming

that anything Ledford privately told him affected the Fund's rating.  (SEC Ex. 79.)

  The SEC's treatment of Ledford belies its allegations.  It devotes an entire section of its

brief to Ledford's supposed "intentional misrepresentations to Moody's" (SEC Mem. 29), yet it

---

[2]  The SEC wrongly alleges in its Complaint that it was Bent II who made this statement to Moody's.  (Complt. ¶104.)  It has never sought to correct this error.

never even examined him under oath.   Nor did it name him as a defendant or seek any injunctive

relief against him, leaving him free to work in the securities industry and preferring to try to tag

the higher profile Bents with responsibility for his conduct as "control persons."

8.      *The SEC's Assertion:  Bent II "instructed the sales team to disseminate" his message of support for the Fund.*  (SEC Mem. 5.)

The Facts:  Bent II never instructed the sales team to disseminate his 1:19 e-mail.  He

simply told RMCI's sales and marketing managers that his message could be communicated "to

clients on an as needed basis." (Ex. 3-L)  RMCI's Director of Marketing, Eric Lansky, in turn,

assured Bent II that, while he wanted a document to use "in response" to investor calls, "we are

not posting anything on the web nor distributing anything proactively."  (Ex. 3-Y.)  Lansky

further instructed RMCI's sales team that Insights was "not to be shared proactively," but rather

was only to be referred to in responding to direct inquiries. (Opp. Ex. S.)  Bent II thus had every

reason to believe that nothing was being shown to investors.  While the SEC makes much of the

Monday 3:41 P.M. Bonanno e-mail to sales and marketing staff (SEC Ex. 49) describing Insights

as "approved," that email was never sent to Bent II.  (Opp. Ex. U.)

9.      *The SEC's Assertion:  Bent II "told Lansky to post [Insights] on Reserve's website at 9:36 P.M. on the 15th."*  (SEC Mem. 8.)

The Facts:  Bent II did not tell Lansky to post anything on the Website and did not

approve any postings.  Instead, in response to an e-mail in which Lansky said he "[w]ould like to

add stmt to website," Bent II wrote "okay, go ahead" – meaning go ahead and prepare a

statement for review, as was required for all RMCI web postings.  (Ex. 3-BB.)  No statement was

attached to Lansky's e-mail, and Bent II testified that he did not understand Lansky to be seeking

approval to post Insights on the Website.  (Ex. 3 ¶39.)

10.     *The SEC's Assertion:  "[N]obody ever told the Fund's sales force to stop spreading the news of RMCI's 'intent to support the Fund.'"*  (SEC Mem. 9.)

The Facts:  Insights was mistakenly posted on the Website at 8:15 A.M. on September

16, and removed less than three hours later.  (Ex. 4 ¶22.)  RMCI's General Counsel thereafter

advised Drahzal, RMCI's Director of Sales, to stop referring to Insights.  (Opp. Ex. J.)  Drahzal,

in turn, instructed the sales staff to stop using Insights, and he has testified that his staff did just

as instructed.  (Opp. Ex. I, 243:20-244:8.)  Although both Willkie and the SEC knew Insights

had appeared on the Website, neither advised Defendants to issue a correction.  In fact, Goldberg

told them to say nothing.  (Exs. 3-F, 125:22-127:24; 3-FF, 185:23-186:17; 3-C.)

Once the Bents told the Board that a support agreement would not be viable early on

September 16, communicating with investors was in the hands of the Independent Trustees, and

they determined the timing of the Fund's ultimate press release.  (Ex. 3 ¶47.)

11.     _The SEC's Assertion_:  *State Street stopped funding redemption requests at noon on September 15.*  (SEC Mem. 12.)

_The Facts_:   Despite having been provided with complete redemption data during the

investigative phase of this case, the SEC erroneously and repeatedly alleged in its Complaint that

State Street stopped funding redemptions at 10:10 A.M. on September 15.  (Complt. ¶¶9, 61,

101.)  In denying Defendants' motion to dismiss, the Court, which was required to treat the

SEC's allegations as true, attached significance to this allegation.  SEC v. Reserve Mgmt. Co.,

732 F. Supp. 2d 310, 315 (S.D.N.Y. 2010).  The SEC now says State Street stopped funding

redemptions at noon – two hours later than the Complaint alleges.  Even its "corrected" claim is

wrong.  As is clear from documentary evidence that has long been in the SEC's possession, State

Street funded redemptions until 5:28 P.M. on September 15, including redemptions requested as

late as 1:24 P.M., which was after the 1:00 Board meeting and before any communication with

investors about supporting the Fund's NAV.  (Ex. 4 ¶2; Ex. 4-A.)

12.     _The SEC's Assertion_:  *"[O]nce the rating agencies received the assurances of support that Defendants provided ..., neither put the Primary Fund on credit watch or downgraded its ratings."*  (SEC Mem. 11.)

_The Facts_:  Without acknowledging the irony, the SEC offers declarations from Moody's

and Standard & Poor's – entities the Financial Crisis Inquiry Commission called "essential cogs in the  wheel of financial destruction" that led to the Fund's collapse.  (Opp. Ex. W at xxv.) Moody's and Standard & Poor's hint in their declarations (but are careful not to say) that they would have downgraded the Fund's rating earlier than they did had they not waited to see a draft of RMCI's proposed support agreement.  The evidence does not bear them out.

Moody's and Standard & Poor's maintained their A1/P1 ratings for Lehman paper until after Lehman filed for bankruptcy, and they did not act with any greater dispatch in downgrading the Fund:  Moody's did not downgrade the Fund's rating until September 17 – the day after the Fund broke the buck.  (SEC Ex. 79 ¶20.)  Likewise, Standard & Poor's was still only threatening a downgrade nearly an hour after the Fund broke the buck.  (SEC Ex. 80 ¶16.)  More to the point, there is no evidence to support the SEC's implied theory that Defendants somehow strung the rating agencies along.  Both rating agencies insisted on seeing a draft of the support agreement.  (Ibid.; SEC Ex. 79 ¶15.)  The reason they did not receive a draft on September 15 was because the Fund's attorney, DiMartino (who had been waiting for the SEC to provide a sample), took until 7:16 P.M. to prepare her first draft.  (Ex. 3-T.)

There is, moreover, good reason to doubt the veracity of the declarations.  The Moody's representative, Shilling, says in his declaration that he was unable to reach any of Bent Sr., Bent II, and Ledford on September 16 (SEC Ex. 79 ¶19), but Bent II's telephone records show that Bent II placed a call to Shilling's direct line (553-1948) at 11:29 A.M. on September 16, which lasted almost 5 minutes.  (Ex. 3-A, p. 187439.)  Shilling did not call again until after the Fund announced it had broken the buck.  Likewise, the Standard & Poor's declarant implies he could not reach anyone from RMCI on September 16 (SEC Ex. 80 ¶15), but Bent II's records show a 5:24 P.M. call that day from Rizzo lasting over 15 minutes.  (Ex. 3-A, p. 187441.)

13.    _The SEC's Assertion_:  Bent II _"personally authorized the Reserve's statement to the Wall Street Journal_."  (SEC Mem. 9; see also p. 27.)

The Facts:  The SEC's argument is, at best, an irrelevancy: the *Journal* never actually published anything saying that RMCI intended to support the Fund.  A statement that is never communicated to investors is not actionable under the securities laws.

