# UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

|  |  |  |
|---|---|---|
| In re THE RESERVE FUND SECURITIES AND DERIVATIVE LITIGATION | : : : : | 09 MD 2011 (PGG) |
| SECURITIES AND EXCHANGE COMMISSION, | : : : | |
| Plaintiff, | : : | |
| v. | : : | No. 09 Civ. 4346 (PGG) |
| RESERVE MANAGEMENT COMPANY, INC., RESRV PARTNERS, INC., BRUCE BENT SR., and BRUCE BENT II, | : : : : : | ECF Case |
| Defendants, | : : | |
| and | : : | |
| THE RESERVE PRIMARY FUND, | : : | |
| Relief Defendant. | : : | |

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

DUANE MORRIS LLP
1540 Broadway
New York, NY  10036
(212) 692-1000
Attorneys for Defendants
Reserve Management Company, Inc. Resrv Partners,
Inc., Bruce R. Bent, Sr. and Bruce R. Bent II

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT……………………………………………………….. 1

MATERIAL UNDISPUTED FACTS……………………………………………. 3

    A.    Background……………………………………………………... 3

    B.    The 8:00 A.M. Board Meeting…………………………………….. 4

    C.    The 9:30 A.M. Board Meeting…………………………………….. 5

    D.    The 1:00 P.M. Board Meeting……………………………………… 5

    E.    Bent II's 1:19 E-mail……………………………………………… 8

    F.    The Insights Piece……………………………………………... 11

    G.    State Street Had Not Stopped Funding Redemptions………………………. 13

    H.    Communications With Rating Agencies…………………………………. 14

    I.    As Soon As Defendants Realized a Support Agreement Was Not
Feasible, They Immediately Advised Counsel, Their Regulator,
and The Board.............................................................................................. 14

    J.    The Board's 10:00 A.M. Meeting On September 16……………………….. 15

THE COMPLAINT……………………………………………………………….. 16

ARGUMENT – SINCE THE SEC CANNOT ESTABLISH ESSENTIAL ELEMENTS
    OF ITS CLAIMS, SUMMARY JUDGMENT SHOULD BE
    ENTERED IN DEFENDANTS' FAVOR………………………………... 16

    I.    THE APPLICABLE LEGAL STANDARD……………………………… 16

    II.    THE SEC CANNOT ESTABLISH ALL OF THE ELEMENTS
    OF ITS SECTION 10(b) and 17(a) CLAIMS……………………………. 17

        A.    Statements Intended to Induce Investors Not to Redeem Are
Not Actionable Because They Do Not Satisfy the "In Connection
With a Purchase or Sale" Requirements………………………….... 18

B.   The "In Connection With" Requirement Cannot Be Satisfied By
Relying on Purchasers to Whom no Representations Were Made……. 19

C.   The Alleged Misrepresentations Were Not Material Because, No
Matter What Defendants Said, Investors Could Not Have Redeemed
and Because Purchasers Did Not Treat the Statements as Important….. 20

D.   Because There Is No Evidence That Defendants' Statements
Did Not Accurately Reflect Their Intent At the Time, the SEC
Will Be Unable to Prove Scienter……………………………….... 23

E.   There Can Be No Aider and Abettor Liability…………………………. 24

F.   There Can Be No "Control Person" Liability…………………………... 24

III.   THE SEC CANNOT PREVAIL ON ITS CLAIMS UNDER
THE ADVISERS ACT…………………………………………………….. 24

A.   Since The Bents Were Not Themselves Investment Advisers,
They Cannot Be Liable for Violating the Advisers Act………………… 24

B.   The Evidence Does Not Support an Advisers Act Claim
Against RMCI…………………………………………………………… 26

IV.   THE SEC CANNOT PRODUCE EVIDENCE ESTABLISHING
THAT THE BENTS AIDED AND ABETTED VIOLATIONS OF
SECTION 206 AND, EVEN IF IT COULD, CIVIL PENALTIES
CANNOT BE IMPOSED……………………………………………………… 29

A.   The SEC Cannot Adduce Evidence Which Supports
An Aiding and Abetting Claim Under the Advisers Act………………… 29

B.   There is No Legal Authority for Imposing Civil Penalties on A
Defendant for Aiding and Abetting a Violation of the Advisers Act........ 30

V.   DISGORGEMENT IS UNAVAILABLE AS A REMEDY
BECAUSE THE SEC HAS NO EVIDENCE OF ANY
"ILL-GOTTEN GAINS"…………………………………………………… 31

VI.   THE SEC CANNOT RECOVER MORE THAN THE FIXED
PENALTIES BECAUSE DEFENDANTS HAD NO PECUNIARY GAIN…. 32

VII.   INJUNCTIVE RELIEF IS NOT WARRANTED GIVEN THE
INDISPUTABLY ISOLATED NATURE OF DEFENDANTS'
ALLEGED WRONGDOING…………………………………………… 33

CONCLUSION……………………………………………………………………… 34

TABLE OF AUTHORITIES

Cases               Page(s)

Aaron v. SEC,
    446 U.S. 680 (1980)................................................................23

Abrahamson v. Fleschner,
    568 F.2d 862 (2d Cir. 1977)...................................................18

ATSI Comms., Inc. v. Shaar Fund, Ltd.,
    493 F.3d 87 (2d Cir. 2007).....................................................24

Basic, Inc. v. Levinson,
    485 U.S. 224 (1988)........................................................ 20-22

Bischoff v. G.K. Scott & Co., Inc.,
    687 F. Supp. 746 (E.D.N.Y. 1986) ........................................18

Celotex Corp. v. Catrett,
    477 U.S. 317 (1986)...............................................................17

Crummere v. Smith Barney, Harris Upham & Co. Inc.,
    624 F. Supp. 751 (S.D.N.Y. 1985) ........................................19

Feit v. Leasco Data Processing Equip. Corp.,
    332 F. Supp. 544 (S.D.N.Y. 1971) ........................................21

Gambella v. Guardian Investor Services Corp.,
    75 F. Supp. 2d 297 (S.D.N.Y. 1999).....................................18

Goldstein v. SEC,
    451 F.3d 873 (D.C. Cir. 2006)...............................................26

Greenspan v. Del Toro,
    1974 U.S. Dist. LEXIS 8475 (S.D. Fla. May 17, 1974) ........26

Gurary v. Winehouse,
    190 F.3d 37 (2d Cir. 1999).....................................................23

Higginbotham v. Baxter Int'l, Inc.,
    495 F.3d 753 (7th Cir. 2007).................................................28

Madison Consultants v. FDIC,
    710 F.2d 57 (2d Cir. 1983).....................................................21

<u>Nobles</u> v. <u>First Carolina Communications, Inc.</u>,
   929 F.2d 141 (4th Cir. 1991) .............................................................21

<u>In re Phillips Petroleum Secs. Litig.</u>,
   881 F. 2d 1236 (3d Cir. 1989).............................................................23

<u>Pommer</u> v. <u>Medtest Corp.</u>,
   961 F.2d 620 (7th Cir. 1992) .............................................................23

<u>Santa Fe Indus. Inc.</u> v. <u>Green</u>,
   430 U.S. 462 (1977).........................................................................21

<u>SEC</u> v. <u>Adoni</u>,
   60 F. Supp. 2d. 401 (D.N.J. 1999) .......................................................19

<u>SEC</u> v. <u>Bausch & Lomb, Inc.</u>,
   565 F.2d 8 (2d Cir. 1977)........................................................... 22, 33-34

<u>SEC</u> v. <u>Bolla</u>,
   401 F. Supp. 2d 43 (D.D.C. 2005),
   <u>aff'd in relevant part</u>, 475 F.3d 392 (D.C. Cir. 2007) ...............................28

<u>SEC</u> v. <u>Bolla</u>,
   550 F. Supp. 2d 54 (D.D.C. 2008) ........................................................30

<u>SEC</u> v. <u>Commonwealth Secs., Inc.</u>,
   574 F.2d 89 (2d Cir. 1978)..................................................................33

<u>SEC</u> v. <u>First Jersey Sec., Inc.</u>,
   101 F.3d 1450 (2d Cir. 1996)...............................................................17

<u>SEC</u> v. <u>Gabelli</u>,
   2010 U.S. Dist. LEXIS 27613 (S.D.N.Y. Mar. 17, 2010) ......................... 29-30, 33

<u>SEC</u> v. <u>Jadidian</u>,
   2011 U.S. Dist. LEXIS 36485 (S.D.N.Y. Mar. 31, 2011) ..............................17, 33

<u>SEC</u> v. <u>Johnson</u>,
   2006 U.S. Dist. LEXIS 50307, ** 22-23 (S.D.N.Y. July 21, 2006)......................32

<u>SEC</u> v. <u>Jones</u>,
   476 F. Supp. 2d 374 (S.D.N.Y. 2007)...............................................31, 33

<u>SEC</u> v. <u>Kelly</u>,
   2011 U.S. Dist. LEXIS 3290 (S.D.N.Y. Jan. 7, 2011)............................. 17, 31-32

SEC v. Monarch Funding Corp.,
    192 F.3d 295 (2d Cir. 1999)...........................................................................17, 27

SEC v. Northshore Asset Mgmt.,
    2008 U.S. Dist. LEXIS 36160 (S.D.N.Y. May 5, 2008).......................................18

SEC v. Norton,
    1997 U.S. Dist. LEXIS 15167 (S.D.N.Y. Sept. 30, 1997).....................................19

SEC v. Norton,
    21 F. Supp. 2d 361 (S.D.N.Y. 1998).......................................................................31

SEC v. PIMCO Advisors Fund Mgmt., LLC,
    341 F. Supp. 2d 454 (S.D.N.Y. 2004)........................................................ 24, 26-27

SEC v. Rorech,
    720 F. Supp. 2d 367 (S.D.N.Y. 2010).....................................................................17

