UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------x
SECURITIES AND EXCHANGE                  :
COMMISSION,                              :
                                         :
                    Plaintiff,           :
                                         :
        v.                               :        No. 09 Civ. 4346 (PGG)
                                         :
RESERVE MANAGEMENT COMPANY, INC.,        :        ECF CASE
RESRV PARTNERS, INC., BRUCE BENT SR.     :
and BRUCE BENT II,                       :
                                         :
                    Defendants,          :
        and                              :
                                         :
THE RESERVE PRIMARY FUND,                :
                                         :
                    Relief Defendant.    :
-------------------------------------------------------------------x

PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
MEMORANDUM OF LAW IN OPPOSITION TO
THE MOTION FOR PARTIAL SUMMARY JUDGMENT OF
DEFENDANTS BRUCE BENT SR., BRUCE BENT II, RESERVE MANAGEMENT
COMPANY, INC. AND RESRV PARTNERS, INC.


                        SECURITIES AND EXCHANGE COMMISSION
                            Nancy A. Brown
                            Valerie A. Szczepanik
                            Michael D. Birnbaum
                            Michael P. Holland
                        3 World Financial Center
                        New York, New York  10281
                        (212) 336-1023 (Brown)


June 13, 2011

# TABLE OF CONTENTS

Page

**PRELIMINARY STATEMENT** ......................................................................................1

**ARGUMENT**......................................................................................................3

**I.   THE COMMISSION HAS SUFFICIENT EVIDENCE OF
EACH OF THE ELEMENTS OF ITS EXCHANGE ACT
AND SECURITIES ACT CLAIMS** ..........................................................3

    A. Because Investors Purchased Shares After Defendants Issued Their
False Statements and Because Defendants Induced Redeemers to
Buy Back into the Fund with Those Same Statements, the Commission
Has Established the Elements of its Claims.............................................3

       1.   Any Purchase Made After Defendants Published Their False and
Misleading Statements of Intent Satisfies the "In Connection With"
Requirement Even if No Investor Relied on Them ..........................4

       2.   Defendants Ignore that the Securities Act and Advisers Act Contain
No "In Connection With" Element at All .........................................7

    B. Investors Had Alternatives Available to Them, Establishing Materiality
Even Under Defendants' Erroneous Test ..............................................8

    C. Defendants Admit that Their Statements Omitted the Many Material
Conditions to and Limitations on their Intent to Support the Fund ......10

    D. Defendants Are Aiders and Abettors of the Entity Defendants' Exchange
Act and Advisers Act Violations Because They Knew of the
Violations and Either Actively Promoted Them or Directed Them. ....13

    E. Defendants Are Liable as Control Persons ...........................................15

**II.  ABUNDANT EVIDENCE OF DEFENDANTS' FAILURE TO
PROVIDE THE BOARD AND INVESTORS WITH ALL
MATERIAL FACTS SUPPORTS THE COMMISSION'S
ADVISERS ACT CLAIMS**.......................................................................17

    A. RMCI, Bent Sr., and Bent II Violated the Investment Advisers Act
by Keeping Material Facts from the Board and Public .........................18

    B. Bent Sr. and Bent II Were Investment Advisers....................................21

       1.   Bent Sr. and Bent II Provided Investment Advice to the Primary Fund..........21

    2.  Bent Sr. and Bent II Received Compensation for Their Investment
        Advisory Services to the Primary Fund ...........................................................24

**III. DEFENDANTS' OWN CALCULATIONS OF THEIR PROFITS
     PROVIDE THE MEASURE OF THEIR ILL-GOTTEN GAINS
     AND THE COURT HAS THE DISCRETION TO AWARD
     PENALTIES BASED ON THAT CALCULATION OR A PER
     VIOLATION CALCULATION**...............................................................................25

**IV. DEFENDANTS' HISTORY OF SECURITIES LAW
     VIOLATIONS MAKES FUTURE VIOLATIONS LIKELY
     AND THEY ARE DESERVING OF AN INJUNCTION** .....................................28

**CONCLUSION** ...............................................................................................................30

# TABLE OF AUTHORITIES

**Page**

**Cases**

Abrahamson v. Fleschner, 568 F.2d 862 (2d Cir. 1977)................................................7, 21

Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128 (1972)...............................5

Anwar v. Fairfield Greenwich Ltd., 728 F. Supp. 2d 372 (S.D.N.Y. 2010)................ 16-17

Arista Records LLC v. Lime Group LLC, 06 CV 5936 (KMW),
2011 WL 1642434 (S.D.N.Y. April 20, 2011) ....................................................................11

Basic, Inc. v. Levinson, 485 U.S. 224 (1988)........................................................................8

Berko v. SEC, 316 F.2d 137 (2d Cir. 1963) ..........................................................................5

Celotex Corp. v. Catrett, 477 U.S. 317 (1986) ...............................................................2, 18

Dietrick v. Bauer, 126 F. Supp. 2d 759 (S.D.N.Y. 2001)...................................................16

Fezzani v. Bear, Stearns & Co., Inc., 384 F. Supp. 2d 618 (S.D.N.Y. 2004)....................17

Goldstein v. SEC, 451 F.3d 873 (D.C. Cir. 2006) ..............................................................20

Hemming v. Alfin Fragrances, Inc., 690 F. Supp. 239 (S.D.N.Y. 1988) ...........................16

In re Alstom SA Secs. Litig., 406 F. Supp. 2d 433 (S.D.N.Y. 2005) .................................16

In re Parmalat Sec. Litig., 594 F. Supp. 2d 444 (S.D.N.Y. 2009) .....................................16

In re Tronox, Inc. Sec. Litig., No. 09 Civ. 6220 (SAS),
2011 WL 43508 (S.D.N.Y. Jan. 5, 2011) ...........................................................................17

Litwin v. Blackstone Group, L.P., 634 F.3d 706 (2d Cir. 2011) ..........................................8

Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC,
652 F. Supp. 2d 495 (S.D.N.Y. 2009)...................................................................................2

Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133 (2000)......................................3

Reserve Mgmt. Corp. v. Anchor Daily Income Fund, Inc.,
459 F. Supp. 597 (S.D.N.Y. 1978) .....................................................................................29

Romano v. Kazacos, 609 F.3d 512 (2d Cir. 2010) ...............................................................3

Page

SEC v. Berger, 244 F. Supp. 2d 180 (S.D.N.Y. 2001),
aff'd, 322 F.3d 187 (2d Cir. 2003)..........................................................................22

SEC v. Blatt, 583 F.2d 1325 (5th Cir. 1978) ........................................................30

SEC v. Calvo, 378 F.3d 1211 (11th Cir. 2004)......................................................28

SEC v. DiBella, 587 F.3d 553 (2d Cir. 2009)............................................2, 14, 15

SEC v. First Jersey Sec., Inc., 101 F.3d 1450 (2d Cir. 1996)........................15, 28

SEC v. First Pacific Bancorp., 142 F.3d 1186 (9th Cir. 1998)............................26

SEC v. Gunn, 3:08-CV-1013-G,
2010 WL 3359465 (N.D. Tex. Aug. 25, 2010).....................................................30

SEC v. Haligiannis, 470 F. Supp. 2d 373 (S.D.N.Y. 2007)..................................27

SEC v. Invest Better 2001, No. 01 Civ. 11427 (BSJ),
2005 WL 2385452 (S.D.N.Y. May 4, 2005) .........................................................27

SEC v. Jadidian, No. 08 Civ. 8079 (PGG),
2011 WL 1327245 (S.D.N.Y. Mar. 31, 2011) ......................................................28

SEC v. Jones, 476 F. Supp. 2d 374 (S.D.N.Y. 2007) ...........................................25

SEC v. Kelly, No. 08 Civ. 4612 (CM),
2011 WL 135845 (S.D.N.Y. Jan. 7, 2011) ........................................................5, 25

SEC v. Kenton Capital, Ltd., 69 F. Supp. 2d 1 (D.D.C. 1998)............................28

SEC v. Mannion, No. 10-cv-3374-WSD, --- F. Supp. 2d ---,
2011 WL 2270856 (N.D. Ga. June 2, 2011)......................................................5, 20

SEC v. Nacchio, 438 F. Supp. 2d 1266 (D. Colo. 2006).......................................20

SEC v. PIMCO Advisors Fund Mgmt., LLC, 341 F. Supp. 2d 454
(S.D.N.Y. 2004)................................................................................................ 21-22

SEC v. Pirate Inv. LLC, 580 F.3d 233 (4th Cir. 2009)...........................................5

SEC v. Posner, 16 F.3d 520 (2d Cir. 1994) ..........................................................26

Page

SEC v. Rabinovich & Assocs., LP, No. 07 Civ. 10547 (GEL),
2008 WL 4937360 (S.D.N.Y. Nov. 18, 2008)......................................................20

SEC v. Steadman, 967 F.2d 636 (D.C. Cir. 1992).......................................................14, 20

