# UNITED STATES DISTRICT COURT FOR THE
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re THE RESERVE FUND SECURITIES AND DERIVATIVE LITIGATION | 09 MD 2011 (PGG) |
| SECURITIES AND EXCHANGE COMMISSION, | |
| Plaintiff, | |
| v. | No. 09 Civ. 4346 (PGG) |
| | ECF Case |
| RESERVE MANAGEMENT COMPANY, INC., RESRV PARTNERS, INC., BRUCE BENT SR., and BRUCE BENT II, | |
| Defendants, | |
| and | |
| THE RESERVE PRIMARY FUND, | |
| Relief Defendant. | |

## REPLY MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

DUANE MORRIS LLP
1540 Broadway
New York, NY  10036
(212) 692-1000
Attorneys for Defendants
Reserve Management Company, Inc. Resrv Partners,
Inc., Bruce R. Bent, Sr. and Bruce R. Bent II

TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES…………………………………………………………….   ii

I.      THE SEC HAS NO CLAIMS AGAINST PARTNERS……………………..   1

II.     THE SEC HAS NO CLAIMS AGAINST BENT SR………………………...   1

III.    THE SECURITIES FRAUD CLAIMS SHOULD BE DISMISSED………..   3

        A.      The SEC Cannot Satisfy the "In Connection With" Requirement…….   3

        B.      The SEC Cannot Establish Materiality…………………………………   6

        C.      The SEC Has No Evidence of Scienter…………………………………...   7

IV.     THE AIDING AND ABETTING AND CONTROL PERSON
        CLAIMS CANNOT STAND……………………………………………………   8

V.      NO CLAIM EXISTS UNDER THE INVESTMENT ADVISERS ACT…….   9

        A.      The Bents Are Not "Investment Advisers" Under The Act…………...   10

        B.      The Bents' Interactions With The Board Are Not
                Actionable Under The Advisers Act……………………………………   11

VI.     THE RELIEF THE SEC SEEKS IS UNAVAILABLE………………………   12

        A.      The SEC Cannot Establish a Reasonable Likelihood
                of Future Violations……………………………………………………..   12

        B.      The SEC Has Established No Basis for Disgorgement………………….   14

TABLE OF AUTHORITIES

Cases                                                                    Page(s)

Abrahamson v. Fleschner,
   568 F.2d 862 (2d Cir. 1976)............................................................................9

Aerovox Corp. v. Concourse Electric Co.,
   90 F.2d 615 (2d Cir. 1937)............................................................................5

ATSI Commc'n, Inc. v. Shaar Fund, Ltd.,
   493 F.3d 87 (2d Cir. 2007)............................................................................8

Faulkner v. Verizon Commc'n, Inc.,
   156 F. Supp. 2d 384 (S.D.N.Y. 2001)...........................................................7

Feit v. Leasco,
   332 F. Supp. 544 (E.D.N.Y. 1971) ...............................................................7

Feitshans v. Kahn,
   2008 U.S. Dist. LEXIS 11330 (S.D.N.Y. Feb. 6, 2008).............................5

Janus Capital Group Inc. v. First Derivative Traders,
   2011 WL 2297762 (June 13, 2011) ...............................................................9

Nolte v. Capital One Fin. Corp.,
   390 F.3d 311 (4th Cir. 2004) ........................................................................2

In re Northern Telecom Ltd Sec. Litig.,
   116 F. Supp. 2d 446 (S.D.N.Y. 2000)...........................................................3

Novak v. Kasaks,
   216 F.3d 300 (2d Cir. 2000)..........................................................................7

In re Parmalat Sec. Litig.,
   479 F. Supp. 2d 332 (S.D.N.Y. 2007)...........................................................1

In re The Reserve Fund Sec. & Deriv. Litig.,
   673 F. Supp. 2d 182 (S.D.N.Y. 2009).........................................................15

In re Reserve Fund Sec. & Deriv. Litig.,
   732 F. Supp. 2d 310 (S.D.N.Y. 2010)...........................................................8

Reserve Mgmt. Corp. v. Anchor Daily Income Fund, Inc.,
   459 F. Supp. 597 (S.D.N.Y. 1978) .............................................................13

SEC v. Adoni,
   60 F. Supp. 2d 401 (D.N.J. 1999) .............................................................4-5

SEC v. Alexander,
  248 F.R.D. 108 (E.D.N.Y. 2007) .............................................................................5

SEC v. Amster & Co.,
  1991 U.S. Dist. LEXIS 6666 (S.D.N.Y. May 14, 1991)..................................... 3-4

SEC v. Bausch & Lomb, Inc.,
  565 F.2d 8 (2d Cir. 1977).........................................................................................12

SEC v. Berger,
  244 F. Supp. 2d 180 (S.D.N.Y. 2001)......................................................................10

SEC v. Calvo,
  378 F.3d 1211 (11th Cir. 2004) ...............................................................................14

SEC v. Collins,
  2003 U.S. Dist. LEXIS 8838 (N.D. Ill. May 21, 2003) ...........................................15

SEC v. Colonial Inv. Mgmt. LLC,
  2008 U.S. Dist. LEXIS 41442 (S.D.N.Y. May 23, 2008),
  aff'd, 381 Fed. Appx. 27 (2d Cir. 2010) .................................................................13

SEC v. Commonwealth Chem. Secs., Inc.,
  574 F.2d 90 (1978).....................................................................................................14

SEC v. DiBella,
  2008 U.S. Dist. LEXIS 109378 (D. Conn. Mar. 13,2008),
  aff'd, 587 F.3d 553 (2d Cir. 2009)...........................................................................13

SEC v. Espuelas,
  699 F. Supp. 2d 655 (S.D.N.Y. 2010).........................................................................1

