UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------------x

SECURITIES AND EXCHANGE : 
COMMISSION, :
                                           :

                    Plaintiff, :

                                         :

      v. :                         No. 09 Civ. 4346 (PGG)
                                         :

RESERVE MANAGEMENT COMPANY, INC., :      ECF CASE
RESRV PARTNERS, INC., BRUCE BENT SR. :
and BRUCE BENT II, :
                                         :

                    Defendants, :
       and :

                                         :

THE RESERVE PRIMARY FUND, :
                                         :

                  Relief Defendant. :

------------------------------------------------------------------------x

### PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION IN LIMINE TO INTRODUCE EVIDENCE OF DEFENDANTS' COMMUNICATIONS WITH PRIMARY FUND INVESTORS

SECURITIES AND EXCHANGE
COMMISSION

Nancy A. Brown
Alexander J. Janghorbani
Michael D. Birnbaum
3 World Financial Center
New York, New York 10281
Tel: (212) 336-1023 (Brown)

Attorneys for Plaintiff

July 17, 2012

## TABLE OF CONTENTS

PRELIMINARY STATEMENT .................................................................................................... 1

ARGUMENT ............................................................................................................................. 3

I.   For Evidence to Be Admissible, It Need Be Relevant to Only One Disputed Fact or
     Element of the Commission's Claim ......................................................................................... 3

II.  Each of the Communications Was in the Offer, or in Connection with a Purchase or
     Sale, of Securities and Is Probative of Those Elements as Well ............................................. 7

     A.   The Reserve's September 15-16 Communications with Investors Were "In the
          Offer" of Securities ......................................................................................................... 7

     B.   The Reserve's September 15-16 Communications with Investors Were "In
          Connection with" the Purchase or Sale of Securities ..................................................... 13

III. Communications with the Reserve's Salesforce Are Relevant to the SEC's Claims Under
     Advisers Act Rule 206(4)-8 .................................................................................................... 15

IV.  The Reserve Sales Force's Communications with Investors Are Not Otherwise
     Inadmissible Hearsay ............................................................................................................. 17

CONCLUSION .......................................................................................................................... 20

## TABLE OF AUTHORITIES

**Cases**                                                                                          **Pages**

Aaron v. SEC,
446 U.S. 680 (1980)............................................................................................. 8

Abrahamson v. Fleschner,
568 F.2d 862 (2d Cir. 1977)............................................................................... 15

Anderson v. United States,
417 U.S. 211 (1974)........................................................................................... 18

Blue Chip Stamps v. Manor Drug Stores,
421 U.S. 723 (1975)............................................................................................. 8

Canatxx Gas Storage Ltd. v. Silverhawk Capital Partners, LLC,
06 Civ. 1330 (LHR), 2008 WL 1999234 (S.D. Tex. May 8, 2008)..................... 18

City of Ann Arbor Emps. Retirement Sys. v. Sonoco Prods. Co.,
827 F. Supp. 2d 559 (D.S.C. 2011)..................................................................... 5

City of Tuscaloosa v. Harcros Chems., Inc.,
158 F.3d 548 (11th Cir. 1998) ........................................................................... 18

Glendale Federal Bank, FSB v. United States,
39 Fed. Cl. 422 (Fed. Cl. 1997) ......................................................................... 18

Gustafson v. Alloyd Co., Inc.,
513 U.S. 561 (1995).......................................................................................... 8, 9

In re Charles Schwab Corp. Secs. Litig.,
No. C 08-02510, 2009 WL 1371409 (N.D. Cal. May 15, 2009) .......................... 10

Meadows v. SEC,
119 F.3d 1213 (5th Cir. 1997) ........................................................................... 10

Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit,
547 U.S. 71 (2006)............................................................................................. 13

Rubin v. United States,
449 U.S. 424 (1981).......................................................................................... 8, 9

SEC v. Am. Commodity Exch., Inc.,
546 F.2d 1361 (1976)........................................................................................... 8

SEC v. Antar,
15 F. Supp. 2d 477 (D.N.J. 1998) ........................................................................ 8

SEC v. Arvida Corp.,
169 F. Supp. 211 (S.D.N.Y. 1959) ................................................................ 10

SEC v. Brown,
740 F. Supp. 2d 148 (D.D.C 2010) ............................................................. 8-9

SEC v. Conaway,
698 F. Supp. 2d 771 (E.D. Mich. 2010) ......................................................... 5

SEC v. Daifotis,
11 Civ. 00137 (WHA), 2012 WL 2132389 (N.D. Cal. June 12, 2012) ................... 15-16

SEC v. Durgarian,
477 F. Supp. 2d 342 (D. Mass. 2007) ............................................................ 8

SEC v. Gagnon,
10 Civ. 11891 (GCS) (E.D. Mich. Mar. 22, 2012) ......................................... 10

SEC v. Greenstone Holdings, Inc.
10 Civ. 1302 (MGC), 2012 WL 1038570 (S.D.N.Y. Mar. 28, 2012)..................... 8-9

SEC v. Mannion,
789 F. Supp. 2d 1321 (N.D. Ga. 2011) ......................................................... 14

SEC v. Morgan Keegan & Co.,
678 F.3d 1233, 2012 WL 1520895 (11th Cir. 2012) ...................................... 14

SEC v. Mozilo,
09 Civ. 3994 (JFW), 2010 WL 3656068 (C.D. Ca. Sept. 16, 2010).................... 6

SEC v. Power,
525 F. Supp. 2d 415 (S.D.N.Y. 2007)............................................................ 8

SEC v. Rabinovich & Assocs., LP,
07 Civ. 10547 (GEL), 2008 WL 4937360 (S.D.N.Y. Nov. 18, 2008)................... 15

SEC v. Sierra Brokerage Servs., Inc.,
608 F. Supp. 2d 932 (S.D. Ohio 2009) ......................................................... 10

SEC v. Solucorp Indus., Ltd.,
274 F. Supp. 379 (S.D.N.Y. 2003) ................................................................ 8

SEC v. Stanard,
06 Civ. 7736 (GEL), 2009 WL 196023 (S.D.N.Y. Jan. 27, 2009) ................... 5, 6

SEC v. Tambone,
550 F.3d 106 (1st Cir. 2008)
vacated and rev'd in part on other grounds,597 F.3d 436 (1st Cir. 2010) ............. 8

SEC v. Thomas D. Kienlen Corp.,
  755 F. Supp. 936 (D. Or. 1991) ................................................................................... 10

SEC v. Tzolov,
  08 Civ. 7699 (SAS), 2011 WL 308274 (S.D.N.Y. Jan. 26, 2011)................................7-8

SEC v. Wolfson,
  539 F.3d 1249 (10th Cir. 2008) ............................................................................... 8, 13

United States v. Borbon,
  No. 05 Cr. 909 (DC), 10 Civ. 2935 (DC), 2010 WL 2998738 (S.D.N.Y. July 29, 2010) ........... 19

United States v. Dominguez,
  280 F. App'x 81 (2d Cir. 2008) ..................................................................................... 19

United States v. Feldman,
  825 F.2d 124 (7th Cir. 1987) ........................................................................................ 19

United States v. Ferguson,
  676 F.3d 260 (2d Cir. 2011)............................................................................................. 5

United States v. Gibson,
  690 F.2d 697 (9th Cir. 1982) ........................................................................................ 18

United States v. Gotti,
  457 F. Supp. 2d 395 (S.D.N.Y. 2006)........................................................................... 18

United States v. Hatfield,
  724 F. Supp. 2d 321 (E.D.N.Y. 2010) ............................................................................. 5

United States v. Jenkins,
  633 F.3d 788 (9th Cir. 2011) .......................................................................................... 6

United States v. Naftalin,
  441 U.S. 768 (1979)......................................................................................................... 8

United States v. Rajaratnam,
  802 F. Supp. 2d 491 (S.D.N.Y. 2011)............................................................................. 6

United States v. Reyes,
  577 F.3d 1069 (9th Cir. 2009) ...................................................................................6-7

**Statutes**

Section 2(a)(3) of the Securities Act of 1933,
  15 U.S.C. § 77b(a)(3)...................................................................................................... 10

