USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 9/10/12

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re THE RESERVE FUND SECURITIES AND DERIVATIVE LITIGATION | 09 MD. 2011 (PGG) |
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>RESERVE MANAGEMENT COMPANY, INC., RESRV PARTNERS, INC., BRUCE BENT SR., and BRUCE BENT II,<br><br>Defendants,<br><br>and<br><br>THE RESERVE PRIMARY FUND,<br><br>Relief Defendant. | **ECF CASE**<br><br>**ORDER**<br><br>09 Civ. 4346 (PGG) |

PAUL G. GARDEPHE, U.S.D.J.:

This Order resolves the Commission's motion in limine No. 3 (Dkt. No. 503). In that motion, the Commission moves for an order (1) precluding certain evidence not produced during discovery, as well as testimony about this evidence; (2) admitting limited evidence of Bent II's email communications with his wife on September 15 and 16, 2008; (3) admitting limited evidence concerning the Reserve's Yield Plus Fund; and (4) permitting the SEC to use leading questions in its examination of Patrick Ledford and John Drahzal.[1] This Order also

---

[1] The Commission also moves for the admission of prior statements of Defendants, their agents, and employees. This aspect of motion in limine No. 3 overlaps substantially with Defendants' motion in limine regarding SEC Exhibits 267-269 (Dkt. No. 477) and motion to exclude evidence regarding the Bents' actions as Fund officers (Dkt. No. 491). These matters will be addressed in a separate order.

resolves Defendants' motion in limine to exclude evidence relating to the Yield Plus Fund (Dkt. No. 485).

For the reasons that follow, the Commission's motion will be granted in part and denied in part. Defendants' motion to exclude evidence relating to the Yield Plus Fund will be granted.

### I. David Gareis's Statistical Analysis

The Commission moves to preclude Defendants from offering testimony from David Gareis – RMCI's director of operations – concerning his statistical analysis of patterns in the redemptions of Primary Fund shares. Defendants offer DX 185-188 – tables of redemption data prepared by Gareis – to demonstrate that shareholders' redemption requests did not lessen after Defendants pledged to support the Fund's $1.00 NAV. Gareis compares redemption data from Monday, September 15, 2008, with like data from previous Mondays. (July 13, 2012 Tr. at 45) Because Gareis is offered as a fact witness and not an expert witness, Defendants do not seek to elicit any conclusions from him as to the significance of this data. In moving to preclude this proof, the Commission argues that the data underlying this analysis has never been produced – despite repeated requests – and notes that Gareis's analysis itself was only produced after discovery closed.

Both sides failed to produce Rule 26(a)(1)(A)(ii) material before the close of discovery, and Gareis's testimony will not be precluded on this basis. However, the Court is troubled by the Commission's allegation that "Defendants have never produced the redemption data for June, July, and August that Gareis analyzed to come up with the charts Defendants would have him testify about." (SEC MIL No. 3 Br. at 14) Moreover, the Commission has submitted correspondence showing that, when asked to confirm that the underlying data was

2

never produced – or, as to September 15, what data is included in Gareis's chart – Defendants responded only that "[t]he SEC did not serve a discovery request for this information." (Birnbaum Decl. Ex. D (June 11, 2012 Gehring Ltr. at 2)

At a July 13, 2012 conference in this action, the Commission told the Court that it had "never seen the underlying numbers." (July 13, 2012 Tr. at 46) Defendants responded that they had produced at summary judgment "the numbers [they] intend[ed] to use at trial" and that "the SEC had never asked for those materials previously or since. If they want the backup now, we'll be happy to give them the backup now." (Id. at 46-47) Weeks later, in response to the Commission's motion in limine, Defendants continue to argue, however, that the Commission does not have the data because it "has never asked for it." (Def. MIL No. 3 Opp. Br. at 5)

Given the representations made at the July 13, 2012 conference – nearly two months ago – Defendants should have produced the underlying data relied on by Gareis long ago. The Commission made clear at that conference that it did not have the underlying data and that it would seek to preclude Gareis's testimony on that basis. (July 13, 2012 Tr. at 46) Defense counsel represented that Defendants would "be happy to give [the Commission] the backup now." (Id. at 46-47) And yet, with a trial date looming, this data has still not been provided.

The Commission claims that it has been prejudiced by the Defendants' failure to produce the underlying data because it has been unable to test his analysis or check his arithmetic.

