USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 10/3/12

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re THE RESERVE FUND SECURITIES AND DERIVATIVE LITIGATION | 09 MD. 2011 (PGG) |
| SECURITIES AND EXCHANGE COMMISSION, Plaintiff, v. RESERVE MANAGEMENT COMPANY, INC., RESRV PARTNERS, INC., BRUCE BENT SR., and BRUCE BENT II, Defendants, and THE RESERVE PRIMARY FUND, Relief Defendant. | ECF CASE <br><br> **ORDER** <br><br> 09 Civ. 4346 (PGG) |

PAUL G. GARDEPHE, U.S.D.J.:

Defendants have moved in limine (1) to exclude the testimony of certain purchaser witnesses under Fed. R. Evid. 602 and 802 (Dkt. No. 479); (2) to exclude the testimony of Peter Heydlauff (Dkt. No. 481); and (3) for an order striking the Commission's deposition counter-designations (Dkt. No. 487).

I. **MOTION TO EXCLUDE THE TESTIMONY OF PURCHASER WITNESSES**

Defendants seek to preclude the testimony of John Boyd, Brian Gamble, Brian Moore, and Tracy Reeg. Each of these witnesses is an employee of an institutional investor that purchased Reserve Primary Fund ("Fund") shares on September 15 or 16, 2008. The Commission offers these witnesses to testify about (1) communications with Defendants on September 15 and 16, 2008; (2) investment decisions concerning the Primary Fund made on

those days; and (3) their employers' policies, procedures, and/or guidelines regarding investment decisions. Defendants object to these witnesses, arguing that they have no personal knowledge of the matters about which they would testify, and will merely present hearsay.

### A. Witnesses' Knowledge of Purchases Made on September 15 and 16, 2008

#### 1. John Boyd

Boyd is the Group Vice President and Treasurer of Supervalu, Inc., where he oversees "the cash management function for Supervalu." (Birnbaum Opp. Decl., Ex. U (Boyd Decl.) ¶ 1) Supervalu purchased Fund shares on September 15, 2008. (Boyd Decl. ¶ 6) Boyd was at an Idaho ranch on September 15 and 16, 2008, however, and had no email or telephone communication with his office until his return on September 17, 2008. (Gehring Decl., Ex. 4 (Boyd Dep.) at 15) Accordingly, it appears that Boyd had no knowledge – at the time – that Supervalu purchased Primary Fund shares on September 15. There is also no evidence that anyone at Supervalu communicated with Defendants on September 15 and 16, 2008, or that Supervalu received any written communication from Defendants during this period, such as a copy of the Reserve Insights piece. Even if such communication took place, Boyd would have no first-hand knowledge of it. He testified at his deposition that his knowledge of events on September 15 and 16 is derived from a summary prepared by a co-worker after Boyd's return to work. (Id. at 17-19)

#### 2. Brian Gamble

Gamble is the director of the Treasury Department at Henry Ford Health System. (SEC 56.1 Stmt. Ex. 84 (Gamble Decl.) ¶ 1) In this capacity, Gamble "had responsibilities with respect to the cash management function of Henry Ford." (Id. at ¶ 2) Gamble did not purchase Fund shares on September 15, nor did he authorize anyone else to do so. (Gehring Decl., Ex. 5

2

(Gamble Dep.) at 66, 70-71) Gamble likewise does not recall having any communications with the Reserve on that day. (Id. at 71) Another employee at Henry Ford – identified as Mr. Wyniemko – purchased Fund shares on Henry Ford's behalf on September 15, but Gamble had no input into Mr. Wyniemko's purchase decision. (Id. at 70-71) Gamble spoke with a Partners' representative on September 16, and was then sent a copy of the Insights piece, but Henry Ford's purchase of Fund shares occurred before that time. (Id. at 99; Gamble Decl. ¶ 12)

### 3. Brian Moore

Moore was a senior treasury analyst in the treasury department of Fidelity National Financial Inc. (Gehring Decl., Ex. 6 (Moore Dep.) at 8; SEC 56.1 Stmt. Ex. 81 (Moore Decl.) ¶ 1) On September 15, 2008, Moore – as part of his routine cash managements duties at Fidelity – placed a redemption order with the Primary Fund. Later that day, he "placed certain purchase orders in the Primary Fund on behalf of various subsidiaries at [Fidelity]."[1] (Moore Decl. ¶¶ 2-3) On September 16, Fidelity's bank informed Moore that Fidelity's account was overdrawn. Research revealed that Fidelity had not received the proceeds of the redemption orders Moore had placed with the Fund the previous day. (Moore Decl. ¶ 4) Moore then called the Reserve to inquire about the problem, and was told that the Primary Fund had received significant redemption requests the previous day and was having difficulty processing redemptions, given the volume. (Moore Decl. ¶ 5) There is no evidence that anyone at Fidelity

