UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
SECURITIES AND EXCHANGE                         :
COMMISSION,                                     :
                                                :
                              Plaintiff,        :
                                                :
          v.                                    :          No. 09 Civ. 4346 (PGG)
                                                :
RESERVE MANAGEMENT COMPANY, INC.,               :          ECF CASE
RESRV PARTNERS, INC., BRUCE BENT SR.            :
and BRUCE BENT II,                              :
                                                :
                              Defendants,       :
          and                                   :
                                                :
THE RESERVE PRIMARY FUND,                       :
                                                :
                              Relief Defendant. :
------------------------------------------------------------------------x

## PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR (i) JUDGMENT AS A MATTER OF LAW AND FOR A NEW TRIAL AS TO CERTAIN OF ITS CLAIMS, AND (ii) DISGORGEMENT, PENALTIES, AND INJUNCTIONS

SECURITIES AND EXCHANGE
COMMISSION

Nancy A. Brown
Alexander J. Janghorbani
Michael D. Birnbaum
3 World Financial Center
New York, New York 10281
Tel: (212) 336-1023 (Brown)

Attorneys for Plaintiff

December 21, 2012

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT .................................................................................1

ARGUMENT ...........................................................................................................3

I. The SEC Is Entitled to Judgment as a Matter of Law Against
RMCI and Resrv Partners on Its Claims Under Section 10(b)
and Rule 10b-5 of the Exchange Act ...............................................................3

    A. Overwhelming Evidence Supports Each Element of the SEC's 10(b)
Claims Against the Entity Defendants.............................................................4

    B. The SEC Is Entitled to a New Trial Against Bent Sr. and Bent II on Certain
Exchange Act Claims that the Jury Never Reached .......................................8

II. RMCI and Resrv Partners Are Entitled to No Recovery from the Expense
Fund Under Their Respective Agreements with the Primary Fund ....................8

    A. RMCI Is Entitled to No Management Fees Under Its Comprehensive
Management Agreement ..................................................................................8

    B. Resrv Partners Is Entitled to No 12b-1 Fees Under the Distribution Agreement .......10

    C. Millions of Dollars in Fund and Trustee Expenses Are Recoverable from
RMCI and Resrv Partners and Should Be Withheld or Off-Set Against
Any Payments to RMCI or Resrv Partners out of the Expense Fund ..........................11

III. As Between Innocent, Harmed Investors, and Adjudged Fraudsters,
RMCI and Resrv Partners, the Court Should Exercise the Equitable
Powers Congress Explicitly Granted It to Deny RMCI and Resrv
Partners Any Recovery and to Direct Distribution to Investors .................14

IV. Any Amounts Awarded to RMCI or Resrv Partners Should Be Disgorged
as Ill-Gotten Gains ........................................................................................16

V. Bent II Should Be Required to Disgorge Any Amounts Paid to Him as
Salary if Reimbursed from the Expense Fund .............................................20

VI. RMCI and Resrv Partners Are Deserving of Substantial Third Tier Penalties .......21

    A. RMCI and Resrv Partners Are Subject to Third Tier Penalties ....................22

B.  RMCI's and Resrv Partners' Repeated Violations Warrant Severe Penalties.............25

C.  Bent II Is Personally Liable for First Tier Penalties ....................................29

VII.    **RMCI, Resrv Partners and Bent II Should be Enjoined from Future Violations of the Statutes They Violated**........................................................................30

A.  The Degree of Scienter ................................................................................31

B.  Defendants' Past Misconduct Suggests a Likelihood of Future Violations. .............36

C.  Defendants' Actions Since September 2008 Demonstrate an Utter Lack of Appreciation for Their Wrongdoing ...........................................................................37

D.  Absent an Injunction, Defendants Will Have Opportunities to Commit Future Violations ...................................................................................................39

VIII.   **The Court Should Order an Evidentiary Hearing (and Appropriate Discovery) of Any Disputed Factual Issues** ....................................................39

**CONCLUSION** ....................................................................................................40

# TABLE OF AUTHORITIES

**Page**

**<u>Cases</u>**

Aaron v. SEC, 446 U.S. 680 (1980) ............................................................................ 31-32

Advance Pharm., Inc. v. United States, 391 F.3d 377 (2d Cir. 2004) ............................................3

Chemical Bank v. Arthur Andersen & Co., 726 F.2d 930 (2d Cir. 1984) ......................................6

In re Reserve Mgmt. Corp., Reserve Mgmt. Co., Henry B.R. Brown
and Bruce R. Bent, Rel. No. IC-11394, IA-733, 1980 WL 20755 (Oct. 10, 1980) ......................36

Katara v. D.E. Jones Commodities, Inc., 835 F.2d 966 (2d Cir. 1987) ...........................................3

Klamberg v. Roth, 473 F. Supp. 544 (S.D.N.Y. 1979) ....................................................................6

Logan v. Bennington College Corp., 72 F.3d 1017 (2d Cir. 1995) .................................................3

Manley v. AmBase Corp., 337 F.3d 237 (2d Cir. 2003).........................................................3-4, 8

Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71 (2006) ....................................5

Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC,
467 F.3d 73 (2d Cir. 2006)............................................................................................................15

Otis & Co. v. SEC, 106 F.2d 579 (6th Cir. 1939)..........................................................................28

Reserve Mgmt. Corp. v. Anchor Daily Income Fund, Inc.,
459 F. Supp. 597 (S.D.N.Y. 1978) ...............................................................................................37

SEC v. Am. Realty Trust, 586 F.2d 1001 (4th Cir. 1978) .............................................................32

SEC v. Amerifirst Funding, Inc., No. 07 Civ. 1188,
2008 WL 1959843 (N.D. Tex. May 5, 2008) ...............................................................................28

SEC v. Black, No. 04 Civ 7377, 2012 WL 4856196 (N.D. Ill. Oct. 9, 2012) ..............................20

SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180 (1963) ..............................................32

SEC v. Castaldo, No. 08 Civ. 8397 (JSR),
2009 WL 2591376 (S.D.N.Y. Aug. 19, 2009)..............................................................................40

SEC v. Coates, 137 F. Supp. 2d 413 (S.D.N.Y. 2001) ..................................................................21

SEC v. Church Extension of Church of Church, Inc., 429 F. Supp. 2d 1045
(S.D. Ind. 2005) ...................................................................................................20

SEC v. Colonial Inv. Mgmt. LLC, 381 F. App'x 27 (2d Cir. 2010)............................28

SEC v. Commonwealth Chem. Secs., Inc., 574 F.2d 90 (2d Cir.1978)...................30, 31

SEC v. Conaway, 697 F. Supp. 2d 733 (E.D. Mich. 2010) ........................................27

SEC v. Czarnik, No. 10 Civ. 0745 (PKC),
2010 WL 4860678 (S.D.N.Y. Nov. 29, 2010) ......................................................... 5-6

SEC v. Daly, 572 F. Supp. 2d 129 (D.D.C. 2008) .....................................................25

SEC v. DiBella, No. 04 Civ. 1342 (EBB),
2008 WL 6965807 (D. Conn. March 13, 2008),
aff'd, 587 F.3d 553 (2d Cir. 2009)......................................................................24, 40

SEC v. DiBella, 587 F.3d 553 (2d Cir. 2009) ..........................................................17

SEC v. E. Delta Resources Corp., No. 10 Civ. 0310 (SJF),
2012 WL 3903478 (E.D.N.Y.  Aug. 31, 2012) ..........................................................25

SEC v. Elliott, No. 09 Civ. 7594 (KBF),
2012 WL 2161647 (S.D.N.Y. June 12, 2012) .....................................................24, 28

SEC v. Falbo, 14 F. Supp. 2d 508 (S.D.N.Y. 1998) ..................................................37

SEC v. First Jersey Secs., Inc., 101 F.3d 1450 (2d Cir. 1996) ...........................4, 17, 31

SEC v. First City Fin. Corp., 890 F.2d 1215 (D.C. Cir. 1989) ..............................18, 20

SEC v. First Pac. Bancorp, 142 F.3d 1186 (9th Cir. 1998) .......................................20

SEC v. Gabelli, 653 F.3d 49 (2d Cir. 2011),
cert. granted on other grounds, 133 S. Ct. 97 (2012)................................................36

SEC v. Ginsburg, 362 F.3d 1292 (11th Cir. 2004) ................................................ 33-34

SEC v. Glantz, No. 94 Civ. 5737 (LAP),
2009 WL 3335340 (S.D.N.Y. Oct. 13, 2009).........................................................28

SEC v. Global Express Capital Real Estate Inv. Fund, I, LLC,
289 F. App'x 183 (9th Cir. 2008) ........................................................................25

SEC v. Golden Apple Oil and Gas, Inc., No. 09 Civ. 7580 (HB),
2011 WL 1432040 (S.D.N.Y. March 21, 2011) ...................................................24

SEC v. Gruss, -- F. Supp. 2d --, 2012 WL 1659142 (S.D.N.Y. May 9, 2012) ...............................7

SEC v. Jadiddian, No.  08 Civ. 8079 (PGG),
2011 WL 1327245 (S.D.N.Y. March 31, 2011) ...................................................27

SEC v. Jasper, No. 07 Civ. 6122, 2010 WL 8781211 (N.D. Cal. 2010) .......................................25

SEC v. Johnson, 03 Civ. 177 (JPK),
2006 WL 2053379 (S.D.N.Y. July 24, 2006) .......................................................6

SEC v. Kapur, No. 11 Civ. 8094 (PAE),
2012 WL 5964389 (S.D.N.Y. Nov. 29, 2012)......................................................25

SEC v. Kane, No. 97 Civ. 2931 (CBM),
2003 WL 1741293 (S.D.N.Y. April 1, 2003) ......................................................25

SEC v. Kenton Capital, Ltd., 69 F. Supp. 2d 1 (D.D.C. 1998)...............................................25, 28

SEC v. Lawton, No. 09 Civ. 368, 2011 WL 494888 (D. Minn. Feb. 7, 2011),
aff'd, 449 F. App'x 555 (8th Cir. 2012) .............................................................20

SEC v. Lazare Indus., Inc., 294 F. App'x 711 (3d Cir. 2008) .......................................................28

SEC v. Lines, No. 07 Civ. 11387 (DLC),
2011 WL 3627695 (S.D.N.Y. Aug. 16, 2011).....................................................24

SEC v. Lorin, 877 F. Supp. 192 (S.D.N.Y.1995),
aff'd in relevant part, 76 F.3d 458 (2d Cir.1996)................................................34, 37

SEC v. Lorin, 76 F.3d 458 (2d Cir. 1996) .......................................................19

SEC v. Lybrand, 281 F. Supp. 2d 726 (S.D.N.Y. 2003),
aff'd sub nom. SEC v. Kern, 425 F.3d 143 (2d Cir. 2005)....................................25, 40

SEC v. Mandaci, 00 Civ. 6635 (LTS)(FM),
2004 WL 2153879 (S.D.N.Y. Sept. 27, 2004).....................................................25, 37

SEC v. Mannion, 789 F. Supp. 2d 1321 (N.D. Ga. 2011) ...........................................6, 7

SEC v. Manor Nursing Ctrs., Inc., 458 F.2d 1082 (2d Cir.1972).....................................16, 36, 37

SEC v. McCaskey, No. 98 Civ. 6153 (SWK)(AJP),
2002 WL 850001 (S.D.N.Y. March 26, 2002) ...................................................25, 27

SEC v. Metcalf, No. 11 Civ. 0493 (CM),
2012 WL 5519358 (S.D.N.Y. Nov. 13, 2012) ...................................................24

SEC v. Milan Capital Group, Inc., No. 00 Civ. 0108 (DLC),
2001 WL 921169 (S.D.N.Y.  Aug. 14, 2001) ...................................................28

SEC v. Miller, 744 F. Supp. 2d 1325 (N.D. Ga. 2010)...................................36

SEC v. Milligan, 436 F. App'x 1 (2d Cir. 2011) ...........................................40

SEC v. Monarch Funding Corp., 192 F.3d 295 (2d Cir. 1999) ...................4, 31

SEC v. Moran, 944 F. Supp. 286 (S.D.N.Y. 1996)...................................32, 38

SEC v. Morgan Keegan & Co., 678 F.3d 1233 (11th Cir. 2012) ...................7

SEC v. Murphy, 626 F.2d 633 (9th Cir. 1980) ...........................................32

SEC v. N. Am. Research  & Dev. Corp, 424 F.2d 63 (2d Cir. 1970)...........7

SEC v. Norton, 95 Civ. 4451 (SHS), 1997 WL 611556 (S.D.N.Y. Oct. 3, 1997)...........6

SEC v. Novus Tech., LLC, No. 07 Civ. 0235,
2010 WL 4180550 (D. Utah Oct. 20, 2010) ...........................................40

SEC v. Offill, No. 07 Civ. 1643, 2012 WL 1138622 (N.D. Tex. April 5, 2012) ...................40

SEC v. Olins, 762 F. Supp. 2d 1193 (N.D. Cal. 2011) ...................................32

SEC v. Opulentica, LLC, 479 F. Supp. 2d 319 (S.D.N.Y. 2007) ...................37-38

SEC v. Pallais, No. 08 Civ. 08384 (GBD)(GWG),
2010 WL 5422531 (S.D.N.Y. Dec. 23, 2010) ...........................................25

SEC v. Palmisano, 135 F.3d 860 (2d Cir. 1998)...........................................31

