UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------------x

SECURITIES AND EXCHANGE                                    :
COMMISSION,                                                :
                                                           :
                              Plaintiff,                   :
                                                           :
              v.                                           :      No. 09 Civ. 4346 (PGG)
                                                           :
RESERVE MANAGEMENT COMPANY, INC.,                          :      ECF CASE
RESRV PARTNERS, INC., BRUCE BENT SR.                       :
and BRUCE BENT II,                                         :
                                                           :
                              Defendants,                  :
              and                                          :
                                                           :
THE RESERVE PRIMARY FUND,                                  :
                                                           :
                              Relief Defendant.            :
----------------------------------------------------------------------x

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S
REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF ITS MOTION FOR (i)
JUDGMENT AS A MATTER OF LAW AND FOR A NEW TRIAL AS TO CERTAIN OF
ITS CLAIMS, AND (ii) DISGORGEMENT, PENALTIES, AND INJUNCTIONS**

SECURITIES AND EXCHANGE
COMMISSION

Nancy A. Brown
Alexander J. Janghorbani
Michael D. Birnbaum
3 World Financial Center
New York, New York 10281
Tel: (212) 336-1023 (Brown)

Attorneys for Plaintiff

February 13, 2013

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ............................................................................................1

ARGUMENT........................................................................................................................2

I.   The Evidence Demonstrates that the Entity Defendants' Fraud Was "in
     Connection with" the Purchase of Fund Shares ...............................................2

II.  RMCI's and Resrv Partners' Claim to Expenses in Excess of Those
     Approved by the Trustees Should Not Be Granted and Any Amounts
     the Fund or Trustees Incurred as a Result of RMCI's or Resrv Partners'
     Fraud Should Be Recouped .............................................................................8

III. Defendants Are Not Entitled to Profit from Their Actions After
     September 16, 2008 ...........................................................................................9

     A. Defendants Have Failed to Demonstrate that Their Profits Were Attenuated
        from Their Fraud and, Thus, Should Disgorge Those Funds .......................9

     B. Well-Settled Principles of Contract Law Defeat RMCI's Claims to
        Fees Under the Management Agreement....................................................11

IV.  Significant Penalties Are Warranted Against Each of the Liable Defendants...........13

     A. The Violations Here Involved Fraud, Deceit, Manipulation or Deliberate or
        Reckless Disregard of a Regulatory Requirement.......................................14

     B. The Entity Defendants' Fraudulent Conduct Put Investor Assets at Significant
        Risk of Substantial Loss.............................................................................16

     C. The Entity Defendants Should Not Profit from Their Fraud .......................18

V.   The Court Should Enter Injunctions Against the Entity Defendants and Bent II ....22

     A. Defendants Fail to Acknowledge, Let Alone Appreciate, Their Wrongdoing ............23

     B. Defendants' Conduct Before and After September 15-16, 2008 Supports
        Injunctive Relief........................................................................................24

     C. Defendants' Scienter Warrants Injunctive Relief .......................................26

VI.  An Evidentiary Hearing (and Relevant Discovery) Is Appropriate for
     Any Disputed Issue ...........................................................................................28

                                                                              **Page**

**CONCLUSION** ..............................................................................................30

## TABLE OF AUTHORITIES

Page

**Cases**

Aaron v. SEC, 446 U.S. 680 (1980) ..............................................................................27

Amaprop Ltd. v. Indiabulls Fin. Servs. Ltd., No. 10 Civ. 1853 (PGG),
2011 WL 1002439 (S.D.N.Y. March 16, 2011),
aff'd, 483 F. App'x 634 (2d Cir. 2012)..........................................................................29

Apex Pool Equip. Corp. v. Lee, 419 F.2d 556 (2d Cir. 1969).......................................12

Atl. Sounding Co., Inc. v. Townsend, 557 U.S. 404 (2009)...........................................19

ARP Films, Inc. v. Marvel Entm't Grp., 952 F.2d 643 (2d Cir. 1991).........................12

A.T. Brod & Co. v. Perlow, 375 F.2d 393 (2d Cir. 1967)...............................................5

Bear Stearns Funding, Inc. v. Interface Group-Nevada, Inc., 361 F. Supp. 2d 283
(S.D.N.Y. 2005)..............................................................................................................11

Chrabaszcz v. Johnston Sch Comm., 474 F. Supp. 2d 298 (D. R.I. 2007) .....................6

Clark-Fitzpatrick, Inc. v. L.I.R.R. Co., 70 N.Y.2d 382 (1987)......................................9

Deutsche Asset Mgmt., Inc. v. Callaghan, No. 01 Civ. 4426 (CBM),
2004 WL 75803 (S.D.N.Y. April 7, 2004) ...................................................................12

Eastman Chem. Co. v. Nestle Waters Mgmt. & Tech., No. 11 Civ. 2589 (JPO),
2012 WL 4474587 (S.D.N.Y. Sept. 28, 2012)..............................................................12

Emigrant Indus. Savings Bank v. Willow Builders, Inc., 290 N.Y. 133 (1943)............12

Galdieri-Amborsini v. Nat'l Realty & Dev. Corp., 136 F.3d 276 (2d Cir. 1998)...........6

Gordon v. Degelmann, 29 F.3d 295 (7th Cir. 1994).......................................................3

In re Vivendi Universal Secs Litig., 765 F. Supp. 2d 512 (S.D.N.Y. 2011)...................3

Jarvis v. Ford Motor Co., 283 F.3d 33 (2d Cir. 2002).....................................................2

Korsinsky v. Salomon Smith Barney Inc., 01 Civ. 6085 (SWK),
2002 WL 27775 (S.D.N.Y. Jan. 10, 2002) ......................................................................5

Page

Malm v. U.S. Lines Co., 269 F. Supp. 731 (S.D.N.Y.),
aff'd, 378 F.2d 941 (2d Cir. 1967)................................................................................. 2-3

Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc., 500 F.3d 171 (2d Cir. 2007).....................11

Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353 (1982) ...............................19

New Windsor Volunteer Ambulance Corps, Inc. v. Meyers, 442 F.3d 101 (2d Cir. 2006)............9

Otis & Co. v. SEC, 106 F.2d 579 (6th Cir. 1939)..........................................................................19

Reserve Mgmt. Corp. v. Anchor Daily Income Fund, Inc.,
459 F. Supp. 597 (S.D.N.Y. 1978) ...........................................................................................20, 25

SEC v. Am. Realty Trust, 586 F.2d 1001 (4th Cir. 1978) .............................................................27

SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180 (1963) .................................................1

SEC v. Colonial Inv. Mgmt. LLC, 381 F. App'x 27 (2d Cir. 2010).............................................15

SEC v. Czarnik, 10 Civ. 745 (PKC),
2010 WL 4860678 (S.D.N.Y. Nov. 29, 2010)..............................................................................5

SEC v. E. Delta Res. Corp., No. 10-CV-310 (SJF)(WDW),
2012 WL 3903478 (E.D.N.Y. Aug. 31, 2012).........................................................................15, 25

SEC v. Elliott, No. 09 Civ. 7594 (KBF), 2012 WL 2161647 (S.D.N.Y. June 12, 2012)..............15

SEC v. First City Fin. Corp., 890 F.2d 1215 (D.C. Cir. 1989)......................................................10

SEC v. First Jersey Secs., Inc., 101 F.3d 1450, 1477 (2d Cir. 1996) ................................23, 24, 25

SEC v. First Pac. Bancorp, 142 F.3d 1186 (9th Cir. 1998) ............................................................10

SEC v. Greenstone Holdings, Inc., 10 Civ. 1302 (MGC),
2012 WL 1038570 (S.D.N.Y. Mar. 28, 2012).........................................................................4-5, 7

SEC v. Inorganic Recycling Corp., No. 99 Civ. 10159 (GEL),
2002 WL 1968341 (S.D.N.Y. Aug. 23, 2002)..............................................................................20

SEC v. Jadidian, No. 08 Civ. 8079 (PGG), 2011 WL 1327245 (S.D.N.Y. Mar. 31, 2011).........21

SEC v. Jones, 476 F. Supp. 2d 374 (S.D.N.Y. 2007) ....................................................................26

iv

Page

SEC v. Kern, 425 F.3d 143 (2d Cir. 2005) ............................................................................... 14-15

SEC v. Moran, 944 F. Supp. 286, 294 (S.D.N.Y. 1996).................................................................27

SEC v. Novus Techs. Inc., 07 Civ. 235 (TC), 2011 WL 2516938 (D. Utah June 23, 2011).........15

SEC v. Pentagon Capital Mgmt. PLC, No. 08 Civ. 3324 (RWS),
2012 WL 1036087 (S.D.N.Y. Mar. 28, 2012) ...............................................................................22

SEC v. Posner, 16 F.3d 520 (2d Cir. 1994) ...................................................................................10

SEC v. Rabinovich & Assocs., L.P., No. 07 Civ. 10547 (GEL),
2008 WL 4937360 (S.D.N.Y. Nov. 18, 2008)...............................................................................20

