USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: September 30, 2013

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re THE RESERVE FUND SECURITIES AND DERIVATIVE LITIGATION | 09 MD. 2011 (PGG) |
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>v.<br><br>RESERVE MANAGEMENT COMPANY, INC., RESRV PARTNERS, INC., BRUCE BENT SR., and BRUCE BENT II,<br><br>Defendants,<br><br>and<br><br>THE RESERVE PRIMARY FUND,<br><br>Relief Defendant. | **MEMORANDUM OPINION & ORDER**<br><br>09 Civ. 4346 (PGG) |

PAUL G. GARDEPHE, U.S.D.J.:

This action arises from the collapse of the Reserve Primary Fund ("Fund"), a money market fund that on September 14, 2008, held $785 million in debt securities issued by Lehman Bros. ("Lehman"), amid total assets under management of $62.5 billion. After Lehman announced on September 14, 2008, that it would file a bankruptcy petition, a run on the Fund ensued. Over the next two days, the Fund received redemption requests totaling approximately $40 billion. On September 16, 2008, the Fund announced that it had "broken the buck" – i.e., its per-share net asset value ("NAV") had fallen below $0.995 – and officially suspended redemptions to investors.

The Securities and Exchange Commission filed this action on May 5, 2009, against Defendants Reserve Management Company, Inc. ("RMCI"), Resrv Partners, Inc., Bruce Bent Sr., and Bruce Bent II (collectively, "Defendants").  The Complaint also names the Reserve Primary Fund as Relief Defendant.  The Complaint alleges numerous violations of federal securities laws.

The Commission's claims proceeded to trial before this Court and a jury on October 9, 2012.  On November 12, 2012, the jury returned its verdict.  As will be discussed more fully below, the jury found for the Commission on certain claims and for the Defendants on others.

The Commission and the Defendants have filed motions for judgment as a matter of law, pursuant to Federal Rule of Civil Procedure 50(b).  The Commission has also moved, in the alternative, for a new trial, pursuant to Federal Rule of Civil Procedure 59.  Defendants have filed a motion to amend the Judgment.  For the reasons stated below, the Judgment will be amended to conform to the jury's verdict that Bent II, RMCI, and Resrv Partners violated Section 17(a)(2) or (3) of the Securities Act.  The parties' motions will otherwise be denied.

The Commission has moved for disgorgement, penalties, and injunctive relief. For the reasons set forth below, the Commission's motion for disgorgement will be denied and its motion for penalties and injunctive relief will be granted in part and denied in part.[1]

---

[1]  Early in this case, the Court ordered that $83.5 million of the Primary Fund's assets be set aside to address, inter alia, Defendants' claims for management fees and expenses, and indemnification ("Expense Fund").  (Dkt. No. 202)  Defendants have asked this Court to release monies from the Expense Fund to compensate them for the fees and expenses they incurred in managing and winding down the Primary Fund between September 15, 2008, and November 23, 2010.  Defendants have also moved for indemnification as to the legal fees they incurred in connection with this case.  Defendants' application for management fees and expenses, and indemnification, is the subject of a related class action settlement that is currently pending before the Court on an application for preliminary approval, see In re Reserve Primary Fund Securities

## BACKGROUND

### I.      THE COMMISSION'S CLAIMS

The central allegation in the Complaint is that while the Fund was collapsing on September 15 and 16, 2008, the Defendants "engaged in a systematic campaign to deceive the investing public into believing that the Primary Fund . . . was safe and secure despite its substantial Lehman holdings."  (Cmplt. ¶ 1)  The SEC alleges that the Defendants "violated the antifraud provisions of the federal securities laws" by engaging in a "campaign of misinformation" designed to "persuade investors to refrain from redeeming shares, and to induce new purchases of shares" in the Primary Fund.  (Cmplt. ¶¶ 4-6)  Defendants are also alleged to have misled the Primary Fund's Board of Directors during this two-day period by failing to give the Board accurate and adequate information about, inter alia, the effect of the Lehman bankruptcy on the Fund.

The Complaint alleges that (1) RMCI, Resrv Partners, Bent II, and Bent Sr. violated and aided and abetted violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5 (Cmplt. ¶¶ 127-130); (2) Bent Sr. and Bent II violated Section 20(a) of the Securities Exchange Act (Cmplt. ¶¶ 131-33); (3) RMCI, Resrv Partners and Bent II violated Section 17(a) of the Securities Act (Cmplt. ¶¶ 134-136); (4) RMCI, Bent Sr. and Bent II violated Sections 206(1) and (2) of the Investment Advisers Act (Cmplt. ¶¶ 137-39); (5) RMCI, Bent Sr. and Bent II violated Section 206(4) of the Investment Advisers Act and Rule 206(4)-8 (Cmplt. ¶¶ 140-42); (6) Bent Sr. and Bent II aided and abetted violations of Section 206(1) and (2) of the Investment Advisers Act (Cmplt. ¶¶ 143-45); and (7) Bent Sr. and Bent II aided and abetted violations of Section 206(4) of the Investment Advisers Act and Rule 206(4)-8 (Cmplt. ¶¶ 146-48).

---

& Derivative Class Action Litig., No. 08 Civ. 8060 (PGG) (S.D.N.Y.) (Dkt. No. 91), and will be addressed in that context.

On February 24, 2010, this Court denied Defendants' motion to dismiss.  (Dkt. No. 272)  On March 28, 2012, this Court denied the parties' cross-motions for summary judgment.  (Dkt. No. 448)  The Commission's claims proceeded to trial before this Court and a jury on October 9, 2012.

## II.    <u>EVIDENCE AT TRIAL</u>

As of September 2008, RMCI, which operated under the name "The Reserve," was a privately held corporation that provided investment advisory services to a number of mutual funds, collectively known as the Reserve Funds.  (Tr. 267)  Resrv Partners served as the broker-dealer for all of the Reserve Funds.  (<u>Id.</u>)  The Reserve Primary Fund – a money market fund – was the "flagship" of the Reserve Funds.  (Tr. 381)

Bruce Bent Sr. was the Chairman of RMCI and Chairman, President, Treasurer and Trustee of the Primary Fund.  (Tr. 571-73; 788)  Bruce Bent II – his son – was Vice Chairman and President of RMCI, and the Co-Chief Executive Officer and Senior Vice President of the Primary Fund.  (Tr. 788, 971-72, 984-85)

Founded in the early 1970s, the Primary Fund had historically invested in conservative assets selected for safety and liquidity.  (Tr. 567-68, 571, 756)  On September 14, 2008, however, the Primary Fund held $785 million in Lehman commercial paper.  (Tr. 275)

On Sunday, September 14, 2008, Lehman announced that it would be filing a bankruptcy petition the next day.  (Tr. 500)  Because of the Primary Fund's holdings in Lehman securities, on Monday, September 15, 2008, the Fund was immediately besieged by shareholders seeking to redeem their shares.  Before the markets opened on Monday morning, the Fund had already received $5 billion in redemption requests.  (Tr. 1002)  By noon on September 15, State Street Bank and Trust Company, the Primary Fund's custodial bank – having processed $10 billion in redemptions – stopped funding redemption requests and suspended the Fund's

overdraft privileges.  (Tr. 1073; PX 124b at 1)  On September 16, 2008, RMCI issued a press release announcing that the Fund had reduced its valuation of its Lehman holdings to zero as of 4:00 p.m. on September 16, 2008, which caused the Primary Fund's NAV to drop to $0.97 per share.  (PX 265)  The Primary Fund had thus "broken the buck," a catastrophic development for a money market fund, which Bent II described as indicating that "[y]ou're out of business."  (Tr. 273-74, 992-93, 1682)

The Primary Fund's Board of Trustees began meeting to address the effects of the Lehman bankruptcy on the Fund at 9:30 a.m. on September 15, 2008.  (Tr. 1020-21)  At that meeting, Defendants Bent Sr. and Bent II, along with RMCI's chief investment officer ("CIO") Patrick Ledford, reported that there was "no valid market" for Lehman debt, but that "bids are being thrown out there anywhere from 45 to 80" cents on the dollar.  (PX149b at 8-9)  Just before the meeting, however, Ledford had told Bent Sr. and Bent II that Lehman paper was being "mark[ed]" at "30 to 40 cents on the dollar, but none has actually traded."  (Id. at 3 )  Bent Sr. recommended that the Board value the Lehman holdings at par.  (Id. at 8-9)  The Trustees ultimately settled on a valuation of 80% of par.  (Tr. 1021; PX 150b at 8-9)

The Board met again at 1:00 p.m. on September 15.  (Tr. 1031)  At the 1:00 p.m. meeting, the Bents introduced the idea of RMCI entering into a credit agreement to support the Fund's $1.00 NAV.  (Tr. 1035-1038; DX 58)  Bent II told the Board that RMCI intended to implement a credit support agreement and to seek approval for such an agreement from the Commission.  (Tr. 1035; DX 58 at 3-4)  No one from RMCI told the Board that there were any conditions on RMCI's willingness or ability to put up enough money to support the Fund's $1.00 NAV.  (Tr. 1040-41)  When Fund Trustees asked RMCI whether it had sufficient capital to

support the Fund's $1.00 NAV, Bent Sr. told the Board that "sufficient capital could be made

available for this purpose." (Tr. 935; DX 58 at 4)

At 1:19 p.m., after the 1:00 p.m. Board meeting had concluded, Bent II sent an

email to RMCI's Director of Sales and Marketing, John Drahzal, with cc's to RMCI's General

Counsel, Chief Operating Officer, and Bent Sr., stating that RMCI

> intend[s] to protect the NAV on the Primary Fund to whatever degree is required.
> We have spoken with the SEC and are waiting [for] their final approval which we
> expect to have in a few hours. You may communicate this to clients on an as
> needed basis. . . . [If] you want something on the website I need to see language
> for approval first, thanks.