ARGUMENT

### I.  THE SEC CANNOT SUSTAIN ITS SUMMARY JUDGMENT BURDEN

The Second Circuit has held that a party moving for summary judgment "'bears a heavy burden of demonstrating the absence of any material issues of fact.'"  Nationwide Life Ins. Co. v. Bankers Leasing Ass'n, 182 F.3d 157, 160 (2d Cir. 1999).  To carry its "initial burden," the movant must "come forward with evidence on each material element of [its] claim or defense, thus demonstrating that [it] is entitled to relief."  Ernest Lawrence Group v. Mktg. the Ams., Inc., 2005 U.S. Dist. LEXIS 25307, *10 (S.D.N.Y. Oct. 26, 2005).  Where the plaintiff is the party who is seeking summary judgment, it "bears a much greater initial burden; it must show that the evidence supporting its claims is so compelling that no reasonable jury could return a verdict for the defendant."  SEC v. Meltzer, 440 F. Supp. 2d 179, 187 (E.D.N.Y. 2006).

"[T]he district court may not only rely solely on the statement of undisputed facts contained in the moving party's Rule 56.1 statement.  It must be satisfied that the citation to evidence in the record supports the assertion."  Vt. Teddy Bear Co., Inc. v. 1-800 BEARGRAM Co., 373 F.3d 241, 244 (2d Cir. 2004).  "[O]nly admissible evidence may be considered."  In re Parmalat Sec. Litig., 659 F. Supp. 2d 504, 516 (S.D.N.Y. 2009).

A court must "view the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the non-moving party."  Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995).  "Credibility determinations, the weighing  of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge."

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  Gauged by these standards, the

SEC's motion must denied.

II.  THE SEC HAS NOT COME CLOSE TO SHOWING THAT
IT IS ENTITLED TO JUDGMENT AS A MATTER OF LAW
ON ITS CLAIMS UNDER SECTIONS 10(b) and 17(a)

The SEC cannot prevail on its claims under §§10(b) of the Exchange Act and 17(a) of the

Securities Act without establishing that Defendants "(1) made a material misrepresentation or a

material omission as to which [they] had a duty to speak, or used a fraudulent device; (2) with

scienter; (3) in connection with the purchase or sale of securities."  SEC v. Monarch Funding,

192 F.3d 295, 308 (2d Cir. 1999).[3]  Although the SEC "must prove every element of its claim,"

SEC v. Rorech, 720 F. Supp. 2d 367, 404 (S.D.N.Y. 2010), here it has failed to come forward

with evidence on any of these elements sufficient to establish that no reasonable juror could find

for Defendants.  This requires the denial of its motion.

A.      The SEC Cannot Establish the "In Connection With" Element of Its Claims

The SEC does not seem to know what to say about the "in connection with the purchase

or sale" of a security element of its claims.  Its one-paragraph discussion of this amounts to little

more than a place holder which ignores the two reasons why it cannot establish this element as a

matter of law:  (1) statements to a Board are not "in connection with" the purchase or sale of a

security; and (2) statements designed to induce investors to hold their securities do not satisfy the

"in connection with" requirement.

1.      Representations to the Board Are Not Actionable Under §§10(b) and 17(a).

Section 10(b) only deals with "conduct designed to deceive or defraud investors."  Ernst & Ernst

v. Hochfelder, 425 U.S. 185, 199 (1976).  Realizing that its investor-based claims are especially

weak, the SEC has tried to bulk up its case by also alleging Board misstatements.  (See SEC

---

[3]        Unless otherwise indicated, citations are omitted and the emphasis is in the original.

Mem. 15.)  Representations to the Board are not, however, actionable under §§10(b) and 17(a).

TCS Capital Mgmt., LLC v. Apax Partners, L.P., 2008 U.S. Dist. LEXIS 19854, *52 (S.D.N.Y.

Mar. 7, 2008) ("the issue under the federal securities laws is whether [investor] was defrauded,

not whether the Board was defrauded"); Golar v. Daniels & Bell, Inc., 533 F. Supp. 1021, 1027

(S.D.N.Y. 1982) (claim that certain directors failed to make full disclosure to disinterested

directors did not state a claim under §10(b) because §10(b) requires "conduct in connection with

the purchase or sale of a security" and "there simply is no requisite securities transaction"); see

also Wright v. Ernst & Young LLP, 152 F.3d 169, 175 (2d Cir. 1998) (securities fraud requires

communication of misstatement to investors).

　　　　To the extent that the SEC is trying to base its §§10(b) and 17(a) claims on alleged

misrepresentations to the Board, it cannot satisfy the "in connection with" requirement.  Thus,

the parties entitled to summary judgment are Defendants – not the SEC.

　　　　2.　　　Statements Intended to Induce Investors Not to Redeem Are Not "In Connection

With" the Purchase or Sale of a Security.  As Defendants explained in their own summary

judgment motion, statements allegedly intended to induce investors not to redeem are not "in

connection with" the purchase or sale of a security, and are not actionable under §§10(b) and

17(a).  Rather than repeat the same explanation here, we incorporate it by reference.  (Opp. Ex. A

p. 18.)  SEC v. Northshore Asset Mgmt., 2008 U.S. Dist. LEXIS 36160, *27 (S.D.N.Y. May 5,

2008) (summary judgment granted dismissing SEC's claim that defendant committed fraud by

inducing investor not to redeem, holding "[t]his is insufficient to demonstrate the 'in connection

with a purchase or sale' requirement").  This also applies to statements that allegedly induced an

investor not to transfer to another Reserve Fund and to continue holding Fund shares.

　　　　Thus, for the same reasons this Court should dismiss the SEC's claims that Defendants

committed securities fraud by inducing investors not to redeem, the SEC cannot satisfy the "in

connection with" element of its claims under §§10(b) and 17(a).

        3.      <u>The SEC's Evidence of Purchases Is Improper and Does Not Satisfy the "In Connection With" Requirement</u>.  Implicitly recognizing that its Complaint was fundamentally flawed because it was all about inducing investors not to redeem, the SEC has now managed to drum up declarations from four previously unidentified investors, all of whom claim a purchase on September 15 or 16.  Even if these declarations are considered – and, for the reasons set forth in Defendants' motion to preclude, they should not be – they do not help the SEC.

        "To satisfy the 'in connection with' requirement, ... more than a purchase is required.  That is, there must be a causal connection between a defendant's misstatements or omissions and the plaintiff's purchase." <u>Troyer</u> v. <u>Karcagi</u>, 476 F. Supp. 1142, 1148 (S.D.N.Y. 1979), citing, <u>inter alia</u>, <u>SEC</u> v. <u>Texas Gulf Sulphur Co.</u>, 401 F.2d 833, 860 (2d Cir. 1968)); <u>Abrash</u> v. <u>Fox</u>, 805 F. Supp. 206, 208 (S.D.N.Y. 1992) (same).  Here, none of the declarations establish the requisite causal connection between the alleged misstatements and a subsequent purchase.

        Indeed, two of the four declarants do not claim to have received any statement about credit support.  Brian Moore of Fidelity National Financial, Inc. only claims that, when he called RMCI on September 16, he "was told that the Primary Fund had received significant redemption requests the prior day and that they had experienced difficulty in processing the volume of the requests" (which, in fact, is what happened), following which he authorized a purchase.  (SEC Ex. 81, ¶5) And John Boyd of Supervalu, Inc. offers only undisguised speculation:  "I was out of contact with Supervalu's offices ... through Wednesday, September 17, 2008.  However, had I been in the office and had S&P or Moody's issued such an alert prior to Supervalu's investment in the Primary Fund on September 15, 2008, I would not have approved that investment."  (SEC Ex. 82, ¶6) There is no causal connection there either.