SEC v. Steadman,
    967 F.2d 636 (D.C. Cir. 1992)..........................................................................29, 34

SEC v. Tecumseh,
    2009 U.S. Dist. LEXIS 119869 (S.D.N.Y. Dec. 22, 2009) ...................................30

SEC v. Texas Gulf Sulphur, Inc.,
    401 F.2d 833 (2d Cir. 1968) ...................................................................................22

Stransky v. Cummins Engine Co., Inc.,
    51 F.3d 1329 (7th Cir. 1995) ..................................................................................23

TCS Capital Mgmt., LLC v. Apax Partners, L.P.,
    2008 U.S. Dist. LEXIS 19854 (S.D.N.Y. Mar. 7, 2008) .......................................21

United States v. Margala,
    662 F.2d 622 (9th 1981)..........................................................................................21

Statutes

15 U.S.C. § 77t(d) ..............................................................................................................33

15 U.S.C. § 78u(d) .............................................................................................................33

15 U.S.C. § 80b-2(11).........................................................................................................25

15 U.S.C. § 80b-6 ...............................................................................................................24

15 U.S.C. § 80b-7 ...............................................................................................................25

15 U.S.C. § 80b-9(e) ..........................................................................................................33

Other Authorities

Fed. R. Civ. P. 56 ...............................................................................................................16

17 C.F.R. § 275.206(4)-8, Rule 206(4)-8 ....................................................................16, 24, 29

Defendants Reserve Management Company, Inc. ("RMCI"), Resrv Partners, Inc. ("Partners"), Bruce Bent II ("Bent II"), and Bruce Bent, Sr. ("Bent Sr.") (together, "Defendants") respectfully submit this memorandum of law in support of their motion for summary judgment dismissing the Complaint of plaintiff Securities and Exchange Commission (the "SEC") on the grounds that (1) the SEC cannot establish essential elements of its claims and (2) there is no legal or factual basis for the relief the SEC seeks.

PRELIMINARY STATEMENT

The premise of the SEC's case is that Defendants made fraudulent statements in order to stop investors from continuing to redeem shares in the Reserve Primary Fund (the "Fund") in the 19-hour period between 1:00 P.M. on September 15, 2008 – the day that Lehman Brothers' bankruptcy filing set off a global financial crisis – and 8:00 A.M. the following morning. (Complt. ¶ 6; see also Id. at ¶¶ 9, 45, 82, 86, 110.)  Even if the SEC had proof to support this theory, and it has none, summary judgment would still have to be granted in Defendants' favor because of two gaping holes in the SEC's case.

First, the SEC cannot establish fraud "in connection with the purchase or sale of a security," as required by Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and Section 17(a) of the Securities Act of 1933 (the "Securities Act").  As a matter of black letter law, statements designed to induce investors to hold onto securities instead of redeeming them cannot satisfy the "in connection with the purchase or sale" requirement and therefore are not actionable under §§ 10(b) and 17(a).

Second, the SEC cannot establish materiality, another essential element of each of the its claims.  Because it is undisputed that investors could not have redeemed Fund shares after 1:33 P.M. on September 15, 2008, the misstatements allegedly made to investors thereafter to induce them not to redeem – when they could not have redeemed anyway – are immaterial as a matter of

law.

The SEC's inability to satisfy the "in connection with" and materiality requirements of Sections 10(b) and 17(a) by themselves warrant the entry of summary judgment in Defendants' favor.  But the SEC also cannot establish scienter.  The evidence simply does not show that Defendants made any misstatements with the requisite fraudulent intent.

Even if the SEC's claims were viable, Defendants would still be entitled to summary judgment dismissing the relief the SEC is seeking – disgorgement, a permanent injunction, and civil penalties.  Disgorgement can only be awarded where there is a direct connection between the allegedly illegal conduct and the receipt of some ill-gotten gains.  (The same holds true for civil penalties beyond the fixed amounts in the applicable statutes, which require a "pecuniary gain . . . as a result of the violation.")  No such connection can possibly be shown in this case because Defendants received no ill-gotten gains – and the SEC has no evidence (or even a theory) that they did.

Injunctive relief, in turn, requires proof of a reasonable likelihood that the alleged past wrongdoing will recur.  Here, RMCI and Resrv are no longer in the securities business, and the two Bents' alleged misconduct was confined to an extraordinarily short period of less than 24 hours while they were attempting to cope with the effects of a once-in-a-lifetime worldwide financial crisis.  Under these circumstances, the SEC cannot possibly put forward evidence that an injunction is needed to prevent a cognizable danger of recurrence.

Given all these legal deficiencies, it is not clear why the SEC chose to bring securities fraud claims against Defendants.  Whatever the SEC's goal may be, it cannot establish essential elements of each of its claims, nor justify its proposed relief, and summary judgment should therefore be entered dismissing the Complaint.

## MATERIAL UNDISPUTED FACTS[1]

A.    Background

Bent Sr. was, until November 2010, the Chairman of the Fund, and he remains the Chairman of RMCI, which was the Fund's investment adviser.  More than forty years ago Bent Sr. co-invented the concept of money market funds, and he has been in the money market business ever since.  Until Lehman filed for bankruptcy on September 15, 2008, none of Defendants' money funds had ever experienced a credit default.  (Bent Sr. Decl. ¶ 3.)

As soon as Lehman's bankruptcy filing appeared imminent on the evening of September 14, 2008, Bent II began to seek guidance about how the filing would affect the Fund, which owned $785 million of Lehman commercial paper.  At the time, Bent II was the Fund's Vice Chairman and Co-Chief Executive Officer as well as the Vice Chairman and President of RMCI and Vice Chairman of Resrv, the Fund's broker-dealer.  Bent II had never before had to deal with an investment in a bankrupt issuer.  (Bent II Decl. ¶ 3.)

At 9:18 P.M., he spoke to Catherine Crowley ("Crowley"), RMCI's General Counsel, to discuss convening a meeting of the Fund's Board.  (Bent II Ex. A.)  Bent II was on one call after another until 10:56 P.M., tried unsuccessfully to reach his father (who was then on a flight to Italy) at 1:06 A.M., and started fielding calls again at 3:47 A.M. the next morning when his father arrived in Italy.  By 6:28 A.M. on the morning of September 15, Bent II had notified the Board that it would have to meet "this morning ASAP to consider using fair valuation for the Lehman paper that our funds currently hold which totals approximately $800 million."  (Bent II Ex. B.)  In between, Bent II did not sleep.  (Bent II Decl. ¶ 3.)

The fact that the Fund held Lehman paper was not news to the Board.  At the Board's last

---

[1]    The following undisputed facts are drawn from the pleadings, sworn testimony, and contemporaneous documentary evidence, as more fully discussed in the accompanying declarations of Bent Sr., Bent II, David Gareis, and Daniel Boruch.

quarterly meeting on September 10, 2008, RMCI's Chief Investment Officer, Patrick Ledford ("Ledford"), reported that the Fund had 1.1% of its assets in Lehman debt, which he believed was safe. (Bent Sr. Ex. F.) Investors also knew the Fund held Lehman paper. The Fund's most recent SEC filing disclosed all the Fund's Lehman holdings, and the Fund made a holdings list available on demand – something no other money fund did at that time. (Bent Sr. Decl. ¶ 8.)

The Fund's investment in Lehman was not only fully disclosed, it complied with all applicable SEC money fund investment guidelines: Lehman paper was highly rated and the Fund's holdings fell well below the maximum permissible amount of securities of any one issuer. (Bent Sr. Decl. ¶ 8.) Indeed, although the SEC has leveled all sorts of charges against Defendants, none of its claims alleges that the investment in Lehman paper was wrongful. That lawful investment, and not the conduct alleged in the Complaint, is what caused the collapse of the Fund.

B.   The 8:00 A.M. Board Meeting

On September 15, 2008, the Fund had eight trustees, all but one of whom – Bent Sr. – was independent. The Independent Trustees were sophisticated individuals, and some had extensive experience in the financial markets. One had been the Chief Operating Officer of Bear Stearns for twenty years; another had been an executive vice president and senior managing director of Smith Barney. (Bent Sr. Decl. ¶ 5.) As might be expected from their backgrounds, the Independent Trustees actively participated in Board meetings.

Six trustees took part in the 8:00 A.M. telephonic meeting on September 15, including Bent Sr. who called in from Italy where he and his wife were celebrating a milestone anniversary. (Bent Sr. Decl. ¶ 11.) According to the minutes (Bent Sr. Ex. I), the following individuals also attended the 8:00 A.M. Board meeting:

- Stuart Strauss ("Strauss") of Clifford Chance, the Independent Trustees' counsel and an experienced Investment Company Act lawyer;

- Joel Goldberg ("Goldberg"), a former Director of the SEC's Division of Investment Management and partner at Willkie Farr & Gallagher ("Willkie"), which acted as counsel for both the Fund and RMCI;
- Rose DiMartino ("DiMartino"), Goldberg's partner at Willkie;
- Sean McKee of KPMG, LLP, the Fund's auditing partner;
- RMCI's Chief Investment Officer (Ledford);
- Fund Secretary and RMCI's General Counsel (Crowley);
- Patrick Farrell ("Farrell"), RMCI's Chief Financial Officer;
- Christine Massaro ("Massaro"), RMCI's Chief Compliance Officer; and
- Bent II, and his brother, Vice Chairman Arthur Bent.

Bent Sr. began the meeting by stating that, based on the Fund's total assets, its net asset value ("NAV") would drop below $0.995 if Lehman were valued at 55% of par, causing the Fund to break the buck. During the same meeting, Bent II reported that investors had already placed $5.2 billion in redemption orders, presumably because of the Fund's Lehman holdings, and Bent Sr. added that "as the assets of the fund go down, the more significant the Lehman holdings become relative to the total assets of the fund." (Bent Sr. Ex. G.) Defendants thus candidly explained the situation to the Independent Trustees who, at Bent II's suggestion, agreed to meet again at 9:30 A.M. that morning. (Bent Sr. Ex. G.)