SEC v. Tambone, 550 F.3d 106 (1st Cir. 2008),
rev'd en banc on other grounds, 587 F.3d 436 (2010)........................................20

SEC v. Tecumseh Holdings Corp., No. 03 Civ. 5490 (SAS),
2009 WL 4975263 (S.D.N.Y. Dec. 22, 2009) ....................................................28

SEC v. Texas Gulf Sulphur Co., 401 F.2d 833 (2d Cir. 1968)...........................................3

SEC v. Young, Civil Action No. 09-1634,
2011 WL 1376045 (E.D. Pa. April 12, 2011)........................................... 22-23, 24

SEC v. Zandford, 535 U.S. 813 (2002)...............................................................................3

United States v. Bilzerian, 926 F.2d 1285 (2d Cir. 1991) .................................................11

United States v. Elliot, 62 F.3d 1304 (11th Cir. 1995) .......................................................24

United States v. Naftalin, 441 U.S. 768 (1979) ..................................................................7

United States v. Ogale, 378 F. App'x 959 (11th Cir. 2010) ...............................................21

United States v. Quinones, No. 09-4361-cr,
2011 WL 1150864 (2d Cir. Mar. 29, 2011)................................................... 12-13

**Statutes and Regulations**

Securities Act of 1933

    Section 2(a)(3), 15 U.S.C. § 77b(a)(3)............................................................................7

    Section 17(a), 15 U.S.C. § 77q(a)...................................................................2, 3, 7, 29

Securities Exchange Act of 1934

    Rule 12b-2, 17 C.F.R. § 240.12b-2...............................................................................15

    Section 10(b), 15 U.S.C. § 78j(b) ............................................................1, 3, 4, 13, 29

    Rule 10b-5, 17 C.F.R. § 240.10b-5.........................................................................13, 29

                                                                                          **Page**

Investment Advisers Act of 1940

    Section 202(11), 15 U.S.C. § 80b-2(11) ...................................................................21, 24

    Section 206(1), 15 U.S.C. § 80b-6(1) ...............................................................13, 17, 21

    Section 206(2), 15 U.S.C. § 80b-6(2) .......................................................13, 17, 20, 21

    Section 206(4), 15 U.S.C. § 80b-6(4) .......................................................13, 17, 20, 21

       Rule 206(4)-8, 17 C.F.R. § 275.206(4)-8 ...........................................13, 17, 20, 21

    Section 209(e), 15 U.S.C. 80b-9(e)..............................................................................15

Investment Company Act of 1940

    Section 10(a), 15 U.S.C. § 80a-10(a)...........................................................................29

    Section 34(b), 15 U.S.C. § 80a-33(b) ..........................................................................29


**Rules**

Fed. R. Civ. P. 30(b)(6)..........................................................................................................6


**Miscellaneous**

In re Reserve Mgmt. Corp., Reserve Mgmt. Co., Henry B.R. Brown
and Bruce R. Bent, Rel. Nos. IC-11394, IA-733,
1980 WL 20755 (Oct. 10, 1980)........................................................................................29

Investment Advisers Act Rel. No. IA-1092, 1987 WL 112702 (Oct. 9, 1987)................24

E.C. Lashbrooke, Jr., The Alternative –Action Requirement:
The Derailment of Santa Fe, 1981 Duke L. J. 963 (1981)...................................................8

Plaintiff Securities and Exchange Commission (the "Commission") respectfully submits this memorandum of law in opposition to the Motion for Summary Judgment of Defendants Reserve Management Company, Inc. ("RMCI"), Resrv Partners, Inc. ("Resrv Partners"), Bruce Bent Sr. ("Bent Sr.") and Bruce Bent II ("Bent II").

## **Preliminary Statement**

Defendants are not entitled to summary judgment on any of the Commission's claims. The Commission has offered a wealth of evidence to support each of its Securities Act, Exchange Act and Advisers Act claims – such substantial evidence, in fact, that it is the Commission's Motion for Summary Judgment on those claims that should be granted.

Defendants' chief tactic on this motion is to ignore critical evidence and then claim that none exists. For example, Defendants' primary argument on the Commission's Section 10(b) claim is that the Commission cannot establish that there were any purchases made "in connection with" Defendants' false pledge to support the Fund. But, rather than proving that point, Defendants are forced to admit that there were in fact purchases made after they broadly disseminated Defendants' message of commitment to support the Fund.

Defendants try the same thing to defeat the Commission's Advisers Act claims, arguing that there is no evidence that either Bent was an investment adviser under the Act. That argument requires them to ignore the substantial evidence of both Bents' active management of the Fund's investments both before September 15 and 16 and during those critical days, but it also requires them to ignore the Declaration of Bent Sr. they submit in support of their motion. In his Declaration, Bent Sr. attests to his "personal" review of the very investment in Lehman that brought them to this point.

1

Defendants even try to ignore evidence of their long history of securities laws violations in arguing that injunctive relief is improper because their misconduct on September 15 and 16 was, they say, a single, isolated infraction. Defendants' record speaks for itself. What happened on September 15 and 16 was not an isolated, uncharacteristic lapse of long-standing compliance; it was just another – much more serious – instance of Defendants' disregard for their obligations to abide by the securities laws.

And when ignoring bad facts fails them, Defendants turn to ignoring controlling law. So, for example, in arguing that the "in connection with" element defeats the Commission's Exchange Act and Securities Act claims, Defendants disregard the statutory language of Section 17(a) that requires no purchase of a security at all. In arguing that no penalties can be awarded on Advisers Act aiding and abetting claims, Defendants ignore the Second Circuit's unequivocal holding to the contrary in SEC v. DiBella, 587 F.3d 553 (2d Cir. 2009).

On this motion against the party with the burden of proof, Defendants' job here is to demonstrate that there is insufficient evidence to support essential elements of the Commission's claims. Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). But ignoring evidence in the record (or controlling authority) will not work to win Defendants summary judgment. Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC, 652 F. Supp. 2d 495, 503 (S.D.N.Y. 2009) (defendants' failure to acknowledge record evidence precludes summary judgment argument that none exists).

Thus, this is not the typical summary judgment motion where the moving party cites testimony or documentary evidence and the opponent cites conflicting testimony or evidence, creating an issue of fact. To the extent that the Commission disputes any of Defendants' 56.1 statements of facts, it is largely to point out the testimony from disinterested witnesses that

2

makes those statements false, not disputed. Defendants are left with no "evidence supporting [their motion] that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses," and, for that reason, summary judgment should be denied. Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 151 (2000) (noting that the same standard applies to Rule 56 motions as to Rule 50 motions for directed verdict).

<h3 style="text-align:center">ARGUMENT</h3>

**I.    THE COMMISSION HAS SUFFICIENT EVIDENCE OF EACH OF THE ELEMENTS OF ITS EXCHANGE ACT AND SECURITIES ACT CLAIMS**

A.    Because Investors Purchased Shares After Defendants Issued Their False Statements and Because Defendants Induced Redeemers to Buy Back into the Fund with Those Same Statements, the Commission Has Established the Elements of Its Claims.

The evidence satisfies the "in connection with" element. In arguing that the Commission cannot satisfy its obligations under Section 10(b) of the Exchange Act and Section 17(a) of the Securities Act because it merely alleges that statements were made to investors to induce them not to redeem (Defendants' Memorandum in Support of Summary Judgment Motion ("Def. Br.") at 18-19), Defendants discount or ignore two key points: (1) Investors did purchase Fund shares after Defendants issued their misleading statements of support; and (2) the Securities Act imposes no requirement that the Commission show that any purchase of Fund shares was made.

The "in connection with" element should be "construed 'not technically and restrictively but flexibly to effectuate its remedial purposes.'" Romano v. Kazacos, 609 F.3d 512, 524 (2d Cir. 2010) (quoting SEC v. Zandford, 535 U.S. 813, 819 (2002)). Any statement made in a manner "reasonably calculated to influence the investing public" meets the "in connection with" requirement. SEC v. Texas Gulf Sulphur Co., 401 F.2d 833, 862 (2d Cir. 1968). Since Defendants made their statements for the sole purpose of influencing investors contemplating investments in the Primary Fund, including those considering purchases of Fund shares, they were made in connection with a purchase of securities.

3

1.   Any Purchase Made After Defendants Published Their False and Misleading
     Statements of Intent Satisfies the "In Connection With" Requirement Even
     if No Investor Relied on Them

Defendants concede that the Commission's claims under Section 10(b) of the Exchange

Act will succeed if the Commission offered evidence of purchases. (Def. Br. at 19.)  But they

dismiss the 1.6 billion shares (Pl. Mov. App'x Ex. 95)[1] actually purchased between 1 p.m. on

September 15 and 4:00 p.m. on September 16 (when the Reserve announced the Fund broke the

buck).  Most purchases, Defendants claim, were "automated" (Def. Br. at 19), and the rest,

unconnected to the misstatements because Defendants could identify "only six" who received

any communication from the Reserve, and none bought while *Insights* was posted on the

Reserve's website.  (Id. at 19-20.)  None of these arguments is supported by law or fact.