SEC v. First Jersey Sec., Inc.,
  101 F.3d 1450 (2d Cir. 1996).................................................................................5, 14

SEC v. Follick,
  2002 U.S. Dist. LEXIS 24112 (S.D.N.Y. Dec. 18, 2002) .........................................3

SEC v. Forman,
  2010 U.S. Dist. LEXIS 56802 (D. Mass. June 9, 2010) ............................................6

SEC v. Gonzalez de Castilla,
  184 F. Supp. 2d 365 (S.D.N.Y. 2002).......................................................................12

SEC v. Haligiannis,
  470 F. Supp. 2d 373 (S.D.N.Y. 2007).......................................................................16

SEC v. Householder,
  2002 WL 31207292 (N.D. Ill. 2002) ....................................................................11

SEC v. Jones,
  476 F. Supp. 2d 374 (S.D.N.Y. 2007)..................................................................14

SEC v. Lyon,
  605 F. Supp. 2d 531 (S.D.N.Y. 2009)................................................................ 3-4

SEC v. Mannion,
  2011 U.S. Dist. LEXIS 63621 (N.D. Ga. June 2, 2011) .......................................4

SEC v. Miller,
  2006 U.S. Dist. LEXIS 56413 ..............................................................................16

SEC v. Norton,
  1997 U.S. Dist. LEXIS 15167 ................................................................................6

SEC v. Pac. Bancorp,
  142 F.3d 1186 (9th Cir 1998) ...............................................................................16

SEC v. PIMCO Advisors Fund Mgmt.,
  341 F. Supp. 2d 454 (S.D.N.Y. 2004)..................................................................11

SEC v. Posner,
  16 F.3d 520 (2d Cir. 1994)...................................................................................16

SEC v. Stanard,
  2009 U.S. Dist. LEXIS 6068 (S.D.N.Y. Jan. 27, 2009).........................................8

SEC v. Tecumseh Holdings Corp.,
  2009 U.S. Dist. Lexis 119869 (S.D.N.Y. Dec. 22, 2009)....................................14

SEC v. Todd,
  2007 U.S. Dist. LEXIS 38985 (S.D. Cal. May 30, 2007).....................................16

SEC v. Todd,
  2011 U.S. App. LEXIS 12692 (9th Cir. June 23, 2001) .........................................8

SEC v. Woodruff,
  2011 U.S. Dist. LEXIS 34569 (D. Colo. Mar. 31, 2011) .......................................2

SEC v. Young,
  2011 U.S. Dist. LEXIS 39460 (E.D. Pa. Apr. 12, 2011) ......................................10

St. Paul Reinsurance Co. Ltd. v. Commercial Fin. Corp.,
  144 F. Supp. 2d 1057 (N.D. Iowa 2001)................................................................4

<u>Sullivan</u> v. <u>Chase Inv. Servs. of Boston, Inc.</u>,
    434 F. Supp. 171 (N.D. Cal. 1977) ........................................................................11

<u>TCS Capital Mgmt., LLC</u> v. <u>Apax Partners, L.P.</u>,
    2008 U.S. Dist. LEXIS 19854 (S.D.N.Y. Mar. 7, 2008) ..........................................2

<u>United States</u> v. <u>Naftalin</u>,
    441 U.S. 768 (1979).............................................................................................. 5-6

<u>Statutes</u>

15 U.S.C. § 77t(d) ....................................................................................................15

15 U.S.C. § 78u(d) ...................................................................................................15

15 U.S.C. § 80b-9(e) ................................................................................................15

Since September 2008, the SEC has taken 36 days of testimony and interviews from every conceivable witness.  It has subpoenaed more than half a million pages of documents.  Yet it has not come forward with evidence that would allow a jury to find in its favor on each of the elements of each of its claims against each of the Defendants.  In many instances, it has not even tried to differentiate among its various causes of action, or among Defendants, simply lumping them all together.  That is not sufficient on summary judgment.  The rules are the same for the SEC as for other litigants:  to defeat a motion for summary judgment, the party with the burden of proof at trial must come forward with hard evidence – not just conjecture – showing that it can establish each element of each claim against each Defendant.  Because the SEC has not done so here, summary judgment should be entered in Defendants' favor.[1]

## I.   THE SEC HAS NO CLAIMS AGAINST PARTNERS

The SEC bears the "burden to link [each] defendant to the making of a misstatement." SEC v. Espuelas, 699 F. Supp. 2d 655, 660 (S.D.N.Y. 2010).  But, with respect to one of the four defendants, Partners, the SEC mentions it only once, claiming it is controlled by Bent Sr.  (SEC Opp. 15-16.)  Being controlled by Bent Sr. does not contravene any known securities law.  Since the SEC has pointed to no wrongdoing by Partners, summary judgment should be granted in its favor.  See In re Parmalat Sec. Litig., 479 F. Supp. 2d 332, 341 (S.D.N.Y. 2007) (dismissing fraud claims where, "[a]bsent any allegations that the individuals were acting as agents for the Named Subsidiaries when they made the alleged misrepresentations, the Named Subsidiaries cannot be vicariously liable for their actions").

## II.   THE SEC HAS NO CLAIMS AGAINST BENT SR.

Forced to lay its cards on the table and identify what it believes Bent Sr. did from his 50th

---

[1]      Defendants incorporate by reference their memorandum in opposition to the SEC's summary judgment motion ("Defs. Opp."), a copy of which is annexed as Exhibit 5 to the Reply Appendix ("Rep. Ex.").  Defined terms have the same meaning as in our prior submissions.

anniversary trip to warrant fraud charges, the best the SEC can muster is that Bent Sr. allegedly "edited the particular misleading statements communicated to Reserve investors and he personally addressed the Primary Fund's Board about the most pressing issues of the day, ranging from Defendants' 'intent' and ability to support the Primary Fund to trading activity in the kinds of Lehman securities that the Primary Fund Board voted to carry at 'fair value.'" (SEC Opp. 14.)[2] Under either theory, the SEC cannot meet its burden.