Section 6(a) of the Securities Act of 1933,
  15 U.S.C. § 77f(a) ............................................................................................................... 9

Section 17(a) of the Securities Act of 1933,
  15 U.S.C. §77q(a) ......................................................................................................... Passim

Section 10(b) of the Securities Exchange Act of 1934,
  15 U.S.C. s 78j(b) .......................................................................................................... Passim

Section 206(4) of the Investment Advisers Act of 1940,
  15 U.S.C. § 80b-6 ........................................................................................................... Passim

**Rules**

Fed. R. Evid. 401 ..................................................................................................................... 2, 4

Fed. R. Evid. 801(d)(2)(D) ........................................................................................................ 18

17 C.F.R. § 275.206(4)-8 ...................................................................................................... Passim

**Treatises**

8 Louis Loss and Joel Seligman Securities Regulation, 3721 3d edition, 2004 ........................... 14

The Securities and Exchange Commission ("Commission" or "SEC") respectfully submits this memorandum of law in support of its motion in limine to admit evidence of communications of Defendants Bruce Bent II ("Bent II"), Reserve Management Company, Inc. ("RMCI"), and Resrv Partners, Inc. ("Resrv Partners") with Primary Fund investors, including telephone call recordings, emails, and testimony of Reserve salespeople and Primary Fund investors.[1]

## PRELIMINARY STATEMENT

As the Court noted, and we think Defendants must concede, a fund's breaking of the buck is material. Therefore, statements made to assure investors that the Fund will <u>not</u> break the buck must be material too. But Defendants argue with that. They claim that Bent II's 1:19 email of NAV support was not material and that, in any event, investors could not have understood his pledge to be unequivocal. (Docket Entry ("DE") 393, Defs' Moving Summary Judgment Brief, at 20-22.)

Defendants now seek to preclude the Commission from offering Defendants' communications with investors that show (1) that statements were made to investors, (2) what those statements were, (3) how investors (and Reserve salespeople) interpreted those statements, and (4) that investors (and Reserve salespeople) attached importance to the statements.[2] They

---

[1]    We understood the Court's direction at the Conference to require briefing on Defendants' First Proposed In Limine Motion (Defendants' July 9, 2012 Letter at 1-2) and Plaintiff's Ninth Proposed In Limine Motion (Plaintiff's July 9, 2012 Letter at 5). We reserve our rights to respond to Defendants' other proposed In Limine Motions, including their Second Proposed In Limine Motion, seeking to preclude evidence from our purchaser witnesses on the grounds that they lack personal knowledge under Fed. R. Evid. 602.

[2]    We understand Defendants to be objecting to three investor witnesses, Eduardo Lalo Torres, Anthony Alvino, and Steve Haussler, and all telephone recordings or written communication between any Reserve entity and an investor or prospective investor. Attached hereto as Appendix A, is a list of the SEC's proposed investor communication exhibits, which Defendants objected to.

argue that none of them is admissible because, if made to investors who did not purchase shares, the communications are irrelevant:

- to the Securities Act claims because they were not made "in the offer" of securities;

- to the Exchange Act claims because they were not made in connection with the purchase or sale of any security; and

- to the Investment Advisers Act claims because the calls were made by Resrv Partners employees, not RMCI employees.

Defendants' argument conflates the low threshold for relevance with the Commission's ultimate burden to prove each element of its fraud charges, including the offer, purchase, or sale elements of Sections 17(a) and 10(b). But evidence is relevant and, thus admissible, as long as it is probative of *any* fact in dispute or *any* element of the Commission's case. Fed. R. Evid. 401. Here, investor communications are at least relevant to the questions of what was said to investors and salespeople, how each of them interpreted it, and what the significance of it was to investors. This evidence does not lose that relevance if it is deemed irrelevant to *another specific* element of a claim.

Nor is there any requirement, as Defendants suggest, that testimony on the issue of materiality be presented only by a witness who had an investment decision to make. Courts routinely allow non-investors to speak to the importance of market information on the theory that analysts, for example, are qualified to talk about the importance of that information.

In any event, the communications the Commission proffers here were all made to investors in the offer, sale, or purchase of a security, and are therefore relevant to these elements, too. Defendants' argument to the contrary misapprehends the breadth of those elements. To be in the offer of a security, the Defendants' communications with investors merely need occur *at the same time* (not in the same breath) as an offering of the Primary Fund's securities. Of course,

on September 15 and 16, the Primary Fund was open for business and the Reserve had an effective prospectus on file with the SEC. Bent II himself recognized the importance of communicating the message to solicit purchases, urging his marketing staff to "try and get the institutional folks [investors] back in" the Fund. And, every salesman used the pledge to solicit investors; they communicated it to prospective investors, and investors who had redeemed, but whom the Reserve tried to convince to buy back in. Under the securities laws, these are offers irrespective of whether each salesman used the magic word "offer" in each communication.

Each investor communication was also "in connection with" a purchase or sale because there were purchases during the time Defendants were sharing their message of support with investors. That is all the law requires. Finally, the sales force's relevant communications with investors were made at the explicit direction of Bent II and RMCI, the investment adviser, and pursuant to written agreements that authorized Resrv Partners to use sales materials furnished by RMCI. This evidence is also, therefore, directly relevant to the Commission's claims under Rule 206(4)-8 of the Investment Advisers Act of 1940, which requires neither an offer, purchase, or sale.

It would, indeed, be the odd securities case where the very investor communications at issue were precluded, especially where Defendants dispute their importance and meaning to investors. This case presents no reason for special exception and the Court should, therefore, admit the proffered evidence.

## ARGUMENT

I.   For Evidence to Be Admissible, It Need Be Relevant to Only One Disputed Fact or Element of the Commission's Claim

Defendants argue that the Reserve's communications with investors are not relevant because those communications were not made in connection with a "purchase or sale" or an

3

"offer" of securities. This argument conflates the Federal Rules' low threshold for relevance with the Commission's ultimate burden of proof in this case. Under Fed. R. Evid. 401, evidence is relevant if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Thus, evidence is relevant and admissible if it is of consequence to *any* fact at issue in the Plaintiff's case, even if not relevant to another element or to multiple elements. See Fed. R. Evid. 401, 1972 advisory committee notes ("the fact to be proved may be ultimate, intermediate, or evidentiary"). Here, the Commission will ultimately need to prove every element of its 17(a) and 10(b) fraud claims: that Defendants made material false statements, with scienter, "in the offer or sale" or "in connection with the purchase or sale of a security." And, to do so, the Commission will have to establish several disputed facts to which the communications with investors are probative, including:

(1)  <u>What was said to investors</u>. The 1:19 email was never sent directly to any investor. Therefore, the communications that the sales force had with investors are relevant to establish what was actually communicated to investors, apart from the *Insights*.

(2)  <u>The pledge of support was unequivocal, unconditional, and not temporary</u>. While Defendants will argue that their statements were intended to convey their then-existing intent, an intention that might change at any moment, the Commission will seek to establish that a reasonable interpretation of Bent II's 1:19 email was that it was an unequivocal, unconditional pledge of support. How the Reserve's sales force heard and communicated Bent II's 1:19 email, and how investors perceived those communications, is especially relevant to that question.

(3)  <u>The statements were material</u>. Materiality is a disputed issue in this case, and one that is a mixed question of fact and law. The Commission may prove it by proffering investors to speak to what was important to them.

Thus, if salesmen's calls with investors merely establish what was being communicated they are relevant. The Commission need not establish that the calls are also probative of what the investors did with that information, or even if they thought it material; those calls are being

4

offered to establish one fact, not the others.  Likewise, so long as investors can speak to materiality, they need not also be able to speak to any other element, like "in connection with the purchase or sale of a security."  If an investor is qualified to testify about his consideration of a Primary Fund investment on September 15 and 16 and can speak to what factors he viewed as important to an investment decision – whether or not he made any – he is qualified to testify about materiality.  The relevance test does not require that the proffered evidence make more than one fact or *an entire claim* more or less probable.