Fed. R. Civ. P. 26(a)(1)(A)(ii) imposes on a party a duty to provide "all documents . . . that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses. . . ." A party is required to make such disclosures "without

3

awaiting a discovery request." Id. Where a party fails to produce documents required by Rule 26(a), it is "not allowed to use that information at trial unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1).

Despite the mandatory language of Rule 37(c)(1), the Second Circuit has held that preclusion is a discretionary remedy, even where "the trial court finds that there is no substantial justification and the failure to disclose is not harmless." Design Strategy, Inc. v. Davis, 469 F.3d 284, 296 (2d Cir. 2006). In deciding whether to exercise its discretion to impose sanctions, a court should consider: "'(1) the party's explanation for the failure to comply with the [disclosure requirement]; (2) the importance of the testimony of the precluded witness[es]; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance.'" Patterson v. Balsamico, 440 F.3d 104, 117 (2d Cir. 2006) (quoting Softel, Inc. v. Dragon Med. & Sci. Commons, Inc., 118 F.3d 955, 961 (2d Cir.1997). Although Rule 37(c)(1) does not require a movant to show bad faith on the part of the offending party, see Design Strategy, 469 F.3d at 296, "it is well-recognized that 'preclusion of witness testimony is a drastic remedy and should be exercised with discretion and caution." Morgenstern v. County of Nassau, No. 04-CV-0058 (JS)(ARL), 2008 WL 4449335, at *1 (E.D.N.Y. Sept. 29, 2008).

As to the first factor, Defendants' explanation that the underlying data was not requested by the Commission is not made in good faith. The material was requested at the July 13 conference, and defense counsel represented that it would be provided. This factor therefore weighs in favor of preclusion. As to the second factor, Gareis's testimony purports to address the pattern of redemptions on Monday, September 15, 2008, as compared to other Mondays in previous months. (July 13, 2012 Tr. at 45) Defendants intend to offer Gareis's analysis to

4

support their argument that the alleged false and misleading statements had no effect on investors' decisions concerning Primary Fund shares. It is clear from Defendants' summary judgment papers and their trial witness and exhibit lists, however, that they will pursue many avenues in challenging materiality in this case. Gareis's testimony simply brings more grist to that mill.

As to the third factor, the Court finds that the Commission has been prejudiced by Defendants' inexplicable failure to produce the underlying data, because it has lacked the material necessary to test the accuracy of Gareis's analysis.

Finally, trial in this case is set for October 1, 2012 (Dkt. No. 460), having been long delayed.[2] Both sides recognize that there is no possibility of a continuance at this point. (SEC MIL No. 3 Br. 19 (citing June 14, 2012 Tr. at 27-28); May 29, 2012 Jacobs Ltr. at 6)

Application of the four-factor test here indicates that Gareis's testimony should be precluded. While the testimony is relevant to Defendants' materiality argument, Defendants have not explained why they have not provided the underlying data, the Commission has been prejudiced as a result, and there is no possibility of a continuance. As discussed above, Defendants have been on notice since at least July 13, 2012 that the Commission sought this data, and they chose not to provide it.

The Commission's motion to preclude Gareis's statistical testimony and the accompanying documents is granted.

## II.    Other Documents Not Produced During Discovery

The Commission moves to preclude a variety of unrelated documents which it claims were not produced in discovery.

---

[2] Trial was originally set for July 16, 2012, but was adjourned at the parties' request. (June 14, 2012 Tr. at 2)

5

A.   **Faxes Sent to Bent Sr. in Italy**

The Commission moves to preclude two faxes that were allegedly sent to Bent Sr. in Italy on September 15, 2008. Both documents list Anne Marie Riccobona as the sender. (DX 23; DX 24) The Commission alleges that the documents now labeled DX 23 and DX 24 – fax cover sheets with attached documents – were produced during discovery with different pages attached. As to DX 23, the Commission notes that the cover page contains no Bates number, but that an identical cover sheet produced during discovery bears Bates number RF-SEC-00105121. That document has different pages attached than DX 23, however. (Birnbaum Decl. ¶ 7, Ex. F) Moreover, the cover page for the fax designated as DX 23 indicates that the fax contains eleven pages, but DX 23 contains fourteen pages. The version produced to the Commission during discovery contains eleven pages. (Birnbaum Decl., Ex. F)

One would hope that a discrepancy of this nature would be resolved through discussions between counsel rather than a motion to the Court, but such cooperation has been notably absent in this case.