---

[1] The parties agree that Fidelity made fourteen purchases of Fund shares on September 15 and 16, 2008, two of which were placed by Moore. (Def. Investor Br. at 6; SEC Investor Opp. Br. 3 n.2)

received the <u>Insights</u> piece or that any Fidelity employee was given assurances by a Reserve representative that the Fund's $1.00 NAV would be preserved.[2]

### 4. <u>Tracy Reeg</u>

Reeg is the portfolio manager of Principal Global Investors (Gehring Decl., Ex. 10 (Reeg Dep.) at 9-10; SEC 56.1 Stmt. Ex. 83 (Reeg Decl.) ¶ 1), which placed three orders to purchase Fund shares on September 15-16, 2008. (Reeg Decl. ¶¶ 7, 10) Principal purchased $6 million in Fund shares on September 15; purchased $1.2 million in Fund shares at 10:25 a.m. on September 16; and purchased $40 million in Fund shares at 2:00 p.m. on September 16. (Reeg Decl., ¶¶ 7, 10) It appears that Reeg was only responsible for making the $1.2 million purchase. (Reeg Dep. at 71) From Reeg's declaration and deposition testimony, it does not appear that she spoke with anyone at the Reserve on September 15 or 16, or that she reviewed any written material from the Reserve on those days. (Reeg Dep. at 71; Reeg Decl.)

In her declaration, Reeg reports certain conversations that Peter Heydlauff, another Principal employee, had with Reserve representatives. (Reeg Decl. ¶ 7) For example, on the morning of September 15, Heydlauff told Reeg about a conversation he had with a Reserve representative about the Fund's "exposure . . . to Lehman." Heydlauff "did not report any indication from his conversation with his Reserve contact that raised a concern that the Primary Fund was in danger of breaking the buck." (<u>Id</u>.) In her declaration, Reeg also reports that at 7:01 p.m. on September 15, a Reserve representative sent an email to Heydlauff stating, <u>inter alia</u>, that "RMCI . . . intends to enter into support agreements with the Primary Fund to support the value of Lehman credit held in the Fund." (Reeg Decl. ¶ 8, Ex. B) The email also

---

[2] Defendants argue that Moore has stated that his recollection of events is "a bit fuzzy." (Def. Investor Br. at 7) This argument goes to the weight of his proposed testimony and not to whether it should be admitted.

4

reported that the Reserve had "discussed with the SEC that our intent is to mitigate any decline in value of the Lehman debt so that it will not result in a decrease to the NAV of the Fund." (Id.) The Insights piece – which provides similar assurances – is attached to this email. (Id.) This email was forwarded to other employees at Principal, but not to Reeg. (Id.)

### B. Analysis

Under Federal Rule of Evidence 602, "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." F.R.E. 602. Rule 801(c) defines "hearsay" as an out-of-court statement "a party offers in evidence to prove the truth of the matter asserted in the statement." F.R.E. 801(c)(2).

Defendants' motion to preclude these four witnesses will be denied. While the factual accounts summarized above present obvious hearsay issues – addressed below – these witnesses are likely competent to testify about, for example, the investment policies and practices of their employers, and the types of facts that are material in making an investment decision. It also appears likely that the purchase of Fund shares on September 15 or 16 could be established through these witnesses, based on company records. Reeg and Moore, of course, purchased Fund shares themselves on behalf of their companies.

These witnesses will not be permitted to testify, however, about what their colleagues told them Reserve representatives had said. For example, Reeg will not be permitted to testify to what a Reserve representative allegedly told Heydlauff. The SEC's argument (SEC Investors Opp. Br. 5) that the Commission is not offering Reserve statements for their truth does not address the hearsay issue. Admission – through Reeg – of what a Reserve representative told

5

Heydlauff, requires the jury to accept that Heydlauff's account to Reeg of what the Reserve representative said was accurate.[3]

It is also unlikely that these witnesses will be permitted to testify about the motivation for their colleagues' purchase of Fund shares, unless shares were purchased in accordance with an automatic purchase program. A witness is generally not competent to testify about the unspoken motives of another person; to the extent that someone has expressed the reasons for his or her actions, offering those reasons through another person often presents hearsay issues. See Chamilia, LLC v. Pandora Jewelry, LLC, No. 04-CV-6017 (KMK), 2007 WL 2781246, at *17 n.14 (S.D.N.Y. Sept. 24, 2007) (testimony about another's motivation for not making a purchase is hearsay).

## II. MOTION TO PRECLUDE PETER HEYDLAUFF

Defendants move to preclude the testimony of Peter Heydlauff on the grounds that he was not identified as a witness until the June 11, 2012 Joint Pre-Trial Order. Defendants' motion will be granted.

As discussed above, Heydlauff worked with Reeg as an analyst at Principal. Heydlauff spoke to a Reserve representative on the morning of September 15 and received written communications from the Reserve, including a copy of the Insights piece, later that day.