SEC v. Patel, 61 F.3d 137 (2d Cir. 1995) ...................................................18-19

SEC v. Pentagon Capital Mgmt. PLC, 844 F. Supp. 2d 377 (S.D.N.Y. 2012)...................17, 18, 36

SEC v. Pentagon Capital Mgmt. PLC, No. 08 Civ. 3324 (RWS),
2012 WL 1036087 (S.D.N.Y. March 28, 2012) ...........................................27, 28

SEC v. Pittsford Capital Income Partners, LLC, No. 06 Civ. 6353 T(P),
2007 WL 2455124 (W.D.N.Y. Aug. 23, 2007) ...................................................37

SEC v. Posner, 16 F.3d 520 (2d Cir. 1994) ......................................................20

SEC v. Rabinovich & Assoc., L.P., 07 Civ. 10547 (GEL),
2008 WL 4937360 (S.D.N.Y. Nov. 18, 2008).......................................................4

SEC v. Rajaratnam, 822 F. Supp. 2d 432 (S.D.N.Y. 2011)..............................27

SEC v. Ramoil Mgmt., Ltd., No. 01 Civ. 9057 (SC),
2007 WL 3146943 (S.D.N.Y.  Oct. 25, 2007) ............................................... 24-25

SEC v. Razmilovic, 822 F. Supp. 2d 234 (E.D.N.Y. 2011)................................40

SEC v. Shapiro, 494 F.2d 1301 (2d Cir.1974)...................................................36

SEC v. Softpoint, Inc., 958 F. Supp. 846 (S.D.N.Y. 1997) .......................... 30-31

SEC v. Snyder, No. 03 Civ. 4658, 2006 WL 6508273 (S.D. Tex. Aug. 22, 2006) ......................40

SEC v. Sw. Coal & Energy Co., 624 F.2d 1312 (5th Cir. 1980) .......................32

SEC v. Tecumseh Holdings Corp., No. 03 Civ. 5490 (SAS),
2009 WL 4975263 (S.D.N.Y. Dec. 22, 2009) ....................................................35

SEC v. Teo, No. 04 Civ. 1815, 2011 WL 4074085 (D.N.J. Sept. 12, 2011) ........................... 19-20

SEC v. Tzolov, 08 Civ. 7699 (SAS), 2011 WL 308274 (S.D.N.Y. Jan. 26, 2011) ......................39

 SEC v. United Energy Partners, Inc., 88 F. App'x 744 (5th Cir. 2004) .......................................25

SEC v. U.S. Sustainable Energy Corp., No. 08 Civ. 0245,
2011 WL 2980549 (S.D. Miss. July 21, 2011) ...................................................40

SEC v. Verdiramo, No. 10 Civ. 1888 (RMB),
2011 WL 4344310 (S.D.N.Y. Sept. 9, 2011).............................................32, 38

SEC v. Warde, 151 F.3d 42 (2d Cir. 1998).........................................................18

SEC v. Youmans, 729 F.2d 413 (6th Cir. 1984).................................................39

SEC v. Young, 09 Civ. 1634 (JRP),
2011 WL 1376045 (E.D. Pa. Apr. 12, 2011) ........................................................4

SEC v. Zandford, 535 U.S. 813 (2002)................................................................5

United States v. Naftalin, 441 U.S. 768 (1979) ........................................................5, 6

VanCook v. SEC, 653 F.3d 130 (2d Cir. 2012).............................................................25

Voccola v. Gaudett, 861 F. Supp. 2d 52 (D. Conn. 2012).............................................3

**Statutes and Rules**

Securities Act of 1933

    Section 17(a)(2), 15 U.S.C. § 77q(a)(2)........................................ passim

    Section 17(a)(3), 15 U.S.C. § 77q(a)(3)........................................ passim

    Section 20(b), 15 U.S.C. § 77t(b) .............................................30, 31

    Section 20(d), 15 U.S.C. § 77t(d) ...............................22, 27, 29, 30

Securities Exchange Act of 1934

    Section 10(b), 15 U.S.C. § 78j(b) .............................................. passim

      Rule 10b-5, 17 C.F.R. § 240.10b-5........................................ passim

    Section 13(d), 15 U.S.C. § 78m(d) ..........................................19, 20

    Section 20(a), 15 U.S.C. § 78t(a)...................................................8

    Section 20(e), 15 U.S.C. § 78t(e).................................................8

    Section 21(d)(5), 15 U.S.C. § 78u(d)(5) .................................15, 31

Investment Advisers Act of 1940

    Section 206(1), 15 U.S.C. § 80b-6(1) ...........................................33

    Section 206(2) 15 U.S.C. § 80b-6(2) .......................................23, 32

    Section 206(4) 15 U.S.C. § 80b-6(4) ........................................ passim

      Rule 206(4)-8, 17 C.F.R. § 275.206(4)-8 ............................... passim

    Section 209(d), 15 U.S.C. § 80b-9(d) ..........................................30

    Section 209(e), 15 U.S.C. § 80b-9(e).....................................21, 22, 28

Investment Company Act of 1940

 Section 22, 15 U.S.C. § 80a-22 ........................................................................12

  Rule 22c-1, 17 C.F.R. § 270.22c-1 .........................................................12

 Section 25(c), 15 U.S.C. § 80a-25(c) ..........................................................14, 15

Sarbanes-Oxley Act of 2002

 Section 308(a), 15 U.S.C. § 7246(a) ..................................................................2

17 C.F.R. § 201.1003 ...........................................................................22, 29, 30

Fed. R. Civ. P. 50(b) ..................................................................................3, 4, 38

Fed. R. Civ. P. 59 ...........................................................................................3, 38

Fed. R. Civ. P. 60 ..............................................................................................38

**Miscellaneous**

8 Louis Loss & Joel Seligman, Securities Regulation 3721 (3d ed. 2004) .......................................5

Plaintiff Securities and Exchange Commission respectfully submits this Memorandum of Law in Support of its Motion for (i) Judgment as a Matter of Law and for a New Trial as to certain of its claims, and (ii) Disgorgement, Penalties, and Injunctions in furtherance of the Court's Endorsed Order of November 21, 2012 requiring briefing on the remaining issues in the case, including Defendants' entitlement to recovery from the Expense Fund for Management Fees and/or Expenses.[1]

## PRELIMINARY STATEMENT

The Commission's Motion for Judgment as a Matter of Law on its Section 10(b) and Rule 10(b)-5 claims against RMCI and Resrv Partners (the "Entity Defendants") should be granted. The uncontroverted evidence at trial established that purchases occurred during the period that the Jury found that RMCI and Resrv Partners were engaged in fraud. Indeed, that evidence conclusively establishes that investors purchased into the Primary Fund after receiving the statements at issue. Thus, if the Entity Defendants violated the antifraud provisions of the Securities Act (as the Jury found that they did), that same conduct "in connection with the purchase of a security" violated the identical provisions of the Exchange Act. If Judgment is entered on the Exchange Act claim against the Entity Defendants, as it should be, the Court should grant a new trial on the secondary liability claims for control person liability against both Bents and for aiding and abetting liability against Bent II that the Jury did not consider.

As to payments from the Expense Fund, the Court should direct the remainder of it to investors. Defendants are not entitled to any further distributions from the Expense Fund as a matter of both law and equity. As a matter of law, their own contracts prohibit any recovery of

---

[1]     Plaintiff reserves its right to respond to any renewed motion made by Defendants for indemnification. In light of Defendants' prior submissions, and the subsequent Jury verdict, Plaintiff is unable to anticipate the basis on which Defendants would seek indemnification, and in what allocation or amounts.

management fees or additional expenses.  Even if they did not, however, any monies owing to Defendants should be offset by Fund expenditures incurred because of their fraud.

And as a matter of equity, the Entity Defendants' claim to any Expense Fund money should be barred.  Two immutable principles should guide the Court's analysis here:  (1) RMCI and Resrv Partners committed fraud against Fund investors and did so with the highest degree of scienter; and (2) any money not distributed to RMCI and Resrv Partners from the Expense Fund will go to defrauded investors.  The Court has full authority under the Exchange Act and the Investment Company Act to decide that, as between RMCI or Resrv Partners and the investors, investors should recover first.

Finally, the Court has broad equitable discretion to fashion a remedies award that serves the goals of deterrence and punishment in deciding whether to order disgorgement and penalties and in what amounts.  Should the Court award RMCI or Resrv Partners any of the monies they claim under their respective agreements with the Fund, the Court should also order those amounts disgorged as ill-gotten gains.  But even if the Court awards them nothing, or determines that disgorgement should not be ordered, the Court should order substantial third-tier penalties against both Entity Defendants and first-tier penalties against Bent II.[2]  Finally, an injunction should be entered against RMCI's, Resrv Partners', and Bent II's further violations of the federal securities laws in light of the reasonable likelihood that such violations will recur if not enjoined.

---

[2]     If penalties are awarded, the staff will seek Commission authorization for a Fair Fund, from which (if approved by the Court pursuant to Section 308(a) of the Sarbanes-Oxley Act of 2002, 15 U.S.C. § 7246(a)), the penalties can be returned to investors.

## ARGUMENT

**I.     The SEC Is Entitled to Judgment as a Matter of Law Against RMCI and Resrv Partners on Its Claims Under Section 10(b) and Rule 10b-5 of the Exchange Act**

Under Fed. R. Civ. P. 50(b), the Court should grant judgment as a matter of law to the Commission on its Section 10(b) and Rule 10b-5 claims against both RMCI and Resrv Partners (the "Entity Defendants").  In finding that both entities violated Sections 17(a)(2) or (3) of the Securities Act with scienter, the Jury necessarily also found that the SEC satisfied each element of 10(b) save that Entity Defendants' fraud was "in connection with the purchase" of a security.  However – under this Circuit's law and the Court's instruction to the Jury on that element – there is no "legally sufficient evidentiary basis" to find that element unmet as there must be to survive a Rule 50(b) motion.  Voccola v. Gaudett, 861 F. Supp. 2d 52, 53-54 (D. Conn. 2012) (quoting Advance Pharm., Inc. v. United States, 391 F.3d 377, 390 (2d Cir. 2004)).  To the contrary, the only evidence adduced at trial shows that investors purchased into the Primary Fund during and after the time the statements for which the Jury found the Entity Defendants to be otherwise liable were communicated publicly.  See Logan v. Bennington College Corp., 72 F.3d 1017, 1022 (2d Cir. 1995) (A court should grant a Rule 50(b) motion where there is "such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [the movant].") (alterations in original and quotations omitted).

Alternatively, and under the lesser standard imposed by Rule 59, a new trial on the Commission's Exchange Act claims against the Entity Defendants is warranted.  Under Rule 59, "a less stringent standard applies to a motion for a new trial."  Katara v. D.E. Jones Commodities, Inc., 835 F.2d 966, 970 (2d Cir. 1987).  A new trial is warranted when the jury's verdict is "against the weight of the evidence."  Manley v. AmBase Corp., 337 F.3d 237, 245 (2d

3

Cir. 2003) (quotations omitted).  Unlike the standard under Rule 50(b), a new trial "may be

granted even if there is substantial evidence supporting the jury's verdict" and "a trial judge is

free to weigh the evidence himself, and need not view it in the light most favorable to the verdict

winner."  Id. at 244-45 (citation omitted).

A.      Overwhelming Evidence Supports Each Element of the SEC's 10(b) Claims
        Against the Entity Defendants

        The Jury found that the Entity Defendants violated Sections 17(a)(2) or (3) of the

Securities Act and that RMCI violated Investment Advisers Act Section 206(4) and Rule 206(4)-

8.  (DE 571, at 3, 5-6.)  The elements of Section 10(b) – that the Entity Defendants (i) made a

material misrepresentation or omission, or used a fraudulent device, (ii) with scienter, (iii) in

connection with the purchase or sale of a security – are "[e]ssentially the same" as those of

Section 17(a)(2) and (3).[3]  SEC v. Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999);

SEC v. First Jersey Secs., Inc., 101 F.3d 1450, 1467 (2d Cir. 1996); see also Tr.[4] at 3091:21-

3092:19 ("Numerous courts have held that the elements of Section 17(a) are essentially the same

as those under Section 10(b) and Rule 10b-5.") (citing cases); DE 393 (Defendants' Summary

Judgment Br.), at 17.  Those differences that do exist between the provisions – that 10(b)

requires (i) scienter, and (ii) the fraud be "in connection with the purchase or sale" of a security –

present no obstacle to liability under the Exchange Act here.

---

[3]      The relevant language of the anti-fraud provisions of Advisers Act Rule 206(4)-8 is also
virtually identical to that of Rule 10b-5, particularly in light of the Jury's finding that RMCI
violated Rule 206(4)-8 with scienter.  See SEC v. Rabinovich & Assoc., L.P., 07 Civ. 10547
(GEL), 2008 WL 4937360, at *4 (S.D.N.Y. Nov. 18, 2008) (Rule 206(4)-8 "prohibits investment
advisers from making false statements of material fact to any investor or prospective investor in
a pooled investment vehicle, or failing to state material facts necessary to make statements made
to such investors not misleading"); SEC v. Young, 09 Civ. 1634 (JRP), 2011 WL 1376045, at *7
(E.D. Pa. Apr. 12, 2011) (finding that 10(b) violation also establishes Rule 206(4)-8 violation).