SEC v. Ramoil Mgmt., Ltd., No. 01 Civ. 9057 (SC),
2007 WL 3146943 (S.D.N.Y. Oct. 25, 2007).................................................................................22

SEC v. Robinson, No. 00 Civ. 7452 (RMB)(AJP),
2002 WL 1552049 (S.D.N.Y. July 16, 2002).................................................................................21

SEC v. Universal Major Indus. Corp., 546 F.2d 1044 (2d Cir. 1976) .....................................27-28

SEC v. Verdiramo, No. 10 Civ. 1888 (RMB)(AJP),
2013 WL 57823 (S.D.N.Y. Jan. 7, 2013) ......................................................................................15

United States v. Naftalin, 441 U.S. 768 (1979) ...............................................................................4

**Statutes and Rules**

Securities Act of 1933

Section 5, 15 U.S.C. § 77e........................................................................................ 14-15, 25

Section 17(a)(1), 15 U.S.C. § 77q(a)(1)....................................................................................15

Section 17(a)(2), 15 U.S.C. § 77q(a)(2)........................................................................... passim

Section 17(a)(3), 15 U.S.C. § 77q(a)(3)........................................................................... passim

Section 20(d), 15 U.S.C. § 77t(d) ...................................................................... 14, 15-16, 18

Page

Securities Exchange Act of 1934

    Section 10(b), 15 U.S.C. § 78j(b) ............................................................... passim

        Rule 10b-5, 17 C.F.R. § 240.10b-5 ...........................................................2, 6, 25

    Section 20(a), 15 U.S.C. § 78t(a) .............................................................................8

Investment Advisers Act of 1940

    Section 206(4) 15 U.S.C. § 80b-6(4) ........................................................... passim

        Rule 206(4)-8, 17 C.F.R. § 275.206(4)-8 ..................................................14, 23

    Section 209(e), 15 U.S.C. § 80b-9(e) .................................................14, 16, 18

Investment Company Act of 1940

    Section 15, 15 U.S.C. § 80a-15 .............................................................................26

    Section 25(c), 15 U.S.C. § 80a-25(c) ....................................................................13

Securities Enforcement Remedies and Penny Stock Reform Act of 1990,
Pub. L. 101-429 ................................................................................................ passim

Fed. R. Civ. P. 49(a) ...............................................................................................2

Fed. R. Civ. P. 50(b) ...................................................................................... passim

Fed. R. Civ. P. 59 ............................................................................................ passim

**Administrative Decisions**

In the Matter of Reserve Mgmt. Corp., et al., Rel. No. IC-11394, IA-733,
1980 WL 20755 (Oct. 10, 1980) .............................................................................25

In the Matter of Reserve Mgmt. Corp., et al., Rel. No. IC-9826,
1977 SEC LEXIS 1421 (June 27, 1977) .................................................................26

**Miscellaneous**

H.R. Rep. 101-616, 1990 U.S.C. C.A.N. ....................................................16, 18, 19

8 Louis Loss & Joel Seligman, Securities Regulation 3721 (3d ed. 2004) ....................4

## PRELIMINARY STATEMENT

No more compelling argument can be made for the need for penalties and injunctions here than Defendants' own post-trial briefs. From start to finish, RMCI and Resrv Partners (the "Entity Defendants") and Bent II maintain that they did nothing wrong, that the Jury did not find that they did anything serious, or that the Jury's findings are mere "surplusage." But the Jury concluded that those Defendants did do something serious: they engaged in transactions, practices or courses of business which operated as a "fraud or deceit upon" investors, and/or they made "untrue" statements of "material fact." And that the Entity Defendants did so intentionally or recklessly, not by carelessness or mistake.

So the Court has before it a choice made much less complicated by Defendants' refusal to admit the Entity Defendants' serious wrongdoing: hand over millions of dollars to recalcitrant defendants or give Defendants only what they are owed as expenses and direct the rest to innocent investors. In making that choice, the Court should not only keep the equities in this case in mind; it should also consider the effect of an award to the Entity Defendants on other market participants. If the Court is to promote the "high standards of business morality exacted by our laws regulating the securities industry," SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 201 (1963), it should enter the relief necessary here to deter not just these Defendants, but those who may find themselves in like circumstances in the future. Otherwise few will consider a Jury verdict of fraud "serious," or have any reason to fear that the results that could flow from a fraud verdict outweigh the possible benefits of deceiving investors.

As to the Commission's motion for relief under Rule 50(b) or Rule 59, Defendants' only argument against it is to miscast it as something it is not: a challenge to inconsistent verdicts. The Commission's motion, however, merely asks the Court to ensure the verdict in this case is

consistent with the evidence adduced at trial. That evidence demonstrated unequivocally that the
material misrepresentations at issue were made "in connection with" the purchase of Primary
Fund shares.

## ARGUMENT[1]

### I.  The Evidence Demonstrates that the Entity Defendants' Fraud Was "in Connection with" the Purchase of Fund Shares

Defendants cite no evidence to challenge the SEC's motions under Fed. R. Civ. P. 50(b)
and 59 against the Entity Defendants under Section 10(b) and Rule 10b-5 of the Securities
Exchange Act of 1934 (the "Exchange Act"). Instead, to circumvent the undisputed evidence,
Defendants inaccurately re-cast the SEC's argument as one challenging inconsistent verdicts.
But the SEC agrees that inconsistent verdicts are permissible, as it points out in its brief opposing
Defendants' own meritless Rule 50(b) motion.[2]

The SEC's argument is grounded in the principle that a verdict must be "based upon the

---

[1]  All references to (1) "Tr." are to trial transcripts; (2) "SEC Mov. Br." are to the SEC's initial
brief in support of its post-trial motions; (3) "SEC Mov. Ex." are to the Exhibits attached to the
Dec. 21, 2012 Janghorbani Declaration; (4) "Defs. Mov. Br." are to Defendants' initial brief in
support of its post-trial motions; (5) "SEC Opp. Br." are to the SEC's opposition to Defendants'
post-trial motions; and (6) "Defs. Opp. Br." are to Defendants' brief in opposition to the SEC's
post-trial motion. In addition, all references to "Ex." are to the exhibits to the Reply Declaration
of Alexander Janghorbani filed in support of this brief unless otherwise indicated.

[2]  Defendants' own Rule 50(b) motion—that the Jury could only have found the Entity
Defendants liable for Ledford's misstatements (and not the Bents') because it found that Bent II
acted only negligently—rests on the precise inconsistency argument that Defendants
acknowledge here is flawed and should, therefore, be denied. (Defs. Mov. Br. at 10-15.)

Any argument that Rule 49(a) applies different rules to special verdict sheets is likewise
unavailing. (See Defs. Opp. Br. at 6 n.3.) In asking the Jury to reach a conclusion about
ultimate liability requiring them to apply instructions on the law, the Court did not render a
special verdict form under Rule 49(a) (which asks a jury to answer fact questions). Jarvis v.
Ford Motor Co., 283 F.3d 33, 56 (2d Cir. 2002). In any event, for the reasons cited in the SEC's
opposition brief, Defendants' are not entitled to judgment as a matter of law for any
inconsistency. (See SEC Opp. Br. at 7-13.)

evidence and the law." Malm v. U.S. Lines Co., 269 F. Supp. 731, 731-732 (S.D.N.Y.), aff'd,

378 F.2d 941 (2d Cir. 1967). The evidence in this record indisputably supports the SEC's claim

under Section 10(b) since investors continued to purchase Fund shares after every misstatement

at issue. Thus, under any theory of the evidence, there is no legally cognizable basis to find that

the Entity Defendants' fraud was not "in connection with the purchase or sale" of a security.

First, despite Defendants' oft-repeated assumption that the Jury based its verdict solely

on Ledford's fraud, for purposes of determining the Entity Defendants' liability, the Court can

and should consider evidence of the nexus between security purchases and any misstatements

here at issue, irrespective of whether they were made by Ledford or the Bents. See In re Vivendi

Universal Secs. Litig., 765 F. Supp. 2d 512, 546-47 (S.D.N.Y. 2011) (in determining whether

evidence supports a verdict against corporate defendants, the Court should consider all the

evidence, including of the actions and mental states of individual defendants cleared of all

charges). Defendants' suggestion that the Court accept their own self-serving interpretation of

the Jury's findings that the Entity Defendants' scienter could not have been supplied by the

Bents is inappropriate in analyzing motions under Rules 50(a) and 59 because it ignores the

admitted evidence and requires crediting one verdict over the other.[3] But, "[t]here is no priority

among inconsistent verdicts." Gordon v. Degelmann, 29 F.3d 295, 298 (7th Cir. 1994). In

Gordon, the Seventh Circuit reversed a district court's decision to vacate one of two inconsistent

verdicts because, as Defendants note (Defs. Opp. Br. at 11): "The district court did not explain

why it started from the verdict absolving [one defendant.] Why not the other way 'round?" Id.