(PX 48; Tr. 1044-45)

As a result of Bent II's email, Drahzal reported to the Reserve sales force that "the

Reserve would support the $1.00 NAV of the Primary Fund and that [sales people] could pass

that on to customers." (Tr. 391) The sales team – which included Resrv Partners personnel –

told Primary Fund shareholders and prospective clients about RMCI's planned credit support

agreement and that RMCI had decided to support the Primary Fund's $1 NAV. (Tr. 391-94; PX

16, 250) The calls to prospective clients were intended to encourage them to purchase shares in

the Primary Fund. (Tr. 395-96)

Bent II's 1:19 p.m. email also caused RMCI marketing personnel to issue a

shareholder communication entitled "The Reserve Insights." (Tr. 2001) This communication,

which was reviewed before distribution by Bent II, Bent Sr., and RMCI sales and marketing

personnel, among others, contains the following allegedly false statements: (1) that RMCI

intended to enter into a credit support agreement to support the Primary Fund's $1.00 NAV; (2)

that RMCI was submitting appropriate documentation to the Commission to ensure the

implementation of the credit support agreement; (3) that the support agreement would "ensure

6

the integrity of the $1.00 NAV"; and (4) that the Lehman holdings would not have a "material impact" on the Fund or a "negative impact[]" on the Fund's NAV because the holdings would "mature at par value."  (PX 49, 106; Tr. 628-29, 1081)

"The Reserve Insights" release was sent to numerous Primary Fund investors, as well as to rating agencies – Standard & Poor's and Moody's – on September 15, 2008.  (PX 54-55, 75; Tr. 555)  The communication was also posted on RMCI's website, where it remained for approximately three hours on the morning of September 16, 2008.  (Tr. 964-65)  This communication delayed adverse action by the rating agencies.  (Tr. 532-37)

Ledford told Moody's at about 2:30 p.m. on September 15, 2008, that redemptions appeared to have "stopped" and that RMCI had been able to sell sufficient assets to fund outstanding redemption requests.  (PX 24b at 2; Tr. 2176-79)  Given that redemptions continued apace (Tr. 2839), a reasonable jury could have found that Ledford's statement on this point was false.  As to the sale of assets, Ledford admitted at trial that his statement to Moody's that the Reserve had been able to sell sufficient assets to fund redemption requests was false. (Tr. 2176-79)

The Board of Trustees met again at 10:00 a.m. on September 16, 2008.  (Tr. 1145) At that time, Bent II informed the Board that redemption requests had reached approximately $24.6 billion, of which only approximately $10.7 billion had been paid.  (DX 134 at 1)  Bent II further disclosed that State Street had suspended the Fund's overdraft privileges the previous morning.  (Id.)  Bent II also told the Board that RMCI had not entered into a credit support agreement and did not intend to enter into an agreement to support the Fund's $1.00 NAV.  (Id.) Later that day, the Primary Fund announced that it had "broken the buck."

III.     **THE VERDICT**

On November 12, 2012, the jury returned its verdict.  The jury found for the Defendants on the SEC's claims under Section 10(b) of the Securities Exchange Act and Rule 10(b)(5); under Section 20(a) of the Securities Exchange Act; under Section 17(a)(1) of the Securities Act; and under Section 206(1) of the Investment Advisers Act.  The jury also found in favor of Bent Sr. on all remaining claims against him.  Bent II was found to have negligently violated Sections 17(a)(2) or (3) of the Securities Act, but found not liable on all remaining claims against him.  As for the corporate defendants, the jury found that RMCI and Resrv Partners knowingly or recklessly violated Sections 17(a)(2) or (3) of the Securities Act, and that RMCI negligently violated Section 206(2) of the Investment Advisers Act and knowingly or recklessly violated Section 206(4) and Rule 206(4)-8.  Lastly, the jury found that no defendant had aided and abetted RMCI's violation of Section 206(4) of the Investment Advisers Act and Rule 206(4)-8.[2]

---

[2]  More specifically, the jury found in favor of :

1.  Defendants RMCI, Resrv Partners, and Bent II as to the SEC's claims under Section 10(b) and Section 20(a) of the Securities Exchange Act and Rule 10b-5;

2.  Defendants RMCI, Resrv Partners, and Bent II as to the SEC's claims under Section 17 (a)(1) of the Securities Act;

3.  the SEC as to its claim that RMCI and Resrv Partners knowingly or recklessly violated Sections 17(a)(2) or (3) of the Securities Act;

4.  the SEC as to its claim that Bent II negligently violated Sections 17(a)(2) or (3) of the Securities Act;

5.  Defendants RMCI, Bent Sr., and Bent II as to the SEC's claims under Section 206(1) of the Investment Advisers Act;

6.  Defendants RMCI, Bent Sr., and Bent II as to the SEC's claim that they knowingly or recklessly violated Section 206(2) of the Investment Advisers Act;

After polling the jury, and before the jury was discharged, the Court asked the parties, "Are there any applications with respect to the jury's verdict?"  The SEC answered, "No, your Honor."  Defense counsel answered, "Not at the moment, your Honor."  The Court then discharged the jury.  (Tr. 3358)

## **DISCUSSION**

The Commission has moved for judgment as a matter of law, pursuant to Federal Rule of Civil Procedure 50(b), as to its Section 10(b) and Rule 10b-5 claims against RMCI and Resrv Partners.  (SEC Br. (Dkt. No. 622) at 3-7)  In the alternative, the Commission seeks a new trial on these claims, pursuant to Federal Rule of Civil Procedure 59.  (Id. at 8)  The Commission has also moved for disgorgement, penalties, and injunctive relief.

Defendants move for judgment as a matter of law, pursuant to Federal Rule of Civil Procedure 50(b), on the Commission's claims that RMCI and Resrv Partners knowingly or

---

7.  the SEC as to its claim that RMCI negligently violated Section 206(2) of the Investment Advisers Act;

8.  Defendants Bent Sr. and Bent II as to the SEC's claim that they negligently violated Section 206(2) of the Investment Advisers Act;

9.  Defendants Bent Sr. and Bent II on the SEC's claim that they knowingly or recklessly aided and abetted RMCI's violation of Section 206(1) or (2) of the Investment Advisers Act;

10. the SEC as to its claim that RMCI knowingly or recklessly violated Section 206(4) of the Investment Advisers Act and Rule 206(4)-8;

11. Defendants Bent Sr. and Bent II as to the SEC's claim that they knowingly, recklessly, or negligently violated Section 206(4) of the Investment Advisers Act and Rule 206(4)-8; and

12. Defendants Bent Sr. and Bent II as to the SEC's claim that they knowingly or recklessly aided and abetted RMCI's violation of Section 206(4) of the Investment Advisers Act and Rule 206(4)-8.

(Tr. 3351-57; Dkt. No. 571 (Verdict Form))

9

recklessly violated Section 17(a)(2) or (3) of the Securities Act, and that RMCI knowingly or recklessly violated Section 206(4) of the Investment Advisers Act and Rule 206(4)-8.  (Def. Br. (Dkt. No. 628) at 10-15)

Defendants also seek an order amending the judgment (1) to strike – as surplusage – the jury's findings that RMCI and Resrv Partners intentionally or recklessly violated Section 17(a)(2) or (3) of the Securities Act and that RMCI intentionally or recklessly violated Section 206(4) of the Investment Advisers Act and Rule 206(4)(-8); and (2) to reflect that the jury found that Defendants RMCI, Resrv Partners, and Bent II violated Section 17(a)(2) <u>or</u> (3) of the Securities Act.  (<u>Id.</u> at 4-10)

## I.   MOTIONS FOR JUDGMENT AS A MATTER OF LAW OR FOR A NEW TRIAL

### A.   Applicable Law

The standard for granting judgment as a matter of law under Rule 50 is "well established":

> Judgment as a matter of law may not properly be granted under Rule 50 unless the evidence, viewed in the light most favorable to the opposing party, is insufficient to permit a reasonable juror to find in [the opposing party's] favor.  In deciding such a motion, the court must give deference to all credibility determinations and reasonable inferences of the jury, and it may not itself weigh the credibility of witnesses or consider the weight of the evidence. . . . Thus, judgment as a matter of law should not be granted unless
>
> "(1) there is such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or
>
> (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [the movant]."

<u>Galdieri-Ambrosini v. Nat'l Realty & Dev. Corp.</u>, 136 F.3d 276, 289 (2d Cir. 1998) (internal citations omitted) (quoting <u>Cruz v. Local Union No. 3</u>, 34 F.3d 1148, 1154 (2d Cir. 1994)); <u>see also</u> <u>Brady v. Wal-Mart Stores, Inc.</u>, 531 F.3d 127, 133-34 (2d Cir. 2008) (same).

A motion for a new trial under Rule 59 is subject to

a less stringent standard than Rule 50 in two significant respects:  (1) a new trial under Rule 59(a) "may be granted even if there is substantial evidence supporting the jury's verdict," and (2) "a trial judge is free to weigh the evidence himself, and need not view it in the light most favorable to the verdict winner," DLC Mgmt. Corp. v. Town of Hyde Park, 163 F.3d 124, 133-34 (2d Cir. 1998). That being said, for a district court to order a new trial under Rule 59(a), it must conclude that "'the jury has reached a seriously erroneous result or . . . the verdict is a miscarriage of justice,'" i.e., it must view the jury's verdict as "against the weight of the evidence." Id. at 133 (quoting Song v. Ives Labs., Inc., 957 F.2d 1041, 1047 (2d Cir. 1992) (internal citations omitted)).

Manley v. AmBase Corp., 337 F.3d 237, 244-45 (2d Cir. 2003); see also Katara v. D.E. Jones

Commodities, Inc., 835 F.2d 966, 970 (2d Cir. 1987).

> ### B.      The Commission's Motion for Judgment
> ###         as a Matter of Law or for a New Trial

The Commission argues that it is entitled to judgment as a matter of law on its

Section 10(b) and Rule 10b-5 claims against RMCI and Resrv Partners.  (SEC Br. (Dkt. No. 622)

at 3-7)  Because the jury found that "both entities violated Sections 17(a)(2) or (3) of the

Securities Act with scienter," the Commission argues that the jury necessarily found that the

Commission had satisfied each element of a Section 10(b) violation against these defendants,

except for the "in connection with the purchase" of a security element.  (Id. at 3)  As to that

element, the Commission argues that there was an "overwhelming amount of evidence" at trial

that investors "purchased into the Primary Fund during and after the time the statements for

which the [j]ury found [RMCI and Resrv Partners] to be otherwise liable were communicated

publicly."  (Id.; see also id. at 7 ("no legally cognizable basis exists for [RMCI and Resrv

Partners] to have violated the Securities Act's and Advisers Act's antifraud provisions with

scienter but not Section 10(b)"))

Although the Commission contends otherwise (see SEC Reply Br. (Dkt. No. 624)

at 2), this argument is clearly an attack on the consistency of the jury's verdict.  The Commission

11

is arguing that the jury's verdict against RMCI and Resrv Partners with respect to the Section 17(a)(2) or (3) claim is inconsistent with its verdict in favor of these defendants on the Section 10(b) and Rule 10b-5 claims.