        Brian Gamble of Henry Ford Health Systems, in turn, claims that at around 9:30 A.M on

the morning of September 16, "we were assured by Elliott Goldstein that ... RMCI ... would

stand behind the Primary Fund to protect its NAV, and at 9:35 A.M. Mr. Goldstein emailed us a

copy of the Insights publication providing substantially identical  assurances."  (SEC Ex. 84, ¶2)

RMCI's records show that the only purchase Henry Ford made on either of those two days was

at 11:15 A.M. on September 15 – almost a full day before Henry Ford was told of possible credit

support.  This, too, does not satisfy the "in connection with" requirement.  Freschi v. Grand Coal

Venture, 551 F. Supp. 1220, 1227 (S.D.N.Y. 1982) ("there can be no causal connection where

the alleged misrepresentation or omission occurred after the purchase").

    That leaves only the declaration of Tracy Reeg of Principal Financial Group, Inc.[4]

Reeg claims that at 7:01 P.M. on September 15 one of its analysts received a copy of Insights by

e-mail and, "as a result," decided to purchase $41.2 million Fund shares on September 16.  (SEC

Ex. 83, ¶7).  Principal is the only investor the SEC has identified as having seen Insights and

then making a purchase.  If the SEC wants to base its whole case on this investor, it will still

have to demonstrate materiality, which is addressed below.

B.    The SEC Cannot Establish A Material Misstatement

    The SEC's discussion of materiality is basically boilerplate.  Whether information about

a company's financial condition might be important to investors under other circumstances,

nothing Defendants supposedly said after 1:24 P.M. on September 15 was material here because

an appreciable number of investors could not have used the information once State Street

stopped funding new redemption requests.  Feit v. Leasco Data Processing Equip. Corp., 332

F. Supp. 544, 571 (S.D.N.Y. 1971) (no materiality unless "a rational connection exists between

its disclosure and a viable alternative course of action by any appreciable number of investors").

---

[4]    The SEC did not identify Principal as a witness, except as a group of 90,000 Fund investors.  Defendants thus had no opportunity to depose Principal.  If Principal's declaration is not precluded, Defendants should be allowed to depose Principal under Fed. R. Civ. P. 56(d).

This point is discussed more fully in Defendants' own summary judgment motion, which is incorporated herein by reference.  (See Opp. Ex. A, pp. 20-23.)

If the alleged misstatements were not immaterial as a matter of law, materiality would raise an issue of fact.  As the court pointed out in SEC v. Biovail Corp., 2010 U.S. Dist. LEXIS 59700, **7-8 (S.D.N.Y. June 16, 2010), "summary judgment on the issue of materiality may be inappropriate even when the material facts are undisputed as those facts are 'merely the starting point' for the 'delicate assessment of the inferences a reasonable shareholder would draw from a given set of facts and the significance of those inferences to him.'"

In this case, a reasonable juror could conclude that statements of intent describing what RMCI was planning to do, but had not yet done, were immaterial.  Until RMCI obtained SEC approval and implemented a support agreement, investors would have understood  there to be no assurance the Fund's NAV would remain at $1.00.  Biovail, supra, *10 (unclear whether alleged misstatements were material where "surrounded by other statements indicating that the results were preliminary and subject to revisions"); Meltzer, supra, 440 F. Supp. 2d at 190 ("Materiality is a 'fact-specific inquiry,' and a 'relative concept, so that a court must appraise a misrepresentation or omission in the complete context in which the author conveys it'").

And that is what in fact happened.  In September 2008, the Fund had approximately 90,000 investors.  Now, years later, the SEC has identified only one investor who purports to have seen the alleged misstatement prior to purchasing.  By contrast, during those same two days, over two thousand investors requested redemptions – and the pace at which they did so was unaffected by anything Defendants said.  (Opp. Ex. C ¶¶6-10.)  Based on this investor behavior alone, a reasonable juror could conclude that the alleged misstatements were immaterial.  The SEC thus cannot establish materiality.

C.      The SEC Cannot Establish the Falsity Element of Its Claims

The SEC concedes that the statements at issue here are "statements of intent" (SEC Mem. 3, 17-18, 25-26) – not statements of fact.  Such statements would only be false if they did not reflect the speaker's true intent when they were made.  Va. Bankshares v. Sandberg, 501 U.S. 1083, 1093 (1991) (holding that to be actionable, statements of belief and opinion must be "made with knowledge that the [speakers] did not hold the beliefs or opinions expressed"); see also In re Salomon Analyst AT&T Litig., 350 F. Supp. 2d 455, 466 (S.D.N.Y. 2004) ("It is not sufficient for [purposes of falsity and scienter] to allege that an opinion was unreasonable, irrational, excessively optimistic, not borne out by subsequent events, or any other characterization that relies on hindsight or falls short of an identifiable gap between the opinion publicly expressed and the opinion truly held") (emphasis added).

In its brief, the SEC does not challenge Defendants' "belief that they could support the Fund."  It only claims this belief lacked "a reasonable basis."  (SEC Mem. 17.)  That contention, even if correct, would mandate denial of the SEC's motion.  The Supreme Court held in Va. Bankshares that a party can only be liable for statements of intent, such as those at issue here, if actual knowledge of falsity is shown.  The SEC claims that Va. Bankshares permits a statement of intent to be shown false by "facts … available to the speaker" (SEC Mem. 16), but the case says no such thing.  The SEC has improperly imported the "recklessness" concept, which applies to scienter, into its discussion of falsity.  In re Bank of Am. Corp. Secs., 2010 U.S. Dist. LEXIS 89199, *116 (S.D.N.Y. Aug. 27, 2010) (noting "prevailing conclusion" among District Courts in Second Circuit that recklessness cannot satisfy subjective falsity requirement).

Even under the SEC's erroneous legal standard, it cannot satisfy its summary judgment burden to show falsity.  Defendants have presented ample evidence that their statements about credit support accurately reflected their intent at the time they were made and were not subject to

any undisclosed conditions. (Ex. 2 ¶36; SEC Ex. 2, 77:19-78:2; Ex. 2-B, 90:22-91:2.) While the SEC may disagree, it has not come forward with evidence so compelling that no reasonable juror could find in Defendants' favor. None of the cases the SEC cites (SEC Mem. 16-17) indicate that questions about whether Defendants really intended to do what they said can be decided on summary judgment. Va. Bankshares, supra, 501 U.S. at 1090 (interpreting jury verdict); Luce v. Edelstein, 802 F.2d 49, 56 (2d Cir. 1986) (holding on appeal from motion to dismiss that "[p]lausible allegations that defendants made specific promises to induce a securities transaction while secretly intending not to carry them out or knowing they could not be carried out ... are sufficient ... to state a claim for relief under Section 10(b)"); United States v. Autuori, 212 F.3d 105, 119 (2d Cir. 2000) (reversing trial court's entry of judgment of acquittal after jury verdict where "jury could infer that Autuori's statements were representations that contradicted his honest view"); SEC v. Infinity Group Co., 212 F.3d 180, 193 (3d Cir. 2000) ("view[ing] the evidence in the light most favorable to the SEC as verdict winner").

If anything, the SEC's cases confirm what the Second Circuit has repeatedly held – that "[i]ssues of motive and intent are usually inappropriate for disposition on summary judgment." Wechsler v. Steinberg, 733 F.2d 1054, 1058 (2d Cir. 1984); Press v. Chem. Inv. Servs. Corp., 166 F.3d 529, 538 (2d Cir. 1999) ("Whether a given intent existed is generally a question of fact, appropriate for resolution by the trier of fact"); SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996) (same); accord SEC v. Caserta, 75 F. Supp. 2d 79, 93 (E.D.N.Y. 1999) ("Ascertaining one's state of mind is a quintessential factual exercise").

Given the factual nature of the intent inquiry, it is not surprising that the SEC has failed to cite a single case in which the Court found scienter as a matter of law. What is surprising is that the SEC moved for summary judgment at all since even the cases that it cited all hold that intent presents an issue of fact which should be decided by the jury.