C.    The 9:30 A.M. Board Meeting

When the Board reconvened at 9:30 A.M., the Board deliberated and then voted to value Lehman at 80% of par. (Bent Sr. Ex. H, p. 8.) During the same meeting, Bent II also reported to the Board that "our custody bank [State Street] is not necessarily sending out wires [in payment of redemption requests] as soon as they get instructions from us." (Bent Sr. Ex. H, p. 3.)

D.    The 1:00 P.M. Board Meeting

RMCI became aware that other money funds which held Lehman paper had publicly announced entering into support agreements. Before considering any disclosures of their own, RMCI sought advice from Willkie – counsel to both RMCI and the Fund. At 12:20 P.M. on

September 15, Crowley sent DiMartino and Goldberg an e-mail, stating, "We want to issue a statement as soon as possible that we will stand behind Primary," and asking, "Does that require that we notify the SEC first or do they just need to pre-approve whatever form that credit support takes?"  (Bent II Ex. C.)  Based on Willkie's advice (Bent II Ex. N, p. 79), Bent II set up another Board meeting for 1:00 P.M. that day to discuss a support agreement.  (Bent II Ex. D.)

Although Goldberg himself had never before been asked for advice about a support agreement (Bent II Ex. E), he nevertheless assumed the Bents understood how support agreements worked and did not explain the mechanics of such agreements to them.  (Bent II Ex. E pp. 35-36; see also p. 38.)  But the Bents had no experience in providing support to a fund regulated by the SEC and did not know until hours later that they would have to quantify the amount of support they were committing to provide.  (Bent II Decl. ¶ 10.)

According to the approved minutes of the 1:00 P.M. Board meeting, Bent II explained that he was proposing a support agreement because redemption requests "had continued unabated throughout the morning," and there "appeared to be a run on the Primary Fund."  (Bent Sr. Ex. J, p. 3.)  The approved minutes also state that, "[a]s of the beginning of the 1:00 PM call, redemption requests from the Primary Fund were approximately $16.5 billion."  (Ibid.)  While the Independent Trustees tried to alter this minute entry two years later immediately following a series of SEC interviews, the evidence establishes that the Board was told that redemptions were substantial enough at 1:00 P.M. on September 15 to be causing a "run on the Primary Fund."  Indeed, DiMartino testified on February 3, 2009 – less than five months after the meeting took place – that the Board was told, most likely by CFO Farrell, that redemptions had climbed to $14 billion.  (Bent II Ex. F, p. 92.)

The minutes further make clear that the Board discussed whether putting a support "arrangement in place could result in a reduction of redemptions."  (Bent Sr. Ex. I.)  Discovery

has uncovered no evidence that the support agreement was intended to attract new purchasers.  In fact, Bent II has testified that attracting new purchases was not on his mind.  (Bent II Decl. ¶ 9.) Consistent with this, the 1:00 P.M. minutes make no mention of purchases, but do state:  "Bent II told the Trustees that in order <u>to address what appeared to be a run on the Primary Fund</u>, RMCI would like authorization from the Board to approach the SEC to inquire about putting a credit support agreement in place for the Fund."  (Bent Sr. Ex. I, p. 4; emphasis added.)

The amount of support RMCI would provide was not discussed, nor were the mechanics of how the support agreement would work explained.  (Bent II Ex. F, p. 70.)  Although Strauss asked whether RMCI had enough capital to provide support, and Bent Sr. responded that sufficient capital could be made available (Bent Sr. Ex. I, p. 4), no one questioned Bent Sr. about how much support he thought might be needed.

As of 1:00 P.M., the Fund had approximately $150 million more in assets than was needed for the Fund to maintain a $1.00 NAV without any credit support.  (Bent Sr. Decl. ¶ 23.) Although he had not been asked to specify the amount, Bent Sr. thought he could raise up to $100 million.  (Bent Sr. Decl. ¶ 21.)  But, like the SEC's then-chairman, he expected the markets to rebound from what he viewed as an overreaction to the Lehman bankruptcy, and did not realize at the time that Lehman's bankruptcy filing had precipitated what Federal Reserve Chairman Bernanke later characterized as "the worst financial crisis in global history, including the Great Depression."  (Bent Sr. Decl. ¶ 21)  There is no better proof that Bent Sr. genuinely held this belief then that he left his own shares in the Fund.  (Bent Sr. Decl. ¶ 53.)

None of the Independent Trustees asked whether Bent Sr. was committing RMCI to provide $785 million in support, nor could they have thought he was doing so.  The Independent Trustees were responsible for annually approving the Fund's Management Agreement with RMCI, which involved reviews of its financials, and thus knew RMCI was a high overhead, low

margin business which did not generate that level of profits.  (Bent Sr. Decl. ¶ 31.)

There is, moreover, evidence that RMCI was understood to be offering to provide support of a different order of magnitude.  The draft support agreement that DiMartino prepared three hours later stated that RMCI would provide up to $10 million to support the Fund's NAV – an amount General Counsel Crowley recalled the SEC had proposed – and that RMCI readily could have made available on September 15.  (Bent II Decl. ¶ 17.)  DiMartino also testified that, since no particular dollar amount was discussed at the Board meeting, she did not believe there was any inconsistency between what Bent Sr. told the Board and the amount she included in her draft.  (Bent II Ex. F, p. 67.)  Neither she nor any other attorney ever advised RMCI that its contemplated credit support agreement was inadequate.  In any event, the $10 million was not a cap, but an initial contribution.  DiMartino testified that, had additional support been needed, the amount could simply be increased. (Bent II Ex. F, p. 67.)

E.     Bent II's 1:19 E-mail

While the 1:00 P.M. meeting was in progress, the Board authorized Goldberg and DiMartino to contact the SEC about putting a support agreement in place.  (Bent Sr. Ex. I, p. 4.) Goldberg and DiMartino then called Robert Plaze ("Plaze"), the SEC official responsible for support agreements, and explained the Fund's situation.  (Bent II Ex. E, p. 41.)  Plaze told Goldberg and DiMartino that he would send them a sample support agreement and that, if they provided the right documentation, the SEC would likely grant relief quickly.  (Bent II Ex. F, p. 120; Ex. K, p. 132.)  DiMartino advised Crowley that RMCI could publicize the fact that it had had preliminary discussions with the SEC about a support agreement, and Goldberg similarly advised Bent II that RMCI could announce its intention to support the Fund.  (Bent II Ex. F, pp. 81-82; Ex. E, pp. 28-29.)

At 1:19 P.M., just after the Board Meeting ended, Bent II – based on the SEC's

indications that it would likely grant relief quickly and the advice of his counsel that RMCI could

publicize its discussions with the SEC, sent an e-mail to RMCI's Directors of Sales and

Marketing with a copy to Crowley, stating (Bent II Ex. L):

> We (Reserve Management Company, Inc.) intend to protect the NAV on the
> Primary Fund to whatever degree is required.  We have spoken with the SEC and
> are waiting [for] their final approval which we expect to have in a few hours.
> You may communicate this to clients on an as needed basis.

Within ten minutes after Bent II sent his e-mail, Crowley circulated a clarification which

stated:  "We haven't entered into the agreements yet; that's why Bruce's e-mail said we intend

to.  We will submit a form of the agreement to the SEC this afternoon for its review and approval

which we expect to obtain."  (Bent II Ex. O.)

The Complaint alleges that Bent II's goal in sending his 1:19 e-mail "was to convince

investors to stop redeeming shares in the Primary Fund by inducing them to rely on the false

representation that RMCI would maintain the $1.00 NAV."  (Complt. ¶ 82; emphasis added.)

The SEC will be unable to produce any evidence establishing that the e-mail did not accurately

reflect Bent II's intent as of 1:19 P.M. on September 15, when he still believed that it would be

within RMCI's power to protect the Fund's NAV.  Although the SEC has alleged that Bent II

never really intended to follow through on implementing a support agreement, his conduct was

consistent with his statement of intent:  he immediately put RMCI's lawyers to work preparing

the documents the SEC would need, one of whom had Massaro find a sample no action letter that

DiMartino could use to get started.  (Bent II Ex. P.)

The SEC did not, however, act as quickly.  By 3:02 P.M., when Willkie still had not

received the sample support agreement that Plaze promised, Willkie called Plaze to remind him

that they were still waiting for it.  (Bent II Ex. F, p. 90.)  When Plaze finally forwarded the

sample at 3:16 P.M., he apologized that "[t]hings are coming at me from all directions today."

(Bent II Ex. Q.)  As hard as it was for Plaze to keep up on September 15, Bent II had many

demands on his attention as well.  He spent more than nine hours on the phone speaking to the

Board, soliciting legal advice from counsel, responding to inquiries, seeking a bank counterparty

who would enter into a reverse purchase agreement, and trying to obtain essential information

from State Street, the Federal Reserve Banks of both New York and Boston, and investment

bankers who had been asked to look for a buyer or strategic partner for RMCI.  (Bent II Decl.

¶ 16.)

       DiMartino did not complete her first draft of the no action letter until 4:30 P.M., and did

not transmit her earliest draft of a support agreement for nearly another three hours (Bent II Ex.

R.)  She sent it to Crowley – but not to the Bents.  (Ibid.)  Even though this documentary

evidence was already in the SEC's possession when it filed its Complaint, the SEC nevertheless

wrongly alleges that RMCI's counsel had "virtually finalized all of the draft documentation

necessary to implement a support agreement for the Primary Fund by 4:00 p.m." (Complt. ¶ 98.)

       Once Crowley received the draft no action letter, she forwarded it to another in-house

RMCI attorney, Scarlet Du ("Du"), and to Massaro – but not to the Bents.  After reviewing the

draft, Du noted that "the maximum contribution amount by RMCI is $10 million," and asked

"[i]s it sufficient?" (Bent II Ex. S.)  Crowley's response was that the "[t]he SEC suggested the

$10 million so we can go with that for now."  (Ibid.)