As a factual matter, Defendants' assertions about the nature and number of purchases are

almost impossible to assess because they offer no indication of which purchases support their

various factual conclusions.  So, for example, whether a purchase is "automated" or not is a

claim Defendants ask the Court to accept on their say so.  (Gareis Decl. ¶ 24.)  Second, if

Defendants' use of the label "automated" is meant to convey that these purchases were not the

product of any investment decision, they are wrong.  Defendants' own documents show that

broker sweeps stopped after the Fund publicly announced it had broken the buck. (Counter 56.1

¶ 114 (RBC Wealth Management, for example, purchased 23 million shares on September 16 at

3:08 p.m., then no further purchases on the 17th).).  If truly automated, one would have expected

those purchases to have continued so long as the Fund was accepting them (which it continued to

do on the 17th), but instead, they stopped when Defendants publicly retracted their vow of

support.  Someone decided to stop the "automated" purchases for those accounts when they

---

[1] References to "Pl. Mov. App'x Ex. __" are to the Exhibits included in the Commission's
Appendix, submitted in Support of Plaintiff's Motion for Summary Judgment on May 13, 2011.

4

learned that the Fund broke the buck, and they could have done so earlier had Defendants made full disclosure of the limits on and conditions to their support.

As to the non-"automated" purchases, Defendants acknowledge that there were six of them during the post- 1 p.m. period. (Def. Br. at 19-20.) That is enough to satisfy even Defendants' view of the "in connection with" test. SEC v. Mannion, No. 10-cv-3374-WSD, 2011 WL 2270856, at *8 (N.D. Ga. June 2, 2011) ("in connection with" element adequately pled where complaint alleged that just one purchase had been made into fund while defendants were publicly making fraudulent statements). But Defendants seem to argue that six is too few (Def. Br. at 20), and that the Commission must show that some greater majority of purchasers heard Defendants' message. In pressing for that causal connection between message and purchase, however, Defendants impose a reliance element that does not apply in enforcement cases such as this one. Berko v. SEC, 316 F.2d 137, 143 (2d Cir. 1963) (whether investors relied on misrepresentation or were injured is "legally irrelevant"); SEC v. Kelly, No. 08 Civ. 4612, 2011 WL 135845, at *16 (S.D.N.Y. Jan. 7, 2011) (Def. Br. at 31-32); accord SEC v. Pirate Inv. LLC, 580 F.3d 233, 239 n.10 (4th Cir. 2009).[2]

Finally, Defendants ignore two facts that make their position untenable. First, they assume that because no purchases were recorded by Defendants while *Insights* was posted on the Reserve website, no purchases could have been made in reliance on that publication. (Def. Br. at 20.) Even putting aside the legal irrelevance of reliance, Defendants do not address the possibility that investors who saw the posting made their purchases later in the day, and ignore

---

[2] Even in private cases, where reliance is an element, no reliance need be shown for those who bought in the face of material omissions. Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 153-154 (1972) (where defendants failed to disclose facts, "proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material"). For that reason, too, it would not matter if no purchaser received Defendants' public communication.

purchasers who were assured by a copy of *Insights* that was read to them over the phone or emailed to them. Nor do Defendants acknowledge that the Reserve's records for transactions during that period are wholly unreliable as to time, such that transactions were not recorded contemporaneously with investors' redemption or purchase requests. (See, e.g., Counter 56.1 ¶ 110.) Thus, the Reserve's records of purchases do nothing to support the claimed irrelevance of Defendants' misstatements to investor decision-making.

Defendants also ignore the disinformation they conveyed to the ratings agencies and the *Wall Street Journal* and the ramifications of that campaign on investors. Primary Fund investors were watching the market in the aftermath of Lehman's bankruptcy and monitoring, in particular, news from the ratings agencies. (Pl. 56.1[3] ¶¶ 34, 78.) Had Moody's or Standard & Poor's lowered the ratings assigned to the Fund,[4] many investors whose investment guidelines required that they select only top-rated money market funds would not have made the investments that they did. Thus, whether RMCI personnel communicated the false assurances of the Fund's safety directly to investors, or simply relied on the ratings agencies to convey the same message through a failure to issue a credit watch or downgrade, all purchases were made while Defendants' materially misleading statements had been publicly disseminated.[5]

---

[3] References to "Pl. 56.1 ¶ __" refer to the Statement of Undisputed Fact submitted by the Commission on May 13, 2011 with the Commission's Motion for Summary Judgment.

[4] According to their published criteria, each of the ratings agencies would have put the Fund on credit watch, if not downgraded it, had they known that the Bents' statement of support was qualified and conditional. (Pl. Mov. App'x Exs. 80 (Rizzo (S&P) Decl. ¶¶ 6, 8); 79 (Shilling (Moody's) Decl. ¶¶ 9, 10).)

[5] Defendants argue that they did tell the ratings agencies when they decided to withdraw their pledge of support. (Def. Br. at 14.) But the telephone records they cite refute that contention. (Counter 56.1 ¶ 127 (phone records show no calls by Bent II at those times to ratings agencies).) Nor is the latest claim consistent with Bent II's testimony about those events, in which he (in his personal capacity and as RMCI's 30(b)(6) designee) did not recall anything he discussed with the ratings agencies on September 16, or even whether he spoke with them at all. (Id.)

2.    Defendants Ignore that the Securities Act and Advisers Act Contain
      No "In Connection With" Element at All

Defendants are wrong to argue that the Commission must prove a purchase with respect

to its claims under Section 17(a) of the Securities Act. (Def. Br. at 18.)  Because the Securities

Act requires that fraud occur "in the offer or sale" of securities, the Commission need prove no

purchase at all.  Section 17(a) prohibits false and misleading statements made in the "offer" of

securities.  15 U.S.C. § 77q(a); United States v. Naftalin, 441 U.S. 768, 773 (1979).  "Offer" is

defined by Section 2(a)(3) as "every attempt or offer to dispose of, or solicitation of an offer to

buy, a security or interest in a security for value."  15 U.S.C. § 77b(a)(3).

Thus, when Bent II directed Drahzal and his sales force to encourage the redeemers of

10+ billion shares to cancel their redemptions and buy back into the Fund, Defendants engaged

in an "offer" of securities.  (Pl. 56.1 ¶ 91.)  In offering those securities, Defendants repeated the

same unqualified, unlimited pledge of support contained in Bent II's 1:19 Email, and a promise

of interest for the invested funds.  (Counter 56.1 ¶ 61.)  Therefore, under Section 17(a),

Defendants would be liable for their conduct even if no purchases had been made.

Finally there is no "in connection with" requirement under the Advisers Act.

Abrahamson v. Fleschner, 568 F.2d 862, 877 (2d Cir. 1977) (reading an "in connection with"

requirement into the Advisers Act "would lead to a construction of the Advisers Act clearly

inconsistent with the intent of Congress . . . [which] intended to protect investors against frauds

committed by investment advisers who managed their clients' funds . . ..")  Therefore, even if the

Commission had no evidence of purchases, Defendants would still be liable for their

misstatements and omissions to both the Board and investors under the Advisers Act.

B.    Investors Had Alternatives Available to Them, Establishing Materiality Even
      Under Defendants' Erroneous Test

Long held and recently affirmed Second Circuit precedent holds that materiality is an

objective test that does not require a showing that any investor would have acted differently.

Litwin v. Blackstone Group, L.P., 634 F.3d 706, 717 (2d Cir. 2011). All that is required is a

"substantial likelihood that the disclosure of the omitted fact would have been viewed by the

reasonable investor as having significantly altered the 'total mix' of information made

available." Id. (citing Basic, Inc. v. Levinson, 485 U.S. 224, 231-32 (1988)).[6]

Even an application of Defendants' test of materiality, however, does not advance

Defendants' cause because Primary Fund investors had alternatives available to them to avoid

harm. Defendants' arguments all rise and fall on the false premise that because no Primary Fund

investors could have redeemed after 1 p.m., Defendants' misrepresentations must have been

immaterial because no investor could have relied to their detriment on them. (Def. Br. at 20.)

Both purchasers and existing investors had alternatives that Defendants ignore in their

briefs. The many purchasers into the Fund on those two days could have avoided harm by

passing on Reserve investments entirely or selecting a Reserve fund other than the Primary Fund.

Had Defendants disclosed that they would not support the Fund unless the government or a third

party stepped in or the markets turned around, the total mix of information available to investors

before they made the investment decision to purchase would have been significantly altered.