First, Board communications are not actionable under §§ 10(b) or 17(a). TCS Capital Mgmt., LLC v. Apax Partners, L.P., 2008 U.S. Dist. LEXIS 19854, *52 (S.D.N.Y. Mar. 7, 2008). Thus, the sole basis for the SEC's aiding and abetting and control person claims against Bent Sr. is that he suggested changing "ensure" to "mitigate" in an early draft of *Insights*. (Ex. 2-L.) Bonanno (the RMCI employee who posted Insights) testified that Bent Sr. neither directly nor indirectly authorized him to publish that document. (Ex. 3-AA, 261:24-264:2.) Since mere "general involvement in the review process" does not establish aiding and abetting liability, SEC v. Woodruff, 2011 U.S. Dist. LEXIS 34569, *51 (D. Colo. Mar. 31, 2011), summary judgment should be granted dismissing these claims.

As for the Advisers Act claims, the SEC takes issue with only two things Bent Sr. actually said to the Board. First, it points to his statement that RMCI could make "sufficient capital" available to cover the Lehman shortfall – a prediction that would not be actionable even under ordinary circumstances (see Nolte v. Capital One Fin. Corp., 390 F.3d 311, 315-16 (4th Cir. 2004) (prediction of "sufficient capital" inactionable)), let alone at the onset of what turned into "the worst financial crisis in global history, including the Great Depression." (Ex. 2 ¶ 21.) Second, the SEC points to "trading activity" in Lehman, about which Bent Sr. properly deferred to RMCI's

---

[2]      In a footnote, the SEC claims:  "Defendants make no argument at all that Bent Sr. lacked scienter when he made his statements of support to the Board . . . ."  (SEC Opp. 10.)  But, in his declaration, Bent Sr. states: "neither I, nor any of the other defendants, ever intended to deceive anyone."  (Ex. 2, ¶ 56.)  To anyone but the SEC, this would be a clear denial of scienter.

CIO, who in turn accurately reported to the Board what RMCI's trading desk was experiencing. (Opp. Ex. B ¶¶ 3-8.)  Here, too, the evidence against Bent Sr. turns out to be non-existent, and so judgment should be granted dismissing these claims as well.

### III.   THE SECURITIES FRAUD CLAIMS SHOULD BE DISMISSED

Since Defendants have pointed to the lack of evidence for essential elements in the SEC's claims, the SEC can "avoid summary judgment only by introducing evidence that could allow a jury to find in its favor." SEC v. Follick, 2002 U.S. Dist. LEXIS 24112, *8 (S.D.N.Y. Dec. 18, 2002).  The SEC had to "come forward with specific facts showing a genuine issue for trial on the existence of an element essential to the SEC's case and on which the SEC bears the burden of proof." SEC v. Amster & Co., 1991 U.S. Dist. LEXIS 6666, *19 (S.D.N.Y. May 14, 1991).  It cannot simply "'rely on mere conclusory allegations nor speculation, but instead must offer some hard evidence.'" SEC v. Lyon, 605 F. Supp. 2d 531, 540 (S.D.N.Y. 2009).

In its opposition papers, however, the SEC has failed to present the kind of hard evidence that would allow a jury to find in its favor on each element of its securities fraud claims against each of the Defendants.  These claims should therefore be dismissed.  In re Northern Telecom Ltd. Sec. Litig., 116 F. Supp. 2d 446, 455 (S.D.N.Y. 2000) (holding that failure of proof on "any one" of "these three essential elements of plaintiffs' claims 'necessarily renders all other facts immaterial' and requires summary judgment in favor of defendants").

### A.   The SEC Cannot Satisfy the "In Connection With" Requirement

By its silence, the SEC concedes that statements made to induce investors to hold their shares are not actionable under either § 10(b) of the Exchange Act or § 17(a) of the Securities Act. This concession removes the underlying premise of the SEC's entire case.  (Complt. ¶ 82.) Summary judgment should therefore be granted dismissing all claims based on inducing investors not to redeem.  To try to salvage its case, the SEC now offers two substitute theories based on (1)

purchases made after Defendants stated they intended to support the Fund and (2) redemptions supposedly canceled after Defendants induced investors to buy back into the Fund.  The SEC, however, has not come forward with evidence which would allow a jury to find in its favor on either theory.

With respect to purchases made *after* statements of support, the SEC has put forward no proper evidence that Defendants made such statements to any purchasers other than the six whom Defendants previously identified.[3]  (Ex. 4 ¶¶ 20-27.)  While the SEC makes a misguided attack on the Gareis declaration (SEC Opp. 9), it offers no countervailing evidence of its own.  As the party with the burden of proof, the SEC cannot avoid summary judgment simply by critiquing Defendants' evidence or by speculating on the "possibility" that other purchasers might have seen or been told something.  (SEC Opp. 5-6.)  As the Court held in SEC v. Amster & Co., supra, 1991 U.S. Dist. LEXIS 6666, *38:  "The difficulty with the SEC's approach is that it cannot establish a factual proposition upon which it bears the burden of proof by attacking the credibility of witnesses whose testimony negates the proposition."