That this is so is evidenced by the frequency with which courts admit testimony from professional securities analysts to establish materiality in securities cases.  Analysts make no investment decisions; they may make recommendations to investors about whether they should purchase, sell or hold securities, or they may merely follow an industry and offer industry commentary.[3]  And yet, analysts are routinely permitted to testify as persons who consider investments, not people who actually make an investment decision.  E.g., United States v. Ferguson, 676 F.3d 260, 275 n.10 (2d Cir. 2011) (citing the substantial evidence of materiality in securities fraud case elicited from "[t]wo stock analysts and an AIG investor-relations manager" who testified about "the importance of loss reserve information to investors and analysts").[4]  So, too, investor relations executives.  They make no investment decisions, but because of their

---

[3]    See "Analyzing Analyst Recommendations," available at http://www.sec.gov/investor/pubs/analysts.htm.

[4]    See also United States v. Hatfield, 724 F. Supp. 2d 321, 325, 326 (E.D.N.Y. 2010) (testimony from analyst regarding the importance to him of information sufficient to support jury verdict on insider trading charges respecting materiality of information on which defendant insider traded); SEC v. Stanard, 06 Civ. 7736 (GEL), 2009 WL 196023, at *23-24 (S.D.N.Y. Jan. 27, 2009) (relying on testimony from analyst regarding importance of undisclosed information in determining materiality); see also City of Ann Arbor Emps. Retirement Sys. v. Sonoco Prods. Co., 827 F. Supp. 2d 559, 578-79 (D.S.C. 2011) (denying summary judgment to defendant on materiality in light of analyst reports indicating their interest in subject of non-disclosure); SEC v. Conaway, 698 F. Supp. 2d 771, 850 (E.D. Mich. 2010) (citing testimony of stock analyst on materiality).

interaction with investors, they are qualified to testify to what kinds of questions investors ask and how those questions reflect the importance attached to information. See United States v. Rajaratnam, 802 F. Supp. 2d 491, 506 (S.D.N.Y. 2011) (investor relations employee testified about importance to investors of information allegedly tipped to insider trader).

Indeed, if Defendants were right that only those who made investment decisions can testify about the importance of the undisclosed information, the rule would forbid reference to Defendants' own views of the significance of the information.[5] But see United States v. Jenkins, 633 F.3d 788, 802-03 (9th Cir. 2011) (holding that defendants' concern with postings on internet message board demonstrated that such postings were material); SEC v. Mozilo, No. CV-09-3994-JFW, 2010 WL 3656068, at *13 (C.D. Cal. Sept. 16, 2010) (relying on defendants' and analysts' testimony regarding the importance of information, court finds a reasonable jury could find the disclosures were material); Stanard, 2009 WL 196023, at *24 (pointing to defendant's own view of the importance of the information).

In United States v. Reyes, 577 F.3d 1069, 1075 (9th Cir. 2009), the court explicitly rejected the argument that materiality can only be established by one making an investment decision. There, the government in a stock option back-dating case offered the testimony of an equity analyst to support the proposition that investors would want to know that a company had granted back-dated options because of their impact on net income and earnings. Id. at 1075-76. Defendant argued that such testimony was inadmissible because the analyst "had made no personal decision to invest in Brocade's stock." Id. at 1075. The Ninth Circuit affirmed the

---

[5]     Defendants are certainly entitled to argue that what the investor witnesses deemed significant is not a perfect proxy for what an objectively reasonable investor would find material, but that argument goes to the weight the Jury should place on certain testimony, not whether the Primary Fund investors' testimony is relevant. Indeed, despite their ultimate failure to do so, Defendants asked, and the Court granted them, the opportunity to put up three investor witness to counter materiality, so they must agree that investor testimony is relevant to that element.

district court's decision to admit the testimony, holding that materiality's objective standard meant that the witness need not have made any investment decision himself. Id.

Thus, as long as the SEC's proffered evidence of communications with investors is probative of *any* fact or element at issue – such as materiality of the statement, the making of the statement, or the meaning of the statement – it is relevant and admissible. And there is no requirement that the evidence must also establish some other element of the Commission's claims.

II.    Each of the Communications Was in the Offer, or in Connection with a Purchase or Sale, of Securities and Is Probative of Those Elements as Well

While they need be relevant to only one fact or element, all of the communications are probative of the "in the offer of" and "in connection with" elements as well as their patent relevance to materiality.

A.    The Reserve's September 15-16 Communications with Investors Were "in the Offer" of Securities

Each of the Defendants' communications with investors on the relevant days – whether made by email, telephone, or via the Reserve's website – was "in the offer" of securities because (1) they were communicated while the Primary Fund had an open offer of securities, and (2) were intended to, and did, communicate an offer of securities. These communications are, thus, directly relevant to the SEC's Section 17(a) claims and should be admitted. 15 U.S.C. § 77q(a) (prohibiting fraud "in the offer or sale of any securities"). Defendants' contention that the Reserve's communications with investors were not "in the offer" – presumably because each communication did not contain the magic word "offer" – reflects an overly-technical definition of the nexus requirement that has been roundly rejected and would lead to absurd results.

Section 17(a) "is a general prohibition against fraud in the offer or sale of securities," SEC v. Tzolov, 08 Civ. 7699 (SAS), 2011 WL 308274, at *2 (S.D.N.Y. Jan. 26, 2011)

7

(quotations omitted), and "has been broadly construed to encompass a wide range of conduct." SEC v. Antar, 15 F. Supp. 2d 477, 528 (D.N.J. 1998). The Supreme Court has embraced an expansive reading of Section 17(a)'s "in the offer" requirement, holding that the fraud may occur in any stage of the "entire selling process." United States v. Naftalin, 441 U.S. 768, 773 (1979) (defining the nexus requirement "broadly").[6] Indeed, because 17(a)'s nexus requirement is posed in the disjunctive ("in the offer or sale"), a completed transaction is not necessary to give rise to liability.[7]

Thus, misstatements are "in the offer," even if they do not appear in the offering documents, as long as they are made during the offering of securities. See SEC v. Wolfson, 539 F.3d 1249, 1264 (10th Cir. 2008) (false statements in periodic filings, which themselves did not offer securities, actionable under 17(a) because they were made "while Sukumo was in the process of peddling newly issued . . . stock to investors"); SEC v. Durgarian, 477 F. Supp. 2d 342, 356 (D. Mass. 2007) (alleged fraud "in the offer" even where fraud occurred after investors had purchased into a mutual fund).[8] As the court in SEC v. Greenstone Holdings, Inc. recently

---

[6]    See also Gustafson v. Alloyd Co., 513 U.S. 561, 577 (1995) ("§ 17(a) contained no language suggesting a limitation on the scope of liability"); Rubin v. United States, 449 U.S. 424, 431 (1981) (17(a) was "enacted to protect against fraud and promote the free flow of information in the public dissemination of securities"); Aaron v. SEC, 446 U.S. 680, 696 (1980) (17(a), as anti-fraud provision, should be "construed not technically and restrictively, but flexibly to effectuate its remedial purposes") (citation and internal quotations omitted).

[7]    See Blue Chip Stamps v. Manor Drug Stores, 421 U.S. 723, 734 (1975) (in comparison to Section 10(b), 17(a) "provide[s] a remedy to those who neither purchase nor sell securities"); SEC v. Tambone, 550 F.3d 106, 122 (1st Cir. 2008) ("[b]ecause section 17(a) applies to both sales and offers to sell securities, the SEC need not base its claim of liability on any completed transaction at all"), vacated and rev'd in part on other grounds, 597 F.3d 436 (1st Cir. 2010); SEC v. Am. Commodity Exch., Inc., 546 F.2d 1361, 1366 (10th Cir. 1976) ("actual sales were not essential" to 17(a) charge).