Defendants offer no explanation for the internal inconsistencies in DX 23, or for the inconsistencies between the fax submitted as DX 23 and the version the Commission claims was previously produced. Until these discrepancies are explained – particularly the discrepancy as to the fax's page count – the Court has no confidence that DX 23 is in fact a fax that was sent to Bent Sr. Given that the document contains no time stamp, it is likely the sender's copy, but that merely compounds the uncertainty about how many pages were in fact faxed to Bent Sr. The Commission further claims that the version of this fax produced during discovery contained pages not included in DX 23, and that the omitted material constitutes "pages Defendants would

prefer to deny were ever sent to Bent Sr. on September 15," including "statements that the Primary Fund's Lehman exposure did not have a 'material impact.'" (SEC MIL No. 3 Br. 23)

As to DX 24, the document has no Bates number and likewise has no time stamp showing that it was in fact sent as a fax. The Commission represents that the pages attached to the fax cover sheet in DX 24 have been produced in multiple forms, making it unclear what was actually sent to Bent Sr.

The Commission's motion to preclude DX 23 and DX 24 is granted, subject to an explanation from Defendants regarding these discrepancies.

**B.   DX 97**

The Commission seeks to preclude DX 97 on the grounds that it is an incomplete version of PX 49. PX 49 is an email from Frank Bonnano, director of marketing, to the Reserve Sales and Marketing teams. DX 97 presents the same email, but in a different format. The Commission argues that DX 97 should not be admitted because it was never produced to the Commission and presents PX 49 in a different format. Defendants argue that DX 97 was produced in like form on June 13, 2011, as an attachment to the Declaration of Asim Tewary in Opposition to the SEC's motion for summary judgment. This document was in fact attached to the Tewary Opposition Declaration. (See Dkt. No. 388 at Ex. 1) While DX 97 presents PX 49 in a different format, the change in format apparently reflects an effort to demonstrate who the recipients were of this email. Accordingly, there is no reason to preclude it from trial. The Commission's motion to preclude DX 97 is denied.

**C.   DX 183**

The Commission moves to preclude DX 183 because -- although a version of it had been produced before -- this new version has certain lines highlighted. The Commission

7

argues that because Defendants did not produce this document in the same form during discovery, they should not be allowed to introduce it at trial as anything other than a demonstrative exhibit.

Defendants point out that this exhibit was produced at summary judgment, as Exhibit A to the Gareis Declaration. (Dkt. No. 398) Although the names of investors were redacted in the previous version to preserve investor confidentiality, the information in the Master list table was made available to the SEC.[3] Defendants also argue that this information was available to the Commission even before the Complaint was filed. (Second Gehring Answering Decl. ¶ 3, Ex. Z (Gareis Decl.) ¶ 4 and Ex. A)

The Commission's motion to exclude DX 183 is therefore denied.

## III. Testimony or Argument About Telephone Calls Not Reflected in Telephone Records Defendants Produced During Discovery

The Commission seeks to preclude Defendants from offering testimony or making arguments concerning telephone calls for which there are no corroborating records. While Defendants produced a table of all calls in and out of the Reserve on a Reserve line for September 15 and 16, 2008 (see SEC MIL No. 3 Br. at 26; Def. MIL No. 3 Opp. Br. at 14), they did not produce telephone records concerning (1) Bent Sr.'s hotel phone in Italy; (2) the dial-in number for the various meetings of the Primary Fund's Board of Trustees; and (3) Patrick Farrell – the Reserve's former Chief Financial Officer – who was working in Chicago on September 15. The Commission argues that "Defendants had an obligation to preserve and produce phone

---

[3] Defendants acknowledge that DX 183 contains redemption data though December 2008, whereas the version attached to the Gareis Declaration includes data only through September 15, 2008. (Def MIL No. 3 Opp. Br. at 12 n.6) Defendants intend – and will only be permitted – to introduce information that was contained in the version attached to the Gareis Declaration.

8

records and, if they did not, they should not now be allowed to benefit from that failure by claiming calls that cannot be confirmed against their own records." (SEC MIL No. 3 Br. at 24)

Under Fed. R. Civ. P. 34(a), a party can be compelled to produce documents only if it has either possession of the documents or "control" over them, which is customarily interpreted as meaning that the party has "the legal right to obtain the documents requested on demand." Golden Trade, S.r.L. v. Lee Apparel Co., 143 F.R.D. 514, 525 (S.D.N.Y. 1992). See also In re NASDAQ Market-Makers Antitrust Litigation, 169 F.R.D. 493, 530 (S.D.N.Y. 1996) (A party has 'control' over a document if that party has a legal right to obtain those documents.). "In the face of a denial by a party that it has possession, custody or control of documents, the discovering party must make an adequate showing to overcome this assertion." Golden Trade, S.r.L. v. Lee Apparel Co., 143 F.R.D. 514, 525 at n.7 (S.D.N.Y. 1992).