The Commission has been delinquent in identifying witnesses with knowledge. At summary judgment, the Commission submitted declarations of Boyd, Gamble, Moore, and

---

[3] This issue was not present in United States v. Detrich, 865 F.2d 17, 20-21 (2d Cir. 1988), cited by the Commission. (SEC Investor Opp. Br. 5) In that case, the Second Circuit found reversible error where the trial judge excluded an exculpatory statement made by an out-of-court declarant, because the out-of-court statement constituted circumstantial evidence of the defendant's state of mind. The out-of-court statement was in writing, however, so there was no issue about what the declarant had said. Here there is no record of what Heydlauff said to Reeg. Indeed, Reeg has testified that she does not have "any recollection of any specific conversation [she] had with Mr. Heydlauff." (Reeg Dep. at 70)

Reeg, although none of these individuals had been previously identified by the Commission as witnesses. Over Defendants' objection, the Court considered these declarations at summary judgment, and ruled in March 2012 that these individuals would be permitted to testify at trial, because "[a]ny prejudice to [D]efendants flowing from the SEC's failure to identify these investors by name during discovery can be cured by granting [D]efendants an opportunity to take their depositions before trial." (March 28, 2012 Tr. at 15) Accordingly, the Court gave Defendants leave to depose these four individuals.

In May 2012, the Commission designated twelve additional purchaser witnesses it wished to call at trial. After initially denying the Commission's request in its entirety, the Court allowed the Commission to select three of the twelve, and gave Defendants leave to depose these three additional witnesses.[4] (June 1, 2012 Tr. at 9) In doing so, the Court stated that it was "troubled about the timing of the SEC's disclosure of these witnesses." (Id. at 7) The Court again made clear that such late disclosure of witnesses was disruptive, and that it would not deprive Defendants of their right to take a deposition of a potential trial witness. The Commission did not identify Heydlauff as a potential trial witness until the submission of the Joint Pre-Trial Order on June 12, 2012, however. Even then, the Commission identified Heydlauff as a rebuttal witness.

Given Reeg's April 27, 2011 declaration, it had to have been obvious to the Commission since at least April 2011 – and probably long before – that Heydlauff was a potential witness, and that Reeg lacked personal knowledge of Principal's interactions with

---

[4] The Commission argues that Defendants were given general leave to depose investors as they saw fit, and that it was their decision not to depose Heydlauff. (SEC Investors Opp. Br. at 7) This is incorrect. The Court reopened discovery to permit Defendants to depose individuals that the SEC had belatedly announced that it wished to call at trial. Defendants were not free to notice other depositions.

7

Reserve employees on September 15, 2008. The Commission inexplicably chose not to disclose him as a potential witness, however.

The Court made clear – on multiple occasions – that it was greatly troubled by the Commission's late disclosure of witnesses. Heydlauff should have been disclosed long ago.[5] The Court will not require Defendants to go to trial having not had an opportunity to depose a trial witness. Accordingly, Defendants' motion to preclude Heydlauff from testifying at trial will be granted.

### III. DEFENDANTS' OBJECTIONS TO THE SEC'S DEPOSITION COUNTER-DESIGNATIONS

Defendants move to strike the Commission's deposition counter-designations, arguing that they go beyond the scope of the rule of completeness.

F.R.E. 106 provides

> If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part – or any other writing or recorded statement – that in fairness ought to be considered at the same time.

The Second Circuit has

> interpreted Rule 106 to justify the admission of previously excluded portions of partially received documents or statements only when necessary to explain the admitted portion, to place it into context, to ensure a fair and impartial understanding of the admitted portion, or to correct a misleading impression that might arise from excluding it.

United States v. Rivera, 61 F.3d 131, 135-36 (2d Cir. 1995) (citing United States v. Castro, 813 F.2d 571, 575-76 (2d Cir. 1987)). "Under this principle, . . . an 'omitted portion of [the] statement must be placed in evidence if necessary to explain the admitted portion, to place the admitted portion in context, to avoid misleading the jury, or to ensure fair and impartial

---

[5] It is also apparent that Heydlauff is not a true rebuttal witness, but instead was added to the Commission's witness list when the evidentiary issues with Reeg's testimony were understood.

understanding of the admitted portion.'" United States v. Johnson, 507 F.3d 793, 796 (2d Cir. 2007) (citing Castro, 813 F.2d at 575-76)

The Court is concerned that some of the counter-designations made by the Commission are overly inclusive. Rule 106 is aimed at permitting excerpts of testimony or other evidence to be understood in context; its purpose is not to permit an adversary to create a full record as to a particular issue. It is not clear, however, whether the designations, or counter-designations, will actually be used at trial. Accordingly, Defendants' motion to strike will be denied without prejudice to renewal as to counter-designations the Commission seeks to admit at trial.

## CONCLUSION

Defendants' motions in limine are granted in part and denied in part as set forth above.

The Clerk of the Court is directed to terminate the motions (Dkt. Nos. 479, 481, 487).

Dated: New York, New York
October 3, 2012

SO ORDERED.

_____
Paul G. Gardephe
United States District Judge