[4]      All citations to "Tr." refer to the trial transcript in this case and are attached as Exhibit A
to the December 21, 2012 Declaration of Alexander J. Janghorbani ("Janghorbani Decl.").  All
reference to lettered exhibits are exhibits to the Janghorbani Decl.

First, the Jury explicitly found that the Entity Defendants acted with scienter in violating Sections 17(a)(2) and (3), 206(4), and Rule 206(4)-8.[5]  (DE 571, at 3, 5-6.)  Second, under the prevailing law, there can be no real question that the Entity Defendants' fraud was "in connection with the purchase" of securities.  That element merits a "broad interpretation." Merrill Lynch, Pierce, Fenner & Smith Inc. v. Dabit, 547 U.S. 71, 85 (2006); SEC v. Zandford, 535 U.S. 813, 819 (2002) (the statute, including the nexus requirement, "should be construed not technically and restrictively, but flexibly to effectuate its remedial purpose") (internal quotation marks omitted).  All that is needed to satisfy 10(b)'s nexus requirement is that the fraud "coincide" with *any* purchase.  Dabit, 547 U.S. at 85.  The Commission, thus, need only show "deception 'in connection with the purchase or sale of any security,' not deception of an identifiable purchaser or seller."  Id.  In other words, so long as "someone buy[s] or sell[s] the security during the period of allegedly fraudulent conduct," the element is satisfied.  (DE 565, at 9 (quoting 8 Louis Loss & Joel Seligman, Securities Regulation 3721 (3d ed. 2004).)

In holding the Entity Defendants liable for violating Sections 17(a)(2) or (3), the Jury necessarily found 10(b)'s requisite nexus between the fraud and a purchase.  Courts have long held that the required nexus between the fraud, on the one hand, and 10(b)'s "purchase" or 17(a)'s "offer," on the other, is identical.  The terms are used "interchangeably."  United States v. Naftalin, 441 U.S. 768, 773 n.4 (1979).[6]  If anything, 17(a) requires a closer link between the offer and the fraud than the link required under Section 10(b).[7]

---

[5]    As the Jury was instructed that scienter under the Exchange Act and the Securities Act claims mean the same thing – that a defendant "acted knowingly with intent to defraud or with reckless disregard for the truth" (compare DE 570 at 20 (defining scienter for Section 10(b)) with id. at 29 (scienter for Section 17(a)) – there can be no dispute that the Jury found the scienter requirement for the Commission's Exchange Act claims against the Entity Defendants satisfied.

[6]    See also SEC v. Czarnik, 10 Civ. 745 (PKC), 2010 WL 4860678, at *4 (S.D.N.Y. Nov. 29, 2010) (language of 17(a) is "virtually identical to the language in Section 10(b)" and "have

Here, the Court instructed the Jury that the SEC's 17(a), 206(4), and 10(b) claims were based on the exact same misstatements or otherwise fraudulent conduct.[8] Thus, whatever statements the Jury found were fraudulently made in violation of 17(a) and 206(4) were also made "in connection with" purchases into the Primary Fund as long as *any* purchase of Primary Fund shares was consummated during the fraud.  SEC v. Mannion, 789 F. Supp. 2d 1321, 1332-33 (N.D. Ga. 2011) (single purchase made after distribution of misleading disclosure, even if purchaser did not rely on it, was sufficient to establish "in connection with").

And even if the Jury had not made any finding concerning the nexus of the Entity Defendants' misrepresentations and their *offer* of securities, the uncontroverted evidence presented to the Jury requires a finding that Defendants' fraud was "in connection with" the *purchase* of Primary Fund shares.  Indeed, the Court instructed the Jury that "in connection with" was satisfied here because there were purchases during the period of allegedly fraudulent conduct:

> [T]he 'in connection with' aspect of this element is satisfied if you find that there was *some nexus* or relation between RMCI['s], [and] Resrv Partners['] . . . allegedly fraudulent conduct and the purchase of Primary Fund shares. This 'nexus' between the allegedly fraudulent

---

on occasion been used interchangeably"); SEC v. Johnson, 03 Civ. 177 (JPK), 2006 WL 2053379, at *4 (S.D.N.Y. July 24, 2006) (finding elements "are essentially identical" and noting that a jury finding of 10(b) liability "bound" the Court to find liability under Section 17(a)); SEC v. Norton, 95 Civ. 4451 (SHS), 1997 WL 611556, at *3 n.1 (S.D.N.Y. Oct. 3, 1997) (same).

[7]   Naftalin, 441 U.S. at 773 n.4 ("we are not necessarily persuaded that 'in' is narrower than 'in connection with'") (emphasis added); Chemical Bank v. Arthur Andersen & Co., 726 F.2d 930, 944-45 (2d Cir. 1984) (noting that "[t]he standard for connection imposed by § 17(a) of the 1933 Act is at least as high as that of § 10(b) and Rule 10b-5 . . . .") (emphasis added); Klamberg v. Roth, 473 F. Supp. 544, 556 (S.D.N.Y. 1979) (discussing Naftalin and finding 17(a)'s nexus requirement to be more rigorous than 10(b)'s).

[8]   See DE 570, at 27 ("For purposes of its Section 17(a) claim, the SEC is relying on the same alleged misstatements or omissions that I read to you in discussing the SEC's Section 10(b) and Rule 10b-5 claims"); id. at 35 (instructing Jury that SEC relied on same misstatements for RMCI's violation of 206(4)).  In other words, that the Entity Defendants committed fraud, either by misleading the investing public, through the 1:19 email, Insights, or Talking Points, as to RMCI's willingness to protect the $1 NAV or Ledford's lies to Moody's.  (Id. at 15.)

6

> conduct and a purchase may be satisfied where someone bought
> Primary Fund shares during the period of allegedly fraudulent conduct.
> *It is undisputed here that purchases of Primary Fund shares were*
> *made during the period of allegedly fraudulent conduct -- that is, on*
> *September 15 and 16, 2008.*

(DE 570, at 18 (emphasis added).)  That "undisputed" fact was presented to the Jury through

Defendants' own documents and witnesses, which demonstrate that at least 62 investors

purchased over $1 billion in Primary Fund shares while the Defendants were disseminating their

message of the support. (DX 184, Tab Non-Mechanical (Primary Fund purchases from

September 15, 2008 at 1:26 p.m. through September 16, 2008 at 3:56 p.m.).)  According to

Defendants' own testimony, supplied by the Reserve's Director of Operations, at least six of

these investors received one or both messages and subsequently purchased Fund shares.  (Tr.

965:20-25.)  Defendants submitted no evidence to contradict the existence or timing of these

purchases.  Thus, no legally cognizable basis exists for the Entity Defendants to have violated

the Securities Act's and Advisers Act's antifraud provisions with scienter but not Section 10(b).

To require more than a showing that Defendants' false statements were conveyed to

investors, who then purchased securities, would require that the Commission prove reliance,

something it manifestly need not do.[9]  Indeed, this Court already explicitly rejected exactly this

argument. (DE 557, Oct. 2 Order, at 2 ("In sum, it is irrelevant whether investors relied on the

---

[9]    See, e.g., SEC v. N. Am. Research  & Dev. Corp, 424 F.2d 63, 84 (2d Cir. 1970)
("reliance is immaterial because it is not an element of fraudulent representation under Rule 10b-
5 in the context of an SEC proceeding against a broker, whether disciplinary . . . or injunctive");
SEC v. Gruss, 859 F. Supp. 2d 563, 670 (S.D.N.Y. 2012) ("the SEC does not need to prove
reliance on the investment adviser's misleading statements, nor does the SEC need to prove
injury") (citation and quotation marks omitted); see also SEC v. Morgan Keegan & Co., 678
F.3d 1233, 1244 (11th Cir. 2012) ("[j]ustifiable reliance," . . . is not an element of an SEC
enforcement action because Congress designated the SEC as the primary enforcer of the
securities laws"); Mannion, 789 F. Supp. 2d at 1332 (SEC is not required to demonstrate that an
investor ever read the allegedly false statement because "the SEC does not have to prove that the
investor actually relied on the inflated NAVs").

Defendants' statements, or whether any such reliance would have been reasonable.").)

The Court should, therefore, find that the Entity Defendants' fraud was "in connection with" the more than $1 billion in securities that were purchased during the fraud and enter judgment against the Entity Defendants for violating Section 10(b) and Rule 10b-5. In the alternative, the Court should grant the Commission a new trial against the Entity Defendants on its 10(b) claims because, without any evidence to contradict the "in connection with" element, the Jury's verdict on those claims is a "seriously erroneous result" that is "against the weight of evidence." Manley, 337 F.3d at 245.

B.    **The SEC Is Entitled to a New Trial Against Bent Sr. and Bent II on Certain Exchange Act Claims that the Jury Never Reached**

Because the Jury erroneously found the Entity Defendants' fraud was not "in connection with" the purchase of securities, it (properly) did not reach the questions of whether (i) Bent Sr. or Bent II violated the control person provision of Exchange Act Section 20(a); and (ii) Bent II aided and abetted the Entity Defendants' fraud under Exchange Act Section 20(e).[10]  Thus, the Jury did not consider the elements of those charges. Therefore, the Commission also is entitled to a new trial on its secondary liability claims under Section 20(a) (against both Bents) and Section 20(e) (against Bent II).

II.    **RMCI and Resrv Partners Are Entitled to No Recovery from the Expense Fund Under Their Respective Agreements with the Primary Fund.**

A.    RMCI Is Entitled to No Management Fees Under Its Comprehensive Management Agreement

RMCI is not entitled to any management fees under its comprehensive management agreement with the Primary Fund (the "Management Agreement") (PX 81). The Management

---

[10]    DE 571, at 1-2 (instructing Jury not to consider either Bent's liability as a control person or aider and abettor unless it first found that the Entity Defendants violated Section 10(b)).

Agreement obligates RMCI to conduct itself in compliance "with the requirements of the . . . Investment Advisers Act of 1940," and "at all times conform to the provisions of. . . any other applicable provisions of state or Federal law." (PX 81 ¶ 4.)  The Jury's verdict that RMCI either knowingly or recklessly violated Section 17(a)(2) or (3) of the Securities Act and Advisers Act Section 206(4) and Rule 206(4)-8 establishes that RMCI did not fulfill those obligations. Therefore, RMCI breached the Management Agreement and is entitled to no compensation.

Second, RMCI is not entitled to any compensation for managing money that was unwillingly trapped in the Fund after it collapsed.  The Primary Fund agreed to pay RMCI comprehensive fees "equal to a percentage of the average daily net assets attributable to each class of the [Fund's] shares set forth in Schedule B." (PX 81, Management Agreement ¶ 3.)[11] "Net assets" is not defined in the Management Agreement.  But testimony at trial made clear that "net assets" are those shares that remain unredeemed in the Fund, and do not include those that were redeemed (even if unpaid).  Patrick Farrell, Chief Financial Officer of the Fund, testified that redeemed amounts became liabilities of the Fund, whether funded or not, and would be subtracted when calculating the "net assets" of the Fund.  (Tr. 308:6-12.)  Farrell's testimony is supported by the Reserve's contemporaneous records, which reflect a net asset value that exclude redeemed shares regardless of whether those redeemers were timely paid.[12]  If the redeemed shares are liabilities of the Fund, they cannot also be part of any "net asset" determination. Furthermore, investors did not "earn dividends on the day a redemption is processed, regardless of the time the order is received" (Ex. O, Primary Fund Prospectus and supplements thereto, at 5), which further clarifies the Reserve's own treatment of redeemed shares as no longer part of

---

[11]     That Schedule assigns differing percentages owing on each class of the Fund's shares.

[12]     See PX 265 (press release announcing that valuing Lehman assets at "zero" moved the Primary Fund's NAV to 97 cents per share, a number that necessarily accounted for many more redemptions than the approximately 10 billion that were funded on September 15).

the Primary Fund.

A definition of net assets that subtracts redeemed shares is also consistent with the arrangement memorialized in the Management Agreement and Prospectus.  RMCI was retained by the Fund, including the Trustees acting on behalf of its investors, to manage investors' money, and RMCI was to be paid by those same investors for the investment management services they provided.  A redeeming investor necessarily determined not to have RMCI manage those funds.  Investors should not be forced to pay for the management services they had acted to cut off.

Once redeemed (but unpaid) shares are subtracted from the assets of the Fund, RMCI's management fees for the period it seeks them would amount to approximately $5 million.[13] RMCI has already received $6.5 million as an advance on their claimed fees. (DE 241-2 at 51 of 77 (Defendants' chart of claimed management and 12b-1 fees allegedly owed through September 9, 2009).)  Accordingly, RMCI is due nothing more and, indeed, should be ordered to refund the $1.5 million over-payment it has already received.

B.  Resrv Partners Is Entitled to No 12b-1 Fees Under the Distribution Agreement

Defendants also have sought 12b-1 fees under the Distribution Agreement (PX 56) between the Primary Fund and Resrv Partners for the period from September 15, 2008 through February 2009. (DE 240, RMCI Management Fee Br. at 4.)[14]  The Distribution Agreement

---

[13]    The Commission has had no discovery on these amounts, but takes this number from the amount calculated by the Trustees' consultant, Cornerstone.  (See Ex. B (Letter to the Court of Mark Holland, Counsel to the Independent Trustees, dated January 25, 2010) at 5 n.3.)  This amount includes expenses incurred by RMCI.  As Defendants have framed it, the Management Agreement provides for all of RMCI's compensation – expenses plus profit.