Perhaps the Jury wrongly decided Bent II was only negligent and Bent Sr. not liable at all, so

---

[3]  Defs. Opp. Br. at 8 ("Since the jury found that Bent II had not knowingly or reckless[ly]
violated Section 17(a)(2) or (3), the jury could not have found either RMCI or Partners liable for
knowingly or recklessly violating the same statute based on Bent II's conduct").

why is that verdict not the "inconsistent" one?

Here, the evidence conclusively shows that whichever statements the Jury predicated liability on were "in connection with" as a matter of law. Defendants cite no evidence to the contrary, merely asserting without citation that "no evidence was presented that an investor actually received Insights or any other message of support prior to making a purchase." (Defs. Opp. Br. at 9.) But that contention is flatly contradicted by the record evidence. (SEC Mov. Br. at 7.)[4]

But even accepting Defendants' assumption that the Entity Defendants' were found liable solely for Ledford's fraud yields the same result. Ledford's false statements to Moody's about the Fund's ability to repay investors through asset sales were "in connection with." As the Jury was instructed, that element requires only "some nexus" to a purchase (DE 570 at 18) and is met so long as "someone buy[s] or sell[s] the security during the period of allegedly fraudulent conduct." (DE 565 at 9 (quoting 8 Louis Loss & Joel Seligman, Securities Regulation 3721 (3d ed. 2004).) The nexus requirement is not onerous and applies to novel—as well as shopworn— frauds. (See SEC Mov. Br. at 5-6.) Moreover, it is irrelevant whether the statement was ever communicated directly to an investor.[5] Misstatements concerning a feature or the value of the

---

[4]     By way of example, David Gareis, the Entity Defendants' own Chief Operating Officer, admitted that at least six investors received the message of support prior to purchasing Fund shares. (Tr. at 965 ("six customers had received such information and then made purchases"), 1955, 2294.) In addition, Insights was sent to Principal Financial Group at 8:01 pm on September 15, the day before Principal invested over $47 million. (PX 55 at RF-SEC-00000381 (email from Mark Rothwell to, among others, kooienga.mark@principal.com and Heydlauff.Peter@principal.com); DX 184, Tab 2 at lines 9 and 33, shows that Mark Kooienga placed two of Principal's trades on September 16, after receiving Insights).)

[5]     United States v. Naftalin, 441 U.S. 768, 773 (1979) (fraud need not be perpetrated on investor); SEC v. Greenstone Holdings, Inc., 10 Civ. 1302 (MGC), 2012 WL 1038570, at *7 (S.D.N.Y. Mar. 28, 2012) (holding that "there is no question" that false statements to a transfer

4

security itself are "in connection with."[6]

Here, there is no question that the requisite nexus exists. Ledford made false statements to Moody's at 2:18 pm on September 15 about the Fund's ability to raise cash to repurchase Fund shares and repay redemptions. (PX 24 at 2, 6.) In other words, his false statements concerned the Fund's securities. Moreover, the Entity Defendants advertised the Fund's AAA ratings from Moody's and continued to sell their AAA-rated securities to the public up through the afternoon of September 16. (Tr. at 989.) After 2:18 pm on September 15 investors purchased nearly $1 billion in additional Fund shares. (DX 184 at tab 1 (showing purchases into the Fund).) Indeed, many of the Fund's investors could not invest in anything less than AAA-rated securities (Tr. at 383-84, 726) and monitored for "credit watches" indicating that a ratings agency may be revisiting its rating. For example, one investor, Principal Financial Group, which invested over $47 million after Ledford's statements (Tr. at 903, 906-07), "looked out for" whether their money market investments had been put on credit watch. (Id. at 899; see also id. at 1580 (Haussler testifying that a credit watch is "not a good thing").)

Defendants make no effort to dispute the requisite nexus, however. Instead, they simply assert—without citation—that no "connection was ever shown between that statement and the purchase of Fund shares." (Defs. Opp. Br. at 9.) But to require more than that the false statement be about a security that was being sold to the public and that shares were, indeed,

_____

agent that did not reach investors satisfied the "in connection with" element); SEC v. Czarnik, 10 Civ. 745 (PKC), 2010 WL 4860678, at *4 (S.D.N.Y. Nov. 29, 2010) (same).

[6] See, e.g., Korsinsky v. Salomon Smith Barney Inc., 01 Civ. 6085 (SWK), 2002 WL 27775, at *5 (S.D.N.Y. Jan. 10, 2002) ("misrepresentations or omissions concerning the value of a covered security satisfy the 'in connection with' requirement"); cf. A.T. Brod & Co. v. Perlow, 375 F.2d 393, 396-97 (2d Cir. 1967) (10(b) does not "contain[] any language which would indicate that those provisions were intended to deal only with fraud as to the 'investment value' of securities").

purchased—in other words, to require that either Moody's or an investor actually took action in response to Ledford's misstatements—would be to require reliance. While that may be what Defendants wish the law required, it does not. (See SEC Mov. Br. at 9 n.7.) Here, false statements were made about the very securities being sold, and those securities were purchased thereafter, all that the law requires in SEC enforcement actions.[7]

Defendants' other arguments fare no better. Defendants urge that the SEC waived its right to move for judgment as a matter of law on "in connection with" under Rule 50(a) because "the SEC did not argue that the same evidence satisfied both the 'in connection with' element of Section 10(b) and the 'in the offer' element of Section 17(a)" or that Ledford's statement was "in connection with." (Defs. Opp. Br. at 12.) It is blackletter law, however, that to preserve a valid Rule 50(b) claim, a party need only move—as the Commission did—as to the relevant element, in this case "in connection with."[8] Moreover, the SEC did make Rule 50(a) motions as to both "in connection with" and "in the offer," citing to the same evidence for both. (Ex. D at 8-9.) Defendants also inexplicably argue that a new trial is not warranted on the Section 10(b) claims against the Entity Defendants simply because the SEC chose not to challenge the Jury's verdict as to the Bent II's primary liability; but the two issues are unrelated.

---

[7]    Defendants also claim that the Jury could have found that Ledford's statements to Moody's "constituted an 'act, practice, or course of business that was fraudulent, deceptive, or manipulative' under Advisers Act Section 206(4). (Defs. Opp. Br. at 10.) While that is irrelevant for purposes of an "in connection with" analysis, the SEC agrees. Defendants' argument in their moving brief, taking exactly the opposite position and urging that the Court dismiss the Jury's finding that the Entity Defendants violated Section 206(4), is therefore, by their own admission, frivolous and should be denied. (See Defs. Mov. Br. at 11-12 n.5.)

[8]    Galdieri-Amborsini v. Nat'l Realty & Dev. Corp., 136 F.3d 276, 286 (2d Cir. 1998) (judgment as a matter of law must "identify the specific element"); Chrabaszcz v. Johnston Sch. Comm., 474 F. Supp. 2d 298, 308 (D. R.I. 2007) ("even a generalized pre-verdict motion made orally may support a more specific Rule 50(b) motion that attacks a specific element of the claim").

6

At a minimum, the SEC is entitled to a new trial on Section 10(b) and Rule 10b-5 under Rule 59. As we cannot know what swayed the Jury, its failure to apply correctly the law of "in connection with" to the evidence—a necessary element of the charge—alone merits a new trial. But, in any event, the vast weight of the evidence supports liability. There is no dispute that Ledford's statements were knowingly false. Ledford admitted it, acknowledging that he knew the Fund had only raised $1 billion while he was telling Moody's that the Fund satisfied $15 billion in redemptions. (Tr. at 2171, 2177-79.) In making statements he knew to be false, Ledford acted with scienter as a matter of law.[9] In addition, every relevant witness testified that the Fund's ability to repay investors, its ratings, and the potential for any change in those ratings were all critical features of any money market fund investment. (See SEC Opp. Br. at 16 n.21; Tr. at 899.) And Defendants were unable to produce a single witness or adduce any evidence that this information was unimportant to investors and point to no record evidence in their brief to counter the conclusion that the Jury's verdict on Section 10(b) and Rule 10b-5 was against the evidence.

Finally, in a footnote, Defendants contend—again without any citations to the evidence—that the SEC is not entitled to a new trial as to its secondary liability claims against Bent II because the Jury did not find Bent II liable for aiding and abetting 206(4) and control person liability requires "something more than mere negligence." (Defs. Opp. Br. at 14 n.6.) But the elements for Sections 206(4) and 10(b) are different and must be considered standing alone. Because the Jury was specifically instructed not to even consider aiding and abetting 10(b) if it

---

[9]   Greenstone Holdings, Inc., 2012 WL 1038570, at *6 ("In order to show scienter, the SEC must demonstrate either that the defendant had actual knowledge of material facts that were omitted or distorted or failed or refused to ascertain and thereafter accurately disclose such facts after having been put on notice as to their possible existence.") (quotations omitted).

7

found no primary liability, it never considered the issue and should now be given the opportunity to do so. Moreover, had it considered the claim under Section 20(a), the Jury would have been asked to find not that Bent II himself made a false statement or otherwise engaged in fraudulent conduct, but merely that he was aware of the Entity Defendants' fraud and "did not take steps to prevent it . . . [or that inaction was] to further the fraud." (DE 570 at 25.) Thus, conduct (or inaction) that would not itself constitute primary liability can form the basis of control person liability. But the Jury never considered this issue because it was instructed not to.