   An inconsistent jury verdict "is a possible ground for a new trial, but not for entry of judgment as a matter of law."  In re Vivendi Universal Sec. Litig., 765 F. Supp. 2d 512, 550 (S.D.N.Y. 2011); see also Kosmynka v. Polaris Industries, Inc., 462 F.3d 74, 77 (2d Cir. 2006) (rejecting argument that defendant was entitled to judgment as a matter of law where the jury's verdict was inconsistent); Tolbert v. Queens College, 242 F.3d 58, 74 (2d Cir. 2001) ("The correct course, if the [jury's] answers were ineluctably inconsistent, would not be to enter judgment as a matter of law but rather to order a new trial.").  Accordingly, to the extent that the Commission seeks judgment as a matter of law based on an allegedly inconsistent jury verdict, its motion will be denied.

   To the extent that the Commission argues that it is entitled to a new trial because the jury's verdict is inconsistent, that argument has been waived.  As discussed above, when asked after the verdict was delivered – but before the jury was discharged – whether it had "any applications with respect to the jury's verdict," the SEC answered, "No, your Honor."  (Tr. 3358)  The Commission thereby waived its objection to any inconsistency in the jury's verdict.  See Kosmynka, 462 F.3d at 83 ("It is well established that a party waives its objection to any inconsistency in a jury verdict if it fails to object to the verdict prior to the excusing of the jury."); DiBella v. Hopkins, 403 F.3d 102, 117 (2d Cir. 2005) ("We need not reach or decide this issue because Hopkins waived it by failing to raise an objection to the inconsistent verdicts while the jury was still empaneled.  Instead he raised this objection for the first time in his post-trial motions.  It is well settled that if a party does not challenge the consistency of jury verdicts while

the jury is still empaneled, the objection is waived."); <u>Lavoie v. Pacific Press & Shear Co.</u>, 975 F.2d 48, 54-56 (2d Cir. 1992) (same); <u>United States Football League v. National Football League</u>, 842 F.2d 1335, 1367 (2d Cir. 1988) (same).  The reason why objections to inconsistent verdicts are required before a jury is dismissed is, of course, "so that the court has available to it the option of re-submitting the questions to the jury after some further instruction."  <u>Kosmynka</u>, 462 F.3d at 83-84.  Because the Commission failed to timely object, its inconsistent verdicts argument is waived, and its motion for a new trial will be denied.

### C.   <u>Defendants' Motion for Judgment as a Matter of Law</u>

Defendants move, pursuant to Federal Rule of Civil Procedure 50(b)[3], for judgment as a matter of law on the SEC's claims that RMCI and Resrv Partners knowingly or recklessly violated Section 17(a)(2) or (3) of the Securities Act, and that RMCI knowingly or recklessly violated Section 206(4) of the Investment Advisers Act.[4]  (Def. Br. (Dkt. No. 628) at 11)  Defendants argue that no reasonable jury could have found that (1) RMCI and Resrv Partners engaged in a scheme to defraud in violation of Sections 17(a)(3) of the Securities Act or Section 206(4) of the Investment Advisers Act; (2) CIO Patrick Ledford's statements to Moody's were attributable to Resrv Partners; or (3) Moody's was defrauded.  Because there was ample evidence to support the jury's verdict against RMCI and Resrv Partners on these claims, Defendants' motion will be denied.

---

[3]  While Defendants purport to base their motion on Federal Rule of Civil Procedure 50(a), their motion is more accurately styled as a renewed motion for judgment as a matter of law under Rule 50(b).  9B Charles Alan Wright & Arthur B. Miller, <u>Federal Practice and Procedure</u>, § 2537 (3d ed.) ("Either party may make a renewed motion for judgment as a matter of law during the trial, which technically is a Rule 50(a) motion, or after trial, which will be made under Rule 50(b).").

[4]  RMCI and Resrv Partners thus challenge those aspects of the jury's verdict that reflect a finding of scienter.

**1.     Evidence that RMCI and Resrv Partners Engaged in an Act,
Pattern, or Course of Business that Operated as a Fraud**

RMCI and Resrv Partners argue that "[t]here was no evidence from which the
jury could reasonably have concluded that anyone acting on behalf of RMCI or Resrv Partners
knowingly or recklessly engaged in an act, practice, or course of business which (a) involved
more than making a misstatement and (b) operated as a fraud." (Id. at 12)  In support of this
argument, Defendants contend that because the jury did not find that the Bents acted with
scienter, the verdict against RMCI and Resrv Partners on the Section 17(a)(2) or (3) claims could
only have been based on Ledford's misrepresentation to Moody's, but that statement cannot
provide a basis for scheme liability under Section 17(a)(3) against RMCI or Resrv Partners.  (Id.
at 12-13)

As discussed in connection with the Commission's motion for judgment as a
matter of law, however, a Rule 50 motion may only be sustained based on insufficiency of
evidence – not on an alleged inconsistency in the jury's verdict.   The remedy for an inconsistent
verdict is a new trial, not judgment as a matter of law.[5]  Vivendi, 765 F. Supp. 2d at 546, 550.
("The Court's task in evaluating a Rule 50 motion is to look at the trial evidence and assess
whether that evidence was sufficient to support the verdict. . . . The Court's task on a Rule 50
motion is not to examine different aspects of the jury's verdict to determine whether they can be
logically reconciled with one another. . . . An inconsistent verdict is a possible ground for a new

---

[5]  Defendants have not moved for a new trial.  Any such motion would have been denied – to the
extent based on inconsistency in the verdict – because the Defendants waived their rights in this
regard.  As noted above, before the jury was discharged, the Court asked counsel whether either
side had "any applications with respect to the jury's verdict." (Tr. 3358)  Defense counsel stated
"[n]ot at the moment, your Honor." (Id.)  The Court then discharged the jury. (Id.)  As
discussed above, Defendants thereby waived any objection based on inconsistency in the verdict.
See Kosmynka, 462 F.3d at 83 ("It is well established that a party waives its objection to any
inconsistency in a jury verdict if it fails to object to the verdict prior to the excusing of the
jury.").

trial, but not for entry of judgment as a matter of law.'"); see also Kosmynka, 462 F.3d at 77;

Tolbert, 242 F.3d at 74.

As the Vivendi court explained, this Court must look to all evidence in the record

on which the jury could have based a finding of liability, rather than try to divine what the jury

had in mind.  Moreover, the fact that a jury absolved one defendant of liability is not

determinative of whether there is sufficient evidence to sustain a verdict against another

defendant on the same claim, even if the evidence is the same:

> . . . the evidence in this case could reasonably have supported a finding of scienter
> against each of the defendants.  The fact that the jury absolved [two individual
> defendants] of liability does not negate the fact that there was sufficient evidence
> in the record in the first instance to enable a reasonable jury to find against all
> three defendants on the issue of scienter, thereby foreclosing judgment as a matter
> of law in Vivendi's favor.

Id. at 546-47.

Here – as the Court explained in denying Defendant's Rule 50(a) motion on the

same issue at trial – the evidence went beyond mere misstatements and was sufficient to permit a

reasonable jury to find a scheme to defraud.  See Tr. 3086-87 ("a reasonable jury could conclude

that the SEC has offered more than misstatements and omissions in connection with its claims

under . . . Sections 17(a)(1) and (3) and Section 206(4) and Rule 206(4)-8"); see also Tr. 3011-

12).  In particular, the jury could have found that

> all of the steps RMCI and Bent II took in connection with a proposed credit
> support agreement, including asking their outside counsel to approach the SEC
> about a credit support agreement, directing outside counsel to prepare such an
> agreement, obtaining board approval concerning a credit support agreement, and
> asking the chief financial officer, Mr. Farrell, to set up a segregated account for a
> credit support agreement . . . were parts of a fraudulent scheme because the Bents
> and RMCI never had any intention of implementing the agreement to support the
> one dollar NAV of the Primary Fund.

(Tr. 3012)  As to Resrv Partners, the jury could also have found, for example, that the

dissemination of statements to investors – both orally and in the "Reserve Insights" piece – to the

effect that RMCI would "ensure the integrity of the [Primary Fund's ] $1.00 NAV" (PX 49, 106;

Tr. 532) was part of a scheme to defraud.  Contrary to Defendants' argument (Def. Br. (Dkt. No.

628) at 12-13), the fact that the jury chose not to make a scienter finding as to Bent II does not

demonstrate that there was insufficient evidence to make a scienter finding as to RMCI and

Resrv Partners.  Stated another way, the jury's "verdict does not (and could not) establish that

there was 'no proof' that [RMCI and Resrv Partners] acted with scienter" in an act, practice, or

course of business that operated as a fraud.  Vivendi, 765 F. Supp.2d at 549.

## 2. Evidence that Ledford was Acting on Behalf of Resrv Partners

In arguing that Resrv Partners is entitled to judgment as a matter of law,

Defendants argue that "there is absolutely nothing in the record suggesting that [CIO Patrick]

Ledford was acting on behalf of Resrv Partners when he made the statement to Moody's [at

about 2:30 p.m. on September 15, to the effect that redemptions had stopped and that the Reserve

had been able to sell sufficient assets to fund redemptions]."  (Def. Br. (Dkt. No. 628) at 13)

This argument is without merit.