D.     The SEC Cannot Establish the Scienter Element of Its Claims

1.     The SEC Cannot Establish Recklessness As a Matter of Law.  Even as to the scienter element, the SEC misapprehends the recklessness standard for securities fraud in the Second Circuit, which requires a showing of "a state of mind *approximating actual intent,* and *not merely a heightened form of negligence.*"  South Cherry St., LLC v. Hennessee Group LLC, 573 F.3d 98, 109 (2d Cir. 2009).  Accord Biovail, supra, 2010 U.S. Dist. LEXIS 59700, *15 (denying summary judgment where defendant's actions "may well reflect mismanagement and possibly negligence.  Perhaps they were worse.  But this record does not compel the conclusion that he acted with an 'egregious refusal to see the obvious, or to investigate the doubtful'"); see In re Wachovia Equity Secs. Litig., 753 F. Supp. 2d 326, 367 (S.D.N.Y. 2011) (fraud claim dismissed where it appeared that "Defendants simply did not anticipate the full extent of the mortgage crisis and the resulting implications for the Pick-A-Pay loan portfolio.  Although a colossal blunder with grave consequences for many, such a failure is simply not enough to support a claim for securities fraud.  Bad judgment and poor management are not fraud, even when they lead to the demise of a once venerable financial institution").

The SEC does not even remotely satisfy the recklessness standard for scienter here.  Indeed, in In re Phillips Petroleum Sec. Litig., 881 F.2d 1236 (3d Cir. 1989) – the SEC's main case on the subject of recklessness – the court held the jury would have to decide whether defendant was reckless in stating its intent.  The SEC cites Phillips as authority for the sweeping proposition that, "[w]here a statement of intent is made in the fast-moving securities market, the speaker is reckless in making it unconditional because circumstances might change that could cause him to change his mind" (SEC Mem. 25), but the Court in Phillips articulated no such categorical rule.  What it actually held was that, while "a subsequent change of intention will not, by itself, give rise to a cause of action under Section 10(b) or Rule 10b-5," "a jury could ...

<u>reasonably find</u> making the statements [of intent] to be an extreme departure from the standards of ordinary care" where it is foreseeable that the defendant's intention may change.  <u>Id.</u> at 1247 (emphasis added).  Even were <u>Phillips</u> applicable here, the most it would establish is that intent raises a triable issue of fact – not that summary judgment is appropriate.

But the facts in <u>Phillips</u> are so different from the facts in this case that the SEC cannot even rely on it to create an issue of fact about whether it was reckless for Bent II to state that RMCI intended to support the Fund.  The defendant in <u>Phillips</u> was a partnership led by corporate raider T. Boone Pickens.  Between December 4 and 24, the partnership issued press releases and filed a Schedule 13-D, along with eight amendments, stating that it would "'not sell any Phillips shares owned by it back to Phillips except on an equal basis with all other shareholders.'" <u>Id.</u>, 881 F.2d at 1239.  Despite these repeated assurances, the partnership later agreed to sell its shares back to Phillips on terms different from those offered to other shareholders.  The shareholders then sued for fraud, claiming that the partnership's statements were reckless.  The Third Circuit held that, even though the partnership's statements of intent "needed only to be true when made," a jury could "reasonably find" "<u>given the foreseeability of what actually occurred</u>," that it was reckless for the partnership to repeat its unequivocal statements as the tender offer progressed, thereby reinforcing the perception that its intention would not change "no matter what." <u>Id.</u>, 881 F.2d at 1247-1248 (emphasis added).[5]

---

[5]     The SEC also claims that <u>SEC</u> v. <u>Jakubowski</u>, 150 F.3d 675 (7th Cir. 1998), shows Bent II was reckless in supposedly failing to read an e-mail referring to Insights as "approved."  (SEC Mem. 27.)  (In fact, Bent II never received the email. (Opp. Ex. U.))  In any event, the facts in <u>Jakubowski</u> could not be more different.  Jakubowski was a Skadden attorney who filled out multiple forms stating that stock was being purchased for the account of a secretary when it was actually being purchased for a venture capital firm which could not itself have made the purchase.  When Jakubowski – who was paid $50,000 for his efforts – claimed he had not read the prospectus and was unaware of any restrictions, the Court found that, even if he had not read the prospectus, the forms he personally completed stated that subscription rights could not be transferred.  The Court added:  "for a lawyer to fail to read a document central to a business transaction is reckless indeed."  <u>Id.</u>, 150 F.3d at 681.

Even if the Second Circuit would have reached the same result that the Third Circuit reached in <u>Phillips</u> – and the Second Circuit has never so much as string-cited <u>Phillips</u> in the 22 years since it was decided – a reasonable jury could make no comparable finding of recklessness here because what actually occurred was not foreseeable. Unlike the partnership in <u>Phillips</u>, Defendants in this case were not corporate raiders who deliberately made repeated disclosures over a period of several weeks in connection with a planned corporate takeover; Defendants were instead dealing with the start of an unprecedented worldwide financial crisis caused by factors of which they were unaware. They did not foresee, when they stated RMCI intended to support the N.A.V., that the market would not return to normal after the initial shock of the Lehman filing and would instead suddenly collapse, leaving the Fund with massive redemptions and without liquidity – a problem far beyond RMCI's capacity to resolve.

Recent authority establishes that the 2008 financial crisis was indeed unforeseeable. <u>See</u> <u>Wachovia</u>, <u>supra</u>, 753 F. Supp. 2d at 356 ("To find scienter on these facts would be to assume that the duration of the financial crisis was both inevitable and foreseeable to Defendants"); <u>Plumbers & Steamfitters Local 773 Pension Fund</u> v. <u>Canadian Imperial Bank of Commerce</u>, 694 F. Supp. 2d 287, 301 (S.D.N.Y. 2010) (defendant "could not have been expected to anticipate the [financial] crisis with the accuracy Plaintiff enjoys in hindsight"). A reasonable juror could therefore find that Defendants were not reckless for failing, in the SEC's words, to "appreciat[e] that the situation might require them to change their minds." (SEC Mem. 25.)

To establish scienter based on recklessness, the Second Circuit has required evidence showing "defendants' knowledge of facts or access to information contradicting their public statements." <u>Novak</u> v. <u>Kasaks</u>, 216 F.3d 300, 308 (2d Cir. 2000). For example, in <u>SEC</u> v. <u>McNulty</u>, 137 F.3d 732, 741 (2d Cir. 1998), the Second Circuit affirmed an order refusing to vacate a default judgment of recklessness where there was evidence that defendant had included

false statements in SEC filings after being advised by outside counsel not to file the documents. Here, the opposite happened:  when one of the Willkie layers (who was a former Director of the SEC's Division of Investment Management) was shown a draft statement saying that RMCI "intends to protect the NAV on the Primary fund to whatever degree is required" (Ex. 3-V), he did not direct RMCI not to make the statement.  (Exs. 3-V; 3-K, 130:1-132:19.)

In short, the most that the SEC could possibly hope to show on recklessness would be a triable issue of fact.  Either way, the SEC is not entitled to summary judgment.

2.      Defendants' Expert Reports Further Reinforce Lack of Scienter.  If any of the SEC's claims survive, Defendants will offer qualified testimony from two experts – one on securities markets and the other on corporate governance – who will further rebut any inference of scienter.  See SEC v. Snyder, 292 Fed. Appx. 391, 401 (5th Cir. 2008) (expert testimony may be probative, but not determinative, as to whether defendants acted with scienter).  The first of Defendants' experts is Prof. Richard Painter, the S. Walter Richey Professor of Corporate Law at the University of Minnesota Law School.  Prof. Painter will opine that, as a result of the Lehman bankruptcy, Defendants faced escalating problems far different from anything an investment adviser in the money market fund business had before experienced and that, in dealing with these once-in-a-lifetime events, Defendants made certain assumptions that were reasonable at the time, and certain disclosures consistent with these assumptions.  (Opp. Ex. D-1.)