       DiMartino finally sent her first draft of a support agreement to Crowley at 7:16 P.M.

(Bent II Ex. T), and she followed up with a revised draft of the no action letter at 7:27 P.M.

(Bent II Ex. U.)  Crowley did not forward either document to the Bents because she understood

that DiMartino was still working on them.  (Bent II Ex. K. p. 103.)

       By mid-afternoon, Crowley realized that the drafting process was taking longer than

expected and grew concerned about whether RMCI could still accurately say that SEC approval

was expected within a few hours.  She sent Goldberg the following e-mail at 2:49 P.M. asking

for his advice about "talking points" that RMCI's public relations team was preparing (Bent II Ex. V):

> While Rose [DiMartino] is busy drafting our SEC letter, can you take a quick look at our talking points below?  They seem okay to me but given the time, I'm not comfortable with the representation that we expect SEC approval "in a few hours" although that was what [Plaze] said in our first call.  Let me know what you think.

The "talking points" that Crowley asked Goldberg to review included statements that "[t]he Reserve intends to protect the NAV on the Primary fund to whatever degree is required"; that "[t]he Reserve will enter into agreements which will support the value of the Lehman securities held in our fund"; and that "[t]hese agreements are intended to ensure that any decline in the value in the Lehman debt will not affect the $1 NAV of the Reserve Primary Fund."  (Bent II Ex. V.)  Goldberg told Crowley that RMCI could say final approval was expected shortly, and did not object to anything else in the "talking points," even though they used much of the same language the SEC now contends was improper.  (Bent II Ex. K, p. 131.)

Once Bent II put the preparation of the documents relating to the support agreement in the hands of RMCI's attorneys, he assumed they would do what was necessary and focused his attention on the many other issues facing him.  (Bent II Decl. ¶ 20.)

F.    The Insights Piece

Shortly before 3:00 P.M. on September 15, Eric Lansky ("Lansky"), RMCI's Sales Director, prepared a statement similar to the "talking points" Crowley had earlier cleared with Goldberg.  (Bent II  Ex. Y.)  Lansky told Bent II that he would first show the statement to Crowley, and then present it to Bent II.  Lansky assured Bent II that "we are not posting anything on web nor distributing anything proactively."  (Ibid.)

RMCI's Marketing Director, Frank Bonanno ("Bonnano"), later sent a draft statement to Bent II who read parts of it to his father and made some changes.  (Bent II Decl. ¶ 33.)  Bent II

did not see the statement again and, although the formal review process was begun, it was never completed.  (Bent Sr. Decl. ¶¶ 33-34.)  Even so, Bonanno authorized the sales and marketing teams to use the statement, which was entitled *Reserve Insights* ("Insights"), "on your calls and when fielding any redemption requests."  (Bent II Ex. Z.)  Insights was not a press release and was never picked up on any newswires.  (Bent II Decl. ¶ 33.)  Had Bent II been able to review the version of Insights that was ultimately circulated, he would not have approved it because it included objectionable language that Crowley had struck.   (Bent II Decl. ¶ 37.)

A few hours later, Lansky sent Bent II an e-mail in which he wrote that he wanted to add "a statement" to the website.  (Bent II Ex. BB.)  Lansky's e-mail did not attach the proposed statement.  At 9:36 P.M., Bent II, who by then had been working for about 40 hours without sleep, responded, "OK, go ahead."  (Id.)  In doing so, Bent II wrongly assumed that Lansky would prepare a statement which would be put through RMCI's formal review process, as was required for any web posting.  (Bent II Decl. ¶¶ 39-40.)  Instead, Insights was posted on the website, www.theR.com (the "Website"), on September 16 from 8:15 A.M. until around 11:00 A.M., when it was removed.[2]  (Gareis Decl. ¶ 22.)  During that less than three-hour window, not a single purchase of Fund shares was made.  (Gareis Decl. ¶ 24.)

The posting of Insights on the Website on the morning of September 16 clearly occurred by mistake.  By then, Insights was out of date because the Bents had already advised the SEC that a support agreement could not be done.  (Bent II Ex. EE.)  As it was, Bent II did not know until shortly before 11:00 A.M. on September 16 that Insights had been posted.  As soon as he learned of it, he directed it be taken down.  (Bent II Decl. ¶ 38.)  Although both the SEC and DiMartino were aware that Insights had been posted, and each was in communication with Defendants throughout the day on September 16, neither advised Defendants to post a corrective

---

[2]        The Complaint erroneously asserts that Insights was posted on the Website at 9:36 P.M. on September 15.  (Complt. ¶ 112.)  No evidence supports this assertion.

disclosure.  (Bent II Ex. GG, pp. 259-261.)  In fact, when Crowley asked Goldberg whether

RMCI could tell the public that a statement providing updated information about the Fund was

on its way, Goldberg advised RMCI not to do so.  (Bent II Ex. CC.)

G.      State Street Had Not Stopped Funding Redemptions

        The Complaint also faults Defendants for failing to disclose to the Board that "[a]t

approximately 10:10 a.m. [on September 15], . . .State Street, the Reserve Funds' custodian

bank, stopped funding redemption requests placed by shareholders."  (Complt. ¶ 61).  This

allegation is flat out wrong.  State Street did not stop funding redemptions then and actually

continued sending out wires until 5:28 P.M. that day.  (Gareis Decl. ¶ 2.)

        For much of September 15, State Street did not tell Defendants that it had made an

internal decision to stop funding redemptions.  At 9:47 A.M., State Street advised RMCI that,

while wires would be delayed because of the "situation going on in the market as a result of

Lehman, AIG and Merrill . . . [and] big demand on money today," the "2:30 timeframe is

probably a safe bet" for the funding of all redemption requests.  Through 1:00 P.M., State Street

generally acted consistently with its promises, funding approximately $11 billion in redemptions

by noon.  When 3:00 P.M. came without all redemptions being paid, Bent II began trying to get

State Street to explain the delays in the wires.  To this end, he called State Street over a dozen

times from 3:45 P.M. onward, and sent many e-mails.  Internal State Street documentation shows

that, as late as 6:24 P.M. that day, State Street was still giving RMCI the run-around, and had not

responded to Bent II's inquiries.  (Gareis Decl. ¶ 17.)

        While Defendants did not know it at the time of the 1:00 P.M. Board meeting, State

Street made an internal decision at around 1:33 P.M. to put the Reserve on a "debit hold."

(Gareis Decl. ¶ 13.)  No investors who redeemed after State Street made that decision were able

to cash out of the Fund, no matter what Defendants said.  Nor was there anything the Board – or

even the SEC – could have done to force State Street to satisfy redemption requests.  (Bent II Ex. HH.)

H.      Communications With Rating Agencies

        The Complaint alleges that, shortly after the 1:00 P.M. Board meeting on September 15, Bent II told Moody's and Standard & Poor's about RMCI's intent to enter into a credit support agreement.  (Complt. ¶ 81.)  The Complaint further alleges that, when pressed for additional details, Bent II promised to provide more information later in the day.  If these statements were made, they were true at the time.  Bent II believed until late on September 15 that RMCI would and could enter into a support agreement that would be sufficient to protect the Fund's NAV, and he did not know that it would take DiMartino until 7:15 P.M. to prepare the first draft of an agreement.  (Bent II Decl. ¶ 23.)  There is no evidence that any of the Defendants supplied the rating agencies with false information.

I.      As Soon As Defendants Realized a Support Agreement Was Not Feasible,
        They Immediately Advised Counsel, Their Regulator, and The Board

        By day's end on September 15, redemptions exceeded $20 billion.  The market remained illiquid and had not rebounded, as Bent Sr. had earlier in the day assumed it would.  It became clear to the Bents that, with the unprecedented market collapse that the Lehman bankruptcy caused, the level of support that would actually be required to keep the Fund's NAV at $1.00 far exceeded RMCI's resources, and a support agreement would not be viable.  (Bent II Decl. ¶ 44.) They therefore contacted Goldberg first thing Tuesday morning, told him of their conclusion, and asked him to reach out to the SEC.  (Bent II Decl. ¶ 45.)  Bent II also called Standard & Poor's and Moody's at 7:12 A.M. and 8:19 A.M., respectively, to make sure that they knew RMCI was not going to enter into a support agreement.  (Bent II Decl. ¶ 43.)

        At 7:42 A.M. on September 16, following Goldberg's call with the Bents, Goldberg sent Plaze and the then-director of the SEC's Division of Investment Management an e-mail

-14-

disclosing the following information (Bent II Ex. EE):

> Reserve needs an emergency order suspending redemptions.  They can't price and they don't have enough cash to meet redemptions unless they sell at fire sale prices which will wreck [the] NAV.  They're going out of business.

By 8:00 A.M., the Bents, along with Goldberg and DiMartino, had the first of several conversations with the SEC.  During that call, Goldberg disclosed the volume of redemptions, the fact that State Street has stopped funding redemptions, the Fund's inability to raise cash by liquidating assets, the inability of RMCI to implement a viable support agreement, RMCI's effort to obtain relief from the Federal Reserve, and the unavailability of other alternatives.  (Bent II Ex. FF, pp. 101-151.)  Defendants thus made voluntary and full disclosure <u>to their regulator</u> at 8:00 A.M. on September 16 of all the information that the SEC incorrectly alleges in its Complaint they had withheld starting at 1:00 P.M. the day before.  (Complt. ¶¶ 4, 7.)

J.       The Board's 10:00 A.M. Meeting On September 16

At the Board's next meeting at 10:00 A.M. on September 16, Bent II reported on the developments since the prior meeting:  redemption requests had reached $24.6 billion; State Street had stopped paying redemptions; RMCI could not provide the enormous amount of support necessary to maintain the Fund's $1.00 NAV; the SEC had been contacted; and it was likely the Fund would break the buck without an infusion of cash.  (Bent Sr. Ex. J.)  The Complaint does not allege that Defendants made any false representations to, or withheld any material information from, the Board on September 16 or thereafter.