Even existing investors had a choice. Rather than hold their shares, they could have

transferred Primary shares into other Reserve Funds, such as Government or Treasury. Indeed,

---

[6] This rule makes sense, particularly in Commission enforcement actions where there is no
requirement that the Commission establish reliance. As noted by one commentator, the test that
Defendants proffer – a fact is immaterial if investors had no way to avoid their injury – is "more
properly [understood as] an element of reliance," not materiality. E.C. Lashbrooke, Jr., The
Alternative –Action Requirement: The Derailment of Santa Fe, 1981 Duke L. J. 963 (1981).

that was a choice Defendants encouraged investors to make. As Drahzal testified, Bent II told

him to tell the sales force that they should offer clients the option to move their money from the

Primary Fund to another Reserve product. (Counter 56.1 ¶ 124.) And that is exactly what the

sales force did, even on September 16. (Id.) Many investors took that option; according to

Reserve's records, more than 250 transactions were booked as transfers on September 15 and 16

out of the Primary Fund to some other Reserve fund, amounting to over $50 million. (Pl. Mov.

App'x Ex. 96.) All of those investors received their dollar for redeemed Primary Fund shares.

    In support of their remarkable contention that there is no evidence that purchasers

subjectively regarded Defendants' statement of intent as material (Def. Br. at 22), Defendants

cite the Declaration of David Gareis. Mr. Gareis' Declaration in turn cites his analysis of the 62

"non-automated" purchases (as defined by him) into the Fund, and the "six" purchases he

determined were connected to Defendants' dissemination of the message of support (all, except

one, unidentified). [7] Mr. Gareis then reviewed those purchasers' 30-day investment history, and

concluded that they were all "routine, end-of-day investments and not some sort of reaction to

any email from RMCI." (Gareis Decl. ¶ 27.) [8]

    Mr. Gareis' analysis does not cite any conversations he had with any of the investors.

Had he had those conversations, he would have learned that investors who did speak to the

---

[7] Gareis cites the "complete record" of the information that was communicated to investors by
RMCI in the emails and recorded telephone calls from those two days. (Gareis Decl. ¶ 25.) But
Defendants forget that, by their own admission, not all phone lines were in fact taped, or, if they
were, calls from some lines were never produced by Defendants. (Counter 56.1 ¶ 115.) In
addition, how Gareis can make the claim that he could identify, let alone listen to, all recorded
calls associated with the 62 purchases is inexplicable, given that most of the calls provide very
little identification of the non-RMCI speaker. (Id.)

[8] The reliability of Gareis's analysis is further undercut by his overstatement of his experience
and qualifications. Gareis swears to his 14 year tenure as Managing Director at the Reserve
(Gareis Decl. ¶ 1), but he testified that his brother-in-law, Bent II, hired him in 2003. (Counter
56.1 ¶ 141.)

9

Reserve acted on the assurances that they received. (Counter 56.1 ¶¶ 115, 116.) In fact, many of them may have been targets of the campaign Bent II set in high gear when he instructed his Global Head of Sales, John Drahzal, to "get the institutional folks back in" after those investors redeemed their Primary Fund shares. (Pl. 56.1 ¶ 91.) Drahzal and his team responded by "communicat[ing] around the Credit Support Agreement" on September 15 to encourage those investors to "buy back in." (Counter 56.1 ¶ 61.) Some of those institutional clients did buy back in on September 15. (Id.) And even those investors who did not speak directly to the Reserve acted on the implicit assurances they obtained from seeing no action by any ratings agency, a direct result of Defendants' efforts to assuage analysts' concerns. (Id.; Pl. 56.1 ¶¶ 37, 57.)

C.    Defendants Admit that Their Statements Omitted the Many Material Conditions to, and Limitations on, their Intent to Support the Fund

The Commission needs no more evidence of Defendants' scienter than their own admissions that they had in their minds several significant conditions to and limitations on the support they were willing to commit and that they disclosed none of them. The Commission will not repeat its arguments on this point here, as it is fully briefed in our Memorandum of Law in Support of the Commission's Motion for Summary Judgment ("Pl. Br."), at 16-20.[9]

There is no need to offer any additional evidence that Bent II did not really "expect[] to be able to implement an adequate support agreement" (Def. Br. at 23) when he pledged that RMCI would support the Fund. Bent II testified that when he first authorized his sales staff to announce support for the Primary Fund "to whatever degree is required" he (1) had no idea what level of support would be necessary; (2) knew that RMCI only had $50 million available for such

---

[9] Defendants make no argument at all that Bent Sr. lacked scienter when he made his statements of support to the Board, but since he testified later to the conditions to, and limitations on, his commitment at the time he made it, his scienter is established too. (Pl. Br. at 12, 18-19.)

10

support; and (3) was relying on either improved market conditions or help from the government

or third parties to obviate the need for effective support from RMCI. (Pl. Br. at 16-20.)

Contrary to Defendants' contentions, their scienter is not negated (Def. Br. at 6, 9-11) and

their conduct is not excused (id. at 34) by any "advice of counsel" on September 15 or 16. First,

Defendants may not benefit from an advice of counsel defense because they continue to claim

privilege over relevant communications with counsel. "[A] party who intends to rely at trial on

the advice of counsel must make a full disclosure during discovery; failure to do so constitutes a

waiver of the advice-of-counsel defense." Arista Records LLC v. Lime Group LLC, 06 CV 5936

(KMW), 2011 WL 1642434, at *2 (S.D.N.Y. April 20, 2011) (quotations omitted). Despite

Defendants' express waiver of privilege for "advice that Counsel provided RMCI on September

15-16, 2008 regarding communications with the public" (Counter 56.1 ¶ 138), Defendants

continue to withhold documents relating to that very topic. (Id.)[10] Without a full record of the

communications between counsel and Defendants, the Commission would be unfairly prejudiced

by Defendants' use of the privilege as a sword and a shield, United States v. Bilzerian, 926 F.2d

1285, 1292 (2d Cir. 1991), and for that reason they can no longer assert that defense.

In any event, there is no evidence that would support that defense. Any advice rendered

by Defendants' counsel either (i) followed, rather than led to, Defendants' conduct; (ii) was

ignored by Defendants; (iii) did not sanction the statements Defendants claims it did; or (iv) was

not based on full disclosure of all material facts to counsel.

While Defendants now claim that Bent II sent his 1:19 Email "based on … the advice of

his counsel" (Def. Br. at 9-10), he testified that he did not seek any legal advice concerning the

---

[10] Indeed, in response to repeated requests that they take another look at their privilege log,
Defendants insisted as recently as April 13, 2011, that they stand by their privilege claims.
(Counter 56.1 ¶ 138.)

substance of his 1:19 Email *before* sending it. (Counter 56.1 ¶ 139.) To the contrary, Bent II

testified that he sought legal advice by copying the Reserve's General Counsel, Catherine

Crowley, on the very 1:19 Email he authorized Reserve personnel to share with the public. (Id.)

And even if Crowley's subsequent email could be considered relevant advice, it did not address

Bent II's statement that RMCI intended to protect the Primary Fund's NAV to whatever degree

is required. (Bent II Ex. O.)[11]

When counsel did advise Defendants on September 15 and 16, the Bents ignored them.

For example, Joel Goldberg of Willkie Farr testified that Bent II contacted him on September 15

to ask "[w]hether it would be all right to tell investors that they intended to support the NAV,"

and Goldberg counseled that it would only be appropriate if Defendants were "fully committed

to doing that." (Counter 56.1 ¶ 72.) As Goldberg explained, the Bents should not have

communicated an intent to support the Fund if they merely "wanted to" provide support. (Id.)

And while Defendants characterize their "talking points" draft as "cleared with

Goldberg," they cannot point to any communication approving those talking points. Goldberg

himself testified that he only addressed the specific issue Crowley raised in her email – namely,

whether the Reserve could state that they expected SEC approval "in a few hours" given the fact

that no documents had yet been submitted to the SEC. (Counter 56.1 ¶ 95.)

Finally, if Defendants did receive any legal advice on September 15 that had any bearing

on their respective states of mind, it provides no defense here because counsel's advice was

predicated upon the same false statements and omissions Defendants conveyed to the Board and

investing public. Earlier this year, the Second Circuit reiterated the clear limits of the advice-of-

---

[11] If Crowley's email should have been understood as tempering Bent II's statement of
unqualified "intent," that message was not heeded by Bent II, who hours later authorized his
marketing team to deliver the same message to the *Wall Street Journal*. (See Pl. 56.1 ¶¶ 30-32.)

counsel defense, holding that a defendant must first establish that he has made full disclosure to

his lawyer of all relevant facts before he can assert that his counsel's advice excuses his conduct.

United States v. Quinones, No. 09-4361-cr, 2011 WL 1150864, at *1 (2d Cir. Mar. 29, 2011).

Here, Defendants repeatedly assured counsel of their willingness and ability to support

the Primary Fund's $1.00 NAV and those representations clearly informed counsel's advice on

September 15; none of them learned of the qualifications, contingencies and limitations that

Defendants had in their minds. (Counter 56.1 ¶ 140.)[12]

D.   Defendants Are Aiders and Abettors of the Entity Defendants' Exchange Act and
     Advisers Act Violations Because They Knew of the Violations and Either Actively
     Promoted Them or Directed Them.