As for cancellations of redemptions, this theory was not pled in the Complaint, and may not be considered.  Lyon, 605 F. Supp. 2d at 550 ("While the SEC's theory is not a new 'claim' for Rule 15 purposes – the Commission stated a claim for securities fraud in its complaint . . . it is a new theory of that fraud claim . . . .  Because the SEC did not plead this theory of fraud with particularity in its complaint, the Court will not consider it in resolving this motion"); St. Paul Reinsurance Co. Ltd. v. Commercial Fin. Corp., 144 F. Supp. 2d 1057, 1061 (N.D. Iowa 2001)

---

[3]     The SEC tries to turn the "in connection with" requirement into a reliance issue, but the two elements are distinct.  The SEC does not have to show that an investor actually relied on a misrepresentation, but it does have to show that there was something upon which the investor could have relied.  SEC v. Mannion, 2011 U.S. Dist. LEXIS 63621, *23 (N.D. Ga. June 2, 2011) (for "in connection with," SEC had to show purchase by the investor provided with inflated NAV, but did "not have to prove that the investor actually relied on the inflated NAVs") (emphasis added) ; SEC v. Adoni, 60 F. Supp. 2d 401, 409 (D.N.J. 1999) ("the most liberal readings of Section 10(b) have involved at least the opportunity for public reliance") (emphasis added).

("party pleading fraud is 'limited to the specific allegations pleaded in [its] complaint'" because purpose of 9(b) is to afford "defendant fair notice of the plaintiff's claim"); see also Feitshans v. Kahn, 2008 U.S. Dist. LEXIS 11330, *18 (S.D.N.Y. Feb. 6, 2008) ("'memorandum of law is not a proper vehicle for rewriting or amending the complaint'"). In any event, the discussions about canceling redemptions did not mention credit support. Rather, the evidence shows that the only thing investors were told was that they could avoid losing interest if they rescinded the redemptions, which was a true statement. (Opp. Ex. I, 204:10-209:1.) No investors ever agreed to rescind (Id., 197:1-2; Rep. Ex. 6 ¶ 12), making this unpled theory much ado about nothing.

The SEC also refers, misleadingly, to information "conveyed" to the Wall Street Journal. (SEC Opp. 6.) As the SEC knows, the Journal never published anything about RMCI's intent to support the Fund. Thus, nothing told to the Journal reached investors. SEC v. Adoni, 60 F. Supp. 2d 401, 410 (D.N.J. 1999) (holding that "in connection with" requirement not satisfied where fraudulent information never reaches investing public). Similarly, the SEC's theory about what investors might have done, had the rating agencies downgraded the Fund, is both entirely speculative and based on inadmissible evidence about the rating agencies' "published criteria." (SEC Opp. 6 n. 4.) See Aerovox Corp. v. Concourse Electric Co., 90 F.2d 615, 616-617 (2d Cir. 1937) (Dun & Bradstreet report referenced in affidavit is "hearsay evidence of no probative value whatever"). Since a "nonmovant can create a genuine issue of material fact only by citing competent, admissible evidence," SEC v. Alexander, 248 F.R.D. 108, 110 (E.D.N.Y. 2007), the "published criteria," as hearsay, cannot create a triable issue.

Finally, despite the substantial Second Circuit authority holding that the elements of claims under §§ 10(b) and 17(a) are the same, SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996), the SEC suggests it can simply dispense with this impossible-to-satisfy requirement for its § 17(a) claim. (SEC Opp. 7.) The only case the SEC cites for its novel theory is United States v.

Naftalin, 441 U.S. 768, 773 n. 4 (1979), where the Supreme Court simply found that, for purposes

of § 17(a), "the fraud [need not] occur in any particular phase of the selling transaction."  Naftalin

in no way suggests a purchase is not required under § 17(a).  As the court held in SEC v. Norton,

1997 U.S. Dist. LEXIS 15167, *8 n. 1 (S.D.N.Y. Sept. 30, 1997):

> Although Section 17 of the Securities Act refers to "in the offer or sale of
> any securities" and Section 10(b) of the Exchange Act requires misstatements made
> "in connection with the purchase or sale or any security," the Court will treat the
> two phrases interchangeably.  *See United States v. Naftalin*, 441 U.S. 768, 773
> (noting that "in" is not necessarily narrower than "in connection with" and noting
> that the two terms have been treated interchangeably on occasion).

Accord SEC v. Forman, 2010 U.S. Dist. LEXIS 56802, *24 (D. Mass. June 9, 2010) (stating that

"Courts draw no distinction between 'in the offer or sale' and the 'in connection with the purchase

or sale' language of Rule 10b-5").

B.     The SEC Cannot Establish Materiality

Faced with a long line of cases holding that a misstatement is not material unless investors

could respond to full disclosure by protecting themselves against loss, the SEC tries to escape

summary judgment on materiality by arguing that it does not matter whether investors could have

acted differently had the facts been disclosed.  But the only support the SEC cites for its position is

a thirty-year-old law review article whose reasoning has never been adopted by a federal court.

(SEC Opp. 8 n. 6.)  Suffice it to say that the cases on which Defendants rely remain good law and

establish that a fact is not material if investors could not have acted on it. (Defs. Mem. 20-22.)

Here, there was nothing investors could have done to successfully redeem (*i.e.*, cash out)

after State Street imposed a "debit hold" and stopped funding new redemption requests at 1:33

P.M. on September 15.  (Ex. 4-F)  While the SEC suggests that investors could have transferred

into other Reserve Funds, there are two problems with this theory (which also appears nowhere in

the SEC's Complaint and therefore cannot be considered).  First, to "transfer" between funds, an

investor must redeem and then purchase new shares.  (Opp. Ex. C p. 5 n. 1.)  Once State Street

suspended funding new redemption requests, that applied to transfers as well.[4]

    In any event, transfer was not a "viable alternative course of action by an appreciable number of investors," Feit v. Leasco, 332 F. Supp. 544, 571 (E.D.N.Y. 1971), and thus cannot help the SEC establish materiality. Had more investors moved their shares to other funds, fewer investors would have been left to absorb the loss when the Primary Fund broke the buck. The alternative course of action that the SEC says was available would, at most, only have shifted the loss among investors; it would not have helped an appreciable number of investors avoid a loss altogether. Since Defendants' statements did not deprive an appreciable number of investors of a viable remedy, the SEC cannot establish the materiality element of its claims.