[8]    See also SEC v. Power, 525 F. Supp. 2d 415, 420 (S.D.N.Y. 2007) (17(a)'s liability may be predicated on false statements in a periodic report file with the Commission); SEC v. Solucorp Indus., Ltd., 274 F. Supp. 2d 379, 419 (S.D.N.Y. 2003) (17(a) liability where misstatements contained in press releases and periodic filings, not offering documents); cf. SEC

8

noted in granting the SEC summary judgment on Section 17(a) and 10(b) against a defendant who made false statements in press releases, a statement is actionable if it was "intended to influence the investing public." 10 Civ. 1302 (MGC), 2012 WL 1038570, at *11 (S.D.N.Y. Mar. 28, 2012). This comports with the Section 17(a)'s driving motive "to protect against fraud and promote the free flow of information in the public dissemination of securities." Rubin, 449 U.S. 424, 431 (1981).

Here, there can be no question that Defendants were involved in "offering" Primary Fund shares on September 15 and 16. The Fund had an effective registration statement – constituting an ongoing offer of sales – on file with the SEC on those days.[9] And investors took them up on their offer, purchasing over $1.5 billion in shares on September 15 and 16. (DE 387-1, at 24, ¶ 6.a.) Thus, because Defendants were offering securities at the time, their communications were "in the offer" of securities. And in pledging to support the value of the very securities being offered, Defendants' statements directly touched those offerings.

Defendants cannot successfully argue – as they have attempted -- that investors made only a single investment decision the very first time they used the Reserve, such that no additional communications could be "in the offer."[10] This argument fails to explain why the Reserve had an effective, ongoing registration statement (an offer) if all investment decisions had

---

v. Brown, 740 F. Supp. 2d 148, 163 (D.D.C 2010) (dismissing 17(a) charge because SEC did not allege that there was any offer or sale of securities during the nine-year period that the false statements were made, but denying motion to dismiss Section 10(b) claim).

[9]    See PX 261 (the Reserve's Prospectus); Gustafson, 513 U.S. at 574 ("the term 'prospectus' relates to public offerings by issuers"); see also 15 U.S.C. § 77f(a) ("A registration statement shall be deemed effective only as to the securities specified therein as proposed to be offered."). References to "PX" are to Plaintiff's proposed trial exhibits; each is submitted herewith as Exhibit A to the Declaration of Michael D. Birnbaum, executed July 17, 2012.

[10]    July 13, 2012 Conference Tr. at 54 (Defendants' argument that investors who called into the Reserve on September 15 and 16 could not be offerees because they had made their investment decisions "months before, based on the prospectus").

been concluded, but also misapprehends the very nature of their investors' investing habits. As Defendants' own limited production of some investment history shows, investors made sometimes daily investment decisions -- choosing on any given day to buy Primary Fund shares, or sell them, or do both.[11] After all, this was a money fund and investors were urged to use it for their "cash management" needs. When they needed cash, they redeemed; and when they had extra cash, they selected the money market fund in which they wanted to invest it. The Reserve hoped that they would select the Primary Fund and stood ready to sell them shares.

In any event, the Reserve's communications with investors were themselves offers and were understood as such by every person involved in making them. Courts apply a broad interpretation of "offer" under the federal securities laws. Meadows v. SEC, 119 F.3d 1213, 1226 (5th Cir. 1997) ("in the investment context, one who solicits attempts to produce the sale by urging or persuading another to act . . . [p]ersuasion can take many forms"). Thus, press releases (such as the *Insights* piece) and oral communications announcing positive news about a company's securities, even if they stop short of using the word "offer," have been held to constitute offers under Section 2(a)(3) (defining "offer" for the purposes of the Securities Act).[12]

---

[11]     Birnbaum Decl., Ex. H (attaching Defendants' Expert's analysis of Fund records for certain investors' investment history and showing the in and out investment movements of those investors over the two month period); id., Ex. I (attaching account statements produced by three investors (but not Defendants) and showing their purchase and sale patterns for the month of September).

[12]     See SEC v. Gagnon, 10 Civ. 11891 (GCS), 2012 WL 994892, at *8 (E.D. Mich. Mar. 22, 2012) (citation omitted) (web site postings and marketing materials could constitute offers); SEC v. Sierra Brokerage Servs., Inc., 608 F. Supp. 2d 932, 952 n.28 (S.D. Ohio 2009) (press releases and internet posts touting company's business and stock price constituted an offer); SEC v. Thomas D. Kienlen Corp., 755 F. Supp. 936, 941 (D. Or. 1991) (marketing materials announcing "[g]reater safety," "improved performance," and "[l]ower costs" were offers to sell); SEC v. Arvida Corp., 169 F. Supp. 211, 215 (S.D.N.Y. 1959) (press release and statements concerning securities' value were an offer). See also In re Charles Schwab Corp. Secs. Litig., No. C 08-02510, 2009 WL 1371409, at *5 (N.D. Cal. May 15, 2009) ("offering documents under the federal securities laws are generally different than contract 'offers' (a far narrower concept)").

And here, Bent II, RMCI, and Resrv Partners, intended the investor communications as such. In an internal September 15 email, Bent II stated his motivation in communicating with investors was to get them, at least in part, to purchase new shares: "Just try and get the institutional folks back in." (PX 112, at RF-SEC 00178835 (emphasis added).) In other words, he wanted to solicit institutional investors to buy back into the Fund. To this end, he instructed John Drahzal, head of his sales force, to "communicate" his message of support to clients. (PX 48.) Drahzal too understood that his sales force was soliciting purchases in the Fund.[13] Indeed, when speaking with Senior Reserve Officers, Drahzal stated: "[L]ook, we're protecting the N.A.V.[,] [t]hey'll come back in, I think." (PX 124(a), at 8 min., 32 sec. to 8 min., 58 sec.; 124(b), at 11:25-12:9.) In other words, Defendants' support pledge would promote sales.[14]

The institutional sales force also understood these communications to be offers, and conveyed them as such to investors. First, the Commission expects that Ryan Green, Vice President for Insitutional Sales, will testify that he informed *prospective* investors of RMCI's commitment to support the Fund and that he did so as part of an effort to sell Fund shares. Second, the *Insights* was sent to several investors who had already fully redeemed, with the

---

[13]    See Birnbaum Decl., Ex. C (Drahzal Dep. Tr., at 71:17-23 ("Q: What did you understand the salesforce's goals to be on September 15, 2008? A: Answering questions and taking orders. Q: And does "taking orders" include both redemptions and purchases? A: Yes."). Drahzal also told Chief Investment Officer Patrick Ledford and Chief Financial Officer Patrick Farrell, among others, that he would "figure out who we think is going to come back from a liquidity perspective" (PX 124(a), at 9 min., 34 sec.; PX 124(b) at 13:9-13), by which he meant "purchase shares." (Birnbaum Decl., Ex. C, Drahzal Dep. Tr., at 199:11-18.) Plainly Defendants' Global Head of Sales understood the linkage between the statements and the offering. Indeed, it is telling whom Bent II involved in the 1:19 email and creating the *Insights* piece. The 1:19 email he sent to his Global Head of Sales, whose job presumably was largely focused on *selling*. And, the *Insights* piece was prepared by the Reserve's Marketing Department, which, again, was presumably responsible for *marketing* the Fund.

[14]    It is of no import that the shares being offered were of the Primary Fund and not RMCI or Resrv Partners, as there is no requirement that a person act "in the offer" of their own securities, rather than another's. Meadows, 119 F.3d at1226 (salesman liable under 17(a) for selling other companies' securities).

obvious intent that they might buy back in. (Birnbaum Decl. ¶ 9.) <u>Third</u>, at the direction of

Drahzal (who was acting on Bent II's instructions), the sales force called investors who had

redeemed and asked them to cancel their redemptions and buy back in so that they would earn

interest in the Fund overnight. (Birnbaum Decl., Ex. C, Drahzal Dep. Tr., at 191:17-192:21.)