### A.   Bent Sr.'s Calls on his Hotel Phone in Italy

During the critical time period – September 15 and 16, 2008 – Bent Sr. was in Italy, vacationing with his wife at the Hotel Borgo Paraelios in Rieti. Although Bent Sr.'s cell phone records for these days have been produced,[4] Defendants have not produced any records reflecting calls on Bent Sr.'s hotel phone. It is apparent, however, that Bent Sr. or his wife made some use of the hotel phone, because the hotel's bill reflects telephone charges in the amount of € 104.00. (Second Gehring Answering Decl. Ex. HH) Defendants argue that they should suffer no sanction, because they made "extraordinary efforts" to obtain records for the hotel phone from Italy and failed through no fault of their own. Defendants also argue that the Commission has known since February 27, 2011, that Defendants were unable to obtain these records, and made no effort obtain them through the Hague Convention.

---

[4] Those records show that on September 15 and 16, 2008, Bent Sr. participated in 42 telephone calls for a total of 739 minutes (12.3 hours). (Second Gehring Answering Decl. Ex. HH (Feb. 27, 2011 Dellaportas Ltr.))

9

This issue dates back to November 2010, when the Commission sought, and the Court granted, an order compelling Defendants to produce records of telephone calls made by Bent Sr. on his hotel phone on September 15 and 16, 2008. (Dkt. No. 350 (Nov. 29, 2010 Order) at 7) That Order directed Defendants, in the event that they were unable to produce these records, to set forth in writing all steps they had taken to obtain them since the Commission first requested them. (Id.)

Unable to obtain the records, Defendants described their efforts in a February 27, 2011 letter to the Court. (Second Gehring Answering Decl. Ex. HH (Feb. 27, 2011 Dellaportas Ltr.)) Defendants represented that:

> Bent Sr. contacted the hotel on October 2, 2008, and was told that the telephone records were destroyed "[a]s soon as the bill is entered." Bent Sr. asked the hotel to obtain records from the telephone company, and offered to pay the cost, but "never heard back."
>
> Bent Sr. then sent an email to the hotel on October 10, 2008. In this email, he repeated his request for "a copy of [his] telephone calls from the phone company for the duration of my stay at your lovely hotel arriving Monday, September 15, 2008 and leaving Wednesday, September 17, 2008. I[f] there is any cost, please let me know and if we can pay for accelerated service I would be pleased to do so." Bent Sr. provided his telephone number in the email in the event that the hotel had any questions about his request, but he never received any response to his email.
>
> An attorney from Defendants' law firm, who is fluent in Italian, made several attempts to contact the Hotel in December 2010. No one answered the phone, and there was no voicemail where she could leave a message. She then wrote an email to the hotel in Italian, explaining that she represented Bent Sr. and that it was important that someone call her back. No one from the hotel contacted her. The attorney also contacted an Italian government travel bureau for the province of Rieti to determine whether the hotel was still in business, but no one at the bureau had heard of the hotel. The attorney then called the hotel on weekends in December 2010 and January 2011, but no one answered the phone.
>
> On January 11, 2011, Bent Sr. sent a follow-up letter to the hotel in Italian and English again requesting the telephone records, and enclosing 100 Euros for expenses. He did not receive any response

(Id. at 1-3, Exhs. A-D)

This Court cannot say that Bent Sr.'s efforts to obtain records of his hotel phone usage were inadequate. The Commission has not rebutted Defendants' showing that they were unable to obtain these records. See Golden Trade, S.r.L. v. Lee Apparel Co., 143 F.R.D. 514, 525 at n.7 (S.D.N.Y. 1992) ("In the face of a denial by a party that it has possession, custody or control of documents, the discovering party must make an adequate showing to overcome this assertion."). Therefore, the Court will not preclude Defendants from offering testimony concerning calls made on Bent Sr.'s hotel phone for which no records have been produced.

In the event that Defendants choose to introduce evidence concerning such a call, however, the Court will permit the Commission to introduce, as admissions, defense counsel's prior statements concerning the likelihood of such a call. From the outset of this case, defense counsel has downplayed the significance of any calls Bent Sr. might have made on the hotel phone.