[14]    In Defendants' original submission on this issue, they mistakenly referred to the Distribution Agreement as one between RMCI and the Fund and sought payment for the fees under that Agreement for RMCI.  (See DE 240, Application of Reserve Management Company, Inc. for Payment of Management Fees, Rule 12B-1 Fees, and Certain Expenses Related to Work

subjects Resrv Partners to many of the same compliance with law obligations to which the

Management Agreement subjects RMCI.  (PX 56, ¶ 8(a).)  Thus, because the Jury found that

Resrv Partners recklessly or intentionally violated the Securities Act, Resrv Partners breached

the Distribution Agreement and is entitled to nothing.

C.    Millions of Dollars in Fund and Trustee Expenses Are Recoverable from RMCI and
      Resrv Partners and Should Be Withheld or Off-Set Against Any Payments to RMCI or
      Resrv Partners out of the Expense Fund

But for RMCI's fraud, the Fund would not have incurred many of the $16 million in

expenses it did from September 15, 2008 through November 23, 2010, all of which were paid

with investor funds.  (Ex. C (DX 232).)  That money is now recoupable by the Fund, either by

direct demand by the Fund's Trustees from RMCI and Resrv Partners or by offset from any

amounts payable to the Entity Defendants from the Expense Fund.

While the Trustees are in the best position to know what expenses the Fund incurred as a

result of the Entity Defendants' fraud, and the Commission has had no discovery of the details of

those expenses, certain of them listed on DX 232 are clearly the direct result of RMCI's and

Resrv Partners' fraud.  For example, according to DX 232, the Fund paid Willkie Farr over $7

million to defend litigation against the Fund and Trustees.  Those efforts included numerous

removal petitions and significant briefing of the subsequent remand motions.  None of those

efforts would have been necessary but for RMCI's and Resrv Partners' fraud.

In addition, had there been no fraud, as soon as sufficient Fund assets were liquidated, the

Trustees and the Fund would have paid off all $1 confirm holders in the order that their

redemption requests had been received, and without regard to the effect of those pay-outs on

---

Done for the Reserve Primary Fund from September 15, 2008 to September 9, 2009, dated
January 11, 2010 ("RMCI Management Fee Br.") at 4.)  But the Distribution Agreement is
between Resrv Partners and the Fund. (PX 56 at 1.)

non- or late-redeemers.[15] That is what both the Fund's prospectus and the Investment Company

Act required the Fund to do. (Ex. O (Primary Fund prospectus and supplements thereto, at 5,

and Investment Company Act § 22 and Rule 22c-1.) Thus, on October 30, 2008, when the Fund

had accumulated $26 billion from liquidation of its holdings, it would have used those amounts

to pay off nearly all of the pre-break the buck redemptions.

But that is not what the Trustees did. Because of the claims of fraud – that RMCI's false

statements of credit support dissuaded holders from placing redemption orders that they might

otherwise have submitted – the Trustees recognized that to honor the early redeemers'

redemption orders would prejudice the late-redeemers' asserted right to recovery under their

fraud theory.[16] The Plan of Liquidation explained:

> Litigation has been commenced against the Fund . . . asserting or
> challenging the entitlement of investors to $1.00 per share and making
> certain other claims. Without debating the merits of any claim at this
> point, the Board considers it important to provide liquidity to investors
> without prejudicing the legal rights and remedies, if any, of any
> Distributee's claims. Consequently, the approach adopted in this Plan
> is to make interim payments . . . to Distributees Pro Rata. . . out of
> Fund assets up to the amount of a special reserve, which would include
> amounts that would be required to satisfy disputed claims.

---

[15]  According to the Fund's December 3, 2008 Plan of Liquidation, 21.1 billion shares
redeemed at $1.00 per share by 11:00 a.m. on September 16, 2008 remained unpaid. (Ex. E
(Dec. 3, 2008 Primary Fund Plan of Liquidation).). As of the first distribution date, October 30,
2008, the Fund had $26 billion in cash to distribute. (Ex. D (Oct. 30, 2008 Reserve Release).)

[16]  The earliest of these claims of September 15 and 16 fraud was the class action captioned
Third Avenue Institutional International Value Fund L.P. v. The Reserve Fund, No. 08 Civ. 8103
(PGG) (S.D.N.Y.), filed September 19, 2008. There, the lead Plaintiff alleged that "[i]n an effort
to stem the tide of redemption requests from the Fund and prevent a 'run on the bank' scenario,
Defendants issued a press release on September 15th" that "promise[d] that the Primary Fund
would not 'break the buck' and report [a] NAV of less than $1[,] reassur[ing] Plaintiff and other
members of the Class, who did not seek immediate redemption of their shares." Ex. F (Third
Avenue Complaint ¶ 6). As relief, the Third Avenue Lead Plaintiff sought to enjoin "Defendants
from making any redemption payments in excess of $0.95 per share until such time as
Defendants have appropriately recalculated the value of all redemption requests in a manner
consistent with their contractual obligations under the Fund Prospectus and their fiduciary duties
. . . ." Id., (Third Avenue Complaint Prayer for Relief ¶ (c)).

(Ex. E (Plan of Liquidation).)  Accordingly, the Trustees decided to pay out the $26 billion to all investors – redeemers, early or late, and non-redeemers – on a pro rata basis.

The Trustees' response to the fraud claims – to withhold full satisfaction of early redeemers' claims to preserve the fraud claimants' right to recovery – engendered myriad lawsuits by investors holding $1 confirms.  In their lawsuits, early redeemers claimed the Fund breached its contractual and statutory obligations to pay them the amounts they had redeemed.[17] Those suits required the Fund's and Trustees' response,[18] which cost money that the Entity Defendants, found liable for the fraud, should bear, not innocent investors.

In pursuit of their fiduciary duties to the Fund and its investors, we expect that the Trustees will make their own careful examination of the costs and fees they incurred on behalf of the Fund to address matters made necessary by RMCI's and Resrv's fraud.  For example, they

---

[17]     The first of those lawsuits appears to be Safeco Ins. Co. of Am. v. The Reserve Fund, Civ. No. 08-4776 (Mass. Superior Ct., Suffolk Cty.), filed October 27, 2008, and removed to the District Court for the District of Massachusetts on November 12, 2008 (No. 08-CV-11885), then conditionally transferred for pretrial purposes to this Court by the MDL panel on February 11, 2009 and assigned docket number 09-CV-1287.  The rest were BNP Paribas Secs. Corp. v. The Reserve Fund, No. 09-CV-5997 (S.D.N.Y.); Banc of Am. Secs. LLC v. The Reserve Fund, No. 08-CV-11204 (S.D.N.Y.); CELLCO Partnership v. The Reserve Fund, No. 09-CV-2300 (S.D.N.Y.); Clark Enterprises, Inc. v. The Reserve, No. 08-CV-9387 (S.D.N.Y.); Colorado Surplus Asset Fund Trust v. The Reserve Fund, No. 09-CV-5442 (S.D.N.Y.); Deutsche Bank Secs. Inc. v. The Reserve Fund, No. 09-CV-2379 (S.D.N.Y.); E*Trade Fin. Corp. v. The Reserve Fund, No. 09-CV-2378 (S.D.N.Y.); Nissan N. Am., Inc. v. The Reserve Fund, No. 09-CV-4290 (S.D.N.Y.); PG&E Corp. v. The Reserve Fund, No. 09-CV-0892 (S.D.N.Y.); Time Warner Inc. v. The Reserve Fund, No. 09 Civ. 4310 (S.D.N.Y.); Verisign, Inc. v. The Reserver Fund, No. 09-CV-2663 (S.D.N.Y.); Visa USA, Inc. v. The Reserve Fund, No. 09-CV-4331 (S.D.N.Y.); and Wal-Mart Stores, Inc. v. The Reserve Fund, No. 09-CV-1048 (S.D.N.Y.).  Most of these cases were filed in state court and reached various stages of litigation before they were removed by Defendants, and seven (Univision, Banc of America, Wal-Mart, Safeco, CELLCO, E*Trade and Deutsche Bank) were the later subjects of remand motions and the remand order of this Court issued after a hearing.  See Order, dated September 30, 2009 (DE 83 in 09-MD-2011).

[18]     "The Board, together with outside advisors, has begun the process of estimating the amount to be initially set aside for the special reserve."  Ex. G (Dec. 24, 2008 Reserve Release), at 1).

know whether amounts paid to other local counsel related to redeemer actions that were precipitated by the fraud allegations.[19]  Similarly, they know how much of the work performed by other Fund consultants related to the fraud, e.g., Compass Lexicon ($551,388), Ignited Discovery ($35,042), Joseph Monagle ($595,416 and, for his counsel, $83,711).  They are best situated to determine how much and which of these costs are attributable to the fraud, and which are not.  Should they fail to do so, however, the Court should require a full accounting of all costs and expenses incurred by the Fund to determine what amounts should be offset against any monies paid to RMCI or Resrv for expenses.  This was, after all, investor money that was spent and if its origins were RMCI's or Resrv Partners' fraud it should be returned to investors.

**III.**  **As Between Innocent, Harmed Investors, and Adjudged Fraudsters, RMCI and Resrv Partners, the Court Should Exercise the Equitable Powers Congress Explicitly Granted It to Deny RMCI and Resrv Partners Any Recovery and to Direct Distribution to Investors**

Both the Investment Company Act and the Exchange Act grant the Court the authority to award RMCI and Resrv Partners nothing in exercise of its power to act for the benefit of investors.  Section 25(c) of the Investment Company Act provides that "[a]ny district court . . . is authorized to enjoin the consummation of any plan of reorganization . . . if such court shall

---

[19]    And they know which costs were incurred to defend against which claims of fraud.  Some portion of the defense costs picked up by the Fund were undoubtedly attributable to defending the Fund and Trustees against the class complaints that alleged fraud other than that now established in this case.  (E.g., Dyer v. The Reserve Fund, No. 08-CV-8139 (S.D.N.Y.) (DE 1) (complaint alleging misstatements and omission in the Fund's registration statement, among other public statements, regarding its safety and conservative investment objectives.)  But, in terms of sheer numbers, those complaints (10) are dwarfed by the number of actions both class (like Third Avenue) and non-class (like First Data Corp. v. The Reserve Fund, No. 09 Civ. 1457 (S.D.N.Y.), totaling 6 separate actions), that alleged the same fraud as found by the Jury in the instant case, and those actions filed by early redeemers demanding full payment of their confirmed redemptions that were necessitated by the Trustees' decision to preserve the fraud claimants' recovery rights (at least 17).  In any event, by January 2010, all of the class claims included allegations mirroring those asserted by the Commission.  See Consolidated Class Complaint, filed January 5, 2010 in In re the Reserve Primary Fund Secs. & Deriv. Class Action Litig., No. 08 Civ. 8060 (PGG) (S.D.N.Y.), ¶¶ 10, 124-154, 160- 167.

determine that any such plan is not fair and equitable to all security holders." Section 21(d)(5) of the Exchange Act allows "the Commission [to] seek, and any Federal court [to] grant, any equitable relief that may be appropriate or necessary for the benefit of investors."[20]  Where the choice is directing those remaining funds to blameless investors or adjudged fraudsters, the Court's equitable discretion should be exercised in favor of investors.

In ordering a pro rata distribution of Primary Fund assets to all investors, this Court recognized that "when funds are limited, hard choices must be made." (DE 201, at 20 (quoting Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC, 467 F.3d 73, 84 (2d Cir. 2006).)  Thus, when the Court ordered the pro rata distribution, it necessarily denied the claims of the early redeemers to a $1 per share recovery.  The Court reasoned that distinctions among investors was made impossible by the allegations that (i) some investors were induced to stay invested by RMCI's fraud; and (ii) the Board made NAV determinations on inaccurate or incomplete information.  (DE 201, at 20-25.)  Thus, as a direct result of RMCI's fraudulent conduct, the Court could make no legitimate distinctions among investors and concluded that it was more equitable to force the early unpaid redeemers – all $28 billion worth of shares (DE 201, at 12.) – to take less than the amounts printed on their confirms and suffer a loss so that all investors could be treated fairly.

But if deciding among competing blameless investors was a hard choice, choosing between investors and two entities the Jury found to have defrauded those investors should not

---

[20]     The Court enjoined the Trustees' Plan of Liquidation and asserted jurisdiction over the Primary Fund's assets pursuant to the Court's authority under Section 25(c) of the Investment Company Act and Section 21(d)(5) of the Exchange Act.  (DE 202, Order, entered November 25, 2009 ¶¶ 1, 2.)  As part of that Order, the Court determined that the remaining assets of the Primary Fund would be distributed to all investors on a pro rata basis, minus any amounts that the Court approved to be paid to claimants, such as RMCI and Resrv Partners, out of the Expense Fund.  (Id. ¶¶ 2, 5(c).)  Thus, whatever amounts the Court does not pay out to RMCI and Resrv Partners will be paid to investors.

be.  Under traditional equity principles that inform courts' disgorgement analysis, the Court

should recognize that investors' equitable claims to recovery from the Expense Fund are far

superior to any claim the Reserve Entities may have.