## II.    RMCI's and Resrv Partners' Claim to Expenses in Excess of Those Approved by the Trustees Should Not Be Granted and Any Amounts the Fund or Trustees Incurred as a Result of RMCI's or Resrv Partners' Fraud Should Be Recouped

The Commission adheres to its position—stated repeatedly—that RMCI and Resrv Partners should be reimbursed for those expenses reasonably incurred and actually paid in managing the 5,400[10] accounts of Primary Fund shareholders. And where there are expenses for which the Trustees are satisfied that Defendants' claims are substantiated, the SEC joins in their recommendation that those amounts be paid, to the extent that (1) the Court agrees that the salaries paid to the Bents themselves are appropriate (SEC Opp. Br. at 40-41) and (2) the Court orders that expenses attributable to the Entity Defendants' fraud be deducted or recouped. (SEC Mov. Br. at 11-14.)

No interest should be paid on these amounts, however. Defendants have not asserted a breach of contract claim in this case, and New York contract law would prohibit any claim that

---

[10]   Defendants frequently claim that there were 90,000 shareholders in the Fund, but have never provided any basis for that assertion, nor any details regarding how many of those 90,000 were active and invested in the Fund as of September 16, 2008. At a conference before the Court, the Independent Trustees clarified that there were really only 5,400 accounts. (Ex. E., Sept. 10, 2010 Conf. Tr. at 16.) Whatever the number, had the Fund paid all the $1 dollar confirm holders at the end of October 2008, it is clear that the number of accounts RMCI "managed" thereafter would have been substantially fewer.

8

Defendants would assert, even one in quasi-contract.[11]  But, even so, pre-judgment interest in

this federal question case is discretionary, and the Court should exercise its discretion to decline

to award it where that money would necessarily come from investors who are still awaiting

repayment of the money they entrusted to RMCI.  (SEC Opp. Br. at 43-44.)

**III.    Defendants Are Not Entitled to Profit from Their Actions After September 16, 2008**

Irrespective of whether the Court considers disgorgement or contract principles, the

results are the same—Defendants are not entitled to the $23 million profit they claim under the

Fund's Comprehensive Fee Investment Management Agreement for managing the Fund's

remaining assets after the Fund broke the buck.

A.    Defendants Have Failed to Demonstrate That Their Profits Were Attenuated From Their
Fraud and, Thus, Should Disgorge Those Funds

As set out in the SEC's moving brief, the Commission has met its burden under the law

to establish that Defendants should be ordered to disgorge amounts reasonably attributable to

their fraud—specifically the $23 million they claim for post-breaking-the-buck management fees

and unpaid broker expenses.[12]  But in arguing that their profits are too far removed from their

---

[11]    RMCI appears to argue (without saying so) that it should be awarded its fees on a quantum
meruit basis, if contract remedies are barred, but that theory is not available to it.  Clark-
Fitzpatrick, Inc. v. L.I.R.R. Co., 70 N.Y.2d 382, 388 (1987) ("The existence of a valid and
enforceable written contract governing a particular subject matter ordinarily precludes recovery
in quasi contract for events arising out of the same subject matter.").  The only theory
Defendants can assert, then, is one for restitution.  But, as the Second Circuit has held, restitution
is only available to defaulting parties where the default was neither willful, nor deliberate.  New
Windsor Volunteer Ambulance Corps, Inc. v. Meyers, 442 F.3d 101, 118 (2d Cir. 2006).  That is
not the case here.  Thus, Defendants' claim to fees is an argument that relies on the equities,
giving the Court substantial discretion in what it can award on that basis.

[12]    And in this case, the Commission does not seek the return of all the monies due RMCI, just
those amounts that make up the $23 million in profits that they claim if the Court determines to
award them fees under the Management Agreement.  (That $23 million is the number attested to
by RMCI's own expert, Charles Lundelius, and, as Defendants note (Defs. Opp. Br. at 18), is

fraud to warrant disgorgement, Defendants fail to meet their own burden to show the requisite clear attenuation. Instead, Defendants attempt to shift the burden back to the Commission, arguing that the SEC must show that events that post-date the fraud did not cut off the "but for" causation between the fraud and the profits earned by RMCI and Resrv Partners. (Defs. Opp. Br. at 23-24.) This burden shifting is unsupported by the law. Indeed, the law gives the benefit of any doubt about causation to the Commission, not Defendants. SEC v. First City Fin. Corp., 890 F.2d 1215, 1232 (D.C. Cir. 1989) (defendants must show "a clear break in or considerable attenuation of the causal connection between the illegality and the ultimate profits").)

Courts regularly order disgorgement of profits earned long after the fraudulent conduct. (See SEC Mov. Br. at 20 n.24.) Thus, in both SEC v. Posner, 16 F.3d 520, 522 (2d Cir. 1994), and SEC v. First Pac. Bancorp, 142 F.3d 1186, 1192 (9th Cir. 1998), the Courts affirmed disgorgement of compensation violators had earned from companies they had fraudulently acquired. While the fraud in both of those cases, like the fraud here, ended long prior to the payments they were made to disgorge, neither the Second nor the Ninth Circuit had any trouble finding an adequate "but for" connection between the profits and the wrongdoing. And in neither case was the Commission put to the task of showing that the defendants had not come by their gains lawfully.

Defendants have no answer to Posner and First Pacific. In response, they suggest that they merit their profits because someone else would have had to do the work they did anyway. (Defs. Opp. Br. at 24.) This is a red herring. While profits for such management by a non-fraudster may not be objectionable, it is so for the Defendants here precisely because their actions on September 15 and 16 were causally connected to their "management" of so much

_____

made up of the $8 million he estimates as their profit and the $15 million in broker expenses that Defendants claim they are due, but which they have never paid to any broker.)

money for so long. Thus, irrespective of whether such management work needed to be done, these Defendants are not entitled to the profit associated with it.

B.   Well-Settled Principles of Contract Law Defeat RMCI's Claims to Fees Under the Management Agreement

Principles of contract law preclude RMCI and Resrv Partners from recovering the $20+ million they seek under the Management Agreement and the Distribution Agreement. RMCI acknowledges that its contract with the Fund obligated it to abide by the securities laws. (Defs. Opp. Br. at 15.) And it does not argue with the notion that a material breach defeats the defaulting party's right to enforce an agreement.[13]  Instead, Defendants argue that RMCI's breach was excused because the Trustees elected to ignore the breach and to continue the agreement. (Id. at 16.) But the equitable election of remedies rule on which Defendants rely does not help them here because, almost immediately after September 16, 2008, the Trustees manifested their unequivocal position that the Fund would not pay RMCI the amounts that it claimed were due it under the Management Agreement. (Ex. F (Draft Minutes of Board of Trustees' Meeting, February 20, 2009), at GP_SEC 0001987); Ex. G (Jan. 6, 2009 Press Release, "Additional Information Regarding the Reserve Primary Fund" (noting that "[a]ccrued comprehensive management fee payments on unfunded redemptions are unpaid; all such payments are subject to approval by the board of trustees.").)

---

[13]   It is a "fundamental principle of contract law that the material breach of a contract by one party discharges the contractual obligations of the non-breaching party." Bear Stearns Funding, Inc. v. Interface Group-Nevada, Inc., 361 F. Supp. 2d 283, 291 (S.D.N.Y. 2005); see also Merrill Lynch & Co., Inc. v. Allegheny Energy, Inc., 500 F.3d 171, 186 (2d Cir. 2007) ("Under New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain, or, synonymously, where that party has committed a material breach."); Trustees' Br. at 17 (collecting cases setting forth the New York law principle that a party states a claim for breach of contract only where it alleges that it has complied with its obligations under the contract it sues to enforce.)