As an initial matter, and as discussed above, this Court need not look only to

Ledford's conduct in analyzing whether the jury's verdict against Resrv Partners can withstand

Defendant's Rule 50(b) motion.  Second, as this Court stated in rejecting this same argument at

trial, the evidence that Ledford was "a registered representative for Resrv Partners" was

sufficient to send the issue to the jury.  (Tr. 3026-27; see PX 103 at 12 (Resrv Partners

organization chart listing Ledford as a registered representative); Tr. 2168 (Ledford testimony

that Resrv Partners "held my registrations, my Series 7 and my Series 66 license"))

In short, there was sufficient evidence for the jury to conclude that Ledford was acting on behalf of Resrv Partners when he spoke with Moody's.

### 3. Evidence that Ledford's Statements Operated as a Fraud on Moody's

Defendants argue that "the record does not contain a shred of evidence that Ledford's statement operated as a fraud on Moody's," because the statement was not material to Moody's. (Def. Br. (Dkt. No. 628) at 14) Noting that no Moody's employee testified at trial that Ledford's statement was significant to Moody's, Defendants argue that there is no evidence that "Moody's took (or refrained from taking) any action in response to Ledford's statement." (Id.)

Materiality is judged by an objective standard, however. See TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 445 (1976) ("The question of materiality, it is universally agreed, is an objective one, involving the significance of an omitted or misrepresented fact to a reasonable investor."). Accordingly, the Commission was not required to call a Moody's employee to testify that Ledford's statement was subjectively important to that employee or to Moody's.

There was ample evidence that Ledford's misrepresentation to a rating agency about the Reserve's ability to sell assets to satisfy redemption requests was material. As an initial matter, Bent Sr. testified that if the rating agencies downgraded the Primary Fund's rating, or put the Fund on a credit watch, that would exacerbate investors' concerns and lead to more redemptions. (Tr. 728) Moreover, several witnesses testified that an inability to satisfy redemption requests would be the death knell for a money market fund. For example, Ledford testified that an inability to meet redemption requests "potentially could put the Reserve out of business." (Tr. 297-98, 2174 (reflecting tape recorded statement by Ledford in which he referred to a failure to make redemptions as the "kiss of death" for a money market fund)) Bent II agreed

that if the Fund could not make redemptions, investor panic would ensue.  (Tr. 1016)  RMCI's chief financial officer, Patrick Farrell, testified that "the main premise of the fund is that you can get your money out same day," and so it would be "really bad" if the Fund could not meet redemption requests that "same day."  (Tr. 295, 298)  In sum, there was overwhelming evidence that Ledford's representation to Moody's that the Reserve had been able to sell sufficient assets to meet redemption requests was material.

Defendants' motion for judgment as a matter of law will be denied.

## II.   DEFENDANTS' MOTION TO AMEND THE JUDGMENT

Defendants RMCI and Resrv Partners urge this Court to amend the judgment to strike – as surplusage – the jury's finding that RMCI and Resrv Partners intentionally or recklessly violated Section 17(a)(2) or (3) of the Securities Act, and Section 206(4) of the Investment Advisers Act and Rule 206(4)-8.  Because liability under these provisions requires merely a finding of negligence, Defendants contend that the scienter finding should be struck.  (Def. Br. (Dkt. No. 628) at 3, 6-10).  Defendants also move this Court to modify the judgment to indicate that the jury found that Defendants RMCI, Resrv Partners, and Bent II violated Section 17(a)(2) or (3) of the Securities Act.  (Id. at 4-6)

### A.   Motion to Strike "Surplusage"

Defendants argue that this Court erred in including in the verdict form a question asking whether the Commission had proven by a preponderance of the evidence that Defendants RMCI, Resrv Partners, and Bent II knowingly or recklessly violated Sections 17(a)(2) or (3) of the Securities Act or Section 206(4) of the Investment Advisers Act and Rule 206(4)-8, and that because these claims required only a finding of negligence, they are entitled to an order striking the jury's scienter finding as surplusage.  (Def. Br. (Dkt. No. 628) at 6).

This Court's original draft of the verdict form included one question for the

Commission's Section 17(a) claims, and one question for the Commission's Section 206(4)

claim.[6]  At the charge conference, however, defense counsel argued that it would be important to

_____

[6]  The Court's original draft verdict form included the following questions relating to the Section
17(a) and Section 206(4) claims:

**Third Claim for Relief**

**6.  Has the SEC proven by a preponderance of the evidence that RMCI, Resrv
Partners, or Bent II knowingly or recklessly violated Section 17(a)(1), knowingly or
recklessly violated Section 17(a)(2) or (3), or negligently violated Section 17(a)(2) or
(3) of the Securities Act?**

a.      RMCI:

Yes      _____          No          _____

b.      Resrv Partners:

Yes      _____          No          _____

c.      Bent II:

Yes      _____          No          _____

*       *       *       *

**Fifth Claim for Relief**

**8.  Has the SEC proven by a preponderance of the evidence that RMCI, Bent Sr., or
Bent II knowingly or recklessly violated Section 206(4) of the Investment Advisers
Act and Rule 206(4)-8, or negligently violated Section 206(4) of the Investment
Advisers Act and Rule 206(4)-8?**

a.      RMCI:

Yes      _____          No          _____

b.      Bent Sr.:

Yes      _____          No          _____

c.      Bent II:

know – at the penalty phase – whether a jury's finding against a defendant was based on

negligence or scienter:

> THE COURT:  Ms. Jacobs, do you have anything else on the verdict sheet?
>
> MS. JACOBS:  Yes, your Honor.  On Page 3, the third claim for relief doesn't differentiate between the scienter-based and the negligence-based claims, which could be important on a going-forward basis.  If there were a finding against the defendants on a negligence claim and there were some penalty phase, that would be very different from a fraud-based determination.
>
> . . . .
>
> Your Honor, the statute – the penalty statute has certain penalties for negligence and certain penalties for fraud.  And if you don't have it broken down, then I don't see how anybody can ever decipher, divine what the jury intended.
>
> The reason that we have a jury is specifically to get these kinds of findings.  So it just doesn't seem right to bypass it.

(Tr. 3068, 3070-71)

The Court accepted Defendants' argument and agreed to add questions to the

verdict form that would make it clear, as to the Section 17(a) and Section 206(4) claims, whether

a finding against a defendant was based on negligence or scienter:

> THE COURT:  Well, my inclination, if it's important down the road to know whether the jury accepted – made a scienter finding or a negligence finding, then I suppose we'll have to have separate questions for that.  It's going to increase the number of questions the jury has to answer, which will undoubtedly extend their deliberations, but I don't know that there's any other course, if the parties believe that it's necessary to have a jury determination on each theory of liability.

(Tr. 3071 (emphasis added)).

After the Court circulated a new draft of the verdict form to the parties – which

included the questions that Defendants now object to – Defendants complained that the jury

should not be asked "to make findings of knowing or reckless conduct as to Sections 17(a)(2)

---

Yes       _____       No       _____

and (3) of the Securities Act and Sections 206(2) and Section 206(4) of the Advisers Act."  (Nov. 6, 2012 Jacobs Ltr. (Dkt. No. 647) at 1)  Defense counsel went on to say that, "[t]o eliminate the possibility of confusing the jury, we propose . . . <u>eliminating the state of mind element from the verdict form</u>."  (<u>Id.</u>) (emphasis added)  As an alternative, defense counsel suggested that "the Court could add the following language to the discussion of 'negligence' [in the jury instructions] . . . :  'Where a claim only requires that the defendant act "negligently," you may still find that the defendant violated the law if you find that the defendant acted knowingly or recklessly.  Negligence is simply the minimum that you must find.'"  (<u>Id.</u>)  The Court added to the jury instructions the language proposed by defense counsel (Tr. 3311), but refused to eliminate from the verdict form any mention of the state of mind element.

In rejecting defense counsel's proposal to eliminate the state of mind element from the verdict form, the Court pointed out that

> the entire notion of asking separate questions for scienter and negligence was an idea that came from defendants.  It was not in the original version of the verdict sheet.  The justification that was offered by defendants is that it would be important to know, for remedy purposes, whether the jury's liability finding was based on scienter or negligence.  So I accepted that.  And it was for that reason that I broke out separate questions for negligence and scienter.

> Ms. Jacobs, . . . the reason why there are separate questions is that it was actually your idea.

> MS. JACOBS:  Your Honor, that is true.

(Tr. 3081-82)

The Court then went on to explain that it was "important for the jury to know that if there is scienter a liability finding can be premised on that" (Tr. 3082), and that questions addressing both possible forms of liability were fully consistent with the jury instructions:

> I do think it's consistent with the notion that everyone agrees on, that liability can be premised on either mental state . . . it can be premised either on scienter or negligence, so I don't see any harm in asking whether they find that scienter's established as to one and, if not, whether negligence has been made out by a preponderance of the evidence.  I mean, that just reflects the charge, and it reflects our common goal of insuring that the jury understands that liability can be premised as to certain of the claims on either a finding of scienter or a finding of negligence.

(Tr. 3084)

Defendants' present argument – that the jury's scienter findings should be struck as surplusage – is not persuasive.  As an initial matter, what defense counsel proposed at trial – eliminating the state of mind element from the verdict form (see Nov. 6, 2012 Jacobs Ltr. (Dkt. No. 647) at 1) – was clearly not appropriate.  See United States v. Wilkerson, 361 F.3d 717, 732 (2d Cir. 2004) ("[A] defendant who requests an instruction 'bears the burden of showing that the requested instruction accurately represented the law in every respect. . . .'") (quoting United States v. Abelis, 146 F.3d 73, 82 (2d Cir. 1998)); Savard v. Marine Contracting Inc., 471 F.2d 536, 540 (2d Cir. 1972) ("A requested instruction must be complete and fully correct.").

Moreover, the questions Defendants now challenge are not surplusage.  They reflect well established law – acknowledged by Defendants at trial (Nov. 6, 2012 Jacobs Ltr. (Dkt. No. 647)) and set forth in the jury instructions[7] – that a verdict for the Commission on the

---

[7]  The Court's charge included the following language:

> While the elements of a Section 17(a) violation are substantially similar to those under Section 10(b) and Rule 10b-5, there are several important differences that I will now explain.
>
> First, while the SEC must establish scienter to prove a violation of subsection (1) of Section 17(a), that is, the SEC must prove that the defendant you are considering acted knowingly with intent to defraud or with reckless disregard for the truth, to prove a violation of Subsections (2) and (3) of Section 17(a), the SEC need only prove that a defendant acted with negligence. This means that even if you find that a defendant did not violate Section 10(b), Rule 10b-5, or Section 17(a)(1), because that defendant did not act with scienter, you may nonetheless find that defendant liable under Sections 17(a)(2) and (3) if that defendant acted negligently.