Defendants' other expert is Prof. Lisa M. Fairfax, the Leroy Sorenson Merrifield Research Professor of Law at the George Washington University School of Law.  Prof. Fairfax will opine that the Bents' actions on September 15 and 16 – including their eight meetings with the Board, and their reliance on advice of counsel – comported with good corporate governance principles, and were inconsistent with an intent to defraud.  (Opp. Ex. E-1.)

The SEC will not be able to challenge Defendants' experts' opinions with its own experts

because it retained none.  Defendants' unrebutted experts reports create issues of fact that cannot be resolved on summary judgment.  See SEC v. Biovail Corp., 2010 U.S. Dist. LEXIS 27604, *4 (S.D.N.Y. Mar. 18, 2010) (where parties offered opposing expert reports on falsity, "[t]his alone is sufficient to defeat this aspect of ... motion for summary judgment").

       3.     A Valid Advice of Counsel Defense Exists Here.  Where a fraud claim is based on conduct the defendant was advised by counsel could properly be undertaken, reliance on such advice "has been recognized as a viable defense to scienter in securities fraud cases." Caserta, supra, 75 F. Supp. 2d at 94.  The defense "is available when the person asserting it can show that (i) he made a complete disclosure of the relevant facts to counsel; (ii) he received advice from counsel that the conduct in question was legal; and (iii) he relied on that advice in good faith." SEC v. Leffers, 289 Fed. Appx. 449, 451 (2d Cir. 2008).  Where a defendant alleges that it acted on advice of counsel, the defense generally presents a "triable issue" of fact.  Leberman v. John Blair & Co., 880 F.2d 1555, 1560 (2d Cir. 1989).

      Defendants can establish an advice of counsel defense here.  First, all the relevant facts were disclosed to the Willkie attorneys.  DiMartino and Goldberg had attended the Board meetings (Exs. 2-I; 2-J); they knew Bent Sr. told the Board he thought sufficient capital could be made available to support the Fund (Ex. 2-I); they drafted a support agreement which called for RMCI to provide $10 million in support – but could be increased (Ex. 3-R;  Ex. 2-K, 67:17-25); and they knew RMCI planned to tell the public that it "intends to protect the NAV on the Primary Fund to whatever degree is required" (Ex. V).  (Indeed, the SEC is not merely trying to hold Defendants liable for actions they took in reliance on the advice of counsel, which would be bad enough, but for actions taken by counsel themselves, such as Willkie's use of a $10 million cap in the support agreement. (Exs. 3-R; 3-S.))  Second, the Willkie attorneys advised Bent II and RMCI's in-house attorney that the disclosures could be made.  (Exs. 3-E, 52:1-53:9, 57:7-

59:18; 3-F, 82:5-11; 3-V; 3-K, 130:1-132:19.)  Third, Defendants strictly followed all the advice they were given.  (See, generally, Defendants' Advice of Counsel Timeline.)  Their reliance on the advice of counsel further precludes a finding of scienter.

        4.      Ledford's Statements to Moody's Were Unauthorized and Cannot Be Imputed to RMCI.  Other than the Bents, Ledford is the only specific employee whose statements the SEC seeks to impute to RMCI.  There are two problems with the SEC's attempt to hold RMCI liable for Ledford's statements:  1) the statements were not within the scope of Ledford's employment; 2) Ledford's state of mind cannot be determined as a matter of law.

        First, as the SEC concedes, nothing Ledford said can be imputed to RMCI unless it was within the scope of his employment.  (SEC Mem. 28.)  See In re Parmalat Sec. Litig., 684 F. Supp. 2d 453, 472 (S.D.N.Y. 2010) ("A principal is not charged with the acts or knowledge of an agent when the agent acts outside the scope of the agent's employment").  Although the SEC says that "[c]ommunicating with the rating agencies was one of Ledford's responsibilities as CIO" and that "the Bents were aware that Ledford performed that role" (SEC Mem. 29), the evidence actually shows that, at 10:22 A.M. on September 15, Bent II told Ledford that he and his father were "going to talk to [Moody's] at 5:00. ... [Y]ou don't need to do anything. ... We've got it covered."  (Opp. Ex. K.)  At a minimum, this instruction raises a factual issue about whether Ledford was authorized to speak to Moody's after 10:22 A.M.  Once Moody's dealt with the Bents directly, it knew it should communicate with them – not Ledford.

        Second, where an employee is acting within the scope of his authority, his conduct can only be imputed to his employer if the plaintiff can show that the employee "committed a culpable act with the requisite scienter... ."  Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc., 531 F.3d 190, 195 (2d Cir. 2008).  While the SEC has produced the transcripts of two telephone calls from which it purports to discern Ledford's state of mind, that

is not enough to determine whether Ledford acted with scienter, which "is considered to be subjective in nature" and inappropriate for summary disposition.  SEC v. Johnson, 2005 U.S. Dist. LEXIS 4732, *9 (S.D.N.Y. Mar. 24, 2005).  Ledford himself was not deposed.

As an afterthought, the SEC tacks onto its discussion of Ledford a sentence referring to unspecified "RMCI employees' knowledge about State Street's refusal to extend additional overdraft protection ... and the Fund's inability to sell sufficient assets to address that problem" – matters about which the SEC contends RMCI should have informed "the Board and the public." (SEC Mem. 29.)  But RMCI had no duty to inform the public about either matter; it informed the Board about both on the morning of September 16; any failure to inform the Board would not, in any case, be actionable under §§10(b) or 17(a); and there is no evidence any RMCI employee acted with scienter concerning the disclosure of these matters.

### III.  THE SEC CANNOT ESTABLISH ALL OF THE ELEMENTS OF CONTROL PERSON LIABILITY UNDER §20(a)

In Point III of its brief, the SEC finally makes clear that its control person claim seeks to hold the Bents liable for (1) their own conduct and (2) Ledford's communications with rating agencies.  (SEC Mem. 34.)  It cannot prevail on either theory.  First, the SEC's assertion that "most of the wrongdoing by the Entity Defendants was in fact committed by Bent Sr. and Bent II" (SEC Mem. 34), even if true, would not give rise to a control person claim.  In Kalnit v. Eichler, 85 F. Supp. 2d  232, 246 (S.D.N.Y. 1999), aff'd, 264 F.3d 131 (2d Cir. 2001), the Court rejected a control person claim against defendants alleged to be primary violators:

> Under plaintiff's theory, however, the Directors would be primary violators rather than control persons, because primary liability may be imposed '"not only on persons who made fraudulent misrepresentations but also on those who had knowledge of the fraud and assisted in its perpetration.'" ...  Therefore, ... the Directors could not be control persons and section 20(a) does not apply.

Having sued Bent II as a primary violator, the SEC cannot also seek to hold him liable for the same conduct as a control person.  There is an additional reason why the SEC cannot impose

control person liability on Bent II based on Ledford's conduct.  To establish a prima facie claim

under §20(a), the SEC would have to prove "(1) a primary violation by the controlled person, (2)

control of the primary violator by the defendant, and (3) that the defendant was, in some

meaningful sense, a culpable participant in the controlled person's fraud." ATSI Communs., Inc.

v. Shaar Fund, Ltd., 493 F.3d 87, 108 (2d Cir. 2007).  Control of the primary violator requires

that "[t]he Section 20(a) defendant must not only have actual control over the primary violator,

but have 'actual control over the *transaction* in question.'" In re Alstom SA Secs. Litig., 406 F.