When all of this information was disclosed to the Independent Trustees at 10:00 A.M. on September 16, they did nothing with it:  they did not set a new value for Lehman; they did not vote to suspend sales; and they did not, and could not, make it possible for investors who placed redemption requests to cash out.  In short, there is no evidence that the Independent Trustees would have done anything differently on September 15 even had they been provided with more

information on Monday afternoon, as opposed to Tuesday morning.

THE COMPLAINT

The Complaint asserts seven claims against Defendants under the Exchange Act, Securities Act, and Advisers Act.  Each time Defendants have asked the SEC to elaborate on its claims, the SEC has responded by directing Defendants back to the Complaint:  "Plaintiff's detailed Complaint sets forth the basis of its allegations."  (SEC's Request for Admission, p. 1.)  It should be noted that not a single one of the SEC's claims is based on an allegation that the purchase of Lehman paper, which was fully disclosed and entirely permissible, was wrongful.

The first claim for relief charges Bent II, RMCI, and Resrv with violating § 10(b) of the Exchange Act and Bent Sr. and Bent II with somehow aiding and abetting the other Defendants' primary violations.  The second claim charges Bent Sr. and Bent II with liability as control persons under § 20(e) of the Exchange Act.  In its third claim for relief, the SEC seeks to hold RMCI, Resrv, and Bent II liable under § 17(a) of the Securities Act.  The fourth claim asserts that RMCI, Bent Sr., and Bent II violated §§ 206(1) and 206(2) of the Advisers Act.  The fifth claim charges the same three defendants with violating § 206(4) of the Advisers Act and Rule 206(4)-8 promulgated thereunder.  The sixth and seventh claims allege that Bent Sr. and Bent II aided and abetted the violations alleged in the fourth and fifth claims.  By way of relief, the Complaint seeks a permanent injunction, disgorgement of "the ill-gotten gains [Defendants] received from the violations alleged herein," and civil penalties.

ARGUMENT

SINCE THE SEC CANNOT ESTABLISH ESSENTIAL ELEMENTS OF ITS CLAIMS, <u>SUMMARY JUDGMENT SHOULD BE ENTERED IN DEFENDANTS' FAVOR</u>

I.      THE APPLICABLE LEGAL STANDARD

Under Fed. R. Civ. P. 56(a), "[s]ummary judgment is warranted when the moving party shows that 'there is no genuine dispute as to any material fact' and that it 'is entitled to judgment

-16-

as a matter of law.'"  <u>SEC</u> v. <u>Jadidian</u>, 2011 U.S. Dist. LEXIS 36485, * 11 (S.D.N.Y. Mar. 31,

2011).[3]  Where, as in this case, "'the nonmoving party will bear the burden of proof at trial, Rule

56 permits the moving party to point to an absence of evidence to support an essential element of

the nonmoving party's claim.'"  <u>Ibid.</u>; <u>Celotex Corp.</u> v. <u>Catrett</u>, 477 U.S. 317, 323 (1986)

(movant entitled to judgment as matter of law where "nonmoving party has failed to make a

sufficient showing on an essential element of her case with respect to which she has the burden

of proof").  Here, since the SEC cannot establish essential elements of its claims in this case,

summary judgment should be entered in favor of Defendants.

II.     THE SEC CANNOT ESTABLISH ALL OF THE<br>
ELEMENTS OF ITS SECTION 10(b) and 17(a) CLAIMS

To hold Defendants liable under §§ 10(b) of the Exchange Act and/or 17(a)(1) of the

Securities Act, the SEC would have "to prove that in connection with the purchase or sale of a

security [each] defendant, acting with scienter, made a material representation (or a material

omission if the defendant had a duty to speak) or used a fraudulent device."  <u>SEC</u> v. <u>First Jersey</u>

<u>Sec., Inc.</u>, 101 F.3d 1450, 1467 (2d Cir. 1996).  <u>See</u> <u>SEC</u> v. <u>Monarch Funding Corp.</u>, 192 F.3d

295, 308 (2d Cir. 1999) ("Essentially the same elements are required under § 17(a)(1)-(3) in

connection with the offer or sale of a security, though no showing of scienter is required for the

SEC to obtain an injunction under subsections (a)(2) or (a)(3)"); <u>SEC</u> v. <u>Kelly</u>, 2011 U.S. Dist.

LEXIS 3290, * 41 (S.D.N.Y. Jan. 7,  2011) ("elements of a claim under Section 17(a)(1) are

'essentially the same' as the elements of a claim under Section 10(b) and Rule 10b-5").  The

failure to establish any one of these elements is fatal.  <u>SEC</u> v. <u>Rorech</u>, 720 F. Supp. 2d 367, 404

(S.D.N.Y. 2010) (SEC "must prove every element of its claim").

---

[3]      To conserve space, citations are omitted throughout this memorandum.

A.     Statements Intended to Induce Investors Not to Redeem Are Not Actionable Because They Do Not Satisfy the "In Connection With a Purchase or Sale" Requirement

Summary judgment should be entered dismissing all claims arising from statements Defendants allegedly made to stop redemptions – and induce investors to hold their shares – because, as a matter of law, such statements were not made "in connection with" the purchase or sale of a security, and therefore are not actionable under §§ 10(b) and 17(a).  As the Second Circuit held in Abrahamson v. Fleschner, 568 F.2d 862, 868 (2d Cir. 1977), "the requirement of fraud in connection with the purchase or sale of a security is not satisfied by an allegation that plaintiffs were induced fraudulently not to sell their securities."

This principle equally applies to a misrepresentation which induces an investor not to redeem a security.  In SEC v. Northshore Asset Mgmt., 2008 U.S. Dist. LEXIS 36160, * 27 (S.D.N.Y. May 5, 2008), the SEC alleged that one of the defendants convinced an investor "to redeem 75%, rather than 100%, of its Ardent Domestic investment."  The Court granted summary judgment dismissing the claim because "[t]his is insufficient to demonstrate the 'in connection with a purchase or sale' requirement."  Ibid.  See also Gambella v. Guardian Investor Services Corp., 75 F. Supp. 2d 297, 299 (S.D.N.Y. 1999) (claim that plaintiff " was fraudulently induced to retain his UENT stock which is now valueless" not actionable under § 10(b)); Bischoff v. G.K. Scott & Co., Inc., 687 F. Supp. 746, 752 (E.D.N.Y. 1986) ("Allegations that persons were fraudulently induced not to sell their securities do not meet the requirement that complained of fraud be in connection with the purchase or sale of securities").

Because statements allegedly made to induce investors not to redeem do not satisfy the "in connection with a purchase or sale" requirement of §§ 10(b) and 17(a)(1), the SEC's claims that Defendants violated §§ 10(b) and 17(a)(1) by making statements to induce investors not to redeem are deficient as a matter of law and must be dismissed.

B.    The "In Connection With" Requirement Cannot Be Satisfied By
<u>Relying on Purchasers to Whom no Representations Were Made</u>

Although the thrust of the Complaint is that Defendants made misrepresentations to induce investors not to redeem, the SEC adds a gratuitous allegation that Defendants also sought to induce purchases.  (Complt. ¶ 4.)  Even if there were some factual basis for this allegation, and there is not, Defendants would still be entitled to summary judgment to the extent that purchases were made by investors to whom Defendants made no representations.

To establish fraud "in connection with" the purchase of a security, the SEC must come forward with evidence that the defendant made a representation to a purchaser.  In this case, with the exception of a limited number of investors who were in <u>direct</u> contact with RMCI's sales staff on September 15 – virtually none of whom purchased Fund shares – there is no evidence that Defendants made representations to investors.  With respect to these purchasers to whom no representations were made, the "in connection with" requirement cannot be satisfied.

The "in connection with" requirement has been interpreted "to mean 'that the fraud must have some direct pertinence to a securities transaction.'"  <u>SEC</u> v. <u>Norton</u>, 1997 U.S. Dist. LEXIS 15167, * 15 (S.D.N.Y. Sept. 30, 1997).  <u>See also</u> <u>Crummere</u> v. <u>Smith Barney, Harris Upham & Co. Inc.</u>, 624 F. Supp. 751, 755 (S.D.N.Y. 1985) ("To satisfy the purchase and sale requirements of rule 10b-5, there must be a causal connection between the misstatements or omissions and the plaintiff's purchases or sales, and there can be no such connection where the misstatement occurs after the purchase"); <u>SEC</u> v. <u>Adoni</u>, 60 F. Supp. 2d. 401, 409 (D.N.J. 1999) ("the most liberal readings of § 10(b) have involved at least the opportunity for public reliance").

Between 1:19 P.M. on September 15, when Bent II sent his internal e-mail to RMCI's Sales and Marketing Directors, and 3:59 P.M. on September 16, when the Fund announced that it was breaking the buck, there were only 62 non-automated purchases of Fund shares, and only six of these purchases were made by investors who received an e-mail or other communication

concerning RMCI's intent to support the Fund.  (Gareis Decl. ¶24.)  During the same period, Defendants issued no press releases and made no public announcements.  Thus, of the 62 purchases between 1:19 P.M. on September 15 and 3:59 P.M. on September 16, 56 clearly cannot satisfy the requirement of fraud "in connection with" the purchase of a security because no representation – false or otherwise – was made to those purchasers.  In the less than three-hour window from 8:15 A.M. to 11:00 A.M. on September 16 while Insights was on the Website, no purchases of Fund shares were made.  (Gareis Decl. ¶ 24.) .[4]

In sum, other than for six purchasers, the SEC cannot satisfy the in connection with requirement of §§ 10(b) and 17(a), and even as to those six purchasers, the claims fail for the reasons set forth below.