Defendants are not entitled to summary judgment on the Commission's claims of aiding

and abetting the Entity Defendants' violations of Section 10(b) and Rule 10b-5 of the Exchange

Act or of Sections 206 (1), (2), (4) and Rule 206(4)-8 of the Advisers Act. Defendants contend

that neither Bent is liable for aiding and abetting RMCI's Advisers Act violations, and Bent Sr.

cannot be liable for aiding and abetting the Entity Defendants' Exchange Act violations, because,

according to Defendants, there exists no evidence of any underlying primary violations, both

lacked actual knowledge of the Entity Defendants' underlying violations and neither provided

any "substantial assistance" to cause those violations. (Def. Br. at 29; Bent Sr. Br. at 4-5.[13]) To

reach these conclusions, Defendants ignore overwhelming evidence of the Bents' active and

knowing participation in – and orchestration of – the Entity Defendants' violations.

---

[12]  Defendants also claim that their decision to limit support to a fixed amount was prompted by
some combination of advice from counsel and the Commission. (Def. Br. at 8-9.) But DiMartino
testified unambiguously that she explained to the Bents that the $10 million figure included in a
draft support agreement was not an amount of support the SEC ever suggested; rather, "it was
given purely as an example of how the credit support agreement would operate." (Counter 56.1 ¶
86.) DiMartino further testified the Bents told her that the $10 million was just a starting point
and that Defendants were committed to providing more if and when necessary. (Id. ¶¶ 86, 88.)

[13]  Defendants do not seek summary judgment concerning Bent II's aiding and abetting the Entity
Defendants' Exchange Act violations.

Defendants are correct that aiding and abetting liability may not be imposed upon the Bents based solely upon "ultimate supervisory responsibility" (Def. Br. at 29 (quoting SEC v. Steadman, 967 F.2d 636, 647 (D.C. Cir. 1992)), but they are wrong that the Commission relies solely on the Bents' supervisory status. In Steadman, the D.C. Circuit held that the district court erred in relying upon defendant's "ultimate supervisory authority" as a basis for aiding and abetting liability where the district court could not otherwise find "a single piece of evidence that tends to show that Mr. Steadman was generally aware [of the corporation's underlying violations]." Steadman, 967 F.2d at 647. Here, the Bents were intimately involved in drafting, approving, and personally articulating the statements (and related omissions) that form the basis of the Commission's case against the Entity Defendants. (Pl. 56.1 ¶¶ 17, 30-31, 41-44, 46, 55.)

Defendants further contend that regardless of Bent Sr.'s awareness of the Entity Defendants' actions, he did not "substantially assist" the underlying violations. (Bent Sr. Br. at 4.) This argument should fail as well.

In SEC v. DiBella, 587 F.3d 553 (2d Cir. 2009), the case upon which Defendants rely, the Second Circuit affirmed a jury verdict that DiBella was liable for aiding and abetting violations of the Exchange Act and Advisers Act. Id. at 566-69. The Court noted that sufficient evidence existed to demonstrate that DiBella not only "knew" of but "acted to encourage" the underlying fraud. Id. at 569. Bent Sr.'s actions clearly reflect his encouragement of – indeed, his participation in – the fraud here. Among other acts, Bent Sr. (along with Bent II) edited the particular misleading statements communicated to Reserve investors and he personally addressed the Primary Fund's Board about the most pressing issues of the day, ranging from Defendants' "intent" and ability to support the Primary Fund to trading activity in the kinds of Lehman securities that the Primary Fund Board voted to carry at "fair value." (Pl. 56.1 ¶¶ 41, 42, 55, 83.)

14

Finally, and contrary to Defendants' assertions, penalties are available for aiding and abetting an Adviser Act violation. (Def. Br. at 30 (stating that "§ 209(e) does not empower courts to impose a penalty on anyone other than the primary violator").) Were there any question about that, it was resolved by the Second Circuit in DiBella, a controlling case upon which Defendants rely elsewhere in their moving papers but ignore on this point:

> Section 80b-9(e)(1) [of the Advisers Act] provides that when "any person has violated any provision of [the Advisers Act], ... the court shall have jurisdiction to impose ... a civil penalty to be paid by the person who committed such violation." 15 U.S.C. § 80b-9(e)(1) (emphasis added). Included within a "violation" of the Advisers Act is the aiding and abetting of principal violations of the Advisers Act.

DiBella, 587 F.3d at 571 (quoting Section 80b-9(e)(1)) (emphasis omitted).[14]

E.   Defendants Are Liable as Control Persons

Defendants contend that Bent Sr. cannot be liable as a control person of RMCI (and presumably Resrv Partners) because of what Defendants claim was a lack of control by Bent Sr. over the Entity Defendants and a lack of "culpable participation" by Bent Sr. in the Entity Defendants' misstatements and omissions of material facts. (Bent Sr. Br. at 6.)[15]

Control over a primary violator may be established by showing that the defendant possessed "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise." SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1472-73 (2d Cir. 1996) (quoting 17 C.F.R. § 240.12b-2). Bent Sr. has acknowledged his ownership of RMCI and Resrv Partners (together with his sons). (Pl.

---

[14] Defendants do not dispute that penalties are available for aiding and abetting violations of the Exchange Act.

[15] Defendants make no such arguments on behalf of Bent II, claiming only that he cannot be liable as a "control person" in the absence of any primary violations of the securities laws.

56.1 ¶ 1.)  That ownership provided Bent Sr. with the power to direct or cause the direction of the Entity Defendants' actions, and it is sufficient on its own to satisfy the control element.

Were it not sufficient, plenty of other evidence of Bent Sr.'s control over the Entity Defendants exists.  Bent Sr. acknowledged that he was the highest ranking officer of both RMCI and Resrv.  (Bent Sr. Decl. ¶ 1.)  While not determinative of control (Bent Sr. Br. at 5-6), officer status is certainly a factor relevant to any "control person" analysis.  In re Alstom SA Secs. Litig., 406 F. Supp. 2d 433, 488 n.51 (S.D.N.Y. 2005) (a CEO's or COO's role in the "day-to-day management and operation of the company," as compared to, for example, an outside director's, is particularly probative of control).[16]  Indeed, when the argument suited them, Defendants conceded that their control, admitting that both Bents "exercised control and decision-making authority over RMCI's investment advisory business, including with the management of the Fund." (Counter 56.1 ¶ 146; see also Def. 56.1 ¶ 100; Pl. 56.1 ¶¶ 41, 115.)

Bent Sr. not only controlled the Entity Defendants, the record makes clear his culpable participation in their securities law violations.  Where a control person "'knew or should have known that [the] primary violator . . . was engaged in fraudulent conduct, but . . . did not take steps to prevent" it, culpability is established.  In re Parmalat Sec. Litig., 594 F. Supp. 2d 444, 458 (S.D.N.Y. 2009) (quoting Dietrick v. Bauer, 126 F. Supp. 2d 759, 765 (S.D.N.Y. 2001)).

Unlike defendants in the principal case upon which Bent Sr. relies, Anwar v. Fairfield Greenwich Ltd., 728 F. Supp. 2d 372, 414 (S.D.N.Y. 2010), whose "participation" was limited to being "passive recipients" of various emails, Bent Sr. drove the decisions of the Entity

---

[16] The Alstom court further noted that while Hemming v. Alfin Fragrances, Inc., 690 F. Supp. 239 (S.D.N.Y. 1988) (Bent Sr. Br. at 5) has been cited for the proposition that officer status alone is not sufficient to establish control, subsequent authority has distinguished between outside directors and certain officers whose titles suggest greater control.  Alstom, 406 F. Supp. 2d at 488 n.51.

Defendants on September 15 and 16, including what strategies to pursue and what to communicate to the public.[17]  (Pl. 56.1 ¶¶ 41-45, 55-57.)

  Fezzani v. Bear, Stearns & Co., Inc., 384 F. Supp. 2d 618, 646 (S.D.N.Y. 2004), cited by Defendants for the proposition that "significant participation" is insufficient to support control person liability where a defendant does not direct a primary violator to engage in underlying illegal conduct, also offers no help to Bent Sr.  (Bent Sr. Br. at 6.)[18]  Bent Sr.'s statements to the Board (and all present at those meetings) and his approval of *Insights* led directly to those material misleading statements to the public that are the subject of the Commission's action against the Entity Defendants.  Indeed, Bent Sr. not only supervised Ledford in connection with the latter's communications with ratings agencies on September 15, Bent Sr. communicated directly with Henry Shilling of Moody's on September 15 and, in doing so, determined the message to be communicated to such analysts.  (Pl. 56.1 ¶¶ 12, 57.)  In that way, the evidence demonstrates that this case is more like In re Tronox, Inc. Secs. Litig., No. 09 Civ. 6220 (SAS), 2011 WL 43508, at *8-9 (S.D.N.Y. Jan. 5, 2011), where the court held that defendant would be a control person if he was a senior officer and acted as a perpetrator of the fraud.