C.    <u>The SEC Has No Evidence of Scienter</u>

    To establish scienter, the SEC argues it "needs no more evidence . . . than [Defendants'] own admissions that they had in their minds several significant conditions to and limitations on the support they were willing to commit and that they disclosed none of them." (SEC Opp. at 10.) But Defendants have "admitted" no such thing, and the SEC is play-acting in suggesting otherwise. What the SEC self-servingly calls "conditions" and "limitations" was Defendants' realization, between Monday night and Tuesday morning, that the credit crisis and resulting run on the Fund had reached the point where any credit support exceeded RMCI's means. (Ex. 2 ¶¶ 29-30.) Once Defendants reached that conclusion, they advised the SEC – before trading opened on Tuesday morning. Shortly thereafter, the Board was told the same thing. (Ex. 2-J at 1-2.)

    Parties faced with new facts and changing circumstances have a right to change their minds, even when the "change of mind closely follows a statement of intent." Faulkner v. Verizon Commc'n, Inc., 156 F. Supp. 2d 384, 396 (S.D.N.Y. 2001). See also Novak v. Kasaks, 216 F.3d

---

[4]    The SEC notes that investors who transferred shares to other Reserve funds ultimately received a dollar for redeemed shares (SEC Opp. 9), but omits the fact that it was the SEC who, in October 2008, directed that those redemptions be given effect. (Opp. Ex. C p. 5 n. 1.)

300, 309 (2d Cir. 2000) ("allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud").[5]  The SEC has put forward nothing more than that here.[6]

IV. <u>THE AIDING AND ABETTING AND CONTROL PERSON CLAIMS CANNOT STAND</u>[7]

The SEC argues that "Defendants ignore overwhelming evidence of the Bents' active and knowing participation in . . . the Entity Defendants' violations" (SEC Opp. 13), but it never bothers to identify that "evidence."  The only conduct it mentions in its discussion of aiding and abetting is the editing of *Insights*.  Because the statement of intent in *Insights* does not give rise to a primary securities fraud violation, the aiding and abetting and control person claims should also be dismissed.  <u>ATSI Commc'n, Inc.</u> v. <u>Shaar Fund, Ltd.</u>, 493 F.3d 87, 108 (2d Cir. 2007).  Further, the Bents' editing of a draft of a document which they did not authorize for publication does not constitute "substantial assistance," and therefore is not a basis for secondary liability.  <u>SEC</u> v. <u>Stanard</u>, 2009 U.S. Dist. LEXIS 6068, *88 (S.D.N.Y. Jan. 27, 2009) ("showing of 'actual knowledge of the violation by the aider and abettor'" needed for liability under § 20(e)); <u>SEC</u> v. <u>Todd</u>, 2011 U.S. App. LEXIS 12692, **37-38 (9th Cir. June 23, 2011) (control person liability only if officer or director authorized public statements and press releases).

---

[5]     This Court's dismissal decision does not support the SEC's scienter position, as it was premised on certain key allegations which, at that stage, the Court was required to accept as true, but which turned out to be false (and which the SEC knew or should have known were false all along), such as the claim that State Street stopped funding redemptions at 10:10 A.M.  <u>In re Reserve Fund Sec. & Deriv. Litig.</u>, 732 F. Supp. 2d 310, 316, 323 (S.D.N.Y. 2010).  (Ex. 4 ¶ 2.)

[6]     The SEC also argues that Defendants' "scienter is not negated" by their reliance on advice of counsel (SEC Opp. 11) – a defense Defendants did not assert as a basis for summary judgment because this Court ruled it raised a "triable issue."  <u>Reserve Fund</u>, <u>supra</u>, 732 F. Supp. 2d at 321 n. 8.  But the defense is a bar to the SEC's summary judgment motion and is addressed in Defendants' opposition brief.  The discovery complaints that the SEC raises on this issue are addressed in the accompanying Dellaportas reply declaration.  (Rep. Ex. 7 ¶¶ 2-6.)

[7]     Although the SEC says Defendants did not seek summary judgment on the aiding and abetting claims against Bent II (SEC Opp. 13 n. 13), Defendants did so.  <u>See</u> Opp. Ex. A, p. 24.

V.     NO CLAIM EXISTS UNDER THE INVESTMENT ADVISERS ACT

The SEC claims the Bents can be liable under the Advisers Act for statements to the Board because they were "investment advisers" under § 202(11) of the Act, in that "each advised their client, the Reserve funds, concerning investments in securities, and each received compensation for doing so."  (SEC Opp. 21.)  As set forth below, this argument fails on two grounds.

A.     The Bents Are Not "Investment Advisers" Under The Act

The Fund had only one investment adviser:  RMCI.  Under Section 1 of the Management Agreement between RMCI and the Fund, RMCI had the sole responsibility to "select and manage the Portfolio's investments and . . . determine what investments shall be made or disposed of by the Portfolio and . . . effect such acquisitions and dispositions, all in furtherance of the Portfolio's investment objective and policies, subject to the overall control and direction of the [Fund's] Board of Trustees."  (Rep. Ex. 7-D.)  The Fund had no contract with the Bents because they were not the Fund's investment advisers; they were RMCI employees.  Under Section 3 of the Management Agreement, only RMCI was paid for advising the Fund.  Id.  The Bents, by contrast, received officer salaries and, if RMCI returned a profit, shareholder distributions.  (Exs. 2 ¶ 54; 3 ¶ 48.)  That does not transform them into "investment advisers" under the Act.