The Reserve *Insights* release – which was sent to investors and posted on Reserve's

website – made explicit what was obvious to Bent II, Drahzal, and the sales force; that the pledge

of support was an offer. In its first paragraph, the *Insights* stated that it was "providing

information regarding the investment strategies of our fund offerings." (PX 49, at RF-SEC-

00073283 (emphasis added).) It further spoke to prospective investors' investment

considerations:

- It invited investment: "We thank you for the opportunity and privilege to serve
  your cash management and liquidity needs." (<u>Id.</u>, at RF-SEC-00073284);

- It cautioned prospective clients to "carefully consider the investment objectives,
  risks and charges and expenses of a fund before investing." (<u>Id.</u>);

- It notified investors that it "is possible to lose money by investing in the funds."
  (<u>Id.</u>); and

- It told prospective investors how to obtain a copy of the Fund's prospectus and
  instructed them to "read the prospectus carefully before you invest." (<u>Id.</u>)

In other words, *Insights* delivered good news and solicited purchases. This is an offer.

Finally, that the *Insights*, the 1:19 email, and the sales force's oral communications were

all intended to induce purchases of Fund shares is confirmed by the results. When investors

sought to purchase shares after 1:19 p.m. they were allowed to do so: the Fund was offering

securities throughout September 15 and 16.

Because they were made while the Primary Fund was offering shares, intended to

influence those investors, and themselves offered securities, Defendants' communications to

investors were made "in the offer" for purposes of Section 17(a). Defendants' cramped reading

– that evidence of the sales force's communications is not admissible unless each salesperson uttered the word "offer" during each call – is contrary to the law, the facts of this case, and would lead to absurd results. For example, a broker could easily escape liability under Section 17(a) by simply breaking his fraudulent offer into two phone calls: the first employing the magic word "offer," and the second relaying the misstatements. The second call, the one demonstrating the false statements, would not, under Defendants' view, be admissible because it would not independently constitute an offer. But Section 17(a)'s fraud prohibition is not that cabined and evidence of investor communications is thus directly relevant to the SEC's claims.

B.      The Reserve's September 15-16 Communications with Investors Were "in
        Connection with" the Purchase or Sale of Securities

Taking their "connection" argument a step further, Defendants seem to argue that to adduce evidence of communications relating to the Plaintiff's Exchange Act claims, the Commission must show that the misrepresentation produced an identifiable purchase or sale. But that is wrong, as the Supreme Court held in Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 85 (2006). In that case, the Court reaffirmed that the Exchange Act's "in connection with" phrase merits a "broad interpretation," holding that all that is required is that there is "deception 'in connection with the purchase or sale of any security,' not deception of an identifiable purchaser or seller. . . . [T]his broader interpretation of the statutory language comports with the long-standing views of the SEC." Id. (quotations omitted);[15] see also Wolfson, 539 F.3d at 1262 (the Supreme Court has "consistently embraced an expansive reading of 10(b)'s 'in connection with requirement").

---

[15]     In so ruling, the Court held that fraud claims brought by holders (rather than purchasers or sellers) that alleged manipulation of stock prices, during a period when securities were being offered for sale, were pre-empted by the federal securities laws because those claims alleged fraud in connection with the purchase or sale of securities, even though no plaintiff was a purchaser. Id. at 89.

As this Court has already acknowledged, if there were purchases during the time that Bent II's message of support was shared with investors, then the "in connection with" element is satisfied: "The nexus between the fraud or alleged fraud and a purchase or sale may be satisfied in an action brought by the SEC, so long as 'someone buys or sells the security during the period of allegedly fraudulent conduct.'" (March 28 Conf. Tr., at 42 (citing 8 Louis Loss and Joel Seligman Securities Regulation, 3721 3d edition, 2004).)

There is no question that purchases did occur while Bent II's message of support was being disseminated, over the phone, by email, and on the Reserve's website, and Defendants have admitted as much. Defendants admit that at least 62 individual ("non-automated") purchases of Primary Fund shares, totaling $1.5 billion, were recorded after Bent II issued his 1:19 pledge of support. (DE 387-1, at 24, ¶ 6.a.) They even concede that some of the purchasers acted after they received the message. "[A] handful of shareholders who received the information in the 1:19 Email or the Insights Piece subsequently went on to purchase shares." (DE 384, Declaration of David Gareis, executed June 13, 2011, ¶ 12.) Nothing more is required. SEC v. Mannion, 789 F. Supp. 2d 1321, 1332-33 (N.D. Ga. 2011) (single purchase made after distribution of misleading disclosure, even if purchaser did not rely on it, was sufficient to establish "in connection with"); cf. SEC v. Morgan Keegan & Co., 678 F.3d 1233, 1248 (11th Cir. 2012) (where SEC sued broker dealer for oral misstatements made to small number of investors, court confirmed that the Commission is "authori[zed] to seek relief for *any* violation of the securities laws, no matter how small or inconsequential.") (emphasis in original).

Thus, that anyone purchased Reserve shares while the sales force was communicating Bent II's 1:19 email message and disseminating *Insights* by email, telephone and the Reserve's web site satisfies Section 10(b)'s "in connection with" requirement.

14

III.   Communications with the Reserve's Sales Force Are Relevant to the SEC's Claims
       Under Advisers Act Rule 206(4)-8

Because Resrv Partners acted at the direction of RMCI, the communications between its

sales force and investors are relevant to the Commission's claims under Section 206(4) and Rule

206(4)-8 of the Advisers Act, even if the investors only held their shares or the Reserve failed to

offer new ones after the communications (which they did not).

The Advisers Act does not require that the Commission show that any of Defendants'

false statements was made in connection with any offer, purchase, or sale of securities.

Abrahamson v. Fleschner, 568 F.2d 862, 877 (2d Cir. 1977).  And Section 206(4) and Rule

206(4)-8 prohibit the investment adviser Defendants from making false statements directly to

investors.  SEC v. Rabinovich & Assoc., LP, 07 Civ. 10547 (GEL), 2008 WL 4937360, at *4

(S.D.N.Y. Nov. 18, 2008).  Thus, communications with investors who merely held off redeeming

are relevant to the Commission's Adviser Act claims.

It makes no difference that the calls with investors were made by salesmen registered

with Resrv Partners and employed by Reserve Management Corp. ("RMC"), and not formally

employed by its affiliate, RMCI, the investment adviser.  First, the message the salespeople were

asked to communicate was RMCI's and Bent II's message.  (PX 48 ("We (Reserve Management

Company Inc.) intend to protect the NAV on the Primary fund to whatever degree is required.").)

It was sent by Bent II, RMCI's President (PX 44), to his Global Head of Sales, John Drahzal (PX

103, at 3),[16] with the instruction that it be communicated to "clients on an as needed basis."  (PX

48.)  Bent II testified that he was "comfortable with the sales team" repeating that message, and

that he "would have been okay" if Drahzal relayed the 1:19 email to the sales force.  (Birnbaum

---

[16]   Drahzal was paid by RMC (PX 103), and was registered with Resrv Partners.  (PX 103 at
12;  PX 147(h).)

Decl., Ex. D, Bent II Inv. Test., Nov. 3, 2008, at 165:7-14; Ex. E, Bent II Inv. Test., Nov. 25,

2008, at 91:4-11.)  As the court held in SEC v. Daifotis, an executive who "exercised authority

over his own non-casual statements with the intent and reasonable expectation that such

statement would be relayed to the investing public, should be deemed to be the person who

'made' the statements to the investing public," and can be liable for those statements.  Id., -- F.

Supp. 2d --, 11 Civ. 00137 (WHA), 2012 WL 2132389, at *8 (N.D. Cal. June 12, 2012).  The

*Insights* piece, which proclaimed in its heading "Views from your cash management experts,"

was also expressly the investment adviser's statement.  (PX 49, at RF-SEC-00073283.)  RMCI

and Bent II are therefore liable for the statements they made and directed others to make,

irrespective of the affiliation of the persons who conveyed them.

 Second, Resrv Partners (and, thus, the sales force) was explicitly authorized to convey

sales material provided to it and its employees by RMCI.  The Distribution Agreement between

Resrv Partners and the Fund (PX 56) provides:

> [Resrv Partners] will not give any information or make any representations
> other than as contained in the Registration Statement or Prospectus(es) and
> Statements of Additional Information filed under the Securities Act of 1933
> or the Act, as in effect from time to time, or in any supplemental sales
> literature provided by the Trust's investment adviser or the adviser to any
> other series of the Trust to use in connection with the sales of shares.

(PX  56 ¶ 7(b))(emphasis added).)