For example, in their February 27, 2011 letter, Defendants state that Bent Sr.'s cell phone "was the phone he predominantly used for work":

> In a few limited instances, however (most likely for incoming calls made to him while he was speaking on his cell phone), Mr. Bent Sr. made use of the hotel phone. . . . At the conclusion of his stay, the hotel presented Mr. Bent Sr. with a bill listing a telephone charge of 104 Euros. The bill did not contain a breakdown of specific calls.
>
> In all likelihood, those calls (if made to Mr. Bent, as opposed to his wife) would have come from persons at the Reserve, who likely would have been the only persons who would have known where Mr. Bent Sr. was staying for his anniversary. The SEC already has access to those call logs as well, as the Reserve's telephone records have been produced. In short, we question whether there are any calls either to or from Mr. Bent Sr. during that two-day period for which the SEC does not already have a record.

(Second Gehring Answering Decl. Ex. HH (Dellaportas Feb. 27, 2011 Ltr.) at 2)

11

Similarly, at the July 13, 2012 conference in this case, Defendants continued to maintain that testimony relating to calls on Bent Sr.'s hotel phone would not be an issue:

> [m]ost of Mr. Bent's calls were to people who in the U.S. the records have also been produced – his two sons, anything into the Reserve. So the only calls that wouldn't have a record were calls Mr. Bent made with his hotel phone to people other than the Bents and the Reserve. I don't know if there even are such calls. I don't know that the SEC doesn't point to any testimony where Mr. Bent said he called on his hotel phone someone other than the Reserve and the Bents. So if it's something specific, the SEC can point it out, but sitting here today, I'm not aware of any testimony of any alleged call which is not documented on some phone record somewhere.

(July 13, 2012 Tr. at 43)

To the extent that any witness has a sudden recollection – four years later – about a telephone call Bent Sr. made on his hotel phone – which is not reflected in any telephone records – the SEC will be permitted to introduce defense counsel's prior statements concerning the likelihood of such a call.

### B. Farrell Telephone Calls; Calls to Dial-In Number for Trustee Meetings

As to Patrick Farrell, the Reserve's former CFO, Defendants represent that any calls he made on September 15 and 16 – when he was working in Chicago – were made on his personal cell phone. (Def. MIL No. 3 Opp. Br. at 13) While the Commission asserts that Farrell's calls were made on a "Reserve-issued cell phone" (SEC MIL No. 3 Br. at 26), it has offered no evidentiary support for that assertion. Moreover, the Commission's argument that Farrell's alleged participation in September 15, 2008 Board meetings at 9:30 a.m. and 1:00 p.m. cannot be corroborated absent telephone records is clearly flawed. There were numerous attendees for both Board meetings, and many of these individuals have been designated as trial witnesses. Farrell's participation in these meetings can be confirmed or denied by these witnesses. The Commission's motion to preclude is, as to Farrell, denied.

As to the dial-in number for Board meetings, Defendants assert that the Commission "[n]ever sought this information in the discovery process," and contend that the conference dial-in number was provided by a third party service. (Def. MIL No. 3 Opp. Br. at 14-15) The Commission has offered no evidence challenging either assertion. Defendants further note that cell phone data and call recordings already provided to the Commission should be adequate to track calls made from a Reserve line into the conference dial-in number.

The Commission's motion to preclude is, as to the conference dial-in number, denied.

## IV. Bent II's Email Communications with His Wife

The Commission moves to admit two exhibits reflecting Bent II's email communications with his wife on September 15 and 16, 2008. PX 275 is an Excel spreadsheet summarizing the email traffic between Bent II and his wife on those days; the exhibit indicates that Bent II and his wife exchanged 71 email messages. Only the date and time of these email communications is revealed in PX 275; the substance of the emails is not disclosed. The Commission offers PX 275 to rebut Bent II's claim that the "extraordinary demands of his work" prevented him from carefully reading certain materials at issue, including the Insights piece and The Wall Street Journal release. See Bent II Decl. in Support of SJ ¶ 33. Exhibit 148 is an email chain between Bent II and his wife on September 15, 2008, in which Bent II comments on shareholder redemptions and the valuation of Lehman paper. The Commission argues that this exhibit is relevant to Bent II's scienter.