**IV.    Any Amounts Awarded to RMCI or Resrv Partners Should Be Disgorged as Ill-Gotten Gains**

RMCI has submitted claims to the Expense Fund for $8 million in profits and $15 million

in unpaid, but allegedly owing, broker expenses (or "revenue sharing payments"), apparently

payable to Resrv Partners under its Distribution Agreement with the Fund.  (Ex. P (July 15, 2010

Report of Charles Lundelius, submitted on Summary Judgment by Defendants as Exhibit 5-B), at

21; Ex. H (KPMG Report, at 8);[21] id. (December 6, 2010 Letter to the Court of Mark Holland, at

3-4).)[22]  All of that, if awarded to RMCI or Resrv Partners, would be ill-gotten gains to them

causally connected to their fraud and should be disgorged if paid.  If the Court awards any

interest on those amounts, that interest should be recouped, too.

"The effective enforcement of the federal securities laws requires that the SEC be able to

make violations unprofitable. The deterrent effect of an SEC enforcement action would be

greatly undermined if securities law violators were not required to disgorge illicit profits." SEC

v. Manor Nursing Ctrs., Inc., 458 F.2d 1082, 1104 (2d Cir.1972).  The amount of disgorgement

"should include all gains flowing from illegal activities, plus prejudgment interest, and 'need

---

[21]    KPMG prepared an analysis of the Entity Defendants' claims for expenses from
September 15, 2008 through August 31, 2010, pursuant to the Court's Order, entered September
27, 2010 (DE 160).  That Report, dated December 6, 2010 (the "KPMG Report"), was submitted
to the Court as an enclosure to the Letter to the Court of Mark Holland, dated December 6, 2010.

[22]    See also DE 240, Management Fee Br., at 2 (putting the total management fees and Rule
12b-1 fees due and owing for that period at $27,271,406.09, the same number cited in Lundelius'
July Report at 21 (Ex. P).)  Defendants originally called the $15 million an "out of pocket
expense," but when forced to admit that none of the brokers had made a claim for any of that
amount and that Defendants had therefore not paid any of it, Defendants reclassified the $15
million as monies due them under the Management Agreement.  (See Ex. I (Dec. 14, 2010 Letter
to the Court of John Dellaportas), at 4).)

only be a reasonable approximation of profits causally connected to the violation.'" <u>SEC v.</u>
<u>Pentagon Capital Mgmt, PLC</u>, 844 F. Supp. 2d 377, 425 (S.D.N.Y. 2012) (quotations omitted).
Causality under the securities laws is determined by a "but for" analysis. <u>SEC v. DiBella</u>, 587
F.3d 553, 572 (2d Cir. 2009) ("Had Silvester not chosen to invest Fund assets with Thayer,
[defendants] would not have been paid the fee at issue.")

Here, "a reasonable approximation of profit causally connected to the violation" includes
all of the $23 million RMCI estimates as its profits on the amounts due it under the Management
Agreement. <u>Pentagon Capital</u>, 844 F. Supp. 2d at 425 (the Commission need only offer a
"reasonable approximation of profits causally connected to the violation") (citing <u>First Jersey</u>
<u>Secs.</u>, 101 F.3d at 1475). But for the Entity Defendants' fraud, there would have been an orderly
liquidation of Fund assets in a much shorter period of time, leaving no assets to manage.

First, as a result of the fraud, the Fund was forced to hold back $3.5 billion to address
potential litigation that otherwise could have been distributed more promptly to investors. (DE
201, at 9-10.) Second, had RMCI and Resrv Partners not issued their misleading statements to
investors, and had RMCI fully disclosed to the Board and investing public the true state of affairs
the Primary Fund then faced and the Bents own limited resources, the Trustees might well have
voted to liquidate the Fund on the afternoon of the 15th. In overseeing that liquidation, the
Trustees might well have determined that there was little reason to take their time to "maximize
the potential return to investors" that apparently led RMCI to delay selling Fund securities. (DE
267, RMCI Reply in Support of Fee and Expense Application, at 6.) In an orderly liquidation,
uncomplicated by investor claims of fraud that necessitated a $3.5 billion reserve while
competing claims were litigated, and where the Fund had already suffered a hit to its NAV, the
Trustees would have recognized that an early return of cash to investors would have served them

17

better.  But where the fraud claims meant that investors were not likely to receive their full share of the NAV any time soon, and a reserve was required to address the competing claims, RMCI had every incentive to hold onto as many assets as possible and the Trustees had no basis to force their liquidation.

This approximation of Defendants' disgorgement necessarily recognizes that "when calculating disgorgement . . . 'separating legal from illegal profits exactly may at times be a near-impossible task.'"  Pentagon Capital, 844 F. Supp. 2d at 425 (quoting SEC v. First City Fin. Corp., 890 F.2d 1215, 1231 (D.C. Cir. 1989)).  But, as courts in this Circuit have long found, "'any risk of uncertainty should fall on the wrongdoer whose illegal conduct created that uncertainty.'"  Id. (quoting SEC v. Warde, 151 F.3d 42, 50 (2d Cir. 1998)).

Once the Commission comes forward with a reasonable approximation of a defendant's ill-gotten gains, the burden shifts to the defendant to demonstrate that it is not.  In this case, because the Commission uses RMCI's own calculation of profit, RMCI cannot argue that it does not reasonably approximate what RMCI would gain if awarded those amounts.  And if RMCI chooses to argue that that sum is not causally connected to its fraud, it bears the burden to demonstrate a "clear break in or considerable attenuation of the causal connection."  First City Fin. Corp., 890 F.2d at 1232.

A defendant's burden to demonstrate that clear break in causation is not satisfied by speculation of what might have happened had he complied with the law.  The Second Circuit rejects defendants' mere posturing of hypothetical outcomes.  For example, in SEC v. Patel, 61 F.3d 137, 140 (2d Cir. 1995), the Court denied an appeal from an insider trader who sought to overturn a disgorgement order of losses avoided calculated as the difference between his sale price and the price of the stock after the inside information was revealed.  In doing so, the Court

affirmed the District Court's discretion to reject defendant's arguments about other factors that might have pushed the stock price lower and lessened losses he avoided that were attributable to the nonpublic information. Id. And in SEC v. Lorin, 76 F.3d 458, 462 (2d Cir. 1996), the Court affirmed the District Court's disgorgement order in a pump and dump case where the Commission based its figure solely on the profits defendants earned and even though it had presented no evidence of the fair value of those securities prior to the inflationary fraudulent conduct.

A recent case involving disgorgement for an Exchange Act Section 13(d) violation is also instructive. In SEC v. Teo, No. 04 Civ. 1815, 2011 WL 4074085 (D.N.J. Sept. 12, 2011), defendants were found liable for failing to file the appropriate Section 13(d) filings required when a shareholder acquires more than 5% of an issuers outstanding securities. Id. at *2. On its post-trial motion for disgorgement, the Commission argued that defendants' disgorgement should be measured by the difference between the price they paid for their shares and the price at which they sold them. Id. at *5. Defendants argued that the Commission's figure was not causally related to their violations because "the SEC did not prove 'that the 13(d) violations found by the jury had any effect on the price of [the issuer's] stock." Id. at *6. The Court rejected the defendants' invitation to speculate about what might have happened had the defendants properly disclosed their stock ownership:

> This Court cannot speculate as to how disclosure would have affected the market for Musicland stock or the poison pill, and thus the value of Teo's shares. Several scenarios are possible: nothing could have happened, the poison pill could have been activated causing the shares to be diluted, or Teo could have been forced to sell his shares in order to lower his percentage of ownership. This court also cannot speculate as to the effect the disclosure would have had on the prices of shares. As stated above, any uncertainty must be resolved against the wrongdoer.

19

Id. at *6.  This approach accords with the very purpose of disgorgement – to keep wrongdoers

from benefiting from the fruits of their frauds – by denying them the benefit of the doubt in a

"but for" examination.[23]

### V.    Bent II Should Be Required to Disgorge Any Amounts Paid to Him as Salary if Reimbursed from the Expense Fund

As part of their expense application (as opposed to their Management Fees application),

Defendants have claimed the right to "reimbursement" for the $3 million paid to each of the

Bents from September 15, 2008 to August 31, 2010.  (Ex. H (KPMG Report at 13).)  Any

amounts paid out of the Expense Fund to Bent II are recoverable as disgorgement.

Through his conduct on September 15 and 16, Bent II prolonged the duration of the Fund

and manufactured the need for his continued employment and, therefore, his salary.  Such

amounts paid to him are therefore properly recoverable as disgorgement.[24]  According to the

KPMG Report, Bent II earned approximately $1 million from his Primary Fund activities during

---

[23]    See First City, 890 F.2d at 1232 (examining defendants' hypothetical outcomes had it
complied with disclosure obligations and concluding that "appellants' efforts to hypothesize both
the takeover efforts of a First City that complied with section 13(d) and the market reaction to
that are impossibly speculative."); SEC v. Lawton, No. 09 Civ. 368, 2011 WL 494888, at *4 (D.
Minn. Feb. 7, 2011), aff'd, 449 F. App'x 555 (8th Cir. 2012) (in rejecting defendant's argument
that monies earned derived from lawful trading of client's accounts, court held it was impossible
to determine what portion of client's money would have been left in accounts to trade had
defendant made proper disclosures, and disgorgement of all of those earnings was appropriate).

[24]    SEC v. Posner, 16 F.3d 520, 522 (2d Cir. 1994) (ordering disgorgement of all income
earned as officers and directors of company over which they fraudulently obtained control,
finding that "but for their illegal conduct," defendants would never have gained control of
company and would not have been entitled to any of the compensation paid to them); see also
SEC v. First Pac. Bancorp., 142 F.3d 1186, 1192 (9th Cir. 1998) (affirming disgorgement of
defendant's salary where defendant's fraud extended the bank's life, thereby allowing him to
continue drawing a salary); SEC v. Black, No. 04 Civ. 7377, 2012 WL 4856196, at *3 (N.D. Ill.
Oct. 9, 2012) (noting that officer's compensation after time when he should have made proper
disclosures were ill-gotten gains on grounds that, had he made proper disclosures, corporation
would have terminated him); SEC v. Church Extension of Church of Church, Inc., 429 F. Supp.
2d 1045, 1050-51 (S.D. Ind. 2005) (requiring disgorgement of half of defendants' salaries in
final year of employment on theory that "[b]ut for the securities violations," company would
have collapsed earlier, "so violations enabled the defendants to continue their employment").

the period September 15, 2008 through August 31, 2010.  (Ex. H (KPMG Report at 13,

Observation No. 2).)  Any amounts otherwise deemed payable to RMCI from the Expense Fund

that include reimbursement for his salary should be deducted prior to payment to it.

## VI.     RMCI and Resrv Partners Are Deserving of Substantial Third Tier Penalties

Regardless of the amounts, if any, that the Court awards in disgorgement, the Court

should impose substantial third tier penalties on RMCI and Resrv Partners.

Penalties under the Remedies Act are designed to achieve two goals:  punishment of the

violator and deterrence of future violations.  In enacting the statute, Congress recognized that the

remedy of disgorgement was deficient in serving those goals because it merely returns a

violating defendant to his pre-violation position and insufficiently deters the violating conduct,

whether by that defendant or others:

> Currently, even a violator who is caught is required merely to give
> back his gains with interest, leaving him no worse off financially than
> if he had not violated the law.  The Committee therefore concluded
> that authority to seek or impose substantial money penalties, in
> addition to the disgorgement of profits, is necessary for the deterrence
> of securities law violations that otherwise may provide great financial
> returns to the violator.

SEC v. Coates, 137 F. Supp. 2d 413, 429 (S.D.N.Y. 2001) (quoting H.R. Rep. No. 101-616

(1990).)

Significant penalties serve the additional public policy goals of "encouraging investor

confidence, increasing the efficiency of financial markets, and promoting the stability of the

securities industry."  SEC v. Palmisano, 135 F.3d 860, 866 (2d Cir. 1998).  Thus, courts have

recognized the important role penalties play in promoting the creation of capital by ensuring the

integrity of the securities markets.

The Securities and Advisers Acts each provide for three tiers of possible penalties; the appropriate penalty tier depends on the nature of the violation. Thus, Section 20(d) of the Securities Act and Section 209(e) of the Advisers Act provide:

> (A) *First Tier*. The amount of the penalty shall be determined by the court in light of the facts and circumstances. For each violation, the amount of the penalty shall not exceed the greater of (i) $[6,500] for a natural person or $[65,000][25] for any other person, or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation.
>
> (B) *Second Tier*. Notwithstanding subparagraph (A), the amount of penalty for each such violation shall not exceed the greater of (i) $[65,000] for a natural person of $[325,000] for any other person, or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation, if the violation described in paragraph (1) involved fraud, deceit, manipulation or deliberage or reckless disregard of a regulatory requirement.
>
> (C) *Third Tier*. Notwithstanding subparagraphs (A) and (B), the amount of penalty for each such violation shall not exceed the greater of (i) $[130,000] for a natural person or $[650,000] for any other person, or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation, if –
>
> > (I) the violation described in paragraph (1) involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and
> >
> > (II) such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons.

A.     RMCI and Resrv Partners Are Subject to Third Tier Penalties

Because both RMCI and Resrv Partners were found liable for intentional or reckless fraudulent conduct that created a significant risk of substantial losses to other persons, each is subject to third tier penalties. First, the Jury explicitly found that both RMCI and Resrv Partners

---

[25]     The Debt Collection Improvement Act of 1996 requires agencies to adjust civil penalties for inflation every four years. Thus, dollar amounts provided here are adjusted statutory amounts for conduct committed between February 14, 2005 and March 3, 2009. See 17 CFR § 201.1003.

acted fraudulently with scienter. (DE 571, at 3, 5-6.)[26]  Second, hundreds of investors were
exposed to a risk of substantial loss.  According to the phone recordings produced by
Defendants, the institutional sales force repeated the false message of support in hundreds of
calls with investors after 1:19 p.m. on September 15, 2008.  (As a small sampling, of the 65
salesforce calls included on Plaintiff's Exhibit List alone, 32 reflect salesmen conveying the
message of support to separate investors (See Ex. R.).)  RMCI and Resrv Partners sent the
*Insights* piece to more than 200 institutional investors.  (PX 54-55; Exs. J-L.)  While there was
no evidence introduced as to how many investors saw the *Insights* while it was posted on the
Reserve's web site, it was posted for approximately three hours on the morning of September 16,
2008.  (Tr. 964:22-965:3 (admission of David Gareis, Reserve Director of Operations).)  The
message of support was similarly disseminated through at least one news outlet, CraneData.com,
and it was available to anyone who subscribed to that publication (Tr. 1250:2-5), including
existing or potential investors in the Primary Fund.  Finally, both Moody's and S&P received the
message of support.  Peter Rizzo of S&P testified that he did not issue a credit watch on or
downgrade the Primary Fund's "Triple A" rating in light of RMCI's assurances that it was
willing and able to provide credit support.  (Tr. 535:9-17.)[27]

    The message of credit support exposed investors to substantial loss in two ways:  (1)
those who failed to redeem their Primary Fund shares were exposed to a loss they could have
avoided if they had exchanged their Primary shares for the Reserve's Government Fund, or other
fund shares (Tr. 1551:24-1552:10); and (2) those who purchased new shares were exposed to a
loss they could have avoided by choosing to buy a different money market fund entirely. (Tr.

---

[26]     The Jury also found RMCI acted negligently in violating Advisers Act Section 206(2).

[27]     Investors testified that the Primary Fund's Triple A rating was material to their
investment decisions.  E.g., Alvino (Tr. 869:11-18); Reeg (Tr. 897:16-22); Torres (Tr. 1525:7-
13; 1527:10-16); Haussler (Tr. 1576:7-1577:13).

895:19-24.)[28]  Indeed, investors were not merely exposed to the risk of losing their investments

in the Primary Fund, but – because investors used the Fund as a corporate checking account –

also to the risk of higher borrowing and opportunity costs incurred to find replacement cash to

meet their obligations when the Reserve was unable to pay them back.  (See Tr. 1591:1-14

(Haussler testifying to his concern that absent another source to pay Paycor's clients, it "would

be a very disastrous thing for our business"); 1610:18-20 ("we, Paycor, used our company funds

to make up any difference").

       Courts have not hesitated to find that third tier penalties are warranted in similar

situations where the defendants' conduct created a risk of loss to investors, even without

evidence that any specific loss occurred.[29]  Nor should this Court.

---

[28]     The Court has already found that loss did in fact occur to some investors as a result of
Defendants' fraud.  In ordering a pro rata distribution, the Court denied a $1 recovery to
investors holding approximately $28 billion of Primary Fund shares who had submitted
redemptions prior to 3 p.m. on September 16, 2008, and who held $1 confirmations of those
redemption requests. (DE 201 at 12.)  Had there been no fraud, those investors would have
recovered $1 irrespective of the Fund's Lehman loss.  But because of Defendants' fraud, the
Court properly ruled pursuant to its equitable authority that Defendants' fraud made distinctions
among investors – between those who redeemed and those who were persuaded not to – unfair.
(DE 201, at 20-22.)  That those investors suffered an indisputable loss as a result of Defendants'
fraud supports the conclusion that investors were subjected to a risk of loss from Defendants'
misconduct.

[29]     E.g., SEC v. Metcalf, No. 11 Civ. 0493 (CM), 2012 WL 5519358, at *7 (S.D.N.Y. Nov.
13, 2012) ("market manipulation scheme created significant risk of substantial losses to other
persons"); SEC v. Elliott, No. 09 Civ. 7594 (KBF), 2012 WL 2161647, at *11 (S.D.N.Y. June
12, 2012) (sale of unregistered securities created risk of loss sufficient to warrant third tier
penalty even where no evidence of loss to any investor); SEC v. Lines, No. 07 Civ. 11387
(DLC), 2011 WL 3627695, at *2 (S.D.N.Y. Aug. 16, 2011) (defendant's misleading touts of the
value of stock while concealing his own financial interests artificially inflated trading and
"created risk of substantial losses to unwitting purchasers"); SEC v. Golden Apple Oil and Gas,
Inc., No. 09 Civ. 7580 (HB), 2011 WL 1432040, at *1 (S.D.N.Y. March 21, 2011) (risk of
substantial losses created by pump and dump scheme); SEC v. DiBella, No. 04 Civ. 1342 (EBB),
2008 WL 6965807, at *7 (D. Conn. March 13, 2008), aff'd, 587 F.3d 553 (2d Cir. 2009)
(defendant's involvement in bribery scheme created risk of loss to fund investors);  SEC v.
Ramoil Mgmt., Ltd., No. 01 Civ. 9057 (SC), 2007 WL 3146943, at *13 (S.D.N.Y. Oct. 25, 2007)
(finding that defendant's false filings created risk of loss because without them, stock would

B.     RMCI's and Resrv Partners' Repeated Violations Warrant Severe Penalties

In assessing penalties, the statute requires that the Court consider the facts and circumstances surrounding the conduct.  Factors that courts look at include:  "'"(1) the egregiousness of the violations at issue, (2) defendants' scienter, (3) the repeated nature of the violations, (4) defendants' failure to admit to their wrongdoing; (5) whether defendants' conduct created substantial losses or the risk of substantial losses to other persons; (6) defendants' lack of cooperation and honesty with authorities, if any; and (7) whether the penalty that would otherwise be appropriate should be reduced due to defendants' demonstrated current and future financial condition.'"  SEC v. Kapur, No. 11 Civ. 8094 (PAE), 2012 WL 5964389, at *6-7 (S.D.N.Y. Nov. 29, 2012) (quoting SEC v. Lybrand, 281 F. Supp. 2d 726, 729 (S.D.N.Y. 2003), aff'd sub nom. SEC v. Kern, 425 F.3d 143 (2d Cir. 2005)).

---

have been delisted a year earlier than it was); SEC v. Mandaci, 00 Civ. 6635 (LTS)(FM), 2004 WL 2153879, at *13 (S.D.N.Y. Sept. 27, 2004) (defendant's false stock touts created significant risk of loss); SEC v. Kane, No. 97 Civ. 2931 (CBM), 2003 WL 1741293, at *3 (S.D.N.Y. April 1, 2003) (third tier penalty imposed because defendant's misappropriation created risk of loss even though he made full restitution); SEC v. McCaskey, No. 98 Civ. 6153 (SWK)(AJP), 2002 WL 850001, at *13 (S.D.N.Y.  March 26, 2002) (defendants' market manipulation created significant risk of loss); accord SEC v. Global Express Capital Real Estate Inv. Fund, I, LLC, 289 F. App'x 183, 189 (9th Cir. 2008); SEC v. United Energy Partners, Inc., 88 F. App'x 744, 747 (5th Cir. 2004); SEC v. E. Delta Resources Corp., No. 10 Civ. 0310 (SJF), 2012 WL 3903478, at *9 (E.D.N.Y.  Aug. 31, 2012); SEC v. Jasper, No. 07 Civ. 6122, 2010 WL 8781211, at *11 (N.D. Cal. 2010) (defendants' conduct led to delisting by NASDAQ which created significant risk of loss); SEC v. Daly, 572 F. Supp. 2d 129, 133 (D.D.C. 2008) (rejecting defendant's argument that Commission must demonstrate loss suffered by investors, court orders penalties on finding that defendant's false accounting created significant risk of loss);  SEC v. Kenton Capital, Ltd., 69 F. Supp. 2d 1, 17 (D.D.C. 1998) (holding third tier penalties justified where investors were at risk of loss, but suffered none because of SEC's intervention); cf. VanCook v. SEC, 653 F.3d 130, 137, 144 (2d Cir. 2012) (affirming penalties imposed by Commission on defendant whose misconduct created significant risk of loss); compare SEC v. Pallais, No. 08 Civ. 08384 (GBD)(GWG), 2010 WL 5422531, at *4 (S.D.N.Y. Dec. 23, 2010) (awarding only a second tier penalty where SEC failed to show substantial loss ($7,057.20) and could not show risk of loss where it provided "no facts to demonstrate that either a large number of investor or investors with substantial funds were exposed to or could have been induced by Pallais's fraudulent press releases").

Those factors make imposition of the maximum penalty appropriate here. In a time of unprecedented market turmoil, when investors were – in Bent Sr.'s words – "desperate" to find a safe place for their cash (Tr. 823:20-824:1), RMCI and Resrv Partners misled them about the safety of a Primary Fund investment, and they did so intentionally or recklessly. Those acts were egregious and the Jury found that RMCI and Resrv Partners engaged in those acts with the highest levels of scienter. Neither RMCI nor Resrv Partners has ever admitted wrongdoing. Indeed, both seek a new trial of the Jury's verdicts against them, indicating that they are not yet ready to concede responsibility for any wrongdoing. (DE 616.) No Defendant has "cooperated" with the Commission. Throughout this litigation, Defendants have steadfastly maintained that their conduct arose from circumstances beyond their control – the financial crisis of 2008, their lawyers, or other employees. (Tr. 3174:5-6 (calling Lansky "the overeager employee"); Tr. 3144:15-17 ("on September 15th, there were lawyers all over the place"); Tr. 3146:18-19 ("we had lawyers drafting these papers, drafting it with the $10 million"); Tr. 3190:14-3191:7 (listing all the matters on which the Bents consulted "the best lawyers").)

While Defendants' misconduct did not occur over an extended period of time, it was not because Defendants recognized their mistake and acted to stop it. Rather, RMCI and Resrv Partners had no choice but to retract their false statements of support once they realized that their inability and unwillingness to support the $1 NAV would be revealed. Indeed, even when RMCI and Resrv Partners rescinded their promise of support, they did nothing to ensure that investors knew about it, and the Reserve's sales force continued to disseminate the message of support throughout the day on September 16. (Tr. 416:1-16.)

Nor can Defendants argue that their conduct was not recurrent. RMCI and Resrv Partners delivered RMCI's statement of support for the Fund throughout the day on the 15th and

16th repeatedly; they repeated it orally through the sales force, in writing through the *Insights* (distributed to more than 200 investors, and ultimately posted to their website); and through the media talking points (distributed to the *Wall Street Journal* and CraneData.com), and through the assurances given to the ratings agencies. And they did nothing to correct the false statements once they knew them to be false.

Consideration of all the relevant factors indicates that third tier penalties should be awarded in order to visit the appropriate punishment on RMCI and Resrv Partners. To further serve the goal of deterrence, moreover, the Court should exercise its discretion to impose a large enough penalty to create a financial disincentive to further violations. In doing so, the Court should consider the considerable financial wherewithal of RMCI and Resrv Partners.[30]  It is especially important to impose penalties as a deterrent function if the Court determines to order little to no disgorgement. McCaskey, 2002 WL 850001, at *14.

Thus, the Court should base its penalty calculation of each issuance of a false or misleading statement to an investor, rating agency, or other person. Both penalty statutes at issue authorize the Court to calculate penalties on a per violation basis:  "[T]he amount of penalty for each such violation shall not exceed the greater of …."  See Securities Act Section 20(d)(2)(C);

---

[30]      See, e.g., SEC v. Jadiddian, No. 08 Civ. 8079 (PGG), 2011 WL 1327245, at *8 (S.D.N.Y. March 31, 2011) (in light of defendant's "significant wealth," and the need to provide "the necessary financial disincentive," court imposed full second tier penalty on wrongdoer caught by FBI sting even where no investor lost money and defendant was criminally convicted); cf. SEC v. Rajaratnam, 822 F. Supp. 2d 432, 434 (S.D.N.Y. 2011) (applying same considerations to penalty decision under insider trading penalty statute, court based penalty amount in part on amount necessary to "deprive this defendant of a material part of his fortune"); SEC v. Conaway, 697 F. Supp. 2d 733, 772 (E.D. Mich. 2010) (ruling that penalty should be doubled should defendant be entitled to indemnification or reimbursement of any portion of it); see also SEC v. Pentagon Capital Mgmt. PLC, No. 08 Civ. 3324 (RWS), 2012 WL 1036087, at *9 (S.D.N.Y. March 28, 2012) (rejecting defendant's suggested penalty as "plainly insufficient to deter or punish Defendants or deter those similarly situated" who are "sophisticated securities traders . . . who are highly skilled in statistical analysis of risk and gain. . . [of] illegal trading").

Advisers Act Section 209(e)(2)(C) (emphasis added). Numerous courts hold that a per violation

calculation can be based on each violative act, measured either by the number of violative

transactions, or the number of investors to whom the violative conduct was directed.[31]

 Here, the Jury found that RMCI and Resrv Partners misled offerees. The SEC has not

calculated the precise number of offerees to whom these Defendants communicated the

misleading statement of support. Indeed, such a calculation may well be impossible given that

some of the sales staff – including Drahzal's and Goldstein's – lines were not recorded. (Ex. Q

(key to taped phone lines produced by Defendants (indicating no taped lines for Drahzal or

Goldstein).) However, we do know that more than 200 investors and prospective investors

received the *Insights* piece alone. (PX 54-55; Exs. J, K.) Thus, if the Court were to impose third

tier penalties against just one of the Entity Defendants on a per violation basis, just for the

---

[31] E.g., SEC v. Colonial Inv. Mgmt. LLC, 381 F. App'x 27, 32 (2d Cir. 2010) (holding that District Court acted within its discretion by awarding a penalty of $25,000 for each of the defendant's eighteen violative transactions); SEC v. Lazare Indus., Inc., 294 F. App'x 711, 715 (3d Cir. 2008) (noting that the statute would permit a penalty equal to the maximum amount multiplied by the 54 illegal sales of stock); cf. Otis & Co. v. SEC, 106 F.2d 579, 584 (6th Cir. 1939) (each sale of stock constitutes separate violation of act); see also Elliott, 2012 WL 2161647, at *11 (finding third tier penalties warranted where defendants sold billions of dollars in unregistered securities, but ordering first tier penalties of $6,500 per sale transaction); Pentagon Capital Mgmt., PLC, 2012 WL 1036087, at *3-4 (holding that penalties could be imposed at maximum third tier level per instance of violative late trading, or $1.2 billion for individual defendant and $6.03 billion for corporate defendant, but ordering double the pecuniary gain or $38 million as appropriate penalty in exercise of the Court's discretion); SEC v. Glantz, No. 94 Civ. 5737 (LAP), 2009 WL 3335340, at *6 (S.D.N.Y. Oct. 13, 2009) (imposing maximum third tier penalty for each investor defrauded); SEC v. Milan Capital Group, Inc., No. 00 Civ. 0108 (DLC), 2001 WL 921169, at *3 (S.D.N.Y. Aug. 14, 2001) (while holding that third tier penalties were justified, court imposes second tier penalty of $50,000 for each of 200 defrauded investors); accord SEC v. Amerifirst Funding, Inc., No. 07 Civ. 1188, 2008 WL 1959843, at *8-9 (N.D. Tex. May 5, 2008) (holding that third tier penalties were warranted, but, in light of defendant's likely inability to pay, imposing penalty of $2,000 per each of 589 sales of securities in unregistered offering); Kenton Capital, Ltd., 69 F. Supp. 2d at 17 and n. 15 (imposing maximum third tier penalties for each investor solicited).

violations of the Securities Act, and only accounting for the transmission of the *Insights* piece,

penalties of as much as $130,000,000 ($650,000 x 200 offerees) would be warranted.[32]

C.    Bent II Is Personally Liable for First Tier Penalties

Bent II properly merits a first tier penalty for his negligent violation of the Securities Act.

First tier penalties are capped at (i) $6,500 per violation or (ii) the gross amount of Bent II's

pecuniary gain.  Securities Act Section 20(d)(2)(A) and 17 CFR § 201.1003.

Each of the factors cited above applies with equal force to justify the imposition of a

penalty in this case, and indicates the need for deterrence.  Bent II acted only negligently, but he

did so at a time when investors most needed the cautious guidance of RMCI, their investment

adviser.  Bent II negligently ordered, or allowed, the message of support to be communicated, or

communicated it himself, on several different occasions to several different audiences:  (1) at

1:19 (PX 48); (2) to the ratings agencies (Tr. 521:6-521:9); (3) to media outlets (PX 60; Trial Tr.

at 1103:9-11; 1330:14-22); and finally (4)  to the public at large in approving the posting of the

*Insights* on the Reserve's website.  (PX 58.)  When he knew that message was no longer true, he

did nothing himself to stop its dissemination.  (DX 145 and Tr. at 2022:5-2023:17; 2687:10-

2688:25.)  He has never accepted responsibility, blaming all sorts of other actors.

---

[32]    That amount would be far less than the maximum penalty the Court could appropriately order under the statutes.  Additional penalties could be leveled for the many additional salesforce calls in which the false statements were conveyed – Defendants' records indicate hundreds of calls over those two days (DX 193); or by counting investors who viewed *Insights* on the Reserve's website – surely a considerable number, considering the website had 900 visitors on the afternoon of September 15 alone.  (PX 58.)  The Court could also order penalties for each investor in the Fund on the grounds that the ratings agencies did not put the Primary Fund on credit watch and investors, therefore, were denied a full and accurate disclosure of the risk.  Since the Jury found both entities liable under the Securities Act, the Court could rightly double the penalty for the violations of the Securities Act.  And the Court could double the penalty again for RMCI for its violations of the Advisers Act Section 206(4) and Rule 206(4)-8.  Whatever the amount, all of it will go to investors if a Fair Fund is approved.

The only means by which Bent II will be deterred from future wrongful conduct – and by which others in Bent II's position at other entities with similar responsibilities will be deterred – is to impose maximum penalties provided by the statute, particularly given the Bents' substantial wealth. Accordingly, Bent II should be ordered to pay at least $6,500 per offeree, or as much as $1,300,000 – a figure that, like the calculations above, is conservative because it only counts those who received *Insights* by email.

Alternatively, if the Court were to award RMCI the out-of-pocket expenses it has claimed for managing the Primary Fund since September 15, 2008, and were to allow reimbursement of Bent II's salary during that period, it should order him to pay those amounts back to the Expense Fund as disgorgement. As explained above, this amount could be the penalty measurement as Bent II's pecuniary gain attributable to the fraud, or more than $1 million. Securities Act Section 20(d)(2)(A) and 17 CFR § 201.1003 (capping the first tier penalty at the "greater of (I) [$6,500] . . . or (II) the gross amount of pecuniary gain to such defendant as a result of the violation.")

## VII.   RMCI, Resrv Partners and Bent II Should be Enjoined from Future Violations of the Statutes They Violated

Section 20(b) of the Securities Act and Section 209(d) of the Advisers Act empower the Court to enjoin RMCI, Resrv Partners, and Bent II from future violations of the antifraud provisions of the federal securities laws for which the Jury found them liable. Such an injunction is appropriate where there exists a "realistic likelihood" that the Defendants will again violate the federal securities laws. SEC v. Softpoint, Inc., 958 F. Supp. 846, 867 (S.D.N.Y. 1997) (quoting SEC v. Commonwealth Chem. Secs., Inc., 574 F.2d 90, 99-100 (2d Cir.1978)).

The Second Circuit has elucidated a number of factors to consider in determining whether to enter an injunction:

> (1) the degree of scienter involved, (2) the isolated or recurring nature of the fraudulent activity, (3) the defendant's appreciation of his wrongdoing, and (4) the defendant's opportunities to commit future violations.

Softpoint, 958 F. Supp. at 867 (citing Commonwealth Chem. Secs., Inc., 574 F.2d at 100).

While there is no question that each of RMCI, Resrv Partners, and Bent II was found to have violated the federal securities laws, each of the other relevant factors counsels the Court to enter injunctions against these Defendants.

A.     The Degree of Scienter

While the degree of the defendant's scienter is a relevant factor, an injunction may issue against further violations of non-scienter-based violations, including Bent II's and RMCI's negligent violations of the Securities Act and Advisers Act, respectively.  The Supreme Court long ago held that "the Commission need not establish scienter as an element of an action to enjoin violations of § 17(a)(2) and § 17(a)(3) of the 1933 Act." Aaron v. SEC, 446 U.S. 680, 702 (1980); see also Monarch Funding Corp., 192 F.3d 295, 308 (2d Cir. 1999) ("[n]o showing of scienter is required for the SEC to obtain an injunction of subsections (a)(2) or (a)(3) [of Section 17 of the Securities Act].");  First Jersey Secs.,101 F.3d at 1467 ("Scienter, however, need not be established for the SEC to obtain an injunction under [Section] 17(a)(2) or (3)."). This rule is consistent with both the wording and legislative history of the Securities Act:

> [W]hen scienter is an element of the substantive violation sought to be enjoined, it must be proved before an injunction may issue.  But with respect to those provisions such as § 17(a)(2) and § 17(a)(3), which may be violated even in the absence of scienter, nothing on the face of § 20(b) [of the Securities Act] or § 21(d) [of the Exchange Act] purports to impose an independent requirement of scienter.  And there is nothing in the legislative history of either provision to suggest a contrary legislative intent.

Aaron, 446 U.S. at 701.[33]  Pursuant to the Supreme Court's holding in Aaron, courts in this and

other Circuits have enjoined defendants for negligence-based violations.[34]

As the Court explained in Moran, the fact that an underlying violation "constitutes

negligence and was not intentional . . . [does not mean that] such a violation is incapable of

repetition."  944 F. Supp. 286, 294 (S.D.N.Y. 1996) (enjoining defendant from further violations

of Section 206(2) based on a finding of negligence); see also Am. Realty Trust, 586 F.2d at 1007

("Proof of negligent misstatements or negligent omissions … establishes an affront to the goal

the statutes sought to achieve … [and an] injunction in such a case can provide substantial

assurance that the negligent issuer will take more pains the next time to avoid all falsity.").

Of course, the degree of scienter is not at all an issue with respect to RMCI and Resrv

Partners.  The Jury concluded that both had acted with the highest degree of scienter:  knowingly

or recklessly. (DE 571 at 3, 5-6.)  And the specific facts upon which the Jury rendered its verdict

also speak to the severity of each Defendant's violations.  Defendants' violations were hardly

technical in nature.  The Entity Defendants repeatedly told investors, ratings agencies, and the

---

[33]     The same is also true for Section 206(2) of the Advisers Act, which like 17(a)(2) and (3)
of the Advisers Act requires only that a defendant be negligent.  See Aaron, 446 U.S. at 693
("Congress had not sought to require a showing of intent in actions to enjoin violations of §
206(2)") (citing SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 195 (1963)).

[34]     See, e.g., SEC v. Moran, 944 F. Supp. 286, 294 (S.D.N.Y. 1996) (enjoining defendant
from further violations of Section 206(2) based on a finding of negligence); SEC v. Verdiramo,
No. 10 Civ. 1888 (RMB), 2011 WL 4344310, at *11 (S.D.N.Y. Sept. 9, 2011) (issuing
permanent injunctions including one against violator of Section 5 of the Securities Act for whom
no finding of scienter was made).  Accord SEC v. SW. Coal & Energy Co., 624 F.2d 1312,
1320-21 (5th Cir. 1980) (affirming injunction against future violations of Section 17(a)(2) based
on finding of negligence); SEC v. Am. Realty Trust, 586 F.2d 1001, 1007 (4th Cir. 1978)
(affirming permanent injunction against negligent violations of Section 17(a)(2)); SEC v. Olins,
762 F. Supp. 2d 1193, 1196-97 (N.D. Cal. 2011) (enjoining defendant from future violations of
Section 5 of the Securities Act without finding scienter) (citing SEC v. Murphy, 626 F.2d 633,
656 (9th Cir. 1980)).

press that an investment in the Primary Fund was guaranteed.[35]  RMCI did not, however, have

the financial wherewithal to guarantee the $1 NAV of each investor to "whatever degree is

required." (Tr. at 1134:13-1136:14 (Bent II explaining that Reserve's cash on hand was

insufficient to support the Primary Fund's NAV to whatever degree required).

Through the Reserve's Chief Investment Officer, Patrick Ledford, the Entity Defendants

also told Moody's that they were able to raise sufficient liquidity on September 15 to satisfy all

of the Primary Fund's unprecedented redemption requests, but Ledford testified that his

statements to Moody's were not true. (Tr. at 2178:19-2179:19.)  And Ledford (and therefore the

Entity Defendants) knew that these statements were false when he made them.  Several senior

officers, including Ledford, spoke only moments before Ledford's Moody's call about the

Reserve's *inability* to satisfy redemptions, something Ledford called "the kiss of death." (Id. at

2174:10-22, commenting on PX 124.)

Thus the Entity Defendants misled the investing public about the core terms of

investments in the Primary Fund – the viability of the $1 NAV and the Fund's ability to satisfy

redemption requests. (Tr. at 567:14-21 (Bent Sr. testifying that safety of principal, instant li-

quidity and a reasonable rate of return are tenets of running a money market fund); id. at 1263:3-

5 (Bent II calling the "stable one dollar NAV" "the Holy Grail of the money market industry.").)

In addition to deceiving investors, RMCI negligently misled the Primary Fund's Board in

violation of the adviser's fiduciary duties,[36] further counseling for an injunction against RMCI,

as courts have concluded. See SEC v. Ginsburg, 362 F.3d 1292, 1304 (11th Cir. 2004)

---

[35]     See e.g., PX 55 (transmission of *Insights* to investors); PX 4, 28, 168 (pre-*Insights* telephone communications with investors conveying substance of Bent II's 1:19 Email); PX 74, 75 (transmission of *Insights* to ratings agencies), and PX 77 (CraneData.com article reflecting Reserve's media talking points).

[36]     DE 570 at 32 ("For purposes of Section 206(1) and (2), the client is the Fund's Board of Trustees").

(reversing district court's denial of permanent injunction where factors, including defendants breach of fiduciary duties, weighed in favor of permanent injunction); SEC v. Lorin, 877 F. Supp. 192, 201 (S.D.N.Y. 1995) (finding breach of fiduciary duties to support finding of egregiousness"), aff'd in relevant part, 76 F.3d 458 (2d Cir.1996).

Although the Jury found that he did not act with scienter, Bent II's negligent violations also repeatedly gave investors a false understanding of the Primary Fund's most important investment term – the stability of a $1 NAV.  And Bent II was hardly a minor participant in RMCI's repeated promises to protect the $1 NAV.  Throughout September 15, Bent II authored or authorized statements guaranteeing the Fund's $1 NAV or remained silent as his employees informed him of the false message they were communicating to investors.[37]

In other words, Bent II was negligent again and again on September 15 and 16, and that negligence led directly to the Entity Defendants communicating a misleading message to the investing public.  It was Bent II who drafted the 1:19 Email that his own father said he would not have approved.  (Tr. 642:23-644:7)  It was Bent II who, hours later at 5:46 p.m. on September 15, authorized the media talking points that reaffirmed the Reserve's purported commitment to the Primary Fund's $1 NAV; at a time when the Fund was closed for business and he could have easily determined the level of redemptions and that the markets remained illiquid. (PX 60.)  And it was Bent II who told his marketing director to "go ahead" when that director asked whether he

---

[37]     PX 48 (Bent II's 1:19 Email authorizing Reserve Entity employees to convey intent to "protect the NAV on the Primary fund to whatever degree is required); PX 106 (Bent II's comments on draft Insights); PX 60 (Bent II's approval of media talking points); PX 58 (Bent II's instruction to Marketing Director to "go ahead" and post "statement that we have already prepared" to website); PX 201 (Insights transmitted to Bent II with email stating "client inquiries … can be addressed with the [Insights] document); PX 76 (email to Bent II and others complimenting "piece marketing put together" as "a piece of art"); PX 77 (September 16 7:27 a.m. email copied to Bent II reminding recipients of "statement distributed yesterday (which we will be posting to TheR.com) for investors").

could post to the Reserve website a "statement that we have already prepared." (PX 58.)  As for

the statement itself, *Insights*, Bent II provided handwritten edits to a draft he reviewed but left

untouched the draft's unequivocal statements about the Reserve's "commit[ment] to a $1.00

NAV for its Primary Fund." (PX 106.)  And Bent II was either negligent in not reading, or

negligent in failing to correct and countermand, the final *Insights* piece that his marketing

director sent him with an email indicating that it would be shared with investors. (PX 201.)  On

September 16, after Bent II had conclusively decided against supporting the Primary Fund, he

negligently failed to tell the Reserve Entities' sales force to stop disseminating the company's

message of NAV support.  (Tr. 2023:10-17 (Bent II did not tell the Reserve's head of sales on

the morning of September 16 that the Reserve was not going to support the Primary Fund's

NAV"; see also id. at 416:1-15 (salesperson Ryan Green did not learn until at least late afternoon

on September 16 that Reserve did not plan to support the Primary Fund's NAV); DX 145 (head

of sales John Drahzal email asking Reserve counsel at 1:11 p.m. whether sales team should

continue to use *Insights* piece).)  In fact, Bent II failed to tell his salesforce about the Reserve's

decision not to support the Primary Fund even after receiving emails that Reserve personnel were

continuing to tell the public that the Reserve fully intended to support the Fund. (PX 77 (email

noting continued use of *Insights* and plan to post to website.).)  As with this case, courts enjoin

defendants from violating non-scienter provisions of the securities laws where they played a

"central role" in those violations.  E.g., SEC v. Tecumseh Holdings Corp., No. 03 Civ. 5490

(SAS), 2009 WL 4975263, at *5 (S.D.N.Y. Dec. 22, 2009) (Defendant's central role in fraud

weighed in favor of permanent injunction).

B.     Defendants' Past Misconduct Suggests a Likelihood of Future Violations.

The Second Circuit is clear that, while evidence of recidivism counsels for an injunction, the mere violation at issue can, itself, provide the requisite evidence of reasonable likelihood of recurrence. "'[F]irst offenders' are not immune from injunctive relief." SEC v. Shapiro, 494 F.2d 1301, 1308 (2d Cir.1974); accord SEC v. Miller, 744 F. Supp.2d 1325, 1336 (N.D. Ga. 2010) ("numerous courts have found no requirement that a defendant must have committed violations before the ones at issue") (citations omitted).  The Second Circuit recently reiterated this principle in SEC v. Gabelli, holding that the SEC's injunctive relief claim should not have been dismissed even if the instant conduct was to be the only wrong they had committed, explaining that "fraudulent past conduct gives rise to an inference of a reasonable expectation of continued violations." 653 F.3d 49, 61 (2d Cir. 2011) (quoting Manor Nursing Ctrs., 458 F.2d at 1100), cert. granted on other grounds, 133 S. Ct. 97 (2012)); accord Pentagon Capital Mgmt., 844 F. Supp. 2d at 424 (enjoining first time violators on basis of violations established in instant case and strength of inference of continued violations).  And fraudulent conduct is precisely what the Jury found when it announced that each of the Entity Defendants intentionally violated the anti-fraud provisions of the Securities Act, RMCI intentionally violated the antifraud provisions of the Advisers Act, and RMCI and Bent II negligently violated the anti-fraud provisions of the Advisers Act and Securities Act, respectively.

Nonetheless, the Entity Defendants are recidivists.  In In re Reserve Mgmt. Corp., Reserve Mgmt. Co., Henry B.R. Brown and Bruce R. Bent, the Reserve family of entities was found to have violated Section 17(a) of the Securities Act (among other securities laws) in making inadequate or misleading disclosures to Reserve fund investors. Rel. No. IC-11394, IA-733, 1980 WL 20755, at *1 (Oct. 10, 1980).  That finding came three years after Reserve

Management Corp. (RMCI's predecessor) entered into a consent order with the Commission that found that the adviser had willfully violated provisions of the Investment Company Act, and by which the adviser agreed to the imposition of sanctions, including a suspension and a waiver of $1.4 million in advisory fees. See Reserve Mgmt. Corp. v. Anchor Daily Income Fund, Inc., 459 F. Supp. 597, 600-01 (S.D.N.Y. 1978).

And Bruce Bent II's ascension to a leadership position at the Reserve did not translate to greater compliance with the federal securities laws, as in both 2005 and 2006 the Commission's examinations staff identified serious violations of the Investment Company Act, the Advisers Act and the Exchange Act that resulted in Deficiency Letters. (Exs. M, N (noting, among other things, overpayment of management and Rule 12b-1 fees to RMCI).)

C.    Defendants' Actions Since September 2008 Demonstrate an Utter Lack of Appreciation for Their Wrongdoing

A defendant's refusal to accept responsibility for his wrongdoing merits injunctive relief because it indicates his lack of appreciation for his obligations under the law. Manor Nursing, 458 F.2d 1082, 1101 (2d Cir. 1972) ("the fact that [defendants] continued to maintain that their past conduct was blameless was a factor appropriately considered by the district court in assessing the need for a permanent injunction").[38]

---

[38]    See also Lorin, 877 F. Supp. at 201 (defendants' failure to admit wrongdoing "makes it rather dubious that they are likely to avoid such violations of the securities laws in the future."); accord Mandaci, 2004 WL 2153879, at *12 (permanent injunction warranted based on, among other facts, defendant's failure to show any "appreciation of the wrongfulness of his actions"); SEC v. Falbo, 14 F. Supp. 2d 508, 529 (S.D.N.Y. 1998) (granting injunction and noting defendants steadfast refusal to accept responsibility for his actions in support of holding); SEC v. Pittsford Capital Income Partners, LLC, No. 06 Civ. 6353 T(P), 2007 WL 2455124, at *15 (W.D.N.Y. Aug. 23, 2007) (holding defendants' failure to show "appreciation of the wrongfulness of their actions" weighed in favor of permanent injunctions against future violations of Section 17(a) of Securities Act); cf. SEC v. Opulentica, LLC, 479 F. Supp. 2d 319, 329 (S.D.N.Y. 2007) (even defendant's "guilty plea in the parallel criminal case does not

Here, Defendants have steadfastly denied any responsibility for any wrongdoing.  In fact, their own motions under Rules 50(b), 59 and 60 reflect their intention to press on with their fight against culpability.  And throughout the investigation and this litigation Defendants have consistently attempted to shift the blame to anyone but themselves. At trial, Defendants' plan to point fingers at others was frustrated, at least in part, by the Court's October 2, 2012 in limine ruling, which precluded the introduction of evidence of, among other irrelevancies, the government's investigations of financial institutions other than the Reserve and measures the Government put in place after September 16, 2008.[39]  Even now, after the Jury found it liable for fraud, RMCI continues to blame its counsel, Willkie Farr, for its own failings in a lawsuit before this Court.  Blaming others does not indicate an acceptance of responsibility.

These actions demonstrate the liable Defendants' unwillingness to recognize their wrongdoing and make permanent injunctions appropriate to preclude further violations.  See Verdiramo, 2011 WL 4344310, at *14 (in granting injunction enjoining future violations of Section 5 of Securities Act, court noted that defendant's continued reference to counsel's advice "illustrates [defendant]'s efforts to shift blame and responsibility for [defendant's] illegal actions."); Moran, 944 F. Supp. at 292 (noting "statements to the press, and subsequent actions belie" claimed acceptance of responsibility, as does defendant's attempts to blame others, including the SEC, for his own securities violations).)

Finally, Defendants continue to ask the Court to put their interests ahead of wronged investors.  Despite being found liable for misleading their investors, the Entity Defendants continue to seek profits "earned" from managing the money of investors whose money was

---

conclusively establish his appreciation of his past wrongdoing [as he] pled very close to the trial date.")

[39]     DE 557, Oct. 2, 2012 In Limine Order.

trapped in the Fund after it collapsed (including investors who bought in after RMCI guaranteed the $1 NAV). Any supposed profits that Defendants collect from the Expense Fund will necessarily reduce money otherwise earmarked for Primary Fund investors.

D.    Absent an Injunction, Defendants Will Have Opportunities to Commit Future Violations

Defendants will have every opportunity to commit future violations. An injunction should issue regardless of whether the Entity Defendants or Bent II are currently functioning as registered investment advisers or broker dealers. As the Court explained in SEC v. Tzolov, an absence from the securities industry can be temporary. 08 Civ. 7699 (SAS), 2011 WL 308274, at *5 (S.D.N.Y. Jan. 26, 2011); see also SEC v. Youmans, 729 F.2d 413, 415-16 (6th Cir. 1984) (District Court erred in focusing too heavily on defendant's change in occupation, as defendant could easily reenter business that required periodic filings with the SEC).

Accordingly, the Court should permanently enjoin those Defendants the Jury found liable from further violations of the securities laws that it found them to have violated.

VIII.    The Court Should Order an Evidentiary Hearing (and Appropriate Discovery) of Any Disputed Factual Issues

Should Defendants raise any factual issues on these post-verdict motions relating to disgorgement or penalty, the Court should order an evidentiary hearing to resolve them, and an appropriate opportunity for the Commission to engage in limited discovery on any they identify and as to which they blocked discovery during the discovery period.

Because the remedies to be ordered after a jury verdict on liability in securities cases is strictly the province of the Court, and because many of the issues that relate to the appropriate

remedy relate little to the facts that determined liability, courts frequently hold evidentiary hearings in the remedies phase.[40]

In this case, where Defendants are likely to dispute the connection of their violations to the length of time it took to wind down the Fund, and the costs the Fund and Trustees incurred as a result of the fraud they committed, it may well be that factual issues will need to be addressed. None of that was relevant to the Jury's determination of liability.  For example, Defendants may dispute that the Trustees would have acted differently at the 1 p.m. Board Meeting had they had all the facts, particularly in their response to Defendants' request for authorization to pursue a credit support agreement.  Similarly, only the Trustees can address the allocation they made of their legal fees, and only the Trustees can tell the Court how much of their other millions of dollars in expenses should be recouped from RMCI and Resrv Partners as costs of the fraud that are more properly borne by RMCI and Resrv Partners than the Fund.

## CONCLUSION

For all the foregoing reasons, Plaintiff's Motion should be granted in all respects, and any claim for distribution from the Expense Fund Defendants make should be denied.

---

[40]    See, e.g., SEC v. Milligan, 436 F. App'x 1, 3 (2d Cir. 2011) (noting that District Court held evidentiary hearing on remedies); Lybrand, 281 F. Supp. 2d at 729; SEC v. Castaldo, No. 08 Civ. 8397 (JSR), 2009 WL 2591376, at *2 (S.D.N.Y.  Aug. 19, 2009); SEC v. Razmilovic, 822 F. Supp. 2d 234, 242 (E.D.N.Y. 2011); SEC v. Dibella, 2008 WL 6965807, at *1 ; see also SEC v. Offill, No. 07 Civ. 1643, 2012 WL 1138622, at *1 (N.D. Tex. April 5, 2012); SEC v. U.S. Sustainable Energy Corp., No. 08 Civ. 0245, 2011 WL 2980549, at *17 (S.D. Miss. July 21, 2011) (ordering hearing on remedies); SEC v. Novus Tech., LLC, No. 07 Civ. 0235, 2010 WL 4180550, at *1 (D. Utah Oct. 20, 2010); SEC v. Snyder, No. 03 Civ. 4658, 2006 WL 6508273, at *1 (S.D. Tex. Aug. 22, 2006).

Dated: New York, New York
       December 21, 2012                Respectfully submitted,

                                        SECURITIES AND EXCHANGE COMMISSION

                                        By: _____
                                            Nancy A. Brown
                                            Alexander J. Janghorbani
                                            Michael D. Birnbaum

                                        3 World Financial Center
                                        New York, New York 10281
                                        (212) 336-1023

                                        Attorneys for Plaintiff