11

Questions under the equitable election of remedies doctrine "are particularly fact intensive," because they are essentially questions of waiver that must be "'clear, unmistakable and without ambiguity.'" Eastman Chem. Co. v. Nestle Waters Mgmt. & Tech., No. 11 Civ. 2589 (JPO) (HBP), 2012 WL 4474587, at *2 (S.D.N.Y. Sept. 28, 2012). Here, the Trustees gave no clear, unmistakable and without ambiguity indication of anything in the post-September 2008 period other than their intention not to pay Defendants the amounts they were demanding under their interpretation of the Management Agreement. See Deutsche Asset Mgmt., Inc. v. Callaghan, No. 01 Civ. 4426 (CBM), 2004 WL 75803, at *17 (S.D.N.Y. April 7, 2004) (finding that modification of contract can be established by course of performance and issues of fact were raised as to whether non-breaching party's continued performance indicated its acceptance of modified payment terms of contract between the parties). Defendants continued to provide the management services until September 2009 knowing that the Trustees would not pay them on the basis of a "net assets" definition that included redeemed, but unpaid, amounts.[14]

Even if RMCI's and Resrv Partners' breach did not disqualify them from pursuing their contract claims, their entitlement to compensation is limited by what the parties to the relevant agreements intended at the time they were formed. (Defs. Opp. Br. at 18 (citing cases).) Here,

---

[14] Defendants' reliance on ARP Films, Inc. v. Marvel Entm't Grp., 952 F.2d 643, 649 (2d Cir. 1991) (Defs. Opp. Br. at 16) is misplaced. In ARP Films, the party withholding payment withheld it unilaterally, in order, it argued, to encourage the other party to recant its anticipatory repudiation, and continued to accept the contract's benefits. Id. at 648. Here, in contrast, the Trustees gave notice to Defendants of their interpretation of their obligations under the contracts and the terms on which they were willing to pay. Defendants continued to perform on that basis. And in Apex Pool Equip. Corp. v. Lee, 419 F.2d 556, 563 (2d Cir. 1969) (Defs. Opp. Br. at 16), the Court held that where the non-breaching party identifies the breach and seeks to negotiate more favorable terms as a result, he has not affirmed the contract. "The negotiations that Apex conducted with Lee, unlike those mentioned in Emigrant Indus. Savings Bank [v. Willow Builders, Inc., 290 N.Y. 133, 145 (1943) (Defs. Opp. Br. at 16)], were not an affirmance of the contractual obligation, but sought more favorable terms for Apex in a new contract." Id.

12

the focus is on the parties' intended meaning of "net assets." The Trustees contend that they

construed "net assets" as those assets that remain unredeemed. (Trustees' Brief in Response to

Parties' Post-trial Memoranda ("Trustees' Br.") at 17-18.)[15]  And we also know how Defendants

treated redeemed shareholders prior to September 15. Their own CFO testified about the

accounting treatment of redemptions, explaining that redemption orders were subtracted from

assets to produce the "net assets" of the Fund. (Tr. at 308.) And from the Fund's Prospectus, we

know that investors were told that they would earn no dividends on money redeemed, regardless

of when the redemption was actually paid. (SEC Mov. Ex. O (Prospectus at May 21, 2008

Supplement (5th consecutive page) ("Shares do not earn dividends on the day a redemption is

processed, regardless of the time the order is received.").)  If RMCI considered redeemed but

unpaid assets as undeserving of the benefits of remaining in the Fund, it must also consider them

free from the obligations of remaining in the Fund. Thus, the amounts due under the

Management Agreement are, according to the Trustees, $5 million, (SEC Mov. Br. at 10), and

RMCI has been paid in excess of that already.

## IV.   Significant Penalties Are Warranted Against Each of the Liable Defendants

An award here of anything less than full third-tier penalties against the Entity Defendants

and significant first-tier penalties against Bent II will frustrate the deterrent effect Congress

---

[15]   Because we know what the parties intended, Defendants are right that the Court need not
accept the SEC's "musings on this issue." (Defs. Opp. Br. at 18.) However, it is necessary to
correct Defendants' endless "judicial estoppel" arguments. In its proposed Order on the Section
25(c) application, the SEC called all investors in the Reserve Fund "shareholders" for the
purposes of defining the group of investors who would be affected by the Court's distribution
order. They could as easily have been called "investors." No greater import was argued or
conceded. And because it was the Court's Order, the Court should give it the meaning it
ascribed to the term when it signed the Order.

13

sought to achieve in the Remedies Act[16] and will tell advisers and investors that market partici-

pants risk little from defrauding investors. Defendants' arguments to the contrary are entirely

unavailing, confusing the statutory elements of penalty with those of the underlying violations.

Third tier penalties under each of the Acts at issue can be awarded on a showing of two

things: (1) the violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard

of a regulatory requirement"; and (2) such violation directly or indirectly resulted in substantial

losses or created a significant risk of substantial losses to other persons. Securities Act Section

20(d)(2)(C); Advisers Act Section 209(e)(2)(C). As both elements are satisfied here, third-tier

penalties should be awarded.

A.      The Violations Here Involved Fraud, Deceit, Manipulation or Deliberate or Reckless
        Disregard of a Regulatory Requirement

There is no question that the Jury found that the Entity Defendants intentionally or

recklessly violated the Securities Act and the Advisers Act. Penalties at the second- or third-tier

level are available to address this conduct committed with scienter. Defendants argue that

neither second- nor third-tier penalties is appropriate for violations of Sections 17(a)(2) or (a)(3)

and Section 206(4) and Rule 206(4)-8. (Defs. Opp. Br. at 32-33.) This argument is contradicted

by the case law, the legislative history of the Remedies Act, and common sense.

Courts, including the Second Circuit, award second- and third-tier penalties without

regard for the elements of the underlying claim. Contrary to Defendants' assertion that

"negligence" claims "are not even eligible for second tier penalties," (Id. at 33), the Second

Circuit has approved third-tier penalties for violators of Securities Act Section 5 (which, like

---

[16] The "Remedies Act" was enacted as the Securities Enforcement Remedies and Penny Stock
Reform Act of 1990, Pub.L. 101-429.

Section 17(a)(2) and (3), has no scienter requirement[17]), so long as the violator acted with

scienter, as here. SEC v. Kern, 425 F.3d 143, 153 (2d Cir. 2005) (affirming award of third-tier

penalties where trial court had found that defendants acted with knowledge of the "fraudulent,

market-manipulating nature of their acts").[18]  The Court of Appeals has even approved awards of

higher-tier penalties for rule-based violations that involved no fraud at all. SEC v. Colonial Inv.

Mgmt. LLC, 381 F. App'x 27, 32 (2d Cir. 2010) (affirming penalties awarded for each trade

instituted in violation of Exchange Act Rule 105). Judging from Kern and Colonial, the Second

Circuit disagrees with Defendants' view that sections of the securities laws that "have no scienter

requirements, are not ordinarily considered serious." (Defs. Opp. Br. at 33.)  That Court views

them as just as deserving of higher penalties as any other violation if committed with scienter. [19]

　　Nor would Congress agree that certain violations are ineligible for penalties. Had

Congress wanted to restrict higher penalties to scienter-based statutory violations, it could have

said so in the Remedies Act. For those portions of the Remedies Act applicable to the Securities

Act, in particular, limiting the available penalties would have been easy, since only Section

17(a)(1) requires scienter to make out a claim, and the penalty provisions could easily have made

only a violation of that provision eligible for the second or third tiers. Instead, the statute (like

the Advisers Act penalty provisions) gives the Court the explicit authority to consider all tiers

---

[17]  SEC v. Elliott, No. 09 Civ. 7594 (KBF), 2012 WL 2161647, at *7 (S.D.N.Y. June 12, 2012) ("Scienter is not an element of a section 5 violation.") (quotations omitted).

[18]  Accord SEC v. Verdiramo, No. 10 Civ. 1888 (RMB)(AJP), 2013 WL 57823, at *3-4 (S.D.N.Y. Jan. 7, 2013) (awarding second-tier penalty against Section 5 violator because defendant acted recklessly); SEC v. E. Delta Res. Corp., No. 10-CV-310 (SJF)(WDW), 2012 WL 3903478, at *9 (E.D.N.Y. Aug. 31, 2012) (same).

[19]  SEC v. Novus Techs. LLC, 07 Civ. 235 (TC), 2011 WL 2516938, at *3 (D. Utah June 23, 2011) (Defs. Opp. Br. at 33) is of no help to Defendants since, in that case, the SEC had only asked the Court to consider a first tier penalty for the Section 17(a)(2) and (3) violations there.

with respect to "any person [who] has violated <u>any</u> provision of this subchapter, the rules or regulations thereunder." Securities Act Section 20(d)(1) (emphasis added); <u>see also</u> H.R. Rep. 101-616, 1990 U.S.C. C.A.N. at *1379, 1384 (indicating Congressional intent to make even "violations of bookkeeping provisions or the Commission's customer protection rule" eligible for third-tier penalties even though they "may occur without engaging in conduct to defraud").

Indeed, when it suited their purposes, Defendants themselves acknowledged that penalties could be imposed if the Jury found—as it did—that they acted with scienter, even in violating Sections 17(a)(2) or (3) or Section 206(4). (<u>See</u> SEC Opp. Br. at 4 (in urging the Court to insert the mental state choice into the verdict form, Defendants pointed to the distinctions in penalties available for different levels of conduct and argued that "[t]he reason that we have a jury is specifically to get these kinds of findings"); <u>accord</u> Defs. Mov. Br. at 2 ("The distinction between fraud and negligence findings is not an abstraction; it has potential ramifications for penalties and perhaps other areas.").) Having got what they asked for, for the reasons they asked for it, Defendants' arguments against awarding penalties on that basis are particularly hollow.

B.    The Entity Defendants' Fraudulent Conduct Put Investor Assets at Significant Risk of Substantial Loss

Because the Jury found that the Entity Defendants acted to defraud investors with scienter, the only way the Entity Defendants can make themselves ineligible for third-tier penalties is to ignore the "risk of substantial losses" clause in the third-tier penalty provisions. Securities Act Section 20(d)(2)(C)(II); Advisers Act Section 209(e)(2)(C)(II). [20] Despite devoting so much of their brief to establishing that the Commission should be estopped from

---

[20]   In a one sentence throw away, Defendants claim that the Commission should also be estopped from arguing that the Entity Defendants' conduct created a "risk of loss" too, but they do not say why. (Defs. Opp. Br. at 34.)

16

arguing that actual investor loss occurred, Defendants must concede that the Commission never argued that <u>risk of loss</u> was irrelevant here.[21]  (Defs. Opp. Br. at 30.)  Defendants say nothing about the risk of substantial loss because that point is beyond dispute.  The record shows that investors remained in the Fund, and even purchased new shares in the Fund, believing the Entity Defendants' false statements of support.  Thus, their investments were placed at the <u>risk</u> that the Entity Defendants would renege on that pledge and cause them loss.

Furthermore, while the Court need not consider any evidence of actual loss to impose third-tier penalties for each Entity Defendant, if the Court should accept <u>Defendants'</u> invitation to examine the losses investors actually incurred (Defs. Opp. Br. at 32 (claiming "[a]ny losses that investors sustained here were due not to any securities violation, but to the Fund's investment in Lehman")), the Court should not accept Defendants' mischaracterization of that evidence.  That investors actually lost money when they purchased shares at $1.00 or decided against transferring funds from the Primary Fund to other Reserve funds is clear.  Tracy Reeg testified that her company, Principal, which purchased Primary Fund shares in the relevant time period, relied on the continued Triple A rating of the Fund (Tr. at 897); and Lalo Torres, another investor in the Fund, testified that he relied on promises of continued safety when deciding how much money to move to a different Reserve Fund (that ultimately paid out at a full dollar).  (Tr. at 1546; 1552.)  Those two investors, like countless others, made decisions to buy new shares or to forgo transferring funds to a different Reserve fund on the basis of the Entity Defendants' false statements.  Had they not made those decisions, they may have suffered no loss at all.

---

[21]   In the very same conference transcript Defendants quote, we said: "We do not have to show investor loss to get a penalty.  All that has to be shown is risk of investor loss."  (Ex. H (December 15, 2010 Tel. Conf. Tr. at 21).)  And we reiterated that position in connection with Defendants' motion for summary judgment (DE 396 at 25)—a motion the Court denied.

17

C.    The Entity Defendants Should Not Profit from Their Fraud

A significant penalty is necessary here to ensure that the Entity Defendants and Bent II do not profit from their violations, and to deter other market participants. If the Court determines that it may not reclaim the fees and expenses the Entity Defendants earned from holding hostage investor funds as disgorgement, then it can make their fraud unprofitable and provide the necessary disincentive through an appropriate level of penalties. Congress gave courts great discretion in setting penalties to serve the greater goal of deterrence, to maintain investor confidence in the integrity, fairness and efficiency of the securities market, and to deal with situations just like this one. H.R. Rep. 101-616, 1990 U.S.C. C.A.N. at *1381. It instructed courts to level penalties "for each violation," Securities Act Section 20(d)(2)(A); Advisers Act Section 209(e)(2)(A), but allowed them to define the violation, permitting them to award a penalty for each violative act, or a single penalty for a series of violations as one violative scheme. It provided three tiers, to be meted out depending on the nature of the conduct, and directed that courts consider "the facts and circumstances." Id. Thus, the Remedies Act was written to ensure that courts had maximum flexibility to craft remedies that appropriately punished the infractions of the defendants before them and provided sufficient disincentives to similar conduct, vindicating the rights of the defrauded investors at issue and providing protections to future investors from similar fates.

The Remedies Act therefore allows the Court to remedy the wrongs here through the imposition of penalties even if it finds itself unable to award other remedies. Indeed, the Entity Defendants, Bent II, and other market participants, would hardly be deterred in any meaningful way if relieved of sanctions for their misconduct. And such a result would deal a blow to investor protection and market integrity.

In seeking only minimal penalties, Defendants argue with the calculation the Commission

18

suggests, maintaining that it would offend Congressional intent to calculate penalties on a per victim basis because Congress did not authorize that method "explicitly." (Defs. Opp. Br. at 36.) But Congress did authorize that method, among others. When Congress enacted the Remedies Act, courts had already interpreted the Securities Act to allow the treatment of each securities transaction as a separate violation, not just parts of a single scheme. E.g., Otis & Co. v. SEC, 106 F.2d 579, 584 (6th Cir. 1939) (holding that each wrongful sale transaction constituted a separate violative act). In interpreting the Remedies Act itself, numerous courts have used a per victim or per transaction calculation in fixing penalties. (SEC Mov. Br. at 28 n.31 (collecting cases).) Had Congress meant to prohibit that method, it could have so said in the statute itself, or amended the statute to so provide when it amended other provisions of the Securities Act in Sarbanes-Oxley in 2002 or when it amended both the Securities Act and the Advisers Act in Dodd-Frank in 2010. But it did not. Under well-established principles of statutory interpretation, Congress is presumed to have been "aware of existing law when it passes legislation." Atl. Sounding Co., Inc. v. Townsend, 557 U.S. 404, 428 (2009); see also Merrill Lynch, Pierce, Fenner & Smith v. Curran, 456 U.S. 353, 382 n.66 (1982). Congressional inaction, thus, evinces its approval of such a calculus to effect deterrence and investor protection.

Indeed, it was Congress' explicit intent that courts have maximum flexibility in deciding appropriate penalties, and it instructed courts to consider imposing penalties even where other remedies were deemed inappropriate. H.R. Rep. 101-616, at *1389 ("This discretion would permit the court to impose a civil money penalty even if it determined that injunctive or other equitable relief against the same defendant was not warranted.").

In this case, the factors support the imposition of significant penalties for the reasons cited in our moving brief. Defendants' arguments to the contrary are unpersuasive. They claim,

19

for example, that they "cooperated" with the Commission (Defs. Opp. Br. at 34), but point only to their production of documents in response to the Commission's investigative document subpoenas. That they complied with compulsory process is hardly the kind of "cooperation" that courts typically credit.[22] As to the Entity Defendants' exit from the industry, Defendants ignore that penalties should be imposed not just to deter these Defendants, but to deter others like them.[23] If the Entity Defendants escape significant penalties, the message to investment advisers would be that defrauding investors presents a risk of only nominal sanctions. As to why they persist in denying responsibility, Defendants explain that they should not have to admit wrong-doing because they were "cleared of the serious charges." (Defs. Opp. Br. at 34.) Defendants offer no basis to believe that they will ever appreciate the seriousness of the Entity Defendants' wrongdoing unless provided with a reason to do so. Obviously the million dollar penalty the Commission imposed all those many years ago for RMCI's previous violations was not deterrent enough. Reserve Mgmt. Corp. v. Anchor Daily Income Fund, Inc., 459 F. Supp. 597, 601 (S.D.N.Y. 1978) (noting that the penalty imposed by the Commission totaled $1.4 million).

The only other argument Bent II musters against a per victim calculation and in support of the nominal one-time penalty of $6,500 he suggests, is that the Commission has offered no evidentiary support for its claim that he is wealthy. (Defs. Opp. Br. at 37.) And, they argue, in any event, he has suffered enough, having to "uproot his family, [while he] is now, in his 40s, trying to start over." (Id.) But while it is surprising that Defendants would put such a challenge

---

[22] Compare, e.g., SEC v. Inorganic Recycling Corp., No. 99 Civ. 10159 (GEL), 2002 WL 1968341, at *5 (S.D.N.Y. Aug. 23, 2002) (declining to impose penalties in light of "meaningful contrition" and "prompt and significant cooperation" with parallel criminal investigation).

[23] SEC v. Rabinovich & Assocs., L.P., No. 07 Civ. 10547 (GEL), 2008 WL 4937360, at *6 (S.D.N.Y. Nov. 18, 2008) ("a substantial penalty is necessary in order to deter [defendant] and others from future violations").

to the Commission—given their many efforts to block discovery into the Bents' wealth—it is not a difficult one to meet. Bent II offers no evidence of his financial condition in support of his prayer for the lowest possible penalty, a failure that is fatal to his request that the Court consider his reduced circumstances. See, e.g., SEC v. Robinson, No. 00 Civ. 7452 (RMB)(AJP), 2002 WL 1552049, at *12-13 (S.D.N.Y. July 16, 2002) (rejecting defendant's claims of impecunity where he "offered no admissible evidence to support his claim"). The record establishes that the Bents, including Bent II, earned millions of dollars from their management of the Reserve (if not established by their current claims of millions of dollars in fees and expenses from the final two years of running a liquidating firm). In 2007, alone, RMCI paid its Office of the Chair $20 million in bonuses on top of their salaries (Ex. B at RF-SEC-00088772), all money Bent II split three ways with his father and brother. (Ex. A (chart showing ownership of RMCI and Resrv Partners).) For the two years thereafter, Bent II is requesting that the Court pay him nearly $1 million in salary. (Defs. Opp. Br. at 28 n.10.)

Furthermore, in his own name, with his wife, or in his wife's name, Bent II maintains three separate residences, including a $16 million TriBeCa penthouse, a beach house on the Delaware shore, and a multi-acre cattle farm in Hyde Park. (Ex. I.) And in his professional endeavors, Bent II appears to have gone on to a successful new career in patent licensing to the financial industry. (Ex. J.) As this Court held in SEC v. Jadidian, No. 08 Civ. 8079 (PGG), 2011 WL 1327245, at *8 (S.D.N.Y. Mar. 31, 2011), Bent II's "significant wealth" makes a persuasive argument for higher penalties, so that the message that wrongful conduct will carry a meaningful penalty will be heard, both by him and others similarly situated, and provide a necessary disincentive to further violations.

What is clear from case after case is that courts have exercised the discretion Congress

21

authorized to order a penalty that would serve the purposes of equity, maintenance of investor

confidence in the integrity of the markets and deterrence. Thus, where imposing third-tier

penalties per victim or per transaction produces a number that is excessive, courts will not

default to imposing only one third-tier penalty, but will exercise their equitable authority to

arrive at a penalty sufficient to sufficient to achieve those purposes. E.g., SEC v. Pentagon

Capital Mgmt. PLC, No. 08 Civ. 3324 (RWS), 2012 WL 1036087, at *4, 9 (S.D.N.Y. Mar. 28,

2012) (recognizing that statute permitted penalties of $1.2 billion on a per transaction basis, court

limited penalties to $38 million as appropriate to "deter or punish Defendants or deter those

similarly situated"); SEC v. Ramoil Mgmt., Ltd., No. 01 Civ. 9057 (SC), 2007 WL 3146943, at

*13 (S.D.N.Y. Oct. 25, 2007) (imposing penalties for each of five false filings, but at $10,000

per violation, as sufficient to serve penalty purposes). Here, those goals counsel for significant

penalties against the Entity Defendants and Bent II.[24]

V.     **The Court Should Enter Injunctions Against the Entity Defendants and Bent II**

Defendants' response to the Commission's application for injunctive relief asks the Court

to ignore (i) the Jury's finding that the Entity Defendants' committed fraud; (ii) the Entity

Defendants' history of violative conduct; and (iii) controlling precedent permitting injunctions

---

[24]   The discretion authorized by Congress gives the Court many options in this case as well.
Defendants claim that only Ledford's conduct can explain the Jury's verdict, but they ignore the
equally plausible likelihood that the Jury found the Entity Defendants liable for false statements
on the 16th that they could not attribute to Bent II as the maker. (SEC Opp. Br. at 12.) If so, the
Court could calculate penalties just on the purchases made on the 16th, on the theory that the
false statements were publicly disseminated at the time of those purchases. In that case, the 11
investors that Defendants admit made "unautomated" purchases on that date were defrauded in
both the offer and purchase of securities. The Entity Defendants could therefore be liable for
three violations (two for RMCI and one for Resrv Partners) times 11, or $21,450,000. Or the
Court could determine that all 868 purchases made ("automated" and "non-automated" (DX
184)) were subject to the risk of loss created by the Entity Defendants' false statements on
September 16, and decide that a single first tier penalty per violation of $65,000 would be
appropriate, producing a penalty of $56,420,000.

based on underlying negligent conduct.

A.   Defendants Fail to Acknowledge, Let Alone Appreciate, Their Wrongdoing

The Entity Defendants and Bent II resolutely deny any responsibility for their securities

law violations, making an injunction against further violations not only appropriate, but

necessary to prevent further harm to investors. SEC v. First Jersey Secs., Inc., 101 F.3d 1450,

1477 (2d Cir. 1996) ("persistent refusals to admit any wrongdoing ma[k]e it rather dubious that

[the offenders] are likely to avoid such violations of the securities laws in the future in the

absence of an injunction.") (quotation marks and citation omitted). Defendants do not even

acknowledge the Jury's full verdict—stating that "Defendants accept [the Jury verdict] *to the*

*extent it reflects . . . that Defendants committed no fraud.*" (Defs. Mov. Br. at 1 (emphasis

added).) Later, less guarded, Defendants make their rejection of the Jury's verdict and their own

wrongdoing crystal clear: "[B]oth RMCI and Resrv Partners were also cleared of all fraud

charges." (Id. at 24.) All of this is manifestly at odds with the Jury's conclusions that the Entity

Defendants violated Sections 17(a) and 206(4) and Rule 206(4)-8 with scienter. (See SEC Opp.

Br. at 4-6.) Even the Jury's finding that Bent II negligently violated Section 17(a) comes in for

disparagement by Defendants. (Defs. Mov. Br. at 1 (noting Defendants' "disagree[ment] with

that negligence finding").)

If they acknowledge that any wrongdoing occurred here at all, Defendants have gone to

great lengths to shift the blame for it to others. In addition to attempting to shift all of the blame

to Ledford, on the same day that Defendants served their response to the Commission's moving

memorandum, they filed a complaint against the Primary Fund's Board of Trustees blaming

them for virtually every problem Defendants have faced since September 15, 2008. (08-cv-

08060 (PGG), DE 80 at 34 ¶¶ 7, 46-47.)[25]  Their complaint against the Fund's Board joins

RMCI's complaint against its former counsel, Willkie Farr, in which RMCI alleges that it was

Willkie's misconduct that precipitated this law suit.  (RMCI v. Willkie Farr & Gallagher LLP,

No. 11 Civ. 7045 (PGG) (DE 10-1).)  As the Second Circuit has long held, such finger-pointing

supports the need for injunctive relief.  First Jersey Secs., 101 F.3d at 1477; see also SEC Mov.

Br. at 37 n.38 (citing cases).

B.      Defendants' Conduct Before and After September 15-16, 2008 Supports Injunctive Relief

        Mindful that courts properly consider whether a defendant's misconduct is of an "isolated

or recurring nature" in considering injunctive relief (SEC Mov. Br. at 31), Defendants paint a

history of compliance with the securities laws that is belied by the record.  Defendants urge the

Court to consider what they describe as the Commission's decision to "allow[] Defendants to

continue managing $50+ billion in Fund assets … for more than two years following the events

in question" as evidence that that the Commission trusted Defendants to avoid further violations

of the federal securities laws.  (Defs. Opp. Br. at 38.)  But, in its initial filing, the Commission

urged the Court to exercise its jurisdiction over all the assets remaining in the Fund and, among

other relief, sought an order appointing a monitor for the Primary Fund to "protect investors'

interests."  (DE 15 at 25.)

        Defendants also ask the Court to ignore evidence of prior securities violations because of

the timing of those infractions or the nature of the evidence.  (Defs. Opp. Br. at 38-40.)  But

[25]  Defendants even go so far as to retread their old, baseless charge that the Trustees "altered"
the Fund's Board Minutes.  But as the Court will recall, it was Defendants, not the Trustees, who
altered Fund Board Minutes.  Even though the full Board, including Bent Sr., voted to approve
the Minutes with brackets around the number of redemptions reported at the 1 p.m. meeting (Ex.
K (Bent Sr.'s handwritten approval on version of minutes with brackets, dated day after the
Board met to approve them)), RMCI altered the "final" Minutes to remove the brackets without
the Independent Trustees' knowledge or consent.

Courts routinely weigh similarly "old" violations in favor of granting applications for injunctive relief. See, e.g., First Jersey Secs., 101 F.3d at 1477-78 (affirming grant of injunction where district court considered misconduct dating back more than 20 years); SEC v. E. Delta, 2012 WL 3903478, at *6 (in granting injunction against further violations of Securities Act Section 5, court noted 1995 and 1998 sanctions by NASD and SEC, respectively, as supporting likelihood of recidivism).

Moreover, while Defendants insist that their prior misconduct does not demonstrate any pattern of securities law violations (Defs. Opp. Br. at 39), Defendants do not dispute that the Reserve settled an action with the Commission alleging violations of Securities Act Section 17(a) for failing to disclose adequately certain material facts, just as the Jury found Defendants failed to do here. Rel. No. IC-11394, IA-733, 1980 WL 20755, at *1 (Oct. 10, 1980) (describing violations of both Section 17(a) of the Securities Act and 10(b) of the Exchange Act). Likewise, Defendants do not dispute that among the several violations noted in a 2005 deficiency letter is one for an "'untrue statement' in violation of Rule 10b-5 of the Exchange Act" based on misleading representations concerning how RMCI calculated management fees charged to the Reserve Funds. (SEC Mov. Ex. M, at 3.)

Defendants label other violations as merely "technical," apparently having learned nothing since their appearance before Judge Duffy in Reserve Mgmt. Corp. v. Anchor Daily, 459 F. Supp. at 601. There, the Court rejected Defendants' attempt "to pass [their misconduct] off as merely technical violations." Id. In fact, in an all too familiar pattern, those "technical violations" resulted in an order requiring Reserve Management Company "to repay certain of the investment advisory fees to the investment company" because the company improperly retained fees from the Reserve Fund to which it was not entitled. Id.

25

Finally, Defendants urge the Court to ignore deficiency letters resulting from SEC

regulatory exams of RMCI in 2005 and 2006 (when Bent II was President and Vice-Chairman of

RMCI (PX 44)) because many investigations of investment advisers reveal "at least one defi-

ciency." (Defs. Opp. Br. at 40.) But there were multiple deficiencies here, and they were hardly

trivial. To the contrary, they involved inaccurate record-keeping that caused $16.7 million of

investor money to go missing from the Fund's cash account (SEC Mov. Ex. N. at 1-2) and

involved the same kind of misconduct at the heart of the earlier settlements with the SEC.[26] That

Defendants fail to appreciate the violative nature of the Entity Defendants' repeated past

conduct, and subsequently continued to violate the securities laws in many of the same ways,

confirms the wisdom of granting injunctions here.[27]

C.      Defendants' Scienter Warrants Injunctive Relief

Defendants do not address the deceptive nature of the Entity Defendants' violations other

than to label them violations of mere "negligence statutes" and to repeatedly (but without citation

to the record) shift all of the blame to Ledford, for whom they take no responsibility. (Defs.

Opp. Br. at 1, 33, 38.) As addressed above and in the SEC's Brief in Opposition to Defendants'

Omnibus Post-trial Motion, the Court need not accept Defendants' self-serving characterization

of the Jury's findings since it presided over a trial replete with evidence of the Entity

---

[26]   For example, the violations identified in the Commission's 2005 deficiency letter to RMCI
was a violation of Investment Company Act Section 15(a), which led to the significant
overpayment of management fees to RMCI by the Primary Fund. (SEC Mov. Ex. M at 1.)
Violations of this same statute led to the suspension of Reserve Management Corporation's
registration in 1977. Rel. No. IC-9826, 1977 SEC LEXIS 1421, at *3 (June 27, 1977).

[27]   This case is not like SEC v. Jones, where there existed no evidence aside from a defendant's
underlying violation "to suggest some cognizable danger of recurrent violation.'" (Defs. Opp.
Br. at 38, quoting Jones, 476 F. Supp. 2d 374, 384-85 (S.D.N.Y. 2007).)

Defendants' scienter in making numerous false statements to multiple audiences.[28]  Moreover, Defendants' continued efforts to hide the ball in their attempts to maximize their profits from the remaining pool of defrauded investors' money is particularly probative of Defendants' scienter.

Defendants' contention that Bent II's negligent conduct does not warrant injunctive relief should also be rejected.  The reason for granting an injunction against further negligent violations of the securities laws is clear: "negligent misstatements or negligent omissions . . . establish[] an affront to the goal the statutes sought to achieve . . . [and an] injunction in such a case[s] can provide substantial assurance that the negligent issuer will take more pains the next time to avoid all falsity."  SEC v. Am. Realty Trust, 586 F.2d 1001, 1007 (4th Cir. 1978).

Defendants argue that under Aaron v. SEC, 446 U.S. 680 (1980), Bent II's negligence should be considered in light of the relevant context to assess the likelihood "that such a future violation may occur."  (Defs. Opp. Br. at 41.)  The Commission agrees.  Because Bent II has failed to take responsibility for his actions, has sought to force still-uncompensated investors to pay for his salary and RMCI's (and thus his own) profits, and because the record established that Bent II failed to give investors complete and truthful information when given numerous chances to do so (SEC Mov. Br. at 29), the relevant context here favors injunctive relief.  Defendants offer no compelling reason why Bent II's negligence should be treated any differently from the "lack of vigilance" the court in SEC v. Moran, 944 F. Supp. 286, 294 (S.D.N.Y. 1996) (Defs. Opp. Br. at 41) held warranted injunctive relief.  Indeed, contrary to Defendants' assertion that

---

[28]  Defendants also suggest that the Entity Defendants should not be enjoined because they are no longer in business. (Defs. Opp. Br. at 39.)  Defendants offer no evidence that the Entity Defendants are defunct.  To the contrary, that Defendants are making claims for payment on behalf of RMCI demonstrates its continued existence.  In any event, an injunction would hardly serve any function if a defendant could simply stop working at the time of a liability finding only to start again after relief is entered. (SEC Mov. Br. at 39.)

27

"[i]njunctive relief is generally not suitable for negligent conduct" (Defs. Opp. Br. at 40), courts in and out of this Circuit have consistently held otherwise. See SEC v. Universal Major Indus. Corp., 546 F.2d 1044, 1046-47 (2d Cir. 1976) (affirming grant of injunctive relief based on finding of negligence); see also SEC Mov. Br. at 32 (collecting cases).

## VI. An Evidentiary Hearing (and Relevant Discovery) Is Appropriate for Any Disputed Issue

Defendants seek $72 million, three quarters of the remaining assets in the Expense Fund, but have failed to provide evidence to substantiate their entitlement to those amounts. The Court should, therefore, deny Defendants' request. Given the competing interests of blameless investors to be made whole, Defendants' track record of asserting insupportable claims to unearned dollars, their failure to document claims to millions in indemnification for attorneys' fees, and the Trustees' legitimate concerns that some amount of the expenses they and the Fund incurred resulted from the Entity Defendants' fraud, incompetence or a combination of both (Trustees' Br. at 26), the Court should, at a minimum, require Defendants to prove-up their claims.[29]

Defendants' motions for pay-outs from the Expense Fund raise issues never addressed in litigating the merits, but there is reason for concern that the amounts are not as straightforward as Defendants portray them. Defendants have a history of presenting amounts for payment that later turn out to be miscalculated, mischaracterized or just wrong. The Trustees point to the several demands they received for reimbursement of Trustee fees, a number that kept changing

---

[29]   Certainly Defendants blocked discovery of any post-September 16 information. While most cases do not need post-trial evidentiary hearings, that is because discovery of relevant matters was accomplished during the pre-trial phase. But where courts have concerns about remedies or any other lingering matters in the post-liability phase, they have not hesitated to hold such proceedings. (SEC Mov. Br. at 40 n.40 (collecting cases).)

28

with each submission. (Trustees' Br. at 21-22.)  In the limited production the Trustees made are more indications of the difficulties the Trustees have recounted in getting to the bottom of what RMCI's expenses actually were.  (E.g., Ex. L, Email from R. Artinian to Independent Trustees, dated May 3, 2010, discussing RMCI claim for reimbursement that was reduced by nearly $1 million after request for back up information; see generally Sept. 10, 2010 Conf. Tr. at 18-20 (Mark Holland description of the history of Trustee efforts to ascertain the reimbursable expenses due RMCI).)  And the KPMG Report similarly details a host of expenses RMCI tried to get the Fund to pay as "Extraordinary Expenses," including over $15 million in its own legal fees, and another $15 million in broker expenses that RMCI never paid and for which the brokers apparently never demanded payment.  (SEC Mov. Ex. H (KPMG Report at 8, 27).)  Other discrepancies are apparent.  As to the reasonableness of the indemnification claims, not even Defendants can claim that the Commission should have pursued discovery of those issues in merits discovery.  Nor can Defendants claim that their entitlement to millions of dollars in indemnification payments should be decided without the Commission's (and the Trustees') examination of the underlying invoices.[30]  But Defendants have not afforded the Commission or the Court that opportunity, not in discovery, and not even in support of their motions for indemnification.

The Trustees ask for the Court's guidance before they spend Fund money to determine which Fund expenses resulted from Defendants' misconduct, ineptitude, or poor record-keeping. (Trustees' Br. at 26.)  To ensure that investor recovery is maximized, the Commission proposes

---

[30]  See Amaprop Ltd. v. Indiabulls Fin. Servs. Ltd., No. 10 Civ. 1853 (PGG), 2011 WL 1002439, at *5 (S.D.N.Y. March 16, 2011) (where Court considered Duane Morris' objections to attorneys' invoices in connection with attorneys' fees motion), aff'd, 483 F. App'x 634 (2d Cir. 2012); see also Ex. E  at 38 (Court expressed concerns with attorney's fees submitted to date.)

to take on that review itself and to make appropriate recommendations to the Court. With full disclosure of the underlying documentation, such as correspondence between RMCI and the Trustees, all final Board Minutes, and legal and consulting invoices submitted and paid, and with the Trustees' cooperation, the Commission can do that work without further expense to the investors.

Defendants have demonstrated that the Court should not accept their claims at face value, and their objection to discovery into their claimed fees and expenses should be understood for what it is: a concern about what the Court (or the Trustees or the Commission) will find if Defendants are required to open their books.

## CONCLUSION

For all the foregoing reasons, and those cited in our Moving Brief, Plaintiff's Motion should be granted in all respects.

Dated: New York, New York
February 13, 2013

Respectfully submitted,

SECURITIES AND EXCHANGE COMMISSION

By: ______________________

Nancy A. Brown
Alexander J. Janghorbani
Michael D. Birnbaum

3 World Financial Center
New York, New York 10281
(212) 336-1023

Attorneys for Plaintiff