22

Section 17(a)(2) or (3) claims, and the Section 206(4) claim, could be based either on a finding

of scienter or negligence.  See Goldwater v. Ginzburg, 414 F.2d 324, 343 (2d Cir. 1969)

("Recklessness is, after all, only negligence raised to a higher power."); SEC v. Mannion, 789 F.

Supp. 2d 1321, 1340 (N.D. Ga. 2011) (noting that, in the context of a claim under Section 206(2)

of the Investment Advisers Act, "allegations of intentional deception will . . . support a claim

. . . . [T]he actions must at least be negligent."); SEC v. Softpoint, Inc., 958 F. Supp. 846, 861-62

(S.D.N.Y. 1997) (noting that while a negligence finding satisfies Section 17(a)(2)-(3), "Section

17(a) of the Securities Act . . . is a general prohibition against fraud"); SEC v. O'Meally, No. 06

Civ. 6483 (LTS), Dkt. No. 158 (Verdict Form), at 5 (including separate questions asking the jury

whether the defendants violated Section 17(a)(2) or (3) with scienter or negligently).

Finally, as Defendants suggested at the charge conference (Tr. 3070-71), the

jury's mental state findings are relevant to this Court's determination of remedies in this case.  In

fashioning a remedy, courts often consider whether a defendant acted with scienter – even as to

violations that do not require a scienter finding.  See, e.g., SEC v. Kern, 425 F.3d 143, 153-54

(2d Cir. 2005) (affirming district court's conclusion that defendants' scienter justified a Tier III

penalty for a violation of a non-scienter claim under Section 5 of the Securities Act); SEC v.

Cavanagh, 155 F.3d 129, 135 (2d Cir. 1998) (noting that courts look to "the degree of scienter

---

Negligence is the failure to use reasonable care, which is the degree of care that a reasonably
careful person would use under like circumstances.  Negligence may consist either of doing
something that a reasonably careful person would not do under like circumstances, or, in
failing to do something that a reasonably careful person would do under like circumstances.

You should be aware that where a claim only requires that the defendant acted negligently,
you may still find that the defendant violated the law if you find that the defendant acted
knowingly or recklessly.  Negligence is simply the minimum that you must find.

(Tr. 3310-11)  With respect to the Section 206(4) claim, the Court instructed the jury that "the
SEC may prevail by demonstrating either scienter or negligence."  (Tr. 3319)

involved" when determining injunctive relief, even for Section 5 non-scienter claims); SEC v. Elliot, No. 09 Civ. 7594 (KBF), 2012 WL 2161647, at *8 (S.D.N.Y. June 12, 2012) (noting that while "[s]cienter is not an element of a section 5 violation . . . [s]cienter is, however, relevant to the nature and extent of civil remedies that may be imposed for such a violation" (internal citation omitted)).  Thus, contrary to Defendants' contention (Def. Br. (Dkt. No. 628) at 9-10), the jury's scienter findings are not irrelevant surplusage.[8]

Defendants' motion to strike the jury's scienter findings will be denied.

**B.    Amendment of Judgment to Indicate that
Defendants Violated Sections 17(a)(2) or (3)**

The Judgment in this case indicates that the jury determined that Defendants "RMCI and Resrv Partners knowingly or recklessly violated Sections 17(a)(2) and (3) of the Securities Act."  (Dkt. No. 575 (Judgment)) (emphasis added)  Defendants have moved to amend the Judgment to reflect that the jury determined that Defendants "RMCI and Resrv Partners knowingly or recklessly violated Sections 17(a)(2) or (3) of the Securities Act."  (Def. Br. (Dkt. No. 628) at 4-6)  The Commission takes no position on this motion.  (SEC Opp. (Dkt. No. 626) at 1 n.1)

Federal Rule of Civil Procedure 60(a) provides that "[t]he court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment."  Fed. R. Civ. P. 60(a).  A court may grant a motion pursuant to Federal Rule of Civil Procedure 60(a) where the "judgment simply has not accurately reflected the way in which the

---

[8]  Slotkin v. Citizens Cas. Co. of N.Y., 614 F.2d 301(2d Cir. 1979), Sextone Co. v. Bldg. Trades Council of Westchester Cnty., 60 F.2d 47 (2d Cir. 1932), and Hedaya Bros. v. FDIC, 799 F. Supp. 13 (E.D.N.Y. 1992), cited by Defendants, are not to the contrary.  In Slotkin and Sextone, the Second Circuit disregarded jury findings that were based on erroneous jury instructions.  See Slotkin, 614 F.2d at 318; Sextone, 60 F.2d at 48-49.  There is no claim here – nor could there be – that this Court's jury instructions on this point were erroneous.  Hedaya concerns pleading standards for a non-fraud claim and is completely inapposite.  Hedaya Bros., 799 F. Supp. at 15.

rights and obligations of the parties have in fact been adjudicated."  In re Frigitemp Corp., 781

F.2d 324, 327 (2d Cir. 1986); see also Truskoski v. ESPN, Inc., 60 F.3d 74, 77 (2d Cir. 1995)

(Rule 60(a) "permits . . . a correction for the purpose of reflecting accurately a decision that the

court actually made"); Hegger v. Green, 91 F.R.D. 595, 598 (S.D.N.Y. 1981) ("[U]nder Rule

60(a) '[r]elief may be had from the clerical mistakes of the court, clerk, jury[,] or party.'"

(quoting 6A Moore Federal Practice P 60.06(3), at 4057 (2d Ed.))).

   With respect to the Third Claim for Relief, the verdict form completed by the jury

indicates that the jury found violations of "Section 17(a)(2) or (3) of the Securities Act."  (Dkt.

No. 571 (Completed Verdict Form) at 3-4 (Questions 7-8))  As noted above, the Judgment

entered in this case indicates that the jury found violations of Section 17(a)(2) and (3).  (Dkt. No.

575 (Judgment) at 1-2) (emphasis added).  Because the Judgment does not accurately reflect the

jury's verdict, the Court will issue an Amended Judgment  indicating that the jury found

violations of Sections 17(a)(2) or (3).

## III.  REMEDIES

###   A.  Disgorgement

####    1.  Applicable Law

   In the exercise of its broad equitable powers, a district court may order the

disgorgement of profits obtained through the violation of federal securities laws.  SEC v. Kelly,

765 F. Supp. 2d 301, 324-25 (S.D.N.Y. 2011) (citing SEC v. Manor Nursing Ctrs., Inc., 458 F.2d

1082, 1104 (2d Cir. 1972)).  Disgorgement "is a method of forcing a defendant to give up the

amount by which he was unjustly enriched."  SEC v. Commonwealth Chem. Sec., 574 F.2d 90,

102 (2d Cir. 1978).  "The primary purpose of disgorgement as a remedy for violation of the

securities laws is to deprive violators of their ill-gotten gains, thereby effectuating the deterrence

objectives of those laws."  SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1474 (2d Cir. 1996).

The disgorgement amount need only be a "reasonable approximation of profits causally connected to the violation," and "any 'risk of uncertainty [in calculating disgorgement] should fall on the wrongdoer whose illegal conduct created that uncertainty.'"  SEC v. Patel, 61 F.3d 137, 139-40 (2d Cir. 1995) (quoting SEC v. First City Fin. Corp., Ltd., 890 F.2d 1215, 1232 (D.C. Cir. 1989)).

Where the SEC seeks disgorgement, it must provide the Court with evidence of specific profits subject to disgorgement.  SEC v. Jones, 476 F. Supp. 2d 374, 386 (S.D.N.Y. 2007).  "The principal issue, therefore, in determining the amount of disgorgement to be ordered is the amount of gain received by each defendant from the fraud."  SEC v. Inorganic Recycling Corp., No. 99 Civ. 10159 (GEL), 2002 WL 1968341, at *2 (S.D.N.Y. Aug. 23, 2002).

## 2.  **Analysis**

The Commission argues that "[b]ut for [RMCI's and Resrv Partner's] fraud, there would have been an orderly liquidation of Fund assets in a much shorter period of time, leaving no assets to manage."  (SEC Br. (Dkt. No. 622) at 17)  Specifically, the Commission argues:

> . . . had RMCI and Resrv Partners not issued their misleading statements to investors, and had RMCI fully disclosed to the Board and investing public the true state of affairs the Primary Fund then faced and the Bents own limited resources, the Trustees might well have voted to liquidate the Fund on the afternoon of the 15th.  In overseeing that liquidation, the Trustees might well have determined that there was little reason to take their time to "maximize the potential return to investors" that apparently led RMCI to delay selling Fund securities.

(Id.)

The Commission made this same argument at summary judgment.  At that time, this Court stated:

> The problem with this argument is that even if defendants had made the disclosures the SEC references, there is no reason to believe that an orderly liquidation of assets would have been possible in mid-September 2008, given the

frozen nature of our financial system and, indeed, the global financial system, at
that time.

. . . [I]n the event that the Commission seeks a disgorgement remedy at the end of
this case, I will need to understand why the Commission believes that "an orderly
liquidation" of assets would have been possible in mid-September 2008[] thus[]
obviating the need for defendants' management of the assets over the next 18
months.

(Mar. 28, 2012 Tr. (Dkt. No. 456) at 64)

      In now seeking disgorgement, the Commission does not address this point, but
instead argues that "[w]hile profits for such management by a non-fraudster may not be
objectionable, it is so for the Defendants here precisely because their actions on September 15
and 16 were casually connected to their 'management' of so much money for so long.  Thus,
irrespective of whether such management work needed to be done, these Defendants are not
entitled to the profit associated with it."  (SEC Reply Br. (Dkt. No. 624) at 10-11)

      "The purpose of disgorgement[, however,] is to force a defendant to relinquish the
amount by which he was unjustly enriched.  This remedy is appropriate only in situations in
which a defendant has benefitted from ill-gotten gains and should not be used as punishment."
SEC v. Norton, 21 F. Supp. 2d 361, 365 (S.D.N.Y. 1998) (emphasis added).

      Here, as this Court has previously stated, the Primary Fund's collapse was caused
by its $785 million investment in Lehman commercial paper.  The Primary Fund's exposure to
Lehman debt led to a staggering run on the Fund once Lehman declared its intention to file a
bankruptcy petition – more than $24 billion in redemption requests in a 24-hour period.  See In
re The Reserve Fund Sec. & Derivative Litig., 673 F. Supp. 2d 182, 195 (S.D.N.Y. 2009) ("The
Primary Fund['s] . . . collapse was a product of the Lehman bankruptcy, an event that brought
the financial markets to a standstill.").  The securities law violations that are the subject of this
case did not lead to the collapse of the Primary Fund.  Indeed, it was the SEC's theory at trial

that Defendants committed the alleged securities law violations in order to stave off the collapse of the Fund.  (Tr. 146, 3207-08)

      The Commission has not demonstrated that any fees or expenses Defendants have or will receive in connection with their management of the Fund after its collapse are "causally connected" to the securities violations established in this case.[9]  There is simply no connection between the claims on which Defendants were found liable and the collapse of the Fund.  Given that the Lehman bankruptcy threw this nation's, and indeed, the world's, financial markets into chaos, the billions of dollars in assets held by the Fund required management for a significant period of time.  The trustees of the Fund recognized this obvious fact, and entered into a contract with the Defendants providing for their continued management of the Fund.  (See Dkt. No. 241 (Birch Decl.) ¶ 4 & Ex. A (Management Agreement), Ex. B (Distribution Agreement))  Finally, in the proposed settlement of the class action litigation currently pending before this Court for a determination as to preliminary approval, Defendants have abandoned any claim other than to out-of-pocket expenses.  See In re Reserve Primary Fund Securities & Derivative Class Action Litig., No. 08 Civ. 8060 (PGG) (S.D.N.Y.), Dkt. No. 91, Ex. 1 (Proposed Settlement) ¶ 9(b)).

      Under all the circumstances, the Court concludes that the Commission has not demonstrated that any disgorgement remedy is appropriate.  See Jones, 476 F. Supp. 2d at 386

---

[9]  The Commission's argument that "as a result of the fraud, the Fund was forced to hold back $3.5 billion to address potential litigation that otherwise could have been distributed more promptly to investors" (SEC Br. (Dkt. No. 622) at 17) is not persuasive.  A critical allegation in the class action cases is that Defendants failed to inform investors of the risks of investing in Lehman commercial paper.  (See Cmplt. (No. 08 Civ. 8060, Dkt. No. 50) ¶¶ 4, 5, 33-34, 37-63, 68-72, 76-77, 81)  At the trial of this case, however, the Commission stipulated that the propriety of Defendants' investments in Lehman commercial paper was not at issue.  (Tr. 2376 ("None of the SEC's claims is based on the allegation that the fund's investment in Lehman paper was itself unlawful."))  Accordingly, to the extent that the Fund withheld monies to address civil litigation claims, that action would have been necessary regardless of the securities violations established in this case.

("Although the Court need only determine a reasonable approximation of Defendants' compensation causally connected to the alleged violations before ordering disgorgement, the Commission has provided no evidence which would allow the Court to do so.").

## B.      Civil Monetary Penalties

The Commission has moved this Court to impose "substantial third tier penalties on RMCI and Resrv Partners" totaling $130 million.  This sum reflects the Commission's view that this Court should impose a $650,000 penalty for each of 200 copies of the "Reserve Insights" piece sent to investors.  (SEC Br. (Dkt. No. 622) at 21, 29)  Defendants RMCI, Resrv Partners, and Bent II argue that this Court should impose no greater than first tier penalties. (Def. Opp. Br. (Dkt. No. 627) at 33)

## 1.      Applicable Law

The Securities Act and Investment Advisers Act authorize this Court to impose civil monetary penalties for violations of those Acts.  The purpose of civil penalties is to deter future violations of the securities laws.  SEC v. Palmisano, 135 F.3d 860, 866 (2d Cir. 1998).  "Under these penalty provisions, the Court determines the amount of the civil penalty in light of the facts and circumstances of the particular case.  Penalties are described in three tiers, imposing escalating fines according to the severity of the violations."  SEC v. Metcalf, No. 11 Civ. 493 (CM), 2012 WL 5519358, at *7 (S.D.N.Y. Nov. 13, 2012).

Section 20(d) of the Securities Act and Section 209(e) of the Investment Advisers Act each provide for the following civil monetary penalties:

> (A) First tier.  The amount of the penalty shall be determined by the court in light of the facts and circumstances.  For each violation, the amount of the penalty shall not exceed the greater of (i) $[6,500] for a natural person or $[65,000] for any other person, or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation.

(B) <u>Second tier</u>. Notwithstanding subparagraph (A), the amount of penalty for each such violation shall not exceed the greater of (i) $[65,000] for a natural person or $[$325,000] for any other person, or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation, if the violation described in paragraph (1) involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement.

(C) <u>Third tier</u>. Notwithstanding subparagraphs (A) and (B), the amount of penalty for each such violation shall not exceed the greater of (i) $[130,000] for a natural person or $[650,000] for any other person, or (ii) the gross amount of pecuniary gain to such defendant as a result of the violation, if –

> (I) the violation described in paragraph (1) involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement; and

> (II) such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons.

15 U.S.C. § 77t(d)(2)(A)-(C); <u>Id.</u> § 80b-9(e)(2)(A)-(C).[10]

"The tier determines the maximum penalty, with the actual amount of the penalty left up to the discretion of the district court." <u>Kern</u>, 425 F. 3d at 153; <u>see also</u> <u>SEC v. Pentagon Capital Mgmt. PLC</u>, 725 F.3d 279, No. 12-1680-cv, 2013 WL 4017028, at *7 (2d Cir. Aug. 8, 2013) ("[The Second Circuit] review[s] the district court's imposition of the civil penalty for abuse of discretion.").

In determining the appropriate civil penalty, courts consider:

"(1) the egregiousness of the violations at issue, (2) defendants' scienter, (3) the repeated nature of the violations, (4) defendants' failure to admit to their wrongdoing; (5) whether defendants' conduct created substantial losses or the risk of substantial losses to other persons; (6) defendants' lack of cooperation and honesty with authorities, if any; and (7) whether the penalty that would otherwise be appropriate should be reduced due to defendants' demonstrated current and future financial condition."

---

[10]  The dollar amounts provided here are the result of the Debt Collection Improvement Act of 1996, which adjusts civil penalty amounts for inflation every four years. <u>See</u> 17 C.F.R. § 201.1003 & tbl. III (providing for these amounts for violations occurring between February 14, 2005, and March 3, 2009).

SEC v. Kapur, 11 Civ. 8094 (PAE), 2012 WL 5964389, at *7 (S.D.N.Y. Nov. 29, 2012) (quoting SEC v. Lybrand, 281 F. Supp. 2d 726, 730 (S.D.N.Y. 2003)).

> ### 2.    Civil Monetary Penalty for RMCI and Resrv Partners

As noted above, the Commission argues that this Court should impose third tier penalties on RMCI and Resrv Partners.  Defendants argue that the Commission should be judicially estopped from seeking third tier penalties, because it persuaded the Court to deny Defendants discovery on the issue of investor loss.  (Def. Opp. Br. (Dkt. No. 627) at 30-31)

"The doctrine of judicial estoppel prevents a party from asserting a factual position in a legal proceeding that is contrary to a position previously taken by him in a prior legal proceeding."  Bates v. Long Island R. Co., 997 F.2d 1028, 1037 (2d Cir. 1993).  The Second Circuit has stated that there are two requirements for application of this doctrine:  "First, the party against whom the estoppel is asserted must have argued an inconsistent position in a prior proceeding; and second, the prior inconsistent position must have been adopted by the court in some manner."  Id. at 1038.  "There are two objectives behind judicial estoppel:  (1) 'to preserve the sanctity of the oath by demanding absolute truth and consistency in all sworn positions'; and (2) 'to protect judicial integrity by avoiding the risk of inconsistent results in two proceedings.'"  Marvello v. Chem. Bank, 923 F. Supp. 487, 490 (S.D.N.Y. 1996) (quoting Bates, 997 F.2d at 1037).

During discovery, the Commission repeatedly argued, in numerous submissions to the Court, that investor loss was not relevant to any issue in this case.  Based on the SEC's arguments, the Court sustained its objections to Defendants' efforts to obtain discovery concerning investor loss.  This Court reviewed the record on this issue at summary judgment:

> During discovery, defendants asked me to compel the SEC to provide an
> additional response to an interrogatory regarding calculation of damages,

including information about how the SEC was calculating investor loss.  In resisting the motion to compel, the SEC argued that "whether there was any investor harm at all" is "simply not relevant."

I ruled in a November 29, 2010[] order that the SEC's disclosures regarding computation of damages were adequate up to that time.  [(Dkt. No. 350 at 17)]  The SEC continued to maintain, in submissions dated December 6, 2010, December 29, 2010, and February 10, 2011, that investor loss was not relevant to the issues in this case.

The SEC does not deny that it previously took the position that investor loss was irrelevant.  The SEC argues, however, that "risk of investor loss" is relevant to determining an appropriate civil penalty.

. . . In the event that this case proceeds to trial, . . . <u>it does appear to me that the SEC will be estopped from arguing that any civil penalty to be imposed should be determined, in part, on the basis of investor losses</u>.

(Mar. 28, 2012 Tr. (Dkt. No. 456) at 20-21 (emphasis added))

This Court addressed this issue again in a September 11, 2012 order resolving a motion <u>in limine</u>.  (Dkt. No. 544).  In that Order, the Court stated:

At summary judgment, the Commission argued that any civil penalty the Court imposed on Defendants should be determined in part on the basis of investor losses.  Defendants correctly pointed out that the SEC had, during discovery, argued that investor losses were irrelevant to its claims.  The Court stated that because the Commission had resisted discovery concerning investor losses, it might be estopped from arguing that any civil penalty to be imposed should be determined in part on the basis of investor losses.

(<u>Id.</u> at 2 n.1 (citations omitted))

The Commission now argues that it should not be estopped from arguing that Defendants' conduct created a "<u>risk</u> of substantial loss," even if it is estopped from arguing that "<u>actual</u> investor loss" occurred.  (SEC Reply Br. (Dkt. No. 624) at 16-17 (emphasis added))  Actual investor losses have a bearing on whether Defendants' conduct presented a risk of substantial investor losses, however.  Having succeeded in blocking all discovery concerning this issue, the Commission cannot now argue that it is entitled to third tier penalties, which require

proof that a defendant's "violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." 15 U.S.C. § 77t(d)(2)(A)-(C); Id. § 80b-9(e)(2)(A)-(C). See Bates, 997 F.2d at 1038.

Even if the Commission were not estopped from seeking third tier penalties, it has not established the requisite connection between a violation involving "fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement" and a "risk of substantial losses." 15 U.S.C. § 77t(d)(2)(C)(I)-(II). The Commission argues that Defendants' "false message of support" – repeated in calls to investors after Bent II's 1:19 p.m. email, and disseminated in the "Reserve Insights" piece – exposed investors to the risk of substantial losses because "(1) those who failed to redeem their Primary Fund shares were exposed to a loss they could have avoided if they had exchanged their Primary shares for the Reserve's Government Fund, or other fund shares . . . and (2) those who purchased new shares were exposed to a loss they could have avoided by choosing to buy a different money market fund entirely." (SEC Br. (Dkt. No. 622) at 23-24)

The Commission has cited no evidence, however, that Primary Fund shareholders could have exchanged their Primary Fund shares for shares in the Reserve's other funds on September 15 and 16, 2008, or that any shareholders chose to hold their Primary Fund shares – rather than exchange them for shares in other Reserve funds – because of statements made by Defendants. As to purchases, while there were some purchases of Primary Fund shares on September 15 and 16, 2008, most of those purchases were the product of automatic investment strategies. Moreover, the Commission has not cited evidence that the claims on which the Defendants were found liable led "directly or indirectly" to purchases of Primary Fund shares.

For all these reasons, this Court will not impose third tier penalties on RMCI or Resrv Partners.

Second tier penalties are appropriate where the violation involves "fraud, deceit, manipulation or reckless disregard of a regulatory requirement" but the Commission cannot prove substantial investor losses or a significant risk of substantial investor losses. See 15 U.S.C. § 77t(d)(2)(B); SEC v. Pallais, No. 08 Civ. 08384 (GBD), 2010 WL 5422531, at *4 (S.D.N.Y. Dec. 23, 2010) (imposing second tier penalties where the defendant committed a securities violation with scienter but "the SEC failed to satisfy the substantial loss requirement" that would trigger third tier penalties).

Here, the jury found that RMCI and Resrv Partners violated Section 17(a)(2) or (3) of the Securities Act with scienter, and that RMCI violated Section 206(4) of the Investment Advisers Act with scienter. Defendants argue that because claims brought under these statutes are "negligence claims," imposing anything more severe than first tier penalties would be inappropriate. However, as noted earlier, courts frequently consider a defendant's level of scienter in determining an appropriate penalty, without regard to the elements of the underlying claim. See, e.g., Elliot, 2012 WL 2161647, at *7 (noting that while "[s]cienter is not an element of a section 5 violation . . . [s]cienter is . . . relevant to the nature and extent of civil remedies that may be imposed for such a violation"). Indeed, the Second Circuit and district courts in this circuit have imposed second and third tier penalties for violations of Section 5 of the Securities Act, even though scienter is not an element of a violation of that statute. See, e.g., Kern, 425 F.3d at 153 (affirming district court's finding that defendants' scienter justified a third tier penalty for a violation of Section 5); SEC v. Verdiramo, No. 10 Civ. 1888 (RMB), 2013 WL 399230, at *1 (S.D.N.Y. Feb. 1, 2013) (imposing second tier penalty for violation of Section 5

because "the violation involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement"); <u>SEC v. E. Delta Res. Corp.</u>, No. 10 Civ. 310 (SJF), 2012 WL 3903478, at *9 (E.D.N.Y. Aug. 31, 2012) (same). In sum, the jury's scienter finding weighs in favor of a second tier penalty.

       As to the egregiousness of RMCI and Resrv Partners' conduct, the jury could have found that these defendants repeatedly disseminated statements to investors representing that RMCI would take all necessary steps to preserve the Fund's $1.00 NAV, when there was never any intention of doing so. Ledford's statement to Moody's that the Reserve had succeeded in selling sufficient assets to satisfy outstanding redemption requests was a flat-out lie. With respect to admissions of wrongdoing, Defendants have consistently asserted that they did nothing wrong, and there is no evidence that they cooperated with the Commission in connection with their wrongdoing. As to whether Defendants' violations were repeated, there was evidence that these Defendants repeatedly disseminated statements that RMCI would "preserve the integrity" of the $1.00 NAV.

       Under all of the circumstances, this Court finds that the maximum second-tier penalty is appropriate as to both RMCI and Resrv Partners. The question remains whether that penalty should be imposed once on each corporate defendant, or 200 times, as the Commission demands. The Commission contends that this Court should "base its penalty calculation o[n] each issuance of a false or misleading statement to an investor, rating agency, or other person." (SEC Br. (Dkt. No. 622) at 27)

       The penalty sections of the Securities Act and the Investment Advisers Act authorize maximum penalties "for each violation," but do not define the term "violation." <u>See</u> 15 U.S.C. § 77t(d)(2)(A)-(C); <u>Id.</u> § 80b-9(e)(2)(A)-(C). Case law indicates, however, that

district courts have the discretion to calculate penalties based on each violative act.  Courts may look to either the number of violative transactions or the number of investors to whom illegal conduct was directed.  See Pentagon Capital Mgmt. PLC, 2013 WL 4017028, at *8 n. 7 (affirming district court's "methodology for calculating the maximum penalty by counting each late trade as a separate violation"); Elliot, 2012 WL 2161647, at *11 (imposing "First Tier damages in the amount of $6,500 per transaction [in unregistered securities]"); SEC v. Glantz, No. 94 Civ. 5737 (LAP), 2009 WL 3335340, at *6 (S.D.N.Y. Oct. 13, 2009) (imposing $200,000 in civil penalties, calculated as "a $100,000 penalty for [both] of Glantz's victims"); SEC v. Milan Capital Grp., Inc., No. 00 Civ. 108 (DLC), 2001 WL 921169, *3 (S.D.N.Y. Aug. 14, 2001) (imposing second tier penalty of $50,000 for each of 200 defrauded investors, for a total penalty of $10 million); accord SEC v. Kenton Capital Ltd., 69 F. Supp. 2d 1, 17 n.15 (D.D.C. 1998) (imposing third tier penalties multiplied by each investor fraudulently solicited).

Other courts have calculated damages based on the number of statutes a defendant violated, or on whether the defendant engaged in a "single scheme or plan."  See, e.g., SEC v. Shehyn, No. 04 Civ. 2003 (LAP), 2010 WL 3290977, at *2, *8 (S.D.N.Y. Aug. 9, 2010) (although defendant made fraudulent representations to a "minimum [of] 700 investors," court found that the defendant "committed 5 [statutory] violations" and awarded "$120,000 for each violation:  Section 10(b), Rule 10b-5, Section 17(a), Section 20(a) and Section 15(a)"); SEC v. Rabinovich & Assocs., LP, No. 07 Civ. 10547 (GEL), 2008 WL 4937360, at *6 (S.D.N.Y. Nov. 18, 2008) ("Although Lovaglio engaged in repeated violations of the securities laws, they all arose from a single scheme or plan.  A [single third tier penalty] is therefore appropriate in this case."); SEC v. Johnson, No. 03 Civ. 177 (JFK), 2006 WL 2053379, at *10 (S.D.N.Y. July 24,

2006) ("Because the jury found Johnson liable for four violations of securities fraud, civil penalties will be ordered for these four violations.").

This Court concludes that only a single second tier penalty – on each of RMCI and Resrv Partners – is proper.  These entities were in business for decades and committed few regulatory violations.  Their wrongful conduct took place over a period of less than 36 hours and during a time of enormous economic stress.  Indeed, these defendants confronted conditions not seen since the Great Depression.  The markets were in chaos and the ramifications of Lehman's bankruptcy were not initially well understood, even by sophisticated fund managers and Government regulators.  Finally, these entities are now defunct.  For all these reasons, only a single second tier penalty on each defendant is appropriate.

### 3.    Civil Monetary Penalty for Bent II

The Commission seeks first tier penalties against Bent II.  (SEC Br. (Dkt. No. 622) at 29)  It argues, however, that this Court should multiply $6,500 – the maximum first tier penalty for individuals – by 200, reflecting the Commission's estimate of the number of investors and prospective investors who received the "The Reserve Insights" piece.  (SEC Br. (Dkt. No. 622) at 30)  The Commission thus seeks a penalty against Bent II of $1.3 million. Bent II argues that "if a penalty is imposed, it should be no more than $6,500." (Def. Opp. Br. (Dkt. No. 627) at 37)

The jury found that Bent II negligently violated Section 17(a)(2) or (3) of the Securities Act.  Bent II's violation involved negligently ordering or allowing to be disseminated statements to the effect that RMCI was willing and able to support the Primary Fund's $1 NAV to whatever degree necessary, without any limitations or conditions.  (Tr. 3308-13 (explaining to

the jury the elements of the Section 17(a) violation with respect to Bent II))  The alleged

misstatements of support included Bent II's 1:19 p.m. email, certain media "talking points"

allegedly approved by Bent II, and statements made to the public through dissemination of the

"The Reserve Insights" piece, or based on the "The Reserve Insights" piece.  (Id.)

   The civil penalty imposed on Bent II must reflect his culpability.  In this regard, it

must be acknowledged that the jury found in Bent II's favor as to the most serious claims against

him.  The jury rejected every charge of scienter lodged against Bent II, and ultimately found him

liable on only a single violation based on negligent conduct.  Moreover, the Court's statements

about the corporate entities' culpability apply with equal force to Bent II.  He has no prior record

of regulatory violations.  His wrongful conduct took place over a period of less than 36 hours and

under extremely stressful and unprecedented economic conditions.  Under all the circumstances,

multiplying the maximum penalty of $6,500 by 200 – leading to a total penalty of $1.3 million –

does not reflect the jury's determination of either Bent II's liability or culpability.

   In light of all the circumstances, the Court will impose a civil monetary penalty of

$100,000 on Bent II.

##   C. <u>Injunctive Relief</u>

   The Commission has asked this Court to permanently enjoin RMCI, Resrv

Partners, and Bent II from committing future violations of the statutes they violated.  (SEC Br.

(Dkt. No. 622) at 30)

   Section 20(b) of the Securities Act provides that "[w]henever it shall appear to the

Commission that any person is engaged or is about to engage in acts or practices constituting a

violation of any provision of this chapter . . . [the SEC] may, in its discretion, bring an action in

[federal court] to enjoin such acts or practices, and upon a proper showing a permanent or

temporary injunction or restraining order shall be granted without bond."  15 U.S.C § 77t(b).

Section 209(d) of the Investment Advisers Act contains an identical provision.  Id. § 80b-9(d).

"A permanent injunction is 'a drastic remedy' and should not be granted lightly, especially when

the conduct has ceased."  SEC v. Steadman, 967 F.2d 636, 648 (D.C. Cir. 1992)) (quoting 1 T.

Hazen, The Law of Securities Regulation § 9.5, at 400 (2d ed. 1990)).

> "'To award such relief, a court must look beyond the mere facts of past violations

and demonstrate a realistic likelihood of recurrence, but fraudulent past conduct gives rise to an

inference of a reasonable expectation of continued violations.'"  SEC v. Opulentica, LLC, 479 F.

Supp. 2d 319, 329 (S.D.N.Y. 2007) (quoting SEC v. Platinum Inv. Corp., No. 02 Civ.

6093(JSR), 2006 WL 2707319, at *4 (S.D.N.Y. Sept.20, 2006)); see also Commonwealth Chem.

Sec., Inc., 574 F.2d at 99 (an injunction is appropriate when "the defendant's past conduct

indicates . . . that there is a reasonable likelihood of further violation in the future"); SEC v.

Monarch Fund, 608 F.2d 938, 943-44 (2d Cir. 1979) (reversing district court's grant of injunctive

relief where the SEC failed to show likelihood of recurrence).

> In determining whether a permanent injunction is appropriate, a court should

consider

> > the fact that defendant has been found liable for illegal conduct; the degree of
> > scienter involved; whether the infraction is an "isolated occurrence;" whether
> > defendant continues to maintain that his past conduct was blameless; and whether,
> > because of his professional occupation, the defendant might be in a position
> > where future violations could be anticipated.

Commonwealth Chem. Sec., 574 F.2d at 100.  A jury's liability findings do not by themselves

provide an adequate basis for granting permanent injunctive relief:  the Second Circuit has

emphasized "the need for the SEC to go beyond the mere facts of past violations and

demonstrate a realistic likelihood of recurrence."  Id. (citation omitted).

Here, the SEC argues that all of the relevant factors weigh in favor of granting permanent injunctive relief.  First, the Commission argues that while the jury's finding that RMCI and Resrv Partners acted with scienter is relevant, an injunction can properly issue against defendants without regard to their level of scienter, where they commit non-scienter-based violations.  (SEC Br. (Dkt. No. 622) at 31-32); see Aaron v. SEC, 446 U.S. 680, 702 (1980) ("[T]he Commission need not establish scienter as an element of an action to enjoin violations of § 17(a)(2) and § 17(a)(3) of the 1933 Act."); First Jersey Sec., 101 F.3d at 1467 ("Scienter . . . need not be established for the SEC to obtain an injunction under of §§ 17(a)(2) or (3)."). Second, the Commission argues that Defendants' violations were not an "isolated occurrence," pointing to two prior violations committed by RMCI in 1978 and 1980, as well as deficiency letters involving inaccurate record-keeping in 2005 and 2006.  (SEC Br. (Dkt. No. 622) at 36-37; SEC Reply (Dkt. No. 624) at 24-26)  Third, the Commission argues that Defendants have not acknowledged their wrongdoing.  (SEC Br. (Dkt. No. 622) at 37-39; SEC Reply (Dkt. No. 624) at 23-24)  Finally, the Commission argues that "Defendants will have every opportunity to commit future violations," even though they are no longer "functioning as registered investment advisers or broker dealers."  (SEC Br. (Dkt. No. 622) at 39)

The Court concludes that a permanent injunction is not warranted against any of the defendants.  RMCI and Resrv Partners are defunct entities and are not reasonably likely to commit future violations.  Given that these entities operated for several decades without any significant regulatory sanction, the Court further concludes that the infractions here are "isolated occurrence[s]."  Commonwealth Chem. Sec., 574 F.2d at 100.  While the Commission points to two violations committed more than thirty years ago to argue that RMCI is a repeat offender (see SEC Br. (Dkt. No. 622) at 36-37), neither case involved "the same or similar . . . illegal

conduct." <u>SEC v. Colonial Inv. Mgmt. LLC</u>, No. 07 Civ. 8849 (PKC), 2008 WL 2191764, at *4

(S.D.N.Y. May 23, 2008).[11]  Because the "Commission has adduced no positive proof aside from

Defendants' past alleged wrongdoing to suggest 'some cognizable danger of recurrent

violation,'" an injunction is not warranted against RMCI or Resrv Partners.  <u>Jones</u>, 476 F. Supp.

2d at 384 (quoting <u>SEC v. Culpepper</u>, 270 F.2d 241, 250 (2d Cir. 1959)).

　　　　　As for Bent II, while a finding of scienter is not a prerequisite for injunctive relief,

cases in which injunctions have been issued against individuals who have engaged in merely

negligent conduct have generally involved more pervasive and repeated misconduct than that at

issue here.  <u>See</u>, <u>e.g.</u>, <u>SEC v. Verdiramo</u>, 890 F. Supp. 2d 257, 261 (S.D.N.Y. 2011) (imposing

injunction against future violations of Section 5 of the Securities Act based on repeated negligent

conduct involving trades "in unregistered transactions on fifteen separate occasions"); <u>SEC v.</u>

<u>Moran</u>, 944 F. Supp. 286, 294 (S.D.N.Y. 1996) (noting "business practice indicating a lack of

vigilance").

　　　　　Here, Bent II's negligent conduct took place over a period of less than 36 hours,

and the Commission has offered no evidence that he had a track record of such misconduct.  <u>See</u>

<u>Moran</u>, 944 F. Supp. at 294.  "[T]he record does not reveal [Bent II's misconduct] to be so

pervasively characteristic of [his] method of doing business as to indicate that he will continue to

---

[11]  The 1980 administrative proceeding involved a claim that RMCI, Bent Sr., and other Reserve
entities "did not specifically disclose problems concerning computer and telephone malfunctions
affecting the ability of Reserve to consistently make same-day payments upon redemption of its
shares." <u>In re Reserve Mgmt. Corp., Reserve Mgmt. Co., Henry B.R. Brown and Bruce R. Bent</u>,
Release No. IC-11394, IA-733, 1980 WL: 20755, at *1 (Oct. 10, 1980).  The 1977 proceeding
appears to be based on allegations that Bent Sr. and his then-colleague Henry Brown violated
certain provisions of the Investment Company Act; it further appears that the two accepted a
suspension and a waiver of $1.4 million in advisory fees as part of a settlement.  <u>See Reserve</u>
<u>Mgmt. Corp. v. Anchor Daily Income Fund, Inc</u>., 459 F. Supp. 597, 600 (S.D.N.Y. 1978)
(describing settlement).  The SEC has not demonstrated that either violation involves conduct
similar to that at issue here.

violate the securities laws unless an injunction is issued." <u>SEC v. O'Meally</u>, No. 06 Civ. 6483

(LTS), 2013 WL 878631, at *2 (S.D.N.Y. Mar. 11, 2013).

   Moreover, this case represents Bent II's first securities law violation, a factor

"relevant to a determination of whether there is a reasonable likelihood that [Bent II] will

commit [future] violations if not enjoined." <u>SEC v. DiBella</u>, No. 04 Civ. 1342 (EBB), 2008 WL

6965807, at *13 (D. Conn. Mar. 13, 2008) (citing <u>Jones</u>, 476 F. Supp. 2d at 384). "Given that

the SEC has not offered proof of other violations committed by [Bent II], this Court must

conclude that the [this] episode . . . was an 'isolated occurrence.'" <u>SEC v. Jadidian</u>, No. 08 Civ.

8079 (PGG), 2011 WL 1327245, at *6 (S.D.N.Y. Mar. 31, 2011). Finally, Bent II has left the

investment field, and it appears unlikely that he will be in a position to violate securities laws in

the future. (<u>See</u> Feb. 13, 2013 Janghorbani Decl., Ex. J (press release indicating that Bent II now

works in patent licensing))

   The Court concludes that the SEC has not demonstrated that injunctive relief is

appropriate as to any of the Defendants.

<u>**CONCLUSION**</u>

   For the reasons stated above, the Commission's motion for judgment as a matter

of law and for a new trial is DENIED. Defendants' motion for judgment as a matter of law is

DENIED. Defendants' motion to amend the Judgment is GRANTED to the extent that the Court

will issue an Amended Judgment indicating that Bent II, RMCI, and Resrv Partners violated

Section 17(a)(2) <u>or</u> (3) of the Securities Act. The motion to amend is otherwise DENIED.

   The Commission's motion for disgorgement is DENIED. A civil penalty of

$325,000 is imposed on RMCI, and a civil penalty of $325,000 is also imposed on Resrv

Partners. A $100,000 civil penalty is imposed on Bent II. The Commission's motion for a permanent injunction against Defendants RMCI, Resrv Partners, and Bent II is DENIED.

The Clerk of Court is directed to terminate the motions (Dkt. Nos. 616, 617) and to close this case.

Dated: New York, New York
       September 30, 2013

SO ORDERED.

Paul G. Gardephe
United States District Judge