Supp. 2d 433, 487 (S.D.N.Y. 2005).

    The Bents did not have actual control over Ledford's conduct and were not a culpable

participant in anything Ledford allegedly did.  At 10:22 A.M. on September 15, Bent II told

Ledford not to communicate with the rating agencies. (Opp. Ex. K.)  The SEC therefore cannot

state a control person claim at all.  If its control person claims are not dismissed outright – as

they should be – the evidence is more than sufficient for a reasonable juror to find in the Bents'

favor.  The SEC should be denied summary judgment on this claim.

### IV.  THE SEC CANNOT ESTABLISH A RIGHT TO RELIEF ON ITS ADVISERS ACT CLAIMS

A.    No Violation of §§206(1) and (2) Can Be Shown

    The SEC seeks to hold the Bents liable for violating §206 of the Advisers Act which only

proscribes conduct by "investment advisers."  The Bents, however, were not investment advisers.

Bent II was not even a member of RMCI's Credit Committee.  (Ex. 2-A, 47:7-10; 51:8-10.)

While the Bents were both officers of RMCI, which was an investment adviser, that did not

make them investment advisers, and they cannot be personally liable under §206.  SEC v.

PIMCO Advisors Fund Mgmt. LLC, 341 F. Supp. 2d 454, 470 (S.D.N.Y. 2004) ("SEC may not

charge Treadway and Corba [the investment adviser's CEO] with violations of Section 206(1) or

206(2), directly, since they are not themselves investment advisers covered by the statutory

provisions").

The SEC's discussion of the facts relevant to its Advisers Act claims is also flawed, beginning with its assertion that "RMCI, Bent Sr., and Bent II withheld critical information from the Trustees on September 15." (SEC Mem. 31.) This is followed by a list of seven pieces of information the SEC claims it is "undisputed" Defendants withheld. As with the balance of the SEC's factual recitation, nothing the SEC calls "undisputed" here is actually undisputed. Indeed, the SEC cannot establish the most basic fact that anything was withheld. For the proposition that "information was not shared with the Board" on September 15, the only evidence the SEC offers is the 1:00 P.M. Board minutes. (SEC Rule 56.1 Statement ¶¶96-100, 103-106.) As Bent Sr. has explained, and the SEC well knows: "Minutes of a board are the synthesis of what was said. It's not a verbatim recitation." (Ex. 2-B, 112:17-18). Here, the audio recordings of the first two Board meetings on September 15, 2008 bear this out, as they show far more information being conveyed than the minutes reflect. (Exs. 2-G; 2-H; 2-I.) And even for the unrecorded meetings, the testimony from the participants does not support the SEC's theories:

- _Alleged Board Non-Disclosure #1_: "State Street's warning on September 12 that it 'may have difficulties [funding redemptions] Monday morning'; its suspension of funding for redemptions requested after approximately 10:10 a.m.; and its communicated overdraft limit for the Reserve on September 15."

The Facts: On the audio recording of the 9:30 A.M. Board meeting, Bent II is heard telling the Board that "our custody bank [State Street] is not necessarily sending out wires [in payment of redemption requests] as soon as they get instructions from us." (Ex. 2-H, p. 16:11-13.) The Board thus knew of redemption delays early Monday morning.

State Street did not suspend "funding for redemptions requested after approximately 10:10 a.m." The data shows that State Street was still wiring out redemption payments as late as 5:28 p.m. that day for redemption requests made as late as 1:24 p.m. (See Ex. 4 ¶2; Ex. 4-A.)

Nor did State Street communicate an "overdraft limit for the Reserve on September 15."  Rather, a State Street officer is recorded telling RMCI that that the "2:30 timeframe is probably a safe bet" for all wires to go out.  (Ex. 4-E.)  At the 10:00 A.M. meeting the next morning, the Board was told State Street did not want to keep extending the overdraft.  (Ex. 2-J p. 1.)

If what the SEC is alleging is that Defendants violated §§206(1) and (2) by failing to convene a ninth Board meeting in order to discuss State Street developments sometime between 1:00 P.M. on September 15 and 10:00 A.M. on September 16, it is not clear what the SEC would have had Defendants disclose or what it thinks the Board could have done.  For much of September 15, State Street sent mixed signals, and Bent II tried to get clarification from State Street into Monday evening.  State Street itself did not seem to know what to do:  an internal e-mail sent at 6:24 P.M. on September 15 indicates that it did not update RMCI because it was "[s]till a very confusing picture."  (Ex. 4-I.)

It is well-settled that managers may take a "reasonable time" to properly inform themselves before disclosing potentially negative information.  Slayton v. Am. Express Co., 604 F.3d 758, 777 (2d Cir. 2010)  ("Taking the time necessary to get things right is both proper and lawful.  Managers cannot tell lies but are entitled to investigate for a reasonable time, until they have a full story to reveal").  "Defendants are permitted a reasonable amount of time to evaluate potentially negative information and to consider appropriate responses before a duty to disclose arises."  In re Elan Corp. Sec. Litig., 543 F. Supp. 2d 187, 217 (S.D.N.Y. 2008).  Here, Bent II knew nothing definitive until 7:00 P.M. on Monday, and he timely reported that information to the Board at 10:00 A.M. on Tuesday morning.  (Ex. 2-J.)

The SEC cites no authority suggesting that a violation of §§206(1) and (2) occurs when, in the heat of a financial crisis, an investment adviser discloses information to a fund's Board at 10:00 A.M. on a Tuesday rather than at 5:00 P.M. the prior evening.  Neither of the only two

cases it mentions in discussing §§206(1) and (2) is even remotely comparable:  <u>SEC</u> v. <u>Tambone</u>, 550 F.3d 106, 146 (1st Cir. 2008), <u>rev'd on other grounds</u>, 597 F.3d 436 (1st Cir. 2010), involved an investment adviser who was held liable under §206 for knowingly allowing preferred investors to engage in short-term and excessive trading to the detriment of long-term investors, and <u>SEC</u> v. <u>Batterman</u>, 2002 WL 31190171, *8 (S.D.N.Y. Sept. 30, 2002), involved an investment adviser who failed to disclose that he was a felon who had previously been sanctioned by the SEC and the New York Stock Exchange, and then misrepresented the fund's performance.  (SEC Mem. 31.)  That these are the only cases the SEC was able to find should tell the Court all it needs to know about whether an investment adviser has ever been held liable under §§206(1) and (2) for anything like the conduct alleged here.

- *<u>Alleged Board Non-Disclosure #2</u>:*  *"The Fund had incurred an $8 billion debt [i.e., daylight overdraft] to State Street."*

    <u>The Facts</u>:  This claim does not appear anywhere in the SEC's self-proclaimed "detailed" Complaint (Opp. Ex. M, p.1) and did not surface until summary judgment.  As Defendants note in their preclusion motion, the law prohibits the SEC from ambushing Defendants in this manner. Even were the Court to consider this untimely argument, daylight overdraft is common industry practice, and there is no evidence the Board did not know about it here.  The SEC only cites to the 1:00 P.M. September 15 Board minutes, but that document reflects that CFO Farrell made a presentation on redemption issues, which necessarily would have included the subject of State Street's daylight overdraft.  (Ex. 2-I pp. 3-4.)  The overdraft issue is also expressly identified in the minutes of the 10:00 A.M. Board meeting on September 16.  (Ex. 2-J, p. 1.)  Since the Board did nothing based on that disclosure, there is no reason to believe that a slightly earlier disclosure of the exact same information would have been material.

- *<u>Alleged Board Non-Disclosure #3</u>:*  *"Lehman commercial paper was trading at levels far below the .80 fair value that the Board had assigned to the Fund's Lehman paper."*

The Facts:  Michael Luciano, RMCI's then-Portfolio Manager, explains in his declaration (Opp. Ex. B) that there were no institutional trades of Lehman paper on September 15-16, a fact CIO Ledford accurately conveyed to the Board. (Ex. 2-H, p. 4; Opp. Ex. B-2, pp. 5-7.)  What the SEC is pointing to, by contrast, are individual trades, most for $50,000 or less.  (SEC Ex. 105 at Exs. B-E.)  Luciano was not aware of those trades, nor would they have been meaningful to him, as he needed an institutional buyer for $785 million of paper. (Opp. Ex. B)

There is no question that these small individual trades would not have been material to the Board either:  Montgoris expressly confirmed as much.  As the former CFO and COO of Bear Stearns, he was in a position to understand the significance of trades, and he testified that "one of the things we discussed was if you could sell the Lehman paper at the best price you could, if it was significant amounts of paper that would be a consideration that we would use in determining market value.  If it was small pieces that really were not indicative of what you could sell 750 million for, that would not be indicative of a price to us... ." (Opp. Ex. H: 90:7-19.)  Since this testimony undermines its claim, the SEC simply ignores it.

- _Alleged Board Non-Disclosure #4_:  "The ratings agencies had expressed concerns about maintaining the Fund's ratings."

The Facts:  Once again, the SEC provides no evidence for its claim that this information was withheld from the Board.  In any event, when asked if he would have wanted to know about a rating downgrade on September 15, Montgoris answered (Opp. Ex. H, 23:24-24:10):

> A.   I'm going to kind of stick with the answer I gave you because with all the turmoil that was taking place on the 15th, if one of the rating agencies was going to call and say that they were thinking about downgrading the fund, that would have been very low on the scale of information that I would have wanted to know about.

As this testimony shows, rating agency information was not material to the Board.

- _Alleged Board Non-Disclosure #5_:  "Management had instructed that no sales of assets be made at less than par."

The Facts:  This alleged non-disclosure is not hinted at in the Complaint and thus represents another post-discovery attempt by the SEC to supplement its pleadings.  As evidence of non-disclosure, the SEC again cites only the minutes.  The SEC could have asked Bent II at any of his four SEC examinations whether he told this to the Board, but chose not to.  Goldberg – one of the Fund's attorneys – was certainly aware of the decision.  (Ex. 3-EE.)  In any event, the SEC offers no explanation as to why RMCI's decision not to sell assets at a loss would have been material.  That was standard practice in the money market fund business.

- *Alleged Board Non-Disclosure #6:  "Bent II had made overtures to investment bankers about selling RMCI and to the Fed for help."*

The Facts:  The minutes of the 10:00 A.M. September 16 meeting reflect that both of these facts were fully disclosed to the Board.  (Ex. 2-J p. 2.)  The SEC does not explain why earlier disclosure would have been material.  Given that the Board did nothing with that very information once it was received, but instead held five more meetings before re-pricing the NAV, such information is *per se* immaterial.  Indeed, Montgoris testified at his investigative deposition that, whatever bad news came its way, the Board was not going to drop the NAV until it definitely heard from the Fed that no help would be forthcoming (Opp. Ex. H, 23:24-24:10):

> in my best business judgment it didn't make any sense to change the valuation of the Lehman paper until we had explored every avenue that was available... .  I wouldn't say I was optimistic that anything was going to happen with the Fed but we did have the conversation and it was certainly I thought worth the effort.

It was only when the Fed delivered that news late in the afternoon on September 16 that it was not going to help the Fund that the Board finally acted.  (Ex. 2-J p. 7.)

- *Alleged Board Non-Disclosure #7:  "International Liquidity's and Yield Plus Funds' NAVs fell below $1.00 during the 9:30 a.m. Board meeting after the Lehman holdings were reduced to 80 percent of par."*

The Facts:  Here, too, the SEC ignores evidence that undermines its position.  Montgoris testified that he would not have expected to discuss the International Liquidity Fund because

"we're not trustees of International Liquidity." (Opp. Ex. H, 39:3-6.)  As for Yield Plus,

Montgoris testified that it would not have been significant because "again my understanding of

Yield Plus was that it was not a guaranteed dollar NAV fund, so I'm not sure that there were any

actions that I knew about that the board would be required to take if Yield Plus broke the buck."

(Opp. Ex. H, 104:21-105:1.)  No material information was withheld.

In any event, the Board was told at the 8:00 A.M. meeting that Yield Plus held 2.57% of

its assets in Lehman. (Ex. 2-G, p. 12.)  As Montgoris testified, when the Board wrote down the

Lehman paper by 20% at the 9:30 A.M. meeting, it understood the write-down to apply "equally

to ... any [other] funds that held Lehman paper." (Opp. Ex. H, 39:16-19.)  The Trustees did not

need the Bents to tell them that 20% of 2.57 = 0.514, or more than a half percent.

B.      The SEC Has Not Established an Entitlement to Judgment on Its §206(4) Claim

The SEC does not devote much effort to its §206(4) claim.  Its entire discussion consists

of a conclusory argument that, since the claim is based on the same facts as its claims under

§§10(b) and 17(a), but does not require proof of scienter, it is "patently obvious" that it should

prevail.  (SEC Mem. 33.)  However, the SEC still has to establish a material misstatement or

omission under §206(4).  As shown in Point II(B) above, the "determination of materiality is a

mixed question of law and fact that generally should be presented to a jury." Press, supra, 166

F.3d at 538.  And, as shown in Point II(C) above, there is a factual dispute as to whether there

were any actual misstatements.  Thus, the SEC is not entitled to summary judgment.

V.  THE SEC HAS NOT SHOWN AN ENTITLEMENT
TO ANY OF THE RELIEF REQUESTED

A.      The SEC Has No Evidence That an Injunction Is Necessary to Prevent a Recurrence

Unfazed by the Second Circuit's clear holding that the SEC "cannot obtain [injunctive]

relief without positive proof of a reasonable likelihood that past wrongdoing will recur," SEC v.

Bausch & Lomb, Inc., 565 F.2d 8, 18 (2d Cir. 1977), the only "proof" the SEC offers is the very

conduct alleged in this case.  (SEC Mem. 35-36.)  That does not satisfy its burden.

To justify its failure to come forward with anything beyond the allegations in this case, the SEC quotes a sentence from SEC v. Mgmt. Dynamics, Inc., 515 F.2d 801, 807 (2d Cir. 1975), that "the commission of past illegal conduct is highly suggestive of the likelihood of future violations."  (SEC Mem. 35.)  While that may have been the law in 1975, it is not the law now.  Two years after Mgmt. Dynamics was decided, the Second Circuit held that "[o]ur recent decisions have emphasized, perhaps more than the older ones, the need for the SEC to go beyond the mere facts of past violations and demonstrate a realistic likelihood of recurrence."  SEC v. Commonwealth Chem. Sec., Inc., 574 F.2d 90, 100 (2d Cir. 1978) (emphasis added).  The SEC has not done so here for a simple reason:  it cannot.  Defendants faithfully and successfully ran their business for forty years without any major issue until the 2008 financial crisis.  Even the alleged misconduct, taken at face value, barely lasted a day.

Where, as here, the alleged misconduct is isolated in nature and limited in duration, there is no likelihood of recurrence, and an injunction cannot be granted.  SEC v. Jadidian, 2011 U.S. Dist. LEXIS 36485, *16 (S.D.N.Y. Mar. 31, 2011) (injunction denied because "this Court must conclude that the TTCN episode – which took place over approximately one month – was an 'isolated occurrence'"); SEC v. Jones, 476 F. Supp. 2d 374, 384 (S.D.N.Y. 2007) (injunction denied where SEC "adduced no positive proof aside from Defendants' past alleged wrongdoing to suggest 'some cognizable danger of recurrent violation'").

The SEC even goes so far to use the Bents' exemplary careers against them, claiming that "courts have concluded that a defendant's experience in the industry increases the likelihood of further violations."  (SEC Mem. 36 n. 20.)  But the cases from which the SEC distills this dubious generalization reached no such conclusion.  In SEC v. Svoboda, 409 F. Supp. 2d 331, 343 (S.D.N.Y. 2006), for example, what the Court concluded was that defendants were reasonably

likely to violate the securities laws again based on "the broad scope of the scheme [which lasted four years], defendants' familiarity with securities trading, and the lengths to which defendants went to conceal their activities."  The SEC has thus grossly mischaracterized <u>Svoboda</u>.

Other factors also militate against an injunction here:  1) it was Defendants who brought this matter to the SEC's attention on September 16; 2)  Defendants sought professional advice throughout the relevant time period; and 3) Defendants were entrusted with winding up the Fund, a process they oversaw for two years and which resulted in the distribution of billions of dollars to investors who have now been paid 99¢ on the dollar for their shares.

B.     <u>The SEC Admits That It Has No Evidence of Any Ill-Gotten Gains</u>

Even at the summary judgment stage of this case, the basis of the SEC's claim for disgorgement remains a mystery.  Because Defendants knew they had received no profits tied to any alleged wrongdoing, they repeatedly asked the SEC to explain its disgorgement theory, first by way of interrogatory and then by way of Rule 30(b)(6) deposition.  (Opp. Exs. N, pp. 5-6; O, p. 5.)  The SEC rebuffed both requests.  Now, with no evidence to satisfy its burden of showing specific profits that it claims are subject to disgorgement, <u>Jones</u>, <u>supra</u>, 476 F. Supp. 2d at 386, the SEC says it is Defendants' fault that it "can only approximate Defendants' ill-gotten gains." (SEC Mem. 37.)  But the SEC has not even gone through the pretense of an approximation, since it well knows there are no "ill-gotten" gains to approximate.

This utter failure of proof cannot be blamed on Defendants.  Although the SEC has the burden of proof on the issue, <u>SEC</u> v. <u>Johnson</u>, 2006 U.S. Dist LEXIS 50307, **22-23 (S.D.N.Y. July 21, 2006), it conducted no discovery concerning profits and never attempted to determine whether there was a basis for asserting that Defendants had been unjustly enriched.  The record contains no evidence of any "ill-gotten gains," which, by definition, includes only the part of Defendants' "compensation causally connected to the alleged violations."  <u>SEC</u> v. <u>Kelly</u>, 2011

U.S. Dist. LEXIS 3290, *60 (S.D.N.Y. Jan. 7, 2011).

As for the SEC's allusion to Defendants' "conflicting submissions concerning the profits they claim they earned" (SEC Mem. 37), they are non-existent.  The only "submissions" of which Defendants are aware are analyses of Defendants' expenses prepared to meet the SEC's ever-changing preconditions to authorizing the payments that Defendants were promised if they continued managing the Fund.[6]  All show that Defendants have advanced millions of dollars in expenses to the Fund which have yet to be reimbursed, and they are also owed management fees, no part of which can be attributed to any wrongdoing.  (Ex. 5 ¶¶4-8.)  Rather, the SEC is seeking disgorgement of payments due for post-liquidation work which would had to have been done whether or not any alleged misstatements were made.  (Ex. 5 ¶¶ 4-8.)

Nor is there any legal basis for the SEC's notion that a defendant charged with securities fraud forfeits the right to all compensation, even compensation not causally connected to an alleged violation.  Kelly, supra, 2011 U.S. Dist. LEXIS 3290, *58 ("because the disgorgement remedy is remedial, rather than punitive, a court cannot order disgorgement of an amount above that which was wrongfully acquired").  The SEC nevertheless demands that the Bents' salaries be disgorged (SEC Mem. 37 n. 21) – something that not only flies in the face of the law, but also represents a 180-degree turn by the SEC, which told the Court that it has "never asserted that the Bents should be required to work for free." (Opp. Ex. P.)   The SEC's position, beyond being without any legal basis, would set a terrible precedent.  Fund managers who stick with their fund and its shareholders in a crisis should not be punished for their efforts.

---

[6]     The document the SEC attributes to Defendants' damage expert (SEC Mem. 37 n.21) is not his report on this issue and does not suggest that Defendants have been paid $8 million in profits, much less that such amount is connected to the alleged wrongdoing.  (SEC Ex. 94.)  It simply calculates the component of RMCI's management fee that would be profit, if the fee were paid in full.  Defendants' expert further concludes that none of that profit would be attributable to alleged fraud (Opp. Ex. F-1), a conclusion the SEC has not sought to rebut.

C.    The SEC's Request for Penalties Is Unsupported By the Law
      and Based on Arguments It Should Be Estopped From Making

The SEC acknowledges (SEC Mem. 38) that one of the factors courts consider in determining whether a civil penalty should be imposed at all is "whether the defendant's conduct was isolated or recurrent." SEC v. Sheyn, 2010 WL 3290977, *8 (S.D.N.Y. Aug. 9, 2010).  Even though it is undisputed that the conduct alleged here was isolated in the extreme, the SEC seeks the highest tier of penalties.  It then tries to inflate that penalty by multiplying it by the number of investors supposedly "affected by the wrongdoing" (SEC Mem. 39) – a number it does not specify.  This formula is all but unprecedented.  While it was mentioned in SEC v. Invest Better 2001, 2005 WL 2385452 (S.D.N.Y. May 4, 2005), a case involving "a Ponzi-style investment fraud" which has nothing in common with this case, it was not actually applied there.  The only case the SEC cites in which the formula was applied is SEC v. Kenton Capital, 69 F. Supp. 2d 1, 17 n.15 (D.D.C. 1998).  But the Court there made clear that the defendant did not object to the formula, which represented the lesser of the SEC's two proposed penalties.

As support for the extraordinary penalty it seeks, the SEC argues that "some investors were forced to incur substantial expenses borrowing money to meet their needs for cash."  (SEC Mem. 39.)  It should not be allowed to make this claim.  Until this motion, the SEC consistently took the position that "investor loss is not an issue here." (Opp. Exs. Q, R.)  By doing so, the SEC blocked Defendants from conducting any discovery on the issue.  It cannot take a different position now in the hopes of obtaining a larger penalty.  Intellivision v. Microsoft Corp., 2011 U.S. Dist. LEXIS 29950, **13-22 (S.D.N.Y. Mar. 23, 2011) (judicial estoppel applied where party took position after close of discovery contradicting earlier representations).

CONCLUSION

For all the reasons set forth above and in the accompanying materials, the SEC's motion should be denied, and summary judgment should instead by granted in Defendants' favor.

Dated:  New York, New York
          June 13, 2011

                                        Respectfully submitted,

                                        DUANE MORRIS LLP


                                        By:_____/s/ Fran M. Jacobs_____
                                                  Fran M. Jacobs
                                                  John Dellaportas
                                                  Kathrine A. Gehring
                                        1540 Broadway
                                        New York, NY  10036
                                        (212) 692-1000
                                        Attorneys for Defendants Reserve Management
                                          Company, Inc., Resrv Partners, Inc., Bruce R.
                                          Bent, Sr. and Bruce R. Bent II