C.      The Alleged Misrepresentations Were Not Material Because,
        No Matter What Defendants Said, Investors Could Not Have Redeemed
        and Because Purchasers Did Not Treat the Statements as Important

To satisfy the materiality requirement of §§ 10(b) and 17(a), "[i]t is not enough that a statement is false or incomplete"; "in order to prevail on a Rule 10(b)-5 claim, a plaintiff must show that the statements were <u>misleading</u> as to a <u>material</u> fact."  <u>Basic, Inc.</u> v. <u>Levinson</u>, 485 U.S. 224, 238 (1988) (emphasis in original).  Defendants are entitled to summary judgment under §§ 10(b) and 17(a) (1) because, as to would be-redeemers, once State Street stopped funding redemptions, any statements made to induce investors not to redeem were immaterial as a matter of law; and (2) because purchasers did not treat the statements as important.

With respect to the statements supposedly made to induce investors not to redeem – even if they satisfied the "in connection with" requirement – they would not be actionable because they are immaterial.  In determining materiality, "the operative question is whether [an investor]

---

[4]      After Insights was removed from the Website, some additional purchases were made.  Starting at 10:00 A.M. on September 16 Board, the Independent Trustees took over responsibility for public disclosures.  (Bent Sr. Decl. ¶ 39.)  Defendants cannot be blamed for purchases made after the Independent Trustees could have suspended sales, but failed to do so.

could have altered its conduct if it had possessed information that was allegedly not disclosed.  If [an investor] does not allege how it could have 'acted differently' – either because there was no available remedy or because [investor] used the remedies available to it – an alleged omission is not a material non-disclosure within the meaning of Section 10(b)."  TCS Capital Mgmt., LLC v. Apax Partners, L.P., 2008 U.S. Dist. LEXIS 19854, * 47 (S.D.N.Y. Mar. 7, 2008).   The test of materiality is not different for the SEC.  See Basic, 485 U.S. at 240 n. 18 ("We find no authority . . . for varying the standard of materiality depending on who brings the action").

A long line of cases supports this materiality principle.  See, for example, Santa Fe Indus. Inc. v. Green, 430 U.S. 462, 474 n. 14 (1977) (where respondents did "not indicate how they might have acted differently had they had prior notice of the merger," their § 10(b) claim was properly dismissed because "failure to give advance notice was not a material nondisclosure"); Madison Consultants v. FDIC, 710 F.2d 57, 62 (2d Cir. 1983) (information is material where investors can show that, had they known the truth, they "had available some reasonably effective means of protecting themselves against loss"); Nobles v. First Carolina Communications, Inc., 929 F.2d 141, 145 (4th Cir. 1991) ("Nobles had no choice but to sell his limited partnership interest, and thus, any misrepresentation or omission made to him with regard to such transaction could not, as a matter of law, have been material"); United States v. Margala, 662 F.2d 622, 626 (9th 1981) (Santa Fe should be read to support a "commonsense proposition about materiality: A reasonable investor will not view a fact as significant unless he could respond to the fact's disclosure by protecting himself from possible financial loss.  There is little reason to require disclosure when an investor could not use the information") (emphasis added); Feit v. Leasco Data Processing Equip. Corp., 332 F. Supp. 544, 571 (S.D.N.Y. 1971) ("Fact is material in a registration statement whenever a rational connection exists between its disclosure and a viable alternative course of action by an appreciable number of investors").

In this case, the last redemption request that State Street funded on September 15 was requested at 1:24 P.M. – before Defendants had communicated to any investors about their intention to support the Fund. (Complt. ¶ 77.) Thus, no matter what Defendants told investors after State Street stopped funding new redemption requests, any investors who wanted to redeem would have had no way of protecting themselves against loss because they could not have cashed out their shares. The alleged misrepresentations to would-be redeemers are thus immaterial as a matter of law. Basic, 485 U.S. at 241 ("materiality depends on the significance the reasonable investor would place on the withheld or misrepresented information").

The SEC has a different problem establishing that material misrepresentations were made to purchasers. There is absolutely no evidence that any of the six purchasers who were informed on September 15 of RMCI's intent to support the Fund regarded it as material; each of the purchases appears to have been a routine, end-of-day trade consistent with the investors' 30-day trading history; and most of the purchasers, consistent with their trading patterns, submitted redemption requests on September 16 – before the Fund announced it broke the buck. (Gareis Decl. ¶ 27.) Nor is there a correlation between the temporary posting of Insights on the Website on September 16 and purchases of Fund shares. On the contrary, between 8:15 and 11:00 A.M. that morning, not a single non-automated purchase was made. Purchasers thus did not appear to attach any significance to Insights. SEC v. Bausch & Lomb, Inc., 565 F.2d 8, 18 (2d Cir. 1977) ("basically indifferent responses" to information support "conclusion that the information was not material"); SEC v. Texas Gulf Sulphur, Inc., 401 F.2d 833, 851 (2d Cir. 1968) (major factor in determining materiality of statement is significance actually attached to it).

Aside from the 1:19 e-mail (whose substance was transmitted to only a handful of purchasers) and Insights (which there is no evidence that purchasers regarded as important), the only other representations that the SEC alleges were made to investors were statements to the

rating agencies.  Defendants made no untrue statements to the rating agencies.  The rating

agencies did not, in any case, rely on Defendants' statements.  Rather, as the SEC alleges, the

rating agencies demanded additional information, "including copies of the actual [support]

agreements" (Complt. ¶ 97), which was never provided to them.

D.     Because There Is No Evidence That Defendants' Statements Did Not Accurately
       Reflect Their Intent At the Time, the SEC Will Be Unable to Prove Scienter

Scienter is a "mental state embracing [an] intent to deceive, manipulate, or defraud."

Aaron v. SEC, 446 U.S. 680, 686 n. 5 (1980).  "[A] statement of intent need only be true when

made; a subsequent change of intention will not, by itself, give rise to a cause of action under

Section 10(b) or Rule 10b-5 thereunder."  In re Phillips Petroleum Secs. Litig., 881 F. 2d 1236,

1245 (3d Cir. 1989).  Accord Gurary v. Winehouse, 190 F.3d 37, 44 (2d Cir. 1999) (summary

judgment granted where there was no evidence that person who made statement of intention "did

not intend to do just what he promised to do at the times he made the statements").

The SEC will be unable to produce evidence establishing that, when Bent II said that

RMCI intended to support the Fund, he did not mean it.  On the contrary, the evidence shows

that, on the afternoon of September 15, Bent II expected to be able to implement an adequate

support agreement, and his intent changed when it became clear the support agreement, which

had earlier seemed workable, was no longer feasible because the amount of support the Fund

would need exceeded RMCI's capabilities. See Pommer v. Medtest Corp., 961 F.2d 620, 623

(7th Cir. 1992) ("securities laws approach matters from an *ex ante* perspective: . . . a statement

true when made does not become fraudulent because things unexpectedly go wrong"); Stransky

v. Cummins Engine Co., Inc., 51 F.3d 1329, 1332 (7th Cir. 1995) (§10(b) "implicitly precludes

basing liability on circumstances that arise after the speaker makes the statement'").

With the benefit of hindsight, it may appear that Bent II should not have expected the

plan for RMCI to support the Fund to be workable.  But securities fraud cannot be based on a

failure to predict the future, particularly a once-in-a-lifetime financial crisis.  It is what Bent II intended at 1:19 P.M. on September 15 – and not what happened later – that is relevant to the issue of scienter.  Since the SEC will be unable to come forward with evidence that Bent II's statement of intent was not true when made, it cannot establish scienter.

E.     There Can Be No Aider and Abettor Liability

Under § 20(e) of the Exchange Act, no Defendant can be held liable as an aider and abettor of a § 10(b) violation unless the SEC first establishes that a primary wrongdoer has committed a § 10(b) violation.  SEC v. PIMCO Advisors Fund Mgmt., LLC, 341 F. Supp. 2d 454, 467-468 (S.D.N.Y. 2004).  Here, as set forth in Point II(A)-(D) above, the SEC cannot establish a primary violation, and it therefore cannot establish aider and abettor liability either.

F.     There Can Be No "Control Person" Liability

Similarly, the SEC cannot establish "control person" liability under § 20(a) of the Exchange Act because, among other things, it cannot establish a primary violation for RMCI's alleged violation of § 10(b).  See  ATSI Comms., Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 108 (2d Cir. 2007) (requiring "primary violation by the controlled person").

III.     THE SEC CANNOT PREVAIL ON ITS CLAIMS UNDER THE ADVISERS ACT

A.     Since The Bents Were Not Themselves Investment Advisers,
         They Cannot Be Liable for Violating the Advisers Act_____

The SEC's fourth and fifth claims seek to hold RMCI, Bent Sr., and Bent II liable for violations of Sections 206(1), (2), and (4), of the Advisers Act, 15 U.S.C. §§ 80b-6(1), (2), and (4), and Rule 206(4)-8 thereunder.  Each of these sub-sections is introduced by language which provides that "[i]t shall be unlawful for any investment adviser, by use of the mails or any means or instrumentality of interstate commerce," followed by a description of the type of conduct it prohibits.  Thus, § 206 is, by its terms, only applicable to "investment advisers."  While RMCI was an investment adviser, neither of the Bents was himself an investment adviser.  Accordingly,

they cannot be liable under the Advisers Act, and summary judgment should be granted dismissing the Advisers Act claims as a matter of law.

The Advisers Act defines " investment adviser" to mean "any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities."  15 U.S.C. § 80b-2(11).

The Advisers Act separately defines "person associated with an investment adviser" as "any partner, officer, or director of such investment adviser (or any person performing similar functions), or any person directly or indirectly controlling or controlled by such investment adviser, including any employee of such investment adviser. . . ."  It thus clearly differentiates between an " investment adviser" and a "person associated with an investment adviser."

As officers of RMCI, the Bents were "persons associated with an investment adviser," but were not "investment advisers":  although they received salaries as RMCI officers, they did not themselves receive compensation tied to advising others as to the value of securities or the advisability of investing in securities, nor did they personally receive compensation for issuing reports concerning securities.  Since §§ 206(1), (2), and (4) prohibit conduct by "investment advisers" and do not purport to regulate "persons associated with investment advisers," Bent Sr. and Bent II cannot be liable for violating these Sections.

Other sections of the Adviser Act apply generally to "any person" and are not limited to "investment advisers."  This shows that, when Congress intended to make a prohibition applicable to "any person," rather than just to "investment advisers," it knew how to do so.  See, e.g., 15 U.S.C. § 80b-7 ("It shall be unlawful for any person willingly to make any untrue statement of material fact in any registration application. . . .").

-25-

In keeping with the plain language of § 206, the SEC has not been allowed to bring claims for violating § 206 against persons who are not investment advisers.  For example, in PIMCO, supra, 341 F. Supp. 2d 454, when the SEC asserted claims under § 206 against two individuals, one of whom was the CEO of an investment adviser, the court dismissed the claim, explaining:  "The SEC may not charge Treadway and Corba with violations of §§ 206(1) or 206(2), directly, since they are not themselves investment advisers covered by the statutory provisions."  Id., 341 F. Supp. 2d at 470.  Greenspan v. Del Toro, 1974 U.S. Dist. LEXIS 8475, * 5 (S.D. Fla. May 17, 1974) ("Since §80b-6 applies only to 'investment advisers,' only such persons shall be amenable to suit").

B.     The Evidence Does Not Support an Advisers Act Claim Against RMCI

Once the claims against the Bents are disposed of, this leaves the SEC with claims that RMCI violated §§ 206(1), (2), and (4) of the Advisers Act.  Sections 206(1) and (2) make it unlawful "to defraud any client or prospective client" or to engage in conduct "which operates as a fraud or deceit upon any client or prospective client," respectively.  For purposes of § 206, the "client" of a money market fund's investment adviser is the fund – and not its investors.  As the court explained in Goldstein v. SEC, 451 F.3d 873, 879-880 (D.C. Cir. 2006):

> An investor in a private fund may benefit from the adviser's advice (or he may suffer from it) but he does not receive the advice directly.  He invests a portion of his assets in the fund.  The fund manager – the adviser – controls the disposition of the pool of capital in the fund.  The adviser does not tell the investor how to spend his money; the investor made that decision when he invested in the fund. Having bought into the fund, the investor fades into the background. . . .  If the person or entity controlling the fund is not an "investment adviser" to each individual investor, then a fortiori each investor cannot be a "client" of that person or entity.  These are just two sides of the same coin.

Although it is not clear from the Complaint, the SEC's claims under §§ 206(1) and (2) must necessarily be based on allegations that the Independent Trustees – who were, in effect, RMCI's client – were defrauded.  The SEC will be unable to prove such allegations.

In <u>PIMCO</u>, <u>supra</u>, 341 F. Supp. 2d at 470, the Court pointed out that "[t]he provisions of §§ 206(1) and 206 (2) have been interpreted as substantively indistinguishable from § 17(a) of the Securities Act, except that § 206(1) requires proof of fraudulent intent, while § 206(2) simply requires proof of negligence by the primary wrongdoer." To establish a claim under § 17(a)(1), the SEC must present evidence of, among other things, a material misrepresentation or omission that was made with scienter. <u>SEC</u> v. <u>Monarch Funding Corp.</u>, 192 F.3d 295, 308 (2d Cir. 1999). For many of the same reasons that the SEC cannot establish the elements of its § 17(a) claim, it also cannot establish the elements of its § 206(1) claim.

With respect to the matters about which the Independent Trustees were supposedly misled – RMCI's ability to support the Fund, whether State Street was funding redemptions, and redemption levels – the SEC will be unable to prove scienter and a material misrepresentation. First, there is no evidence that RMCI's ability to support the Fund was misrepresented at the 1:00 P.M. Board Meeting on September 15. (Bent Sr. Decl. ¶¶ 20-26.) Second, there is irrefutable evidence that, as of 1:00 P.M. on September 15, State Street had not decided yet to stop funding redemptions. (Gareis Decl. ¶¶ 4-5.) Third, the Board was told at the 1:00 P.M. meeting that "redemption requests from shareholders in the Primary Fund had continued unabated throughout the morning," when they had already reached $5.2 billion. (Bent Sr. Ex. J.) Based on these undisputed facts, the SEC will not be able to show a misstatement to the Board.

While the absence of a misrepresentation is fatal to the SEC's § 206(1) claim, that is not its only deficiency. The SEC also cannot show that, if there were a misrepresentation, it would have been material. Once the Independent Trustees had all the information on September 16 that they supposedly lacked on September 15, nothing changed. After the Board was told at 10:00 A.M. on September 16 that the Fund would likely break the buck, the Independent Trustees did not re-value the Fund's Lehman paper or suspend purchases. And, once State Street stopped

-27-

funding redemptions, there was nothing the Independent Trustees (or even the SEC) could have done to force State Street to make payments.  (Bent II Ex. HH, pp. 33-34.)  For this reason, because the Independent Trustees did not and could not do anything to protect investors who wanted to redeem, the information supposedly misrepresented was not material.

With respect its § 206(2) claim, "the SEC must prove by a preponderance of the evidence that:  (1) Defendants are investment advisers; (2) Defendants used the mails or any other means or instrumentality of interstate commerce, directly or indirectly (3) to make a misstatement or omission of material fact to a client or prospective client; and (4) Defendants acted negligently." SEC v. Bolla, 401 F. Supp. 2d 43, 67 (D.D.C. 2005), aff'd in relevant part, 475 F.3d 392 (D.C. Cir. 2007).

In this case, RMCI has been left to guess what the SEC's § 206(2) claim is based on.  The Complaint refers only to "fraudulent conduct" (Complt. p. 9), and does not allege that RMCI was negligent in any respect.  To date, the sole negligent act that the SEC has so much as alluded to is RMCI's alleged failure to monitor the price of Lehman paper on September 15 and 16.  Even if that claim had actually been pled in the Complaint, it would have been baseless.  As the Bent Sr. declaration establishes, RMCI did monitor Lehman trades.  (Bent Sr. Decl. ¶ 15)

Moreover, even though a § 206(2) claim does not require scienter, it still requires a material misstatement or omission.  Bolla, 401 F. Supp. 2d at 67.  The materiality requirement cannot be satisfied here because, for the reasons set forth above, the Independent Trustees could not have done –and did not, in fact, do – anything else to keep the Fund from breaking the buck once State Street stopped funding redemptions.  Defendants also cannot be faulted for failing to tell the Board what State Street was doing until they themselves had a clear understanding.  See, for example, Higginbotham v. Baxter Int'l, Inc., 495 F.3d 753, 761 (7th Cir. 2007) ("Taking the time necessary to get things right is both proper and lawful.  Managers cannot tell lies but are

entitled to investigate for a reasonable time, until they have a full story to reveal")

According to the SEC, its claim under § 206(4), and Rule 206(4)-8 thereunder, also does not require a showing of scienter.  (ECF Doc. No. 126, p. 27.)  However, Rule 206(4)-8 <u>does</u> require that any misstated or omitted fact be "material."  <u>See</u> Rule 206(4)-8(a)(1).  Thus, for the same reason that the SEC cannot establish the materiality element of its §§ 10(b) and 17(a) claims, it cannot establish materiality for its § 206(4) claim.

IV. THE SEC CANNOT PRODUCE EVIDENCE ESTABLISHING THAT
THE BENTS AIDED AND ABETTED VIOLATIONS OF SECTION 206
<u>AND, EVEN IF IT COULD, CIVIL PENALTIES CANNOT BE IMPOSED</u>

A. The SEC Cannot Adduce Evidence Which Supports
<u>An Aiding and Abetting Claim Under the Advisers Act</u>

To sustain its sixth and seventh claims, which seek to hold the Bents liable for aiding and abetting violations of §§ 206(1), (2), and (4), the SEC would have to show:  "(1) an underlying violation of the act; (2) Defendant's knowledge of the fraudulent acts; and (3) Defendant's provision of substantial assistance to the primary violation."  <u>SEC</u> v. <u>Gabelli</u>, 2010 U.S. Dist. LEXIS 27613, *22 (S.D.N.Y. Mar. 17, 2010).  <u>Accord</u> <u>SEC</u> v. <u>Steadman</u>, 967 F.2d 636, 647 (D.C. Cir. 1992).  The SEC cannot make that showing for either Bent.

In <u>Steadman</u>, <u>supra</u>, the Court reversed a finding that the defendant was liable for aiding and abetting a violation of the Advisers Act based on his "ultimate supervisory responsibility" over the primary wrongdoer (967 F.2d at 647):

> However important that admission may be to a finding of liability based on *respondeat superior*, it is completely beside the point when the question is aiding and abetting.  The SEC has not pointed to a single piece of evidence that tends to show that Mr. Steadman was generally aware that the Corporation's subscription and redemption accounts were being managed improperly or that surprise audits were required.  Mr. Steadman, therefore, may not be held liable for aiding and abetting those violations.
>
> The evidence is just as lacking in this case.  There was no primary violation here; the

-29-

Bents did not know of any fraud; and no evidence exists showing that they provided substantial assistance, which requires more than approval and acquiescence in someone else's misconduct. SEC v. Tecumseh, 2009 U.S. Dist. LEXIS 119869, * 17 (S.D.N.Y. Dec. 22, 2009) ("it is well-established in the Second Circuit that 'mere awareness and approval of [a] primary violation is insufficient to make out a claim for substantial assistance.'").

B.    There is No Legal Authority for Imposing Civil Penalties on
      A Defendant for Aiding and Abetting a Violation of the Advisers Act

Even if the SEC's aiding and abetting claim were not factually baseless, the civil penalties the SEC seeks against Bent Sr. and Bent II for purportedly aiding and abetting violations of § 206 are not recoverable as a matter of law.  The Complaint cites § 209(e) of the Advisers Act, 15 U.S.C. § 80b-9(e), as authorizing the Court to order the Bents to pay civil monetary penalties for allegedly aiding and abetting a violation of § 206.  (Complt. p. 43(V).)  But § 209(e)(1) does not empower courts to impose a penalty on anyone other than the primary violator.  It provides that "the Commission may bring an action in a United States district court to seek, and the court shall have jurisdiction to impose, upon a proper showing, a civil penalty to be paid by the person who committed such violation."  (Emphasis added.)

This language has been held to bar the SEC from seeking to impose civil monetary penalties on aiders and abettors under the Advisers Act.  As the court held in Gabelli, 2010 U.S. Dist. LEXIS 27613, * 30, "the statutory language is unambiguous that civil penalties in judicial proceedings may be imposed only upon a 'person who committed' a violation of the Investment Advisers Act").  Accord SEC v. Bolla, 550 F. Supp. 2d 54 (D.D.C. 2008) ("Section 209(e) of the Advisers Act does not authorize the SEC to seek, or grant this Court jurisdiction to impose, monetary penalties upon Defendant for his aiding and abetting violations of the Act").  Accordingly, the SEC's request that civil monetary penalties be imposed on the Bents for aiding and abetting violations of § 206 has no legal basis and should be dismissed.

-30-

## V.    DISGORGEMENT IS UNAVAILABLE AS A REMEDY BECAUSE THE SEC HAS NO EVIDENCE OF ANY "ILL-GOTTEN GAINS"

Other relief that the SEC seeks is also unavailable in this case.  For example, the fourth item in the SEC's prayer for relief is an order requiring "each of the Defendants to disgorge the ill-gotten gains they received from the violations alleged herein. . . ."  (Complt. p. 43(IV).) Disgorgement is intended to prevent unjust enrichment and "is appropriate only in situations in which a defendant has benefitted from ill-gotten gains and should not be used as punishment." SEC v. Norton, 21 F. Supp. 2d 361, 365 (S.D.N.Y. 1998).

In discovery, Defendants have repeatedly sought to find out from the SEC what it claims are "ill-gotten gains."  In response, the SEC has provided nothing except tautological statements such as "it seeks disgorgement of all ill-gotten gains derived by Defendants from their conduct as alleged in the Complaint" (SEC's Response to Interrog. No. 1) or generic statements such as that it seeks "disgorgement of all ill-gotten gains, . . . including but not limited to, all fees, bonuses, or other payments earned or claimed under any agreements or otherwise pertaining to assets under management after September 16, 2008, and any agreements made pursuant to indemnification agreements relating to Defendants' litigation expenses incurred in their respective defenses of this action" (SEC's Suppl. Disclosure Statement, p. 2 ¶ C).  This laundry list of amounts that may be paid to Defendants is no substitute for evidence.  The reason for this failure of proof is simple:  Defendants received no ill-gotten gains in this case.  (Boruch Decl.)

Where, as here, the SEC seeks disgorgement, but can produce no evidence that would enable the Court to determine what part of the defendants' gains, if any, is causally connected to the alleged wrongdoing, summary judgment dismissing the disgorgement claim is proper.  SEC v. Kelly, 2011 U.S. Dist. LEXIS 3290 (S.D.N.Y. Jan. 7, 2011) (summary judgment dismissing disgorgement claim); SEC v. Jones, 476 F. Supp. 2d 374 (S.D.N.Y. 2007); Norton, 21 F. Supp. 2d at 366 (same).  The same result is appropriate here.

In <u>Kelly</u>, <u>supra</u>, when the SEC was asked in discovery to identify the nature and amount of profit it sought to disgorge based on defendants' alleged involvement in a scheme to inflate stock prices, it gave responses that were almost as generic and unenlightening as the responses it gave in this case:  it cited the yearly compensation and bonus amounts of one of the defendants. The Court pointed out (2011 U.S. Dist. LEXIS 3290, * 60):

> There is no evidence that Rindner's entire compensation from 2000 through 2003 was tied to AOL's recognition of advertising revenue on the round- trip transactions, and there is no evidence in the record that would allow this Court to determine what percentage of his compensation should be disgorged.

> The Court also noted that, "because the disgorgement remedy is remedial, rather

than punitive, a court cannot order disgorgement of an amount above that which was wrongfully acquired."  <u>Id.</u>, * 58.  Since the SEC had "proffered no evidence this Court could use to reasonably approximate the percentage of [defendants'] compensation that was causally connected to the alleged violations," <u>Id.</u>, * 59-60, it granted summary judgment to defendants on the disgorgement claim – even though it declined to dismiss the securities fraud claims.

The SEC's disgorgement claim was dismissed for essentially the same reason in <u>Jones</u>, <u>supra</u> – because the SEC was "unable to set forth any evidence of specific profits subject to disgorgement" or even "provide the Court with any guideposts for determining the amount of Defendants' compensation subject to disgorgement."  <u>Id</u>, 476 F. Supp. 2d at 386.

Since the SEC cannot sustain its "initial burden of persuasion that the amount of disgorgement it seeks approximates the amount by which the defendant was unjustly enriched," <u>SEC</u> v. <u>Johnson</u>, 2006 U.S. Dist. LEXIS 50307, ** 22-23 (S.D.N.Y. July 21, 2006), it cannot obtain disgorgement.

## VI.  THE SEC CANNOT RECOVER MORE THAN THE FIXED PENALTIES BECAUSE DEFENDANTS HAD NO PECUNIARY GAIN

In the event that the SEC's claims are not dismissed in their entirety, its request for civil

penalties should be limited to the fixed amounts set forth in the applicable penalty statutes, which authorize the Court to impose penalties in the greater of (1) that fixed amount or (2) "the gross amount of pecuniary gain to such defendant as a result of the violation."  15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d); 15 U.S.C. § 80b-9(e).  As we explained in Point V above, the SEC can show no pecuniary gain to the Defendants from any alleged violation.

VII.    INJUNCTIVE RELIEF IS NOT WARRANTED GIVEN THE INDISPUTABLY
        ISOLATED NATURE OF DEFENDANTS' ALLEGED WRONGDOING

Even if the SEC were to prevail on any or all of its claims, it would not be entitled to a permanent injunction against Defendants.  In recognition of the serious consequences of granting injunctive relief, the Second Circuit has emphasized that the SEC must "go beyond the mere fact of past violations and demonstrate a realistic likelihood of recurrence."  SEC v. Commonwealth Secs., Inc., 574 F.2d 89, 100 (2d Cir. 1978).  "It is well settled that the Commission cannot obtain [injunctive] relief without positive proof of a reasonable likelihood that past wrongdoing will recur."  Bausch & Lomb., 565 F.2d at 18. No such positive proof exists here.

Where the alleged misconduct occurred on an isolated occasion and was of limited duration, the SEC cannot sustain its burden of showing a likelihood of recurrence.  Jadidian, 2011 U.S. Dist. LEXIS 36485, * 16 ("Given that the SEC has not offered proof of other violations committed by Jadidian, this Court must conclude that the TTCN episode – which took place over approximately one month – was an 'isolated occurrence,'" and injunction denied on summary judgment); Gabelli, 2010 U.S. Dist. LEXIS 27613, * 26-27  (SEC did not plausibly allege reasonable likelihood defendants would engage in future violations where there was no allegation of "other fraudulent activity either prior or subsequent to the specific claims brought here"); Jones, 476 F. Supp. 2d at 384-385 (where SEC "has adduced no positive proof aside from Defendants' past alleged wrongdoing to suggest 'some cognizable danger of recurrent violation,'" court concluded that, "[w]hen viewed together with the severity of potential

-33-

collateral consequences for Defendants should a permanent injunction issue. . . , the [SEC's] requested relief can only be characterized as a penalty").

Another factor which has been held to militate against the issuance of an injunction is a defendant's reliance on advice of counsel and its conduct after the alleged violation was brought to its attention. Steadman, 967 F.2d at 648 (holding that "[g]ood faith reliance on the advice of counsel is also a factor in determining the propriety of injunctive relief").

The SEC cannot sustain its burden of presenting evidence establishing a realistic likelihood of recurrence here. Indeed, RMCI is not a registered investment adviser anymore, nor is Resrv still a registered broker-dealer. The purported misconduct was confined to a 19-hour period when Defendants were grappling with a once-in-a-lifetime worldwide catastrophe. See Bausch & Lomb., 565 F.2d at 18 (rejecting injunction where defendant, "in an agitated moment, temporarily abandoned his usual caution and allowed inside material information to 'pop out'"). Defendants made no attempt to hide what had happened: they surrounded themselves with experts from whom they sought legal advice and even reached out to the SEC on September 15 and 16, 2008.

No less importantly, the SEC did not thereafter raise any objection to the Independent Trustees' decision to continue using Defendants to administer the highly complex liquidation and distributions of the Fund's remaining $50+ billion of assets. Rather, it reaped the benefits of Defendants' services and then reneged on its promise to reimburse them for the same.

Under the circumstances, a permanent injunction would stigmatize Defendants but serve no beneficial purpose. The SEC's application for one is baseless and should be dismissed.

<u>CONCLUSION</u>

For all of the foregoing reasons, summary judgment should be granted to Defendants dismissing the Complaint in all respects.

Dated:  New York, New York
        May 13, 2011

                                    Respectfully submitted,

                                    DUANE MORRIS LLP

                                    By:_____/s/ Fran M. Jacobs_____
                                            Fran M. Jacobs
                                            John Dellaportas
                                            Kathrine A. Gehring
                                  1540 Broadway
                                  New York, NY  10036
                                  (212) 692-1000
                                  Attorneys for Defendants
                                      Reserve Management Company, Inc. Resrv
                                      Partners, Inc., Bruce R. Bent, Sr. and Bruce
                                      R. Bent II