## II.  ABUNDANT EVIDENCE OF DEFENDANTS' FAILURE TO PROVIDE THE BOARD AND INVESTORS WITH ALL MATERIAL FACTS SUPPORTS THE COMMISSION'S ADVISERS ACT CLAIMS

  Defendants' misstatements and omissions to the Board on September 15 violated Sections 206(1), (2), and (4) and Rule 206(4)-8 and their misstatements and omissions to investors violated Section 206(4) and Rule 206(4)-8.  Defendants' summary judgment motion

---

[17]  That Bent Sr. had "no e-mail access and a single cell phone" (Bent Sr. Br. at 6), hardly shows his lack of participation in the Entity Defendants' underlying securities violations.  In any event, Bent Sr. had both telephone access (which his phone records show he used extensively), and he was able to (and did) receive faxes at his hotel in Italy.  (Id. ¶ 50.)

[18]  As the court noted in Tronox, 2011 WL 43508, at *8, the quoted portion from the Fezzani opinion relied upon by Bent Sr. is mere dicta, since the Fezzani court had already dismissed the control person claims as time barred.

should therefore be denied and the Commission's summary judgment motion on the same claims

should be granted.

A.    RMCI, Bent Sr., and Bent II Violated the Investment Advisers Act by Keeping Material
      Facts from the Board and Public

Defendants' arguments against RMCI's liability for Adviser Act violations do not

warrant summary judgment in their favor.  Indeed, Defendants fail even to address many of the

material omissions and misstatements made to the Board on September 15, including:

- State Street had warned on September 12 that it "may have difficulties [funding redemptions] Monday morning" (Pl. 56.1 ¶ 97 ); it suspended funding for redemptions requested after approximately 10:10 a.m. (id. ¶ 96); and it had communicated an overdraft limit for the Reserve on September 15 (id. ¶¶ 93, 98);

- The Fund had incurred an $8 billion debt to State Street (id. ¶ 99);

- Lehman commercial paper was trading at levels far below the .80 fair value that the Board had assigned to the Fund's Lehman paper.  (id. ¶¶ 116, 117.)

- The ratings agencies had expressed concerns about maintaining the Fund's ratings (id. ¶ 104);

- Management had instructed that no sales of assets be made at less than par (id. ¶ 108);

- Bent II had made overtures to investment bankers about selling RMCI and to the Fed for help (id. ¶ 109); and

- International Liquidity's and Yield Plus Funds' NAVs fell below $1.00 during the 9:30 a.m. Board meeting after the Lehman holdings were reduced to 80 percent of par (id. ¶¶ 112, 113).[19]

As to those omissions Defendants do address, Defendants wrongly claim that there is no

evidence that there were any, and, that if there were omissions, none was material.  First,

Defendants persist in arguing that Defendants told the Board at the 1 p.m. meeting that 16.5

---

[19] Defendants ignore the evidence gathered in discovery and address only those allegations in the Complaint.  But facts learned in discovery that support the legal claims in the Complaint are fair game to defeat summary judgment.  Indeed, to defeat summary judgment, a plaintiff is required to come forward with sufficient evidence "beyond the bare allegations of the complaint to support" its case.  Celotex, 477 U.S. at 324.  This is not a case where Plaintiff is adding claims; rather, it is simply offering evidence that further supports its previously stated claims.

billion shares had been redeemed (Def. Br. at 28), without any acknowledgement that what the Board was told about the level of redemptions is a disputed issue of fact.  (Pl. 56.1 ¶ 102.)[20]

Second, Defendants argue that any fact withheld from the Board was not material because, once the Board obtained full disclosure (and despite the Trustees' "shock" at learning facts Defendants had withheld (Pl. 56.1 ¶ 110)), "nothing changed," because there was nothing the Board could do in the face of State Street's refusal to fund redemptions. (Def. Br. at 28.)

Again, Defendants' materiality test is really a test of reliance that does not apply here. But, as was true with statements to investors, the application of Defendants' test gives them no right to summary judgment with respect to their misstatements and omissions to the Board.  Had the Trustees been told all the facts at the 1:00 p.m. meeting on the 15th, they might have reacted quite differently than they did when those facts were finally revealed on the 16th.[21]  Had they known that Bent Sr.'s assurance that "sufficient capital could be made available" to support the Fund was really limited by RMCI's access to only $50 million, Bent Sr.'s own $10 million cap, and was conditioned on a third party or government bailout, the Trustees might have had a very different view of the likelihood that credit support agreement was going to be effective.  Had they known any of the other facts withheld from them, they would have had a much greater appreciation for the dire situation at hand.  They would have understood that their valuation of Lehman could in fact be informed by actual trading in the market, and that actual trading put the

---

[20] It seems unlikely that it is an issue that will be resolved in Defendants' favor, given the recent testimony in this case by the Independent Trustees' counsel, Fund counsel, and the Lead Independent Trustee, all of whom testified that (1) the Independent Trustees are in unanimous agreement that no one told them redemption levels of anywhere near 16.5 billion shares; and (2) the decision to clarify the minutes was the Independent Trustees' own and was free from any influence exerted by any member of the Commission staff.

[21] While it cannot be said with any certainty that the Trustees would have acted in a certain way had all material facts been disclosed to them, what is certain is that there were actions available to the Trustees that they might have pursued with the benefit of full disclosure.

price at a fraction of the valuation they had assigned. (Counter 56.1 ¶¶ 46, 47.) They would have understood that, barring government intervention, State Street was highly unlikely to allow the Fund to incur even more debt by resuming redemption funding, and that the "reverse repo" facility the Bents hoped State Street might provide exceeded the maximum debt the Primary Fund could permissibly incur. (Pl. 56.1 ¶ 107.) And they would have understood that if RMCI announced that two of its other Funds' NAVs had fallen below a dollar, few investors would stay with, or buy into, the Primary Fund. With all of that, and before even more redemptions and purchases were recorded, the Trustees might well have voted to liquidate the Fund.

Sections 206(2) and 206(4) and Rule 206(4)-8 do not require scienter. SEC v. Tambone, 550 F.3d 106, 146 (1st Cir. 2008) (Section 206(2) simply requires proof of negligence), rev'd en banc on other grounds, 587 F.3d 436 (2010); Steadman, 967 F.2d at 646-47 (scienter not required under Section 206(4)); SEC v. Rabinovich & Assocs., LP, No. 07 Civ. 10547 (GEL), 2008 WL 4937360, at *4 (S.D.N.Y. Nov. 18, 2008) (not identifying scienter among elements of a Rule 206(4)-8 violation). Though RMCI's, Bent Sr.'s, and Bent II's fraudulent acts were certainly committed knowingly and intentionally, their violations of Sections 206(2), 206(4) and Rule 206(4)-8 under the lower standard applicable to these sections of the Act are obvious.[22] Additionally, the substance of their Section 206(4) and Rule 206(4)-8 violations is not limited to statements and omissions to the Independent Trustees; it also includes statements made to current and prospective Primary Fund investors. Goldstein v. SEC, 451 F.3d 873, 881 n.6 (D.C. Cir. 2006); see also Rabinovich, 2008 WL 4937360, at *4. For all the reasons that the Bents'

---

[22] If Defendants claim that the Commission must prove separate negligent acts, they are wrong. The same acts can support both an intentional and non-intentional, or negligence-based, claim under the Advisers Act. Mannion, 2011 WL 2270856, at *14; cf. SEC v. Nacchio, 438 F. Supp. 2d 1266, 1283 (D. Colo. 2006) (same with respect to claims under Section 17(a)(2) of the Securities Act).

statements to investors violated the antifraud provisions of the Securities Act and the Exchange Act, they violate these provisions of the Advisers Act as well.

B.      Bent Sr. and Bent II Were Investment Advisers

Sections 206(1), (2), and (4) and Rule 206(4)-8 of the Advisers Act apply to "any investment adviser" with no requirement that the adviser be registered with the SEC.  15 U.S.C. § 80b-6.  Section 202(11) defines "investment adviser" as "any person who, for compensation, engages in the business of advising others . . . as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities." 15 U.S.C. § 80b-2(11).[23]

The Bents are liable as advisers because each advised their client, the Reserve funds, concerning investments in securities, and each received compensation for doing so.

1.      Bent Sr. and Bent II Provided Investment Advice to the Primary Fund

Bent Sr. and Bent II provided investment advice to their client, the Primary Fund.  Where a person is involved in the selection of investments for a fund of investors' money, he is an investment adviser under the Advisers Act.  Abrahamson, 568 F.2d at 871 (Congress intended the definition of investment adviser to apply to those "who exercise control over what purchases and sales are made with their clients' funds"); see also United States v. Ogale, 378 F. App'x 959, 960 (11th Cir. 2010) (defendant was investment adviser under the act because he promised investors that he would exercise "control over what purchases and sales [were] made with investors' funds," even if none was ever actually made).[24]

---

[23] Defendants acknowledge that RMCI was at all relevant times an investment adviser. (Def. 56.1 ¶ 2.)

[24] Defendants' citation to SEC v. PIMCO Advisors Fund Mgmt., LLC, 341 F. Supp. 2d 454 (S.D.N.Y. 2004) (Def. Br. at 26), is misplaced, at best, if not misleading.  The court did not "dismiss[]" claims asserted by the Commission under § 206 against two individuals, as Defendants contend. (Def. Br. at 26.)  Rather, in that case, the Commission only asserted aiding

As Chairman of RMCI, and head of RMCI's Credit Committee, Bent Sr. was much more than just an "officer[] of RMCI." (Def. Br. at 25.) As head of RMCI's Credit Committee, Bent Sr. was directly responsible for creating the approved list of investments for the Primary Fund. (Counter 56.1 ¶ 7 ("[Bent Sr.] personally monitors the credit quality of all money market investments for Reserve's funds."); Bent Sr. Decl. ¶ 9 ("I personally reviewed RMCI's credit file on Lehman . . .").) The Credit Committee provided an updated list of approved investments to the Independent Trustees at each Board meeting. Bent Sr. also headed RMCI's Investment Policy Committee, which was, in Bent Sr.'s words, responsible for reviewing "[w]hat we were investing in; what did we think about the investments." (Counter 56.1 ¶ 7.)

Bent II, Vice Chairman and Co-Chief Executive Officer of the Primary Fund and Vice Chairman and President of RMCI, was also a member of RMCI's Investment Policy Committee. (Counter 56.1 ¶ 9 (citing Bent II's role on the Committee and explaining that the "[Investment Policy Committee] determines Reserve's investment policies and its execution strategies.") Bent II regularly advised the Trustees at Board meetings, including providing the Independent Trustees with what was known as "the president's report," which included "macro level" information about the portfolios of the Reserve Funds and Bent II was responsible for answering any Trustee questions about the Report. (Counter 56.1 ¶ 9.)

In addition, where individuals dominate and control the investment adviser entity, courts conclude that the individuals are investment advisers under the Act. SEC v. Berger, 244 F. Supp. 2d 180, 185 (S.D.N.Y. 2001), aff'd, 322 F.3d 187 (2d Cir. 2003) (as sole owner and officer of investment adviser entity, defendant was investment adviser); SEC v. Young, Civ. Action No. 09-1634, 2011 WL 1376045, at *1, 7 (E.D. Pa. April 12, 2011) (as co- founder and

and abetting, not direct, Advisers Act claims against the individuals (which the court refused to dismiss). PIMCO 341 F. Supp. 2d at 462.

22

managing member of investment adviser entity, defendant acted as investment adviser). There is no dispute here that the Bents controlled every aspect of RMCI. (Counter 56.1 ¶ 146.)

Neither Bent abandoned his investment adviser role on September 15th. During the 8:00 a.m. and 9:30 a.m. Board meetings, both Bents advised the Board on the appropriate valuation for the Lehman securities. While discussing the fair value accounting of the Primary Fund's Lehman position, Bent Sr. assured the Independent Trustees that he and Bent II would "make the determination, as far as pricing is concerned." (Counter 56.1 ¶ 7.) During a discussion of the Trustees' decision to hold or sell the Fund's Lehman positions, Bent Sr. listed all the things he and Bent II would do to advise the Trustees, including that they would provide their "opinion as to . . . [the] true value of the security" and "what our recommendations are." (Id.)

The primary purpose of the 9:30 a.m. Board meeting was for Bent Sr. and Bent II to report to the Independent Trustees their findings concerning the current prices at which Lehman was trading in the market and advise the Trustees concerning the appropriate valuation for the securities. After conferring with Ledford immediately prior to the 9:30 meeting, and obtaining input from Bent II, Bent Sr. reported to the Independent Trustees and then participated in the Board's discussion concerning the proper value to assign to the Reserve's Lehman holdings and whether to hold or sell the positions. (Pl. 56.1 ¶ 42) William Montgoris, an Independent Trustee, summed up the role that Bent Sr.'s investment advice played in the Board's decisions concerning valuation and whether to sell the Lehman positions: The Independent Trustees "accept management's valuation of the Lehman paper at 80, and we additionally accept management's recommendation that we not liquidate the position." (Counter 56.1 ¶ 7.) Management in that case was Bent Sr. and Bent II.

Bent Sr.'s and Bent II's conduct on September 15 fits squarely within the exact language used in Section 202(11). They were "engage[d] in the business of advising others . . .as to the value of securities or as to the advisability of investing in, purchasing, or selling securities." 15 U.S.C. § 80b-2(11).

### 2. Bent Sr. and Bent II Received Compensation for Their Investment Advisory Services to the Primary Fund

Contrary to Defendants' claims, the Bents did receive compensation tied to advising the Reserve Funds "as to the value of securities or the advisability of investing in securities." (Def. Br. at 25.) Where one receives any economic benefit from the provision of investment advice, the compensation element is satisfied. United States v. Elliot, 62 F.3d 1304, 1311 (11th Cir. 1995) (defendant's unfettered access to investment adviser's bank accounts constituted compensation under the Advisers Act even where they received no separate investment adviser's fee); see also Young, 2011 WL 1376045, at *7 (defendant's income came solely from investment adviser and constituted "compensation" under the Act); Investment Advisers Act Release No. IA-1092, 1987 WL 112702, at *5 (Oct. 8, 1987) ("[t]he compensation element is satisfied by the receipt of any economic benefit, whether in the form of an advisory fee or some other fee relating to the total services rendered, commissions, or some combination of the foregoing . . . [it] is satisfied if a single fee is charged for a number of different services, including investment advice").

In 2007 and 2008, Bent Sr. and Bent II each received self-determined salaries of $1 million plus bonuses that amounted to one-third of the Reserve's profits. (Counter 56.1 ¶ 143.) RMCI is a "sub-chapter S" corporation, meaning that its profits were distributed directly to Defendants at the end of each year. (Id. ¶ 143.) Defendants do not dispute that RMCI's profits derive from the investment advice it provided (through the Bents) to the Funds. Nor do

Defendants offer any support for the assertion that none of their compensation was obtained as a result of the control the Bents exercised over the investments that were made with client funds. Because both Bents were compensated by RMCI for their investment advice to the Funds, they are investment advisers.

### III. DEFENDANTS' OWN CALCULATIONS OF THEIR PROFITS PROVIDE THE MEASURE OF THEIR ILL-GOTTEN GAINS AND THE COURT HAS THE DISCRETION TO AWARD PENALTIES BASED ON THAT CALCULATION OR A PER VIOLATION CALCULATION

Defendants themselves have identified $8 million as the profits they "earned" from their unlawful activities and have therefore supplied evidence of at least one appropriate measure of disgorgement. (Pl. 56.1 ¶ 126.)[25] Defendants' argument that summary judgment must be granted to them on the Commission's disgorgement claim because the Commission has provided no evidence of ill-gotten gains associated with their wrongdoing is therefore meritless. In Kelly, 2011 WL 135845, at *22-23 (Def. Br. at 31-32), the court held that the disgorgement claim failed because the Commission offered no evidence that the defendant's compensation was tied to or based on the revenues earned from certain wrongful transactions with which he had been involved. See also SEC v. Jones, 476 F. Supp. 2d 374, 386 (S.D.N.Y. 2007) (same). But here, Defendants have elected to pursue profits for managing the entirety of the assets left in the Fund when it broke the buck, assets they would never have managed had it not been for Defendants' fraud.[26] Had Defendants revealed to the public and the Board that they had no intention to support the Fund unless the Fed bailed them out, investors would have redeemed all of those

---

[25] To the extent that Defendants also now claim that their profits should also include the $15 million they once claimed as reimbursable expenses for brokers' commissions that they never paid (see Counter 56.1 ¶ 144)), those profits too should be subject to disgorgement.

[26] Defendants have steadfastly rejected the Trustees' offer to pay management fees on the basis of unredeemed assets, or those assets they might argue would have been under management regardless of Defendants' misconduct.

assets, and none would have bought any new shares. And had Defendants revealed the same thing to the Board, along with the fact that they had already incurred $8 billion in overdraft liability to State Street, the Board might well have closed down the Fund, halting any additional purchases, and allowing for an orderly liquidation of all of its assets, leaving nothing for Defendants to manage over the succeeding 18 months.[27] The profits that they claim, therefore, are undeniably tied to or based on their wrongful conduct. (See Counter 56.1 ¶ 137.)

In addition, where, as here, Defendants' fraudulent conduct prolonged the life of an entity, courts have determined that all compensation received by them during the entire period should be disgorged, even if the fraud ended prior to the demise of the entity. SEC v. First Pacific Bancorp., 142 F.3d 1186, 1192 (9th Cir. 1998); cf. SEC v. Posner, 16 F.3d 520, 522 (2d Cir. 1994) (ordering disgorgement of all income earned as officers and directors of company over which they fraudulently obtained control, finding that but for their unlawful conduct, defendants would never have gained control of company and would not have been entitled to any of the compensation paid to them). Thus, while Defendants' fraud may have ended when the Fund announced it had broken the buck, the effect of their fraud (and the benefits that derived from it to which they claim an entitlement) continued long after September 2008.[28]

Alternatively, if Defendants were now to argue that the Court should disregard their own claim of profits earned, then the Court may properly award the difference between what

---

[27] Even Defendants would concede that the purchases they acknowledge were not "automated" added money to the Primary Fund that RMCI would not have managed absent Defendants' conduct.

[28] Defendants are correct that their profits have not yet been paid. But that is reason enough to deny summary judgment now. The issue of whether Defendants should be paid under their Management Agreement, and what amount, is before the Court pursuant to the Order of November 25, 2009. If the Court grants Defendants the full profits they seek, then those amounts are disgorgible. But until it decides that issue, summary judgment on the claim should not be ordered.

Defendants took in over the period of their fraudulent conduct and what they have distributed. SEC v. Haligiannis, 470 F. Supp. 2d 373, 384-85 (S.D.N.Y. 2007) (investment adviser's disgorgement properly measured as difference between total investor contributions over period of fraudulent conduct minus distributions). Using Defendants' numbers, and assuming the fraud lasted from 1 p.m. on September 15 through 4 p.m. on September 16, investors made $1.6 billion in purchases. (Pl. Mov. App'x Ex. 95 (subtracting post September 16, 4 p.m. purchases).) Using Defendants' numbers again, distributions to date amount to .99 per share. (July 15, 2010 Reserve Press Release, available at http://www.ther.com/pdfs/Primary%20Distribution_71510.pdf, and reflecting distributions to date of .9904 per share). In this case, purchases minus distributions puts Defendants' disgorgement at $16 million.[29]

As to penalties, Defendants set out the correct statutory standard, but they are wrong when they claim that the Commission can show no pecuniary gain to them. Again, it is the Defendants who have made a claim under the Management Agreement for their fees, and it is they who quantify their pecuniary gain as at least $8 million. (Pl. 56.1 ¶ 126.) If the Court agrees that those amounts should be paid, they represent Defendants' pecuniary gain for penalty purposes.

But even if no pecuniary gain could be demonstrated, penalties in the amount of the maximum third tier amount of $130,000 for the Bents and $650,000 for each Entity Defendant should be awarded for each of the violations that the Commission has demonstrated. SEC v. Invest Better 2001, No. 01 Civ. 11427 (BSJ), 2005 WL 2385452, at *4 (S.D.N.Y. May 4, 2005).

---

[29] This $16 million figure may be too conservative, as it credits Defendants for holding onto shareholders' money long enough to earn at least some interest or investment income. By that logic, had Defendants' frustrated the Commission's efforts to compel distributions for long enough to earn one more cent per share, Defendants might implausibly claim that such income would preclude any disgorgement claim.

Here, the Court in exercising its broad discretion may either multiply those amounts by the number of charged violations, or the number of investors on whom those violations were visited. E.g., SEC v. Kenton Capital, Ltd., 69 F. Supp. 2d 1, 17 n.15 (D.D.C. 1998) (multiplying third tier penalty amount by number of investors victimized by conduct).

## IV.   DEFENDANTS' HISTORY OF SECURITIES LAW VIOLATIONS MAKES FUTURE VIOLATIONS LIKELY AND THEY ARE DESERVING OF AN INJUNCTION

Defendants primarily rest their argument for summary judgment on injunctive relief on only one of the factors courts look at:  the isolated nature of the conduct.  Because their conduct was not isolated – at least with respect to Bent Sr. and the Reserve entities he controls – summary judgment would be inappropriate.

Even if the instant conduct is of limited duration, courts find a likelihood of recurrence where the defendants have already been found liable for other violations of the securities laws. E.g., First Jersey Sec., Inc., 101 F.3d at 1477-78 (citing defendants' long history of securities laws violations and sanctions dating back more than 20 years); SEC v. Calvo, 378 F.3d 1211, 1216 (11th Cir. 2004) (finding that previous violation of the securities laws made it likely that defendant would engage in further violations in the future); SEC v. Tecumseh Holdings Corp., No. 03 Civ. 5490 (SAS), 2009 WL 4975263, at *5 (S.D.N.Y. Dec. 22, 2009) (central role played by defendant in fraud and the fact that he had previously been sanctioned for securities violations warranted permanent injunction); compare SEC v. Jadidian, No. 08 Civ. 8079 (PGG), 2011 WL 1327245, at *6 (S.D.N.Y. Mar. 31, 2011) (Def. Br. at 30) ("Given that the SEC has not offered proof of other violations committed by Jadidian, this Court must conclude that the [fraudulent conduct] . . . was an 'isolated occurrence.'") (quotations omitted).  In situations where the defendant has already violated the securities laws prior to the instant violation, the pattern of

wrongdoing makes it more likely that wrongdoing will continue absent the threat of contempt that a permanent injunction provides.

A pattern of wrongdoing is evident here. Bruce Bent Sr. and the Reserve entities he controlled have been sanctioned twice for violations of the Investment Company and Investment Advisers Acts, and once for violations of the anti-fraud provisions of the Securities Act and the Exchange Act. See Reserve Mgmt. Corp. v. Anchor Daily Income Fund, Inc., 459 F. Supp. 597, 600-01 (S.D.N.Y. 1978) (citing Bent Sr. and Reserve Management Corporation's willful violations of the Investment Company Act, and rejecting Bent Sr.'s attempt to "pass these matters off as merely technical violations"); In re Reserve Mgmt. Corp., Reserve Mgmt. Co., Henry B.R. Brown and Bruce R. Bent, Rel. No. IC-11394, IA-733, 1980 WL 20755 (Oct. 10, 1980) (finding respondents to have willfully violated Sections 17(a) of the Securities Act, Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and Section 34(b) of the Investment Company Act with respect to failure to disclose information to investors).

Nor did this pattern abate prior to September 15, 2008, or after Bent II joined his father in running their companies. In 2005, and again, in 2006, the Commission's examinations staff uncovered violations of the Investment Company Act, the Advisers Act and the Exchange Act (including Rule 10b-5) that resulted in Deficiency Letters. (Counter 56.1 ¶ 145.) The 2005 Deficiency Letter in particular cited the Primary Fund's violative board composition, concluding that "for the past 11 years the Reserve Complex has been out of compliance with the requirements of Section 10(a) of the Investment Company Act, and the Primary Fund's overpayment of management and Rule 12b-1 fees to RMCI in material amounts and in derogation of the disclosed method of calculation of those fees." (Counter 56.1 ¶ 145.)) The 2006 Deficiency Letter highlighted continued cash reconciliation issues that created a "serious[]"

$16.7 million short fall in the Primary Fund's cash account at its custodian, and unlawful transactions between one of the Reserve Funds and an affiliate. (Id.)

Even if Defendants' conduct could be called "isolated," that is but a single factor in the list that the Court should consider in determining whether a permanent injunction is appropriate. In assessing those factors, courts have not hesitated to enter injunctions where the other factors outweigh a single incident of fraud. E.g., SEC v. Blatt, 583 F.2d 1325, 1335 (5th Cir. 1978) (entering permanent injunction against defendant who committed only one violation on grounds that defendant had played significant role in egregious fraud); SEC v. Gunn, 3:08-CV-1013-G, 2010 WL 3359465, at *5, 8 (N.D. Tex. Aug. 25, 2010) (trades over two week span on material nonpublic information constituted isolated conduct, but ruling that other factors warranted permanent injunction).

Here, of course, as we have already pointed out in our brief in support of the Commission's motion for Summary Judgment, Defendants' conduct warrants an injunction because all of the factors indicating a likelihood of recurrence are present: Defendants violated the securities laws with a high degree of scienter; they have steadfastly rejected responsibility for the conduct, blaming their employees, their advisers, their bankers, the government – anyone and everyone other than themselves; and each of the Bents has a long history in the industry that he is likely to capitalize on in the future by resuming some sort of financial services employment.

## CONCLUSION

For all the foregoing reasons, the Defendants' Motion for Summary Judgment should be denied in all respects.

Dated: New York, New York
       June 13, 2011

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION

By: _____

Nancy A. Brown
Valerie A. Szczepanik
Michael D. Birnbaum
Michael P. Holland

3 World Financial Center
New York, NY  10281
(212) 336-1023 (Brown)

Attorneys for Plaintiff

31