What the SEC is really asking the Court to do is pierce RMCI's corporate veil, and hold the Bents – *officers* of RMCI – responsible as if they *were* RMCI.  As the Supreme Court recently confirmed in Janus Capital Group Inc. v. First Derivative Traders, 2011 WL 2297762, *2304 (June 13, 2011), the federal securities laws are not an "invitation to disregard the corporate form."  Where, as here, "it is undisputed that the corporate formalities were observed," Id., the courts in applying the federal securities laws are required to respect the corporate form.

The pre-Janus cases cited by the SEC are not to the contrary.  In Abrahamson v. Fleschner, 568 F.2d 862 (2d Cir. 1977), the Court found that the general partners of a partnership were acting

as investment advisers *to their own partnership*.  The Court in that case was not reaching past the actual investment adviser entity and treating the individuals who worked for the adviser entity as if they were themselves the advisers.  In <u>SEC</u> v. <u>Berger</u>, 244 F. Supp. 2d 180, 185 (S.D.N.Y. 2001), the Court disregarded the corporate structure and deemed Berger the true investment adviser because he "owns and controls MCM [the adviser] and is the company's only officer. . . .  MCM and the Fund were *a one-man show, with Berger making all substantive investment decisions*." (Emphasis added.)  Similarly, in <u>SEC</u> v. <u>Young</u>, 2011 U.S. Dist. LEXIS 39460, *22 (E.D. Pa. Apr. 12, 2011), the Court pierced the corporate veil and found defendant was the investment adviser because he was the "President, Chief Investment Adviser, Chief Compliance Officer, and the Managing Member of Acorn Capital [corporate investment adviser] and that, in this capacity, he made investment decisions for Acorn Capital's clients."

Those cases bear no relation to the facts here.  RMCI was no "one-man show."  As the corporate organizational chart shows (Ex. 2-D), RMCI was a *several hundred* person operation. Both Bents were involved in management, but neither made day-to-day investment decisions for the Fund.  (Ex. 2 ¶¶ 7-8.)  Rather, RMCI's CIO, an investment professional with over 20 years of experience, managed the Fund's portfolio.  (<u>Ibid.</u>)  The SEC now claims the Bents "dominate and control" RMCI (SEC Opp. 22), but the "evidence" it cites shows nothing of the sort.  For example, the SEC says "Bent Sr. . . . participated in the Board's discussion concerning the proper value to assign to the Reserve's Lehman holdings and whether to hold or sell the positions."  (SEC Opp. 23.)  As Board Chairman, Bent Sr. was required to do that.  However, when the Trustees wanted a report on Lehman trading, CIO Ledford provided the report.  (Ex. 2-G pp. 37-38; Opp. Ex. B-2.) As for Bent II, he did not speak to the Board on this issue at all.  (<u>Id.</u>)

The kinds of vague allegations the SEC makes are insufficient to impose alter ego liability on the Bents.  As officers of RMCI,  a corporation which observed the corporate form, each Bent

is a "person associated with an investment adviser," and any claims against them must be limited

accordingly.  SEC v. Householder, 2002 WL 31207292, *5 (N.D. Ill. 2002) (finding director of

investment adviser was "person associated with an investment adviser"); SEC  v. PIMCO

Advisors Fund Mgmt., 341 F. Supp. 2d 454, 470 (S.D.N.Y. 2004) ("SEC may not charge

Treadway and Corba with violations of Section 206(1) or 206(2) directly, since they are not

themselves investment advisers covered by the statutory provisions"), citing Sullivan v. Chase Inv.

Servs. of Boston, Inc., 434 F. Supp. 171, 184-85 (N.D. Cal. 1977) ("individuals who are not

investment advisers" under Act cannot be held primarily liable under § 206).

B.    The Bents' Interactions With The Board Are Not Actionable Under The Advisers Act

Second, even if the Bents were "investment advisers" under the Act, nothing that

transpired on September 15 or 16, 2008 would be actionable.  First, no Trustee has testified that

either Bent affirmatively misrepresented anything to them.[8]  As for omissions, the only evidence

the SEC can muster are the 1:00 P.M. Board minutes.  (SEC Opp. 18.)  However, "[m]inutes of a

board are the synthesis of what was said.  It's not a verbatim recitation."  (Ex. 2-B, 112:17-18.)

Indeed, the two recorded Board meetings from earlier that day show that much more was

discussed beyond what is reflected in the minutes.  (Exs. 2-G; 2-H; 2-I.)

The SEC concedes the Board knew everything by Tuesday morning, but did nothing with

the information other than schedule four more meetings. (SEC Opp. 19.)  Faced with this evidence

that the alleged nondisclosures were not material, the SEC embarks on flights of conjecture:  "Had

the Trustees been told all the facts at the 1:00 p.m. meeting on the 15th, they might have reacted

quite differently than they did when those facts were finally revealed on the 16th."  (SEC Opp.

19.)  In a series of hypotheticals, the SEC speculates that "the Trustees might well have voted to

_____

[8]     With respect to redemptions, the only Independent Trustee to testify candidly admitted that
he had an uncertain memory ("there was a lot going on and there were numbers that were coming
at everybody fast and furious").  (Opp. Ex. H, 64:21-22.)

liquidate the Fund." (Id. at 20.)  No citations are provided for this; nor could any be.  According to Montgoris, the only Independent Trustee to testify, the Board decided not to act until "we spoke with [the Federal Reserve] and they came back to us and told us that they didn't anticipate there was going to be  anything that the Fed was going to do to help us out. . . ." (Opp. Ex. H, 92:8-13.) Only then did the Board vote to drop the NAV and liquidate.  (Id., Ex. 2-J p. 7.)

Since the SEC has no evidence that anything Defendants told the Board affected the timing of the liquidation, their statements were *per se* immaterial, and the SEC's conjecture should be rejected.  See SEC v. Gonzalez de Castilla, 184 F. Supp. 2d 365, 376 (S.D.N.Y. 2002) (SEC's burden is "no less than any other party in any other case. . . .  While in a motion for summary judgment every inference based upon an established fact must be drawn against [the movants], as juries are regularly advised, speculation cannot substitute for proof").

## VI.     THE RELIEF THE SEC SEEKS IS UNAVAILABLE

A.     The SEC Cannot Establish a Reasonable Likelihood of Future Violations

Unwilling to cede any point, no matter how groundless, the SEC now argues that its request for a permanent injunction is supported by a "long history of securities law violations" (SEC Opp. 2) based on evidence of (1) two administrative proceedings dating back more than thirty years and (2) deficiency letters issued in 2005 and 2006.  This evidence in no way establishes that, unless enjoined, there is a "reasonable likelihood that past wrongdoing will recur."  SEC v. Bausch & Lomb, Inc., 565 F.2d 8, 18 (2d Cir. 1977).  It is therefore insufficient.

With respect to the administrative proceedings from 1980 and earlier, neither reflects a "pattern of wrongdoing" (SEC Opp. 29) or proclivity to commit securities violations.  Indeed, the SEC has offered nothing indicating the nature of the earlier of these proceedings.  It simply cites a case in which the court noted, by way of background, that, in 1977, Bent Sr. and the late Henry Brown (then a principal of Reserve Management Corp.) had entered into an offer of settlement of

claims relating to sections of the Investment Company Act concerning the selection of auditors and approval of adviser contracts.  Reserve Mgmt. Corp. v. Anchor Daily Income Fund, Inc., 459 F. Supp. 597, 600 (S.D.N.Y. 1978).  While "no one offered in evidence the stipulation or offer of settlement," Id. at 601, the court nevertheless inferred that the violations were not merely technical, and the SEC then quotes this inference as if it were a finding.  (SEC Opp. 29. )  Whether or not the court's surmise was correct, even the SEC does not contend that the 1977 claims, which were settled when Bent II was ten years old, involved charges of fraud or had anything in common with allegations in this case.  They are therefore irrelevant.  SEC v. Colonial Inv. Mgmt. LLC, 2008 U.S. Dist. LEXIS 41442, *10 (S.D.N.Y. May 23, 2008), aff'd, 381 Fed. Appx. 27 (2d Cir. 2010) (conduct to be enjoined must be same as or similar to past conduct).

The 1980 administrative proceeding (resolved when Bent II was 13 years old) is similarly irrelevant.  It was a claim that RMC, RMCI, Bent Sr., and Brown "did not specifically disclose problems concerning computer and telephone malfunctions affecting the ability of Reserve to consistently make same-day payments upon redemption of its shares."  Release No. 733, 1980 WL 20755, *1 (Oct. 10, 1980).  The parties were granted until December 31, 1981 to cure the cited problems, and there is no evidence that they did not do so.

Despite scouring its archives, the SEC could find nothing at all for another quarter century, when the first of two Deficiency Letters was issued.  Unrelated conduct separated by 25 years does not form a "pattern."  See SEC v. DiBella, 2008 U.S. Dist. LEXIS 109378, *49 (D. Conn. Mar. 13, 2008), aff'd, 587 F.3d 553 (2d Cir. 2009) ("passage of 10 years since the misconduct" makes injunction inappropriate).[9]  Nor do deficiency letters signal a propensity to commit securities law violations.  By one estimate, 95% of SEC examinations result in a finding of at least one deficiency.  (Rep. Ex. 7-E.)  In claiming that the Deficiency Letters were issued after "the

---

[9]     Defendants concede DiBella controls aiding and abetting penalties under the Act.

Commission's examinations staff uncovered violations" (SEC Opp. 29), the SEC has taken characteristic liberties with the facts.  The 2005 Deficiency Letter concerned matters that Defendants had already corrected and self-reported to the SEC, including that Father Donald Harrington, the President of St. John's University, was also on the Board of Bear Stearns, a Fund customer, and thus had improperly been counted as an independent trustee.  (SEC Ex. 149; Ex. 2-A, 19:24-21:7; Rep. Ex. 7-F p. 4.)  That the SEC would cite a self-reported technical violation to show the need for a permanent injunction is typical of its overreaching approach in this case.

The cases the SEC cites could not be any more different from this one.  First Jersey Sec., supra, 101 F.3d at 1477 (defendants, who were sanctioned in 1973, 1974, 1984, 1986, and 1990, had "history of engaging in activities that led to misconduct charges, followed by sanctions imposed by various regulatory agencies or courts, followed by new misconduct charges"); SEC v. Calvo, 378 F.3d 1211, 1216 (11th Cir. 2004) (defendant "is a recidivist" whose proclivity to violate securities laws "is particularly apparent from [his] decision to hire. . . a convicted felon with past securities law violations"); SEC v. Tecumseh Holdings Corp., 2009 U.S. Dist. Lexis 119869, *19 (S.D.N.Y. Dec. 22, 2009) (defendant "is a recidivist").

Here, by contrast, the alleged misconduct was not recurring; it was confined to a period of less than 24 hours of extraordinary market tumult, and the SEC has not shown that the same alleged conduct ever occurred in the past.  In short, the SEC has not gone "beyond the mere facts of past violations." SEC v. Commonwealth Chem. Sec., Inc., 574 F.2d 90, 100 (2d Cir. 1978).  Since the SEC has no proof of "'cognizable danger of recurrent violation,'" SEC v. Jones, 476 F. Supp. 2d 374, 384 (S.D.N.Y. 2007), its request for a permanent injunction should be dismissed.

B.    The SEC Has Established No Basis for Disgorgement

The SEC resorts to pure sophistry in attempting to save its disgorgement claim from dismissal.  Lacking a shred of evidence that Defendants received any ill-gotten gains causally

connected to their alleged wrongdoing, the SEC instead asserts that, if Defendants were paid for

the work they did for more than two years in liquidating the Fund after it broke the buck, they

would realize profits.  (SEC Opp. 25-26.)  But there is no connection between any alleged

wrongful conduct and the payment RMCI seeks (but has not yet received) for legitimate services

RMCI subsequently performed at the Trustees' request.  Rather, as this Court has already found,

the Fund's "collapse was a product of the Lehman bankruptcy, an event that brought the financial

markets to a standstill."  In re The Reserve Fund Sec. & Deriv. Litig., 673 F. Supp. 2d 182, 195

(S.D.N.Y. 2009).  While Defendants had hoped to save the Fund, their inability to prevent the

Fund's collapse was not the cause of its collapse; the cause was the Lehman bankruptcy.  Because

no part of RMCI's management fee is attributable to any allegedly wrongful conduct on

Defendants' part, it is not subject to disgorgement.[10]

       The SEC's disgorgement theory starts with a faulty premise and degenerates from there.

Forsaking both logic and facts, the SEC asserts that, had Defendants told the public that they did

not intend to support the Fund, investors miraculously would have redeemed all of their shares on

September 15, leaving Defendants with nothing to liquidate.  (SEC Opp. 25-26.)  But, as the SEC

well knows, no investors were able to execute new redemptions requested after State Street put the

Fund on a "debit hold" at 1:24 P.M. on September 15.  As a result, $40 billion in redemptions

poured in on September 15 and 16, but only $10 billion were funded, and all the remaining shares

had to be liquidated.  RMCI was asked to handle the liquidation of the Fund, and agreed to do so

out of a duty to Fund investors and based on assurances it would be paid.  Through its efforts, the

---

[10]     The SEC wrongly assumes all profits are "ill-gotten gains."  While profits may be gains, they are only "ill-gotten" – and subject to disgorgement – if there is a direct causal link between them and the wrongful conduct.  SEC v. Collins, 2003 U.S. Dist. LEXIS 8838, *14 (N.D. Ill. May 21, 2003) ("Implicit in the disgorgement analysis is the notion that the person ordered to cough up the money actually received the money unjustly, i.e., that he received the money by means of a violation of the securities laws or through fraud or some other wrongdoing").  Statutory penalties are similarly limited to the "pecuniary gain to such defendant as a result of the violation."  15 U.S.C. § 77t(d); 15 U.S.C. § 78u(d); 15 U.S.C. § 80b-9(e) (emphasis added).

Fund distributed  $50+ billion.  Had RMCI not taken on this responsibility, the Fund would have had to pay a third party to perform the same task, at far greater cost.  (Rep. Ex. 7 ¶ 10.)

Under these circumstances, depriving RMCI of payment for dutifully managing the liquidation would be impermissible.  SEC v. Todd, 2007 U.S. Dist. LEXIS 38985, **53-54 (S.D. Cal. May 30, 2007), aff'd in part and rev'd in part on other grounds, 2011 U.S. App. LEXIS 12692 (9th Cir. 2011) (holding that "SEC's position that Defendants should give up their salaries for the time at issue is untenable – it is basically a statement that because of several business decisions or errors, nothing else they did during that period matters.  This is punitive").

By contrast, there was a direct causal connection in the SEC's cases – which does not exist here – between the alleged wrongful conduct and the amount disgorged.  SEC v. Pac. Bancorp, 142 F.3d 1186 (9th Cir 1998) (defendant required to disgorge $688,000 he kept even though prospectus provided for payment to be returned to investors); SEC v. Posner, 16 F.3d 520 (2d Cir. 1994) (defendants fraudulently acquired control of company and plundered it).  As for the SEC's contention that disgorgement should be measured by the difference between investor contributions and distributions (SEC Opp. 26-27), no such all-purpose formula exists.  Rather, contributions have only been treated as "ill-gotten gains" in Ponzi scheme cases like SEC v. Haligiannis, 470 F. Supp. 2d 373, 385 (S.D.N.Y. 2007), where the perpetrator has, in effect, stolen the contributions.

This is not the first time the SEC has overreached in seeking disgorgement.  In SEC v. Miller, 2006 U.S. Dist. LEXIS 56413, **40-41 (N.D. Ga. July 31, 2006), the Court found that:

> the arguments advanced by [the SEC] are so spare and provide so little explanation of the plaintiff's reasoning and methodology that this Court finds it difficult to even evaluate them.  It may well be that the defendant has sustained some gains that should be disgorged, but the Court cannot articulate why that is so, based on a reading of the plaintiff's response.  As the defendant notes, it is up to the plaintiff to explain and support its position; it is not the defendant's or the Court's duty to intuit what that position might be.

The SEC has done no better here.  Its disgorgement claim should therefore be dismissed.

Dated: New York, NY
      July 5, 2011

                  Respectfully submitted,

                  DUANE MORRIS LLP

                  By:_____ /s/ Fran M. Jacobs_____
                      Fran M. Jacobs
                      John Dellaportas
                      Kathrine A. Gehring
                  1540 Broadway
                  New York, NY  10036
                  (212) 692-1000
                  Attorneys for Defendants
                    Reserve Management Company, Inc. Resrv
                    Partners, Inc., Bruce R. Bent, Sr. and Bruce
                    R. Bent II