 The 1:19 email and the *Insights* were just the kind of supplemental sales literature Resrv

Partners was explicitly authorized to use, and its use of Bent II's communication made Resrv

Partners RMCI's agent in the distribution of it, as the agreement provided, "in connection with

the sales of shares." (Id.)  RMC, which employed each member of the sales force, was also

authorized by agreement with RMCI to "do all the work for Reserve Management Company,

Inc."  Birnbaum Decl., Ex. F, Bent Sr. Inv. Test., Oct. 29, 2008, at 12:13-20; see also Birnbaum

Decl., Ex. G, Patrick Farrell (CFO) Inv. Test., Feb. 19, 2009, at 19:12-22 ("So, RMCI was the advisor, and they paid RMC fees in order for them to contract all the day-to-day operations. So, all the employees were paid from RMC, all the bill payments, everything was in the name of RMC.").)

Moreover, investors understood that they were communicating with the investment adviser, precisely because Defendants created that impression. The signature lines on sales force emails – including the emails sending out *Insights* – referred only to "The Reserve," and described it as "the world's most experienced <u>money fund manager</u>."[17] And, when salespeople spoke with investors, they identified themselves – not as employees of Resrv Partners or RMC – but as "the Reserve," or, even more explicitly, the investment adviser. (<u>See, e.g.</u>, PX 175(a), at 10 min., 22 sec. to 10 min., 30 sec.; 175(b), at 8:22 (institutional salesman, Mark Rothwell, telling a customer, "You know, we're the advisor"); PX 3(a) (Green); 32(a) (Druyan); 167(a) (Rothwell) (identifying themselves as "The Reserve").) Because RMCI and/or Bent II made the statements here at issue, directed the sales force to communicate them to investors, and because Resrv Partners was contractually permitted to use sales literature furnished by RMCI, the statements were made by an "investment adviser" and are, thus, relevant to the Commission's Advisers Act claims.

IV.    The Reserve Sales Force's Communications with Investors Are Not Otherwise <u>Inadmissible Hearsay</u>

In addition to being highly relevant to each of the SEC's fraud claims, evidence of the sales force's communications with Primary Fund investors is not otherwise inadmissible hearsay. <u>First</u>, the sales force's statements to investors are not offered for their truth; quite the opposite.

---

[17]    (<u>See, e.g.</u>, PX 145 (Reserve salesperson Mark Rothwell's transmission of *Insights*); PX 131 (salesperson Elliott Goldstein's email to investor attaching holdings report) (emphasis added).)

The Commission's claim is that Defendants' pledge of support was false. Instead, the sales calls are offered to show (1) that the statement was made to investors, and (2) its effect on the listener.[18] In any event, the sales force's statements are themselves binding on Defendants as statements of their "agent or employee on a matter within the scope of that relationship." Fed. R. Evid. 801(d)(2)(D).[19] Each member of the institutional sales force was a registered representative of Resrv Partners. (See PX 147 (l) (Goldstein); 147(m) (Green); 147(s) (Rothwell); and 147(t) (Semilof).) Moreover, as described supra, each was also communicating with investors at the direction of Bent II and RMCI. And, because their primary job responsibility was to speak with investors (and, by the 1:19 email, Bent II specifically told them to do so), each salesman was operating "within the scope" of his employment relationship.

It is likewise irrelevant whether Defendants even authorized each specific statement, as long as that statement concerned a matter within the scope of the sales force's duties. See Canatxx, 2008 WL 1999234, at *12 (quoting Glendale Fed. Bank, FSB v. United States, 39 Fed. Cl. 422, 424 (Fed. Cl. 1997)) ("According to 802(d)(2)(D), an agent may make vicarious admissions for his principal whether or not he is specifically authorized to speak on that subject"). Plainly, communicating with investors about the Reserve and its fund offerings was a matter within the sales force's duties. These statements are also admissible against Bent II. In

---

[18] See Anderson v. United States, 417 U.S. 211, 221 n.8 (1974) ("Of course, evidence is not hearsay when it is used only to prove that a prior statement was made and not to prove the truth of the statement"); United States v. Gibson, 690 F.2d 697, 700 (9th Cir. 1982) (investors' communications with salesmen "was offered to prove the existence of a scheme; the statements were not offered for their 'truthfulness.'"); United States v. Gotti, 457 F. Supp. 2d 395, 397 (S.D.N.Y. 2006) ("[i]t is well established . . . that statements offered for their effect on the listener are not hearsay") (quotation marks and citation omitted).

[19] See, e.g., City of Tuscaloosa v. Harcros Chemicals, Inc., 158 F.3d 548, 561 n.13 (11th Cir. 1998) (sales representative's statement to a prospective customer constituted a party admission against his employer); Canatxx Gas Storage Ltd. v. Silverhawk Capital Partners, LLC, 06 Civ. 1330 (LHR), 2008 WL 1999234, at *12 (S.D. Tex. May 8, 2008) (investment broker's statements were party admissions against employer).

upholding the admission of sales communications with investors, on similar facts, the court in

United States v. Feldman noted that "the question is whether the [individual] officers authorized,

either impliedly or expressly, the making of the statements." 825 F.2d 124, 128 (7th Cir. 1987).

Here, Bent II expressly authorized his sales force to speak with investors on the topic of RMCI's

support pledge.[20]

The investor's side of the conversations also comes in because it demonstrates effect on

the listener of the sales force's statements and is not offered for the truth of what any of them

said. In addition, courts routinely allow the introduction of the other voices heard on recorded

telephone conversations to put Defendants' respective statements into context and to render them

intelligible. United States v. Dominguez, 280 F. App'x 81, 84 (2d Cir. 2008) (rejecting

defendant's argument that recorded statements of confidential source were inadmissible when

offered to establish a context for the recorded statements of defendant); United States v. Borbon,

05 Cr. 909 (DC), 10 Civ. 2935 (DC), 2010 WL 2998738, at *6 (S.D.N.Y. July 29, 2010) (same).

Thus, the Reserve sales force's communications with investors are relevant and admissible.

---

[20]    See PX 48 ("You may communicate this to clients . . . ."); Birnbaum Decl., Ex. D (Bent
II Inv. Test., Nov. 3, 2008, at 165:7-14; Birnbaum Decl., Ex. E, Bent II Inv. Test., Nov. 25, 2008,
at 91:4-22. (Bent II was "comfortable with the sales team" repeating the 1:19 message and he
"would have been okay" if Drahzal relayed the 1:19 email to the sales force).

## CONCLUSION

For the foregoing reasons, the Commission respectfully requests that the Court grant its motion in limine to admit evidence of the Bent II's, RMCI's and Resrv Partners' (including the Reserve sales force's) communications with Primary Fund investors, irrespective of whether those investors ultimately purchased new Fund shares.

Dated: New York, New York
      July 17, 2012

<div style="margin-left:2em">

SECURITIES AND EXCHANGE COMMISSION

By:     _____

Nancy A. Brown
Alexander J. Janghorbani
Michael D. Birnbaum
Securities and Exchange Commission
3 World Financial Center, Room 400
New York, New York 10281-1022
Tel. (212) 336-1023 (Brown)

</div>

20

Appendix A

**SEC v. Reserve Management Company, Inc., et al., 09 Civ. 4346 (S.D.N.Y.)**[1]

| Exhibit | Bates Number, Call Identifier or Description | Objections |
|---|---|---|
| 2 | The Reserve recorded telephone call, Sept. 16, 2008, 8:58 am[2]<br>c2222_16_09_2008_085857 | 402, 403, 802 |
| 3 | The Reserve recorded telephone call, Sept. 15, 2008, 1:59 pm<br>c101_15_09_2008_135930 | 402, 403, 802 |
| 4 | The Reserve recorded telephone call, Sept. 15, 2008, 3:31 pm<br>c101_15_09_2008_153105 | 402, 403, 802 |
| 5 | The Reserve recorded telephone call, Sept. 16, 2008, 9:32 am<br>c101_16_09_2008_093221 | 402, 403, 802 |
| 6 | The Reserve recorded telephone call, Sept. 16, 2008, 4:46 pm<br>c101_15_09_2008_164616 | 402, 403, 802 |
| 7 | The Reserve recorded telephone call, Sept. 15, 2008, 5:01 pm<br>Green_c101_15_09_2008_170134 | 402, 403, 802 |
| 8 | The Reserve recorded telephone call, Sept. 16, 2008, 8:01 am<br>c101_16_09_2008_080139 | 402, 403, 802 |
| 9 | The Reserve recorded telephone call, Sept. 16, 2008, 8:52 am<br>c101_16_09_2008_085225 | 402, 403, 802 |
| 10 | The Reserve recorded telephone call, Sept. 16, 2008, 9:08 am<br>c101_16_09_2008_090853 | 402, 403, 802 |
| 11 | The Reserve recorded telephone call, Sept. 16, 2008, 11:41 am<br>c101_16_09_2008_114123 | 402, 403, 802 |
| 12 | The Reserve recorded telephone call, Sept. 16, 2008, 1:43 pm<br>c101_16_09_2008_134301 | 402, 403, 802 |
| 13 | The Reserve recorded telephone call, Sept. 16, 2008, 3:51 pm<br>c101_16_09_2008_155132 | 402, 403, 802 |

---

[1]    Plaintiff has previously submitted all of these proposed Exhibits on a disc on July 11, 2012, with the proposed Joint Pretrial Order.

[2]    All times provided are Eastern Daylight Time, unless otherwise noted.

| Exhibit | Bates Number, Call Identifier or Description | Objections |
|---------|---------------------------------------------|------------|
| 14 | The Reserve recorded telephone call, Sept. 16, 2008, 4:39 pm<br>c101_16_09_2008_163930 | 402, 403, 802 |
| 15 | The Reserve recorded telephone call, Sept. 16, 2008, 4:43 pm<br>c101_16_09_2008_164322 | 402, 403, 802 |
| 16 | The Reserve recorded telephone call, Sept. 15, 2008, 1:26 pm<br>c101_15_09_2008_132646 | 402, 403, 802 |
| 17 | The Reserve recorded telephone call, Sept. 15, 2008, 4:27 pm<br>c101_15_09_2008_162754 | 402, 403, 802 |
| 27 | The Reserve recorded telephone call, Sept. 15, 2008, 1:16 pm<br>c707_15_09_2008_131612 | 402, 403, 802 |
| 28 | The Reserve recorded telephone call, Sept. 15, 2008, 1:25 pm<br>c707_15_09_2008_132539 | 402, 403, 802 |
| 29 | The Reserve recorded telephone call, Sept. 16, 2008, 4:50 pm<br>c707_16_09_2008_165023 | 402, 403, 802 |
| 30 | The Reserve recorded telephone call, Sept. 15, 2008, 1:27 pm<br>c707_15_09_2008_132730 | 402, 403, 802 |
| 31 | The Reserve recorded telephone call, Sept. 15, 2008, 1:36 pm<br>c707_15_09_2008_133613 | 402, 403, 802 |
| 32 | The Reserve recorded telephone call, Sept. 15, 2008, 5:17 pm<br>c2323_15_09_2008_171727 | 402, 403, 802 |
| 33 | The Reserve recorded telephone call, Sept. 15, 2008, 4:22 pm<br>c707_15_09_2008_162208 | 402, 403, 802 |
| 34 | The Reserve recorded telephone call, Sept. 15, 4:30 pm<br>c707_15_09_2008_163013 | 402, 403, 802 |
| 35 | The Reserve recorded telephone call, Sept. 16, 2008, 9:11 am<br>c707_16_09_2008_091131 | 402, 403, 802 |
| 36 | The Reserve recorded telephone call, Sept. 16, 2008, 7:45 am<br>c707_16_09_2008_074557 | 402, 403, 802 |
| 37 | The Reserve recorded telephone call, Sept. 16, 2008, 5:39 pm<br>c707_16_09_2008_173954 | 402, 403, 802 |
| 38 | The Reserve recorded telephone call, Sept. 16, 2008, 7:00 pm<br>c707_16_09_2008_190044 | 402, 403, 802 |

| Exhibit | Bates Number, Call Identifier or Description | Objections |
|---------|----------------------------------------------|------------|
| 39 | The Reserve recorded telephone call, Sept. 16, 2008, 9:46 am<br>c707_16_09_2008_094626 | 402, 403, 802 |
| 40 | The Reserve recorded telephone call, Sept. 16, 2008, 10:10 am<br>c707_16_09_2008_101002 | 402, 403, 802 |
| 51 | Email from J. St Clair to P. Knodel<br>Subject: The Reserve Insights, Sept. 15, 2008, 3:51 pm<br>RF-SEC-00000411-13 | 402, 403, 802 |
| 52 | Email from J. St Claire to R. Schwartz<br>Subject: the Reserve Insights, Sept. 15, 2008, 3:56 pm<br>RF-SEC-00000414-15 | 402, 403, 802, 901 (Incomplete) |
| 53 | Email from E. Goldstein to T. Hopkins<br>Subject: The Reserve, Sept. 15, 2008, 4:18 pm<br>RF-SEC-00000277-79 | 402, 403, 802 |
| 54 | Email from R. Green to S. Haussler<br>Subject: letter, Sept. 15, 2008, 5:13 pm<br>RF-SEC-00000252-54 | 402, 403, 802 |
| 55 | Email from M. Rothwell to Various<br>Subject: Primary Fund, Sept. 15, 2008, 8:01 pm<br>RF-SEC-00000381-85 | 402, 403, 802, 901 |
| 131 | Email from E. Goldstein to M. Johnston<br>Subject: Re: Fund Holdings – Lehman, Sept. 16, 2008, 7:15 am<br>RF-SEC-00075204-05 | 402, 403, 802 |
| 132 | Email from E. Goldstein to C. Crowley, copying B. Semilof; J. Drahzal<br>Subject: The Reserve, Sept. 16, 2008, 11:30 am<br>RF-SEC-DL-00000017 | 402, 403, 802 |
| 133 | Email from E. Goldstein to J. Drahzal, copying B. Semilof<br>Subject: First Data, Sept. 16, 2008, 7:23 pm<br>RF-SEC-00074287 | 402, 403, 802 |
| 134 | Email from E. Goldstein to C. Reseigh<br>Subject: re: Recap of our Conversation, Sept. 16, 2008, 7:40 pm<br>RF-SEC-00033870-71 | 402, 403, 802 |
| 136 | Email from E. Goldstein to X. Yu, copying A. de Lugnani<br>Subject: RE: Lehman and ML exposure, Sept. 15, 2008, 5:04 pm<br>RF-SEC-00035055-61 | 402, 403 |
| 137 | Email from R. Green to W. Bradley<br>Subject: re: Atlas Investment, Sept. 15, 2008, 4:32 pm<br>RF-SEC-00081259-62 | 402, 403, 802 |
| 138 | Email from E. Goldstein to B. Polansky<br>Subject: The Reserve, Sept. 16, 2008, 10:41 am<br>RF-SEC-00035458-60 | 402, 403, 802 |
| 139 | Email from R. Green to E. Goldstein<br>Subject: re: Liberty Media, Sept. 15, 2008, 3:41 pm<br>RF-SEC-00081179-80 | 402, 403 |

| Exhibit | Bates Number, Call Identifier or Description | Objections |
|---|---|---|
| 141 | Email from J. Mellecker to C. Crowley<br>Subject: Cantella Financial, Sept. 17, 2008, 12:34 pm<br>RF-SEC-00340811-13 | 402, 403, 802 |
| 142 | Email from E. Goldstein to C. Lesem<br>Subject: The Reserve, Sept. 16, 2008, 1:35 pm<br>RF-SEC-00035119-21 | 402, 403, 802 |
| 143 | Email from E. Goldstein to C. Graunstadt; B. Gamble<br>Subject: The Reserve, Sept. 16, 2008, 9:35 am<br>HF-SEC 000039-41 | 402, 403, 802 |
| 144 | Email from E. Lansky to V. Tolve, copying B. Semilof<br>Subject: RE: Lehman, Sept. 15, 2008, 5:23 pm<br>RF-SEC-00192916-21 | 402, 403, 802 |
| 145 | Email from M. Rothwell to T. Pierce and various others<br>Subject: Primary Fund, Sept. 15, 2008, 7:01 pm<br>MCILIT 0002066-68 | 402, 403, 802 |
| 146 | Boy Scouts of America Interoffice Correspondence from T. Pierce to R. Kopsa<br>SUBJECT: Lehman Bros., Sept. 16, 2008<br>RMCILIT 0002065 | 402, 403, 802, 901 |
| 154 | The Reserve recorded telephone call, Sept. 16, 2008, 12:55 pm<br>c2323_16_09_2008_125522 | 402, 403, 802 |
| 155 | The Reserve recorded telephone call, Sept. 16, 2008, 4:58 pm<br>c303_16_09_2008_165859 | 402, 403, 802 |
| 156 | The Reserve recorded telephone call, Sept. 15, 2008, 5:47 pm<br>c2323_15_09_2008_174715 | 402, 403, 802 |
| 157 | The Reserve recorded telephone call, Sept. 16, 2008, 1:41 pm<br>c2323_16_09_2008_134153 | 402, 403, 802 |
| 158 | The Reserve recorded telephone call, Sept. 16, 2008, 2:22 pm<br>c2323_16_09_2008_142200 | 402, 403, 802 |
| 159 | The Reserve recorded telephone call, Sept. 16, 2008, 2:41 pm<br>c2323_16_09_2008_144146 | 402, 403, 802 |
| 164 | The Reserve recorded telephone call, Sept. 16, 2008, 1:46 pm<br>Rothwell_c1819_16_09_2008_134616 | 402, 403, 802 |
| 165 | The Reserve recorded telephone call, Sept. 16, 2008, 2:48 pm<br>Rothwell_c1819_16_09_2008_144809 | 402, 403, 802 |
| 166 | The Reserve recorded telephone call, Sept. 15, 2008, 9:38 am<br>c1819_15_09_2008_093807 | 402, 403, 802 |
| 167 | The Reserve recorded telephone call, Sept. 15, 2008, 1:48 pm<br>c1819_15_09_2008_134802 | 402, 403, 802 |

| Exhibit | Bates Number, Call Identifier or Description | Objections |
|---|---|---|
| 168 | The Reserve recorded telephone call, Sept. 15, 2008, 1:57 pm<br>c1819_15_09_2008_135713 | 402, 403, 802 |
| 169 | The Reserve recorded telephone call, Sept. 15, 2008, 2:06 pm<br>c1819_15_09_2008_140630 | 402, 403, 802 |
| 170 | The Reserve recorded telephone call, Sept. 15, 2008, 2:44 pm<br>c1819_15_09_2008_144443 | 402, 403, 802 |
| 171 | The Reserve recorded telephone call, Sept. 16, 2008, 9:29 am<br>c1819_16_09_2008_092932 | 402, 403, 802 |
| 172 | The Reserve recorded telephone call, Sept. 16, 2008, 1:32 pm<br>c1819_16_09_2008_133206 | 402, 403, 802 |
| 173 | The Reserve recorded telephone call, Sept. 16, 2008, 4:59 pm<br>c1819_16_09_2008_165242 | 402, 403, 802 |
| 174 | The Reserve recorded telephone call, Sept. 16, 2008, 6:59 pm<br>c1819_16_09_2008_185921 | 402, 403, 802 |
| 175 | The Reserve recorded telephone call, Sept. 16, 2008, 7:16 pm<br>Rothwell_c1819_16_09_2008_191611 | 402, 403, 802 |
| 176 | The Reserve recorded telephone call, Sept. 16, 2008, 8:01 pm<br>Rothwell_c1819_16_09_2008_200106 | 402, 403, 802 |
| 177 | The Reserve recorded telephone call, Sept. 16, 2008, 9:03 pm<br>c1819_16_09_2008_210318 | 402, 403, 802 |
| 178 | Cantella & Co. recorded telephone call, Sept. 16, 2008, 12:24 pm<br>OUT326-20080916-172407-1221585847.2355<br>(RMCILIT 0002058) | 402, 403, 802 |
| 179 | The Reserve recorded telephone call, Sept. 15, 2008, 6:06 pm<br>c1819_15_09_2008_180639 | 402, 403, 802 |
| 238 | Email from R. Green to S. Haussler, copying C. Schmalz; T. Kelly<br>Subject: Re: Screen shot of Paycor Holdings in The Primary Institutional Money Market Fund, Sept. 16, 2008, 11:43 am<br>RF-SEC-00081146-49 | 402, 403, 802 |
| 240 | Email from C. Schmalz to S. Haussler<br>Subject: FW: Scan from PAYCOR_CINCINNATI, Apr. 24, 2012, 9:23 am<br>RMCILIT 0002089-93 | 402, 403, 802, 901 |
| 243 | Email from M. Rothwell to C. Bernard | 402, 403 |

| Exhibit | Bates Number, Call Identifier or Description | Objections |
|---|---|---|
|  | Subject RE: Lehman Holdings, Sept. 15, 2008, 12:18 pm<br>RF-SEC-00000369-71 |  |
| 244 | Email from M. Rothwell to C. Forno, copying V. Northrup<br>Subject: re: Request, Sept. 15, 2008, 7:42 pm<br>RF-SEC-00186283-84 | 402, 403 |
| 245 | Email from M. Rothwell to J. Drahzal; B. Semilof<br>Subject: SEC Filing, Sept. 16, 2008, 2:44 pm<br>RF-SEC-00072882 | 402, 403 |
| 250 | The Reserve recorded telephone call, Sept. 15, 2008, 1:24 pm<br>c101_15_09_2008_132426 | 402, 403, 802 |
| 251 | The Reserve recorded telephone call, Sept. 15, 2008, 1:32 pm<br>c101_15_09_2008_133208 | 402, 403, 802 |
| 252 | The Reserve recorded telephone call, Sept. 15, 2008, 2:27 pm<br>c101_15_09_2008_142738 | 402, 403, 802 |
| 253 | The Reserve recorded telephone call, Sept. 15, 2008, 2:28 pm<br>c101_15_09_2008_142843 | 402, 403, 802 |
| 254 | The Reserve recorded telephone call, Sept. 15, 2008, 4:37 pm<br>c101_15_09_2008_163719 | 402, 403, 802 |
| 255 | The Reserve recorded telephone call, Sept. 15, 2008, 6:06 pm<br>c101_15_09_2008_180629 | 402, 403, 802 |
| 256 | The Reserve recorded telephone call, Sept. 16, 2008, 8:57 am<br>c101_16_09_2008_085734 | 402, 403, 802 |
| 257 | The Reserve recorded telephone call, Sept. 16, 2008, 4:22 pm<br>c101_16_09_2008_162252 | 402, 403, 802 |
| 258 | The Reserve recorded telephone call, Sept. 16, 2008, 4:45 pm<br>c101_16_09_2008_164532 | 402, 403, 802 |
| 259 | The Reserve Confirmation Notices<br>RMCI-SEC-DM-004000-4110 | 402, 403 |
| 270 | The Reserve recorded telephone call, Sept. 16, 2008, 1:45 pm<br>c2626_16_09_2008_134514 | 402, 403, 802 |
| 271 | The Reserve recorded telephone call, Sept. 16, 2008, 1:50 pm<br>c2525_16_09_2008_135006 | 402, 403, 802 |
| 272 | The Reserve recorded telephone call, Sept. 16, 2008, 1:57 pm<br>c2525_16_09_2008_135744 | 402, 403, 802 |
| 273 | The Reserve recorded telephone call, Sept. 16, 2008, 2:04 pm<br>c2626_16_09_2008_140454 | 402, 403, 802 |

| Exhibit | Bates Number, Call Identifier or Description | Objections |
|---------|----------------------------------------------|------------|
| 274 | The Reserve recorded telephone call, Sept. 16, 2008, 2:07 pm<br>c2626_16_09_2008_140718 | 402, 403, 802 |