Defendants argue that PX 275 is unfairly prejudicial, because while the exhibit reflects a large number of emails, the actual communications are quite short. (Def. MIL No. 3 Opp. Br. at 18) Defense counsel represents that Bent II will testify at trial, however, that "he was so busy with imminent, material matters . . . that he did not carefully read everything that came

13

before him." (Id.) In considering whether Bent II was too busy to read the communications that his subordinates were proposing to disseminate to the public, the jury is entitled to consider evidence about how he was spending his time during these critical two days. To the extent that Defendants believe that it is necessary for the jury to see the content of these emails, they may seek their admission.

Defendants present no argument concerning the admissibility of PX 148. This exhibit is clearly relevant, because Bent II tells his wife that "we have redemptions coming in . . . and we need to try and prevent those." (PX 148)

The Commission's motion to admit PX 275 and PX 148 is granted.

## V.  Evidence Concerning the Yield Plus Fund

The parties make cross motions regarding evidence concerning the Yield Plus Fund, which was part of the Reserve fund family. The Commission seeks to offer evidence that Defendants did not tell the Primary Fund's trustees – who also served as trustees for the Yield Plus Fund[5] – that when the Board voted to lower the value of Lehman paper to 80 percent of par at 9:30 a.m. on Monday, September 15, the Yield Plus Fund's NAV fell below $1.00 per share.[6] The Commission contends that this was "highly relevant information for the Primary Fund and its Board," in that "[n]ews that one Reserve-managed fund had broken the buck would have had grave implications for the Primary Fund because investors would respond to NAV weakness in any Reserve fund by fleeing the entire fund complex, including the flagship Primary Fund." (SEC MIL No. 3 Br. at 30)

Introducing evidence concerning another Reserve fund presents a significant risk of jury confusion. The Commission's claims in this case are not premised on Defendants'

---

[5] SEC MIL No. 3 Br., Ex. O (Feb. 17, 2009 Inv. Test. Tr., at 7-8)
[6] SEC MIL No. 3 Br., Ex. Q (Farrell Feb.19, 2009 Inv. Test. at 48-49)

14

conduct in connection with the Yield Plus Fund, which is not a money market fund and which is not governed by SEC Rule 2a-7. Were this Court to permit the SEC to introduce evidence concerning the Yield Plus Fund, Defendants would be entitled to introduce evidence that their disclosures to the Trustees concerning this fund were adequate. The Court cannot permit the trial of this action to evolve into a mini-trial about whether Defendants' disclosures to the Trustees concerning the Yield Plus Fund were adequate. The jury in this case must stay focused on Defendants' statements and conduct relative to the Primary Fund, and not be distracted by Defendants' statements and conduct concerning other funds in the Reserve family.

The Commission's motion to admit evidence concerning the Yield Plus Fund is denied, and Defendants' motion to exclude this evidence is granted.

## VI. Use of Leading Questions in Examining Ledford and Drahzal

The Commission seeks permission to use leading questions in examining Patrick Ledford – RMCI's chief investment officer – and John Drahzal – RMCI's global head of sales.

Fed. R. Evid. 611(c) provides that leading questions ordinarily should not be used on direct examination, except "when a party calls a hostile witness, an adverse party, or a witness identified with an adverse party." "The term 'witness identified with an adverse party' is intended to apply broadly to an identification based upon employment by the party or by virtue of a demonstrated connection to an opposing party." Glen Weissenberger, Federal Evidence 1996 Courtroom Manual 134 (1995).

The Commission expects to call Ledford and Drahzal in its case in chief. (Dkt. No. 455 Ex. A (Pre-trial order)) Both men are alleged to have been involved in alleged misstatements, but neither has been named as a defendant in this or any other action filed by the Commission.

Although the Court may later determine – based on an adequate record – that leading questions are appropriate, any determination now concerning this issue is premature. The Court has no information concerning, for example, these witnesses' current relationship with Defendants, whether they have agreed to cooperate with the Commission, or whether defense counsel still represents them. (SEC MIL No. 3 Br. at 34 n.50) These matters will become much clearer at trial, and the Court will also have an opportunity to determine whether Ledford or Drahzal "evidence[] hostility, bias, or recalcitrance during [their] testimony." S.E.C. v. World Information Technology, Inc., 250 F.R.D. 149, 151 (S.D.N.Y. 2008).

The SEC's motion is denied without prejudice to renewal at trial on the basis of an adequate evidentiary record.

## CONCLUSION

For the reasons stated above, the Commission's motion in limine No. 3 is granted in part and denied in part. Defendants' motion to exclude evidence regarding the Yield Plus Fund is granted.

The Clerk of the Court is directed to terminate the motions. (Dkt. Nos. 485, 503)

Dated: New York, New York
September 10, 2012

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge